# United States Court of Appeals
## For the First Circuit

No. 25-1667

GARY CIFIZZARI
Plaintiff - Appellant

v.

TOWN OF MILFORD; VINCENT LIBERTO, former Milford Police
Officer; JOHN CHIANESE, former Milford Police Officer; TODD A.
GATTONI, as personal representative of the Estate of Anthony Digirolamo;
FRANCIS X. SMALL, as personal representative of the Estate of Donald
Small,
Defendants - Appellees,

JOHN AND JANE DOES 1-20,
Defendants.

Appeal from the United States District Court
for the District of Massachusetts
Case No. 4:22-cv-40139-MRG

## RECORD APPENDIX
## VOLUME I OF VI
## (RA 1-713)

Jon Loevy
Steve Art
Mark Loevy-Reyes, BBO# 707974
LOEVY + LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
P: (312) 243-5900
F: (312) 243-5902
jon@loevy.com

October 29, 2025

# RECORD APPENDIX
# TABLE OF CONTENTS

**VOLUME I**

Docket Entries.................................................................................... RA 1

Amended Complaint [ECF 65] ........................................................... RA 17

Defendants' Motion for Summary Judgment, with Incorporated
Memorandum of Law [ECF 117]........................................................ RA 46

Defendants' Joint Local Rule 56.1 Concise Statement of Undisputed
Material Facts in Support of Summary Judgment [ECF 118] .........................RA 111

Defendants' Index to Record Appendix [ECF 118-1]...................................... RA 152

    Exhibits 1-9 [ECF 120]........................................................... RA 154

**VOLUME 2**

    Exhibits 10-38 [ECF 120-1] ................................................................ RA 714

**VOLUME 3**

Plaintiff's Response to Defendants' Joint Local Rule 56.1 Concise
Statement of Undisputed Material Facts [ECF 122]..................................... RA 1214

Plaintiff's Statement of Material Facts [ECF 123] ...................................... RA 1287

Plaintiff's Exhibits in Opposition to Defendants' Motion for Summary
Judgment [ECF. 124] ....................................................................... RA 1320

    Exhibit 1 - Com. v. Gary Cifizzari, Criminal Trial Transcript,
    Vol. 5, July 27, 1984 [ECF 124-1]...................................................... RA 1324

    Exhibit 2 - Com. v. Michael Cifizzari, Criminal Trial Transcript,
    September 21-22, 1983 [ECF 124-2] .................................................... RA 1458

Exhibit 3 - Com. v. Michael Cifizzari, Motion to Suppress Transcript [ECF 124-3].............................................................. RA 1707

Exhibit 4 - Com. v. Gary Cifizzari, Criminal Trial Transcript, Vol. 4, July 26, 1984 [ECF 124-4].............................................. RA 1753

Exhibit 5 - Com. v. Michael Cifizzari, Grand Jury Transcript [ECF124-5] ........................................................................... RA 1760

Exhibit 6 - MSP Case Report, October 11, 1979 [ECF 124-6] .......... RA 1764

Exhibit 7 - Com. v. Gary Cifizzari, Criminal Trial Transcript, Vol. 2, July 24, 1984 [ECF 124-7]........................................... RA 1778

## VOLUME 4

Exhibit 8 - MPD Report, October 5, 1979 RE Kathy Duncan [ECF 124-8] .......................................................................... RA 1819

Exhibit 9 - MPD Report (Small), September 30, 1979 RE Kathy Duncan [ECF 124-9].................................................................. RA 1821

Exhibit 10 - MPD Report (Liberto), October 2, 1979 RE Lindsey [ECF 124-10] ........................................................................ RA 1824

Exhibit 11 - Giroux Milford, MA Arrests [ECF 124-11] ................... RA 1826

Exhibit 12 - Giroux RI Criminal History [ECF 124-12].................... RA 1831

Exhibit 13 - Plaintiff Information MA DOC [ECF 124-13]............... RA 1867

Exhibit 14 - Com. v. Gary Cifizzari, Criminal Trial Transcript, Vol. 3, July 25, 1984 [ECF 124-14]...................................... RA 1869

Exhibit 15 - FBI 2013 Memo Regarding Michael Giroux [ECF 124-15]........................................................................ RA 1994

Exhibit 16 - Com. v. Gary Cifizzari, Grand Jury Transcript [ECF 124-16]........................................................................ RA 1998

Exhibit 17 - Deposition Transcript, Cifizzari v. Town of Milford, et al., Mary Ellen Auger [ECF 124-17] .................................................... RA 2003

Exhibit 18 - Deposition Transcript, Cifizzari v. Town of Milford, et al., Defendant Chianese [ECF 124-18] ........................................... RA 2021

Exhibit 19 - Deposition Transcript, Cifizzari v. Town of Milford, et al., David Giroux [ECF 124-19] ..................................................... RA 2032

Exhibit 20 - Affidavit of David Giroux, Cifizzari v. Town of Milford, et al., [ECF 124-20] ................................................................ RA 2049

Exhibit 21 - Deposition Transcript, Cifizzari v. Town of Milford, et al., Thomas Greene [ECF 124-21] ................................................... RA 2054

Exhibit 22 - Deposition Transcript, Cifizzari v. Town of Milford, et al., Brian Harris [ECF 124-22] ....................................................... RA 2077

Exhibit 23 - Documents related to Michael Giroux Informant Activity [ECF 124-23] ................................................................... RA 2087

Exhibit 24 - Deposition Transcript, Cifizzari v. Town of Milford, et al., Lawrence Murphy [ECF 124-24] ............................................ RA 2112

Exhibit 25 - CORI for Michael Giroux [ECF 124-25] ...................... RA 2151

Exhibit 26 - Michael Giroux's Path on Night of Murder [ECF 124-26] ................................................................................. RA 2160

Exhibit 27 - Michael Giroux October 5, 1979 Interview Notes [ECF 124-27] ................................................................................. RA 2162

Exhibit 28 - Michael Giroux October 24, 1979 Interview Notes [ECF 124-28] ................................................................................. RA 2165

Exhibit 29 - Michael Giroux Murder Conviction [ECF 124-29] ....... RA 2167

Exhibit 30 - February 27, 1981-Report by Dr. Robeson [ECF 124-30] ................................................................................. RA 2169

Exhibit 31 - March 13, 1981 Evaluation [ECF 124-31]...................... RA 2171

Exhibit 32 - July 20, 1981 Evaluation [ECF 124-32]......................... RA 2177

Exhibit 33 - September 25, 1981 Evaluation [ECF 124-33] .............. RA 2183

Exhibit 34 - Deposition Transcript, Cifizzari v. Town of Milford,
et al., Daniel Sullivan [ECF 124-34] ................................................. RA 2185

Exhibit 35 - Chianese Interview of Robert Cananzey,
February 26, 1981 [ECF 124-35] ........................................................ RA 2206

Exhibit 36 - Deposition Transcript, Cifizzari v. Town of Milford,
et al., Thomas O'Lauglin (FED. R. CIV. P. 30(b)(6) for Town of
Milford [ECF 124-36] ......................................................................... RA 2208

Exhibit 37 - Deposition Transcript, Cifizzari v. Town of Milford,
et al., FED. R. CIV. P. 30(b)(6) for Town of Milford
[ECF 124-37] ....................................................................................... RA 2269

Exhibit 38 - Cifizzari v. Town of Milford et al., FED. R. CIV. P.
30(b)(6) Notice to the Town of Milford [ECF 124-38]...................... RA 2274

Exhibit 39 - 1977 Rescission of Discipline for Defendant Small
[ECF 124-39] ....................................................................................... RA 2286

Exhibit 40 - 1981 Milford Police Department Analysis
[ECF 124-40] ....................................................................................... RA 2289

## VOLUME 5

Exhibit 41 - MPI 1985 Model Policies for Milford Police
Department [ECF 124-41] .................................................................. RA 2432

Exhibit 42 - Defendant Town of Milford Response to Plaintiff's
First Set of Interrogatories [ECF 124-42] ......................................... RA 2459

Exhibit 43 - Plaintiff's Rule 26(a)(2) Disclosures and Reports
[ECF124-43] ........................................................................................ RA 2479

**VOLUME 6**

Exhibit 44 - February 18, 2019-Bode Report [ECF 124-44] ............. RA 2728

Exhibit 45 - DiGirolamo February 26, 1981 Report [ECF 124-45].................................................................. RA 2731

Exhibit 46 - Letter from MSP John McKiernan to Greene [ECF 124-46].................................................................. RA 2733

Exhibit 47 - Handwritten Miranda Copy [ECF 124-47] .................... RA 2740

Exhibit 48 - Michael Cifizzari first person "statement" [ECF 124-48].................................................................. RA 2745

Exhibit 49 - Michael Cifizzari first person "statement" [ECF 124-49].................................................................. RA 2748

Exhibit 50 - Michael Cifizzari third person "statement" [ECF 124-50].................................................................. RA 2754

Exhibit 51 - Endorsement Allowing Motion for New Trial [ECF 124-51].................................................................. RA 2757

Exhibit 52 - Nolle Prosequi [ECF 124-52]...................................... RA 2760

Exhibit 53 - Plaintiff's 2003 Request for DNA Testing [ECF 124-53].................................................................. RA 2762

Exhibit 54 - MPD Report (Small), September 30, 1979 RE Halkett [ECF 124-54] ....................................................... RA 2772

Exhibit 55 - Com. v. Gary Cifizzari, Criminal Trial Transcript, Vol. 6, July 30, 1984 [ECF 124-55]...................................... RA 2774

Exhibit 56 - Providence Journal Article: Lawyers: DNA Points to R.I. Man in 1979 Murder [ECF 124-56] ....................................... RA 2783

Exhibit 57 - Boston Globe Article [ECF 124-57]............................... RA 2787

Plaintiff's Opposition to Defendants' Motion for Summary Judgment
[ECF 127]...................................................................................... RA 2829

Defendants' Reply Memorandum Supporting Town of Milford
Defendants' Motion for Summary Judgment [ECF 130] ............................ RA 2917

Show Cause Order [ECF 136] ................................................... RA 2929

Defendants' Supplemental Memorandum Addressing the Court's
Inquiries in Support of Summary Judgment [ECF 137].............................. RA 2931

Plaintiff's Supplemental Memorandum in Opposition to Defendants'
Motion for Summary Judgment [ECF 138]................................................. RA 2937

Order on Defendants' Motion for Summary Judgment [ECF 141] .............. RA 2943

Transcript of Motion Hearing held on June 6, 2025 [ECF 147]................... RA 2978

Testimony by Robert Cananzey from Michael Cifizzari's trial ................... RA 2980

# United States District Court
## District of Massachusetts (Worcester)
## CIVIL DOCKET FOR CASE #: 4:22-cv-40139-MRG

Cifizzari v. Town of Milford et al

Assigned to: District Judge Margaret R. Guzman

Case in other court: USCA - First Circuit, 25-01667

Cause: 42:1983 Civil Rights Act

Date Filed: 11/29/2022

Date Terminated: 07/09/2025

Jury Demand: Both

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

**Plaintiff**

**Gary Cifizzari**                                     represented by    **Eva M. Badway**

Attorney General's Office

Room 2019

One Ashburton Place

Boston, MA 02108-1698

617-727-2200 x2824

Fax: 671-727-5755

Email: eva.badway@mass.gov

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**William S. Smith**

The Law Office of William S. Smith

206 Worcester Road

PO Box 585

Princeton, MA 01541

774-317-9287

Fax: 508-267-0500

Email: holdenattorney@gmail.com

*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Jon Loevy**

Loevy & Loevy

311 N. Aberdeen

Third Floor

Chicago, IL 60607

312-243-5900

Email: jon@loevy.com

*ATTORNEY TO BE NOTICED*

**Mark Loevy Reyes**

Loevy & Loevy

311 N. Aberdeen Street

3rd Floor

Chicago, IL 60607

RA 1

(312) 243-5900
Email: mark@loevy.com
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Town of Milford**                                   represented by   **William B. Scarpelli**
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210
617-737-8886
Fax: 617-342-4957
Email: wscarpelli@morrisonmahoney.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian W. Murray**
Town of Milford
Legal Department
52 Main Street
Milford, MA 01757
508-634-2302
Fax: 508-634-2324
Email: bmurray@townofmilford.com
*TERMINATED: 05/30/2023*
*ATTORNEY TO BE NOTICED*

**Joseph H. Caffrey**
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210-1181
617-737-8894
Fax: 617-342-4826
Email: jcaffrey@morrisonmahoney.com
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Vincent Liberto**                                   represented by   **William B. Scarpelli**
*Former Milford Police Officer*                                       (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph H. Caffrey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**John Chianese**                                     represented by   **William B. Scarpelli**
*Former Milford Police Officer*                                       (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

RA 2

Joseph H. Caffrey
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Anthony Digirolamo**                          represented by **William B. Scarpelli**
*Former Milford Police Sgt.*                                   (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Joseph H. Caffrey**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**Donald Small**                                represented by **William B. Scarpelli**
*Former Milford Police Sgt.*                                   (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Joseph H. Caffrey**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**John and Jane Does 1-20**

**Defendant**

**Todd A. Gattoni**                             represented by **Joseph H. Caffrey**
*as personal representative of the Estate of*                  (See above for address)
*ANTHONY DIGIROLAMO*                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Francis X. Small**                            represented by **Joseph H. Caffrey**
*as personal representative of the Estate of*                  (See above for address)
*DONALD SMALL*                                                 *ATTORNEY TO BE NOTICED*

**Interested Party**

**Worcester District Attorney's Office**        represented by **Eva M. Badway**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/29/2022 | 1 | COMPLAINT against All Defendants filed by Gary Cifizzari. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Barrows, Jennifer) (Entered: 11/30/2022) |
| 11/30/2022 | 2 | NOTICE issued to Attorney William S. Smith regarding mandatory use of ECF in compliance with Local Rule 5.4. Failure to comply may result in the imposition of sanctions. (Barrows, Jennifer) (Entered: 11/30/2022) |

| | | |
|---|---|---|
| 11/30/2022 | 3 | ELECTRONIC NOTICE of Case Assignment. District Judge Leo T. Sorokin assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge David H. Hennessy. (Finn, Mary) (Entered: 11/30/2022) |
| 12/06/2022 | 4 | Filing fee/payment: $ 402.00, receipt number 100001299 for 1 Complaint (Barbosa, Nilsa) (Entered: 12/06/2022) |
| 12/06/2022 | 5 | Summons Issued as to John and Jane Does 1-20, John Chianese, Anthony Digirolamo, Vincent Liberto, Donald Small, Town of Milford. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Dore, Samantha) (Entered: 12/06/2022) |
| 03/16/2023 | 6 | ELECTRONIC NOTICE of Reassignment. Judge Margaret R. Guzman added. District Judge Leo T. Sorokin no longer assigned to case. (Danieli, Chris) (Entered: 03/16/2023) |
| 03/17/2023 | 7 | SUMMONS Returned Executed Town of Milford served on 2/24/2023, answer due 3/17/2023. (Smith, William) Modified text on 3/22/2023 (Barrows, Jennifer). (Entered: 03/17/2023) |
| 03/23/2023 | 8 | NOTICE of Appearance by Brian W. Murray on behalf of Town of Milford (Murray, Brian) (Entered: 03/23/2023) |
| 03/23/2023 | 9 | Joint MOTION for Extension of Time to May 19, 2023 to File Answer re 1 Complaint by Town of Milford.(Murray, Brian) (Entered: 03/23/2023) |
| 03/24/2023 | 10 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting 9 Motion for Extension of Time to Answer. John and Jane Does 1-20 answer due 5/19/2023; John Chianese answer due 5/19/2023; Anthony Digirolamo answer due 5/19/2023; Vincent Liberto answer due 5/19/2023; Donald Small answer due 5/19/2023; Town of Milford answer due 5/19/2023. (Castles, Martin) (Entered: 03/24/2023) |
| 05/19/2023 | 11 | NOTICE of Appearance by Joseph H. Caffrey on behalf of Anthony Digirolamo, Vincent Liberto, Donald Small, Town of Milford (Caffrey, Joseph) (Entered: 05/19/2023) |
| 05/19/2023 | 12 | NOTICE of Appearance by Joseph H. Caffrey on behalf of John Chianese (Caffrey, Joseph) (Entered: 05/19/2023) |
| 05/19/2023 | 13 | ANSWER to 1 Complaint with Jury Demand by Town of Milford.(Caffrey, Joseph) (Entered: 05/19/2023) |
| 05/19/2023 | 14 | ANSWER to 1 Complaint with Jury Demand by John Chianese.(Caffrey, Joseph) (Entered: 05/19/2023) |
| 05/19/2023 | 15 | ANSWER to 1 Complaint with Jury Demand by Anthony Digirolamo.(Caffrey, Joseph) (Entered: 05/19/2023) |
| 05/19/2023 | 16 | ANSWER to 1 Complaint with Jury Demand by Vincent Liberto.(Caffrey, Joseph) (Entered: 05/19/2023) |
| 05/19/2023 | 17 | ANSWER to 1 Complaint with Jury Demand by Donald Small.(Caffrey, Joseph) (Entered: 05/19/2023) |
| 05/26/2023 | 18 | NOTICE of Withdrawal of Appearance by Brian W. Murray (Murray, Brian) (Entered: 05/26/2023) |
| 05/26/2023 | 19 | NOTICE of Scheduling Conference. Scheduling Conference set for 6/21/2023 11:15 AM in Courtroom 2 - Worcester (Remote only) before District Judge Margaret R. Guzman. |

| | | |
|---|---|---|
| | | (Castles, Martin) (Entered: 05/26/2023) |
| 05/26/2023 | 20 | SUGGESTION OF DEATH Upon the Record as to Anthony Digirolamo by Anthony Digirolamo. (Caffrey, Joseph) (Entered: 05/26/2023) |
| 05/26/2023 | 21 | SUGGESTION OF DEATH Upon the Record as to Donald Small by Donald Small. (Caffrey, Joseph) (Entered: 05/26/2023) |
| 05/30/2023 | 22 | SUGGESTION OF DEATH Upon the Record *of Vincent Liberto* by Vincent Liberto. (Caffrey, Joseph) (Entered: 05/30/2023) |
| 06/06/2023 | 23 | NOTICE of Appearance by William B. Scarpelli on behalf of Anthony Digirolamo, Vincent Liberto, Donald Small, Town of Milford (Scarpelli, William) (Entered: 06/06/2023) |
| 06/06/2023 | 24 | NOTICE of Appearance by William B. Scarpelli on behalf of John Chianese (Scarpelli, William) (Entered: 06/06/2023) |
| 06/07/2023 | 25 | *Amended* ANSWER to 1 Complaint with Jury Demand by John Chianese.(Caffrey, Joseph) (Entered: 06/07/2023) |
| 06/07/2023 | 26 | AMENDED ANSWER to *Plaintiff's* 1 Complaint by Anthony Digirolamo. (Caffrey, Joseph) (Entered: 06/07/2023) |
| 06/07/2023 | 27 | AMENDED ANSWER to *Plaintiff's* 1 Complaint by Vincent Liberto. (Caffrey, Joseph) (Entered: 06/07/2023) |
| 06/07/2023 | 28 | AMENDED ANSWER to *Plaintiff's* 1 Complaint by Donald Small. (Caffrey, Joseph) (Entered: 06/07/2023) |
| 06/07/2023 | 29 | AMENDED ANSWER to *Plaintiff's* 1 Complaint by Town of Milford. (Caffrey, Joseph) (Entered: 06/07/2023) |
| 06/14/2023 | 30 | Joint Statement NOTICE by John Chianese, Anthony Digirolamo, Vincent Liberto, Donald Small, Town of Milford re 19 Notice of Scheduling Conference (Caffrey, Joseph) Modified on 6/15/2023 (Castles, Martin). (Entered: 06/14/2023) |
| 06/15/2023 | 31 | CERTIFICATION pursuant to Local Rule 16.1 by John Chianese.(Caffrey, Joseph) (Entered: 06/15/2023) |
| 06/16/2023 | 32 | CERTIFICATION pursuant to Local Rule 16.1 *(D)(3)*. (Caffrey, Joseph) (Entered: 06/16/2023) |
| 06/19/2023 | 33 | First CERTIFICATION pursuant to Local Rule 16.1 *(D)(3)* by Gary Cifizzari.(Smith, William) (Entered: 06/19/2023) |
| 06/21/2023 | 34 | Electronic Clerk's Notes for proceedings held before District Judge Margaret R. Guzman: Scheduling Conference held on 6/21/2023, Case called, Counsel appear by video-conference for scheduling conference, Court adopts the parties joint statement as the scheduling order, Electronic scheduling order to issue, (Court Reporter: Valerie OHara at vaohara@gmail.com)(Attorneys present: Smith/Caffrey,Scarpelli) (Castles, Martin) (Entered: 06/21/2023) |
| 06/21/2023 | 35 | District Judge Margaret R. Guzman: ORDER entered. ELECTRONIC SCHEDULING ORDER: Status Conference set for 1/11/2024 at 2:15 PM in Courtroom 2 - Worcester (Remote only) before District Judge Margaret R. Guzman. Fact Discovery to be completed by 6/21/2024, dispositive Motions due by 10/31/2024,(Castles, Martin) (Entered: 06/21/2023) |

| | | |
|---|---|---|
| 08/02/2023 | 36 | NOTICE of Appearance by Mark Loevy Reyes on behalf of Gary Cifizzari (Reyes, Mark) (Entered: 08/02/2023) |
| 08/10/2023 | 37 | MOTION for Leave to Appear Pro Hac Vice for admission of Jon Loevy Filing fee: $ 125, receipt number AMADC-9986078 by Gary Cifizzari. (Attachments: # 1 Exhibit A. Affidavit of Jon Loevy)(Reyes, Mark) (Entered: 08/10/2023) |
| 08/11/2023 | 38 | Assented to MOTION for entry of Stipulated and HIPAA qualified Protective Order by Gary Cifizzari. (Attachments: # 1 Exhibit 1)(Reyes, Mark) (Entered: 08/11/2023) |
| 08/14/2023 | 39 | MOTION to Appoint and Substitute Personal Representatives for Deceased Defendants by Gary Cifizzari.(Reyes, Mark) (Entered: 08/14/2023) |
| 08/14/2023 | 40 | MEMORANDUM in Support re 39 MOTION to Appoint and Substitute Personal Representatives for Deceased Defendants filed by Gary Cifizzari. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Reyes, Mark) (Entered: 08/14/2023) |
| 08/14/2023 | 41 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting 37 Motion for Leave to Appear Pro Hac Vice Added Jon Loevy. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (Burgos, Sandra) (Entered: 08/14/2023) |
| 08/16/2023 | 42 | NOTICE of Appearance by Jon Loevy on behalf of Gary Cifizzari (Loevy, Jon) (Entered: 08/16/2023) |
| 08/16/2023 | 43 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting 38 Motion for entry of Stipulated HIPPA Confidentiality Order. (Castles, Martin) (Entered: 08/16/2023) |
| 08/16/2023 | 44 | District Judge Margaret R. Guzman: ORDER entered. STIPULATED AND HIPPA QUALIFIED PROTECTIVE ORDER.(Castles, Martin) (Entered: 08/16/2023) |
| 08/24/2023 | 45 | NOTICE by Gary Cifizzari re 39 MOTION to Appoint and Substitute Personal Representatives for Deceased Defendant *Anthony DiGirolamo and Donald Small* (Reyes, Mark) (Entered: 08/24/2023) |
| 08/28/2023 | 46 | Opposition re 39 MOTION to Appoint and Substitute Personal Representatives for Deceased Defendant filed by Town of Milford. (Caffrey, Joseph) (Entered: 08/28/2023) |
| 08/31/2023 | 47 | MOTION for Leave to File *a Reply in Support of Motion to Substitute and Appoint Representatives, Unopposed* by Gary Cifizzari.(Reyes, Mark) (Entered: 08/31/2023) |
| 08/31/2023 | 48 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting 47 Motion for Leave to File Reply. (Castles, Martin) (Entered: 08/31/2023) |
| 08/31/2023 | 49 | Joint MOTION for access to certain individuals' criminal offender record information by Gary Cifizzari. (Attachments: # 1 Text of Proposed Order)(Reyes, Mark) (Entered: 08/31/2023) |

| | | |
|---|---|---|
| 08/31/2023 | 50 | Joint MOTION for Leave to File *proposed order to Motion for access to certain individuals' criminal offender record information under seal* by Gary Cifizzari.(Reyes, Mark) (Entered: 08/31/2023) |
| 09/01/2023 | 51 | Joint MOTION FOR ACCESS TO CERTAIN INDIVIDUALS CRIMINAL OFFENDER RECORD INFORMATION *(Corrected)* by Gary Cifizzari.(Reyes, Mark) (Entered: 09/01/2023) |
| 09/05/2023 | 52 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered finding as moot 49 Motion for access to certain individuals' criminal offender record information. (Burgos, Sandra) (Entered: 09/05/2023) |
| 09/05/2023 | 53 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting 50 Joint MOTION for Leave to File proposed order to Motion for access to certain individuals' criminal offender record information under seal. Counsel will receive an email within twenty-four (24) hours of this order with instructions for submitting sealed documents for which leave has been granted in accordance with the Local Rules of the U.S. District Court of Massachusetts. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Burgos, Sandra) (Entered: 09/05/2023) |
| 09/07/2023 | 54 | SEALED Proposed Order to 50 Joint Motion for access to certain individuals' criminal offender record information.(Barrows, Jennifer) Modified on 9/7/2023 (Barrows, Jennifer). (Entered: 09/07/2023) |
| 09/07/2023 | 55 | REPLY to Response to 39 MOTION to Appoint and Substitute Personal Representatives for Deceased Defendant *, in support of* filed by Gary Cifizzari. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Reyes, Mark) (Entered: 09/07/2023) |
| 09/12/2023 | 56 | MOTION for Leave to File *Sur-Reply Memorandum To Plaintiffs Motion To Substitute And Appoint Representatives* by Town of Milford.(Caffrey, Joseph) (Entered: 09/12/2023) |
| 09/18/2023 | 57 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting 56 Motion for Leave to File Sur-Reply. (Castles, Martin) (Entered: 09/18/2023) |
| 09/18/2023 | 58 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting 51 Motion FOR ACCESS TO CERTAIN INDIVIDUALS CRIMINAL OFFENDER RECORD INFORMATION. (Castles, Martin) (Entered: 09/18/2023) |
| 09/18/2023 | 59 | District Judge Margaret R. Guzman: ORDER entered REGARDING RELEASE OF CORI AND NATIONAL CRIME INFORMATION CENTERS RECORDS. (Castles, Martin) (Entered: 09/18/2023) |
| 09/25/2023 | 60 | SUR-REPLY to Motion re 39 MOTION to Appoint and Substitute Personal Representatives for Deceased Defendant filed by Town of Milford. (Caffrey, Joseph) (Entered: 09/25/2023) |
| 01/03/2024 | 61 | ELECTRONIC NOTICE OF RESCHEDULING. Status Conference reset for 1/16/2024 at 2:30 PM in Courtroom 2 - Worcester (Remote only) before District Judge Margaret R. Guzman. (Castles, Martin) (Entered: 01/03/2024) |
| 01/10/2024 | 62 | ELECTRONIC NOTICE OF RESCHEDULING. Status Conference reset for 2/12/2024 at 2:15 PM in Courtroom 2 - Worcester (Remote only) before District Judge Margaret R. Guzman. <br><br> This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible. |

| | | |
|---|---|---|
| | | Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(Castles, Martin) (Entered: 01/10/2024) |
| 02/12/2024 | 63 | Electronic Clerk's Notes for proceedings held before District Judge Margaret R. Guzman: Status Conference held on 2/12/2024, Case called, Counsel appear by video-conference for status conference, Parties inform the Court that fact discovery is ongoing and on track, Court informs parties a ruling on the pending motion will be resolved shortly, Court sets a further status conference, ( Status Conference set for 4/26/2024 at 2:00 PM in Courtroom 2 - Worcester (Remote only) before District Judge Margaret R. Guzman), (Court Reporter: Marianne Kusa Ryll at justicehill@aol.com.)(Attorneys present: Loevy Reyes/Caffrey,Scarpelli) (Castles, Martin) (Entered: 02/12/2024) |
| 02/29/2024 | 64 | District Judge Margaret R. Guzman: ORDER entered granting in part 39 Motion to Substitute Party. For the reasons stated, this motion is GRANTED IN PART. Plaintiff must amend his complaint within 30 days of this order should he seek to continue his claims against Defendants DiGirolamo and Small by naming their personal representatives in their stead. Service of process must be made on the parties consistent with this order within 14 days of the filing of the amended complaint. (Castles, Martin) (Entered: 02/29/2024) |
| 03/08/2024 | 65 | AMENDED COMPLAINT against Donald Small, Vincent Liberto, John and Jane Does 1-20, Town of Milford, John Chianese, Anthony Digirolamo, Todd A. Gattoni, Francis X. Small, filed by Gary Cifizzari.(Reyes, Mark) (Entered: 03/08/2024) |
| 03/11/2024 | 66 | Summons Issued as to Todd A. Gattoni, Francis X. Small. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Burgos, Sandra) (Entered: 03/11/2024) |
| 03/18/2024 | 67 | WAIVER OF SERVICE Returned Executed by Gary Cifizzari. Vincent Liberto waiver sent on 3/18/2024, answer due 5/17/2024. (Reyes, Mark) (Entered: 03/18/2024) |
| 03/21/2024 | 68 | SUMMONS Returned Executed Todd A. Gattoni served on 3/21/2024, answer due 4/11/2024. (Reyes, Mark) (Entered: 03/21/2024) |
| 03/21/2024 | 69 | SUMMONS Returned Executed Francis X. Small served on 3/19/2024, answer due 4/9/2024. (Reyes, Mark) (Entered: 03/21/2024) |
| 03/28/2024 | 70 | *Defendant Town of Milford's Answer, Affirmative Defenses and Jury Demand* ANSWER to 65 Amended Complaint by Town of Milford.(Caffrey, Joseph) (Entered: 03/28/2024) |
| 03/28/2024 | 71 | *Answer, Affirmative Defenses and Jury Demand of Defendant John Chianese* ANSWER to 65 Amended Complaint by John Chianese.(Caffrey, Joseph) (Entered: 03/28/2024) |
| 04/09/2024 | 72 | ANSWER to 65 Amended Complaint *Answer, Affirmative Defenses And Jury Demand Of Defendant, Francis X. Small As Personal Representative Of The Estate Of Donald Small To Plaintiffs Amended Complaint* by Donald Small, Francis X. Small.(Caffrey, Joseph) (Entered: 04/09/2024) |
| 04/11/2024 | 73 | ANSWER to 65 Amended Complaint *ANSWER, AFFIRMATIVE DEFENSES AND JURY DEMAND OF DEFENDANT, TODD A. GATTONI AS PERSONAL REPRESENTATIVE* |

| | | |
|---|---|---|
| | | *OF THE ESTATE OF ANTHONY DIGIROLAMO TO PLAINTIFFS AMENDED COMPLAINT* by Todd A. Gattoni.(Caffrey, Joseph) (Entered: 04/11/2024) |
| 04/16/2024 | 74 | MOTION to Compel *Compliance with Subpoena* by Gary Cifizzari.(Reyes, Mark) (Entered: 04/16/2024) |
| 04/16/2024 | 75 | MEMORANDUM in Support re 74 MOTION to Compel *Compliance with Subpoena* filed by Gary Cifizzari. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Reyes, Mark) (Entered: 04/16/2024) |
| 04/18/2024 | 76 | NOTICE of Appearance by Eva M. Badway on behalf of Worcester District Attorney's Office (Badway, Eva) (Entered: 04/18/2024) |
| 04/18/2024 | 77 | Assented to MOTION for Extension of Time to May 16, 2024 to Oppose Motion to Compel by Worcester District Attorney's Office.(Badway, Eva) Modified on 4/19/2024 (Castles, Martin). (Entered: 04/18/2024) |
| 04/18/2024 | 78 | *Amended* ANSWER to 65 Amended Complaint by Francis X. Small.(Caffrey, Joseph) (Entered: 04/18/2024) |
| 04/19/2024 | 79 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting 77 Motion for Extension of Time to File Response to 74 MOTION to Compel *Compliance with Subpoena*. Response due by 5/16/2024. (Castles, Martin) (Entered: 04/19/2024) |
| 04/19/2024 | 80 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered. REFERRING CASE to Magistrate Judge David H. Hennessy Referred for: Events Only (e). Motions referred: 74 MOTION to Compel *Compliance with Subpoena*. Further information: Ruling on motion.(Castles, Martin) Motions referred to David H. Hennessy. (Entered: 04/19/2024) |
| 04/25/2024 | 81 | ANSWER to 65 Amended Complaint by Vincent Liberto.(Caffrey, Joseph) (Entered: 04/25/2024) |
| 04/26/2024 | 82 | Electronic Clerk's Notes for proceedings held before District Judge Margaret R. Guzman: Status Conference held on 4/26/2024, Case called, Counsel appear by video-conference for status conference, Parties update the Court on the status of discovery, Parties request additional time to complete discovery, Court grants request, Amended Scheduling Order Deadlines: Fact Discovery to be completed by 8/31/2024, Dispositive Motions due by 12/31/2024, Court sets a further status conference, ( Status Conference set for 9/18/2024 at 2:15 PM in Courtroom 2 - Worcester (Remote only) before District Judge Margaret R. Guzman, (Court Reporter: Marianne Kusa Ryll at justicehill@aol.com)(Attorneys present: Loevy Reyes/Caffrey) (Castles, Martin) (Entered: 04/26/2024) |
| 05/02/2024 | 83 | Joint MOTION to Stay *Action on The Plaintiff's Motion to Compel* by Gary Cifizzari, Worcester District Attorney's Office.(Badway, Eva) (Entered: 05/02/2024) |
| 05/10/2024 | 84 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered. REFERRING MOTION 83 Joint MOTION to Stay *Action on The Plaintiff's Motion to Compel* filed by Worcester District Attorney's Office, Gary Cifizzari to (Castles, Martin) Motions referred to David H. Hennessy. (Entered: 05/10/2024) |
| 05/10/2024 | 85 | Magistrate Judge David H. Hennessy: ELECTRONIC ORDER entered granting 83 Joint MOTION to Stay Action on The Plaintiff's Motion to Compel by Gary Cifizzari, Worcester District Attorney's Office. (King, Dawn) (Entered: 05/10/2024) |
| 06/21/2024 | 86 | MOTION to Quash *and/or Limit Scope of Pl's Amended Rule 30(b)(6) Depo Notice andor Issue Protective Order Protecting Town from Providing Certain Testimony, with Incorporated Memorandum of Law* by Town of Milford.(Scarpelli, William) (Entered: 06/21/2024) |

| | | |
|---|---|---|
| 06/24/2024 | 87 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered. REFERRING MOTION 86 MOTION to Quash and/or Limit Scope of Pl's Amended Rule 30(b)(6) Depo Notice and or Issue Protective Order Protecting Town from Providing Certain Testimony, filed by Town of Milford. (Castles, Martin) Motions referred to David H. Hennessy. (Entered: 06/24/2024) |
| 07/02/2024 | 88 | ELECTRONIC NOTICE Setting Hearing on Motion 86 MOTION to Quash *and/or Limit Scope of Pl's Amended Rule 30(b)(6) Depo Notice andor Issue Protective Order Protecting Town from Providing Certain Testimony, with Incorporated Memorandum of Law*; and 74 MOTION to Compel *Compliance with Subpoena* : <br><br> IN PERSON Motions Hearing set for 7/11/2024 at 11:00 AM in Courtroom 1 - Worcester (In person only) before Magistrate Judge David H. Hennessy. (King, Dawn) (Entered: 07/02/2024) |
| 07/02/2024 | 89 | RESPONSE to Motion re 86 MOTION to Quash *and/or Limit Scope of Pl's Amended Rule 30(b)(6) Depo Notice andor Issue Protective Order Protecting Town from Providing Certain Testimony, with Incorporated Memorandum of Law (In Opposition)* filed by Gary Cifizzari. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20)(Reyes, Mark) (Entered: 07/02/2024) |
| 07/09/2024 | 90 | STATUS REPORT and Motion for Extension of Time by Worcester District Attorney's Office. (Attachments: # 1 Exhibit List of documents produced in second production, # 2 Exhibit List of documents withheld)(Badway, Eva) Modified on 7/10/2024 (Burgos, Sandra). Modified on 7/10/2024 to correct filing type (King, Dawn). (Entered: 07/09/2024) |
| 07/10/2024 | 91 | Magistrate Judge David H. Hennessy: ELECTRONIC ORDER entered denying request for extension in para. 17 of 90 STATUS REPORT and Motion for Extension of Time by Worcester District Attorney's Office. <br><br> Denied with leave to refile upon compliance with Local Rule 7.1(a)(2). (King, Dawn) (Entered: 07/10/2024) |
| 07/10/2024 | 92 | STATUS REPORT *and Renewed Motion for Extension of Time* by Worcester District Attorney's Office. (Badway, Eva) Modified on 7/10/2024 (King, Dawn). (Entered: 07/10/2024) |
| 07/10/2024 | 93 | Magistrate Judge David H. Hennessy: ELECTRONIC ORDER entered granting 92 STATUS REPORT and Renewed Motion for Extension of Time by Worcester District Attorney's Office re 74 MOTION to Compel *Compliance with Subpoena* <br><br> Response due by 7/18/2024. (King, Dawn) (Entered: 07/10/2024) |
| 07/10/2024 | 94 | ELECTRONIC NOTICE Resetting Hearing on Motion 74 MOTION to Compel *Compliance with Subpoena* only: <br><br> IN PERSON Motion Hearing set for 7/23/2024 at 2:00 PM in Courtroom 1 - Worcester (In person only) before Magistrate Judge David H. Hennessy. (King, Dawn) (Entered: 07/10/2024) |
| 07/11/2024 | 95 | Electronic Clerk's Notes for proceedings held before Magistrate Judge David H. Hennessy: Motion Hearing held on 7/11/2024 re 86 MOTION to Quash *and/or Limit Scope of Pl's Amended Rule 30(b)(6) Depo Notice andor Issue Protective Order* |

| | | |
|---|---|---|
| | | *Protecting Town from Providing Certain Testimony, with Incorporated Memorandum of Law* filed by Town of Milford.<br><br>Case called. Court and parties go over the disputed discovery requests. Defendant's motion is granted in part and denied in part. Order to follow. Plaintiff submits a deposition to the court.<br><br>(Court Reporter: Digital Recording.) To order a copy of this Digital Recording, please go to https://forms.mad.uscourts.gov/Audio.html. For a transcript of this proceeding, contact mad_transcripts@mad.uscourts.gov.(Attorneys present: Loevy Reyes; Scarpelli, Caffrey) (King, Dawn) (Entered: 07/11/2024) |
| 07/12/2024 | 96 | Magistrate Judge David H. Hennessy: PROTECTIVE ORDER entered re 86 MOTION to Quash and/or Limit Scope of Pl's Amended Rule 30(b)(6) Depo Notice and/or Issue Protective Order Protecting Town from Providing Certain Testimony, with Incorporated Memorandum of Law by Town of Milford. (King, Dawn) (Entered: 07/12/2024) |
| 07/17/2024 | 97 | RESPONSE to Motion re 74 MOTION to Compel *Compliance with Subpoena* filed by Worcester District Attorney's Office. (Attachments: # 1 Exhibit Subpoena, # 2 Exhibit Subpoena, # 3 Exhibit Subpoena, # 4 Exhibit Privilege log, # 5 Exhibit Second production log, # 6 Exhibit Revised privilege log)(Badway, Eva) (Entered: 07/17/2024) |
| 07/17/2024 | 98 | MOTION for Leave to File *Reply in Support of His Motion to Compel Compliance with Subpoena (Unopposed)* by Gary Cifizzari.(Reyes, Mark) (Entered: 07/17/2024) |
| 07/18/2024 | 99 | Magistrate Judge David H. Hennessy: ELECTRONIC ORDER entered granting 98 MOTION for Leave to File Reply in Support of His Motion to Compel Compliance with Subpoena (Unopposed) by Gary Cifizzari.<br><br>Reply is due by close of business on 7/19/24.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (King, Dawn) (Entered: 07/18/2024) |
| 07/18/2024 | 100 | EXHIBIT *redacted version of Exhibit. A* to 97 RESPONSE to Motion re 74 MOTION to Compel Compliance with Subpoena by Worcester District Attorney's Office. (Badway, Eva) Modified docket text on 7/19/2024 (Burgos, Sandra). (Entered: 07/18/2024) |
| 07/18/2024 | 101 | REPLY to Response to 74 MOTION to Compel *Compliance with Subpoena (in Support of)* filed by Gary Cifizzari. (Reyes, Mark) (Entered: 07/18/2024) |
| 07/23/2024 | 102 | Electronic Clerk's Notes for proceedings held before Magistrate Judge David H. Hennessy: Motion Hearing held on 7/23/2024 re 74 MOTION to Compel *Compliance with Subpoena* filed by Gary Cifizzari.<br><br>Case called. Court goes over the discovery items in the motion with the Worcester District Attorney's Office and counsel and makes rulings. Order to issue. Parties will work on the items and if another hearing is needed, they can contact the court.<br><br>(Court Reporter: Digital Recording.) To order a copy of this Digital Recording, please go to https://forms.mad.uscourts.gov/Audio.html. For a transcript of this proceeding, contact mad_transcripts@mad.uscourts.gov.(Attorneys present: Loevy Reyes; Bagway; Scarpelli) (King, Dawn) (Entered: 07/23/2024) |
| 07/23/2024 | 103 | Magistrate Judge David H. Hennessy: ELECTRONIC FURTHER ORDER and CORRECTION entered re 102 Motion Hearing held on 7/23/2024 re 74 MOTION to |

| | | Compel Compliance with Subpoena filed by Gary Cifizzari.

The court further orders the parties to resolve the matters it took under advisement by 7/30/24. If the parties require more time, please file for an extension.

(King, Dawn) (Entered: 07/23/2024) |
|---|---|---|
| 07/25/2024 | 104 | Magistrate Judge David H. Hennessy: ORDER entered granting in part and denying in part 74 MOTION to Compel Compliance with Subpoena by Gary Cifizzari. (King, Dawn) (Entered: 07/25/2024) |
| 07/27/2024 | 105 | Transcript of Motion Hearing held on July 11, 2024, before Magistrate Judge David H. Hennessy. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Marianne Kusa-Ryll at justicehill@aol.com. Redaction Request due 8/19/2024. Redacted Transcript Deadline set for 8/27/2024. Release of Transcript Restriction set for 10/25/2024. (Cook, Savannah) (Entered: 07/29/2024) |
| 07/27/2024 | 106 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (Cook, Savannah) (Entered: 07/29/2024) |
| 07/29/2024 | 107 | STATUS REPORT by Gary Cifizzari. (Reyes, Mark) (Entered: 07/29/2024) |
| 07/30/2024 | 108 | Magistrate Judge David H. Hennessy: ORDER entered. re 74 MOTION to Compel *Compliance with Subpoena* filed by Gary Cifizzari.

Plaintiff's motion to compel as to Documents 8.1, 9.1, 34.1, 52.1, 55.1, and 58.1 is DENIED as moot.(King, Dawn) (Entered: 07/30/2024) |
| 07/30/2024 | 109 | Case no longer referred to Magistrate Judge David H. Hennessy. (King, Dawn) (Entered: 07/30/2024) |
| 08/13/2024 | 110 | Assented to MOTION for Extension of Time to Extend Fact Discovery by Twenty Days to Take Deposition Under Rule 30(b)(6) and Third-Party Deposition by Gary Cifizzari. (Reyes, Mark) (Entered: 08/13/2024) |
| 08/14/2024 | 111 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting 110 Assented-To Motion to Extend Fact Discovery by Twenty Days. Fact Discovery is due by September 20, 2024. (Frisch, Suzanne) (Entered: 08/14/2024) |
| 09/18/2024 | 112 | Electronic Clerk's Notes for proceedings held before District Judge Margaret R. Guzman: Status Conference held on 9/18/2024. Case called. Counsel appear by video for status conference. Court and counsel discuss case, Court offers mediation by the magistrate judge. Court extends expert deadlines for both plaintiff and defendants and sets further Status Conference for 11/22/2024 10:00 AM in Courtroom 2 - Worcester (Remote only) before District Judge Margaret R. Guzman. (Court Reporter: Marianne Kusa Ryll at justicehill@aol.com) (Attorneys present: Loevy-Reyes, Caffrey, Scarpelli) (Frisch, Suzanne) (Entered: 09/18/2024) |
| 11/13/2024 | 113 | ELECTRONIC NOTICE OF RESCHEDULING: Status Conference reset for 11/25/2024 at 10:30 AM in Courtroom 2 - Worcester (remote only) before District Judge Margaret R. Guzman.

This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or |

| | | compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.

Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.

For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.

(Frisch, Suzanne) (Entered: 11/13/2024) |
|---|---|---|
| 11/26/2024 | 114 | Electronic Clerk's Notes for proceedings held before District Judge Margaret R. Guzman: Status Conference held on 11/26/2024. Case called. Counsel appear by video for status conference. Court and counsel discuss and set the following deadlines: Dispositive motions due by 3/3/2025; Responses due by 3/24/2025; Replies due by 3/31/2025; Motion Hearing set for 5/12/2025 at 2:00 PM in Courtroom 2 - Worcester (In person only) before District Judge Margaret R. Guzman.); Jury Trial set for 7/14/2025 at 9:00 AM in Courtroom 2 - Worcester (In person only) before District Judge Margaret R. Guzman. (Court Reporter: Marianne Kusa Ryll at justicehill@aol.com) (Attorneys present: Loevy-Reyes, Caffrey, Scarpelli) (Frisch, Suzanne) (Entered: 11/26/2024) |
| 02/24/2025 | 115 | MOTION for Leave to File Excess Pages *Memorandum Unopposed* by Todd A. Gattoni, Francis X. Small, Vincent Liberto, John Chianese, Anthony Digirolamo, Donald Small. (Caffrey, Joseph) (Entered: 02/24/2025) |
| 02/25/2025 | 116 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting 115 Motion for Leave to File Excess Pages. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on February 25, 2025 - in the caption of the document. (SF) (Entered: 02/25/2025) |
| 03/03/2025 | 117 | MOTION for Summary Judgment *with Incorporated Memorandum of Law* by Town of Milford, Vincent Liberto, John Chianese, Anthony Digirolamo, Donald Small.(Scarpelli, William) (Entered: 03/03/2025) |
| 03/03/2025 | 118 | Statement of Material Facts L.R. 56.1 re 117 MOTION for Summary Judgment *with Incorporated Memorandum of Law* filed by Town of Milford, Vincent Liberto, John Chianese, Anthony Digirolamo, Donald Small. (Attachments: # 1 Exhibit Index of Exhibits, # 2 Exhibit Exhibits 1 - 9, # 3 Exhibit Exhibits 10-38)(Scarpelli, William) (Entered: 03/03/2025) |
| 03/04/2025 | 119 | Notice of correction to docket made by Court staff. Correction: docket entry #118 restricted Exhibit 1-9 and 10-38 due to presence of personal identifiers.

**IMPORTANT NOTICE OF REDACTION RESPONSIBILITY**: All filers must redact: Social Security or taxpayer-identification numbers; dates of birth; names of minor children; financial account numbers; and, in criminal cases, home addresses, in compliance with Fed. R. Civ. P. 5.2 or Fed. R. Crim. P. 49.1. This requirement applies to all documents, including attachments.

Counsel is reminded to review the local rules and the attorney handbook when filing documents with the Court by accessing our web page, at www.mad.uscourts.gov under CM/ECF E-Filing. (SB) (Entered: 03/04/2025) |

| 03/05/2025 | 120 | EXHIBIT 1-9 re 117 MOTION for Summary Judgment *with Incorporated Memorandum of Law Defendants Redacted MSJ Exhibits 1-9* by Town of Milford, Vincent Liberto, John Chianese, Anthony Digirolamo, Donald Small. (Attachments: # 1 Exhibit Defendants Redacted MSJ Exhibits 10-38)(Caffrey, Joseph) Modified on 3/5/2025 (SB). (Entered: 03/05/2025) |
|---|---|---|
| 03/24/2025 | 121 | MOTION for Leave to File Excess Pages *(Unopposed)* by Gary Cifizzari. (Attachments: # 1 Exhibit 1)(Reyes, Mark) (Entered: 03/24/2025) |
| 03/24/2025 | 122 | Statement of Material Facts L.R. 56.1 re 117 MOTION for Summary Judgment *with Incorporated Memorandum of Law (Response)* filed by Gary Cifizzari. (Reyes, Mark) (Entered: 03/24/2025) |
| 03/24/2025 | 123 | Statement of Material Facts L.R. 56.1 re 117 MOTION for Summary Judgment *with Incorporated Memorandum of Law* filed by Gary Cifizzari. (Reyes, Mark) (Entered: 03/24/2025) |
| 03/24/2025 | 124 | Exhibit List *in Opposition to Defendants' Motion for Summary Judgment* by Gary Cifizzari.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57)(Reyes, Mark) (Entered: 03/24/2025) |
| 03/24/2025 | 125 | MOTION for Leave to File *His Summary Judgment Response Instanter* by Gary Cifizzari.(Reyes, Mark) (Entered: 03/24/2025) |
| 03/26/2025 | 126 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered GRANTING 121 Motion for Leave to File Excess Pages (Unopposed) and GRANTING 125 Motion for Leave to File His Summary Judgment Response Instanter. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on March 26, 2025 - in the caption of the document. (SF) (Entered: 03/26/2025) |
| 03/26/2025 | 127 | Opposition re 117 MOTION for Summary Judgment *with Incorporated Memorandum of Law* filed by Gary Cifizzari. (Reyes, Mark) (Entered: 03/26/2025) |
| 03/27/2025 | 128 | MOTION for Extension of Time to April 7, 2025 to File Response/Reply as to 123 Statement of Material Facts L.R. 56.1, 124 Exhibit List,,,, 122 Statement of Material Facts L.R. 56.1 by Todd A. Gattoni, Town of Milford, Vincent Liberto, Anthony Digirolamo, Donald Small.(Caffrey, Joseph) (Entered: 03/27/2025) |
| 03/27/2025 | 129 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting 128 Motion for Extension of Time to File Response/Reply to Plaintiff's summary judgment opposition memorandum. Response/Reply due by 4/7/2025. (SF) (Entered: 03/27/2025) |
| 04/07/2025 | 130 | REPLY to Response to 117 MOTION for Summary Judgment *with Incorporated Memorandum of Law* filed by Town of Milford. (Scarpelli, William) (Entered: 04/07/2025) |

| 04/07/2025 | 131 | Statement of Material Facts L.R. 56.1 re 117 MOTION for Summary Judgment *with Incorporated Memorandum of Law Response to Plaintiff's* filed by Town of Milford. (Attachments: # 1 Exhibit Exhibit 1)(Scarpelli, William) (Entered: 04/07/2025) |
|---|---|---|
| 04/24/2025 | 132 | ELECTRONIC NOTICE Resetting Hearing on Motion 117 MOTION for Summary Judgment: Motion Hearing set for 5/20/2025 at 2:00 PM in Courtroom 2 - Worcester (In person only) before District Judge Margaret R. Guzman. (SF) (Entered: 04/24/2025) |
| 05/19/2025 | 133 | ELECTRONIC NOTICE Resetting Hearing on Motion 117 MOTION for Summary Judgment: Motion Hearing set for 5/29/2025 at 11:00 AM in Courtroom 2 - Worcester (In person only) before District Judge Margaret R. Guzman. (SF) (Entered: 05/19/2025) |
| 05/19/2025 | 134 | ELECTRONIC NOTICE Resetting Hearing on Motion 117 MOTION for Summary Judgment: Motion Hearing set for 6/5/2025 at 2:00 PM in Courtroom 2 - Worcester (In person only) before District Judge Margaret R. Guzman. (SF) (Entered: 05/19/2025) |
| 05/20/2025 | 135 | ELECTRONIC NOTICE Resetting Hearing on Motion: Motion Hearing set for 6/6/2025 at 10:00 AM in Courtroom 2 - Worcester (In person only) before District Judge Margaret R. Guzman. (SF) (Entered: 05/20/2025) |
| 05/23/2025 | 136 | District Judge Margaret R. Guzman: SHOW CAUSE ORDER entered. (LB) (Entered: 05/23/2025) |
| 06/03/2025 | 137 | Supplemental MEMORANDUM in Support re 117 MOTION for Summary Judgment *with Incorporated Memorandum of Law Addressing Court's Inquiries* filed by Town of Milford. (Scarpelli, William) (Entered: 06/03/2025) |
| 06/03/2025 | 138 | Supplemental MEMORANDUM in Opposition re 117 MOTION for Summary Judgment *with Incorporated Memorandum of Law* filed by Gary Cifizzari. (Reyes, Mark) (Entered: 06/03/2025) |
| 06/06/2025 | 139 | Electronic Clerk's Notes for proceedings held before District Judge Margaret R. Guzman: Motion Hearing held on 6/6/2025 re 117 Motion for Summary Judgment. Case called. Counsel appear for motion hearing. Court hears argument from counsel and takes matter under advisement. (Court Reporter: Jessica Leonard at jessica@wickedsteno.com) (Attorneys present: Loevy-Reyes, Caffrey, Scarpelli) (SF) (Entered: 06/06/2025) |
| 06/24/2025 | 140 | District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting 117 Motion for Summary Judgment. Motion for Summary, ECF No. 117,is GRANTED on all counts. Written order to issue. This case will be removed from the Court's trial list. (SF) (Entered: 06/24/2025) |
| 07/09/2025 | 141 | District Judge Margaret R. Guzman: ORDER entered. ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 117].(SB) (Entered: 07/09/2025) |
| 07/09/2025 | 142 | District Judge Margaret R. Guzman: ORDER entered. JUDGMENT in favor of defendants. (SB) (Entered: 07/09/2025) |
| 07/14/2025 | 143 | NOTICE OF APPEAL as to 141 Order by Gary Cifizzari. Filing fee: $ 605, receipt number AMADC-11119904 Fee Status: Not Exempt.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US |

| | | District Court Clerk to deliver official record to Court of Appeals by 8/4/2025. (Reyes, Mark) (Entered: 07/14/2025) |
|---|---|---|
| 07/14/2025 | 144 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 143 Notice of Appeal. (MAP) (Entered: 07/14/2025) |
| 07/15/2025 | 145 | USCA Case Number 25-1667 for 143 Notice of Appeal, filed by Gary Cifizzari. (MAP) (Entered: 07/15/2025) |
| 07/28/2025 | 146 | TRANSCRIPT ORDER FORM by Gary Cifizzari for proceedings held on 6/6/2025 before Judge Margaret R. Guzman, (Attachments: # 1 Proof of Service to Opposing Counsel)(Reyes, Mark) (Entered: 07/28/2025) |
| 08/04/2025 | 147 | Transcript of Motion Hearing held on June 6, 2025, before Judge Margaret R. Guzman. COA Case No. 25-1667. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Jessica Leonard at jessica@wickedsteno.com. Redaction Request due 8/25/2025. Redacted Transcript Deadline set for 9/4/2025. Release of Transcript Restriction set for 11/3/2025. (DRK) (Entered: 08/04/2025) |
| 08/04/2025 | 148 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 08/04/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/10/2025 09:10:23 | | | |
| **PACER Login:** | Norgle1905 | **Client Code:** | Cifizzari_Gary |
| **Description:** | Docket Report | **Search Criteria:** | 4:22-cv-40139-MRG |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

GARY CIFIZZARI,                                )
                                               )
      Plaintiff,                          )
                                               )
                                               )   NO. 4:22-cv-40139-MRG
v.                                             )
                                               )
TOWN OF MILFORD, VINCENT                       )
LIBERTO, JOHN CHIANESE, TODD                   )   **JURY TRIAL DEMANDED**
A. GATTONI as personal                         )
representative of the Estate of                )
ANTHONY DIGIROLAMO, FRANCIS                     )
X. SMALL as personal representative of         )
the Estate of DONALD SMALL, and                )
AS-YET UNKNOWN POLICE                          )
OFFICERS AND POLICE                            )
SUPERVISORS                                    )
                                               )
      Defendants.                         )

## AMENDED COMPLAINT

Plaintiff, Gary Cifizzari, by his attorneys, Mark Loevy-Reyes of Loevy &

Loevy, and William S. Smith, Esq. of The Law Office of William S. Smith, complain

of the above-named Defendants, as well as other as-yet unknown police officers and

police supervisors acting under color of state law, hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      How does a person do who was falsely and repeatedly labeled,

"murderer," for some 35 years of his life on earth obtain justice?  This Complaint

opens the door to the answer.  As a direct result of doctored and suppressed reports,

false forensic testimony, coerced and unreliable witness statements, improper

identification procedures, false forensic testimony, and a general pattern of blatant

disregard for the law and the United States Constitution on the part of the Defendants, Plaintiff Gary Cifizzari ("Plaintiff") spent some 35 years in prison for a murder he did not commit, and with which he had all of nothing to do.

2.     Plaintiff was wrongfully convicted and sentenced to life in prison without the possibility of parole and this despite not a scintilla of physical or other evidence tying him to the murder. The sole basis for the Commonwealth's case for guilt was bitemark evidence that was decades later retracted.

3.     Plaintiff continued to assert his innocence for over three decades. Through persistence and a dogged determination to reveal the truth, Plaintiff eventually obtained proof of egregious misconduct by the Defendants.

4.     In 2019, Plaintiff moved for a new trial based on newly discovered evidence. The Commonwealth of Massachusetts (the "Commonwealth") joined in the motion to vacate his conviction. That motion was granted on December 10, 2019, and the Commonwealth *nolle prossed* all of the indictments against Plaintiff.

5.     Among other misdeeds set forth in this Complaint, the Milford Police Department ("Milford PD") violated Plaintiff's constitutional rights by, inter alia, improperly obtaining witness statements in an effort to fabricate Plaintiff's guilt. The Town of Milford and Milford PD also withheld and doctored key exculpatory evidence. These constitutional violations facilitated the presentation of the false evidence to a jury, which resulted in the erroneous conviction of Plaintiff.

6.     The egregious constitutional violations resulted in Plaintiff having been forced to spend decades without his family. Plaintiff was forced to miss weddings, funerals, births, graduations, birthdays, and other monumental life events.

7.     While he can never regain the approximately 35 years that were taken from him as a result of the misconduct described herein, Plaintiff is entitled, pursuant to 42 U.S.C. §§ 1983 and 1988 and state law, to monetary damages for the extraordinary injuries suffered as a result of Plaintiffs mortifying and shocking wrongful arrest, prosecution, conviction, and 35-year imprisonment.

## JURISDICTION AND VENUE

8.     This action is brought pursuant to, inter alia, 42 U.S.C. § 1983, to redress the deprivation, under color of law, of Plaintiffs rights as secured by the Constitution and laws of the United States.

9.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.

10.     Venue is proper under 28 U.S.C. § 1391{b), as the events giving rise to the claims asserted herein occurred in this district and numerous Defendants reside in this district.

## THE PARTIES

11.     At all times relevant to this Complaint until his incarceration, Plaintiff was a resident of Massachusetts. At the time of the arrest giving rise to this action, Plaintiff was living in that same location.

12.     Defendant Town of Milford is located in the County of Worcester and is

RA 19

a municipal corporation of the Commonwealth of Massachusetts.

13.     Upon information and belief, at all times relevant to this Complaint, Defendants Vincent Liberto, John Chianese, Donald Small, and Sgt. Anthony Digirolamo were employed by the Milford Police Department and acting under color of law.

14.     Todd A. Gattoni is named as a defendant as the representative of the Estate of Anthony Digirolamo. Francis X. Small is named as a defendant as the personal representative of the Estate of Donald Small.

15.     Defendants John and Jane Does 1 through 10, whose identities are currently unknown, represent individuals acting under color of law who had personal involvement in the investigation of Plaintiff (the "Doe Defendants").

16.     Defendants John and Jane Does 11 through 20, whose identities are currently unknown, represent those employees who supervised certain Defendants and had personal involvement in the investigation of Plaintiff (the "Supervisory Doe Defendants").

17.     Each of the foregoing Defendants in the above Paragraphs are sued in their individual capacities, and all acted under color of law while engaging in the actions alleged in this Complaint.

## FACTS

18.     Milford resident, Concetta Schiappa, was last seen alive by her next-door neighbor at around 9 p.m. on Friday, September 28, 1979. She was discovered lying dead on her living room floor the following morning.

19.     There was bruising on the right lower part of her stomach and on the inside of her upper left leg, which experts for the prosecution via the Worcester County District Attorney's office later · claimed at trial to be human bitemarks.

20.     The Milford Police Department investigated the murder. Photo and fingerprint technicians took numerous photographs of the inside and the outside of the apartment and searched for latent fingerprints, including removing and testing window shades that had been pulled down by the perpetrator. Policed removed for analysis the rug underneath the victim's body, the pillow that was lying over her arm, a pair of the victim's slippers, and "numerous other items which were around the body," including fragments of the mop used to kill Ms. Schiappa. In addition, Ms. Schiappa's black pocketbook and set of keys were found in a yard two streets away from her apartment.

21.     Prior to and during the autopsy, Dr. Stanley Schwartz, a forensic dental examiner, examined, and photographed the bruising on the victim. He would later testify at the Plaintiff's trial. He also attempted to take an impression of the mark on the victim's abdomen using a rubber base material.

22.     The crime lab analysis itself, however, did not result in any evidence being introduced at the plaintiff's trial.

23.     The Milford Police knew very early on that the real perpetrator, Michael Giroux, had both the motive and opportunity to commit this crime, but utterly failed to adequately investigate him. Neither Mr. Cifizzari nor his brother Michael Cifizzari—Ms. Schiappa's great nephews was a suspect at this stage of the

police investigation. Although none of the people interviewed by the police had useful information regarding the identity of the perpetrator, the Milford Police initially focused on several suspects-including Michael Joseph Giroux, whose DNA was decades later found to match and/or be consistent with the semen on the victim's nightgown.

24.    The police had several reasons to suspect Mr. Giroux. About one year prior to the murder, the victim, Ms. Schiappa, had accused Mr. Giroux of entering her home without permission and stealing cash from the top of her dresser.

25.    Further, approximately just two weeks prior to the murder, Mr. Giroux had come uninvited to· Mr. Terhune's and Ms. Duncan's apartment shortly after being discharged from the United States Army. A scant one or two days after the murder, Mr. Giroux overdosed on drugs and was admitted to the VA hospital in Jamaica Plain.

26.    The Milford and State police were aware that Mr. Giroux had a prior criminal record.

27.    They also interviewed him at least twice. In his statements to the police, Mr. Giroux placed himself within just 200 yards of Ms. Schiappa's residence at approximately the time of the murder. Mr. Giroux stated that, on the evening of September 28, 1979, he went to a bar called Lonergan's, which was located at 5 Central Street, a two-minute walk to Ms. Schiappa's apartment at 72 Central Street. Mr. Giroux told the police that he became "very drunk, so drunk that he said he had trouble talking" and that, after leaving Lonergan's, he walked back to his

brother David's house at 10 Genoa Avenue in Milford. Mr. Giroux said that he cut "through Stone's parking lot because he did not want to walk on Main Street and be seen," and that he then went "down Jefferson St-up street behind Town Hall," The walking route from Lonergan's through Stone's parking lot (located at 32 Central Street) to Jefferson Street to 10 Genoa Avenue passes directly by Ms. Schiappa's residence and the 23 Spring Street location where Ms. Schiappa's pocketbook and keys were ultimately found after the murder.

28. For example, in his initial statement on October 5, 1979, Mr. Giroux stated that he "went ·right home and went to sleep." In the second statement on October 24, 1979, however, he said that he got home and "turned on TV...." Mr. Giroux also admitted that he had changed his clothes, telling the police that his brother David gave him clothes that day ("a brown shirt, a plaid pair of pants and brown socks"), raising the obvious question of whether Mr. Giroux needed to discard his clothes because they were stained with Ms. Schiappa's blood. In addition, Mr. Giroux's brother, David Giroux, is certain that he never owned plaid pants. In the same discussion with police, Mr. Giroux volunteered the strange non-sequitur that "he couldn't stand the sight of blood," which his brother explained was not true.

29. Despite the manifest inconsistencies in Mr. Giroux's statements and significant reasons to suspect him, the Milford Police Department or any other law enforcement entity took no further steps to investigate him or pursue him as a suspect. There is no evidence of which Plaintiff is aware that they interviewed anyone else regarding Mr. Giroux's whereabouts on the night of the murder,

including his brother, David, who would have been his alibi witness. There is also no evidence that the police searched David Giroux's home, where Michael Giroux was staying, to search for the clothes that Michael Giroux admitted he had discarded the night of the murder or to search for items taken from the victim.

30.    Unlike other suspects, Mr. Giroux was never asked to provide a cast of his teeth for comparison to the bitemarks. Indeed, with Michael Giroux's self-serving and false statement that he could not stand the sight of blood, the investigation of Michael Giroux seems to have been non-existent until 2019, when the Plaintiff's newer legal team (for the Motion for New Trial) itself undertook efforts to solve the crime.

31.    Michael Giroux at all times relevant acted as an informant for, at a minimum, the Federal Bureau of Investigation, the Massachusetts State Police, and the Worcester Police Department.

32.    The police interviewed the victim's neighbor, Gary Terhune, and his associates several times after finding inconsistencies in the accounts of his activities during the night of the murder. They never followed-up on these inconsistencies.

33.    The Plaintiff, Gary Cifizzari, did not become a suspect until the police encouraged and coerced his brother, Michael Cifizzari, who suffered from chronic schizophrenia and acute psychosis, to make false statements implicating the Plaintiff in the crime.

34.    Mr. Cifizzari' s older brother, Michael, was diagnosed with schizophrenia in 1970 when he was seventeen years old. He also had a "borderline"

intellectual disability, having scored 75 on an IQ test. In his youth, Michael Cifizzari, was committed to psychiatric institutions a myriad of times. The Milford Police and other law enforcement entities involved were cognizant of his mental condition. They were also aware that he was related to the victim, Ms. Schiappa.

35.     On or about November 21, 1980, Michael Cifizzari was reported to the Milford Police for drinking from a dog bowl on a stranger's porch. Seemingly unprovoked and without any factual predicate or basis, Milford police officer Vincent Liberto and Sergeant Donald Small decided to use this occasion to question and interrogate Michael about the murder while taking him to a psychiatric unit at the Whitinsville Hospital in Milford.

36.     During this interrogation, Michael initially said that he saw his "Aunt Connie" a couple of weeks earlier despite the fact that Ms. Schiappa had died more than a year prior. The Milford officers then asked Michael "how come" he had a fight with her and "why" he had hit her, to which Michael responded that "she got me mad." When the Milford Police further asked if Michael "killed his aunt" or "hit her with a stick," Michael clarified that he did not hit his aunt and that she was alive and gave him money. When Officer Liberto asked why Michael initially said that he hit his aunt, Michael responded: "That is what you want me to say. That's what you want to hear, isn't it?" Officer Liberto characterized Michael as incoherent during this conversation and testified during the Plaintiff's court case that he thought Michael would agree to anything asked of him.

RA 25

37.    On or about February 26, 1981, Michael Cifizzari walked into the Milford police station asking to be allowed to spend the night there. He was homeless, dirty, cold, and hungry. Officer Anthony DiGirolamo, the station desk officer and Michael's youth football coach, had allowed him to sleep at the station about five or six times in the previous six months. Officer DiGirolamo would later testify that "[e]ach time [Michael Cifizzari] came to the station previously, it seemed as though he had something on his mind that he wanted to talk about." On this occasion, Milford police officers DiGirolamo and his colleague, Officer John Chianese, decided to "have a little talk" with Michael about the murder of Ms. Schiappa. Michael was allegedly read his Miranda rights but initially signed a waiver of rights using the name "Paul M. Cartney[1]" before signing his real name. Over the next two hours, Officer Chianese wrote down four different statements, of varying degree of detail, that Michael purportedly gave, supposedly confessing to the murder of Ms. Schiappa.

38.    The interrogation was not recorded, and Michael Cifizzari did not sign or otherwise adopt the statements.

39.    According to the final (fourth) version of the statement drafted by Officer Chianese, after a night of drinking, smoking marijuana, and taking PCP, Michael Cifizzari and his cousin, Robert (Bob) Cananzey, went to Ms. Schiappa's house to ask for money because she had previously given them money. When she refused, the two "knocked her down" and attacked her with a stick. According to the

---

[1] Presumably, this was a bizarre reference to the singer and bassist for the Beatles, Paul McCartney.

statement, "Bobbie was biting her on the neck" and Michael "accidentally bit her on the neck and the inside of her upper leg." The statement says that Michael and Mr. Cananzey "were all drugged out" and does not account for their movements after leaving the victim's apartment.

40. However, and of immense salience, none of the versions of Michael's purported confession provided to Milford officers DiGirolamo and Chianese even so much as mentioned his brother, the Plaintiff Gary Cifizzari.

41. Later that morning, Michael Cifizzari was transported to the Worcester CPAC office, where he was further questioned by State Police Sergeant Joseph Doheny. Michael appeared "somewhat confused" and "wild-eyed," "looked like he had been up all night," and was at times "rambling." Sergeant Doheny reported that Michael stated that he "bit [the victim's] breast and neck. I bit her nipple almost off. I bit her neck and left marks there. I bit her leg and her stomach."

42. Along with Milford Police Sgt. DiGirolamo, Milford Officers Chianese and Nicholas Sullo, Sergeant Doheny began questioning Michael about his statements and asked Michael whether he was sure he had been with his cousin, and not his brother, Gary, at the time of the crime.

43. Hitherto, however, there was no factual basis or predicate whatsoever in the investigation for the police to have suspected the Plaintiff, Gary Cifizzari.

44. Michael then responded that yes, "Gary was there," and said that "they [his cousin and his brother] were both there." Id. However, Michael never once indicated any purported act Gary Cifizzari was supposed to have taken during this

incident. In fact, Michael later testified that when he spoke to Sergeant Doheny, he was actually trying to clarify that the Plaintiff, Gary Cifizzari, had nothing to do with the murder and that, at the time of the crime, he was with his brother Gary elsewhere.

47. Based on his observations of Michael as "wild-eyed" and "rambling," Sergeant Doheny was well aware that, at the time of his questioning, Michael had severe psychiatric problems, as were the Milford officers.

46. Michael's multiple statements were not only inconsistent with each other but also inconsistent with several of the known facts about the crime. Nonetheless, Michael was charged with the murder of Ms. Schiappa the same day as his alleged "confessions."

47. On February 26, 1981, the day Michael Cifizzari gave his statements, police separately interviewed Gary Cifizzari and Bob Cananzey.

48. Gary Cifizzari also maintained his innocence then, and forever thereafter. When questioned about his brother's statements, Gary Cifizzari told police that he was nowhere near Milford on the night of the murder and that he only recalled going there in October 1979, after he and Michael were thrown out of their mother's house and sought to spend the night at their aunt Emma and cousin Antonetta Pasqualone's home in Milford.

49. Police took no further steps to investigate Ms. Schiappa's murder until more than two years after Michael Cifizzari was charged. In October 1982, shortly

after Michael was found to be competent to stand trial[2], the Commonwealth obtained a court order for his dental impressions and sent them to Dr. Stanley Schwartz for comparison to photographs of the bitemarks. In February 1983, Dr. Schwartz excluded Michael as the person who purportedly bit Ms. Schiappa. In his report, Dr. Schwartz noted that Dr. Richard Souviron had also reviewed the materials and agreed that Michael could be excluded as the source of the bitemarks.

50.     On or about April 27, 1983, Gary Cifizzari had tooth impressions taken by Dr. Juliano. Because Mr. Cifizzari had lost a front tooth in a beating in 1980, police also obtained a set of 1977 X-rays of Mr. Cifizzari's dentition and delivered them to Dr. Schwartz. Dr. Schwartz concluded "within reasonable medical certainty" that this final suspect's dentition matched the marks on the victim's body based on the position of the missing maxillary right central incisor. Mr. Cifizzari was interviewed again in May 1983, after the supposed "match" was determined. He again adamantly denied any involvement in the murder.

51.     The case for guilt against Mr. Cifizzari consisted entirely of this "bitemark comparison evidence" in the form of expert testimony, which is now recognized as scientifically unreliable. The Commonwealth heavily relied on this throughout the criminal trial.

52.     As a result of the expert testimony and despite the absence of any other credible evidence linking him to the crime, the Plaintiff, Gary Cifizzari, was convicted of first-degree murder on July 30, 1984. The following day, July 31, 1984,

---

[2] He had originally been found by the court to have been incompetent.

he was sentenced to life in prison without the possibility of parole.

53.     In the (final) Motion for New Trial proceedings, results of recent DNA tests conclusively excluded the Plaintiff, Gary Cifizzari, as a possible contributor of the DNA profile developed from the sperm and saliva deposited on the victim's nightgown at the time of her death.

54.     On or about May 3, 2019, the Massachusetts State Police Laboratory notified the police that the profile from a sperm fraction on Ms. Schiappa's nightgown matched the DNA profile of Michael Giroux, the original (and eminently obvious) suspect in the 1979 murder investigation, as outlined above.

55.     There was, and remains, no evidence that Mr. Giroux ever had any connection to Gary or Michael Cifizzari. Michael Cifizzari testified that he did not know Michael Giroux. At Michael Cifizzari's trial, Sergeant Thomas White also testified that Mr. Giroux did not have any dealings with Michael Cifizzari and did not "hang out in the same circle of friends." In addition, nothing in the autopsy report or investigation reports indicates that more than one person was suspected · of assaulting and killing Ms. Schiappa.

56.     Having escaped justice in this case, Mr. Giroux pursued a life of violent crime. For example, he was one of three conspirators in the murder of a Rhode Island landlord who was shot as he collected rents.

57.     In support of the Plaintiff's Motion for New Trial that would exonerate him, the Commonwealth's own forensic dentistry expert at trial, Richard Souviron, D.D.S., ABFO, in a sworn affidavit, stated, inter alia, "At trial, I identified Mr.

[Gary] Cifizzari as the person who bit the victim, and I did not in any way qualify that statement. I would not offer such testimony today. I therefore recant the testimony that Mr. Cifizzari's teeth were the teeth, to a reasonable degree of certainty, that inflicted both of the victim's bite wounds... There is no degree of certainty with which I could testify that Mr. Cifizzari was 'the biter' in this case," he averred, due to changes in the relevant scientific knowledge.

58.     As referenced herein, the bitemark evidence was, in sum and substance, the entire case the Commonwealth had offered at trial against the Plaintiff.

59.     Eventually, the Commonwealth via the Worcester County District Attorney's office, assented to the most recent and final Motion for New Trial filed by the Plaintiff in the criminal case in 2019. It thereafter entered a nolle prosequi, stating as follows:

> "[T]he aforementioned evidence leads the Commonwealth to determine that Michael Giroux perpetrated this brutal murder, and a Nolle Prosequi of Gary Cifizzari is in the interests of justice in this case."

59.     This admission came, however, some 35 years too late.

60.     At all times relevant, and from his arrest to the assent, the Plaintiff, Gary Cifizzari, was incarcerated in Massachusetts State Prisons, suffering daily, hourly, by the minute, and by each agonizing second, for every one of those 35 years.

## **DAMAGES**

61.     The actions of the Defendants set forth herein unlawfully deprived Plaintiff of his civil rights under the United States Constitution and the laws of the Commonwealth of Massachusetts.

62.     In serving some three-and-a-half decades behind bars, Plaintiff was wrongfully deprived of virtually his entire adult life up until the time of his release. Plaintiff must now attempt to make a life for himself outside of prison without the benefit of the decades of life experiences which ordinarily equip adults for that task.

63.     Although Plaintiff has been out of prison since 2019, he has not maintained gainful employment, largely due to the stigma associated with his vacated murder conviction, and also substantial medical conditions from which he suffers greatly (see below).

64.     Having been incarcerated for most of his adult life, Plaintiff does not have the benefit of education, training, or the professional experience necessary to equip him for the task of finding long-term employment.

65.     Moreover, Plaintiff suffers from a myriad of substantial, debilitating conditions such as cancer and diabetes. Additionally, the emotional pain and suffering caused by losing 35 years in the prime of life is extreme and incessantly agonizing. During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, weddings, graduations, and other life events with

loved ones, the opportunity to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.

66. Plaintiff has suffered severe and extreme injury, including, but not limited to, extraordinary physical suffering and extreme emotional distress, all proximately caused by Defendants' misconduct.

## 42 U.S.C. § 1983 CLAIMS

### COUNT I

**42 U.S.C. § 1983 Claim by Plaintiff for Unduly Suggestive, Biased, and Otherwise Improper Identification Procedures in Violation of the Fourteenth Amendment Against those Defendants then employed by the Milford Police Department as well as John Does 1- 20**

67. Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

68. "A defendant has a due process right to identification procedures meeting a certain basic standard of fairness." Commonwealth v. Dougan, 377 Mass. 303 (Mass. 1979).

69. "Criminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." Gregory v. City of Louisville, 444 F.2d 725, 746 (6th Cir. 2006) (quoting Stovall v. Denno, 388 U.S. 293, 302, 87 S. Ct. 1967 (1967)).

70. Defendants Vincent Liberto, John Chianese, Milford Police Sgt's. Anthony Digirolamo and Donald Small, as well as John Does 1-20 under color of law facilitated identifications using unduly suggestive identification procedures, which

RA 33

led to the improper identification of Plaintiff as the individual who killed the victim.

These improper procedures included:

- Questioning and interrogating Michael Cifizzari- a man who the police knew full well, or reasonably should have known, suffered from severe mental illness- without any factual predicate whatsoever about his supposed involvement in the murder.

- During said questioning and interrogation, without any factual predicate whatsoever, asking Michael Cifizzari suggestively whether he was sure he had been with his cousin, and not his brother, the Plaintiff Gary Cifizzari, at the time of the crime.

- Especially due to Michael Cifizzari's extremely deteriorated mental state, the police's used this technique- one grossly unnecessarily suggestive and conducive to irreparable mistaken identification- to falsely accuse, then ultimately convict, the Plaintiff of a murder he had absolutely nothing to do with.

71.    The Individual Defendants committed these unduly suggestive, biased and otherwise improper acts intentionally and with deliberate indifference to Plaintiff's clearly established constitutional rights. No reasonable officer would have believed these procedures were lawful or would produce a reliable identification of the Plaintiff as the killer.

72.    As a direct and proximate result of these unduly suggestive procedures, Michael Cifizzari falsely identified Plaintiff as having been guilty of murder, in violation of Plaintiffs Fourteenth Amendment right to a fair trial and to be not deprived of liberty without due process of law. Due to these Defendants' misconduct, Plaintiff suffered 35 years of wrongful imprisonment, and endured all of the other physical, emotional and pecuniary damages set forth above.

## COUNT II- 42 U.S.C. § 1983

**42 U.S.C. § 1983 Claim by Plaintiff for Improper Interrogation Procedures and Techniques in Violation of the Fourteenth Amendment Against those Defendants then employed by the Milford Police Department as well as John Does 1-20**

73.     Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

74.     The actions by those Defendants then employed by the Milford Police Department as well as John Does 1-20 in interrogating and questioning the severely mentally ill Michael Cifizzari, then later implicating the Plaintiff in the murder in additional interrogations, as set forth above, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment. They were so brutal and offensive as to shock the conscience. *See* e.g., *Miller v. Fenton*, 474 U.S. 104, 109 (1985).

75.     The Individual Defendants committed these unduly suggestive, biased and otherwise improper acts intentionally and with deliberate indifference to Plaintiff's clearly established constitutional rights. No reasonable officer would have believed these procedures were lawful or would produce a reliable identification of the Plaintiff as the killer.

76.     As a direct and proximate result of these shocking and offensive interrogation procedures, Michael Cifizzari falsely identified Plaintiff as having been guilty of murder, in violation of Plaintiff's Fourteenth Amendment right to a fair trial and to be not deprived of liberty without due process of law.

RA 35

77. Due to these Defendants' misconduct, Plaintiff suffered 35 years of wrongful imprisonment, and endured all of the other physical, emotional and pecuniary damages set forth above.

## COUNT III- 42 U.S.C. § 1983

**42 U.S.C. § 1983 Claim by Plaintiff for Fabricating False lnculpatory Evidence in Violation of the Fourteenth Amendment Against those Defendants then Employed by the Milford Police Department as well as John Does 1-20**

78. Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

79. Vincent Liberto, John Chianese, Milford Police Sgt's. Anthony Digirolamo and Donald Small, as well as John Does 1-20 under color of state law fabricated inculpatory evidence via their use, without any factual predicate, of the interrogation and questioning of the Plaintiffs severely mentally ill brother.

80. As a direct and proximate result of this fabrication of inculpatory evidence the Plaintiff's clearly established Fourteenth Amendment due process rights, including the right to a fair trial and his Fourth Amendment right to be free from unreasonable seizures were violated, and Gary Cifizzari was wrongly convicted and suffered the injuries and damages described above.

## COUNT IV- 42 U.S.C. § 1983

**42 U.S.C. § 1983 Claim by Plaintiff for Fabricating False lnculpatory Evidence in Violation of the Fourteenth Amendment Against Defendant Richard Souviron**

81. Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

RA 36

82.     Vincent Liberto, John Chianese, Milford Police Sgt's. Anthony Digirolamo and Donald Small, as well as John Does 1-20 under color of state law fabricated inculpatory evidence via their use, without any factual predicate, of the interrogation and questioning of the Plaintiff's severely mentally ill brother.

83.     As a direct and proximate result of this fabrication of inculpatory evidence the Plaintiff's clearly established Fourteenth Amendment due process rights, including the right to a fair trial and his Fourth Amendment right to be free from unreasonable seizures were violated, and Gary Cifizzari was wrongly convicted and suffered the injuries and damages described above.

**COUNT V- 42 U.S.C. § 1983**

**42 U.S.C. § 1983 Claim by Plaintiff for Failure to Investigate Against those Defendants then employed by the Milford Police Department as well as John Does 1-20**

84.     Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

85.     Vincent Liberto, John Chianese, Milford Police Sgt's. Anthony Digirolamo and Donald Small, as well as John Does 1-20 under color of state law deliberately and/or recklessly failed to investigate adequately, as any minimally competent officer or forensic scientist would have, by, among other things, failing to adequately investigate the man who was ultimately established via DNA evidence as the murderer, Michael Giroux and his connection with said murder.

86.     As a direct and proximate result of this deliberately and/or recklessly conducted failure, the Plaintiff's clearly established Fourteenth Amendment due

RA 37

process rights, including the right to a fair trial and his Fourth Amendment right to be free from unreasonable seizures were violated, and Gary Cifizzari was wrongly convicted and suffered the injuries and damages described above.

<div align="center">

**COUNT VI- 42 U.S.C. § 1983**

**42 U.S.C. § 1983 Claim by Plaintiff for Malicious Prosecution Against those Defendants then employed by the Milford Police Department as well as John Does 1-20**

</div>

87.     Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

88.     Those Defendants then employed by the Milford Police Department as well as John Does 1- 20, state actors acting under color of law, commenced or caused to be commenced a criminal prosecution, instituted with malice and without probable cause against the Plaintiff. As set forth above, they together constructed a case against the Plaintiff, Gary Cifizzari, by suppressing, fabricating, and/or failing to investigate important evidence, and, ultimately, obtained a conviction against him.

89.     The criminal actions ultimately terminated in the Plaintiff's favor on December 10, 2019, when his convictions were vacated by the trial court on the grounds of his actual innocence, due to conclusive scientific evidence that the perpetrator's DNA did not match him but instead matched Mr. Giroux. The Commonwealth thereafter filed a nolle prosequi indicating that the reason for it was because DNA evidence showed Giroux had committed the murder.

90.     The conduct of Defendants then employed by the Milford Police Department as well as John Does 1-20 violated the Plaintiff's clearly established

<div align="center">RA 38</div>

rights under the Fourth Amendment and the procedural due process component of the Fourteenth Amendment.

91.     As a proximate result of the above-referenced conduct, the Plaintiff was arrested, was prosecuted, was forced to endure an unfair trial and wrongful conviction, and was wrongly imprisoned for some 35 years. He suffered and continues to suffer the highly substantial injuries and damages set forth above.

## COUNT VII- 42 U.S.C. § 1983

### Monell Claim Against The Town of Milford and The Milford Police Department

92.     Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

93.     At all times relevant, including during the investigation of the murder, the defendants The Town of Milford and The Milford Police Department had a policy, custom, or practice of failing to properly discipline, supervise and train Milford police officers including the individuals named in this case. The Town of Milford and The Milford Police Department failed to ensure that its police officers would conduct constitutionally adequate identification procedures; obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclose to prosecutors material information favorable to criminal defendants; follow the duties imposed by Brady v. Maryland; conduct adequate investigations, and never fabricate inculpatory evidence.

94.     These policies, customs and practices led Milford police officers to believe that misconduct would be tolerated and that allegations of abuse of

RA 39

constitutional rights would not be investigated. They made it foreseeable that officers would violate people's constitutional rights.

95.     The policies, customs and practices of the Town of Milford and the Milford Police Department described in this complaint were the moving force behind the plaintiff's arrest, prosecution, conviction and incarceration.

## Count VIII- 42 U.S.C. § 1983

### Claims Against Doe Defendants for Supervisory Liability as to those Defendants then employed by the Milford Police Department as well as John Does 1-20

96.     Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

97.     The Doe Defendants who served as supervisors in the Milford Police Department, acting under color of law with deliberate indifference to the rights of criminal suspects, failed to train and supervise adequately the relevant Milford police officers. In doing so, the Milford supervising Doe Defendants tacitly acquiesced in, condoned, or encouraged their officers to engage in unconstitutional misconduct, including the erroneous identification of the Plaintiff as the killer, the suppression of exculpatory evidence, and other conduct set forth above.

98.     The failure of these defendants to supervise and train those officers amounted to deliberate indifference, or intentional misconduct, which proximately and directly caused the Plaintiff to suffer all of the injuries and damages set forth above.

**Count IX - 42 U.S.C. § 1983**

**Conspiracy Claims Against to those Defendants then Employed by the Milford Police Department as well as John Does 1-20**

99.     Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

100.    Those Defendants then employed by the Milford Police Department as well as John Does 1- 20 acted in concert to deprive the Plaintiff of his constitutional due process rights by, among other things, suppressing, fabricating, failing to disclose, and/or failing to properly investigate the murder.

101.    On information and belief, Defendants affirmatively agreed to act together in, among other things, the wrongful identification of the Plaintiff, in failing to investigate other exculpatory leads and in suppressing evidence helpful to the Plaintiff. By doing so, defendants agreed to deprive Plaintiff of his clearly established rights under the Fourth Amendment and the procedural due process component of the Fourteenth Amendment.

102.    On information and belief, in furtherance of the conspiracy, Defendants undertook overt acts as referenced above and herein.

103.    Defendants' conspiracy directly caused the constitutional deprivations suffered by the Plaintiff's false arrest, malicious prosecution, unfair trial, wrongful conviction and unlawful confinement, and all the other grievous permanent damages set forth above and herein.

## COUNT X- State Civil Rights Statute

**Claims Against those Defendants then Employed by the Milford Police Department as well as John Does 1-20 For Violation Of Massachusetts Civil Rights Ac M.G.L. CH.12, § 111**

104.   Plaintiff hereby incorporates all of the foregoing as if set forth herein and further alleges as follows:

105.   All Defendants interfered with the Plaintiff's exercise and enjoyment of rights guaranteed to him by the United States Constitution, and the Constitution and Laws of the Commonwealth of Massachusetts by, among other things, conducting a sham investigation of the actual perpetrator, Giroux, coaching, coercing or otherwise fabricating evidence against the Plaintiff, or causing witnesses to give statements and/or testimony that would result in his misidentification, or offering statements and/or testimony they knew or should have known was false.

106.   Defendants' misconduct deprived plaintiff of his rights under federal and state law by threats, intimidation and coercion, thereby violating the Massachusetts Civil Rights Act.

107.   As a direct and proximate result of this conduct, plaintiff suffered the injuries as described above.

## CLAIMS FOR DAMAGES

108.   Defendants' actions deprived Gary Cifizzari of his civil rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the Commonwealth of Massachusetts.

109. The defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith and/or malicious acts, misdeeds and omissions caused Cifizzari to be falsely arrested, maliciously prosecuted, unfairly tried, wrongfully convicted, and to suffer 35 years of wrongful imprisonment.

110. All the alleged acts, misdeeds and omissions committed by the defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of defendants meets all of the standards for imposition of punitive damages.

WHEREFORE, Plaintiff, Gary Cifizzari, prays as follows:

A. That the Court enter judgment in favor of the Plaintiff, Gary Cifizzari, and against defendants on all Counts of the Complaint;

B. That the Court award compensatory damages to Plaintiff and against the defendants, jointly and severally, in an amount to be determined at trial;

C. That the Court award punitive damages to Plaintiff and against all individual defendants, jointly and severally, in an amount to be determined at trial, in order that such award will deter similar proscribed conduct by defendants in the future;

D. That the Court award to Plaintiff and against defendants' pre-judgment and post judgment interest on all sums awarded him in this action and that it further award to Plaintiff recovery of all of his costs and expenses concerning this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and/or other authority; and

E. That the Court grant Plaintiff any such other relief to which he may be entitled.

## JURY TRIAL DEMAND

***PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES AND CLAIMS SO TRIABLE.***

RA 43

Dated:  March 8, 2024

                                   RESPECTFULLY SUBMITTED,
                                   GARY CIFIZZARI

                       BY:    /s/ Mark Loevy-Reyes
                                  *One of Plaintiff's Attorneys*

Mark Loevy-Reyes, BBO No. 707974
LOEVY & LOEVY
398 Columbus Avenue, Suite 294
Boston, MA 02116
(312) 243-5900
mark@loevy.com

Jon Loevy*
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
Ph: (312) 243-5900
Fax: (312) 243-5902
jon@loevy.com
*Admitted *pro hac vice*

William S. Smith, Esq., BBO# 635432
THE LAW OFFICE OF WILLIAMS. SMITH
206 Worcester Road,
P.O. Box 585
Princeton, MA O1541
(774) 317-9287
holdenattorney@gmail.com

RA 44

## CERTIFICATE OF SERVICE

I, Mark Loevy-Reyes, an attorney, hereby certify that on March 8, 2024, I filed the foregoing notice using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GARY CIFIZZARI,

     Plaintiff,

     v.

TOWN OF MILFORD, FORMER
MILFORD POLICE OFFICERS VINCENT
LIBERTO, JOHN CHIANESE, FORMER
MILFORD POLICE SGT'S ANTHONY
DIGIROLAMO AND DONALD SMALL,
AS WELL AS-YET UNKNOWN POLICE
OFFICERS AND ADDITIONAL AS-YET
UNKNOWN POLICE SUPERVISORS,
HEREIN REFERRED TO AS JOHN AND
JANE DOES 1-20,

     Defendants.

LEAVE TO FILE GRANTED ON
FEBRUARY 25, 2025

C.A. NO. 4:22-cv-40139-MRG

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
WITH INCORPORATED MEMORANDUM OF LAW**

NOW COME the Defendants who hereby respectfully move for summary judgment of

dismissal in accordance with Fed. R. Civ. P. 56.

Despite the Defendants having played no role in the identification, investigation,

interrogation, arrest, trial or conviction of the Plaintiff, Gary Cifizzari ("Plaintiff") brings this

action pursuant to 42 U.S.C. § 1983, and Mass. Gen. Laws ch. 12, § 11I, alleging that Defendants,

the Town of Milford (the "Town"), three deceased and one former officer of the Town of Milford

Police Department, violated his civil rights 45 years ago by engaging in unlawful conduct during

the investigation that led to his now-vacated conviction for first-degree murder.  For the reasons

set forth below, Defendants' motion for summary judgment should be GRANTED because the

Town and its police officers did not participate in, direct or control any of the allegedly unlawful

conduct that resulted in Plaintiff's conviction.

1

## INTRODUCTION

Plaintiff prosecutes this action despite the Defendants not having coordinated, conducted or controlled the homicide investigation or prosecution which resulted in Plaintiff's conviction. Plaintiff cannot dispute this because he already has received a monetary settlement in the amount of $1 million from the Commonwealth of Massachusetts pursuant to M.G.L. c. 258D, the Erroneous Conviction Felony statute, which settlement was received in return for a release of, among other state actors, the Massachusetts State Police and the Worcester County District Attorney's Office, who together undisputedly coordinated, conducted and controlled the subject homicide investigation and prosecution.

This wrongful conviction action arises from events which occurred over forty-five (45) years ago on September 28, 1979, during an investigation into the brutal murder of Concetta Schiappa in Milford. Plaintiff asserts a wide range of civil rights violations in relation to his 1984 Worcester Superior Court conviction following the investigation of the Schiappa homicide by the Worcester County District Attorney and the Massachusetts State Police. Plaintiff was granted a new trial in 2019, after which the District Attorney elected not to proceed with a re-trial, instead issuing a *Nolle Prosequi* on December 10, 2019, followed by a $1 million settlement by the Commonwealth in May 2021. On November 29, 2022, Plaintiff filed the subject action. (Docket No. 2) On February 27, 2023, Plaintiff served only the Town Milford with the Summons and Complaint.[1]

---

[1] Plaintiff's deadline to serve the individually named defendants, Vincent Liberto, Donald Small, Anthony DiGirolamo and John Chianese, also expired February 27, 2023, without service being made. At no time during the 90 days between the filing of the Complaint on November 29, 2022, and the service deadline on February 27, 2023, did Plaintiff petition the court to seek enlargement of the Fed. R. Civ. P. 4(m) deadline to serve summonses on the individually named defendants, including the three deceased former police officers. Having served Milford on the last day of the Rule 4(m) deadline, Plaintiff cannot deny he knew he had not served the individually named defendants. Moreover, as the accrual date of Plaintiff's action was December 10, 2019 (date of *Nolle Prosequi*), the three-year statute of limitations period for this civil rights action expired on December 10, 2022.

104088292.v1

The Commonwealth's *Nolle Prosequi* expressly cited the unavailability of DNA testing at the time of Plaintiff's arrest for First Degree murder in 1981, recanted "bite mark" expert testimony, the DNA testing evidence linking another suspect, Michael Giroux, to the murder, and the "expedited further testing of available evidence which yielded either exclusion or inconclusive results" in regard to Plaintiff.

In bringing this action, Plaintiff asserts his claims against 4 former (3 deceased) Milford Police individuals who he alleges were involved in the investigation which underlies his claims. However, these assertions lack factual support and the absence of causation. There is no good faith dispute that the homicide investigation relating to Gary Cifizzari was coordinated, directed and controlled by the District Attorney together with the Criminal Prevention And Control ("CPAC") unit of the State Police, and that Plaintiff's homicide prosecution, including most notably bitemark evidence linking him to the murder,[2] was coordinated, directed and controlled by the District Attorney.

Perhaps the most striking, and erroneous, foundational assertion made by Plaintiff is that his conviction was caused by an interrogation of his brother, Michael Cifizzari, on February 26, 1981, during which Michael admitted to the murder, but notably did not implicate Plaintiff. However, only later that same morning after Michael Cifizzari was transported to the State Police CPAC office in Worcester and while questioned by the lead investigator in the Schiappa murder investigation, Sgt. Joseph Doheny, did Michael Cifizzari inform the State Police that Plaintiff was also present at the murder.

---

[2] Three (3) forensic dental expert witnesses testified at trial on behalf of the prosecution – Dr. Stanley Schwartz, Dr. Richard Souviron, DDS, a nationally recognized expert on bite marks in forensic dentistry, and Dr. Anthony Captline D.M.D. , J.D. - that Plaintiff's dental impressions matched the cast of the bite mark discovered on the victim's body and made by Dr. Schwartz at the autopsy. Notably, the third expert who testified for the prosecution, Dr. Captline, was hired by Plaintiff's defense counsel to rebut Doctors Schwartz and Souviron, but unexpectedly informed criminal defense counsel before trial that he agreed with Schwartz and Souviron, and was called by the prosecution to testify.

104088292.v1

The earlier morning interrogation of Michael Cifizzari on February 26, 1981, at the Milford Police Station was entirely unrelated to Plaintiff and did not identify Plaintiff as a suspect or participant in the murder, was not introduced as evidence at Plaintiff's trial, and such questioning (of Michael Cifizzari by Milford Police Sgt. DiGirolamo) was determined to be voluntary and without coercion by the trial judge, Francis Keating, following an extensive evidentiary hearing over two days involving over ten witnesses, and was later upheld by the Massachusetts Appeals Court, Commonwealth v. Michael Cifizzari, 19 Mass. App. Ct. 981, 982 (1985), which concluded:

> [T]here is not the slightest suggestion of actual coercion, pressure, or third-degree tactics employed by the police.

Id.

Ignoring the undisputed facts, Plaintiff nevertheless brought this action against the Defendants, asserting instead that four individual Milford Police officers (1) improperly interrogated Plaintiff's brother, Michael Cifizzari (Counts I, II, IX), (2) fabricated false inculpatory evidence from Michael Cifizzari,[3] and (3) failed to investigate another suspect, Michael Giroux (Counts V, X), all leading to Plaintiff's alleged wrongful conviction. Plaintiff conflates the documented conduct and actions of the State Police during its homicide investigation with the individually named Milford Police officers.

Plaintiff attempts to conceal this inconvenient and undisputed fact by knowingly and in bad faith misrepresenting in its pleadings that the State Police interrogation of Michael Cifizzari

---

[3] See Com. v. Michael Cifizzari, supra at 982 ("To be sure, there was uncontested evidence that the defendant suffered from serious mental illness (chronic paranoid schizophrenia), and there were incidents of disturbed behavior (his false signature on the *Miranda* statement; his response to Officer Sullivan, Asst. Clerk Daley, and Dr. Robison) the night of the confession and the following morning. As to those the judge had the benefit of extensive psychiatric testimony tending both ways with respect to voluntariness. [citation omitted]  The judge made extensive findings of fact and concluded, on abundant supporting evidence, that the Commonwealth had sustained its burden of proving that the defendant's confession was voluntary and was based on a knowing and intelligent waiver of *Miranda* rights. There was no error in his denial of the motion to suppress.")

4

on February 26, 1981, which <u>did</u> implicate Plaintiff in the murder, involved the Defendants, when it was conducted by Sgt. Joseph Doheny of the State Police at its Worcester  CPAC office.

To perform this slight-of-hand, Plaintiff  borrowed verbatim from his May 31, 2019, New Trial Motion to draft the forty-four paragraph "Facts" section (pp. 4-13) of the Complaint. Of particular note at page 11 of the New Trial Motion, the Plaintiff asserted as follows:

> Later that morning [February 26, 1981], Michael [Cifizzari] was transported to the Worcester CPAC office, where he was further questioned by State Police Sergeant Joseph Doheny. . . .  <u>For no reason apparent in the record</u>, Sergeant Doheny began questioning Michael about his statements and asked Michael whether he was sure he had been with his cousin, and not his brother Gary, at the time of the crime. Michael then responded that yes, 'Gary was there,' and said that 'they [his cousin and his brother] were both there.'" (emphasis added)

However, Plaintiff's Complaint at ¶ 41, while otherwise a verbatim replication of his New Trial Motion, removed the phrase "*For no reason apparent in the record*" and replaced it with the phrase "*Along with Milford Police Sgt. DiGirolamo, Milford Officers Chianese and Nicholas Sullo,*" thus, now alleging – without evidence - that these 3 Milford Police officers participated in Sgt. Doheny's interrogation at the CPAC office in Worcester during which Michael Cifizzari implicated Plaintiff in the murder. This assertion is manifestly false and constitutes a striking violation of Rule 11 of the Federal Rules of Civil Procedure.[4]  Without evidence that the Defendants participated in the State Police interrogation whereby Michael Cifizzari implicated Plaintiff, Plaintiff is deprived of a necessary causal relationship between the Town's interrogation and Plaintiff's connection to the murder.

Simply stated, as supported by Plaintiff's own New Trial Motion, Plaintiff's purported wrongful conviction was based on the following causal nexus – (1) the State Police interrogation of Michael Cifizzari at which he implicated Plaintiff in the murder, and (2) Plaintiff's dental

---

[4] Milford reserves its right to seek Rule 11 and other sanctions against Plaintiff on this factual basis and more.

104088292.v1

impression cast obtained solely by the State Police which unequivocally matched the patterned bitemark injuries left on Ms. Schiappa's body, as supported by three separate dental experts. Indeed, "Section C" of Plaintiff's New Trial Motion is captioned "*Gary Cifizzari Did Not Become a Suspect Until the Police Encouraged Michael Cifizzari, Who Suffered from Chronic Schizophrenia and Acute Psychosis, to Make False Statements Implicating His Brother in the Crime*." (New Trial Motion, p. 9)  That interrogation was conducted by Sgt. Doheny of the State Police. The Milford Police did not participate, and were not asked by the District Attorney or the State Police to participate in any part of this interrogation, or with investigating a match between Plaintiff's dental cast and the bite mark injuries on Ms. Schiappa.  Plaintiff's erroneous introduction of Milford police officers at the State Police interrogation cannot substitute for evidence, and this court should not condone such conduct.

More than anything else in his New Trial Motion, Plaintiff emphasized the impact of the bitemark evidence as responsible for his conviction, contending that the case for guilt against him consisted entirely of the bite mark identification evidence in the form of expert testimony; the bite mark evidence was in sum and substance the entire case the Commonwealth had offered at trial against him; the Commonwealth heavily relied on the bite mark comparison evidence throughout the criminal trial; and as a result of the bite mark comparison evidence and despite the absence of any other credible evidence linking him to the murder, he was convicted of First Degree murder on July 30, 1984.

In addition to the various individual capacity claims asserted against the individually named Defendants, Plaintiff also brings a civil rights claim against Milford pursuant to Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978), in which Plaintiff alleges

104088292.v1

that the actions of the individual defendants were taken pursuant to a municipal policy or custom that caused Plaintiff's alleged deprivation of constitutional rights.

**FACTUAL BACKGROUND**

Milford, Massachusetts resident Concetta Schiappa, age 74, was brutally murdered in her 72 Central Street apartment on September 29, 1979. Her body was discovered by her upstairs landlord, Diane Nydam, at approximately 9:15 a.m.  Ms. Nydam contacted the Milford Police, who arrived at the scene immediately after the call.  (SUMF ¶ 1)  The Worcester District Attorney together with the Massachusetts State Police's Crime Prevention and Control unit ("CPAC"), coordinated, directed and controlled the homicide investigation. (SUMF ¶ 4) Massachusetts General Law c. 38, § 4 provides that the District Attorney shall direct and control any criminal investigation of a death.  Since the Town of Milford is in Worcester County, the Worcester County District Attorney had control of the investigation.  (SUMF ¶ 1)

All decisions related to the Schiappa homicide investigation and the resulting criminal prosecutions were made by the District Attorney and the State Police, through its CPAC unit. (SUMF ¶ 10)  Sgt. Joseph Doheny at the CPAC unit in Worcester took charge of the investigation after arriving at the murder scene on the morning of the murder, and called State Police technicians to the scene, including a chemist, fingerprint expert and photographer.  (SUMF ¶ 13)  Strategy and planning for the Schiappa homicide investigation was developed and communicated by Sgt. Doheny, through consultation with Det. Lt. DeFuria, who communicated regularly with each other in the Worcester CPAC office.  (SUMF ¶ 25)

To the extent CPAC desired assistance from the Milford Police during the Schiappa homicide investigation, CPAC would request such assistance, but CPAC would at all times coordinate, direct and control all aspects of the investigation.  (SUMF ¶¶ 59, 65)  It was standard

104088292.v1

protocol during CPAC investigations to request local law enforcement to accompany CPAC investigators on interviews, particularly when witnesses resided in that locality, and  local law enforcement was likely to have more familiarity with local residents and would be of assistance as witnesses to what transpired and was said during witness and suspect interviews. (SUMF ¶¶ 61-62)  The Milford Police was not equipped with a homicide division at the time of the murder investigation. (SUMF ¶ 60)

An autopsy on the victim was performed on September 29, 1979, at Watson Funeral Home, performed by Dr. Ambrose Keeley, a pathologist, in the presence of Dr. Nicholas Capece. (SUMF ¶ 40)  Dr. Stanley Schwartz, D.M.D. from Tufts Dental School was contacted by the State Police to attend the autopsy and examine the bite marks and make impressions. (SUMF ¶ 43)  It was Dr. Schwartz' opinion that the cast had sufficient detail so that if he were allowed to make a cast of a suspect's mouth, he could positively identify it as having made the tooth impressions on the victim's body. (SUMF ¶ 45)

State Police CPAC unit investigators conducted interviews with  neighbors and witnesses beginning immediately after the discovery of Mrs. Schiappa's murder on September 29, 1979, and through the following weeks. They were often accompanied by local Milford Police officers. (SUMF ¶ 68)  During Trooper Doheny's interview with Mrs. Schiappa's neighbor, Kathy Duncan, she reported that her brother-in-law, Michael Giroux, who was visiting her, had been accused of stealing money from Mrs. Schiappa's apartment. (SUMF ¶ 291) CPAC investigator Trooper White "keyed in on Michael Giroux as a suspect," primarily based on Giroux having been accused of theft from Mrs. Schiappa's apartment.  (SUMF ¶ 292)  Trooper White spoke to Giroux on several occasions within 3 to 6 months of the murder.  (SUMF ¶ 294)  The State Police "looked at" Giroux,

8

but couldn't show he knew the Cifizzaris or place him at the scene, and he wasn't charged with the murder. (SUMF ¶ 318)

On February 26, 1981, at approximately 1:00 a.m., Michael Cifizzari walked into the Milford Police station. (SUMF ¶ 99) The overnight desk officer, Sgt. Anthony DiGirolamo, would later testify that "[e]ach time [Michael Cifizzari] came to the station previously, it seemed as though he had something on his mind that he wanted to talk about." (SUMF ¶ 102) Sgt. DiGirolamo, who was Michael Cifizzari's former youth football coach, had allowed him to sleep at the station about five or six times in the previous six months. (SUMF ¶ 101) Present at the station were Sgt. DiGirolamo and Officer Chianese. (SUMF ¶ 103) Starting at about 1:30 a.m. Sgt. DiGirolamo attempted to talk with Michael Cifizzari about the murder while Michael sat in the clerk's office at the station. (SUMF ¶ 107) Sgt. DiGirolamo read Michael Cifizzari his Miranda Rights from a card and Officer Chianese wrote out the Miranda rights, which Michael read. Michael stated that he understood his rights and signed it. (SUMF ¶ 108) Michael was asked by Sgt. DiGirolamo if he knew anything about the murder on Central Street, to which Michael stated he did, and that he was related to Mrs. Schiappa, and knew her as Aunt Connie. (SUMF ¶ 109)

Michael then gave a narrative account during which he admitted that he had gone to Mrs. Schiappa's house on the night she was murdered, around 11:00-11:30 p.m., attempted to get some money from her, was refused, became angry, and then killed her. (SUMF ¶ 110) During this statement he indicated that his cousin, Robert Cananzey, was with him during the murder. (SUMF ¶ 111) One half hour later, at approximately 2:00 a.m., Sgt. DiGirolamo requested that CPAC investigator, Trooper White, who lived in Milford, come to the Milford police station to participate and be briefed on the confession Michael Cifizzari then was giving. (SUMF ¶ 112) Shortly

9

RA 54

thereafter, arrangements were made to bring Michael Cifizzari to the CPAC office in Worcester later that same morning for an interrogation by State Police detectives. (SUMF ¶ 118)

Worcester Assistant District Attorney Lawrence Murphy was assigned to the case when Michael Cifizzari was brought to the CPAC office to give a statement. (SUMF ¶ 128)  Murphy was informed that Michael Cifizzari was coming to the CPAC office for an interrogation, but did not participate in it.  (SUMF ¶ 129)

At approximately 8:00 a.m. on February 26, 1981, after Michael Cifizzari had slept in the Milford Police station and had been given breakfast, he was brought to the Worcester CPAC Office by Sgt. DiGirolamo, and Officers John Chianese and Nicholas Sullo of the Milford Police.  (SUMF ¶ 134)  Upon their arrival, Sgt. Doheny then introduced himself to Michael Cifizzari and reminded him again of his Miranda rights.  Michael Cifizzari stated he understood them and he was willing to talk with Sgt. Doheny.  (SUMF ¶ 136)  Michael Cifizzari then provided Sgt. Doheny a narrative about what he and Robert Cananzey had done to Mrs. Schiappa, biting her and confessing to the murder.  (SUMF ¶ 142)  Sgt. Doheny then asked Michael Cifizzari if he was sure it was his cousin that was with him and not his brother Gary and he said, **"Yes , Gary was there."** (SUMF ¶ 143)

Plaintiff admits that he "became a suspect in the police investigation only after Sergeant Doheny questioned his brother Michael Cifizzari," that he "was not named in any of the four statements written down by the Milford Police, which stated that Michael committed the crimes with Bob Cananzey," and that in none of those statements had Michael ever mentioned Plaintiff. (SUMF ¶¶ 145-146, 150)

Sgt. Doheny arrested Michael Cifizzari at the CPAC office on February 26, 1979, and had him transported to Milford District Court on murder charges.  (SUMF ¶ 153)  In September 1983, Michael Cifizzari was tried and convicted of Second Degree murder at Worcester Superior Court,

10

before Judge Robert Mulkern.  (SUMF ¶ 157)  Michael Cifizzari appealed the conviction, and the conviction was affirmed by the Massachusetts Appeals Court. See Commonwealth. v. Michael Cifizzari, 19 Mass. App. Ct. 981 (1985)(no error in trial court's denial of motion to suppress statements; "Commonwealth sustained its burden of proving that the defendant's confession was voluntary and was based on a knowing and intelligent waiver of Miranda rights.").  (SUMF ¶ 158)

It was only when Michael Cifizzari was interrogated by the State Police that Gary Cifizzari was implicated in the Schiappa murder. (SUMF ¶ 159)  Thereafter, Trooper Thomas Meier of the State Police CPAC unit was directed by Sgt. Doheny to conduct an investigation regarding dental identification, including Michael Cifizzari's tooth impressions which did not match the bite marks on Mrs. Schiappa.  However, Gary Cifizzari's tooth impression did match when consideration was given to his "retreated right front tooth," that had been knocked out and replaced in 1980, after the murder. (SUMF ¶¶ 165, 189)  Dr. Richard Souviron, DMD was referred to Trooper Meier and ADA Murphy by Dr. Schwartz.  Murphy wanted to meet with Souviron to determine if he would be an expert in the murder case and what he would say for an opinion.  (SUMF ¶ 169)  Dr. Souviron's opinion, like Dr. Schwartz' was that Gary Cifizzari's teeth made the marks on Mr. Schiappa's body.  (SUMF ¶ 170)

In November 1983, on the basis of the concurring opinions of Dr. Schwartz and Dr. Souviron, Gary Cifizzari was indicted by a Worcester County Grand Jury for the 1979 murder of Concetta Schiappa.  (SUMF ¶¶  171-172, 206)  On November 21, 1983, Trooper Meier and Lt. DeFuria, together with Taunton Police detectives, served an indictment warrant on Gary Cifizzari and placed him under arrest for the Schiappa murder.  He was advised of his Miranda rights by Lt. DeFuria and then transported to the State Police CPAC office in Worcester.  (SUMF ¶¶ 174, 224) No one from Milford was involved in Gary Cifizzari's arrest.  (SUMF ¶ 227)

11

Beginning July 23, 1984, Gary Cifizzari was tried for First Degree murder at Worcester Superior Court, before Judge Robert J. Hallisey, and was convicted on July 30, 1984. (SUMF ¶ 230)  Twenty witnesses testified at the murder trial, including CPAC investigators Sgt. Doheny and Trooper Meier, Dr. Schwartz, DMD (dental examiner and expert witness), Dr. Anthony Captaline, DMD (dental expert witness), and Dr. Souviron, DMD (dental expert witness). (SUMF ¶ 231)  Except for Milford patrolman, Robert Catusi, who responded to the murder scene and testified at trial solely to identify the victim's body (Mrs. Schiappa was his wife's relative), no member of the Milford Police testified at the Gary Cifizzari murder trial.  (SUMF ¶ 232)

The Commonwealth's prosecutor, ADA Lawrence Murphy, testified that the forensic dental bite mark evidence was "very important" in obtaining the conviction of Gary Cifizzari. (SUMF ¶ 235)  More emphatically, Plaintiff has asserted that "[t]he Commonwealth's case against Mr. [Gary] Cifizzari was predicated entirely on 'expert' bitemark comparison testimony;" and that "[t]he case against [Gary] Cifizzari began and ended with bitemark comparison evidence in the form of expert testimony." (SUMF ¶ 221) The Town of Milford and members of its Police Department did not direct, control or participate in any aspect of securing, assessing, evaluating or utilizing as evidence the dental evidence, from the initiation of the murder investigation through the conviction of Gary Cifizzari. (SUMF ¶ 207)  Moreover, Michael Cifizzari's February 26, 1981, confessions at the Milford police station and at the State Police CPAC office could have been, but were not, introduced as evidence at Gary Cifizzari's murder trial.  (SUMF ¶ 233)

On May 14, 1986, the Massachusetts Supreme Judicial Court affirmed the judgment against Plaintiff. Commonwealth v. Gary Cifizzari, 497 Mass. 560 (1986).  The Court held that: "The circumstances in the case warranted a finding by the jury that a deliberately premeditated murder or a murder by extremely cruel or atrocious means or a murder in the commission of the

104088292.v1

felony of rape was committed by the defendant. As G.L. c. 278, § 33E requires, we have examined the entire case and we conclude that the interests of justice do not warrant the entry of a verdict of a lesser degree of guilt or an order for a new trial." Id. at 369. (SUMF ¶ 236)

On appeal, Plaintiff raised a number of arguments, including but not limited to, the admissibility of bite mark identification evidence; the statement of a trial witness, Annette Pasqualone, Plaintiff's cousin, mentioning Michael Cifizzari's confession; introduction of the theory of joint venture; instruction of felony murder; and the prosecutor's remarks on closing argument regarding a reference to the Cifizzari brothers' smoking marijuana under a bridge after the murder. Id. However, Plaintiff did not argue that any conduct by the Milford Police relative to Michael Cifizzari's questioning on February 26, 1981, or evidence of Michael Cifizzari's confessions – as they were not introduced at trial. (SUMF ¶ 237)

Years later on March 9, 2017, the New England Innocence Project filed an appearance on behalf of Gary Cifizzari, as did Rope & Gray on December 21, 2017. (SUMF ¶ 238) On May 31, 2019, Plaintiff filed a Motion for a New Trial, and on December 10, 2019, the Commonwealth filed an Assent to the motion, which the Superior Court allowed on December 10, 2019. (SUMF ¶¶ 238-240) Also on December 10, 2019, the Commonwealth entered a *Nolle Prosequi* on the count of First Degree Murder, citing: the unavailability of DNA testing as an investigative tool at the time of the 1979 murder and the 1983 arrest, although expedited further DNA testing of available evidence yielded either exclusion or inconclusive results in regard to the defendant, Gary Cifizzari; recanted testimony from Dr. Souviron, one of three prosecution expert dental witnesses on bite mark identification, on which Gary Cifizzari's conviction was "largely" based; and the Commonwealth having determined through DNA evidence that Michael Giroux had perpetrated the murder. (SUMF ¶ 241)

104088292.v1

In May 2021, Plaintiff and the Commonwealth consummated a settlement in the amount of $1 million relative to claims brought, or which could have been brought, against the Commonwealth pursuant to the Massachusetts Erroneous Conviction statute, M.G.L. c. 258D, § 1 et seq, arising from or related to the facts or circumstances surrounding Gary Cifizzari's arrest, indictment, conviction, sentencing and imprisonment in connection with his conviction for the murder of Concetta Schiappa (SUMF ¶ 242) none of which Milford played a role.

## ARGUMENT

## I.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted). Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. (citation omitted). By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case." United States v. Plat 20, Lot 17, Great Harbor Neck, New Shoreham, R.I., 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact," the moving party must " 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file ... demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Ocasio-Hernández v. Fortuño-Burset,

104088292.v1

777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).

Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party

must establish a trial-worthy issue by presenting enough competent evidence to enable a finding

favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st

Cir. 2002) (citation omitted). That is, the nonmoving party must set forth specific, material

evidence showing that there is "a genuine disagreement as to some material fact." Plat 20, Lot 17,

Great Harbor Neck, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–

48 (1986)). The non-moving party may not simply "rest upon mere allegation or denials of his

pleading," but instead must "present affirmative evidence." Anderson v. Liberty Lobby, Inc., 477

at 256-57.

"In reviewing the record, the Court "must take the evidence in the light most flattering to

the party opposing summary judgment, indulging all reasonable inferences in that party's favor."

Cochran, 328 F.3d at 6. The First Circuit has noted that this review "is favorable to the

nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48

(1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material[,]"

Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the Court may

discount "conclusory allegations, improbable inferences, and unsupported speculation." Cochran,

328 F.3d at 6 (quoting Medina-Munoz, 896 F.2d at 8).

## II. THE COURT SHOULD ENTER SUMMARY JUDGMENT DISMISSING PLAINTIFF'S FEDERAL LAW MONELL CLAIM AGAINST THE TOWN

Plaintiff advances one Federal law claim against the Town: a Monell Claim under 42

U.S.C. § 1983, contending that the Town "had a policy, custom, or practice of failing to properly

discipline, supervise and train Milford police officers including the individuals named in this

case," and the Town "failed to ensure that its police officers would conduct constitutionslly

104088292.v1

adequate identification procedures; obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclose to prosecutors material information favorable to criminal defendants, follow the duties imposed by *Brady v. Maryland*, conduct adequate investigations, and never fabricate inculpatory evidence." Exhibit 8, Complaint, Count VII, ¶ 93. According to Plaintiff, "the policies, customs and practices of the Town of Milford and the Milford Police Department described in this complaint were the moving force behind the plaintiff's arrest, prosecution, conviction and incarceration. Exhibit 8, Complaint, Count VII, ¶95. Plaintiff is unable to present evidence supportive of any of these assertions.

Of note, the First Circuit recently issued a decision on the issue of Monell liability in the matter of *Cosenza v City of Worcester*, 120 4th 30 (2024). The *Cosenza* Court noted that Municipalities are responsible only for their unconstitutional acts and are not variously liable.

**A.      The Summary Judgment Record Does Not Support Plaintiff's Municipal Liability Claims as to Count VII Under Monell.**

The Court should enter summary judgment on Plaintiff's Monell claims under Count VII of the Complaint. Under 42 U.S.C. § 1983, Plaintiff has the right to sue those acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia . . . [for] the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Plaintiff must show that "'the challenged conduct [is] attributable to a person acting under color of state law' and that 'the conduct must have worked a denial of rights secured by the Constitution or by federal law.'" Freedman v. Town of Hudson, 714 F.3d 29, 37 (1st Cir. 2013) (quoting Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997) (alteration in original)).

"[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell, 436 U.S. at 691. Rather, the Plaintiff must show that the "the municipality *itself* cause[d]

104088292.v1

the constitutional violation at issue." City of Canton v. Harris, *489 U.S. 378, 385 (1989)*; *see* Collins v. City of Harker Heights, 503 U.S. 115, 122 (1992) ("The city is not vicariously liable under § 1983 for the constitutional torts of its agents: It is only liable when it can be fairly said that the city itself is the wrongdoer."). The Supreme Court, in an effort to prevent municipal liability from "collaps[ing] into de facto *respondeat superior*[,] has set a very high bar for assessing municipal liability under Monell." Young v. City of Providence, 404 F.3d 4, 26 (1st Cir. 2005).

That high bar is surmounted only when the constitutional deprivation arises from a governmental policy or practice. Id.; *see also* Cox v. Murphy, No. 12-11817-FDS, 2016 U.S. Dist. LEXIS 99890, at *19-20 (D. Mass. Feb. 12, 2016). Thus, a plaintiff must show that: "(1) the municipality had a custom, policy, or practice of failing to investigate, discipline, supervise, or train its officers; (2) this custom, policy, or practice was such that it demonstrated a "deliberate indifference" to the rights of those citizens with whom its officers came into contact; and (3) the custom, policy, or practice was the direct cause of the alleged constitutional violation." Id. at 20 (citing DiRico v. City of Quincy, 404 F.3d 464, 468-69 (1st Cir. 2005)); *see also* Young, 404 F.3d at 26.

The policy or custom need not have "received formal approval through the body's official decisionmaking channels, " Monell, 436 U.S. at 691, but "a single decision by a municipal policymaker constitutes official policy 'only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.' " Freeman, 714 F.3d at 38 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). Whether a decisionmaker has final policymaking authority is a question of law determined by state and local laws, including descriptions of duties and obligations. See id.; *see also* Sanoguet-Valentin v. Mun. Gov't of Mayaguez, No. 14-1182 (PAD), 2017 U.S. Dist. LEXIS 15730, at *3 (D.P.R. Feb. 2, 2017).

17

Unofficial practices, policies, and customs may still be actionable under <u>Monell</u> if they are "'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of [those practices, policies, and customs] yet did nothing to end [them].'" <u>Whitfield v. Melendez-Rivera</u>, 431 F.3d 1, 13 (1st Cir. 2005) (quoting <u>Bordanaro v. McLeod</u>, 871 F.2d 1151, 1156 (1st Cir. 1989)).

Here, Plaintiff advances multiple alternative theories of municipal liability.[5]  In part, he contends that the Town did not have adequate policies to address a variety of issues, and failed to adequately train or supervise officers concerning those written policies or its unwritten policies. For the reasons set forth below, all of these theories fail.

        **1.**      **As a Threshold Matter, the Town's Employees Here Were Acting at the Direction of the Commonwealth's District Attorney Under State Law and the Massachusetts State Police, and Therefore Were Not Carrying Out Policies or Customs of the Town Within the Meaning of <u>Monell</u>.**

Unlike investigations of most, if not all, other crimes, which fall under the general policies and procedures of the Milford Police Department, a homicide investigation in Milford, Massachusetts is carried out under Mass. G.L. c. 38 at the direction of the District Attorney under the policies and customs of the Worcester District Attorney and its representatives in the Massachusetts State Police.[6] (Defendants' Joint Local Rule 56.1 Concise Statement of Undisputed Material Facts ["SUMF"], ¶¶ 4-10).

---

[5] Plaintiff alleges that the Town "failed to ensure that its police officers would conduct constitutionally adequate identification procedures; obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclose to prosecutors material information favorable to criminal defendants, follow the duties imposed by *Brady v. Maryland*, conduct adequate investigations, and never fabricate inculpatory evidence." Exhibit 8, Amended Complaint (hereinafter "Complaint"), Count VII, ¶ 93.  According to Plaintiff, "the policies, customs and practices of the Town of Milford and the Milford Police Department described in this complaint were the moving force behind the plaintiff's arrest, prosecution, conviction and incarceration. Exhibit 8, Complaint, Count VII, ¶ 95.

[6] Underscoring this fundamental fact, the Commonwealth paid Plaintiff $1 million to settle the claims against it under Mass. G.L. c. 258D, the Massachusetts Wrongful Conviction Act.

104088292.v1

In the unique context of the Concetta Schiappa homicide investigation, the role of Milford police officers was limited to providing assistance to the Commonwealth and its State Police investigators from CPAC. (SUMF ¶¶ 59-67)  Consequently, the policies and customs that were being carried out were entirely those of the Commonwealth and not the Milford Police.  However, even if they were, Plaintiff cannot show, and no reasonable juror would be able to determine, which particular actions in the Schiappa homicide investigation were taken solely because of municipal policies or customs versus the policies or customs of the District Attorney or the Massachusetts State Police.

To begin, in general, where local law enforcement is carrying out the requirements of state law at the direction of the state or an officer of the state, like the district attorney here, the state or the officer of the state, is the final policymaker for purposes of Monell, not the municipality. McMillian v. Monroe County, 520 U.S. 781, 784-793 (1997). Additionally, although the First Circuit has apparently never addressed a Monell claim in the context of a Massachusetts homicide investigation, the general issue of whether a municipality carrying out state law can serve as the basis for Monell liability has been addressed in at least two other circuits and by another judge of this Court. In Surplus Store & Exchange, Inc v. City of Delphi, the Seventh Circuit observed that:

> "It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law.  If the language and standards from Monell are not to become a dead letter, such a 'policy' simply cannot be sufficient to ground liability against a municipality."

928 F.2d 788, 791-92 (7th Cir. 1991); *see also* Bethesda Lutheran Homes & Servs., Inc. v. Leean, 154 F.3d 716, 718 (7th Cir. 1998)(observing that "the position of this circuit" is that a county "cannot be held liable under section 1983 for acts that it did under the command of state or federal

law"). <u>Surplus Store</u> was cited with approval by Judge Stahl in dicta in a concurrence in <u>Yeo v. Town of Lexington</u>, 131 F.3d 241, 257 (1st Cir. 1997). Additionally, in <u>Vives v. City of New York</u>, the Second Circuit stated:

> [W]e agree with all circuits to address state laws mandating enforcement by municipal police officers that a municipality's decision to honor this obligation is not a conscious choice. As a result, the municipality cannot be liable under <u>Monell</u> in this circumstance. On the other hand, if a municipality decides to enforce a statute that it is authorized, but not required, to enforce, it may have created a municipal policy. However, we do not believe that a mere municipal directive to enforce all state and municipal laws constitutes a city policy to enforce a particular unconstitutional statute . . . . [I]t is necessary, at a minimum, that a municipal policymaker have focused on the particular statute in question. We, therefore, hold that there must have been conscious decision making by the City's policymakers before the City can be held to have made a conscious choice.

524 F.3d 346, 353 (2d Cir. 2008). In <u>Martin v. Evans</u>, 241 F. Supp.3d 276, 284-285 (D. Mass. 2017), Judge Saris discussed the cases above in the context of the City of Boston's enforcement of the Massachusetts Wiretap Act and applied the conscious-choice standard articulated by the Second Circuit to conclude that a complaint could proceed against the City.

However, applying the conscious-choice standard above to the facts of this case, which are very different from the facts that were faced by Judge Saris, the standard weighs overwhelmingly against Plaintiff's <u>Monell</u> claim. Unlike a situation where a municipality is making a conscious choice to enforce a discretionary state law, here state law dictates the paradigm for homicide investigations. State law puts the District Attorney and his State Police representative in the position of coordinating, directing and controlling the investigation. (SUMF ¶¶ 4-10) If a homicide happened in Milford, Milford was not free to disregard state law and investigate the homicide pursuant to its own policies and customs. (SUMF ¶¶ 4-10) Rather, Milford was mandated by state law to defer to the District Attorney, the Massachusetts

104088292.v1

State Police and those offices' policies and customs. (SUMF ¶¶ 64, 65) Accordingly, municipal liability based on <u>Monell</u> is inappropriate here, given the facts of this case.

> **2.     Based on the Summary Judgment Record, Plaintiff Cannot Make the Showing Needed to Support a Claim of Municipal Liability Based on Unconstitutional Custom or Practice.**

Prevailing on a Section 1983 action based on an unconstitutional municipal policy or custom requires a Plaintiff to prove the following: (1) The "custom or practice must be attributable to the municipality" in that "it must be so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice;" and (2) "the [municipal] custom must have been the cause of and the moving force behind the deprivation of the constitutional rights." <u>Bordanaro, et al. v. McLeod, et al.</u>, 871 F.2 1151, 1156 (1st Cir. 1989)(citations omitted). Based on the summary judgment record in this case, Plaintiff cannot meet either prong.

> **a.     *Plaintiff Cannot Show a Widespread Municipal Custom or Practice.***

Plaintiff contends that municipal liability rests with the Town for a variety of unconstitutional municipal practices and customs which he claims caused his prosecution. Seeking to supporting his municipal liability claim, Plaintiff relies only on the facts of one case – his brother Michael's case and not even his own - and conclusory allegations of widespread violations, none with any relevance to his own prosecution. *See <u>Exhibit 8</u>, Complaint, Count VII, ¶¶ 92-95* (alleging failure to improperly discipline, supervise and train officers regarding constitutionally adequate identification procedures, obtain probable cause to prevent false arrest and malicious prosecution, disclose information to prosecutors, follow

104088292.v1

Brady v. Maryland imposed duties, conduct adequate investigations, and refrain from fabricating inculpatory evidence).

At the outset, Plaintiff's claim falters because Milford did not direct or control the homicide investigation, either in practice or by operation of state statute.  Milford did not participate in the identification of Plaintiff as the culprit, participate in the investigation, arrest or prosecution of Plaintiff, fail to disclose evidence to State Police investigators who controlled and directed the investigation, and fabricated no inculpatory evidence.

Plaintiff's claim also falters because the First Circuit has long held that "evidence concerning a single event alone cannot establish a municipal custom or policy" unless "other evidence of the policy has been presented and the 'single incident' in question involves the concerted action of a large contingent of municipal employees." Bordanaro, et al. v. McLeod, et al., 871 F.2 1151, 1156-57 (1st Cir. 1989). "[A] 'single incident' of misconduct, without other evidence, cannot provide the basis for municipal liability under § 1983. Such a result would be the equivalent of imposing *respondeat superior* liability upon the municipality." Id. at 1161 n.8 (citing Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985)).  Having taken discovery concerning his municipality liability claim, and having appealed and litigated an erroneous conviction claim against the Commonwealth, Plaintiff still cannot point to facts in the summary judgment record in this case that support a widespread pattern that Milford town employees fabricated evidence or failed to divulge it to the prosecution because of Milford policies or customs.

The leading case in the First Circuit addressing when a single incident plus more can permit a Plaintiff to show a widespread municipal custom or policy is Bordanaro. The facts in

22

104088292.v1

RA 67

_Bordanaro_, however, are readily distinguishable from those here in at least several separate and significant points.

First, in Bordanaro there was "uncontroverted testimony" of "'about 20 or 30' or '50, 60' situations" in which the municipal police department had engaged in "the facially unconstitutional practice of breaking down doors without a warrant when arresting a felon." Id. at 1156. By contrast, there is no evidence in the summary judgment record here of any other cases similar to the Schiappa homicide investigation in Milford, as coordinated, directed and controlled by the Commonwealth, let alone as many as the 20-60 cases referred to in Bordanaro.

Second, in Bordanaro the evidence showed that the municipality provided a sledgehammer to carry out the unconstitutional conduct. Id. By contrast, here there is nothing in the summary judgment record showing that Milford provided the tools to carry out any unconstitutional practice. Additionally, any such attempted showing by Plaintiff in this case is defeated by the overwhelming fact that all aspects of the case, from the murder to the conviction, and including all intermediate phases concerning which Plaintiff complains and asserts as constitutional violations – investigation, identification, interrogation, and prosecution - were coordinated, directed and controlled by the District Attorney and the State Police. (SUMF ¶¶ 4, 8-10, 19, 25, 27, 35, 43, 59-67, 132-133)

Milford literally played no role at all in Plaintiff's identification, investigation, arrest and conviction. More directly, it played no role in the two central events which resulted in Plaintiff's identification, (1) Michael Cifizzari's implication of Plaintiff at the State Police CPAC office in Worcester on February 26, 1981 (SUMF ¶¶ 143-146, 159), and arrest and conviction, (2) the bite mark identification evidence. (SUMF ¶¶ 40-47, 165-173, 176-212, 213-217, 218-222)

23

104088292.v1

Third, in <u>Bordanaro</u> there was "uncontroverted testimony" that the municipality had "always applied" the unconstitutional custom or policy. <u>Id</u>. Here, by contrast, there is no similar evidence in the summary judgment record showing that what occurred in the Schiappa homicide investigation occurred in any other homicide investigation in Milford, in which the Milford police were involved in assisting in a District Attorney and State Police led murder investigation, as required by state statute.

Fourth, in <u>Bordanaro</u> there was "uncontroverted testimony" that the single incident at issue in that case "appeared no different than any of the previous" similar incidents involving the application of the municipal custom or policy "over the years." <u>Id</u>. Here again, by contrast, there is no evidence in the summary judgment recording showing any similar incidents.

Fifth, in <u>Bordanaro</u> there was "uncontroverted testimony" that what the municipal officers did in that case "follow[ed] what had been accepted departmental practice in the past." <u>Id</u>. By contrast, here again there is no similar evidence in the summary judgment record of other cases like the Schiappa homicide investigation that involved Milford police officers in the past.

Sixth, in <u>Bordanaro</u> the First Circuit concluded a reasonable inference could be drawn that a municipal policy or custom existed because "the entire night watch of the [municipality]" had been involved in the single incident. <u>Id</u>. By contrast, here there is no evidence in the summary judgment record that an entire group of on-duty Milford officers were involved in the Schiappa homicide investigation. Rather, the summary judgment record shows that only a handful of Milford police officers were asked to accompany the State Police investigators, and the entirety of the homicide investigation which was under the coordination, direction and control of the District Attorney and the State Police. (SUMF ¶¶ 17-54, 55-67)

104088292.v1

Likewise, during the early morning when Michael Cifizzari arrived voluntarily at the Milford Police station and confessed to the murder, it was only one Milford officer, Sgt. DiGirolamo, and a scrivener, Officer Chianese, who conducted the interview. (SUMF ¶¶ 99-127)  During the remainder of the Schiappa homicide investigation, only a few other Milford Police officers were asked by the State Police to accompany them to witness interviews, as was CPAC protocol.  (SUMF ¶¶ 59-67, 68-89)

Moreover, the "single incident" at issue in Bardanaro was a discrete event that occurred on one night at one location during a short period of time in which all the municipality's on-duty officers engaged in the same, single instance of unconstitutional conduct under one municipal policy or custom.  Unlike Bardanaro, the events at issue here unfolded over a 1½ year period (the September 1979 homicide through the February 1981 confession by Michael Cifizzari) and, as alleged by Plaintiff, involved a multitude of challenged municipal policies by what *cannot* be fairly described as a "large contingent of individual municipal employees." Id. at 1157.  Here, the investigative steps were carried out by the District Attorney and the State Police with the assistance of several Milford detectives, including Det. Vincent Liberto and Det. Donald Small. (SUMF ¶¶ 68-89)

Finally, after having taken discovery in this case, Plaintiff cannot point to any evidence showing the alleged widespread practices. Rather, Plaintiff continues to rely on only his restatement of the conclusory allegations of his Complaint coupled with imprecise cites to discovery concerning only the facts of not his own case, but the State Police investigation, arrest, and conviction of his brother, Michael.  Perhaps conceding the absence of such facts, Plaintiff does not allege that any such practices were "widespread."

104088292.v1

RA 70

For all of the reasons set forth above, the facts of this case are fundamentally different than the facts at issue in Bardanaro. Thus, Plaintiff cannot rely on the single-incident-plus-more-evidence paradigm to survive summary judgment.

### b.    Plaintiff Cannot Show Attribution to the Municipality.

Plaintiff also cannot show that the Town or its responsible authority here had actual knowledge or constructive knowledge of a widespread problem concerning the policies or customs challenged by Plaintiff. Bardanaro, 871 F.2d at 1157. As the summary judgment record clearly shows, the Town was not in charge of the Schiappa homicide investigation or any other similar homicide investigation. (SUMF ¶¶ 4-16, 17-27) As the summary judgment record shows, the Schiappa homicide investigation, like all homicide investigations in Worcester County, was coordinated, directed and controlled by the District Attorney and the CPAC unit of the State Police. (SUMF ¶¶ 4-16, 17-27) Those facts, make this case materially different than the facts in Bardanaro (where the municipal police chief and by extension the municipality were *solely* in charge of the conduct at issue and the police chief acknowledged as much, Id. at 1157), and do not permit attribution of the challenged policies and customs to the municipality in this case.

Moreover, there is nothing in the record that could show that the chief of police or responsible Milford individual was aware of any widespread problems concerning the policies or customs challenged by Plaintiff. Put simply, the summary judgment record is devoid of any facts - other than the facts surrounding Plaintiff's brother's case - that directly show or from which it can be reasonably inferred that there was any kind of widespread problem relating to *any* of the challenged municipal policies or customs. Plaintiff's reliance on conclusory allegations, speculation, and possible unsupported inferences is not enough for him to survive summary judgment. Caban-Hernandez v. Phillip Morris USA, Inc, 486 F.3d 1, 8 (1st Cir. 2007) (stating that

104088292.v1

a court "will not 'draw unreasonable inferences or credit bald assertions, empty conclusions, [or] rank conjecture'"); Ayala-Gerena v. Bristol Meyers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996)(stating that "summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation").

Additionally, given the unique facts of this case, which involved a homicide investigation carried out under Mass. G.L. c. 38 at the direction of the District Attorney under the policies and customs of the District Attorney and the State Police, Plaintiff cannot show, and no reasonable juror would be able to determine, which particular actions were taken *solely* because of municipal policies or customs versus the policies or customs of the District Attorney or the Massachusetts State Police, neither of *which are parties in this case*, having settled and been released by Plaintiff. (SUMF ¶¶ 240-242) Making that showing is a burden which rests with Plaintiff, who cannot survive summary judgment when the summary judgment record does not support his claim that the policies and customs at issue were those of the Town or even that there was a widespread problem.

This is not the usual Monell municipal liability case where the target is one self-contained municipal police department. Here, two different law enforcement agencies (the Worcester District Attorney and the Massachusetts State Police, who together coordinated, directed and controlled the investigation), with occasional and requested accompaniment by the Milford Police, were involved.  Moreover, given the statutory directive of Mass. G.L. c. 38, sec. 4, the policies and customs of the District Attorney and the Massachusetts State Police superseded the policies and customs of the Milford Police.  As such the acts or edicts of the Town or its police chief were not the controlling policy in this case. Id. at 1157 (citing Monell, 436 U.S. at 694, 98

104088292.v1

RA 72

RA 73

S. Ct. at 2037; City of St. Louis v. Praprotnik, 108 S. Ct. 924-28; Pembaur v. City of Cincinnati, 475 U.S. at 480-81, 106 S.Ct. at 1298-99).

With the possible exception of the chance questioning of Michael Cifizzari on February 26, 1981, by Sgt. DiGirolamo at the Milford Police station, all other law enforcement actions were coordinated, directed and controlled by the State Police, and in particular Sgt. Doheny (SUMF ¶¶ 11, 13-16, 18-19, 25-27, 43).  In all the instances where the State Police were involved, their policies and customs and those of the District Attorney controlled. The municipality and its policymakers had no control over the District Attorney or the Massachusetts State Police. (SUMF ¶¶ 4-27)

Accordingly, based on the summary judgment record, Plaintiff cannot show the necessary attribution to the municipality required by Bardanaro. Thus, for this reason as well, summary judgment should enter for the Town.

### c.   *Plaintiff Cannot Show the Requisite Causal Link.*

Plaintiff cannot show that the challenged municipal policies or customs were the "'moving force' behind [his] injury." Bardanaro, 871 F.2d at 1158 (quoting Oklahoma City v. Tuttle, 471 U.S. 808, 818, 105 S.Ct. at 2434 (1985) and citing other cases).  "There must be some 'affirmative link' between the municipal custom and the constitutional deprivation." Bardanaro, 871 F.2d at 1158 (quoting Tuttle, 471 U.S. at 824-25 & n.8, 105 S.Ct. at 2436-37 & n.8 (opinion of Rehnquist, J.)).

Again, incorporating by reference the argument set forth immediately above, the unique facts of this case defeat Plaintiff's ability to show that the policies or customs of the Milford Police Department were the moving force behind its alleged constitutional violations, because the homicide investigation and prosecution were coordinated, directed and controlled by the District

28

Attorney and his designees in the Massachusetts State Police.  The policies and customs of those law enforcement agencies were being applied in this case, and if Milford's were applied at all, and there is no evidence that they were, they were the subservient policies and customs. Throughout the course of the investigation and prosecution at issue here, Milford police assisted the State Police and the District Attorney in their investigation, insofar as they accompanied State Police investigators to witness interviews. (SUMF ¶¶ 59-89)

Even the questioning of Michael Cifizzari on February 26, 1981, at the Milford Police station by Milford Sgt. DiGirolamo, was paused to allow for the State Police investigator, Trooper Thomas White, to attend and participate (SUMF ¶¶ 112-113, 127, 251, 263), and when Trooper White left the interview room at Michael's request, he arranged for Michael's interrogation later that morning by Sgt. Doheny at CPAC. (SUMF ¶ 281),  And even with Michael Cifizzari's confession in hand, the State Police still conducted its own interrogation later that same morning at its CPAC office in Worcester.  (SUMF ¶¶ 134-155)

There is no evidence in the summary judgment record that either the District Attorney or the State Police followed the policies or customs of the Milford Police Department.  Plaintiff cannot point to anything in the record that would permit a reasonable fact finder to conclude otherwise.  In sum, there is no genuine issue of material fact concerning the total lack of evidence that Milford was the moving force behind Plaintiff's alleged injury.

### 3. Plaintiff's No-Policies Municipal Liability Claim is Barred as a Matter of Law.

To the extent that Plaintiff argues that municipal liability attaches because Milford did not have policies specifically addressing topics – including for example, note taking, report writing, witness interviews and interrogations, file keeping, or handling of possible exculpatory evidence,

29

Plaintiff's claim mirrors those rejected in <u>Alexander v. City of South Bend</u>, 433 F.3d 550 (7th Cir. 2006), where the plaintiff alleged that municipal police department policy manuals did not have information on how to conduct proper witness interviews, photo arrays, or lineups and the municipality made various errors handling those cases. *Alexander*, 433 F.3d at 550.

In <u>Alexander</u>, for example, the Seventh Circuit held that "[a]llegations about what is not in the manual hardly establish that South Bend adopted a policy or had a custom of suggestive interviews, photo arrays, or lineups, or that it was indifferent to people's rights." <u>Id</u>. at 557. The court further held that "shortcomings in th[e] investigation are not indicative of a custom or policy; rather, they are indicative of one flawed investigation." <u>Id</u>. at 557-558.

Like <u>Alexander</u>, at best, Plaintiff can argue only that the investigation here was flawed; but not that it was the result of any official policy or because of any decision by Milford policymakers to conduct suggestive interviews, interrogations, or deliberately withhold exculpatory evidence. Thus, summary judgment should be entered in favor of the Town on Plaintiff's <u>Monell</u> claim.

**4.      Plaintiff Fails to Establish a Failure to Train Claim Against the Town.**

Plaintiff also mounts a section 1983 failure-to-train claim against the Town. Plaintiff alleges that his rights (presumably Fourth and Fourteenth Amendment) were violated by the Town's deficient training of its police officers.  The record here, however, falls short for Plaintiff to survive summary judgment on his failure-to-train claim.

"In the case of a failure-to-train claim, the requirements of proof are rather stringent." <u>Schand v. Springfield</u>, 380 F.Supp.3d 106, 132 (D. Mass. 2019).  "To ground liability "'a training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a

30

showing.'" Id. (quoting Young v. Providence, 404 F.3d 4, 27 (1st Cir. 2005)); accord Bowen v. Manchester, 966 F.2d 13, 18-20 (1st Cir. 1992).

"'Triggering municipality liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies.'" Gray v. Cummings, 917 F.3d 1, 14 (1st Cir. 2019)(quoting Haley v. Boston, 657 F.3d 39, 52 (1st Cir. 2011)). "A plaintiff typically must show a 'pattern of similar constitutional violations by untrained employees . . . to demonstrate deliberate indifference for purposes of failure to train.'" Gray, 917 F.3d at 14 (quoting Connick v. Thompson, 563 U.S. 51, 62, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)(citations omitted)).

Here, Plaintiff can make no such showing. Nothing in the summary judgment record shows a pattern of similar constitutional violations by Milford police officers. Plaintiff cannot point to evidence that the Town knew of a deficiency in its officers' training, that the Town deliberately chose not to provide such training, or that the lack of such training caused the injuries he now alleges. See Bowen v. Manchester, 966 F.2d 13, 19 (1st Cir. 1992) (rejecting a failure to train claim in the context of preventing a suicide in a jail facility where there had been a previous suicide within 3 years but reasoning, in part, that "there was [no] evidence that an atrociously high number of detainees committed suicide in Manchester's lockup to lead a reasonable juror to infer that the[] defendants, individually or jointly, were aware of a particular pattern indicating the need for medical treatment, but willfully blinded themselves to that unusual and large need").

Even if Plaintiff were to try closing this vast gap by way of offering expert testimony concerning perceived deficiencies in the Milford Police training program, such evidence would not suffice. Such an approach was explicitly rejected in Gray, 917 F.3d at 14. See also Schand, 380

31

F. Supp.3d at 123 (same). It is not enough to show that the Town's training program was "faulty;" a Plaintiff "must also show that the [Town] knew or had reason to believe that such a regimen had unconstitutional effects." Gray, 917 F.3d at 14. Absent such proof, Plaintiff cannot point to a genuine issue of material fact. Accordingly, Plaintiff's failure-to-train claim fails.

Additionally, First Circuit precedent does not require perfection, or anything near it, in a training program to satisfy constitutional standards. As observed in Schand:

> In *DiRico v. City of Quincy*, 404 F.3d 464, 469 (1st Cir. 2005), the First Circuit held that even if the training regimen was "wanting," the level of deficiency was not enough to demonstrate deliberate indifference. *Id*. at 469. *DiRico* and *Santiago v. Fenton*, 891 F.2 373 (1st Cir. 1989), which held that "four hours of training, without more, does not amount to a 'conscious' policy to train inadequately." Id. at 382.

Schand at 132.

Here, the summary judgment record shows that Milford officers received training well above the minimal level. All Milford officers received training approved by the Massachusetts Criminal Justice Training Council or its successor, the Municipal Police Training Committee.[7] (SUMF ¶ 335) The Milford Police maintained and distributed to all officers its manual of policies and procedures prepared by the Massachusetts Police Institute and approved by the Town. (SUMF ¶ 335) Personnel records of Defendants Chianese, Digirolamo, Liberto and Small all document that the police officer defendants had been adequately trained. (SUMF ¶ 335)

In sum, when compared to the training found to be constitutionally adequate in Santiago and Schand, the training provided to Milford police officers more than meets the mark for purposes of assessing Monell liability. *See also* Swain v. Spinney, 117 F.3d 1 (1st Cir. 1997) (rejecting failure-

---

[7] In Santiago, 891 F.2d 373, 382 & n.2 (1st Cir. 1989) the First Circuit discussed Massachusetts's state-mandated municipal police training program and suggested that standing alone it undermines arguments about "a 'conscious' policy to train inadequately." Id. at 382.

104088292.v1

RA 77

to-train claim in unlawful strip search case where every officer was supplied with strip-search policy guidelines, including periodic updates—even though not all officers had a consistent understanding of those materials).  But, like Schand, even assuming Milford failed to train the defendant officers, nothing in the record suggests that the failure to train was the "moving force" behind any constitutional violation suffered by Plaintiff. Id. at 133.

Further, if it is Plaintiff's contention that Milford officers deliberately framed Plaintiff, "then the problem was that [the Defendant officers] engag[ed] in an unprofessional act [] to obtain Plaintiff's conviction. Poor training had nothing to do with it." Id. As in Schand, If it is Plaintiff's argument here that he was deliberately framed by the Milford defendants, "undercuts [his] claim that it was poor training that drove the constitutional violation." Id. "A training program was not necessary to inform a police officer that [insert actions] is improperly suggestive." Id. "No reasonable jury could conclude that [such] conduct was driven by poor training." Id.

Additionally, and importantly, unlike Schand, here, the "moving force" inquiry must account for the reality that the Schiappa homicide investigation was coordinated, directed and controlled by the District Attorney and his investigators from the State Police. (SUMF ¶¶ 4-16, 17-27)  The involvement of those two entities and their central and exclusive role in coordinating, directing and controlling the investigation derails the "moving force" inquiry.  Plaintiff cannot show—and no reasonable jury would be able to assess—how Milford's alleged failure to train could impact the investigative steps being carried out at the direction of the District Attorney and the State Police's CPAC unit.

As in Schand, "[t]he final, and perhaps strongest, argument supporting summary judgment in favor of [Milford] is the absence of any evidence of a pattern of police misconduct before

104088292.v1

[September 29, 1979, the start of the State Police Schiappa homicide investigation] that would put the town on notice of some significant risk that, driven by inadequate training, constitutional violations would occur." Id. at 134. "As the First Circuit's Gray decision emphasizes, on this point expert testimony regarding defects in the training regimen is not enough. Actual or constructive notice through a past history of constitutional violations is required." Id.

For the reasons set forth above, the Court should enter summary judgment for Milford on the Count VII Monell claim.

### 5. Plaintiff Fails to Establish a Failure to Supervise Claim Against 'Doe' Supervisory Defendants.

Finally, based on the summary judgment record here, there is an insufficient basis for Plaintiff to attempt to maintain a Monell claim based on an argument of the Town's alleged failure to supervise police officers, as it does in Count VIII, against generic "Doe Supervisory Defendants." "There is no clear standard by which a court can assess whether evidence adduced in support of a Monell claim rises to the level sufficient to defeat a motion for summary judgment." Humphrey v. Town of Spencer, No. CV 4:14-40127-TSH, 2017 WL 2261744, at *11 (D. Mass. Mar. 6, 2017)(citing Cox, 2016 U.S. Dist. LEXIS 99890, at *29). "The Court, however, 'has set a very high bar for assessing municipal liability under Monell,' Young, 404 F.3d at 26, and courts are reluctant to 'lightly infer a municipal policy or practice from a few scattered claims, lest every claim of excessive force [might] engender a Monell claim.'" Humphrey, at *11 (quoting Cox, 2016 U.S. Dist. LEXIS 99890, at *29).

Seeking to supporting a claim for Monell liability based on a failure to supervise, Plaintiff contends generically that the Town "failed to train and supervise adequately the relevant Milford police officers." Exhibit 8, Complaint, Count VIII, ¶ 97. Plaintiff further contends in conclusory fashion that the alleged failure to supervise caused "the erroneous identification of the Plaintiff as

34

104088292.v1

the killer" and "the suppression of exculpatory evidence," which "proximately and directly caused the Plaintiff to suffer all of the injuries and damages set forth above." Exhibit 8, Complaint, Count VIII, ¶¶ 97-98. The only evidence Plaintiff can point to in support of his supervisory liability claim is the subject Schiappa homicide investigation itself, but only as that State Police investigation related to Plaintiff's brother, Michael Cifizzari.[8]

Only rarely can a Monell claim be made based on a single constitutional violation." Humphrey, 2017 WL 2261744, at * 11 (citing Bryan Cty v. Brown, 520 U.S. 397, 409 (1997)). "In those instances, it must be shown that the constitutional violation was 'a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" Id. (quoting Young, 404 F.3d 28 [internal quotation omitted]). "Regardless of whether a Monell claim is predicated on a single or a pattern of violations, the 'salient consideration' is whether there was notice." Humphrey, at *11 (citing Cox, 2016 U.S. Dist. LEXIS 99890, at *29-30). "As Judge Saylor summarized, 'the question is to a considerable extent one of degree: while a single accusation of [unconstitutional conduct] is not enough, at some point, as the accusations and claims begin to pile up, a critical mass may be reached requiring an affirmative response from supervisors.'" Humphrey, at *11 (quoting Cox, at *29).

Applying that standard to the instant action, this is an even weaker case than the court described in Humphrey (where summary judgment was granted) because Plaintiff points to *only* the facts of his brother's case, yet not own case.[9] Plaintiff cannot point to another similar case in

---

[8] Plaintiff may also point to expert reports and testimony, but as noted above, such expert evidence may not be used to create a genuine issue of material fact for purposes of defeating summary judgment.

[9] For the same reason this case is readily distinguishable from the facts in Cox where the Court denied summary judgement. In Cox, Judge Saylor noted that the central municipal employee defendant had been subject to 7 citizen complaints for the same type of excessive force conduct before the incident at issue in Cox. Id. at *10. There were also facts in the summary judgment record concerning other instances of troubling conduct concerning the same municipal employee defendant. Id. at *11. Moreover, there was also evidence that that the same employee had been named as a

35

the past to suggest that the Town was on notice of any similar alleged constitutional violations. Accordingly, the summary judgment record here is insufficient to support a failure-to-supervise Monell claim.

## III.   THE QUALIFIED IMMUNITY DOCTRINE ENTITLES ALL INDIVIDUALLY NAMED POLICE OFFICERS AND "DOE" DEFENDANTS TO SUMMARY JUDGMENT

Plaintiff asserts seven (7) civil rights counts against the individually named former and deceased Milford Police officers,[10] Vincent Liberto (deceased), Anthony DiGirolamo (deceased), Donald Small (deceased), and John Chianese (retired).  Of those counts, six are §1983 counts and one is a Massachusetts civil rights claim under M.G.L. c. 12, §111, as follows:

Count I:      §1983, unduly suggestive, biased and otherwise improper identification procedures related to interrogation of Michael Cifizzari;

Count II:     §1983, improper interrogation procedures and techniques related to the interrogation of Michael Cifizzari;

Count III:    §1983, fabricating false inculpatory evidence related to interrogation of Michael Cifizzari;

Count IV:    Not applicable to Milford defendants;

Count V:     §1983, failure to investigate Michael Giroux;

Count VI:    §1983, malicious prosecution against Plaintiff, Gary Cifizzari;

Count VIII:   §1983, supervisory liability against unnamed Doe Defendants, including failure to train and supervise police officers;

---

defendant in 5 lawsuits alleging excessive force. Furthermore, there was evidence in the summary judgment record that the municipality had done little to investigate, follow up, or discipline the employee concerning any of the numerous troubling incidents. Id. at *10-11. Additionally, there was also evidence of similar, but less severe, nature concerning another municipal employee defendant in the case. Id. Given the history of multiple incidents involving the two employee defendants the Court concluded "a reasonable jury could conclude that the City was on notice as to the possible propensity of [municipal employee #1] or [municipal employee #1 and municipal employee #2] together, to use excessive force during arrests." Id. at *11.  By contrast, there is no similar type of historical evidence here.

[10] Count IV appears to be an accidental duplication of Count III save for the inclusion in the Count's subject heading of nonparty, Richard Souviron, 1 of 3 dental expert witnesses who testified, unrebutted, at Plaintiff's 1984 trial that Plaintiff's tooth impression matched the dental mold of teeth marks secured from the victim's body.

36

Count IX:     §1983, conspiracy against unnamed "Doe" Police Officers, to suppress, fabricate, fail to disclose, fail to properly investigate the murder; and

Count X:      M.G.L. c. 12, §111, Massachusetts civil rights violation against all then employed Milford Police officers for conducting sham investigation of alleged actual perpetrator, Michael Giroux.

Each of these claims are barred by application of qualified immunity, shielding each defendant police officer, named or unnamed, from liability.

"Under the doctrine of qualified immunity, police officers are protected 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Mlodzinski v. Lewis, 648 F.3d 24, 32 (1st Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  Qualified immunity is not merely a defense to liability, but rather shields a police officer from suit altogether. Id.

The First Circuit employs the following analysis to determine whether a defendant is entitled to qualified immunity:

> (1) Whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation. The second prong, in turn, has two parts. We ask (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular actual context of the case, a reasonable officer would have understood that his conduct violated the right.

Id. at 32-33 (citations omitted).  The Court need not decide these questions in order, see Pearson, 555 U.S. at 236, and may resolve the case exclusively at the second step, see Eves v. LePage, 927 F.3d 575, 584 (1st Cir. 2019).

The qualified immunity doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

37

"The 'salient question' is whether the state of the law at the time of the violation gave the defendant fair warning that his particular conduct was unconstitutional.'" Drumgold, 707 F.3d at 42 (quoting Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)).

The question whether a right was "clearly established" divides into two parts: "(1) 'the clarity of the law at the time of the alleged civil rights violation,' and (2) whether, given the facts of the particular case, 'a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights.'" Barton v. Clancy, 632 F.3d 9,22 (1st Cir. 2011)(quoting Maldonado, 568 F.3d at 269)(alterations in original). The "clearly established "inquiry does not require a case directly on point. See Gild v. Cunniffe, 655 F.3d 78, 81 (1st Cir. 2011). The "contours of the right," however, "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

This is not a case where the impermissibility of the defendants' alleged conduct was "so patently evident" that no particular case is needed to have put a reasonable officer on notice of the conduct's unconstitutionality. See Marrero-Mendez v. Calixto- Rodriguez, 830 F3d 38, 47 (1st Cir. 2016)

Plaintiff's § 1983 due process claims against the Milford officers all fail for lack of the essential element of causation sufficient to link alleged unconstitutional conduct to Plaintiff's conviction. Indeed, there is no causal nexus between any alleged conduct by the Milford defendants and Plaintiff's conviction, including Sgt. DiGirolamo's questioning of Plaintiff's brother, Michael Cifizzari, on February 26, 1981, and separate subsequent events leading to Michael Cifizzari's confession to the State Police which implicated Plaintiff in the murder.

38

Plaintiff's claims all rely on knowingly false allegations which contradict the very assertions (i.e., admissions) presented to the Worcester Superior Court in support of his successful Motion for New Trial.  See, for example,

> SUMF ¶ 145 ("Gary Cifizzari became a suspect in the police investigation only after Sergeant Doheny questioned his brother Michael Cifizzari;" "[i]t is worth repeating that Gary Cifizzari was not named in any of the four statements written down by the Milford Police, which stated that Michael committed the crimes with Bob Cananzey.");

> SUMF ¶ 221 ("[t]he Commonwealth's case against Mr. [Gary] Cifizzari was predicated entirely on 'expert' bitemark comparison testimony;" and "[t]he case against [Gary] Cifizzari began and ended with bitemark comparison evidence in the form of expert testimony."); and

> SUMF ¶ 233 (Michael Cifizzari's February 26, 1981, confessions at the Milford police station and at the State Police CPAC office could have been, but were not, introduced as evidence at Gary Cifizzari's murder trial.)

As an essential threshold matter, Plaintiff's assertion that his conviction was caused by an interrogation of his brother, Michael Cifizzari, on February 26, 1981, during which he admitted to the murder and implicated Plaintiff, is false and is contradicted by Plaintiff's earlier admissions. Only later that same morning, after Michael Cifizzari was transported to the State Police CPAC office in Worcester and while under questioning by the lead State Police investigator in the Schiappa murder investigation, Sgt. Doheny, did Michael Cifizzari inform the State Police that Plaintiff was present at the murder.  "Yes, Gary was there." (SUMF ¶ 143)

The earlier morning interrogation of Michael Cifizzari at the Milford police station on February 26, 1981, did not result in the identification of Plaintiff as a suspect in the murder; was not introduced as evidence at Plaintiff's trial; and such questioning (of Michael Cifizzari by Milford Sgt. DiGirolamo) was determined to be voluntary and without coercion by the trial judge, Francis Keating, following an extensive two-day evidentiary hearing involving over ten witnesses (SUMF ¶¶ 275-289), and was later upheld by the Massachusetts Appeals Court, Commonwealth v. Michael Cifizzari, 19 Mass. App. Ct. 981, 982 (1985), which concluded:

104088292.v1

> There is not the slightest suggestion of actual coercion, pressure, or third-degree
> tactics employed by the police.

Id. Attached at *Exhibit 12*.

Ignoring these undisputed facts, Plaintiff nevertheless brought this action against the Defendants, asserting instead that four individual Milford Police officers (1) improperly interrogated Plaintiff's brother, Michael Cifizzari (Counts I, II, IX), (2) fabricated false inculpatory evidence from Michael Cifizzari,[11] (Count III), and (3) failed to investigate another suspect, Michael Giroux (Counts V, X), all leading to Plaintiff's alleged wrongful conviction.  In filing this action, Plaintiff knowingly conflated the documented conduct and actions of the State Police during its homicide investigation with those of the individually named Milford Police officers.

Plaintiff attempts to conceal this inconvenient and undisputed fact, which he had admitted to in his New Trial litigation, by knowingly misrepresenting in his pleadings here that the State Police interrogation of Michael Cifizzari on February 26, 1981 - which did implicate Plaintiff in the murder - involved the Defendants, when it was conducted by Sgt. Doheny of the State Police at its Worcester CPAC office.

To perform this slight-of-hand, Plaintiff  borrowed verbatim from his May 31, 2019, New Trial Motion to draft the forty-four paragraph "Facts" section (pp. 4-13) of the Complaint. Of particular note at page 11 of the New Trial Motion, Plaintiff asserted as follows:

> Later that morning [February 26, 1981], Michael [Cifizzari] was transported to the
> Worcester CPAC office, where he was further questioned by State Police Sergeant
> Joseph Doheny. . . .  <u>For no reason apparent in the record</u>, Sergeant Doheny began

---

[11] See <u>Com. v. Michael Cifizzari</u>, supra at 982 ("To be sure, there was uncontested evidence that the defendant suffered from serious mental illness (<u>chronic paranoid schizophrenia</u>), and there were incidents of disturbed behavior (his false signature on the *Miranda* statement; his response to Officer Sullivan, Asst. Clerk Daley, and Dr. Robison) the night of the confession and the following morning. As to those the judge had the benefit of extensive psychiatric testimony tending both ways with respect to voluntariness. [citation omitted]  The judge made extensive findings of fact and concluded, on abundant supporting evidence, that the Commonwealth had sustained its burden of proving that the defendant's confession was voluntary and was based on a knowing and intelligent waiver of *Miranda* rights. There was no error in his denial of the motion to suppress.")

40

questioning Michael about his statements and asked Michael whether he was sure he had been with his cousin, and not his brother Gary, at the time of the crime. Michael then responded that yes, 'Gary was there,' and said that 'they [his cousin and his brother] were both there.'" (emphasis added)

However, Plaintiff's Complaint at ¶ 42, while otherwise a verbatim replication of the New Trial Motion, removed the phrase "*For no reason apparent in the record*" and replaced it with the phrase "*Along with Milford Police Sgt. DiGirolamo, Milford Officers Chianese and Nicholas Sullo*," thus, now alleging – without evidence - that these 3 Milford Police officers participated in Sgt. Doheny's interrogation at the CPAC office in Worcester during which Michael Cifizzari implicated Plaintiff in the murder.  Exhibit 8, Complaint, ¶ 42.

This assertion is manifestly false and constitutes a striking violation of Rule 11 of the Federal Rules of Civil Procedure.[12]  Without evidence that the Defendants participated in the State Police interrogation whereby Michael Cifizzari implicated Plaintiff, Plaintiff is deprived of a necessary causal relationship between the Milford defendants' interrogation and Plaintiff's connection to the murder.  The entirety of Plaintiff's constitutional claims against the individual Milford officers is premised on a falsehood, of which Plaintiff undeniably was aware when he filed his Complaint in November 2023, because he had asserted the exact opposite in his New Trial Motion.

---

[12] Milford reserves its right to seek Rule 11 and other sanctions against Plaintiff on this factual basis and more.

41

A.      **Defendants Are Entitled to Summary Judgment on All Section 1983 Claims Concerning Interrogation of Michael Cifizzari (Counts I, II and III)**

1.      **Plaintiff Cannot Establish Use of Improper Identification Procedures at Milford Interrogation of Michael Cifizzari Because Plaintiff Was Not Identified During Questioning (Count I)**

As described above and incorporated herein, the absolute core of Plaintiff's Section 1983 claims against the Milford officers arising from the interrogation of Michael Cifizzari is based on a knowing falsity alleged by Plaintiff that the Milford defendants coerced Michael to implicate Plaintiff in the murder, when the undisputed facts indicate that the Milford defendants did not participate in the allegedly unconstitutional conduct.

First, Michael Cifizzari's February 26, 1981, interrogation by Milford Sgt. DiGirolamo was determined to be voluntary and without coercion by the trial judge following an extensive evidentiary hearing involving over ten witnesses, and was later upheld by the Massachusetts Appeals Court in Commonwealth v. Michael Cifizzari, 19 Mass. App. Ct. 981, 982 (1985).  To the extent that the Michael Cifizzari confession is even relevant or admissible in the subject litigation against the Defendants, this ruling collaterally estops Plaintiff from asserting a contrary notion in the present action.  It is well established that federal courts "must give to state court judgments the same preclusive effect as would be given by the courts of the state from which the judgments emerged." Johnson v. Mahoney, 424 F.3d 83, 93 (1st Cir. 2005). This includes issues already litigated in a prior criminal matter. Id. at 94 ("issues decided in criminal prosecutions may preclude their later re-litigation in a civil action."). See e.g., Echavarria v. Roach, Civ. No. 16-11118, 2017 WL 3928270, at *9 (D. Mass. Sept. 7, 2017). See also Schand, supra, at 141.

Second, the allegedly improper identification procedures indisputably were not performed by the Milford police defendants, and Plaintiff's allegations are made possible only by having

104088292.v1

conflated Sgt. DiGirolamo's questioning with that performed hours later by Sgt. Doheny of the State Police in Worcester, which was the source of Plaintiff's identification as a suspect.  Plainitff's twisted allegations, as articulated in ¶70 of the Complaint, knowingly relate to the wrong interrogation.  Indeed, Plaintiff's ¶70 declaration - "During said questioning and interrogation, without any factual predicate whatsoever, asking Michael Cifizzari suggestively whether he was sure he had been with his cousin, and not his brother, the Plaintiff Gary Cifizzari, at the time of the crime" occurred unmistakenly during State Police Sgt. Doheny's interrogation, not Officer DiGirolamo's prior questioning.  Plaintiff's next bullet-point declaration, also in ¶70 of the Complaint, draws also from the State Police's alleged interrogation tactics "to falsely accuse, then ultimately convict, the Plaintiff of a murder he had absolutely nothing to do with," which caused "Michael Cifizzari falsely [to] identify[] Plaintiff as having been guilty of murder." Exhibit 8, Complaint, ¶¶ 70-72.

Plaintiff, of course, knows that the allegations in his Complaint regarding Michael Cifizzari implicating Plaintiff in the murder when being questioned by Officer DiGirolamo are untrue, because he provided the opposite and correct contention in his New Trial Motion, when it was represented to the Superior Court,

> Gary Cifizzari became a suspect in the police investigation only after Sergeant Doheny questioned his brother Michael, who was in the throes of a psychotic episode, and injected Gary's name into Michael's already inconsistent and unreliable narrative. Michael simply adopted Sergeant Doheny's suggestion that Gary was at the scene of the crime without any explanation or elaboration. In fact, Michael had already made four statements to the Milford police about the death of his great-aunt several hours earlier without ever mentioning Gary.

SUMF ¶ 145.

Consequently, the record demonstrates that there is no genuine dispute as to whether there was unduly suggestive, biased, and otherwise improper identification procedures in violation of

104088292.v1

the Fourteenth Amendment by the Milford defendants, entitling them to summary judgment on this claim, Count I.

      **2.**      **Plaintiff Cannot Establish Use of Improper Identification Procedures at State Police Interrogation of Michael Cifizzari Because He Was Not Interrogated By Milford Officers (Count II)**

Similarly, in an almost identical claim under § 1983, Plaintiff again asserts improper interrogation procedures during which "Michael Cifizzari falsely identified Plaintiff as having been guilty of murder," Exhibit 8, Complaint ¶76, while again disregarding the undisputed record that the allegedly improper identification procedures were not performed by the Milford police defendants, but by the State Police during a separate interrogation of Michael Cifizzari.

The record demonstrates, in Count II also, that there is no genuine dispute as to whether there were improper interrogation procedures and techniques "implicating the Plaintiff in the murder," Exhibit 8, Complaint ¶74, entitling the Milford defendants to summary judgment on this claim as a matter of law.

      **3.**      **Plaintiff Cannot Establish That Milford Officers Interrogated Michael Cifizzari When He Implicated Plaintiff, and Thus Cannot Be Alleged to Have Fabricated False Inculpatory Evidence (Count III)**

In another identical claim under § 1983, Plaintiff again asserts improper interrogation procedures – but characterizing it as "fabricating false inculpatory evidence," Exhibit 8, Complaint ¶79, while again disregarding the undisputed record that the allegedly improper identification procedures were not performed by the Milford police defendants, but by the State Police during its separate interrogation of Michael Cifizzari.

The record demonstrates, in Counts I, II, and now Count III, the absence of a genuine dispute whether there were improper interrogation procedures and techniques implicating the

Plaintiff in the murder, entitling the Milford defendants to summary judgment on this claim as a matter of law. While clothed in separate § 1983 garments, Plaintiff's Count III allegations are unchanged from his prior two counts – the alleged improper interrogation by the State Police, at which Sgt. Doheny asked Michael Cifizzari whether he was sure that Plaintiff also was not with him at the murder, was not conducted by the Milford defendants.

**B.     Defendants Are Entitled to Summary Judgment on Claims Related to Failure to Investigate Michael Giroux (Counts V and X)**

Having not coordinated, directed or controlled the Schiappa homicide investigation, the Milford defendants admittedly did not investigate murder suspect, Michael Giroux. Instead, as set forth above and in its Rule 56.1 Statement of Undisputed Material Facts, the Milford Police were provided with discrete assignments by investigators in the CPAC unit of the State Police, typically to accompany CPAC investigators to their witness interviews. (SUMF ¶¶ 59-67)

Specifically, the Milford Police do not investigate murders, but provide assistance as directed by CPAC investigators. (SUMF ¶¶ 61-63) It was standard protocol during CPAC investigations to request local law enforcement to accompany CPAC investigators on interviews, particularly when witnesses resided in that locality. This occurred during the Schiappa homicide investigation. It was generally believed by CPAC investigators that local law enforcement was likely to have more familiarity with local residents and would be of assistance as witnesses to what transpired and was said during witness and suspect interviews. (SUMF ¶¶ 61-62)

The Milford Police, however, did not coordinate, direct or control the Schiappa homicide investigation. Instead, Milford Police detectives were merely assigned discrete tasks, such as accompanying CPAC investigators during interviews. (SUMF ¶ 63) The Milford Police did not coordinate, direct or control the Schiappa homicide investigation, and had no authority from CPAC or the Worcester District Attorney's Office to do so. (SUMF ¶ 64)

104088292.v1

**RA 90**

To the extent CPAC desired assistance from the Milford Police during the Schiappa homicide investigation, it would request such assistance, but CPAC would at all times coordinate, direct and control all aspects of the investigation. (SUMF ¶ 65)   At no time during the course of the murder investigation did the Milford Police coordinate, control or direct the investigation, and was not authorized to do so.  (SUMF ¶ 54)

With respect to Michael Giroux, there is no record that the Milford defendants participated in an investigation of Michael Giroux.  The Town possesses no documents which relate to Giroux, and State Police and District Attorney files produced during discovery do not provide a record of the Milford defendants accompanying State Police investigators during interviews with Giroux, or having been informed of his status as a suspect, nor as a confidential police informant.

Plaintiff's occasional contention during the litigation and a court hearing that Giroux may have been an informant for the Milford Police is without evidentiary support.  While fact witness, Mary Ellen Auger, f/k/a Halkett, testified at her February 9, 2024, deposition that Giroux had informed her and several others while they were sitting on the back porch of Gary Terhume's apartment a couple of days before the murder about being a Milford Police drug informant or "Narc" ("He did undercover work for them. . . . This is what he had told a lot of us") (Exhibit 28, Auger Depo. Tr., pp. 18-19, 23, 48), she clarified that "I really don't know."  (Exhibit 28, Auger Depo. Tr., p. 47). Auger's recollection and testimony, as uncertain and contradictory as it is, constitutes inadmissible hearsay which cannot be used to defeat summary judgment. See Evergreen Partnership Group, Inc. v. Pactiv Corp., 832 F.3d 1, 12 (1st Cir. 2016)("hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted").  Auger's memory of this out of court statement by Giroux is approximately 45 years old.

104088292.v1

Notably, Auger also testified to having seen Michael Cifizzari and Gary Cifizzari together the night Mrs. Schiappa was murdered, sitting on the front steps of the flower shop next to Mrs. Schiappa's Central Street apartment. (Exhibit 28, Auger Depo. Tr., pp. 25-26, 29, 32)  After Auger saw and greeted them, Michael Cifizzari explained that he and Plaintiff were waiting for his friend, Michael Giroux, who was buying drugs from her neighbor, Gary Terhume, at his apartment. (Exhibit 28, Auger Depo. Tr., pp. 25-26, 29, 32, 61)

Plaintiff's assertion that Giroux was an informant for the Milford Police is contrary to Plaintiff's own contentions made to the Superior Court when seeking a new trial,

> Michael Giroux at times acted as an informant for at least the Federal Bureau of Investigation, Massachusetts State Police, and Worcester Police Department.

Exhibit 10, New Trial Motion, p. 8, n.3 (citing Record Appendix ("RA") 1956 (Jan. 24, 1994 letter from Tpr. Greene); 2151 (Aug. 28, 2013 Worcester PD interview of M. Giroux); 2152 (Oct. 29, 2013 FBI interview of M. Giroux). Plaintiff's Automatic Disclosures have not produced any additional documents than those cited in Plaintiff's May 31, 2019, New Trial Motion.

Instead, the summary judgment record indicates that on October 5, 1979, Trooper Robert Meier conducted an interview with Michael Giroux at the Veterans Administration Hospital in West Roxbury.  He was accompanied by Bill Warren, Chief of VA Police, and Dr. Mark Thall, Senior Resident at the VA Hospital.  (SUMF ¶ 299) Giroux informed Trooper Meier that he had been discharged from the Army on September 14, 1979, arrived in Milford September 16, 1979, and was living with his brother.  He received an honorable discharge for hardship - his wife was having problems, and he was in the service twenty and one-half months. (SUMF ¶ 304)

Giroux informed Trooper Meier that on the day of the murder, he worked for his brother putting in carpeting in Framingham.  He arrived home with his brother at 9:30 or 10:00 p.m.  His brother gave him a brown shirt, a plaid pair of pants and brown socks.  Giroux said he wore his

47

104088292.v1

own brown shoes.  His brother dropped Giroux off at Lonigan's where he was watching the Shaver's fight on TV.  He doesn't know what time it was, but at the end of the fight, he started to leave Lonigan's.  He stated that he was very drunk, so drunk that he said he had trouble talking. As Giroux was leaving Lonigan's, he met Sandy Fisher, saying "Hi Sandy," but could not recall  any further conversation.  He said that Sandy's married name is Goucher and that she is a friend of his wife's from school.  Giroux then informed Trooper Meier that he went right home and went to sleep.  Trooper Meier asked Giroux about his route home from Lonigan's, and he said he went through Stone's parking lot because he did not want to walk on Main Street and be seen. (SUMF ¶ 305)

Trooper Meier asked Giroux if he went near the victim's house.  Giroux said no, and also stated that he didn't go to see Gary [Terhume] and Kathy [Duncan] on Central Street, because he thought they would not be home and he was too drunk to talk, anyway. Trooper Meier asked Giroux if he knew Mrs. Schiappa.  He said no, but said he knew where she lived.  He said that last September [1978] he had been visiting Kathy Duncan and Gary [Terhume] and that the lady upstairs had accused him of taking money from Mrs. Schiappa.  Giroux told Trooper Meier that he never talked with Mrs. Schiappa at that time.  Giroux said he did not take Mrs. Schiappa's money and was not in her house.  Giroux said that Mrs. Schiappa had never accused him of taking her money, but that it was the lady upstairs who said he was the only one hanging around there so he must have done it. (SUMF ¶ 306)

Trooper Meier asked Giroux when the last time he was at Kathy Duncan and Gary Terhume's Central Street apartment, and he said it was the Friday before last (the Friday before Mrs. Schiappa was murdered.)  Giroux said he arrived at Terhume's apartment between 8:30 p.m. and 9:15 p.m., had a drink, stayed for a short while and left to get a haircut at the Clip & Cut across

104088292.v1

the street from Friendly's on Main Street.  Giroux said he has not been to the house since then. (SUMF ¶ 307)  Giroux also stated that he had spoken to Troopers Tom White and Brad Holmes the morning of this interview.  (SUMF ¶ 308)  Trooper Meier reported that Giroux informed him how he couldn't stand the sight of blood, and spoke of how his brother had cut his finger a few days ago and how much the site of blood bothered him. (SUMF ¶ 312)

Troopers White and Holmes never told Trooper Meier that they had interviewed Michael Giroux the same morning as he did. He didn't know until Giroux mentioned it.  Trooper Meier knew that White was interested in Giroux as a suspect, "and White is not known for sharing information." (SUMF ¶ 309) Trooper White had located and interviewed Michael Giroux for "hours" and considered him a suspect.  He spoke with Giroux on "several occasions," the last occasion being within 3 to 6 months of the murder. (SUMF ¶ 310) Trooper Meier never saw a police report of White's interview with Michael Giroux which took place the same day as his interview. (SUMF ¶ 311)  At Trooper Meier's interview, Giroux put himself close to the murder scene, at a bar up the street from Mrs. Schiappa's apartment. (SUMF ¶ 313)

Trooper Meier is not aware of any facts to suggest that Michael Giroux was an informant for the Milford Police.  (SUMF ¶ 322)  At no time during the course of the State Police murder investigation, or after, did Trooper Meier come to learn that the Milford Police were aware or had been informed that Michael Giroux was a police informant for any law enforcement agency. (SUMF ¶ 323)  Trooper Meier is not aware of any facts to support the contention that any law enforcement agency involved in the Schiappa homicide investigation failed to investigate Michael Giroux as a suspect because of his role as a police informant. (SUMF ¶ 324)

Finally, Plaintiff is expected to argue in opposition that the Milford defendants, and in particular Detective Liberto, suppressed exculpatory evidence provided by Michael Giroux's

104088292.v1

RA 94

brother, David Giroux.  David Giroux testified at his deposition in the subject civil action that he was interviewed by law enforcement officials following the Schiappa murder about his brother, Michael Giroux.  *Exhibit 29, David Giroux Depo, p. 8.*  He could not recall what the investigators were wearing *Exhibit 29, David Giroux Depo., p. 11*, but then recalled that the police that questioned him were wearing suits.  *Exhibit 29, David Giroux Depo., p. 21.*  He speculated that the police investigator he spoke with could have been MPD Detective Liberto.  *Exhibit 29, David Giroux Depo., p. 22.*  However, when examined further, David Giroux conceded that he didn't know who he spoke with, or even whether the detectives were employed by the State Police or the Milford Police, or a combination of the two.  *Exhibit 29, David Giroux Depo., p. 24.*  "That, I don't remember."  *Exhibit 29, David Giroux Depo., p. 24.*  Other than David Giroux's recent April 3, 2024, testimony, there are no documents in the summary judgment record which evidence that any investigator interviewed David Giroux after the Schiappa murder.

David Giroux also testified that he had loaned Michael Giroux clothes to wear on the evening of the Schiappa murder, and that he observed blood on the clothes when Michael returned home.  *Exhibit 29, David Giroux Depo., p. 8.*  He testified that he didn't think anything of having observed the blood, because Michael said he had gotten into a fight, and getting into fights and having blood on him from those fights was not unusual - "I wouldn't think nothing of it because it wouldn't be the first time he'd come full of blood."  *Exhibit 29, David Giroux Depo., p. 8.*  "He was always taking beatings."  "He'd get some good beatings."  "So seeing him beat up wasn't uncommon."  *Exhibit 29, David Giroux Depo., p. 8.*

David Giroux had met Plaintiff's New Trial investigator, John Nardizzi, two times in 2019.  They also talked on the phone and texted.  *Exhibit 29, David Giroux Depo., pp. 25-26.*  He informed

104088292.v1

Nardizzi in his 2019 statement that "I am not certain if the police talked to me about the murder in 1979." *Exhibit 29, David Giroux Depo., pp. 27-28.*

Despite the absence of contemporaneous records, from any source, of a police interview with David Giroux during the Schiappa murder investigation, it is expected that Plaintiff will contend that the investigators identified by David Giroux were from the Milford Police, despite Giroux's expressed uncertainty, and further that the failure to provide the information provided by David Giroux constitutes suppression of exculpatory evidence in violation of Plaintiff's constitutional rights.

There is, of course, significant doubt that David Giroux could have remembered having been interviewed by police investigators 45 years later, and suggesting that it was a particular investigator would be pure speculation, and also contrary to his corrected deposition testimony. *Exhibit 29, David Giroux Depo., p. 24.*

On May 16, 2019, David Giroux provided a case captioned, typewritten, signed affidavit which Plaintiff's counsel filed in support of his Motion for New Trial, in which he attested to the poor and violent character of his late brother, but nowhere in his affidavit did he mention having been interviewed by police during the Schiappa homicide investigation, or having observed blood on clothes he had loaned his brother that evening. *Exhibit 30, David Giroux Affidavit.*

Indeed, David Giroux's May 16, 2019, affidavit contradicts the testimony he provided at his April 3, 2024, deposition, as follows, in a portion of the affidavit subtitled "Events Relating to the Murder of Concetta Schiappa": (1) he recalled the murder of an elderly woman in September 1979; (2) his brother, Michael, worked for him on a carpet job in Framingham that day; (3) he believed it only "possible" that he loaned Michael clothes to go out that night after work; (4) Michael did not live with him, "although it is possible that I let him spend a night at my house";

and, most notably (5) **"I am not certain if the police talked to me about the murder in 1979."**

*Exhibit 40, David Giroux Affidavit, pp. 2-3 (emphasis added).* Plaintiff's New Trial Motion, in

support of which the David Giroux Affidavit was filed, also did not mention a 1979 police

interview or blooding clothes.  Instead, Plaintiff attested in his New Trial Motion as following

regarding David Giroux,

> Despite the inconsistencies in Mr. [Michael] Giroux's statements and significant
> reasons to suspect him, nothing in the current record indicates that the police took
> any further steps to investigate him. **There is no evidence that the police
> interviewed anyone else regarding Mr. Giroux's whereabouts on the night of
> the murder, including his brother, David,** who would have been his alibi witness.
> There is also no evidence that the police searched David Giroux's home, where
> Michael Giroux was staying, to search for the clothes that Michael Giroux admitted
> he had discarded the night of the murder or to search for items taken from the
> victim.

Exhibit 10, New Trial Motion, p. 7 (emphasis added).

Surely, had David Giroux recalled correctly at his 2024 deposition of having been

interviewed by police during the Schiappa murder investigation, or having observed blood on

Michael Giroux's clothes, he would also have remembered those facts five years earlier in 2019

when questioned by Plaintiff's investigator.  It goes without saying that Plaintiff's New Trial

counsel would have been unlikely to have let the possibility of discovering suppression of

exculpatory evidence slip through their fingers when seeking a new trial.

Finally, regardless of whether David Giroux's newly discovered 2014 recollection of a 1979

police interview is credible, it does not create a disputed issue of fact sufficient to survive summary

judgment on this claim.  At the time of the Schiappa homicide investigation between September

1979 and Gary Cifizzari's conviction in 1983, there was no settled affirmative disclosure obligation

imposed by Brady which included law enforcement  until 1995.  Drumgold, 707 F.3d a 43.  Where

deliberate suppression is involved, however, the First Circuit has explained that "[t]here can be no

104088292.v1

doubt that, under the line of cases running from <u>Mooney</u> and <u>Pyle</u> to <u>Brady</u>, the law was firmly settled [by 1989] that a law enforcement officer may not deliberately suppress material evidence that is favorable to a defendant." <u>Id</u>.

In either event, because Plaintiff may seek to assert that the Milford defendants deliberately suppressed evidence before 1989, summary judgment on qualified immunity grounds is required. It was not clearly established until 1994 that police officers cannot deliberately suppress material evidence, and to the extent they acted deliberately, "a reasonable officer in [their] position plainly would not have appreciated the wrongfulness of his conduct. "The 'salient question' is whether the state of the law at the time of the violation gave the defendant fair warning that his particular conduct was unconstitutional." <u>Drumgold</u>, 707 F3d at 42 (quoting <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 269 (1st Cir. 2009)).

### C.    Defendants Entitled to Summary Judgment for Malicious Prosecution Claim (Count IV)

The record demonstrates that there is no genuine dispute as to whether there was probable cause to initiate legal proceedings against Plaintiff, entitling the individual defendants' to summary judgment on this claim.

"To make out a claim for malicious prosecution, a plaintiff  must prove: (1) the institution of criminal process against the plaintiff with malice; and (2) without probable cause; and (3) the termination of the criminal proceeding in favor of the plaintiff." <u>Gutierrez v. Mass. Bay Transp. Auth.</u>, 772 N.E.2d 552, 561 (Mass. 2022)(citation omitted).  As to the first element, "[i]n broad brush, an individual may be said to have instituted criminal proceedings against another if he caused those proceedings to be initiated." <u>Limone v. United States</u>,579 F.3d 79, 89 (1st Cir. 2009). Swearing out a criminal complaint is the "paradigmatic example" of initiating proceedings, but "initiate" also encompasses a broader range of conduct.  <u>Id</u>.  "[P]robable cause exists when an

104088292.v1

RA 98

officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been or is about to be committed and that the suspect ixs implicated in its commission." Morelli v. Webster, 552 F3d 12, 21 (1st Cir. 2009). "The uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause." Wilson v. Fairhaven, No. 18-cv-11099, 2021 WL 1387778, at *13 (D. Mass. Mar. 8, 2021)(citing Acosta v. Ames Dep't Store, Inc., 386 F.3d 5, 10 (1st Cir. 2004)).

Finally,

> [to]o raise a genuine issue of material fact on the question of malice, the plaintiff must come forward with some evidence that would permit a fact finder to conclude that [the defendant](1) knew there was no probable cause, and (2) acted with an improper motive . . . i.e., acted primarily for a purpose other than that of properly adjudicating the claim.

Damon v. Hukowicz, 964 F. Supp. 2d 120, 140 (D. Mass. 2013)(some alternations in original)(citation omitted).

Summary judgment is appropriate because the record demonstrates that the individual defendants did not institute criminal process against Plaintiff. It played no role in the interrogation which lead to Plaintiff's implication in the murder (SUMF ¶¶ 123-158); no role in investigating Plaintiff (SUMF ¶¶ 159-175; no role in assembling the forensic dental evidence needed to match Plaintiff's bitemarks to Mrs. Schiappa's body (SUMF ¶¶ 213-217); no role in retaining forensic dental experts to cast the molds or testify at trial (SUMF ¶¶ 176-212); no role in arresting or charging Plaintiff (SUMF ¶¶ 218-235); and no role in the prosecution of the trial (SUMF ¶¶ 231-232). Indeed, the individual defendants did not provide testimony against Plaintiff at the trial (SUMF ¶¶ 231-232), and the confessional statement of Michael Cifizzari taken by Sgt. DiGirolamo on February 26, 1981, nor the statement taken by Sgt. Doheny of the State Police, was not introduced by the prosecution at trial. (SUMF ¶ 233).

A judicial guilty finding even though later reversed has been held to preclude a plaintiff's claim for malicious prosecution because probable cause is considered to be at least arguable in such a situation. Dunn v. E.E. Gray, 254 Mass. 202(1926); Broussard v. Great Atlantic & Pacific Tea Co., 324 Mass. 323 (1940 cited in Meehan v. Town of Plymouth, 167 F. 3d 83 (D. Mass. 1999). Conviction of a criminal defendant will be conclusive proof of the existence of probable cause unless the conviction was obtained solely by false testimony of the civil case defendant or was based on fraud, conspiracy or subornation. Dunn v. E.E. Gray, 254 Mass. 202(1926); Broussard v. Great Atlantic & Pacific Tea Co., 324 Mass. 323 (1940 cited in Meehan v. Town of Plymouth, 167 F. 3d 83 (D. Mass. 1999). See also Della Jacova v. Widett, 355 Mass. 266 (1969)(first-tier conviction demonstrates probable cause to defeat malicious prosecution suit unless obtained through wrongful conduct), cited in Limone v. US, 497 F. Supp. 2d 143 (D. Mass. 2007) .

Accordingly, because the record demonstrates that defendants did not the institute criminal process against Plaintiff and the record demonstrates that there is no genuine dispute as to the other elements of Plaintiff's malicious prosecution claim, including whether there was probable cause, summary judgment on Count IV should be granted.

### D.  Unnamed ("Doe") Supervisory Defendants Entitled to Summary Judgment on Supervisory Liability Claim (Count VIII)

The record demonstrates that there is no genuine dispute relative to whether any unnamed "Doe" defendant who served as a supervisor in the Milford Police Department failed to train and supervise adequately those individual defendants.

In § 1983 actions, ""[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior* [, but] supervisory officials may be liable on the basis of their own acts or omissions." Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009)(citation and internal quotation mark omitted). "[L]iability cannot rest solely

104088292.v1

on a defendant's position of authority." Ocasio-Hernandez, 640 F.3d at 16.  As the First Circuit

explained,

> [A] supervisory official may be held liable for the behavior of his subordinates only
> if (1) the behavior of his subordinates results in a constitutional violation, and (2)
> the supervisor's action or inaction was affirmatively linked to that behavior in the
> sense that it could be characterized as supervisory encouragement, condonation or
> acquiescence or gross negligence amounting to deliberate indifference.

Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)(internal citations, brackets, and quotations

omitted).

The supervisory liability standard encompasses causation as well as a deliberate

indifference element, which is to say that "[d]eliberate indifference alone does not equate with

supervisory liability, but rather causation is also an essential element, and the causal link between

a supervisor's conduct and the constitutional violation must be solid."  Justiniano v. Walker, 986

F.3d 11, 20 (1st Cir. 2021)(internal quotation marks, citations, and brackets omitted).  The First

Circuit has acknowledged that the causation element is a difficult one to meet, though it may be

met with evidence of a history of widespread abuse that would alert a supervisor to ongoing

violations or "in a narrow range of circumstances" where a violation "is a highly predictable

consequence of a failure to equip law enforcement officers with specific tools to handle recurring

situations." Id. at 20-21 (internal quotation marks and citations omitted).

Even when taking the evidence in the light most favorable to Plaintiff, he cannot

demonstrate the essential element of a causal link between any (unnamed) supervisor's conduct

and a constitutional violation. It is undisputed that pursuant to a statute, the District Attorney

coordinated, directed and controlled the homicide investigation, and did so in the Schiappa murder

investigation by directing the State Police CPAC unit during its investigation.  (SUMF ¶¶ 4-16,

17-27)  Even assuming that it was the Milford Police which controlled the investigation, it did not,

104088292.v1

Plaintiff still can only infer that unspecified Milford Police supervisors were aware that their subordinates intended to violate Plaintiff's constitutional rights – presumably by questioning his brother, Michael Cifizzari. Plaintiff's speculation and improbable inferences fall far short of demonstrating the requisite strong causal connection needed to establish supervisory liability. If the District Attorney and the State Police indisputably were in charge of the homicide investigation, then the causal nexus between the unnamed Milford Police supervisor's alleged lack of policies and any constitutional violation must fail.

Moreover, with respect to any assertion of a lack of written policies and training, there is no evidence in the summary judgment record demonstrating that any named individual defendant had any role in promulgating policies or carrying out trainings. Mere positions as ranking officers are not sufficient to impose liability on this grounds. Ocasio-Hernandez, 640 F.3d at 16.

Finally, this claim is barred by qualified immunity because the law regarding when supervisory liability under § 1983 could be imposed was not established until 1989, five (5) years after Plaintiff's conviction, and eight (8) years after Officer DiGirolamo's interview with Michael Cifizzari on February 26, 1981. Specifically, in 1989, the First Circuit in Gutierrez-Rodrigues v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989) wrote,

> We have addressed the limits of supervisory liability under § 1983 in the past. We note first that liability may not be predicated upon a theory of *respondeat superior*. See Lipsett v. University of Puerto Rico, 864 F.2d 881, 901-02 (1st Cir. 1988); Guzman v. City of Cranston, 812 F.2d 24, 26 (1st Cir. 1987); Woodley v. Town of Nantucket, 645 F. Supp. 1365, 1372 (D. Mass. 1986). A supervisor "may be found liable only on the basis of her own acts or omissions." Figueroa v. Aponte-Roque, 864 F.2d 947, 953 (1st Cir. 1989). See Guzman, 812 F.2d at 26. It must be shown that the supervisor's conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others. See Germany v. Vance, 868 F.2d 9, 17-18 (1st Cir. 1989). Finally, there must be "an 'affirmative link' between the street-level misconduct and the action, or inaction, of supervisory officials." Woodley, 646 F. Supp. at 1372 (quoting Rizzo v. Good, 423 U.S. 362, 371 (1976); see Lipsett, 864 F.2d at 902.

104088292.v1

RA 102

Accordingly, the individual (unnamed) supervisory defendants are entitled to summary judgment as a matter of law as to Count VII.

### E. Unnamed "John Doe" Defendants Are Entitled to Summary Judgment on Plaintiff's Conspiracy Claim (Count IX)

The record demonstrates that there is no genuine dispute of an alleged conspiracy relative to whether any unnamed "John Doe" defendants, who are alleged to have suppressed, fabricated, failed to disclose evidence, and/or failed to properly investigate the Schiappa murder, entitling defendants to summary judgment. There is no evidence of coercion in this case and any claim under that theory fails, and no evidence in the record allows for the inference that any Milford police defendant entered into an agreement with any other defendant for the purpose of carrying out a tort or depriving Plaintiff of his rights.

Massachusetts courts have recognized two theories of tort-based joint liability: "(1) concert of action, and (2) substantial assistance or aiding and abetting." Taylor v. Am. Chemistry Council, 576 F.3d 16, 35 (1st Cir. 2009)(internal quotation marks and citations omitted). Under a concerted action theory, "there must be, first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." Ward v. Schaefer, No. 16-cv-12543, 2021 WL 1178291, at *31 (D. Mass. Mar. 29, 2021)(citing Aetna Cas. Sur. Co., 45 F.3d at 1564). Plaintiff's § 1983 conspiracy claim cannot proceed against the unnamed Milford police officer defendants because a reasonable jury could not find that there was an agreement to violate Plaintiff's rights, and a jury similarly could not find that any of these defendants engaged in a civil conspiracy under a concerted action theory.

Simply working on a murder investigation at the direction of the State Police and District Attorney and communicating with each other, which is the most the record supports, is insufficient

104088292.v1

to allow for the inference that any Milford defendant entered into an agreement with any other defendant for the purpose of carrying out a tort or depriving Plaintiff of his rights. Opalenik v. LeBrie, 945 S. Supp. 2d 168, 181 (D. Mass. 2013)(finding that evidence that two police departments communicated was insufficient to show agreement between departments and/or individual officers and granting summary judgment).

Massachusetts law recognizes both coercive conspiracies and tort-based joint-action conspiracies. A coercive conspiracy requires Plaintiff to establish "that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently," while a conspiracy premised upon joint liability in tort may be invoked "to support liability of one person for a tort committed by another." MacFarlane v. Town of E. Bridgewater, 110 F. Supp. 3d 310, 329 (D. Mass. 2015)(quoting Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1563-64 (1st Cir. 1994).

Any civil conspiracy claim against the Milford defendants thus must be based on a substantial assistance theory. As the First Circuit has explained,

> To recover under [the substantial assistance] theory, the plaintiff must establish two elements. First, the defendant must give substantial assistance or encouragement to a party engaging in tortious conduct. Only assistance or encouragement this is a substantial factor in causing the resulting tort exposes the actor to liability. To determine whether this threshold is met, courts should consider the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind. Second the defendant must possess an unlawful intent. Unlawful intent comprises two distinct mental states: knowledge that the other's conduct is tortious, and an intent to substantially assist or encourage that conduct.

Taylor, 576 F.3d at 35 (internal quotation marks and citations omitted).

Here, there is no evidence in the record that could support a theory that any defendant knew he was assisting tortious conduct or that he did in fact provide substantial assistance. The record does not permit a reasonable jury to find that the defendants violated Plaintiff's due process right

104088292.v1

RA 104

to a fair trial, and beyond these officers having been directed to perform discrete tasks during the

investigation as directed by the State Police, there is no evidence in the record that the defendants

took any actions with the requisite unlawful intent, entitling defendants to summary judgment on

Count IX of the Complaint.

> **F.     Milford Defendants Are Entitled to Summary Judgment on Plaintiff's Massachusetts Civil Rights Act Claim (Count X)**

The Massachusetts Civil Rights Act ("MCRA") provides a cause of action against "any

person" who

> Interfere[s] by threats, intimidation or coercion, or attempt[s] to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth.

Mass. Gen. Laws ch. 12, § 11H.  In essence, a MCRA claim is a § 1983 claim with the added

requirement of showing the interference with the right was carried out with coercion, threats, or

intimidation. For purposes of the MCRA,

> A "threat" is the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. "Intimidation" involves putting a person in fear for the purpose of compelling or deterring conduct. "Coercion" means the application to another of such force, either physical or moral, as to constrain [him] to do against [his] will something [he] would not otherwise have done.

Bazinet, 190 F.Supp 3d at 239 (internal quotation marks and citations omitted).

Plaintiff alleges, falsely, that the Milford defendants coerced Michael Cifizzari into

identifying Plaintiff as Mrs. Schiappa's murder.  This and other assertions made by Plaintiff in

Count X are not supported by the summary judgment record, and no reasonable jury could find

that any Milford defendant interfered with Plaintiff's rights through coercion, threats, or

intimidation.

104088292.v1

RA 106

Plaintiff cannot present any evidence to demonstrate that any Milford defendant threatened, coerced, or intimidated Michael Cifizzari. Instead, Plaintiff has fabricated a claim which falsely and in bad faith inserts the defendants into the State Police interrogation of Michael Cifizzari on February 26, 1981, at which State Police Sgt. Doheny asked Michael if Plaintiff was with him during the murder. Of course, Plaintiff's false narrative regarding Michael Cifizzari's interrogation by the State Police – in which he insinuated the Milford defendants into that interrogation – cannot create a genuine issue of fact as to whether any defendant applied "such force, either physical or moral, as to constrain [Michael Cifizzari] to do against [his] will something [he] would not otherwise have done." Bazinet, 190 F. Supp. 3d at 239. Quite the opposite, it exposes Plaintiff to Rule 11 sanctions.

Presented with trial and appellate rulings estopping Plaintiff from pursuing a claim that Officer DiGirolamo's earlier questioning of Michael Cifizzari was coercive or violated his rights,[13] Plaintiff instead chose to misrepresent the undisputed facts regarding Michael Cifizzari's interrogation by the State Police.

Accordingly, the defendants are entitled to summary judgment on Plaintiff's MRCA claims (Count X).

## IV. THE INDIVIDUALLY NAMED DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT PURUSANT TO RULE 4(m) BECAUSE PLAINTIFF FAILED TO MAKE SERVICE BEFORE EXPIRATION OF THE SERVICE DEADLINE

Plaintiff attempted an "end around" of the procedural dismissal of his claims against the individually named defendants[14] as required by Fed. R. Civ. P. 4(m) and Local Rule 4.1 due to

---

[13] See, Commonwealth v. Michael Cifizzari, 19 Mass. App. Ct. 981, 982 (1985)("there is not the slightest suggestion of actual coercion, pressure, or third-degree tactics employed by the police.")

[14] The individually named defendants are Donald Small (died November 8, 1994), Anthony DiGirolamo (died March 9, 2006), Vincent Liberto (died June 7, 2020), and John Chianese.

104088292.v1

RA 106

his failure to effectuate service of process. Plaintiff has, during the pendency of the litigation, completely ignored his failure to have served any individually named defendant. Service was too late and substantially beyond the 90-day deadline mandated by Rule 4(m), and the defendants are entitled to dismissal because Plaintiff failed to make timely service.

The Worcester District Attorney's office issued a *Nolle Prosequi* on December 10, 2019. On November 29, 2022, eleven days short of three years later, Plaintiff filed the instant action. (Docket No. 1)  On February 27, 2023, Plaintiff served the Town of Milford only with the Summons and Complaint. However, pursuant to Fed. R. Civ. P. 4(m), Plaintiff's 90 day deadline to serve the individually named defendants, Liberto, Small, DiGirolamo and Chianese, expired on February 27, 2023. At no time between the filing of the Complaint on November 29, 2022, and the service deadline of February 27, 2023, did Plaintiff petition the court to seek enlargement of the Rule 4(m) deadline to serve summonses on the defendants, including the three deceased former police officers. It appears Plaintiff made no effort to even determine the location of any of the individually named defendants, or to determine whether or not they were still living, despite knowing of their advanced ages considering the passage of 44 years since the 1979 murder. Having served Milford on the last day of the Rule 4(m) deadline, Plaintiff was fully cognizant that he had not served the individually named defendants. As the date of accrual of Plaintiff's action was December 10, 2019, the three-year limitations period for this civil rights action expired on December 10, 2022.

The timing of service of process is governed by Fed. R. Civ. P. 4(m), which provides that "[i]f a defendant is not served within 90 days after the complaint is filed, the court - on motion or on its own after notice to the plaintiff - must dismiss the action without prejudice against that defendant or order that service must be made within a specified time." However, "if the plaintiff

104088292.v1

shows good cause for the failure, the court must extend the time for service for an appropriate period." Id. Even when good cause is not shown, "the court has the discretion to dismiss without prejudice or to extend the time period." United States v. Lezdey, No. 12-11486-RWZ, 2013 WL 704475, at *2 (D. Mass. Feb. 26, 2013) (quoting United States v. Tobins, 483 F.Supp.2d 68, 77 (D. Mass. 2007)).

Local Rule 4.1(a) echoes Rule 4(m)'s 90-day standard, providing that, "[a]ny summons not returned with proof that it was served within 90 days of the filing of the complaint is deemed to be unserved for the purpose of Fed. R. Civ. P. 4(m)." Local Rule 4.1(b) continues, "[c]ounsel ... who seek to show good cause for the failure to make service within the 90-day period prescribed by Fed. R. Civ. P. 4(m) shall do so by filing a motion for enlargement of time under Fed. R. Civ. P. 6(b), together with a supporting affidavit. If on the 14th day following the expiration of the 90-day period good cause has not been shown as provided herein, the clerk shall forthwith automatically enter an order of dismissal for failure to effect service of process, without awaiting any further order of the court."

Where a plaintiff has failed to serve defendants within the required 90-day period as required by Fed. R. Civ. P. 4(m), and could not satisfy the burden of demonstrating good cause, a defendant is entitled to the dismissal of those claims as a matter of law. See Radfar v. Crowley, 568 F.Supp.3d 113 (D.Mass. 2021)( Rya W. Zobel, J.)(holding that plaintiff could not avoid dismissal pursuant to Rule 4(m).

The four factors for demonstrating good cause include, (1) "the plaintiff's failure to complete service in timely fashion is a result of the conduct of a third person, typically the process server"; (2) "the defendant has evaded service of the process or engaged in misleading conduct"; (3) "the plaintiff has acted diligently in trying to effect service or there are understandable

104088292.v1

mitigating circumstances"; or (4) "the plaintiff is proceeding pro se or in forma pauperis." See Radfar v. Crowley, 568 F.Supp. 3d at 115-116, citing Martello v. United States, 133 F. Supp. 3d 338, 344–45 (D. Mass. 2015) (quoting McIsaac v. Ford, 193 F.Supp.2d 382, 383 (D. Mass. 2002)).

Accordingly, the individually named Milford defendants are entitled to dismissal and summary judgment of Plaintiff's claims pursuant to Rule 56.

## **CONCLUSION**

For the reasons set forth above, this Court should order that summary judgment of dismissal enter for the Town of Milford and the Milford defendants.

Respectfully submitted,

The Defendants,
By Their Attorneys,

/s/ *William B. Scarpelli*

William B. Scarpelli, BBO #560034
wscarpelli@morrisonmahoney.com
Joseph H. Caffrey, BBO #544570
jcaffrey@morrisonmahoney.com
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
Phone:   617-439-7500

Dated:  March 3, 2025

104088292.v1

RA 109

**CERTIFICATE OF SERVICE**

I, William B. Scarpelli, Esquire, attorney for the defendants, hereby certify that I have this day served the foregoing to counsel by electronic email to

Mark Loevy-Reyes, Esq.
Loevy & Loevy
398 Columbus Avenue, #294
Boston, MA 02116
mark@loevy.com

William S. Smith, Esq.
The Law Office of William S. Smith
206 Worcester Road, P.O. Box 585
Princeton, MA 01541
holdenattorney@gmail.com


Date:  March 3, 2025

/s/ *William B. Scarpelli*
_____
William B. Scarpelli

65

RA 110

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GARY CIFIZZARI,

      Plaintiff,

      v.

TOWN OF MILFORD, FORMER MILFORD
POLICE OFFICERS VINCENT LIBERTO,
JOHN CHIANESE, FORMER MILFORD
POLICE SGT'S ANTHONY DIGIROLAMO
AND DONALD SMALL, AS WELL AS-YET
UNKNOWN POLICE OFFICERS AND
ADDITIONAL AS-YET UNKNOWN POLICE
SUPERVISORS, HEREIN REFERRED TO AS
JOHN AND JANE DOES 1-20,

      Defendants.

C.A. NO. 4:22-cv-40139-MRG

**DEFENDANTS' JOINT LOCAL RULE 56.1 CONCISE
STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, the Defendants submit the following joint statement of

undisputed material facts as to which there is no genuine issue to be tried.

**A.      The Murder**

1.      Milford, Massachusetts resident Concetta Schiappa, age 74, was brutally murdered in her 72 Central Street apartment on September 29, 1979. Her body was discovered by her upstairs landlord, Diane Nydam, at approximately 9:15 a.m.  Ms. Nydam contacted the Milford Police, who arrived at the scene immediately after the call.  *Exhibit 1, State Police Report by Sgt. Joseph Doheny, ¶1, dated October 11, 1979.*

2.      Milford Sgt. Walter Conley[1] and Officer Brian Harris responded to the emergency call, followed soon by Officer Arthur Richards.  Ms. Schiappa appeared to have been badly beaten, and the officers determined that the death appeared to be a homicide.  *Exhibit 1, State Police Report, ¶1, dated October 11, 1979.*

---

[1] Sgt. Conley himself was murdered in 1982 during a bank robbery in Milford while working a uniformed police detail. He was shot and killed while carrying a bag of pennies into the bank during an armored car delivery. The CPAC unit of the State Police also investigated that local murder. *Exhibit 2, Trooper Thomas Meier Deposition, p. 119.*

1

104088615.v1

3.      Milford Police Chief John McGrath, Detective Sergeant Donald Small and Detective Vincent Liberto of the Milford Police were contacted and proceeded immediately to the scene. *Exhibit 1, State Police Report, ¶1, dated October 11, 1979.*

**B.      District Attorney and State Police Murder Investigations**

4.      The Worcester District Attorney together with the State Police CPAC (Crime Prevention and Control) unit, coordinated, directed and controlled the investigation of Concetta Schiappa's homicide. *Exhibit 3, Trooper Robert Meier Affidavit, ¶¶4, 64; Exhibit 4, Michael Cifizzari Trial Transcript, p. 277.*

5.      Massachusetts General Law c. 38, § 4 states that the District Attorney shall direct and control any criminal investigation of a death. Since the Town of Milford is in Worcester County, the Worcester County District Attorney had control of the investigation. *Exhibit 5, ADA Lawrence Murphy Depo., pp. 91-92; Exhibit 3, Meier Affidavit, ¶¶ 4, 64-67.*

6.      All District Attorneys in the Commonwealth have a State Police unit to investigate homicides, and in Worcester County, only the City of Worcester was allowed to perform its own. Even the City of Brockton in Plymouth County cannot perform its own homicide investigations. *Exhibit 5, Murphy Depo., pp. 91-92; Exhibit 2, Meier Depo., p. 64.*

7.      CPAC is a unit of the State Police that works with the Worcester District Attorney, and handles murders for the county, except the City of Worcester. *Exhibit 5, Lawrence Murphy Deposition, pp. 91-92.*

8.      The District Attorney coordinated, directed and controlled the separate criminal prosecutions of Michael Cifizzari and Gary Cifizzari arising from the murder of Concetta Schiappa. *Exhibit 3, Trooper Robert Meier Affidavit, ¶65.*

9.      The District Attorney worked directly with the State Police CPAC unit to carry out the investigation. *Exhibit 3, Trooper Robert Meier Affidavit, ¶66.*

10.      All decisions related to the Schiappa homicide investigation and the resulting criminal prosecutions of Michael Cifizzari and Gary Cifizzari were made by the District Attorney and the State Police, through its CPAC unit. *Exhibit 3, Trooper Robert Meier Affidavit, ¶67.*

11.      Sgt. Joseph Doheny of the State Police CPAC unit in Worcester was the lead detective on the case, and for years on many cases. He was a very well known detective. Exhibit 5, Murphy Depo., p. 105.

12.      Trooper Robert Meier was a State Police detective, and the main detective handling the bitemark evidence and impressions. *Exhibit 5, Murphy Depo., p. 104.*

13.      Sgt. Doheny took charge of the investigation after arriving at the murder scene on the morning of the murder, and called certain people to scene, including a chemist, fingerprint technician and photographer. *Exhibit 4, Michael Cifizzari Trial Tr., p. 348.*

104088615.v1

14.     Sgt. Doheny was the chief investigator; "it was my case."  *Exhibit 4, Michael Cifizzari Trial Tr., pp. 400, 402.*

15.     Sgt. Doheny had a number of people at the CPAC office working on the case. *Exhibit 4, Michael Cifizzari Trial Tr., p. 378.*

16.     Michael Cifizzari confessed during Sgt. Doheny's interview at CPAC that his brother, Gary was also at the murder.  Sgt. Doheny placed Michael under arrest after consulting with his CPAC Supervisor, Det. Lt. DeFuria and Sgt. Dean, then "I had him brought to the Milford Court for a formal arraignment." *Exhibit 4, Michael Cifizzari Trial Tr., p. 384.*

**C.     State Police CPAC Investigation Control and Staffing**

17.     In coordination with the Worcester District Attorney, CPAC investigates homicides and other serious crimes in Worcester County. *Exhibit B, Trooper Robert Meier Affidavit, ¶4.*

18.     Sgt. Joseph Doheny of the Worcester CPAC unit was the lead investigator for the Schiappa murder investigation. *Exhibit 2, Meier Depo., p. 146.*

19.     The direction of the case, how it would proceed, what had to be done, and what records or statements needed to be taken was decided by Sgt. Doheny, Det. Lt. Ralph DeFuria and the prosecutor from the District Attorney, Lawrence Murphy. *Exhibit 5, Meier Depo., p. 63.*

20.     Beginning on October 3, 1979, Trooper Meier participated in the investigation of the September 29, 1979, the Schiappa murder as a member of the CPAC unit. *Exhibit 3, Trooper Meier Affidavit, ¶5.*

21.     Trooper Meier was assigned to the Schiappa homicide investigation team by Sgt. Joseph Doheny, who was the lead CPAC investigator throughout the course of the investigation. *Exhibit 3, Trooper Meier Affidavit, ¶6.*

22.     Trooper Thomas White was also very active in the investigation, as were several other investigators in the State Police CPAC office.  *Exhibit 3, Trooper Meier Affidavit, ¶6.*

23.     Sgt. Doheny's supervisor in the Worcester CPAC unit was Det. Lt. Ralph DeFuria. *Exhibit 3, Trooper Meier Affidavit, ¶7.*

24.     The CPAC investigation team ultimately reported to Lt. Col. John O'Donovan at the Office of Investigations & Intelligence Operations. *Exhibit 3, Trooper Meier Affidavit, ¶7.*

25.     Strategy and planning for the Schiappa homicide investigation was developed and communicated by Sgt. Doheny, through consultation with Det. Lt. DeFuria, who communicated regularly with each other in the Worcester CPAC office. *Exhibit 3, Trooper Meier Affidavit, ¶8.*

104088615.v1

26.     The homicide was initially reported to the Milford Police, where the crime occurred at 72 Central Street, but the investigation was coordinated, directed and controlled by CPAC immediately upon notice of the murder to Sgt. Doheny and his arrival at the murder scene on September 29, 1979.  *Exhibit 3, Trooper Meier Affidavit, ¶9.*

27.     Sgt. Doheny staffed the case with CPAC investigators and State Police technicians, including State Police Chemist James Canney, Corporals John Baliunas and Paul Rich of the MSP Holden Photography Bureau, who arrived at the murder scene, took photographs, and made a search in the apartment for fingerprints.  *Exhibit 3, Trooper Meier Affidavit, ¶10.*

**D.      Scene Investigation**

28.     State Police from the Grafton barracks were contacted and a request was made for the CPAC unit of the Massachusetts State Police to direct and control the investigation.  *Exhibit 1, State Police Report, ¶1, dated October 11, 1979.*

29.     Corporal Thomas Maher of the State Police in Grafton contacted Sgt. Doheny, who immediately contacted Trooper Thomas White and requested that they meet at the scene.  A request was also made for a photograph and fingerprint technician.  *Exhibit 1, State Police Report, ¶1, dated October 11, 1979.*

30.     Upon arrival at the scene, Sgt. Doheny and Trooper White met with Milford Chief McGrath, Milford Sgt. Small and Milford Det. Liberto.  Also present was Trooper Robert McKeon of the State Police in Grafton and other responding members of the Milford Police.  *Exhibit 1, State Police Report, ¶2, dated October 11, 1979.*

31.     The body of Mrs. Schiappa had been identified by Officer Robert Catusi of the Milford Police, a relative by marriage, who notified next-of-kin.  *Exhibit 1, State Police Report, ¶2, dated October 11, 1979.*

32.     Medical Examiner, Dr. Nicholas Capece, had been to the scene, pronounced the victim dead, and ordered the removal of Mrs. Schiappa's body to a local funeral parlor at the conclusion of the police investigation.  *Exhibit 1, State Police Report, ¶2, dated October 11, 1979.*

33.     At the conclusion of the technicians examination, the body of Mrs. Schiappa was removed from the scene by the DePasquale Funeral Home of Milford to the Watson Funeral Home to await an autopsy.  *Exhibit 1, State Police Report, ¶8, dated October 11, 1979.*

**E.      Processing Crime Scene**

34.     State Police Chemist James Canney of the State Police in Boston arrived at the scene, made his investigation and removed evidence, with the exception of a broken dry mop used in the murder, which was taken into possession by Sgt. Doheny. *Exhibit 1, State Police Report, ¶8, dated October 11, 1979; Exhibit 6, State Police Crime Lab Report and Inventory, dated March 16, 1981.*

104088615.v1

RA 114

35.     The State Crime Lab was in charge of the physical evidence from the scene and they are responsible for analyzing it.  *Exhibit 5, Murphy Depo., p. 47.*

36.     Corporals John Baliunas and Paul Rich of the State Police Photography Bureau in Holden arrived at the scene, took photographs, and made a search of the entire apartment for latent fingerprints.  *Exhibit 1, State Police Report, ¶8, dated October 11, 1979.*

37.     State Police fingerprint technicians removed all of the shades from the house and took them to the lab in an attempt to find latent fingerprints. *Exhibit 1, State Police Report, ¶8, dated October 11, 1979.*

38.     Sgt. Doheny reported that both pieces of the mop, a broken piece of the wood, clothing of the victim, and fingernail scrapings taken by Dr. Keeley were taken and secured by him and brought to the MSP Chemical Lab and turned over to the Chemist.  *Exhibit 1, State Police Report, ¶17, dated October 11, 1979.*

39.     Several days later 0n October 3, 1979, Trooper Meier arrived at the murder scene with Det. Lt. DeFuria, Sgt. Doheny, and MPD Det. Liberto to determine if there were items missing from the victim's  apartment.  *Exhibit 1, State Police Report, dated October 11, 1979; Exhibit 2, Meier Depo., p. 30; Exhibit 3, Trooper Meier Affidavit, ¶20.*

**F.     Autopsy and Bite Mark Dental Mold**

40.     An autopsy on the victim was performed on September 29, 1979, at Watson Funeral Home, performed by Dr. Ambrose Keeley, Pathologist, in the presence of Dr. Nicholas Capece. *Exhibit 1, State Police Report, ¶17, dated October 11, 1979.*

41.     Also present at the autopsy was Sgt. Doheny, Trooper White, Cpl. Baliunas of the MSP Photo Lab, Chief McGrath, Det. Sgt. Small, and Det. Liberto.  *Exhibit 1, State Police Report, ¶17, dated October 11, 1979.*

42.     Prior to conducting the autopsy, Dr. Keeley contacted Dr. Arthur Schwartz, Forensic Dentist of the Tufts School of Dentistry.  *Exhibit 1, State Police Report, ¶17, dated October 11, 1979.*

43.     Dr. Schwartz recalled being contacted by the State Police to go to Watson Funeral Home in Milford on to attend autopsy and examine the bite marks and make impressions.  *Exhibit 4, Michael Cifizzari Trial Tr., p. 510.*

44.     Dr. Schwartz examined the bite marks on the body of the victim, and then made a cast of the bite marks located on the victim's stomach. *Exhibit 1, State Police Report, ¶17, dated October 11, 1979.*

45.     Sgt. Doheny reported that it was Dr. Schwartz' opinion that this cast had sufficient detail so that if he were allowed to make a cast of a suspect's mouth, he could positively identify

104088615.v1

**RA 115**

it as having made the tooth impressions on the victim's body. *Exhibit 1, State Police Report, ¶17, dated October 11, 1979.*

46.     Dr. Schwartz did not believe that the bite marks in the left leg were of sufficient quality to warrant casting. *Exhibit 1, State Police Report, ¶17, dated October 11, 1979.*

47.     The Milford Police did not participate in any aspect of the decision to have Dr. Schwartz attend the autopsy, examine the bite marks on the victim, and make a cast of the bite mark from the victim's stomach. *Exhibit 3, Meier Affidavit, ¶60.*

**G.     State Police Investigators**

48.     State Police Sgt. Joseph Doheny was the lead investigator on the Schiappa's homicide case from the day of the murder through the convictions of Michael Cifizzari and Gary Cifizzari. He was a sergeant assigned to the CPAC unit for Worcester County. *Exhibit 5, Murphy Depo., p. 105. He is deceased. Exhibit 2, Meier Depo., pp. 23, 146.*

49.     Trooper Robert Meier was an investigator on Schiappa's homicide case. He was a Trooper with the MSP, assigned to the CPAC unit for Worcester County. *Exhibit 5, Murphy Depo., p. 104. He is retired. Exhibit 2, Meier Depo., p. 6.*

50.     Trooper Thomas White was a CPAC investigator on Schiappa's homicide case. Exhibit 5, Murphy Depo., p. 126. He is deceased. *Exhibit 2, Meier Depo., p. 146.* He responded and participated in the interview of Michael Cifizzari at the Milford Police station during the early morning of February 26, 1981, after Michael Cifizzari confessed to the murder, having also implicated his cousin, Robert Cananzey. *Exhibit 3, Meier Affidavit, pp. 14, 16, 33.* He is deceased. *Exhibit 2, Meier Depo., p. 25.* Trooper White had "keyed in on [Michael] Giroux as a suspect, " primarily based on him having been accused of stealing money from Mrs. Schiappa's apartment months before the murder. *Exhibit 2, Meier Depo., p. 25.*

51.     Lt. Colonel John O'Donovan was the ranking officer of the CPAC unit in Worcester County.  Lt. Detective Ralph DeFuria and Lt. Robert Zullas reported to him. *Exhibit 2, Meier Depo., p. 58.*

52.     State Police Lt. Detective, Ralph DeFuria, was the head of the CPAC unit in Worcester. *Exhibit 2, Trooper Meier Depo., p. 22.* He is deceased. *Exhibit 2, Meier Depo., p. 22.*

53.     State Police Lt. Robert Zullas was also in the chain of command above Sgt. Doheny, and had a number of State Police investigators report to him. He reported directly to Colonel O'Donovan, and oversaw investigations going on in other CPAC offices of the State Police.  He was not stationed at the Worcester CPAC officer, but at State Police headquarters at 1010 Commonwealth Avenue in Boston. He would have had reports provided to him upon the disposition of investigations conducted by CPAC, but did not work on the investigation. *Exhibit 2, Meier Depo., p. 58.*

104088615.v1

RA 116

54.     Other State Police CPAC defectives who worked on the Schiappa murder investigation in lesser capacities were Brad Holmes, Jack Cunningham and Brad Mullen. *Exhibit 2, Meier Depo., pp. 26-27.*

## H.     Milford Police Defendants

55.     Anthony DiGirolamo was a sergeant with the Milford Police.  He conducted an interview with Michael Cifizzari on February 26, 1981, during which Michael confessed to the murder. Together with Milford officers John Chianese and Nicholas Sullo, DiGirolamo transported Michael Cifizzari later that morning from the Milford Police station to the State Police CPAC Office in Worcester, where he was interrogated by lead State Police investigator, Sgt. Doheny. Exhibit 7, State Police Report, by Sgt. Doheny, dated May 7, 1981.  DiGirolamo testified at the June 6, 1983, suppression hearing before Associate Justice Keating, and again at Michael Cifizzari's murder trial.  *Exhibit 3, Trooper Meier Affidavit, pp. 32-33.*  He is deceased.

56.     Vincent Liberto was a detective with the Milford Police.  He responded to the murder scene along with several other members of the Milford Police. Exhibit 1, State Police Report, dated October 11, 1979.  Before Michael Cifizarri's confession on February 26, 1981, Liberto had spoken with Michael Cifizzari about the Schiappa murder, but Michael Cifizzari then was under the influence of drugs making it impossible for Liberto to have a detailed conversation or form opinions about Michael. *Exhibit 7, State Police Report, dated October 11, 1979.*   He is deceased.

57.     Donald Small was a detective sergeant with the Milford Police. He responded to the murder scene.  Small attended witness interviews with Trooper White, including the interview of Gary Terhume in Milford.  *Exhibit 1, State Police Report, dated October 11, 1979.*  He is deceased.

58.     John Chianese was a patrol officer with the Milford Police.  He took notes of an interview with Michael Cifizzari as conducted by Sgt. DiGirolamo on February 26, 1981, during which Michael Cifizzari confessed to the murder and implicated his cousin, Robert Cananzey. Together with Sgt. DiGirolamo and Officer Sullo, Chianese transported Michael Cifizzari from the Milford Police station to the State Police CPAC detective's office in Worcester, where he was interviewed by Sgt. Doheny.  Exhibit 7, State Police Report, dated May 7, 1981.  Later that same afternoon, Chianese was directed to accompany Trooper Meier to Taunton (also accompanied in Taunton by Sgt. Fred Summons of the Taunton Police) to locate and interview Gary Cifizzari and Robert Cananzey. *Exhibit 7, State Police Report, dated May 7, 1981.*  Chianese testified at the June 6, 1983, evidence suppression hearing.  *Exhibit 5, Murphy Dep., pp. 48-49.*  He had retired from the Milford Police two years earlier in 1981.

## I.     Milford Police Investigation Role

59.     The Milford Police Department do not investigate murders, but provide assistance as directed by CPAC investigators. *Exhibit 3, Trooper Meier Affidavit, ¶11.*

104088615.v1

60.    The Milford Police Dept. was not equipped with a homicide division at the time of the murder investigation.  *Exhibit 2, Meier Depo., p. 63.*

61.    It was standard protocol during CPAC investigations to request local law enforcement to accompany CPAC investigators on interviews, particularly when witnesses resided in that locality.  *Exhibit 3, Trooper Meier Affidavit, ¶12.*

62.    This occurred during the Schiappa homicide investigation. It was generally believed by CPAC investigators that local law enforcement was likely to have more familiarity with local residents and would be of assistance as witnesses to what transpired and was said during witness and suspect interviews. *Exhibit 3, Trooper Meier Affidavit, ¶12.*

63.    The Milford Police, however, did not coordinate, direct or control the Schiappa homicide investigation.  Instead, Milford Police detectives were merely assigned discrete tasks, such as  accompanying CPAC investigators during interviews. *Exhibit 3, Meier Affidavit, ¶13.*

64.    The Milford Police had no authority from CPAC or the Worcester District Attorney's Office to coordinate, direct or control the Schiappa homicide investigation. *Exhibit 3, Trooper Meier Affidavit, ¶15.*

65.    To the extent CPAC desired assistance from the Milford Police during the Schiappa homicide investigation, CPAC would request such assistance, but CPAC would at all times coordinate, direct and control all aspects of the investigation.  *Exhibit 3, Trooper Meier Affidavit, ¶53.*

66.    At no time during the course of the murder investigation did the Milford Police coordinate, control or direct the investigation, and was not authorized to do so.  *Exhibit 3, Meier Affidavit, ¶54.*

67.    The Milford Police did not possess or control physical evidence in the murder investigation. *Exhibit 2, Meier Depo., p. 94.*

**J.    Local Witness Interviews**

68.    State Police CPAC unit investigators conducted interviews with  neighbors and witnesses beginning immediately after the discovery of Mrs. Schiappa'a murder on September 29, 1979, and through the following weeks. They were often accompanied by local Milford Police officers.  *Exhibit 1, State Police Report, ¶¶10-37, dated October 11, 1979.*

69.    Trooper White and MPD Det. Sgt. Small interviewed Gary Terhume on September 29, 1979.  Terhume was a resident of the first floor left apartment unit adjacent to Mrs. Schiappa. He stated that on the morning of the murder, he left the bar Vinnie's Back Door with Charles Lindsey at 12:30 a.m., and between 12:30 a.m. and 1:00 a.m. returned to his apartment to retrieve cigarettes, and as he was backing out of the driveway he observed a white man standing in Mrs. Schiappa's living room who he did not recognize. The man was clean shaven, had a black Afro-type neat haircut and wore a dark dress shirt. The shades were up and the overhead light in the

104088615.v1

apartment was on. He told Lindsey that the man did not belong in the apartment. Terhume said he drove his car around the block and passed the apartment but did not observe the individual standing in the same spot, and continued driving to Vinnie's Back Door bar where he dropped off Lindsey and attended a party on Reed Street in Milford, returning home at 2:55 a.m. *Exhibit 1, State Police Report, ¶10, dated October 11, 1979.*

70.     Trooper White and Det. Sgt. Small interviewed Charles Lindsey on September 29, 1979, who corroborated Terhume's story, adding that when Terhume said he saw someone in the apartment he too looked up and didn't see anything, and that he estimated that they left the bar closer to midnight. *Exhibit 1, State Police Report, ¶11, dated October 11, 1979.*

71.     Trooper White and Det. Sgt. Small interviewed both Ronald Nydam and Diane Nydam, Mrs. Schiappa's landlords and upstairs neighbors.  Both had heard noises late the prior evening from Mrs. Schiappa's apartment which Mr. Nydam tried to investigate by walking around the outside of the building.  Mrs. Nydam discovered Mrs. Schiappa's body the following morning and contacted police. *Exhibit 1, State Police Report, ¶12, dated October 11, 1979.*

72.     Sgt. Doheny interviewed Kathy Ann Duncan, on September 29, 1979, who resided with Gary Terhume in the first floor apartment next to Mrs. Schiappa, and who provided Sgt. Doheny with her observations regarding Mrs. Schiappa's windows, doors, shades and  bedtime routines. *Exhibit 1, State Police Report, ¶13, dated October 11, 1979.*

73.     Sgt. Doheny reported that nine (9) other named residents of Mrs. Schiappa's immediate neighborhood were interviewed, but "nothing of evidential value was obtained." *Exhibit 1, State Police Report, ¶14, dated October 11, 1979.*

74.     Sgt. Doheny and MPD Det. Liberto interviewed Nicholas Trongone, the owner of a flower shop located next to Mrs. Schiappa's apartment on Central Street on September 29, 1979, who said that on the prior night at approximately 11:20 p.m. he observe two young men in front of his store looking in the window.  They appeared to be either "high" or drunk.  He also observed a late 1960s, early 1970s maroon colored Ford vehicle with Massachusetts license plates parked in front of Mrs. Schiappa's apartment. *Exhibit 1, State Police Report, ¶15, dated October 11, 1979.*

75.     Sgt. Doheny reported that through an investigation he determined that the motor vehicle was owned by Frank Tamagni, who had parked in front of 72 Central Street to go to the Italian Club at 78 Central Street.  He said that after leaving the club, he approached his his parked car at approximately 12:15 a.m. and noises – "a long low groan" – coming from the dark apartment. *Exhibit 1, State Police Report, ¶16, dated October 11, 1979.*

76.     Trooper White and Det. Sgt. Small interviewed Mary Dumayne on September 30, 1979, Mrs. Schiappa's close friend.  Dumayne stated that that a month or two earlier, Mrs. Schiappa told her about the theft of money from her apartment by a man who was visiting her neighbor, Kathy Duncan.  Mrs. Schiappa had left the money out on her bureau, went outside to garden, and observed the man exiting the rear door of her apartment and enter Duncan's apartment next door. *Exhibit 1, State Police Report, ¶20, dated October 11, 1979.*

9

104088615.v1

RA 119

77.     Trooper White and Det. Sgt. Small on September 30, 1979, met with Mrs. Schiappa's family members in her apartment, who reaffirmed that Mrs. Schiappa carried a black purse which remained missing, reaffirmed Ms. Dumayne's information regarding the stolen money and checks, reaffirmed that Mrs. Schiappa kept her front door locked and her back door open, and identified Mrs. Schiappa's Milford grandniece, Annette Pasqualone as someone who could provide information regarding her habits. *Exhibit 1, State Police Report, ¶21, dated October 11, 1979.*

78.     Sgt. Doheny and Det. Liberto interviewed Dominic Compagnone and Georgiann Compagnone, who stated that while driving on Central Street looking for a parking spot to go to Lonergan's bar, they had observed three (3) young males laying down or slouching on the steps at the flower shop, two with a bottle on their hands, at approximately 10:30 p.m. the night of the murder. *Exhibit 1, State Police Report, ¶22, dated October 11, 1979, and attached typewritten statement.*

79.     Trooper White and Sgt. Small interviewed Donald Halkett on September 30, 1979. Mr. Halkett and his wife, Mary Ellen Halkett, reside in a separate building behind 72 Central Street. The Halketts were interviewed separately because Milford Police recently had investigated reports claiming that Mr. Halkett had made obscene telephone calls to a local nursing home. Mr. Halkett stated that he, his wife, his brother-in-law, David Renaud, and his girlfriend went to dinner and bowling the night of the murder, returned home at 9:30 p.m. to watch a boxing match on television, played cards and then watched television until 1:50 a.m., when his in laws went home and he went to bed. He stated that David Renaud had mentioned hearing someone going in and out of the house next door. *Exhibit 1, State Police Report, ¶22, dated October 11, 1979, and attached typewritten statement.*

80.     Trooper White and Sgt. Small then interviewed Mary Ellen Halkett, also on September 30, 1979. Mrs. Halkett said that she, her husband, her brother David Renaud, and David's girlfriend had returned home at 9:30 p.m. They had dropped off her two children at her parents house before going out to eat and bowl. When they returned to the apartment, she observed that Mrs. Schiappa's blinds were halfway down and there was light from the television. At 10:30 p.m. she saw Gary Terhume arrive at his apartment in his car alone and he stayed there for 15 minutes before he left. *Exhibit 1, State Police Report, ¶23, dated October 11, 1979, and attached typewritten statement.*

81.     Trooper White and Sgt. Small again interviewed Kathy Duncan on September 30, 1979. She said that she had used Mrs. Schiappa's telephone earlier in the day and visited with her for ½ hour. She spent the night of the murder with her mother in Hopedale arriving with Gary Terhume at 9:00-9:30 p.m., and Terhume stayed until 10:30 p.m. and retuned to Milford to pick up clothing she had forgot to bring with her to Hopedale. Terhume returned to Hopedale at 10:45 p.m., and said he was returning to their apartment to sleep. Duncan did not see or hear from Terhume again the rest of the evening until he picked her up in Hopedale between 9:00 and 9:30 a.m. the next morning, shortly after which they received a telephone call from Tracy Lindsey informing them of the Schiappa murder. After retuning to their apartment, Terhume told Duncan that on the night of the murder, he had arrived back at the apartment from a bar, Vinnie's Back Door, between 12:00 and 12:30 a.m. with Charles Lindsey. The back door of the apartment they

10

104088615.v1

RA 120

shared with Mrs. Schiappa was wide open even though he had shut it when he left earlier in the evening, Mrs. Schiappa's blinds were halfway up, the lights were on, a man standing in the living room.  He said he thought nothing of it and went to a party in Milford where he stayed until 3:30 a.m., returning home to sleep.  When asked about Mrs. Schiappa's prior stolen money from her apartment, Duncan said that a year ago her sister Maureen and her brother-in-law Michael Giroux had visited her, during which Mrs. Schiappa had accused Giroux of seeing him leave her apartment before she discovered the missing money. Giroux denied the theft.  Duncan said that Giroux had returned from the U.S. Army 3 weeks ago, had visited her at her apartment 2 weeks ago, and that he was living with his brother David at 10 Genoa Avenue in Milford. *Exhibit 1, State Police Report, ¶24, dated October 11, 1979, and attached statement.*

82.    Sgt. Doheny and Det. Liberto re-interviewed Gary Terhume on September 30, 1979.  He stated that he was at the Back Door bar with Charles Lindsey the night of the murder and returned to his apartment with Lindsey at approximately 11:50 p.m.  He stated that he returned to the apartment to pick up cigarettes, returned to his car where Lindsey was waiting, backed out of the driveway and observed a man standing in Mrs. Schiappa's living room. He drove around the block passing the apartment and did not see anyone inside. He dropped Lindsey off at the Back Door bar, met Lorraine Alteri at 12:30 a.m. to attend a house party on Reed Street where he stayed until 2:50 a. m., and then returned home. The route to the party on Reed Street took him past the apartment but he did not look at the apartment and could not say if the blinds were up or down or it the lights were on or off. *Exhibit 1, State Police Report, ¶25, dated October 11, 1979.*

83.    Det. Sgt. Small interviewed Lorraine Alteri on October 1, 1979, who confirmed that she went to a party with Terhume the evening of the murder, placing the time at some time after 11:30 p.m. *Exhibit 1, State Police Report, ¶25, dated October 11, 1979.*

84.    Trooper Richard Gore and Det. Liberto re-interviewed Donald Halkett and Mary Ellen Halkett on October 1, 1979, to clear up inconsistencies in Terhume's statement.  Mrs. Halkett insisted that she observed Terhume return to his apartment at either 10:25 p.m. or 10:30 p.m., and that he left after 10 to 15 minutes with nothing in his hands, being certain of the time because she checked the clock, and the rear yard where Terhume parked was well lit. *Exhibit 1, State Police Report, ¶28, dated October 11, 1979.*

85.    Det. Lt. Ralph DeFuria and Det. Sgt. Small reinterviewed Charles Lindsey on October 1, 1979, to clear up time discrepancies provided by Terhume.  Lindsey stated that he and Terhume left the Back Door bar at 12:00 a.m. to get cigarettes at Terhume's apartment.  As they were entering the driveway to Terhume's apartment Terhume said "I think I see someone in Connie's apartment who should not be there."  Then, they both looked in the apartment but saw nothing. Terhume continued down to the back of the driveway, entered the apartment and came out with two packs of cigarettes in his hands, and then they left the property to return to the Back Door bar where Lindsey was dropped off. *Exhibit 1, State Police Report, ¶29, dated October 11, 1979.*

86.    Sgt. Doheny and Det. Sgt. Small accompanied Gary Terhume to Boston on October 2, 1979, where he was administered a polygraph examination by State Police Det. Lt. Peter DeStefano, which test revealed that Terhume was "probably telling the truth" about questions

104088615.v1

related to not having killed Mrs. Schiappa, not having performed a sex act upon her, did not know who killer her, and had seen someone in the apartment that night. *Exhibit 1, State Police Report, ¶32, dated October 11, 1979.*

87. On October 3, 1979, Det. Lt. DeFuria, Trooper Meier, and MPD Det. Liberto conducted a detailed searched of the victim's apartment for the missing pocketbook and apartment keys, and found hidden cash, bank accounts and jewelry. *Exhibit 1, State Police Report, ¶33, dated October 11, 1979.*

88. On October 5, 1979, residents of 23 Spring Street in Milford reported finding an empty leather change purse and a set of keys in their yard, which investigators confirmed belonged to Mrs. Schiappa. *Exhibit 1, State Police Report, ¶36, dated October 11, 1979.*

89. Det. Lt. DeFuria and Det. Sgt. Small accompanied Terhume to Bridgewater on October 8, 1979, where a Hypnologist, J. Francis Cloutier, attempted to hypnotize Terhume to elicit further details of what he had seen in the Schiappa apartment on the night of the murder. Cloutier opined that Terhume would not allow himself to be hypnotized but only faked it, and was untruthful or deceitful in what he was saying while supposedly under hypnosis. *Exhibit 1, State Police Report, ¶37, dated October 11, 1979.*

**K.    Michael Cifizzari's November 1980 Psychiatric Episode**

90. Milford Det. Sgt. Donald Small testified at Michael Cifizzari's murder trial that in November 1980, he and Milford Det. Vincent Liberto had transported Michael Cifizzari from Milford District Court to the Milford/Whitinsville Hospital for a court ordered psychiatric assessment. *Exhibit 4, Michael Cifizzari Trial Tr., pp. 701-702 (Bate #8162).*

91. During the ride, Det. Small asked Michael Cifizzari about the death of his Aunt Connie; he asked Michael if he had hit her, and why, to which Michael Cifizzari responded that he did, then said that he didn't, and then said that his aunt was alive and that he hit aunt because that is what he [Small] wanted to hear. *Exhibit 4, Michael Cifizzari Trial Tr., p. 706.*

92. Det. Small testified that he didn't view Michael Cifizzari as a suspect in the Schiappa murder after that conversation, and Det. Liberto contacted CPAC and told them about the conversation. *Exhibit 4, Michael Cifizzari Trial Tr., p. 710).*

93. Det. Small testified that Michael Giroux, not Michael Cifizzari, was the investigation's murder suspect before Michael Cifizzari made his statement to Sgt DiGirolamo. *Exhibit 4, Michael Cifizzari Trial Tr., p. 704.*

94. Det. Small's partner, Detective Vincent Liberto, also testified at Michael Cifizzari's trial that Michael Giroux was the prime murder suspect in the Schiappa case until Michael Cifizzari confessed. *Exhibit 4, Michael Cifizzari Trial Tr., p. 756.*

104088615.v1

95. Det. Liberto was familiar with Michael Cifizzari and transported him with Sgt. Small in November 1980 from Milford Court to Milford-Whitinsville Hospital to the psychiatric unit. *Exhibit 4, Michael Cifizzari Trial Transcript, pp. 757-759.*

96. Michael Cifizzari told them during the ride to the hospital that he had seen to his Aunt Connie two or three weeks ago; admitted hitting her with his right hand; then denied hitting her with a stick; said he thought she was alive; and then said that he hit her because "that is what you wanted me to say." According to Det. Liberto, Michael was not coherent. *Exhibit 4, Michael Cifizzari Trial Tr., pp. 760-761.*

97. Sgt. Liberto called CPAC to inform them of the November 20, 1980, conversation with Michael Cifizzari. *Exhibit 4, Michael Cifizzari Trial Tr., p. 766.*

98. ADA Murphy and Trooper Meier were both aware of the so-called dog bowl incident. *Exhibit 5, Murphy Depo., 125; Exhibit 2, Meier Depo., pp. 114-115.*

**L.     Sgt. DiGirolamo's Interview With Michael Cifizzari**

99. On February 26, 1981, at approximately 1:00 a.m., Michael Cifizzari, then age 27, walked into the Milford Police station. *Exhibit 7, State Police Report, ¶1, dated May 7, 1981; Exhibit 4, Michael Cifizzari Trial. Tr., p. 248.*

100. Michael Cifizzari asked to be allowed to spend the night there. *Exhibit 7, State Police Report, ¶1, dated May 7, 1981; Exhibit 8, Complaint, ¶37.*

101. Officer Anthony DiGirolamo, the station desk officer and Michael Cifizzari's former youth football coach, had allowed him to sleep at the station about five or six times in the previous six months. *Exhibit 8, Complaint, ¶37; Exhibit 7, State Police Report, dated May 7, 1981; Exhibit 4, Michael Cifizzari Trial Tr., pp. 211-215.*

102. Officer DiGirolamo would later testify that "[e]ach time [Michael Cifizzari] came to the station previously, it seemed as though he had something on his mind that he wanted to talk about." *Exhibit 8, Complaint, ¶37; Exhibit 4, Michael Cifizzari Trial Tr., p. 215.*

103. Present at the station at this time were Sgt. DiGirolamo and Officer Chianese. *Exhibit 7, State Police Report, ¶1, dated May 7, 1981; Exhibit 4, Michael Cifizzari Trial Tr., p. 215.*

104. Michael started a conversation with Sgt. DiGirolamo about football in regard to being allowed to stay at the station for the night. *Exhibit 7, State Police Report, ¶1, dated May 7, 1981; Exhibit 4, Michael Cifizzari Trial Tr., p. 250.*

105. Milford detective Liberto had previously spoken with Michael Cifizzari when transporting him to a hospital psychiatric evaluation, but Michael was under the influence of drugs and it was impossible to have a detailed conversation or to form any opinions about him. *Exhibit 7, State Police Report, ¶1, dated May 7, 1981.*

13

106.    Sgt. DiGirolamo and Officer Chianese had no conversations with detectives handling the case before February 26, 1981, and were unaware of Detective Small and Detective Liberto's ride with Michael Cifizzari for a psychiatric evaluation. *Exhibit 4, Michael Cifizzari Trial Tr., pp. 241, 327.*

107.    Starting at about 1:30 a.m. Sgt. DiGirolamo attempted to talk with Michael Cifizzari about the murder while Michael sat in the clerk's office at the station. *Exhibit 7, State Police Report, ¶1,  dated May 7, 1981. Exhibit 9, Suppression Hearing Transcript, p. 11; Exhibit 4, Michael Cifizzari Trial Tr., pp. 215-216, 250.*

108.    Sgt. DiGirolamo read Michael Cifizzari his Miranda Rights from a card and Officer Chianese wrote out the Miranda rights, which Michael read. Michael stated that he understood his rights and signed it. *Exhibit 7, State Police Report, ¶1, dated May 7, 1981; Exhibit 4, Michael Cifizzari Trial Tr., pp. 216-222, 251-255.*

109.    Michael was asked by Sgt. DiGirolamo if he knew anything about the murder on Central Street, to which Michael stated he did, and that he was related to Mrs. Schiappa, and knew her as Aunt Connie.  *Exhibit 7, State Police Report, ¶1, dated May 7, 1981; Exhibit 4, Michael Cifizzari Trial Tr., p. 222.*

110.    Michael then gave a narrative account during which he admitted that he had gone to Schiappa's house on the night she was murdered, around 11:00-11:30 p.m., attempted to get some money from her, was refused, became angry, and then killed her. Exhibit 7, State Police Report, ¶1, dated May 7, 1981; *Exhibit 9, Suppression Hearing Transcript, p. 14; Exhibit 4, Michael Cifizzari Trial Tr., pp. 222-224.*

111.    During this statement he indicated that his cousin, Robert J. Cananzey, was with him during the murder. *Exhibit 7, State Police Report, ¶1, dated May 7, 1981; Exhibit 9, Suppression Hearing Tr., pp. 14-16; Exhibit 4, Michael Cifizzari Trial Tr., pp. 222-224.*

112.    One half hour later, at approximately 2:00 a.m., Sgt. DiGirolamo requested that CPAC investigator, Trooper White, who lived in Milford, come to the Milford police station to participate and be briefed on the confession Michael Cifizzari then was giving.  *Exhibit 7, State Police Report, ¶2, dated May 7, 1981; Exhibit 9, Suppression Hearing Tr., pp. 17-18; Exhibit 4, Michael Cifizzari Trial Tr., pp. 225-226, 275.*

113.    Trooper White arrived, listened to the interview of Michael Cifizzari for a few minutes, but when he attempted to ask questions to clarify certain points, Michael became angry, stated he did not know Trooper White and did not wish to talk with him, and that he wished to talk only with Sgt. DiGirolamo.  *Exhibit 7, State Police Report, ¶2, dated May 7, 1981; Exhibit 9, Suppression Hearing Tr., pp. 18-19; Exhibit 4, Michael Cifizzari Trial Tr., pp. 226-227.*

114.    Complying with Michael Cifizzari's request, Trooper White left the room and stood in the hallway; Sgt. DiGirolamo questioned Michael for another half hour or less. *Exhibit 7, State*

14

104088615.v1

RA 124

*Police Report, ¶2, dated May 7, 1981; Exhibit 9, Suppression Hearing Transcript, p. 19; Exhibit 4, Michael Cifizzari Trial Tr., pp. 227-228.*

115.    Officer Chianese then condensed all three earlier statements from Michael Cifizzari into one complete statement. *Exhibit 4, Michael Cifizzari Trial Tr., pp. 228-231.*

116.    Officer Chianese did not ask any questions during the interview with Michael Cifizzari. *Exhibit 4, Michael Cifizzari Trial Tr., pp. 322-323.*

117.    Officer Chianese had Michael Cifizzari read the narrative statements which Chianese had transcribed. *Exhibit 4, Michael Cifizzari Trial Tr., p. 323.*

118.    Shortly thereafter, arrangements were made to bring Michael Cifizzari to the CPAC office in Worcester later that same morning for an interrogation by State Police detectives, and Trooper White left the Milford police station. *Exhibit 7, State Police Report, ¶2, dated May 7, 1981; Exhibit 9, Suppression Hearing Transcript, p. 19.*

119.    Michael Cifizzari's interview ended at approximately 3:00 a.m. Michael said he was tired and wanted to sleep. Officer Chianese brought Michael a Coke from the soda machine and Michael went to sleep. Michael said he was feeling fine and that he was more relaxed. After 7:150 a.m., Michael was transported to the CPAC office in Worcester, and along the way stopped at the Hungry Lion restaurant in Grafton where Michael ordered a large breakfast which Sgt. DiGirolamo purchased. *Exhibit 4, Michael Cifizzari Trial Tr., pp. 306-307; Exhibit 33, DiGirolamo and Chianese Report, dated February 27, 1981.*

120.    Upon his arrival at the CPAC office with Michael Cifizzari, Sgt. DiGirolamo provided Lt. DeFuria with the Miranda rights sheets and Michael's statements from the interview. *Exhibit 4, Michael Cifizzari Trial Tr., pp. 255-258, 272.*

121.    Sgt. DiGirolamo made copies of the Michael Cifizzari's statement at the CPAC office. *Exhibit 4, Michael Cifizzari Trial Tr., p. 308.*

122.    Until Michael Cifizzari walked onto the Milford police station on February 26, 1979, Sgt. DiGirolamo was not part of the Schiappa murder investigation, and wasn't familiar with many details of the case and had not conducted any interviews or reviewed any reports. *Exhibit 9, Suppression Hearing Transcript, pp. 22-23.*

123.    At the time of his interview with Michael Cifizzari on February 26, 1981, the only thing Sgt. DiGirolamo knew about the case was the bite marks and the stick that was used. *Exhibit 9, Michael Cifizzari Trial Tr., pp. 276-276.*

124.    The details of the investigation were not common knowledge, and there was an effort by the CPAC unit to prevent the details from becoming common knowledge. *Exhibit 4, Michael Cifizzari Trial Tr., p. 337.*

15

104088615.v1

125.    Trooper Meier is not aware of anyone from the State Police CPAC unit who directed Sgt. DiGirolamo to question Michael Cifizzari on February 26, 1979, and believes that he took it upon himself. *Exhibit 2, Meier Depo., p. 113.*

126.    Trooper Meier does not know if CPAC directed Sgt. DiGirolamo and Officer Chianese to question Michael Cifizzari, and has never seen a report to indicate that they were. *Exhibit 2, Meier Depo., p. 132.*

127.    CPAC did not authorize the Milford Police to question Michael Cifizzari.  Trooper Meier believes that the decision by Sgt. DiGirolamo was just spontaneous – Michael Cifizzari showed up at the police station, and they asked him questions, and as soon as Michael said something that they thought was noteworthy, they got Trooper White and Sgt. Doheny from CPAC involved. *Exhibit 2, Meier Depo., pp. 136-137; Exhibit 9, Suppression Hearing Transcript, pp. 17-18.*

**M.    ADA Lawrence Murphy Assignment As Prosecutor**

128.    ADA Lawrence Murphy was assigned to the case when Michael Cifizzari was brought to the CPAC office to give a statement. *Exhibit 5, Murphy Depo., pp. 10-11.*

129.    Murphy was informed that Michael Cifizzari was coming to the CPAC office for an interrogation, but did not participate in it.  *Exhibit 5, Murphy Depo., pp. 11.*

130.    Murphy started as an ADA in Worcester County in 1978.  He was transferred to the Superior Court in 1981 and began handling homicide cases.  He has tried murder cases for 31 years. He retired from the Worcester District Attorney's Office in 2012. *Exhibit 5, Murphy Depo., pp. 9-10.*

131.    Murphy has tried approximately 300 murder trials as a prosecutor with the Worcester District Attorney's Office. *Exhibit 5, Murphy Depo., p. 12.*

132.    Murphy dealt with the State Police CPAC unit, and "dealt almost in no way with Milford Police." *Exhibit 5, Murphy Depo., p. 49.*

133.    Murphy had "very little" interaction with the Milford Police, especially after the suppression hearing in the Michael Cifizzari case at which they testified. *Exhibit 5, Murphy Depo., pp. 106-107.*

**N.    *"Yes. Gary Was There"* -  State Police Interrogation of Michael Cifizzari**

134.    On February 26, 1981, at approximately 8:00 a.m., after Michael Cifizzari had slept in the Milford Police station and had been given breakfast, he was brought to the Worcester CPAC Office by Sgt. DiGirolamo, and Officers John Chianese and Nicholas Sullo of the Milford Police. *Exhibit 7,  State Police Report, ¶3, dated May 7, 1981; Exhibit 9, Suppression Hearing Transcript, pp. 20-21.*

104088615.v1

135.    Sgt. Doheny had a conversation with Sgt. DiGirolamo and read the statement which Michael had given to Milford police. *Exhibit 7, State Police Report, ¶3, dated May 7, 1981; Exhibit 9, Suppression Hearing Transcript, pp. 21.*

136.    Sgt. Doheny then introduced himself to Michael Cifizzari and reminded him again of his Miranda rights. Michael Cifizzari stated he understood them and he was willing to talk with Sgt. Doheny. *Exhibit 7, State Police Report, ¶3, dated May 7, 1981.*

137.    Michael Cifizzari confessed to Sgt. Doheny that in September 1979, he came to Milford from Brockton, where he was living with his aunt, at about noon and went with his cousin, Robert Cananzey, to Draper Park. *Exhibit 7, State Police Report, ¶¶3-4, dated May 7, 1981.*

138.    Michael Cifizzari said they smoked marijuana laced with PCP that Cananzey had with him. *Exhibit 7, State Police Report, ¶4, dated May 7, 1981.*

139.    Michael Cifizzari went on to state that at about midnight he went to his Aunt Connie Schiappa's house on Central Street to get money to buy more drugs. *Exhibit 7, State Police Report, ¶4, dated May 7, 1981.*

140.    Michael Cifizzari stated he went to the front door and Aunt Connie opened the door for him. When asked how she was dressed, Michael said she had on something like a shirt or blouse that buttons down the front and a nightshirt or nightgown. He could not remember the colors. *Exhibit 7, State Police Report, ¶4, dated May 7, 1981.*

141.    Michael Cifizzari said he asked her for money and she said, "See your friends," or in other words - take a hike. *Exhibit 7, State Police Report, ¶4, dated May 7, 1981.*

142.    Michael Cifizzari then provided Sgt. Doheny a narrative about what he and Robert Cananzey had done to Schiappa.

> He stated that she had her legs wide open. She kept saying the same thing over and over. "She was ridiculing us. She kept it up. We put a stop to it. We both kept hitting her, whacking her and whacking her. Bob and I both shoved the stick up her cunt. I bit her breasts and neck. I bit her nipple almost off. I bit her neck and left marks there. I bit her leg and her stomach. The stick snapped inside her. twat. It broke."

*Exhibit 7, State Police Report, ¶4, dated May 7, 1981.*

143.    Sgt. Doheny then asked Michael Cifizzari if he was sure it was his cousin that was with him and not his brother Gary and he said, "**Yes , Gary was there**." *Exhibit 7, State Police Report, ¶4, dated May 7, 1981 (emphasis added).*

144.    When asked if, in fact, it was Gary and not his cousin, he stated, "No, they were both there." *Exhibit 7, State Police Report, ¶4, dated May 7, 1981.*

145.    In his New Trial motion, Plaintiff admits that "Gary Cifizzari became a suspect in the police investigation only after Sergeant Doheny questioned his brother Michael Cifizzari,"

104088615.v1

Exhibit 10, New Trial Motion, p. 65, emphasizing that "[i]t is worth repeating that Gary Cifizzari was not named in any of the four statements written down by the Milford Police, which stated that Michael committed the crimes with Bob Cananzey." *Exhibit 10, New Trial Motion, p. 65.*

146.    In his New Trial motion, Plaintiff admits that Michael [Cifizzari] had already made four statements to the Milford police about the death of his great-aunt several hours earlier without ever mentioning Gary." *Exhibit 10, New Trial Motion, p. 66.*

147.    Michael Cifizzari was then asked by Sgt. Doheny if he would voluntarily allow a dentist to make a tooth impression. *Exhibit 7, State Police Report, ¶4, dated May 7, 1981.*

148.    In response, Michael Cifizzari became very upset, stated "no" he would not allow anyone to make a tooth impression, and he became very angry at Sgt. Doheny and refused to have any further conversation with him. *Exhibit 7, State Police Report, ¶4, dated May 7, 1981.*

149.    According to Sgt. Doheny's report, despite observing that Michael Cifizzari was somewhat confused and did do some rambling, his account of the murder and how it happened had detail in it which, in his opinion, "would be known only to the person who had committed the murder." *Exhibit 7, State Police Report, ¶5, dated May 7, 1981.*

150.    It was only when Michael Cifizzari was interrogated by Sgt. Doheny at the State Police that he implicated Gary Cifizzari in the murder. *Exhibit 2, Meier Depo., p. 80.*

151.    The Milford Police did not question Michael Cifizzari at the CPAC office, only Sgt. Doheny. *Exhibit 2, Meier Depo., pp. 80-81.*

152.    Michael Cifizzari was "somewhat incoherent" and "rambling" but Sgt. Doheny felt Michael had knowledge of the murder that wasn't public knowledge. *Exhibit 7*, State Police, dated May 7, 1981. *Exhibit 2, Meier Depo., p. 81.*

153.    Sgt. Doheny arrested Michael Cifizzari at the CPAC office on February 26, 1979, and had him transported to Milford District Court on murder charges. *Exhibit 7*, State Police, dated May 7, 1981. *Exhibit 2, Meier Depo., pp. 81-82.*

154.    After Michael Cifizzari was placed under arrest and charged with the murder of Concetta Schiappa, he was printed and "mugged" [mugshot] by Cpl. Baliunas of the State Police Photography Lab and taken to the Milford District Court where he was presented before Judge Compognone. *Exhibit 7, State Police Report, ¶6, dated May 7, 1981.*

155.    Michael Cifizzari was not a murder suspect before his confession on February 26, 1981, and even after his confession and having implicated his brother, Gary Cifizzari, the State Police were still actively pursuing other suspects, including Robert Cananzey, Michael Giroux, and Gary Terhume. *Exhibit 4, Michael Cifizzari Trial Tr., p. 340.*

104088615.v1

156.    Michael Cifizzari was found to be indigent and was ordered to the Worcester Superior Court for appointment of counsel. He was ordered held without bail and his case continued to February 27, 1981. *Exhibit 7,  State Police Report, ¶6, dated May 7, 1981.*

157.    In September 1983, Michael Cifizzari was tried and convicted of Second Degree murder at Worcester Superior Court, before Judge Robert Mulkern. *Exhibit 11, Sgt. Doheny and Trooper Meier Report, dated August 2, 1984.*

158.    Michael Cifizzari appealed the conviction, and the conviction was affirmed by the Massachusetts Appeals Court. *Exhibit 5, Murphy Depo., p. 119; Exhibit 12,* Com. v. Michael Cifizzari, 19 Mass. App. Ct. 981 (1985)(no error in trial court's denial of motion to suppress statements; "Commonwealth sustained its burden of proving that the defendant's  confession was voluntary and was based on a knowing and intelligent waiver of Miranda rights.").

**O.    State Police Investigation of Gary Cifizzari**

159.    It was only when Michael Cifizzari was interrogated by the State Police that Gary Cifizzari was implicated in the Schiappa murder. *Exhibit 2, Meier Depo., p. 80.*

160.    That same day, on February 26, 1981, following the State Police interrogation of Michael Cifizzari, Sgt. Doheny directed Trooper Robert Meier and Milford Officer Chianese to travel to the Taunton Police, and with the assistance of Sgt. Fred Simmons of that department, located and interviewed Gary Cifizzari, who denied being involved in the murder of Concetta Schiappa. *Exhibit 7, State Police Report, ¶8, dated May 7, 1981; Exhibit 13, Trooper Meier Report, dated February 26, 1981; Exhibit 3, Trooper Meier Affidavit, ¶37.*

161.    Trooper Meier questioned Gary Cifizzari in Taunton, not Officer Chianese. *Exhibit 2, Meier Depo., p. 82; Exhibit 13, Trooper Meier Report, dated February 26, 1981.*

162.    Trooper Meier also interviewed Robert Cananzey, who also denied that he had ever been to the Schiappa apartment, stating that the only time he was in Milford was to visit his Aunt Emma Pasqualone with Michael Cifizzari. *Exhibit 7,  State Police Report, ¶6, dated May 7, 1981; Exhibit 3, Trooper Meier Affidavit, ¶37); Exhibit 14, Trooper Meier Report, dated February 26, 1981.*

163.    Gary Cifizzari informed Trooper Meier during the interview that he had heard about the murder of his Aunt Connie while at his Aunt Emma Pasqualone's house in Milford, but had done so weeks after the murder, not the same day the body was found. *Exhibit 13, Trooper Meier Report, dated February 26, 1981; Exhibit 3, Trooper Meier Affidavit, ¶38; Exhibit 2, Meier Depo., p. 84.*

164.    On April 7, 1981, Sgt. Doheny testified before the Worcester Grand Jury *In the Matter of Michael Cifizzari* that although Michael Cifizzari admitted to the murder and had said that both his cousin, Robert Cananzey, and his brother, Gary Cifizzari, were with him during the murder, "there appears to be insufficient evidence as to say whether or not he [Robert Cananzey]

104088615.v1

or both of them [Robert Cananzey and Gary Cifizzari] were with him at the time that he supposedly committed the murder." *Exhibit 15, Grand Jury Minutes, dated April 7, 1981, p. 14.*

165.    Thereafter, Trooper Meier conducted the investigation regarding dental records, including Michael Cifizzari's tooth impressions which did not match the bite marks on Mrs. Schiappa, but Gary Cifizzari's tooth impression did match when consideration was given to his "retreated right front tooth," that had been knocked out and replaced in 1980, after the murder. *Exhibit 5, Murphy Depo., pp. 111-113; Exhibit 31, Meier Report, dated May 11, 1983; Exhibit 32, Meier Report, dated May 28, 1983.*

166.    Gary Cifizzari was not under arrest at the time of Trooper Meier's bitemark investigation, but Gary consented to having his dental impression made to compare with the bitemark cast made of Mrs. Schiappa. *Exhibit 5, Murphy Depo., pp. 114.*

167.    Robert Cananzey also voluntarily consented to have his dental impression made. *Exhibit 5, Murphy Depo., pp. 114.*

168.    In October 1983, Trooper Meier and ADA Murphy traveled together to Florida to meet with Dr. Sourviron, and received expert concurrence of Dr. Schwartz's opinion that Gary Cifizzari's dental impression matched bitemarks on Mrs. Schiappa's body. *Exhibit 2, Meier Depo., pp. 50, 90.*

169.    Dr. Souviron was referred to Trooper Meier and ADA Murphy by Dr. Schwartz. Murphy wanted to meet with Souviron to see if he would be an expert in the murder case and what he would say for an opinion. *Exhibit 2, Meier Depo., p. 51.*

170.    Dr. Souviron's opinion was that Gary Cifizzari's teeth made the marks on Mr. Schiappa's body. *Exhibit 2, Meier Depo., p. 52.*

171.    An indictment on murder charges against Gary Cifizzari was then obtained, which was based on the opinions of Dr. Schwartz and Dr. Souviron. *Exhibit 2, Meier Depo., p. 52.*

172.    In November 1983, on the basis of the concurring opinions of Dr. Schwartz and Dr. Souviron, Gary Cifizzari was indicted by the Worcester County Grand Jury for the 1979 murder of Concetta Schiappa. *Exhibit 3, Meier Affidavit, ¶50.*

173.    A third dental expert witness, Dr. Anthony Captline, D.M.D. from Philadelphia, was hired by Gary Cifizzari's defense, but when presented with the expert opinions of Doctors Schwartz and Souviron, agreed that the forensic dental evidence proved that Gary Cifizzari's bite marks matched those on Mrs. Schiappa's body. *Exhibit 2, Meier Depo., pp. 52-53.*

174.    On November 21, 1983, Trooper Meier and Lt. DeFuria, together with Taunton Police detectives, served an indictment warrant on Gary Cifizzari and placed him under arrest for the Schiappa murder. He was advised of his Miranda rights by Lt. DeFuria and then transported to the State Police CPAC office in Worcester. *Exhibit 3, Trooper Meier Affidavit, ¶50.*

104088615.v1

175.    At the State Police CPAC office, Gary Cifizzari was questioned by Sgt. Doheny in Trooper Meier's presence, during which he denied having anything to do with the murder, stated that he was not in Milford during September 1979, and then changed his story to state that he learned of the murder either the night after or two nights after the death while at his Aunt Emma Pasqualone's house in Milford. *Exhibit 3, Trooper Meier Affidavit, ¶51.*

**P.    Bite Mark Evidence and Commonwealth's Forensic Dental Experts**

176.    It was observed at the murder scene on September 29, 1979, that Ms. Schiappa had been bitten in several locations on her body. *Exhibit 1, State Police Report, dated October 11, 1979.*

177.    Sgt. Doheny reported that "obvious human bite marks were observed on her right lower stomach and inside her left leg in the area of the groin." *Exhibit 1, State Police Report, dated October 11, 1979.*

178.    Later that afternoon, prior to conducting the autopsy, Dr. Ambrose Keeley contacted Dr. Arthur Schwartz, Forensic Dentist of the Tufts School of Dentistry. *Exhibit 1, State Police Report, dated October 11, 1979.*

179.    Dr. Schwartz examined the bite marks on the body of the victim, and then made a cast of the bite marks located on the victim's stomach. *Exhibit 1, State Police Report, dated October 11, 1979.*

180.    Sgt. Doheny reported that it was Dr. Schwartz's opinion that this cast had sufficient detail so that if he were allowed to make a cast of a suspect's mouth, he could positively identify it as having made the tooth impressions on the victim's body. *Exhibit 1, State Police Report, dated October 11, 1979.*

181.    Dr. Schwartz did not believe that the bite marks in the left leg were of sufficient quality to warrant casting. *Exhibit 1, State Police Report, dated October 11, 1979.*

182.    Milford did not direct and was not involved in the decision or the arrangements to make a cast of the victim's bite marks. *Exhibit 3, Meier Affidavit, ¶59.*

183.    Thirteen months after the Schiappa murder, in October 1982, ADA Murphy obtained a court order for dental impressions of Michael Cifizzari's teeth. *Exhibit 16, Trooper Meier Report, ¶2, dated January 12, 1984.*

184.    These dental impressions were taken and compared to the bite marks on Mrs. Schiappa's body by Dr. Stanley Schwartz, DDS, of Tufts Dental School. *Exhibit 16, Trooper Meier Report, ¶2, dated January 12, 1984.*

185.    Dr. Schwartz then advised ADA Murphy that the dental impressions of Michael Cifizzari's teeth did not match the bite marks on the body of the victim. *Exhibit 16, Trooper Meier Report, ¶2, dated January 12, 1984.*

104088615.v1

186.    In a discussion of the case between Trooper Meier and ADA Murphy, a decision was made to ask both Robert Cananzey and Michael's brother Gary Cifizzari to submit to having a dental impression made of their teeth.  *Exhibit 16, Trooper Meier Report, ¶3, dated January 12, 1984.*

187.    Both Robert Cananzey and Gary Cifizzari had been implicated in the murder during Michael Cifizzari's February 26, 1981, confession to the State Police during which he admitted to biting Mrs. Schiappa.  *Exhibit 16, Trooper Meier Report, ¶3, dated January 12, 1984.*

188.    Trooper Meier believed, in retrospect after the two guilty verdicts, that if both Robert Cananzey and Gary Cifizzari had dental impressions which did not match the bite marks on the body of the victim, Ms. Schiappa, it then could be assumed that Michael Cifizzari had manufactured his confession in order to seek help for himself.  *Exhibit 16, Trooper Meier Report, ¶3, dated January 12, 1984.*

189.    On March 21, 1983, Trooper Meier was instructed by Sgt. Doheny to arrange for a dental impression to be taken of the teeth of Gary Cifizzari.  *Exhibit 17, Meier Report, dated April 29, 1983.*

190.    When the idea was broached that there should be a waiver from Gary Cifizzari and Robert Cananzey regarding voluntarily providing dental impressions, Trooper Meier drafted the waiver but had it reviewed with the District Attorney's office, and it was reviewed by ADA Daniel Twoomey.  *Exhibit 2, Meier Depo., p. 48.*

191.    Gary Cifizzari signed his waiver on April 27, 1983, as witnessed by Trooper Meier and Dr. Juliano, DMD. Exhibit 18, Signed Waiver from Gary Cifizzari, dated 4/27/83.

192.    The District Attorney reviewed any search warrants sought by the State Police during the Schiappa murder investigation.  *Exhibit 2, Meier Depo., p. 49.*

193.    Trooper Meier did not have any search warrants reviewed by anyone at the Milford Police.  It would have been the District Attorney who would have written the search warrant, based on testimony provided to the grand jury.  *Exhibit 2, Meier Depo., p. 49.*

194.    In March 1983, Trooper Meier had contacted both Gary Cifizzari and Robert Cananzey and asked them if they would voluntarily agree to have dental impressions made of their teeth for the purpose of comparison to bite marks made on the body of Mrs. Schiappa.  Both agreed.  *Exhibit 16, Trooper Meier Report, ¶4, dated January 12, 1984.*

195.    On March 30, 1983, Trooper Meier transported Robert Cananzey to a prearranged appointment with Dr. Peter Juliano, DDS, 185 Belmont St., Brockton, MA.  On April 27, 1983, Gary Cifizzari had an impression of his teeth made in Dr. Juliano's office.  *Exhibit 16, Trooper Meier Report, ¶5, dated January 12, 1984.*

196.    Separately, Gary Cifizzari and Robert Cananzey, in the presence of Trooper Meier and Dr. Juliano, signed waivers where they willingly and freely submitted to having dental

104088615.v1

impressions made of their teeth for the purpose of having the impression compared to the bite marks on the body of Mrs. Schiappa. *Exhibit 16, Trooper Meier Report, ¶5, dated January 12, 1984.*

197.    On April 27, 1983, Trooper Meier arranged for an appointment with Dr. Peter Juliano, DMD in Brockton, who was recommended by Dr. Stanley Schwartz. On that same date Gary Cifizzari signed a waiver in the presence of Dr. Juliano, and an impression of his teeth were made.  *Exhibit 17, Meier Report, dated April 29, 1983.*

198.    On April 29, 1983, Trooper Meier traveled to Dr Juliano's office and took possession of the completed mold of Gary Cifizzari's teeth and transported them to Dr. Schwartz's office in Boston.  *Exhibit 17, Meier Report, dated April 29, 1983.*

199.    Both impressions were transported by Trooper Meier to Dr. Schwartz; Cananzey's impression on April 1, 1983, and Gary Cifizarri's impression on April 29, 1983. *Exhibit 16, Trooper Meier Report, ¶5, dated January 12, 1984.*

200.    On May 13, 1983, two search warrants were obtained by Trooper Meier in Worcester Superior Court - the first for medical records, X-Rays, and photographs of the jaw, head and teeth of Gary Cifizzari in possession of the keeper of the records at the Morton Hospital in Taunton; and the second for X-Rays, dental charts and records for Gary Cifizzari in the possession of Dr. Roland Sedgwick of Taunton, MA.  Both warrants were served on May 16, 1983.  *Exhibit 16, Trooper Meier Report, ¶10, dated January 12, 1984.*

201.    The following day on May 14, 1983, those records were given to Dr. Schwartz to aid him further in making a positive identification.  *Exhibit 16, Trooper Meier Report, ¶10, dated January 12, 1984.*

202.    On May 28, 1983, Trooper Meier and State Police Corporal Bradley Mullen interviewed Gary Cifizzari in Taunton, during which Gary Cifizzari was advised that the dental impression of his teeth matched the bite marks on Mrs. Schiappa's body. *Exhibit 16, Trooper Meier Report, ¶11, dated January 12, 1984.*

203.    Dr. Schwartz testified during Michael Cifizzari's murder trial that Gary Cifizzari's bite mark impression matched the bite mark on the body of the victim. *Exhibit 16, Trooper Meier Report, ¶12, dated January 12, 1984.*

204.    In October 1983, Trooper Meier and ADA Murphy interviewed Dr. Richard Souviron, DDS, a nationally recognized expert on bite marks in forensic dentistry. *Exhibit 16, Trooper Meier Report, ¶13, dated January 12, 1984.*

205.    Dr. Schwartz had collaborated with Dr. Souviron on the Schiappa murder case. Dr. Souviron stated, "The comparisons show that the maxillary and mandibular teeth, to a reasonable degree of certainty, inflicted the bite marks as depicted in the photograph" (of Mrs. Schiappa). *Exhibit 16, Trooper Meier Report, ¶13, dated January 12, 1984.*

104088615.v1

206.    On the basis of concurring opinions of Dr. Schwartz and Dr. Souviron, Gary Cifizzari was indicted in November 1983 by a Worcester County Grand Jury for the 1979 murder of Concetta Schiappa. ). *Exhibit 16, Trooper Meier Report, ¶14, dated January 12, 1984.*

207.    The Town of Milford and members of its Police Department did not direct, control or participate in any aspect of securing, assessing, evaluating or utilizing as evidence the dental evidence, from the initiation of the murder investigation through the conviction of Gary Cifizzari. *Exhibit 3, Meier Affidavit, ¶¶59-62.*

208.    The Milford Police did not participate in any aspect of the decision to have Dr. Schwartz attend the autopsy, examine the bite marks on the victim, and make a cast of the bite mark from the victim's stomach. *Exhibit 3, Meier Affidavit, ¶59.*

209.    The Milford Police did not participate in any efforts or decisions to obtain dental impressions from any murder suspect, including Michael Cifizarri, Gary Cifizzari and Robert Cananzey, to compare with Dr. Schwartz's bite mark cast from the victim. *Exhibit 3, Meier Affidavit, ¶60.*

210.    The Milford Police did not participate in any efforts or decisions to retain other forensic dental experts, including Richard Souviron, DDS, to compare dental impressions to the victim's bite mark cast created by Dr. Schwartz. *Exhibit 3, Meier Affidavit, ¶61.*

211.    Trooper Meier is not aware of any communications between the Milford Police and the Worcester County District Attorney's Office, including with ADA Murphy, to discuss any facts or issues related to the use of the bite mark cast and comparisons with the dental impressions from Michael Cifizzari, Robert Cananzey and Gary Cifizzari. *Exhibit 3, Meier Affidavit, ¶62.*

212.    The State Police through the work of Trooper Meier conducted the dental records and impression investigation. *Exhibit 2, Murphy Depo., pp. 114-115.*

**Q.    Milford Role In Bite Mark Evidence**

213.    Milford was not involved in getting Gary Cifizzari's dental mold made. *Exhibit 2, Meier Depo., pp. 46-47.*

214.    Milford was not involved in dropping off Gary Cifizzari's dental molds to Dr. Schwartz at Tufts University. *Exhibit 2, Meier Depo., p. 43.*

215.    Milford was not involved in securing a search warrant for Gary Cifizzari's dental records. *Exhibit 2, Meier Depo., pp. 46-47.*

216.    Milford did not review the search warrant before it was submitted by Trooper Meier. *Exhibit 2, Meier Depo., p. 49.* The District Attorney wrote the warrant. *Exhibit 2, Meier Depo., p. 49.*

24

217.    There were no search warrants or arrest warrants filed by the Milford Police in the murder investigation of Gary Cifizzari. *Exhibit 2, Meier Depo., p. 63.*

**R.    Gary Cifizzari Indictment, Arrest, Trial and Conviction**

218.    An indictment was obtained against Gary Cifizzari following confirmation of Dr. Souviron's expert dental opinion that his teeth made the marks on Mrs. Schiappa's body. *Exhibit 2, Meier Depo., p. 52.*

219.    The indictment was based primarily on the opinions of Dr. Schwartz and Dr. Souviron. *Exhibit 2, Meier Depo., p. 52.*

220.    "The main reasons for the indictment were the concurring dental experts." *Exhibit 2, Meier Depo., p. 53.*

221.    Plaintiff asserted in his 2019 New Trial Motion that "[t]he Commonwealth's case against Mr. [Gary] Cifizzari was predicated entirely on 'expert' bitemark comparison testimony;" and that "[t]he case against [Gary] Cifizzari began and ended with bitemark comparison evidence in the form of expert testimony." *Exhibit 10, New Trial Motion, pp. 1, 14.*

222.    Plaintiff's New Trial Motion contended that "[a]t the trial in 1984, the Commonwealth offered the testimony of three experts, each of whom – infected by biasing influences – claimed they could unequivocally 'match' Mr. Cifizzari's dental impression to patterned injuries left on the victim's body.  At the time, these opinions were endorsed as reliable, and the Commonwealth assured the jury that the experts were infallible.  The introduction of expert testimony identifying Mr. Cifizzari as the 'biter' sealed his fate, even though the Commonwealth failed to offer any other evidence placing Mr. Cifizzari at the scene of the crime." *Exhibit 10, New Trial Motion, p. 1.*

223.    Also, the statement of Gary Cifizzari's cousin, Annette Pasqualone, that the two brothers had showed up at her house in Milford on September 29, 1979, the day Mrs. Schiappa's body was found, was a reason for the indictment. *Exhibit 2, Meier Depo., pp. 53-54.*

224.    Gary Cifizzari was arrested in Taunton on November 21, 1983, by Trooper Meier and Lt. DeFuria after the grand jury indictment was issued, and he was brought back to the CPAC office in Worcester. *Exhibit 2, Meier Depo., pp. 54-55.*

225.    At the CPAC office in Worcester that evening at 7:15 p.m., and with Gary Cifizzari in custody, Sgt. Doheny and Trooper Meier prepared, and Gary Cifizzari signed, a waiver of rights statement, which stated as follows: "I, Gary J. Cifizzari, was arrested in Taunton tonight at about 5:30 PM. I was advised of my rights at that time and I said I wanted a lawyer. I have now been advised of my rights again and I understand them and I'm now willing to talk to the Police and I don't want a lawyer at this time but I want to call a lawyer after I talk to you." *Exhibit 19, Waiver of Rights, dated November 21, 1983.*

104088615.v1

226.    Sgt. Doheny and Trooper Meier then took a statement from Gary Cifizarri in which he renewed his innocence, stated he was not in Milford in September 1979, never knew where his "Aunt Connie" lived, and had met her only once as a child with his father and brother, and never visited her house. After answering that he and his brother Michael first learned of Mrs. Schiappa's death a day or so later while at his mother's house in Taunton from a telephone call from his Aunt Emma Pasqualone, he then changed his statement to say: "After thinking about it, I now remember it was the night after Connie died because I remember Aunt Emma sitting in the rocking chair telling me she was nervous because Connie had just been killed. It may have been the night after or two nights after. We went there to visit Aunt Emma – not to stay there because we still lived on Hart St. [in Taunton with their mother]." The State Police then showed Gary dental pictures, asking "Are these your teeth?", to which he responded "No, they're not mine because I wasn't there," wherein at 8:06 p.m. questioning was stopped because Gary said he wanted to call his mother. *Exhibit 20, Gary Cifizzari Statement, dated November 21, 1983.*

227.    No one from Milford was involved in Gary Cifizzari's arrest. *Exhibit 2, Meier Depo., p. 55.*

228.    No one from Milford was at the meeting with Gary Cifizzari at the CPAC office after his arrest on November 21, 1983. *Exhibit 2, Meier Depo., pp. 55-56.*

229.    No one from Milford was at the CPAC office on November 21, 1983, for Gary Cifizzari's questioning. *Exhibit 2, Meier Depo., p. 57.*

230.    Gary Cifizzari was tried for First Degree murder at Worcester Superior Court, before Judge Robert J. Hallisey, from July 23, 1984 to July 30, 1984. *Exhibit 11, Sgt. Doheny and Trooper Meier Report, dated August 2, 1984.*

231.    The following twenty (20) witnesses testified at Gary Cifizzari's murder trial: Gary Terhune, Kathy Terhune, née Duncan, Ronald Nydam, Michael Cifizzari (took 5th Amendment outside jury view), Robert Catusi (Milford PD), Elizabeth Desantis (found victim's keys and purse), Sgt. Joseph Doheny, MSP, Trooper Robert Meier MSP, June Cauldwell (dental hygienist), Dr. Stanley Schwartz (dental examiner and expert witness), Nicholas Capece, M.D. (medical examiner), Dwight Watson Jr. (funeral director), Edward Sussman, M.D. (medical examiner), Antonetta Pasqualone (Cifizzari cousin), Anthony Captaline, DMD (dental expert witness), Harry Messier, DMD (Gary Cifizzzari's dentist), Richard Souviron, DMD (dental expert witness), Eleanor Cifizzari (Gary Cifizzari's mother), Gary Cifizzari, Robert Hammack (investigator who took statement from Eleanor Cifizzari). *Exhibit 21, Gary Cifizzari Trial Tr., ; Index Excerpts.*

232.    Except for Milford Police patrolman, Robert Catusi, who responded to the murder scene and testified at trial for the prosecution, without cross examination, solely to identify the victim's body (Mrs. Schiappa was his wife's relative)(Exhibit 21, Gary Cifizzari Trial Tr., Vol. 2, pp. 2-79 to 2-80), no member of the Milford Police testified at the Gary Cifizzari murder trial. *Exhibit 21, Gary Cifizzari Trial Tr., Index.*

233.    Michael Cifizzari's February 26, 1981, confessions at the Milford police station and at the State Police CPAC office could have been, but were not, introduced as evidence at Gary

26
104088615.v1

RA 136

Cifizzari's murder trial. *Exhibit 5, Murphy Depo., p. 115; Exhibit 10, New Trial Motion, pp. 15, 76 n28.*

234.    The Worcester County Superior Court jury returned a guilty verdict for first degree murder against Gary Cifizarri on July 30, 1984. *Exhibit 2, Meier Depo., p. 61; Exhibit 11, Sgt. Doheny and Trooper Meier Report, dated August 2, 1984.*

235.    The forensic dental bite mark evidence was "very important" in obtaining the conviction of Gary Cifizzari. *Exhibit 5, Murphy Depo., pp. 114-115.*

**S.    Post Trial Proceedings**

236.    On May 14, 1986, the Massachusetts Supreme Judicial Court affirmed the judgment against Plaintiff. Commonwealth v. Gary Cifizzari, 497 Mass. 560 (1986). The Court held that:

> The circumstances in the case warranted a finding by the jury that a deliberately premeditated murder or a murder by extremely cruel or atrocious means or a murder in the commission of the felony of rape was committed by the defendant. As G.L. c. 278, § 33E requires, we have examined the entire case and we conclude that the interests of justice do not warrant the entry of a verdict of a lesser degree of guilt or an order for a new trial.

Id. at 369. *Exhibit 22,* Com. v. Gary Cifizzari, 497 Mass. 560 (1986).

237.    On appeal, Plaintiff raised a number of arguments, including but not limited to, the admissibility of bite mark identification evidence; the statement of Annette Pasqualone referencing Michael Cifizzari's confession; introduction of the theory of joint venture; instruction of felony murder; and the prosecutor's remarks on closing argument regarding a reference to the Cifizzari brothers' smoking marijuana under a bridge after the murder. Id. Plaintiff did not argue that any conduct by the Milford Police relative to Michael Cifizzari's questioning on February 26, 1981, or evidence of Michael Cifizzari's confessions that were not introduced at trial, and he did not argue ineffective assistance of counsel relative to the failure to introduce a third-party culprit defense relative to Michael Giroux or other State Police suspects. *Exhibit 22,* Com. v. Gary Cifizzari, 497 Mass. 560 (1986).

238.    The New England Innocence Project filed its appearance on behalf of Gary Cifizzari on March 9, 2017, and Rope & Gray filed its appearance on behalf of Mr. Cifizzari on December 21, 2017. *Exhibit 10, New Trial Motion, p. 35.*

239.    On May 31, 2019, Plaintiff filed a Motion for a New Trial in Worcester Superior Court. *Exhibit 10, New Trial Motion.*

240.    On December 10, 2019, the Commonwealth filed its Assent to Defendant's Motion for New Trial, which the Superior Court allowed the same day. *Exhibit 23, Commonwealth's Assent to Defendant's Motion for New Trial, Doc. No. 88.*

27

241.    Also on December 10, 2019, the Commonwealth entered a *Nolle Prosequi* on the count of First Degree Murder, citing: the unavailability of DNA testing as an investigative tool at the time of the 1979 murder and the 1983 arrest, although expedited further DNA testing of available evidence yielded either exclusion or inconclusive results in regard to the defendant, Gary Cifizzari; testimony from one of three prosecution expert dental witnesses on bite mark identification, on which Gary Cifizzari's conviction was "largely" based, has been recanted; and the Commonwealth determined through DNA evidence that Michael Giroux perpetrated the murder. *Exhibit 24, Commonwealth's Nolle Prosequi, dated December 10, 2019.*

242.    In May 2021, Plaintiff and the Commonwealth consummated a settlement in the amount of $1 million relative to claims brought or which could have been brought against the Commonwealth pursuant to the Massachusetts Erroneous Conviction statute, M.G.L. c. 258D, § 1 et seq, arising from or related to the facts or circumstances surrounding Gary Cifizzari's arrest, indictment, conviction, sentencing and imprisonment in connection with his conviction for the murder of Concetta Schiappa. *Exhibit 25, Settlement and Release, dated May 8, 2021.*

**T.    Michael Cifizzari's Suppression Hearing**

243.    Michael Cifizzari's criminal defense attorney, Michael Monopoli, sought to suppress Michael Cifizzari's confession made at the Milford police station on February 26, 1981, on the ground that it was not voluntarily given, and was unable to make a voluntary waiver. *Exhibit 9, Suppression Hearing Transcript, p. 3.*

244.    A full evidentiary hearing was held before the Judge Francis Keating at Worcester Superior Court over 2 days commencing on June 6, 1983. *Exhibit 9, Suppression Hearing, p. 1.*[2]

245.    ADA Murphy arranged for Milford police officers to testify at the hearing along with other witnesses. *Exhibit 5, Murphy Depo., pp. 48-49.*

246.    As documented in the partial transcript, Judge Keating heard testimony from the following witnesses at the suppression hearing: (1) Sgt. DiGirolamo, Milford Police (pp. 5 to 40); (2) Officer John Chianese, former Milford Police (pp. 40 to 77); (3) Trooper Thomas White, CPAC (pp. 77 to 88); (4) Sgt. Joseph Doheny, CPAC (pp. 88 to 110); (5) James Robison, psychiatrist (112 to 126); and (6) Albert Douglas Pike, psychiatrist (126).    *Exhibit 9, Suppression Hearing, pp. 1-126.*

247.    As reflected in Judge Keating's Order denying Michael Cifizzari's Motion to Suppress Statements, the following other witnesses gave testimony at the hearing: (7) Corporal Edward Sullivan, MSP; (8) Dr. Venyamin Pinsky, psychiatrist; and (9) Dr. Neil Borenstein, psychiatrist.[3] *Exhibit 26, Order Denying Suppression, p. 5, ¶¶9, 11).*

---

[2] The transcript of the June 6, 1983, court hearing on Michael Cifizzari's Motion to Suppress Statements of the Defendant is incomplete as it terminates at the start of an examination of a psychiatrist, James Robison.

[3] Judge Keating's decision denying suppression of the statements by Michael Cifizzari stated that "many psychiatrists testified at the hearing," but he only gave weight to the testimony of doctors Venyamin and Borenstein. The decision does not identify those other psychiatrists or how many testified. *Exhibit 26, Order Denying Suppression, p. 9, ¶11.*

104088615.v1

**RA 138**

248.     Sgt. DiGirolamo testified that Michael Cifizzari came into the police station on February 26, 1981 at approximately 1:00 p.m. (p. 6); he knew him "very well" from having been his youth football coach (p. 6); lost track of him over the years until starting in 1980 Michael would come into the police station looking to sleep a half dozen times. (p. 8).  DiGirolamo observed that Michael had poor hygiene, was depressed and hungry, but "conversed naturally." (p. 9).  *Exhibit 9, Suppression Hearing, pp. 6, 8- 9.*

249.     DiGirolamo testified that on February 26, 1981, Michael came in again to the police station to sit down and relax out of the cold.  (p. 11).  Having observed Michael during his prior visits, it seemed to DiGirolamo that Michael had "something on his mind, but he just wasn't ready to say anything." (p. 11)   He asked Michael if they could talk and Michael said "sure." (p. 11)   During the questioning and after he Michael was read his Miranda rights and signed his name to the waiver, DiGiralamo observed that Michael was "normal" (pp. 13-14), was able to talk to him (p. 14), and did not "notice anything out of the ordinary" with respect to Michael. (p. 14).  During the questioning, Michael "seemed to know what he was doing", "respond[ed] appropriately to questions", was alert, and Sgt. DiGirolamo could "very clearly" understand Michael as he was talking. He had known Michael at that point for a fairly long time. (p. 26).  *Exhibit 9, Suppression Hearing, pp. 11, 13-14, 26.*

250.     After Michael confessed to having killed Mrs. Schiappa with his cousin, Robert Cananzey, Sgt. DiGiralamo said to Michael: "Mike, do you realize what you are telling us?  This is serious. This is a serious charge. You are telling us you killed a woman." (p. 15)   Michael responded "Yeah, I know. I want to tell you all about it. I want to get it off my chest." (p. 16)  *Exhibit 9, Suppression Hearing, pp. 15 -16.*

251.     Sgt. DiGirolamo contacted the Milford Police Chief and Trooper Thomas White from the CPAC unit, who lived in Milford and arrived at the station to participate in the interrogation. (pp. 17 to 18).  Michael, however, refused to speak with Trooper White. (p. 18)  At the conclusion of the questioning, Michael said: "Tony, I'm glad its all over with. I wanted to get it off my chest a long time, that's why I kept coming into the station to see you because I wanted to talk to you." (p. 19) DiGirolamo asked if Michael would go to Worcester in the morning, and Michael agreed.  His observed mental condition at that time was depressed but relaxed. (pp. 19-20)  In the morning, DiGirolamo, Officer Chianese and Officer Sullo transported Michael to the CPAC office in Worcester, and along the way stopped in Grafton at the Hungry L restaurant so Michael could order breakfast. (p. 20-21)  *Exhibit 9, Suppression Hearing, pp. 17-21.*

252.     Prior to Michael Cifizzari coming into the Milford police station on February 26, 1981, Sgt. DiGirolamo did not suspect that Michael was a suspect in the case.  "We had suspected that he might know something about the murder, but at the time, no, I didn't feel he was a suspect." *Exhibit 9, Suppression Hearing, p. 30.*

253.     Sgt. DiGirolamo "figured that [Michael Cifizzari] knew something, where he was related to the woman and he could possibly tell us something about it." *Exhibit 9, Suppression Hearing, p. 30.*

104088615.v1

254.    Sgt. DiGirolamo believed it was an "opportune" time to talk to Michael Cifizzari about the matter because "he was sober, he was calm, and he was, in my opinion, normal. He was talking like any ordinary human being should. [] [T]there were times he came in when he was, well, you could see he was on something. I don't know what type of drugs because I'm not an expert on the subject." *Exhibit 9, Suppression Hearing, pp. 31-32.*

255.    Michael Cifizzari's mind did not wander during the interview with Sgt. DiGirolamo. *Exhibit 9, Suppression Hearing, p. 39.*

256.    During Sgt. DiGirolamo's interview with Michael Cifizzari at the Milford police station, Michael did not say anything about Gary Cifizzari being at the murder scene. Exhibit 9, Suppression Hearing, p. 40.

257.    The only statements Michael made about Gary Cifizzari on the night of the statement in Milford was "I'm like Robert Cananzey. I lift weights, and I'm strong like him." "My brother Gary, I'd do anything for him," and, "I love my brother Gary." *Exhibit 9, Suppression Hearing, p. 39.*

258.    Officer John Chianese testified that on February 26, 1981, when Michael Cifizzari made his statement at the Milford police station, Michael was cold and wet and wanted to come in (p. 43); Michael asked for coffee and Chianese went out and got him a cup (p. 44); Chianese had no trouble understanding him (p. 44); and Michael was not under the influence of drugs or alcohol (p. 44). *Exhibit 9, Suppression Hearing, p. 44.*

259.    Officer John Chianese testified that he was able to understand Michael Cifizzari and believed Michael could understand him (p. 59); Michael was coherent and there was no smell of alcohol on his breath (p. 60); there was no evidence of drugs – "he was very clear" (p. 60); his personal hygiene  that night was "O.K." and he and his clothes appeared to be clean but wet (p. 65); Michael would not ramble into other subjects. (p. 76)  *Exhibit 9, Suppression Hearing, pp. 59-60, 65, 76.*

260.    Officer Chianese did not ask Michael Cifizzari any questions during Sg. DiGirolamo's interview. *Exhibit 9, Suppression Hearing, p. 70.*

261.    Trooper White testified at the suppression hearing and made observations about Michael Cifizzari during the 15-20 minutes he was in the same room as him (p. 80), as follows: he appeared sober and his clothing was unkempt and a little dirty (p. 79); he did not appear to be under the influence of drugs or narcotics (p. 79); he was very excited at initial meeting with him and paranoid (pp. 79-80); he appeared to know what he was saying and was "totally rational;" (p. 82); and Trooper White's initial impression was that he didn't think Michael was "that bright a kid" (p. 82). *Exhibit 9, Suppression Hearing, pp. 79-80, 82.*

262.    Michael Cifizzari completely stopped talking to Trooper White once he asked Michael if he wanted to tell him the story that he had told Sgt. DiGirolamo (p. 84); Michael seemed afraid of him (p. 84); Trooper White said "If you feel more comfortable, Michael, I'll leave the

104088615.v1

room" to question which Michael shook his head in agreement, and Trooper White left the room. (p. 85). *Exhibit 9, Suppression Hearing, pp. 84-85.*

263. After leaving the room at the Milford Police Department where Michael Cifizzari was being questioned, Trooper White set up an interview at the State Police office later in the morning. *Exhibit 9, Suppression Hearing, p. 81.*

264. Sgt. Joseph Doheny testified at the suppression hearing, and testified that as one of the main persons conducting the Schiappa murder investigation, he interviewed Michael Cifizzari at the CPAC office in Worcester on February 26, 1981, starting at about 8:00 a.m. *Exhibit 9, Suppression Hearing, p. 90.*

265. Until that point, Michael Cifizzari's name had come up, but he was not classified as a suspect. *Exhibit 9, Suppression Hearing, p. 90.*

266. Sgt. Doheny read Michael Cifizzari his Miranda rights and said he understood them. Michael looked like he had been up all night, which Sgt. Doheny had been told; he was disheveled, a bit wide-eyed, almost wild-eyed. Michael responded to each question he asked him during the Miranda rights. *Exhibit 9, Suppression Hearing, p. 93.*

267. When Sgt. Doheny questioned Michael about the statements he had given Sgt. DiGirolamo, Michael expanded upon parts, agreed with parts and changed parts. *Exhibit 9, Suppression Hearing, p. 93.*

268. Sgt. Doheny then took a verbal statement from Michael, later reducing that statement and notes to writing and dictated to a stenographer. *Exhibit 9, Suppression Hearing, p. 93.*

269. During Michael Cifizzari's statement, he was asked by Sgt. Doheny if he was sure it was his cousin that was with him and not his brother Gary. Michael's response to that question was "Yes, Gary was there." When Sgt. Doheny asked if it was Gary and not his cousin, Michael responded no, they were both there. *Exhibit 9, Suppression Hearing, p. 95.*

270. The conversation ceased when Sgt. Doheny asked if Michael Cifizzari would voluntarily allow a dentist to make a tooth impression of his teeth, which upset Michael, who responded that he would not allow an impression and did not want to talk to Sgt. Doheny further. *Exhibit 9, Suppression Hearing, p. 95.*

271. ADA Murphy was not concerned that Michael Cifizarri's questioning by Sgt. DiGirolamo began at 1:30 a.m. *Exhibit 5, Murphy Depo., p. 58.*

272. Murphy testified that Michael Cifizzari's "Paul M. Cartney" signature on the Miranda waiver was a strange fact during the suppression hearing, but the judge heard it in depth and found that Michael had waived his rights. *Exhibit 5, Murphy Depo., pp. 59-60.*

31

273.    ADA Murphy recalled that the suppression hearing was thorough, not "a quick handling of the situation" by the trial judge. *Exhibit 5, Murphy Depo., pp. 48-49.*

274.    According to Murphy, Sgt. DiGirolamo was a nice man, and a "people person," who wouldn't yell at people. He was a youth sports coach in Milford who had coached Michael Cifizzari in football as a youth, and had allowed Michael to sleep at the station at different times. "That's the type of guy he was." *Exhibit 5, Murphy Depo., p. 54.*

**U.    Suppression Hearing Findings of Fact**

275.    Based on the testimony adduced at the two day evidentiary hearing on Michael Cifizzari's Motion to Suppress his confession, the court (Keating, J.) issued a 9 page ruling and order denying the motion, including findings of fact, as follows:  *Exhibit 26, Suppression Denial Order, pp. 1- 9.*

276.    On the night of February 26, 1981, Sgt. DiGirolamo was working at the station on the "midnight shift." He had been with the Milford police for about thirty years. On that night, Michael Cifizzari walked into the station at approximately 1:00 a.m. and sat down in the lobby. It appeared to Sgt. DiGirolamo that Michael had come in to keep warm and, perhaps, to be fed.  This practice of coming in off of the street and asking Sgt. DiGiralomo for food had occurred about six times before this incident. Often Michael would be permitted to sleep at the station. On this occasion, Michael sat about fifteen to twenty feet from Sgt. DiGirolamo, and relaxed there for about one-half hour. *Exhibit 26, Suppression Denial Order, p. 2, ¶1.*

277.    Sgt. DiGirolamo had known Michael since he was about twelve years old and also was his football coach.  He liked Michael, and it is obvious that Michael looked up to and considered Sgt. DiGirolamo as somewhat of a father figure. The sergeant had kept in contact with Michael for several years prior to the night in question.  Sgt. DiGirolamo observed that Michael in the fall of 1980 to be a street walker with bad personal hygiene.  He had last seen him in a similar state four or five weeks before the night in question. Michael Cifizzari often appeared to be on drugs when he came into the station. However, on this night, Sgt. DiGirolamo observed Michael to be sober, eyes clear, and speech clear. Michael Cifizzari did not appear to be on drugs. *Exhibit 26, Suppression Denial Order, p. 2, ¶2.*

278.    The murder of Concetta Schiappa occurred on or about September 29, 1979, and the victim appears to have been the aunt of the defendant.  Knowing Michael's relationship to the victim, Sgt. DiGirolamo and Officer John Chianese, had decided that they would question the defendant about the murder the next time that he came in for food and lodging. *Exhibit 26, Suppression Denial Order, pp. 2-3, ¶3.*

279.    After briefly talking with Michael, Officer Chianese told Sgt. DiGirolamo that Michael "wanted to tell us something." Accordingly, the three of them went into an empty room, and before anyone said anything in the room, Sgt. DiGirolamo advised Michael of his <u>Miranda</u> rights. Michael stated that he knew them but the sergeant advised him nevertheless. After advising him orally, the sergeant then printed the <u>Miranda</u> warnings on a piece of paper. The police officers asked Michael to sign the sheet and Michael signed it "Paul M. Carntney" (apparently referring to

32

the Beatles singer "Paul McCartney"). Sgt. DiGirolamo asked him "What's this Mike?", and Michael thereafter signed his name as "Michael, Paul, Cifizzari." *Exhibit 26, Suppression Denial Order, p. 3, ¶4.*

280.    Sgt. DiGirolamo then asked Michael if he knew anything about the murder and he admitted that he did.  He said that he was with Schiappa on the night of the murder and that he and his cousin Robert Cananzey hit and robbed her. Sgt. DiGirolamo asked him whether they killed the woman and he said "Yes".  At this point Sgt. DiGirolamo instructed Officer Chianese to get a pad and write the story down. The sergeant asked Michael, "You know this is serious, don't you Mike?", and Michael responded, "I know, but I just want to get it off my chest." Thereafter, the sergeant instructed Officer Chianese to get the defendant's story three times and write it down three times "to make sure." At the time of the statement, Sgt. DiGirolamo observed Michael to be alert, understandable, and able to talk freely without rambling.  *Exhibit 26, Suppression Denial Order, pp. 3-4, ¶5.*

281.    After having received the statements, Trooper White, who was assigned to the CPAC unit of the State Police, was called by Sergeant DiGirolamo and was asked to question Michael. At about 2:00 a.m., Trooper White entered the room with Michael, Sgt. DiGirolamo and Officer Chianese present. The sergeant asked Michael if he wanted to talk to the trooper and Michael "became paranoid" and refused to talk. Trooper White was able to engage Michael in some general conversation, but when asked to recount his story of the incident, Michael put his head down. Trooper White left the room and Michael began to talk again about the incident. *Exhibit 26, Suppression Denial Order, p. 4, ¶6.*

282.    After the questioning ended, Sgt. DiGirolamo and Officer Chianese took Michael out to get something to eat. At that time, Michael said that he was glad to "get if off [his] chest" and that it had been "a long time." Sgt. DiGirolamo observed Michael to be relaxed, but appeared to be depressed or remorseful as evidenced by the fact that Michael's head was down as he sat. *Exhibit 26, Suppression Denial Order, p. 4, ¶7.*

283.    At about 7:00 a.m., Michael was taken to the CPAC office in Worcester. On route, the officers took him to breakfast at which time he appeared relaxed and hungry. While at the CPAC office, CPAC Sgt. Joseph Doheny attempted to question Michael in the presence of Sgt. DiGirolamo. Sgt. Doheny read Michael his <u>Miranda</u> rights and introduced himself. Sgt. Doheny read one of the statements to Michael which he had given in Milford and said he was willing to talk about it. He then talked about the incident changing and expanding on parts of the story which he had given previously. *Exhibit 26, Suppression Denial Order, p. 4-5, ¶8.*

284.    When asked if he would submit to a tooth impression (regarding a bite found on the victim), Michael stopped abruptly and glared at Sgt. Doheny. He refused to talk anymore, saying to Sgt. DiGirolamo, "That Sgt. Doheny, get him out of here; he's driving me nuts!" At this time, Sgt. Doheny observed the defendant to be "wild-eyed" and somewhat disoriented. However, Michael's responses were not confused.  The interview with Sgt. Doheny was then concluded and Michael was taken to District Court for arraignment. *Exhibit 26, Suppression Denial Order, p. 4-5, ¶8.*

104088615.v1

285.    Michael Cifizzari was examined by court psychiatrist, Dr. James Robeson, at the February 27, 1981, arraignment at Milford District Court, and declared that in his opinion Michael was incompetent to stand trial.  *Exhibit 26, Suppression Denial Order, p. 5, ¶10.*

286.    Many psychiatrists testified at the hearing on this motion regarding Michael Cifizzari's mental condition at the time of the alleged confession on February 26, 1981, at 1:30 a.m.  Of all the doctors (and some laymen) who testified, Judge Keating gave weight only to the testimony of Dr. Venyamin Pinsky and Dr. Neil Borenstein. Dr. Pinsky, a man whose credentials are impeccable, first saw the defendant after he was taken to the treatment center at Bridgewater after Michael's attempted arraignment. Dr. Pinsky observed Michael to be in "an appropriate mood - upset".  In the doctor's opinion, he believed that Michael showed no psychotic symptoms and did not appear to be in an acute psychotic state.  He was oriented as to time and place and attempted to tell the doctor that he had committed no crimes.  *Exhibit 26, Suppression Denial Order, pp. 5-6, ¶11.*

287.    Dr. Borenstein, whose credentials are as equally impressive as Dr. Pinsky's, first saw Michael on May 22, 1981. After reviewing Michael's medical records and examining him, the doctor diagnosed Michael as suffering from a major mental illness, namely schizophrenia. The defendant, at times previous to the one in question, had been diagnosed as a schizophrenic, and, as a result was confined at a state treatment facility at Taunton during July 9, 1973 through November 26, 1974; August 9, 1975 through October 30, 1975; and November 7, 1979 to November 27, 1979.  Dr. Borenstein believed that when Michael first signed the Miranda waiver as "Paul M. Carntney", he believed he was actually Paul McCartney, the Beatles singer. Significantly however, the doctor acknowledged that the defendant "could easily be structured back to his given name" by his friend Sgt. DiGirolamo.  The doctor concluded at the hearing that, given Michael's medical history of mental illness, the false signature, and other persons' observations of his conduct, there is a "likelihood that the voluntariness, willingness and capacity to waive his Miranda rights were impaired."  The doctor admitted however that it is "difficult to be absolutely sure or pin it down" that Michael was mentally ill at the time of the alleged confession. And perhaps most significantly, the court asked Dr. Borenstein, given the paternalistic and trusting relationship between Michael and Sgt. DiGirolomo, and Michael's statements that he felt better about getting things "off his chest," whether these facts would change the doctor's opinion regarding voluntariness. The doctor's response to this inquiry was justifiably equivocal and lacking surety.  He responded by saying, in effect, that Michael may have wanted to please Sgt. DiGirolamo but that the doctor could not be sure.  *Exhibit 26, Suppression Denial Order, pp. 6-7, ¶12.*

288.    Judge Keating then made the following rulings of law:  (1) the interrogation was custodial and Michael was entitled to and received properly his Miranda warnings; (2) Michael's statements "were the 'product of a rational intellect as part of the issue of voluntariness'", citing Com. v. Vazquez, 387 Mass. 96, 99 (1982)(the judge was not required to allow the motion to suppress merely because of the evidence of the mental illness); (3) Michael's mental condition did not render him incapable of understanding the meaning and effect of his confession or cause him to be indifferent to self-protection, as evidenced by Sgt. DiGirolamo's question to him: "You know this is serious Mike, don't you?"; and (4) the Commonwealth has met its burden of proving that Michael Cifizzari "'voluntarily, knowingly, and intelligently' waive[d] the rights protected by the

34

Miranda warnings as required by the Fifth and Sixth Amendments. *Exhibit 26, Suppression Denial Order, pp. 7-9.*

289.    Judge Keating's ruling emphasized that Sgt. DiGirolamo was in a fatherly relationship with Michael Cifizzari, which facilitated the confession by allowing Michael freely "to get if off his chest," but he "was not tricked or cajoled into making a statement," but rather sought out Sgt. DiGirolamo to confide in him. Thus, "in the absence of any trickery on the part of Sgt. DiGirolamo, and given the defendant's apparent clarity on the night in question, the court rules that the confession was "the product of an essentially free and unconstrained choice by its maker." Citing Schneckloth v. Bustamonte, 412 U.S. 218 (1973). *Exhibit 26, Suppression Denial Order, p. 8.*

## V.    State Police Investigation of Michael Giroux

290.    On September 29, 1979, the day Mrs. Schiappa was discovered murdered, Trooper White and MPD Det. Sgt. Small interviewed Gary Terhume, a resident of the first floor left apartment next to Mrs. Schiappa's apartment.  That same day, Sgt. Doheny interviewed Kathy Ann Duncan, who resided with Terhume. *Exhibit 1, State Police Report, dated October 11, 1979.*

291.    During Trooper Doheny's interview with Duncan on September 29, 1979, she reported that her brother-in-law, Michael Giroux, who was visiting her, had been accused several weeks earlier of stealing money from Mrs. Schiappa's apartment. *Exhibit 1, State Police Report, dated October 11, 1979.*

292.    Trooper White had "keyed in on Michael Giroux as a suspect," primarily based on Giroux having been accused of theft from Mrs. Schiappa's apartment. *Exhibit 2, Meier Depo., pp. 25, 125, 138-139.*

293.    Trooper White testified at Michael Cifizzari's murder trial that Michael Giroux was a suspect in the investigation and was located and interviewed. *Exhibit 4, Michael Cifizzari Trial Tr., pp. 340-341.*

294.    Trooper White spoke to Giroux on several occasions within 3 to 6 months of the murder.   Giroux had been admitted to the V.A. Hospital due to a drug overdose a few days after the murder. *Exhibit 4, Michael Cifizzari Trial Transcript, p. 342.*

295.    Trooper White was a senior investigator at CPAC and had been in the office much longer than Trooper Meier.  He lived in Milford and had relationships with Milford police officers that Trooper Meier did not. *Exhibit 2, Meier Depo., p. 125.*

296.    At the beginning of the investigation, Trooper White had a greater role than Trooper Meier and knew more about the case. *Exhibit 2, Meier Depo., pp. 139-140.*

297.    Trooper White was tasked with investigating Giroux's involvement in the murder. *Exhibit 2, Meier Depo., pp. 67-68.*

35

104088615.v1

RA 145

298.    The Plaintiff's Rule 26 Automatic Disclosure contained a handwritten statement of an interview with Michael Giroux dated October 24, 1979. *Exhibit 34, Plaintiff's Disclosure, Bate #000343-000344.*

299.    On October 5, 1979, Trooper Meier conducted an interview with suspect Michael Giroux at the Veterans Administration Hospital in West Roxbury, accompanied by Bill Warren, Chief of VA Police, and Dr. Mark Thall, Senior Resident at the VA Hospital. *Exhibit 27, Michael Giroux Statement, dated October 5, 1979; Exhibit 3, Meier Affidavit, ¶21.*

300.    Trooper Meier was directed by Trooper White to interview Giroux, because White believed Meier may be able to get different information from Giroux that he was unable to, although White never informed Meier what information he had received. *Exhibit 2, Trooper Meier Depo., p. 36.*

301.    Trooper White's request for Trooper Meier to interview Giroux was communicated through Sgt. Doheny, not directly from White as he did not give Meier instructions. *Exhibit 2, Meier Depo., p. 68.*

302.    In Trooper White's interview with Mrs. Schiappa's neighbor, Gary Terhume, the witness said he saw a man with an "Afro-shaped" haircut, which Trooper White thought might be Michael Giroux. *Exhibit 2, Meier Depo., pp. 128-129.*

303.    Trooper Meier has no knowledge as to whether or not that Giroux was an informant for Trooper White, or the Milford Police. *Exhibit 2, Trooper Meier Depo., pp. 37-38.*

304.    Giroux stated that he was discharged from the Army on September 14, 1979, and arrived in Milford on September 16, 1979, and was living with his brother. He was an Army clerk and also drove a tank. He finished high school in the Army. He was stationed at Fort Riley in Kansas.  He received an honorable discharge for hardship - his wife was having problems.  He was in the service twenty and one-half months. *Exhibit 27, Michael Giroux Statement, dated October 5, 1979; Exhibit 3, Trooper Meier Affidavit, ¶22.*

305.    Giroux informed Trooper Meier that on the day of the murder, he worked for his brother putting in carpeting in Framingham.  He arrived home with his brother at 9:30 or 10:00 p.m.  His brother gave him a brown shirt, a plaid pair of pants and brown socks.  He said that he wore his own brown shoes.  His brother dropped Giroux off at Lonergan's where he was watching the Shaver's fight on TV.  He doesn't know what time it was, but at the end of the fight, he started to leave Lonergan's.  He stated that he was very drunk, so drunk that he said he had trouble talking. As Giroux was leaving Lonergan's , he met Sandy Fisher, saying "Hi Sandy," but could not recall any further conversation.  He said that Sandy's married name is Goucher and that she is a friend of his wife's from school.  Giroux then informed Trooper Meier that he went right home and went to sleep. Trooper Meier asked Giroux about his route home from Lonergan's , and he said he went through Stone's parking lot because he did not want to walk on Main Street and be seen. *Exhibit 27, Michael Giroux Statement, dated October 5, 1979; Exhibit 3, Trooper Meier Affidavit, ¶¶22-26.*

104088615.v1

306.    Trooper Meier asked Giroux if he went near the victim's house.  Giroux said no, and also stated that he didn't go to see Gary [Terhume] and Kathy [Duncan] on Central Street, because he thought they would not be home and he was too drunk to talk, anyway. Trooper Meier asked Giroux if he knew Mrs. Schiappa.  He said no, but said he knew where she lived.  He said that last September [1978] he had been visiting Kathy Duncan and Gary [Terhume] and that the lady upstairs had accused him of taking money from Mrs. Schiappa.  Giroux told Trooper Meier that he never talked with Mrs. Schiappa at that time.  Giroux said he did not take Mrs. Schiappa's money and was not in her house.  Giroux said that Mrs. Schiappa had never accused him of taking her money, but that it was the lady upstairs who said he was the only one hanging around there so he must have done it.  *Exhibit 27, Michael Giroux Statement, dated October 5, 1979; Exhibit  , Trooper Meier Affidavit, ¶¶27-28.*

307.    Trooper Meier asked Giroux when the last time he was at Kathy Duncan and Gary Terhume's apartment, and he said it was the Friday before last (the Friday before Mrs. Schiappa was murdered.)  Giroux said he arrived at their house between 8:30 p.m. and 9:15 p.m., had a drink, stayed for a short while and left to get a haircut at the Clip & Cut across the street from Friendly's on Main Street.  Giroux said he has not been to the house since then. *Exhibit 27, Michael Giroux Statement, dated October 5, 1979; Exhibit 3, Trooper Meier Affidavit, ¶29.*

308.    Giroux also stated that he had spoken to State Police investigators Tom White and Brad Holmes the morning of this interview. *Exhibit 27, Michael Giroux Statement, dated October 5, 1979; Exhibit 3, Trooper Meier Affidavit, ¶30.*

309.    Troopers White and Holmes never told Trooper Meier that they had interviewed Michael Giroux the same morning as he did.  He didn't know until Giroux mentioned it.  Trooper Meier knew that White was interested in Giroux as a suspect, "and White is not known for sharing information." *Exhibit 2, Meier Depo., p. 138.*

310.    Trooper White had located and interviewed Michael Giroux for "hours" and considered him a suspect.  White spoke with Giroux on "several occasions," the last occasion being within 3 to 6 months of the murder. *Exhibit 4, Michael Cifizzari Trial Tr., pp. 340-342.*

311.    Trooper Meier never saw a police report of White's interview with Michael Giroux which took place the same day as his interview. *Exhibit 2, Meier Depo., pp. 116-127.*

312.    Trooper Meier reported that Giroux informed him how he couldn't stand the sight of blood, and spoke of how his brother had cut his finger a few days ago and how much the site of blood bothered him. *Exhibit 27, Michael Giroux Statement, dated October 5, 1979; Exhibit 3, Trooper Meier Affidavit, ¶30.*

313.    At Trooper Meier's interview, Giroux put himself close to the murder scene, at a bar up the street from Mrs. Schiappa's apartment. *Exhibit 2, Meier Depo., p. 107.*

314.    Giroux informed Trooper Meier about his walking route on the night of the murder, but Trooper Meier only knew that Lonergan's bar was close to Schiappa's apartment.  Trooper

104088615.v1

White actually lived in Milford and would have known exactly where those places were located. *Exhibit 2, Meier Depo., p. 110.*

315.    Trooper Meier was never instructed to interview Michael Giroux's brother, David Giroux, and suspects that Trooper White did.  *Exhibit 2, Meier Depo., pp. 76-77.*

316.    Trooper Meier is not aware of an interview with David Giroux.  He had never heard of him and was not asked to talk to him.  *Exhibit 2, Meier Depo., p. 116.*

317.    Trooper Meier is not aware of any instruction from Sgt. Doheny or from CPAC for the Milford Police to investigate Michael Giroux.  *Exhibit 2, Meier Depo., p. 93.*

318.    The State Police "looked at" Giroux, but couldn't show he knew the Cifizzaris or place him at the scene, and he wasn't charged with the murder.  *Exhibit 2, Meier Depo., pp. 102.*

319.    Michael Giroux - along with Gary Cifizzari, Robert Cananzey, and Gary Terhume - remained a State Police suspect in the murder even after Michael Cifizzari's confession on February 26, 1981.  *Exhibit 4, Michael Cifizzari Trial Tr., pp. 340, 417.*

320.    Trooper Meier is not aware of any efforts made by the Milford Police to investigate Giroux's role in the murder, or that they were directed by Sgt. Doheny or the State Police to do so. *Exhibit 3, Meier Affidavit, ¶54.*

321.    Plaintiff contended in his 2019 New Trial Motion that he was also prejudiced by his defense counsel's failure to raise a third-party culprit defense, stating "[t]rial counsel failed to introduce any of the readily available evidence regarding Michael Giroux, who had both the motive and opportunity to commit the murder and whom the police suspected but ultimately – and inexplicably – did not charge." *Exhibit 10, New Trial Motion, p. 2.*

**W.    Michael Giroux As Confidential Police Informant**

322.    Trooper Meier is not aware of any facts to suggest that Michael Giroux was an informant for the Milford Police. Exhibit 3, Trooper Meier Affidavit, ¶55.

323.    At no time during the course of the State Police murder investigation, or after, did Trooper Meier come to learn that the Milford Police were aware or had been informed that Michael Giroux was a police informant for any law enforcement agency. Exhibit 3, Trooper Meier Affidavit, ¶56.

324.    Trooper Meier is not aware of any facts to support the contention that any law enforcement agency involved in the Schiappa homicide investigation failed to investigate Michael Giroux as a suspect because of his role as a police informant. *Exhibit 3, Trooper Meier Affidavit, ¶57.*

325.    The only documentary evidence regarding Michael Giroux in his capacity as a police informant was produced by Plaintiff in his Rule 26 Automatic Disclosure, totaling 12 pages.

38

These documents may suggest that Giroux was an informant for the Massachusetts State Police, the Worcester Police and the FBI. However, the earliest such document is dated 1991. As Michael Cifizzari was convicted in 1983 and Gary Cifizzari in 1984, there is nothing in the record which suggests Giroux was a police informant during the Schiappa murder investigation which began September 29, 1979, and ended with Gary Cifizzari's conviction in July 1984. *Exhibit 35, Plaintiff's Automatic Disclosure, Bates #3404-3410, 3601-3604.*

X.    **Evidence Implicating Cifizzari Brothers and Michael Giroux in the Murder**

326.    Sgt. Doheny and MPD Det. Liberto interviewed Nicholas Trongone, the owner of the flower shop located next to Mrs. Schiappa's apartment on Central Street on September 29, 1979, who said that on the night of the murder at approximately 11:20 p.m. he observe two young men in front of his store looking in the window. They appeared to be either "high" or drunk. *Exhibit 1, State Police Report, ¶15, dated October 11, 1979.*

327.    Sgt. Doheny and Det. Liberto then interviewed Dominic Compagnone and Georgiann Compagnone, who stated that while driving on Central Street looking for a parking spot to go to Lonergan's bar, they had observed three (3) young males laying down or slouching on the steps at the flower shop, two with a bottle on their hands, at approximately 10:30 p.m. the night of the murder. *Exhibit 1, State Police Report, ¶22, dated October 11, 1979, and attached typewritten statement.*

328.    Trooper Meier testified that during the investigation, police interviewed a witness who had seen three people outside Mrs. Schiappa's apartment on the night of the murder, but who were never identified. *Exhibit 2, Meier Depo., pp. 128-129.*

329.    Mary Ellen Auger, f/k/a Mary Ellen Halkett, testified that on the night of the murder, after dropping off her two children at her parents' house on Fayette Street in Milford, she and her husband had walked down Central Street on their way back to their apartment located behind Mrs. Schiappa's apartment. *Exhibit 28, Mary Ellen Auger Deposition, p. 25 (dated February 9, 2024).*

330.    Auger came upon Michael Cifizzari and Gary Cifizzari sitting on the steps of the flower shop next to Mrs. Schiappa's apartment building. *Exhibit 28, Auger Depo., p. 25, 32.*

331.    Auger knew Michael Cifizzari from the 8th grade, delivering newspapers and going to the movies together, and asked him what he was doing there. Michael introduced Gary Cifizzari as being his cousin, Gary. *Exhibit 28, Auger Depo., p. 25.*

332.    Michael Cifizzari told Auger they were waiting for his friend who was trying to get drugs. *Exhibit 28, Auger Depo., p. 25.*

333.    Michael Cifizzari said his friend was going to see Gary Terhume and Cathy Duncan to get drugs. Auger understood Michael Cifizzari's friend to be Michael Giroux. *Exhibit 28, Auger Depo., pp. 25, 29, 55.*

104088615.v1

334.    After dark on the night Mrs. Schiappa was murdered, Michael Cifizzari and Gary Cifizzari were seen by Mary Ellen Auger sitting on the steps of the flower shop next door to Mrs. Schiappa's apartment waiting for Michael Giroux, who was looking to buy drugs from Mrs. Schiappa's neighbor, Gary Terhume.  *Exhibit 28, Auger Depo., pp. 25, 29, 32, 55.*

## HIRING AND TRAINING OF MILFORD POLICE OFFICERS

335.    Milford maintained personnel files for all four police officer Defendants, Chianese, Liberto, Digirolomo and Small. *Exhibit 38, Selected Milford Police Officer Personnel Records.* Former Milford Police Chief, Thomas O'Loughlin, and former Milford Town Counsel, Gerald Murphy, testified as to proper training and hiring of the Milford police officer Defendants, including without limitation that all Milford officers received training approved by the Massachusetts Criminal Justice Training Council or its successor, the Municipal Police Training Committee.  The Milford Police maintained and distributed to all officers its manual of policies and procedures  prepared by the Massachusetts Police Institute and approved by the Town.  Milford officers attended 12 weeks of training at the State Police Academy in Framingham, and received 40 hours of in-service training annually, which was required statewide.  Police officers were trained on issues related to exculpatory and inculpatory evidence at the State Police Academy. *Exhibit 36, Gerald Moody Depo. Tr.; Exhibit 37, Thomas O'Loughlin Depo. Tr., pp. 50, 53-54, 60-61, 66-67.*

Respectfully submitted,

The Defendants,
By Their Attorneys,

/s/ *William B. Scarpelli*

William B. Scarpelli, BBO #560034
wscarpelli@morrisonmahoney.com
Joseph H. Caffrey, BBO #544570
jcaffrey@morrisonmahoney.com
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
Phone:   617-439-7500

Dated:  March 3, 2025

104088615.v1

RA 150

## CERTIFICATE OF SERVICE

I, William B. Scarpelli, Esquire, attorney for the defendants, hereby certify that I have this day served the foregoing to counsel by electronic email to

Mark Loevy-Reyes, Esq.
Loevy & Loevy
398 Columbus Avenue, #294
Boston, MA 02116
mark@loevy.com

William S. Smith, Esq.
The Law Office of William S. Smith
206 Worcester Road, P.O. Box 585
Princeton, MA 01541
holdenattorney@gmail.com


Date:  March 3, 2025

/s/ *William B. Scarpelli*
_____
William B. Scarpelli

104088615.v1

RA 151

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GARY CIFIZZARI,

     Plaintiff,

     v.

TOWN OF MILFORD, FORMER MILFORD
POLICE OFFICERS VINCENT LIBERTO,
JOHN CHIANESE, FORMER MILFORD
POLICE SGT'S ANTHONY DIGIROLAMO
AND DONALD SMALL, AS WELL AS-YET
UNKNOWN POLICE OFFICERS AND
ADDITIONAL AS-YET UNKNOWN POLICE
SUPERVISORS, HEREIN REFERRED TO AS
JOHN AND JANE DOES 1-20,

     Defendants.

C.A. NO. 4:22-cv-40139-MRG

## INDEX TO RECORD APPENDIX

| Exhibit No. | Exhibit Description |
| --- | --- |
| 1. | State Police Report, dated October 11, 1979 |
| 2. | Thomas Meier Deposition Transcript |
| 3. | Thomas Meier Affidavit |
| 4. | Excerpted Transcript of Michael Cifizzari Trial |
| 5. | Lawrence Murphy Deposition Transcript |
| 6. | State Police Crime Lab Report, dated March 16, 1981 |
| 7. | State Police Report, dated May 7, 1981 |
| 8. | Amended Complaint |
| 9. | Suppression Hearing Transcript (Partial) |
| 10. | Plaintiff's New Trial Motion (Memorandum) |
| 11. | State Police Report, dated August 2, 1984 |
| 12. | Commonwealth v. Michael Cifizzari, 19 Mass. App. Ct. 981 (1985) |
| 13. | Trooper Meier Report (Gary Cifizzari interview), dated February 26, 1981 |

1

104087228.v1

14.      Trooper Meier Report (Robert Cananzey interview), dated February 26, 1981

15.      Worcester Grand Jury Minutes, dated April 7, 1981

16.      Trooper Meier Report, dated January 12, 1984

17.      Trooper Meier Report, dated April 29, 1983

18.      Signed Waiver by Gary Cifizzari (tooth impression), dated April 27, 1983

19.      Signed Waiver by Gary Cifizzari (representation), dated November 21, 1983

20.      Gary Cifizzari Statement, dated November 21, 1983

21.      Excerpted Transcript of Gary Cifizzari Trial

22.      <u>Commonwealth v. Gary Cifizzari</u>, 497 Mass. 560 (1986)

23.      Commonwealth's Assent to New Trial, dated December 10, 2019

24.      *Nolle Prosequi*, dated December 10, 2019

25.      Settlement and Release, dated May 8,2021

26.      Superior Court Suppression Denial Order

27.      Michael Giroux Statement, dated October 5, 1979

28.      Mary Ellen Auger, f/k/a Halkett Deposition Transcript

29.      David Giroux Deposition Transcript, dated April 3, 2024

30.      David Giroux Affidavit, dated May 16, 2019

31.      Trooper Meier Report, dated May 11, 1983

32.      Trooper Meier Report, dated May 28, 1983

33.      MPD Sgt. DiGirolamo Report, dated February 27, 1981

34.      Michael Giroux Statement, dated October 24, 1979 (with Plaintiff's transcription)

35.      Michael Giroux Informant Documents

36.      Milford Deposition (Gerald Moody), dated September 10, 2024

37.      Milford Deposition (Thomas O'Loughlin), dated September 10, 2024

38.      Personnel file documents of defendants

104087228.v1

RA 153

# EXHIBIT 1.



*Milford PD.*

## The Commonwealth of Massachusetts

### Department of Public Safety

CPAC
283 Main Street, Worcester, Mass.
October 11, 1979

To:      Lt. Col. John R. O'Donovan
         Office of Investigations & Intelligence Operations

From:    Joseph M. Doheny, Sergeant

Subject: Investigation of the homicide of
         CONCETTA SCHIAPPA, WF, DOB      ,
         of 72 Central St., Milford, Mass.

1.       On September 29, 1979, at approximately 9:15 AM, a call was received at the Milford PD from Mrs. Diane E. Nydam of 70 Central St., Milford reporting that she had found the body of her downstairs tenant in the living room of the first floor apartment and she requested the police.  Sgt. Walter Conley and Officer Brian Harris responded immediately followed soon by Officer Arthur Richards.  On entering the first floor right side apartment at 72 Central St. by the rear door, Officers found in the living room of this apartment the body of the above-described female lying face up in approximately the center of the living room floor.  She appeared to have been badly beaten and Officers determined immediately that the death appeared to be a homicide.  As a result Chief John McGrath, Det. Sgt. Donald Small & Det. Vincent Liberto were contacted and proceeded immediately to the scene. SP Grafton was contacted and a request was made for CPAC Officers. Cpl. Thomas Maher of SP Grafton contacted the undersigned at his home and advised me of the situation.  I immediately contacted Tpr. Thomas R. White and requested that he meet me at the scene.  A request was also made for a photo and fingerprint technician.

2.       On arrival at the scene the undersigned and Tpr. White met with Chief McGrath, Sgt. Small & Det. Liberto.  Also present was Tpr. Robert McKeon of SP Grafton and other members of the Milford PD. Investigators were advised that the body had been found by the landlady and resident of the second floor apartment, Mrs. Diane Nydam. The body had been identified as that of Mrs. Concetta Schiappa by Officer Robert Catusi of the Milford PD, a relative by marriage, and Officer Catusi was in the process of notifying next-of-kin.  Medical Examiner, Dr. Nicholas Capece, had been to the scene, pronounced the victim dead, and ordered removal to a local funeral parlor at the conclusion of the police investigation.

-1-

BUREAU OF INVESTIGATIVE SERVICE
MASS. STATE POLICE
Year/Dist/Crime/Case
79-115-0199-0247
Serial
1
Captain          Supervisor

Homicide of Concetta Schiappa    -2-                October 11, 1979

3.          Responding Officers had reported that on their arrival the
rear door was somewhat ajar and there were no lights on in the apart-
ment.  A TV set in the living room directly in front of the body was
on, but had no sound coming from it, and was set on Channel 4.  All
window shades in the house were pulled down to the bottom and beyond
the bottom of the windows with the exception of one shade on the
driveway side of the house, which was up approximately 3 in. from the
bottom.  Another window on the driveway side in the living room at
the front corner of the house was found to be open halfway, but all
other windows in the house were closed.  The front door to the apart-
ment, which entered into the living room from an entryway, was found
to be closed and locked.  No signs of forced entry could be found
anywhere in the home.

4.          The body of the deceased was found clad in a bathrobe and
nightgown lying face up on the floor approximately in the center of
a 14' x 12' living room.  The bathrobe was open in the front and the
nightgown was pushed up to approximately the stomach of the victim.
A pair of slippers was observed on the floor immediately adjacent to
both the left and right feet.  The head of the victim was directly
in front of a chair.  It was lying parallel to a couch and the feet
extending down toward the afore-mentioned television set, which was
at the immediate front of the room.  The victim appeared to have been
beaten severely about the head, face and upper body.  What appeared
to be a broken bone was observed protruding from her right shoulder.
A dustmop with the handle broken off 25 in. from the head of same
lay on the floor between her legs, which were spread at approximately
a 30° angle.  The broken end of this mop contained what appeared to
be bloodstains.  A wet terrycloth towel, off white in color, was
found draped over her left foot and slipper.  Obvious human bite
marks were observed on her right lower stomach and inside her left
leg in the area of the groin.  A pillow within a white pillowcase
was observed laying partially over the victim's left hand and lower
arm and was moderately bloodstained.  A similar pillow was found on
the couch adjacent to the body.  The second pillow had no obvious
bloodstains.  With the exception of an Oriental-type rug and a small
scatter rug, which were under and adjacent to the body and were in a
state of disarray, nothing else appeared to be out of place of dis-
turbed in the living room.

5.          The kitchen of the apartment was found to be extremely un-
tidy with numerous clean and dirty dishes about the sink area and
a large collection of paid bills, coupons and other personal papers
both on the kitchen table and counter areas.  A radio alarm clock
located on the kitchen counter to the right of the sink was found
to be unplugged and the clock was stopped at 10 minutes after 11:00.
In the sink was found a plastic dishpan containing dirty soapy dish
water.  Two soup-style bowls and two smaller bowls appeared to have

RA 156

Homicide of Concetta Schiappa   -3-                    October 11, 1979

been recently washed and were on the right side of the sink on the
counter.  Two clean forks, one tablespoon and three teaspoons were
in the same area.  There was one soiled glass in the sink and two
glasses, apparently recently washed, on the counter  A metal pan
containing what appeared to be chicken wings in a tomato sauce was
found on a hot pad on the right side of the counter.  One dirty fork
and one dirty paring knife were located in the same area.

6.        The bathroom, located off a hallway between the kitchen and
the living room, was found to be in a general condition of disarray.
Noteworthy in this bathroom was the fact that nothing was found in or
about the bathtub with the exception of a damp towel which was laying
across the outside of the bathtub.  The sink in the bathroom con-
tained several bottles and containers of toilet items, a brush and
bathroom cup.  All these items were wet and a stopper was found in
this sink drain.

7.        The bedroom located off the rear of the kitchen immediately
adjacent to the back door was found to be generally neat and orderly,
although the shades in this room were pulled down well beyond the
bottom of the windows.  The bed was neatly made, the covers turned
down but did not appear to have been slept in.  A linen bureau scarf
appeared to be wrinkled and slightly out of place near the right
front corner of the bureau.

8.        Chemist James Canney of SP Boston came to the scene, made
his investigation and removed all of the afore-mentioned items of
evidential with the exception of the broken drymop.  The undersigned
took this item into his possession.  Cpls. John I. Baliunas and
Paul F. Rich of SP Holden Photography Bureau came to the scene, took
the necessary photographs and made a search of the entire apartment
for latent fingerprints.  In addition, the fingerprint technicians
removed all of the shades from the house and took them to the Lab in
an attempt to find latent fingerprints.  At the conclusion of the
technicians examination, the body of Mrs. Schiappa was removed from
the scene by the DePasquale Funeral Home of Milford to the Watson
Funeral Home, Congress St., Milford to await an autopsy.

9.        The residence at 70-72 Central St., Milford was found to be
a two-story wood frame brick front duplex house.  The first floor
contained two apartments with the one on the right belonging to the
victim.  The left side apartment was occupied by one Gary M. Terhume
and his girlfriend, one Kathy Anne Duncan.  The second floor con-
tained only one apartment and that was occupied by the owners of the
building, Mr. & Mrs. Ronald F. Mydam.

10.       On the same date, at approximately 10:00 AM, Det. Sgt. Small
and Tpr. White interviewed Gary M. Terhume, WM, DOB ` ` `--, of
72 Central St., Milford, first floor left apartment.  During the
entire interview with Terhume, he appeared to be very upset and

RA 157

Homicide of Concetta Schiappa    -4-                    October 11, 1979

stated that after bringing his girlfriend, Kathy Duncan, to his
mother's house on Progress St. in Hopedale, he had gone to Vinnie's
Back Door, a bar located on Main St. in Milford, and had stayed in
the bar until approximately 12:30 AM drinking along with one Charles
Lindsey. He stated that at approximately 12:30 AM he left the bar
along with Charles Lindsey and went to his residence to pick up a
package of cigarettes. He stated that when he arrived at his
residence between 12:30 & 1:00 AM, he observed a maroon 1960 vintage
Buick or Chevrolet four door vehicle parked in front of the apartment.
He further stated that he drove into the rear of the apartment,
entered the apartment, retrieved the cigarettes, left, and as he was
backing out of the driveway observed the shades up and the overhead
light on in the Schiappa apartment. He further stated that he ob-
served a white male, 25 to 35 years old, between 5'9" & 5'11" tall,
clean shaven with an Afro-type neat black haircut, standing approxi-
mately two steps into the living room from the hallway of the Schiappa
apartment. He further observed that the unknown white male was not
someone that he was familiar with and appeared to have on a dark-
type dress shirt. Terhume stated that he told Lindsey that the un-
known white male did not belong in the apartment. Terhume continued
he backed out of the driveway, continued down Central St., drove
around the block, coming out directly in front of the apartment where
he did not observe the individual standing in the same spot and con-
tinued back to Vinnie's Back Door where he dropped Lindsey off and
went to a party at Joe Gandolfi's apartment on Reed St. in Milford.
Terhume stated that he left the Gandolfi apartment at approximately
2:55 AM and went to his residence and went directly to bed. It should
be noted that when Det. Sgt. Small and Tpr. White first contacted
Terhume relative to the interview, Terhume commented, "What did he
have to do that to her for?"

11.      On the same date, at approximately 11:00 AM, Det. Sgt. Small
and Tpr. White interviewed Charles N. Lindsey, WM, DOB ´ ˆˋ ˉˉ, of
7 Yale St., Milford, who corroborated Terhume's initial statement,
further stating that when Terhume said that he thought he saw some-
one in the apartment, Lindsey looked up and did not make the same ob-
servation. Lindsey further stated that he felt that the time that
he and Terhume left Vinnie's Back Door was closer to 12 midnight.

12.      On the same date, at approximately 11:15 AM, Det. Sgt. Small
and Tpr. White interviewed Diane E. Nydam, WF, DOB ˆ ˆˋ ˉˉ, and
Ronald F. Nydam, WM, DOB ˉ ˉˉ ˉˉ, of 70 Central St., second floor
apartment & landlord of Mrs. Schiappa. The Nydams stated that on
9-28-79 they were in bed at approximately 11:45 PM when they heard
noises which they initially described as a low groan or a laugh. They
further stated that approximately five to ten minutes later Ronald
Nydam, who had been disturbed by the noises, got out of bed, dressed
and went out the front door of his apartment to the sidewalk in front
of Mrs. Schiappa's apartment. Nydam walked around the house trying

RA 158

Homicide of Concetta Schiappa        -5-            October 11, 1979

to look in the windows of Mrs. Schiappa's apartment to see if any-
thing was wrong and noticed that all the shades had been pulled in
the house.  Through a small opening in a side window in the front
room, Nydam observed what he thought to be the light from the tele-
vision on.  At this time he did not hear any noises and continued
down the driveway where he observed a flash of light coming from the
kitchen area which he first thought to be the light from the refrig-
erator opening and shutting.  He observed that the rest of the
kitchen was in darkness.  Nydam continued to walk to the rear of the
home where he stood on the bulkhead and looked into the rear hall of
Mrs. Schiappa's apartment.  From there he observed that the inside
door to Mrs. Schiappa's apartment was closed.  He further walked
into the back hall and took a closer look at the door, which he con-
firmed was closed.  From there Nydam walked outside back around to
the front where he lingered for a few moments trying to decide whether
he should check further when he heard his wife call to him and re-
turned to their second floor apartment.  Nydam went to bed and at
approximately 12:05 AM his wife Diane thought she could hear furni-
ture moving around in the Schiappa apartment.  Mrs. Nydam stated
that at approximately 12:20 AM she heard what appeared to be a loud
thud coming from the Schiappa apartment.  Mrs. Nydam stated that
after lying in bed for a short time she went to sleep and was awakened
at approximately 8:15 AM the following morning by the ringing of
Mrs. Schiappa's telephone.  After the phone continued to ring several
times, she got out of bed at approximately 9:00 AM and went down to
Mrs. Schiappa's apartment where she found Mrs. Schiappa lying on the
living room floor.  Mrs. Nydam stated to the best of her knowledge
the rear door of Mrs. Schiappa's apartment was slightly ajar and she
thought the lights and TV were off.  She further stated that she
screamed after observing Mrs. Schiappa, returned to her apartment and
called the police.

13.      The undersigned had conversation with Kathy Ann Duncan, WF,
DOB        , who lived with Terhume in the apartment adjacent to the
victim.  Miss Duncan was very much shaken by the events which had
occurred and was interviewed only briefly as to the normal activities
of Mrs. Schiappa.  She stated that Mrs. Schiappa used to pull her
shades all the way down due to patrons of a pool hall in the area
walking by her house and looking in.  This pool hall has been closed
for approximately one-and-one-half years and since that time Mrs.
Schiappa only pulls her shades halfway down.  The shades in her bed-
room would be left open to the bottom of the window but according to
Miss Duncan were never drawn all the way down.  She stated that Mrs.
Schiappa always kept her front door locked but her rear door would be
left open about 3 in.  She assumed that this was so that her cats
could come in and out the door when they wanted to.  She stated that
she would close and lock this back door prior to her going to bed.
Miss Duncan went on to state that Mrs. Schiappa had the bed in her
bedroom made up all day long and would turn it down at night some
time prior to going to bed.  She stated that she got dressed every

Homicide of Concetta Schiappa      -6-           October 11, 1979

morning except when she was not feeling good and planned on staying
in bed.  She stated that she would usually put on her nightgown and
robe somewhere around 8:00 PM or later every night but that if she
expected someone to come to the apartment she would be dressed.  Miss
Duncan further added that to the best of her knowledge the latest
Mrs. Schiappa ever had visitors was about 7:00 PM.  She also stated
that she usually carried a black pocketbook and that she kept this
pocketbook somewhere within the apartment.  Miss Duncan stated she
was very familiar with the apartment and with Mrs. Schiappa's personal
activities as she often used the Schiappa phone, spent time with Mrs.
Schiappa, cared for her when she was ill and, in general, felt very
close to her.

14.      The following residents of the immediate neighborhood were
also interviewed but nothing of evidential value was obtained:

        Richard Casalie, Jr., DOB        , 73 Central St.
        Docithe J. Tondreau, DOB          , and wife Shirley,
           DOB        , 73 Central St.
        Mary  Ann Beal, DOB        , 71 Central St.
        Jo A. Lesazk, DOB        , 10 Claudette Drive, Apt.#1
        Robert Carnaroli, DOB        , 34 Hill St., Hopedale
        Kathy A. Hamm, DOB        , 6 Baker Slip
        Mrs. Blanchard, 71 Central St., and brother, Frank
           Corbett, same address

15.      The undersigned and Det. Liberto interviewed Nicholas A.
Trongone, WM, DOB        , of 64 Central St., Milford.  Mr. Trongone
is a partner in a flower shop known as Flowers Boutique, also located
at 64 Central St., Milford.  He stated that on Friday night, 9-28-79,
at about 11:20 PM, he observed two young males in front of his store
looking in the windows.  He stated that he walked to the front door
and these two subjects walked down the street.  By the way they were
talking and acting he got the opinion that they were either high or
drunk.  He stated that he went out to the Family Restaurant in
Milford about 11:40 PM and did not see the two youths but did observe
a maroon car, which he describes as probably a late '60 or early '70
Ford with Mass. plates, parked directly in front of 72 Central St.
He stated that he returned home about 3:30 AM, did not see anyone
around at that time and that the afore-mentioned car was gone.  He
described the two youths as follows: #1 - a white male, about 20 years
of age, 5'10" tall, stocky build, blond curly hair almost in an
Afro, wearing a light brown waist length windbreaker-type jacket.
#2 - a white male, about 20 years of age or a little younger, dark
brown short hair, slender build, wearing a blue jacket.  He said
neither subject had a beard or mustache and that he felt he could
recognize one of the youths if he saw him again.

RA 160

Homicide of Concetta Schiappa    -7-                    October 11, 1979

16.      The car mentioned by Trongone as the result of investigation
was determined to belong to Frank J. Tamagni, WM, DOB ‾ ‾‾ ‾‾,
61½ Heywood St., Milford, for a 1966 Chevrolet Caprice, color red,
Mass. Reg. 9H-9113.   Mr. Tamagni was interviewed and stated that on
Friday night, 9-28-79, he went to the Italian Club, which is located
at 78 Central St., Milford, at approximately 8:30 PM and parked his
1966 Chevrolet in front of 72 Central St.   He stated that he left
the club at approximately 12:15 AM on 9-29-79.   Tamagni stated that
as he approached his vehicle in front of 72 Central St. he heard
noises which appeared to be coming from the Schiappa apartment.   He
did not observe any lights on in the apartment at that time.   Tamagni
described the noises as a long low groan.

17.      On September 29, 1979, at 4:30 PM, an autopsy on the body of
Concetta Schiappa was performed at the Watson Funeral Home, 24 Con-
gress St., Milford.   The autopsy was performed by Dr. Ambrose Keeley,
Pathologist, in the presence of Dr. Nicholas Capece.   Also present at
the autopsy was the undersigned and Tpr. White, Cpl. Baliunas of the
SP Photo Lab, Chief McGrath, Det. Sgt. Small & Det. Liberto.   Prior
to conducting the autopsy, Dr. Keeley contacted Dr. Arthur Schwartz,
Forensic Dentist of the Tufts School of Dentistry, Medford, Mass.
Dr. Schwartz came to the Funeral Home and examined the bite marks on
the body of the victim.   Dr. Schwartz then made a cast of the bite
marks on the stomach of Mrs. Schiappa.   It was Dr. Schwartz' opinion
that this cast had sufficient detail so that if he were allowed to
make a cast of a suspect's mouth, he could positively identify it as
having made the tooth impressions on the victim's body.   He did not
feel that the bite marks in the left leg were of sufficient quality
to warrant casting.   Dr. Keeley then completed the autopsy, which re-
vealed the following injuries: the jaw of the victim was broken on
both sides, the head and face were severely bruised although no
fracture of the skull could be detected.   Marks consistent with those
made by a human hand were found on the victim's right breast and due
to the position and severity of these marks it was Dr. Keeley's opinion
that the assailant could have been left handed.   On opening the chest
cavity it was found that the penetration in the right shoulder pre-
viously thought to have been a broken bone was, in fact, the broken
piece of the dry mop handle.   A further examination revealed that this
mop handle had been inserted into the vagina of the victim and forced
up into her left chest cavity.   It had then apparently been with-
drawn and forced up into the right chest cavity penetrating the kid-
ney, lung and liver.   Broken pieces of this handle were found both in
the left chest cavity and in the vaginal area.   The broken end of
the handle was measured and found to be 24 in. long.   Both pieces of
the mop, the broken piece of the wood, the clothing of the victim,
and fingernail scrapings taken by Dr. Keeley were taken and secured
by the undersigned and brought to the SP Chemical Lab and turned over
to the Chemist.   At the conclusion of the autopsy, Dr. Keeley ruled
the cause of death to be penetrating wounds of the abdomen with

RA 161

Homicide of Concetta Schiappa        -8-              October 11, 1979

massive hemorrhage. He placed time of death at approximately mid-
night on 9-28-79 or early morning of 9-29-79 and stated that after
infliction of the injuries, the victim could have lived anywhere
from a few minutes to one-half an hour. He has since advised the
undersigned that smears taken from the vagina, rectum and mouth of
the victim all proved negative as to the existence of sperm.

18.      On the same date, at approximately 10:00 PM, Investigators
returned to the Schiappa apartment. The reason for this visit was
that Gary Terhume had stated that he saw a male subject, whom he
could only partially identify, standing in the living room of the
Schiappa apartment. He had further stated that at this time the
apartment was well lit by ceiling lights and that the shades were in
a raised position. Investigators lit the apartment in the way des-
cribed by Terhume and it was evident that anyone standing in the liv-
ing room could be plainly seen and readily identified from the street.
Investigators again viewed the apartment with only the light from the
television on in the living room. Although this light was not as
bright, a person standing in the living room was plainly visible from
the street.

19.      Due to rumors that were circulating that Mrs. Schiappa had
withdrawn $250. from her bank account on Friday, 9-28-79, and a
cursory search of her apartment failed to reveal either a pocketbook
or any substantial amount of money, close associates of hers were
interviewed in an attempt to ascertain if, in fact, she had withdrawn
this money.

20.      On September 30, 1979, at approximately 9:40 AM, Det. Sgt.
Small and Tpr. White interviewed Mary F. Dumayne, DOB       , of
13 Church St., Milford. Mrs. Dumayne stated that she felt she was
Mrs. Schiappa's closest friend and had last talked to her on 9-28-79
by phone. In response to questions by Tpr. White, Mrs. Dumayne stated
that approximately one to two months ago Mrs. Schiappa had told her
that she had a sum of money stolen from the top of her dresser in
the bedroom. Mrs. Schiappa had told Mrs. Dumayne that she had returned
from the bank the day of the theft and had left the money along with
the bankbook on top of the dresser and had gone out of her apartment
to tend to a small garden which was in the rear of her apartment. Mrs.
Schiappa had stated that she was only outside two to three minutes and
when she returned she saw a young man coming from her apartment and
going to the Terhume apartment next door. Immediately upon entering
her apartment Mrs. Schiappa checked the dresser and found the money
missing. She went directly to the Terhume apartment where she accused
the young man of stealing the money, which he denied. Mrs. Dumayne
stated that Mrs. Schiappa was sure that the young man was lying and
had stolen the money. Mrs. Dumayne further stated that Kathy Duncan,
who lived in the Terhume apartment, used her phone frequently and
ran up a large bill as the result of out-of-town calls. Mrs. Dumayne
stated that this had upset Mrs. Schiappa but the matter had been
straightened out with Kathy Duncan. Mrs. Dumayne further stated that

RA 162

Homicide of Concetta Schiappa    -9-                October 11, 1979

Mrs. Schiappa had both black and beige pocketbooks and that the only
jewelry she could recall seeing in the apartment was a small diamond
wedding ring, which Mrs. Schiappa did not wear and was normally kept
in a small box on the dresser.

21.      On the same date Det. Liberto and the undersigned met with
members of the deceased's family at the 72 Central St. apartment.
It was found that none of the family were extremely close to the de-
ceased and, in fact, no one had seen her within the past two weeks,
although they had talked with her on the phone.  They reaffirmed
the fact that she usually carried a black pocketbook, which still
appeared to be missing from the apartment.  They also reaffirmed the
information supplied by Mrs. Dumayne concerning the money or check
which had been stolen from the victim.  A list of her friends were
obtained.  The information concerning the front door to the apart-
ment being locked and the back door being left open was reaffirmed
and it was generally found from the family that the one who could
probably supply the best information concerning Mrs. Schiappa's habits
was a grandniece, one Annette Pasqualone, of 42 Lawrence St., Milford.

22.      On the same date the undersigned and Det. Liberto inter-
viewed Dominic E., DOB           and Georgiann R. Compagnone, DOB
     , of 26 Coolidge Rd., Milford relative to three males that they
had seen on Central St. in Milford in the area of the Flower Boutique
on 9-28-79 at about 10:30 PM.  (Refer to attached statement).

23.      The occupants of an apartment directly to the rear of
72 Central St., Milford were found to be Donald B. & Mary Ellen
Halkett.  Milford Detectives had recently conducted an investigation
which revealed that Halkett had been making obscene phone calls in
the early morning hours to a local nursing home.  As a result of
this background, Halkett and his wife were interviewed separately
on September 30, 1979 at the Milford PD.  It was the general opinion
of Investigators at the conclusion of these interviews that Halkett
had nothing to do with the murder of Mrs. Schiappa, but they did
supply information which somewhat contradicted the original story
given by Gary Terhume.  Refer to attached statements of Donald B.
Halkett, DOB          , & Mary Ellen Halkett nee Renaud, WF, DOB
        , both of 68 Central St., second floor.

24.      As the result of the information supplied by the Halketts,
Det. Sgt. Small and Tpr. White again interviewed Kathy A. Duncan.
(Refer to attached statement).

25.      The undersigned and Det. Liberto reinterviewed Gary M.
Terhume.  This interview was conducted at the Milford PD on Septem-
ber 30, 1979, at 3:45 PM, and by agreement with Terhume it was
taped.  Terhume now stated, in substance, that he quit school in the
sixth grade and that he presently worked in the mill room of Tempron
Products, Granite St., Milford.  That on 9-28-79 he had gone to

RA 163

Homicide of Concetta Schiappa    -10-    October 11, 1979

his grandmother's funeral and then returned with Kathy Duncan and his mother to his grandmother's home in Hopedale. He stated that he and Kathy came to their apartment in Milford in the early afternoon, which he places at approximately 1:30 PM. He stated that they spent some time there, showered and changed clothes, and left to go back to Hopedale at approximately 6:30 PM. It should be noted that Kathy Duncan somewhat disagrees with Terhume's times. He stated that he remained at his grandmother's home in Hopedale until exactly 9:50 PM when he left and drove directly to his Central St. apartment. He parked his car in the rear of the building and went into the house and picked up nightclothes and slippers for Kathy Duncan. He stated he spent about fifteen minutes in the house, returned to his car with the nightclothes over his arm, and drove directly back to Hopedale. He gave the requested items to Kathy and left the Hopedale address at about 10:30 PM. He stopped at the Milford Package Store where he bought a six-pack of 12 oz. bottles of Michelob beer and went to the Back Door, a lounge on Main St. near Central St. in Milford. He stated that he met Charles Lindsey at the Back Door and went with him, at approximately 11:50 PM, back to his apartment on Central St. He stated that the reason for this trip was that he had run out of cigarettes and only had seventy-five cents left in his pocket. He went on to say that he got packs of cigarettes, returned to the car where Lindsey was waiting, and backed out of the driveway. He again gives the account of seeing the male subject standing in the living room of the Schiappa residence. He then went around the block and on coming down the street in front of the 72 Central St. home he did not see anyone inside. He drove Lindsey back to the Back Door and dropped him off. He then met one Lorraine Alteri and went with her to a party at 1 Reed St. in Milford. He places the time that he met the Alteri girl at 12:30 AM and that the route he used to go to the party was to go back down Central St. right by his apartment. He states that at this time he did not even look at the Schiappa apartment and has no idea whether the lights were still on or the shades were still up. Terhume concludes the interview by saying that he stayed at the party on Reed St. until approximately 2:50 AM when he returned alone to his Central St. apartment and went to bed.

26.    On October 1, 1979 Det. Sgt. Small interviewed Lorraine Alteri of the Rolling Green Apts. in Milford. She verified the fact that she had, in fact, met Terhume and gone to the party with him. She puts the time at sometime after 11:30 PM on Friday, 9-28-79.

27.    On the same date Investigators checked various banks in the Town of Milford in an attempt to ascertain whether or not a withdrawal had been made from the Schiappa account on 9-28-79. Two separate bank accounts were found in two different banks and no withdrawals were noted on that date from either account.

RA 164

Homicide of Concetta Schiappa    -11-                    October 11, 1979

28.        On the same date Det. Liberto and Tpr. Richard Gore re-
interviewed the Halketts in an attempt to clear up the discrepancies
in Terhume's story.  Mrs. Halkett still insisted that the time
Terhume arrived at the apartment was either 10:25 or 10:30 pm and
that after staying there ten to fifteen minutes when he left he had
nothing in his hands.  She states she was sure of this as she had
checked her clock and that the rear yard was well lighted as was
the inside and outside of Terhume's vehicle.

29.        On the same date Det. Lieut. Ralph F. DeFuria and Det. Sgt.
Small reinterviewed Charles N. Lindsey, WM, DOB        ., of 7 Yale
Drive, Milford in an attempt to clear up the time discrepancies given
by Terhume.  Lindsey stated he was at Vinnie's Back Door and met Gary
Terhume at about 10:30 PM on 9-28-79.  They played pool for a while
and they left at about 12:00 midnight to get some cigarettes.  They
drove down to Gary's apartment.  As they were driving in Gary's car
Gary said, "I think I see someone in Connie's apartment who should
not be there."  They both looked into the apartment.  He did not see
anything in the apartment.  They drove down back.  Gary went into
his apartment and came out with two packs of cigarettes in his hand
and when they left they drove down Central St. to Rte. 85, to Rte.
495.  They went south on Rte. 495 and got off at Rte. 109 and drove
back uptown.  Gary left him off at the Back Door.  He got in his car
and went home.  Lindsey insisted that on the way into the driveway
that Terhume told him that there was someone in the apartment.

30.        Billy Dean Lindsey, WM, DOB          , of 7 Yale Drive,
Milford, brother of Charles Lindsey and bartender at Vinnie's Back
Door, was interviewed by Investigators in an attempt to pinpoint
the time that Charles Lindsey and Gary Terhume had left the bar.
He places it at between 11:30 & 11:45 PM.  (Refer to attached state-
ment).

31.        Several other people were reinterviewed on this date in
an attempt to clarify the time discrepancies but these efforts met
with negative results.

32.        On October 2, 1979 the undersigned and Det. Sgt. Small
accompanied Gary Terhume to the McCormack Building in Boston where
he was administered a polygraph examination by Det. Lieut. Peter
DeStefano.  The results of this examination indicated that Terhume
was probably telling the truth when he stated that he did not kill
Mrs. Schiappa, that he did not perform any sexual act upon Mrs.
Schiappa, that he did not positively know who killed Mrs. Schiappa,
and that he had, in fact, seen someone within the apartment on the
night of 9-28-79.

33.        On October 3, 1979, as the result of there still being some
confusion as to whether or not anything had been removed from the
Schiappa apartment, Det. Lieut. DeFuria, Tpr. Robert Meier and Det.
Liberto made a thorough and detailed search of the apartment.  The

RA 165

Homicide of Concetta Schiappa   -12-                      October 11, 1979

results of this search were that no pocketbook as described by associates of the victim was found. The keys to her apartment could not be located. Three five-packs of Phillie cigars in a brown paper bag apparently recently purchased were located in the living room of the apartment and $2,517.85 in cash, $1,325. in bonds and two bank books, one for the Milford Savings Bank and one for the Milford Federal Savings & Loan, were found hidden in a closet in the apartment. Also various pieces of jewelry of questionable value. All of the afore-mentioned items were brought to the Milford PD, where the jewelry was secured. The cash, bonds, bankbooks, along with $97. in a wallet which had been found in the bedroom of the home on 9-29-79, were marked by the undersigned and secured in the CPAC safe deposit box in Worcester.

34.    Investigation revealed that the afore-mentioned cigars had been bought by Mrs. Schiappa and that she intended to give them to one Dominic P. D'Amico, WM, DOB        , of 61 Heywood St., Milford. D'Amico was friendly with the Schiappa woman and used to drive her to various places, including church. It was her custom to buy cigars for him.

35.    On the same date, as the result of information received that a male subject had been looking for Gary Terhume in the early morning hours of 10-1-79 and that this subject appeared to be unknown to Terhume or his associates, Robin G. Wright, WF, DOB        , of 33 Prospect Hghts., Milford, who had seen this subject, met with Sketch Artist Barbara Halstad and composed a sketch of this unknown subject. As of the date of this report, this subject has not been identified nor has he been directly connected to this investigation.

36.    On October 5, 1979 Mrs. F. G. DeSantis of 23 Spring St., Milford called Det. Liberto and stated that on Saturday, 9-29-79, her children had found a change purse and a set of keys in her back yard. Investigators met with Mrs. DeSantis, who turned over to them a brown leather change purse, which was empty, and a set of four keys. Two of these keys which were identical fit the front and rear doors of the Schiappa apartment and were subsequently identified by neighbors as Mrs. Schiappa's keys. A detailed search of the area surrounding 23 Spring St. on 10-5-79 failed to reveal any other evidence. It should be noted that Spring St. runs parallel to Central St. and is the second street east of Central St. separated by Jefferson St.  23 Spring St. is very nearly on a straight line from the rear yard of 72 Central St. The finding of the keys and change purse at this location would indicate that the suspect is possibly local or at least knows the area.

37.    On October 9, 1979 Gary Terhume voluntarily accompanied Det. Lieut. DeFuria and Det. Sgt. Small to Bridgewater, Mass., where one J. Francis Cloutier, a Hypnologist, attempted to hypnotize Terhume in order to bring out further details of what he had seen in the Schiappa apartment on the night of 9-28-79. It was Cloutier's

RA 166

Homicide of Concetta Schiappa   -13-                    October 11, 1979

opinion that Terhume would not allow himself to be hypnotized but only faked it.  It was further his opinion that Terhume was untruthful or deceitful in what he was saying while supposedly under hypnosis.

Case Open

Joseph M. Doheny
Sergeant

JMD/mws

Milford Police Dept.
Sept. 30, 1979
12:15 P.M.

Statement of DOMINIC E. COMPAGNONE, DOB          , and
GEORGIANN R. COMPAGNONE, DOB         , of 26 Coolidge Road, Milford,
Mass. given to Sgt. Joseph M. Doheny and Det. Liberto, Milford PD.

On September 28, 1979 at about 10:30 P.M. we were going down
to Lonergan's. We came down Central Street and were looking for
a parking space. We saw three males sitting on the steps in front
of the flower shop. Two of them had a bottle in their hand. They
were like laying down or slouching on the step. We went around
the block and parked on Main Street. There was no parking places
on Central Street as far as just above the flower shop. We turned
right on Baker Slip. After we parked we never looked down the
street again so I don't know if the three guys were still there.

We left Lonergan's about 12:40 A.M. and went to Mendon. I don't
think we went down Central Street, but if we did we didn't notice
anything.

When we first went by there was no car in front of 68-72 Central
but there was a car parked down further. We noticed no lights at
the 72 Central Street apartment.

The first guy had neat, short dark hair, was young - late teens,
early twenties, average build, wearing long -three-quarter length
jacket, dark - possible leather, and had no beard or mustache.

The second guy had blonde hair - light hair - neck length -
flipper rather than Afro, with bangs, was a little younger than the
first guy, thin, 5'9" - 5'10", unknown clothing, possibly no jacket,
no facial hair, seventeen or eighteen years old.

The third guy had dark hair, no description.

The blonde caught our eye. He was spaced out or drunk.

RA 168

Milford PD
Milford, MA
9-30-79

...iew of ... R. ...KETT, WM, DOB
...56 Con...    ...Milfor... given by Tpr. Thomas R. White
in the pre... of Sgt. ... of the Milford PD.

Halke... ...ted that he was married and had two children
...e was emp... at Shawmut North, located at the Haywood
Industrial ... in Franklin, MA. Halkett stated that he was
...his res... all day Friday, September 28, 1979 except
for a brief period between the hour of 3:00 to 4:00 p.m.,
when he went to his counselor at the Valley Adult Center in
Milford. Halkett further stated that after leaving his coun-
selor, he was driven home by his brother-in-law, David Renaud
who lives at 19 Fayette St., Milford. He arrived home at
5:10 p.m., and he along with his brother-in-law, sister-in-
law, and wife went to the Bonanza Steak House in Milford for
dinner. From the Bonanza Steak House they went bowling in
Milford until approximately 8:30 p.m. After leaving the bowl-
ing alley, they rode around town in Renaud's red Pinto driving
down Central St. on two occasions. He stated they arrived at
his apartment approximately 9:30 p.m., where he and Renaud
watched the fights on T.V. and after the fight played cards
with his wife and sister-in-law until approximately 12:30 p.m.
At approximately 12:30 p.m., Halkett stated his wife went to
bed, and he, Renaud, and his sister-in-law watched T.V. till
approximately 1:50 a.m., when Renaud and his wife went home.
Halkett stated that he then went to bed.

When questioned as to whether or not he heard any noises
in his yard, Halkett stated that Renaud had mentioned hearing
someone going in and coming out of the house next door. Halkett
further stated that he had last seen Mrs. Schiappa at 10:00 a.m.
Friday morning calling for her cat. He didn't observe anyone
else around the Schiappa residence from that time up to the
point where he went to his counselor, who he identified as
Dr. Taylor. When questioned by Tpr. White and Sgt. Small,
Halkett admitted that he had had a problem in the past concern-
ing phone calls that he was making to a local Nursing Home
late at night, and that was the reason he was seeking counsel
through the Valley Adult Center.

RA 169

September 30, 1979


Interview of MARY ELL  HALKETT (RENAUD), DOB  , 68 Central St., Milford


I have lived at Central Street for four and one-half years. I knew Mrs. Schiappa, have helped occasionally, but we were not close.

On September 28, 1979 I worked till 5:00 P.M., got home at 5:30 P.M. and then went out to drop the kids off at my parents. I then went to Bonanza and then went bowling with the big balls at the ten pin alley on Rte. 140 and then went to the candlepin alley, Rte. 140 Prospect St. Got through about 8:30-8:45, went to my parent's house and got home about 9:30.

On arriving home I noticed that the shades in Mrs. Schiappa's apartment were halfway down. Television was on as I could see the light from the TV. As we pulled in the driveway, I was driving, I saw her on the couch, sitting up, no one else was there. One cat was by her, the black one.

We went into the apartment - my brother David Renaud and his girl, Kathy Murphy, were with us. The guys watched the fight till 10:30 or 10:40 and then we played cards. We played until 12:30 A.M., then we watched the Midnight Special. My brother and his girl left at 2:00 A.M. and we went to bed.

Gary Terhune pulled in the yard about 10:30 P.M. We were getting ready to play cards, but the fight was still on. He was there about fifteen minutes.- the light was on in the back, and then he left. He was alone. Kathy called right after he pulled out and was looking for him to get her nightgown. Gary hadn't been home all day.

When we pulled in, there was a dark colored car in front of the brick house.


RA 170

Milford PD
Milford, MA
9-30-79

Transcript of .... A. DUNCAN, WF, DOB      ,
of 72 Congress St., Milford, MA given by Tpr. Thomas White
in the presence of Sgt. .... ...

Miss Duncan stated that she is single living with
Gary Terhune. She stated that she last saw Mrs. Schiappa
on Friday, September 28, 1979 at approximately 7:30 p.m.
Miss Duncan had gone to Mrs. Schiappa's apartment to use her
phone and after making a phone call, Miss Duncan stayed at
Mrs. Schiappa's apartment for approximately one half hour.
During this period of time Miss Duncan stated that Mrs. Schiappa
appeared to have been normal and nothing seemed to be bother-
ing her. She stated she left the Schiappa apartment at approx-
imately 8:00 p.m. and went to A-1 Way Laundromat in Milford
where she did some laundry and returned home. From there
Gary drove her to her mother's house which is located on
Progress St. in Hopedale. She stated she arrived at her
mother's house between 9:00 and 9:30 p.m. and that Gary stayed
till approximately 10:30p.m., when she asked him to return to
their apartment and get some clothes she had forgotten. Gary
came back to her mother's house at approximately 10:45 p.m.
with two bathrobes which he left at the house and returned
to Milford. After Gary had left, Miss Duncan called Mary Ellen
Halkett to have her tell Gary if he returned to their apartment
that he had forgotten to bring the clothes that she had requested.
Gary had told her before leaving her mother's house that he
was going home so he could get some sleep. She did not see or
hear from Gary the rest of the evening and called Mrs. Schiappa's
apartment approximately 8:45 a.m. the following morning 9-29-79.
She said she didn't get any answer and called a couple of times
after this, also getting no response. She stated a short time
later at approximately 9:00 to 9:15 a.m., Gary arrived at her
mother's house to pick her up and while they were there Tracy
Lindsey called and told her what had happened at the Schiappa
apartment. Miss Duncan stated that when she told Gary, Gary
stated I hope there is nothing wrong and ran out of her mother's
apartment accompanied by his brother Donald, who went directly
to their apartment to find out what was wrong. After Miss
Duncan returned to her apartment and found out about the
Schiappa death, she talked to Gary at which time Gary said that
he returned to their apartment the previous evening between
12 midnight and 12:30 a.m. from Vinnie's Back Door with Charles
Lindsey. He had returned to the apartment to get some cigarettes
and drove into the driveway where he went into the back door

RA 171

Interview of KATHY A. DUNCAN. (Cont'd)                    -2-

of his apartment to get his cigarettes.  He stated that the
outside back door to the building was wide open when he arrived
and stated he had closed it when he left his apartment.  Gary
stated that when he got back into the car and backed out of
the driveway, he saw a guy standing in the living room of the
Schiappa apartment and that all the lights in the house were
on and the shades were up.  He told her that the guy was ap-
proximately 5'9"-5'11" , cleaned shaven with dark colored
hair wearing a dark shirt and had wide shoulders and was
approximately 25 to 30 years old.  He further told her that
although seeing the individual in Schiappa's apartment seemed
strange, he didn't think anything of it and continued out of
the driveway driving down Central St where he had gone to a
party at Joe Gondolfi's apartment located on Reed St. in Milford.
He further told Miss Duncan that he stayed at the party until
approximately 4:30 a.m. and then returned home and went to bed.
Gary further told Miss Duncan that he had heard about the
party after talking to Lorraine Alteri. who he had met that
evening in the front of Joan's Restaurant.

        When questioned by the investigator concerning problems
that Mrs. Schiappa had had in the past. Miss Duncan stated
that approximately one year ago Mrs. Schiappa had $58 stolen
from her bedroom one afternoon while her sister Maureen and
brother-in-law Michael Geroux were visiting at her apartment.
She further stated that Mrs. Schiappa had accused Michael Geroux
of taking the money because she had observed Geroux coming from
the bedroom shortly before she had discovered the money
missing.  Miss Duncan noted that she confronted Geroux who
denied taking the money.  As a result of further questioning
by the investigators, Miss Duncan stated that Geroux had
completed a tour of duty with the United States Army approxi-
mately 3 weeks ago and had returned to the area where he
visited Miss Duncan approximately 2 weeks ago at her apartment.
She stated that when Geroux had visited her Kathy Murphy, a
friend of hers was present and that they had talked about
Geroux's wife. Maureen fooling around with another guy.  Miss
Duncan further stated that Michael Geroux was living with his
brother David at 10 Genoa Ave.. in Milford.

RA 172

9/28/79

RONALD F. NYDAM
70 CENTRAL ST.
Phone 473 - 3423
DOB
LANDLORD
DIANNE E NYDAM
DOB

AT ABOUT 11:45 PM WE WERE IN BED, I HEARD A GROAN OR MOAN,
5-10 MIN LATER I GOT UP AND WENT DOWNSTAIRS AND OUT THE FRONT
DOOR. I WALKED AROUND THE HOUSE ALL THE SHADES WERE PULLED.
THE SECOND SHADE ON THE SIDE WINDOW WAS UP ABOUT 3 INCHES.
I LOOKED IN I DID NOT SEE ANYTHING, I SAW A LIGHT ON. AS I
WALKED BY THE KITCHEN WINDOW I SAW A LIGHT GO ON AND OFF, AS IF
SOMEONE OPENED THE REFRIG. THE KITCHEN WAS IN DARKNESS. I
WALKED OUT BACK WALKED ON THE BULKHEAD LOOK THRU AND
SAW THAT HER DOOR WAS SHUT. I WALKED INTO THE HALL AND HER
DOOR WAS SHUT. I WALKED OUT THE DRIVEWAY TO THE FRONT OF THE
BUILDING, I COULD HEAR MY WIFE CALLING ME. I WENT UPSTAIRS..

MRS NYDAM AT 12:20 -12:25 HEARD A NOISE AS IF FURNITURE WAS
BEING MOVED ALSO A THUMP. I CHECKED MY CHILDREN BUT THEY WERE
ALL RIGHT. I LOOKED OUT THE WINDOW BUT DID NOT NOTICE ANY
CARS OUT FRONT.
GOT OUT OF BED ABOUT 9:00AM ON SATURDAY MORNING I HEARD THE
PHONE DOWNSTAIRS RINGING AND NO ONE ANSWERED IT. I PUT MY
HOUSE COAT ON AND WENT DOWN TO CHECK ON CONNIE. THE DOOR
WAS OPEN, I WENT IN AND SAW HER ON THE FLOOR. IN THE
LIVING ROOM. I SCREAMED AND RAN OUT. I CALLED THE POLICE

# EXHIBIT 2.

```
              UNITED STATES DISTRICT COURT OF
          FOR THE DISTRICT OF MASSACHUSETTS


                        C.A.No:  4:22-CV-40139-MRG


                          Volume I
                          Pages:  1 to 152
                          Exhibits: (See Index)

----------------------------------------------------------
GARY CIFIZZARI,
            Plaintiff,


              -vs-

TOWN OF MILFORD, FORMER MILFORD POLICE OFFICERS
VINCENT LIBERTO, JOHN CHIANESE, FORMER MILFORD
POLICE SGT'S ANTHONY DIGIROLAMO AND DONALD SMALL,
AS WELL AS-YET UNKNOWN POLICE OFFICERS, AND
ADDITIONAL AS-YET UNKNOWN POLICE SUPERVISORS,
HEREIN REFERRED TO AS JOHN AND JANE DOES 1-20,
            Defendants.
----------------------------------------------------------
```

Deposition of ROBERT C. MEIER, taken on behalf of the Defendants, pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Lisa L. Gross, Notary Public and Certified Shorthand Reporter, held at Law Offices of Bernard W. Schranze, 50 Resnik Road, Suite 201B, Plymouth, Massachusetts, on September 6, 2024, commencing at 10:00 a.m.

PRESENT:

LAW OFFICES OF MARK LOEVY-REYES

BY:  Mark Loevy-Reyes, Esq.

Chicago Office

311 N. Aberdeen Street

Chicago, Illinois 60607

312-243-5900

Email:  mark@loevy.com

For the Plaintiff.


MORRISON MAHONEY

BY: Joseph H. Caffrey, Esq.

     William Scarpelli, Esq.

250 Summer Street

Boston, Massachusetts 02110

617-737-8894

Email: jcaffrey@morrisonmahoney.com

For the Defendant.

Robert Meier
September 06, 2024                                                  3

I N D E X

Direct Examination By Mr. Caffrey........Page 6

Cross Examination By Mr. Reyes...........Page 100

Redirect Examination by Mr. Caffrey......Page 146

E X H I B I T S

| I.D. | Description | Page |
|---|---|---|
| A | Series of Documents produced By witness (13 sub-folders) | 6 |
| B | Statement of Mary Ellen Halkett | 148 |
| C | Statement of Donald Halkett | 148 |

RA 177

P R O C E E D I N G S

Stipulations

All objections except as to the form of the question are reserved until the time of trial; and all motions to strike are reserved until the time of trial. The witness will read and sign the transcript, within (20) days from receipt of transcript, notarization is waived.

---------------------------------
ROBERT C. MEIER, SWORN.
---------------------------------

MR. CAFFREY: Okay. Before we start with the questioning, just put on the record some stipulations and agreements that we have for today's deposition with retired Detective Robert Meier.

First, is that counsel have agreed to the usual stipulations; that all objections except as to the form of the question are reserved until the time of trial; and motions to strike are also reserved until the time of trial.

And the witness has been advised of his right to read and sign the transcript,

and he is advised that he will exercise that right.

The witness has agreed that he will return an errata sheet with changes, if any, within 20 days of receipt of the transcript.

Counsel have agreed that the requirement for the witness's signature on the errata sheet to be notarized is waived, and can just be signed under the pains and penalties of perjury.

The other thing I'm going to put on the record, is that in response to the subpoenas the witness is here today in response to subpoenas, one from my office, and one from Attorney Reye's office. And the witness has brought documents with him in compliance with the subpoena.

We have marked those exhibits. We have marked the documents collectively as Exhibit A, which consists of 13 sub-folders of documents. And the witness agreed to allow counsel to take the documents at the end of the deposition, have them photographed, return the originals back to

Robert Meier
September 06, 2024                                                          6

the witness, and we will abide by that

authorization.  So with that said, I think we

can commence.  So is there anything you want

to add to the stipulations?

MR. LOEVY-REYES:  No.  I agree with

those, and we are ready to proceed.

(Exhibit A marked

for identification.)

DIRECT EXAMINATION BY MR. CAFFREY

Q.  All right.  Good morning, sir.  Can you

tell us your full legal name.

A.  My name is Robert Charles Meier.

Q.  Mr. Meier, where do you reside, sir?

A.  Currently reside at 68 Old Field, two

words, Road, in Plymouth, Massachusetts.

It's Village Crossing Condominiums.

Q.  And roughly how long have you lived

there for, sir?

A.  Since November of 2022.

Q.  All right.  I understand that you are

retired, that's your current work status?

A.  I'm retired, yes.

Q.  Okay.  What's your date of birth, sir.

A.                    .

Q.   Okay.   And in terms of schooling, were you educated here in Massachusetts?

A.   Yes, I was.

Q.   Can you give us a brief thumbnail sketch of your education?

A.   I graduated from Whitman Hanson Regional High School, class of 1965.   And took a post graduate at Salem High School in 1966.   And I graduated from Salem State College in business education in 1970.   And in 1983, I got a master's in criminal justice from the Anna Maria College in Paxton.

Q.   Okay.   And any education classes or courses since that time, 1983?

A.   No.

Q.   Okay.   Jumping ahead, you have spent some time with the Massachusetts State Police?

A.   27 years, yes.

Q.   And while at the state police, did they send you to any formal training classes or courses?

A.   Yes.   22 weeks of classes.   And then

RA 181

there would be would be various refresher courses that the state police send us to.

Q. Okay. And so what year was that roughly, 1971 when you started with the state police?

A. Yes, it was.

Q. So when you started in roughly 1971, is that when you are talking about the 22 weeks of courses?

A. Yes.

Q. And something at the State Police Academy?

A. Yes, it was.

Q. And where was that at the time?

A. It was a brand new academy in Framingham, Massachusetts, right on Route 9.

Q. 1010?

A. No.

Q. It wasn't 1010?

A. 1010 was headquarters.

Q. Only one at a time, sometimes I may be jumping in too quickly. Let me finish the whole question, even though you know right away what the answer is going to be.

So going back then, the academy that you trained at, was not 1010, that's the headquarters?

A.   Yes.  It was 1010, was headquarters, in 1971.  And what was our academy, our new academy, that I attended in 1971, became headquarters for the Mass State Police.

Q.   Okay.

A.   Later.  1010 was a rather run down old factory building that didn't have enough space.  And I'm not sure what year, but it had to be sometime after 1990 they started using the old Pioneer Academy out in Brookfield as the State Police Academy.

And what was the academy -- or the academy on Route 9, that became headquarters for the state police.

Q.   Okay.  So in terms of the 22 weeks of courses, what were they generally, any specificity you can recall?

A.   Criminal law, motor vehicle law.  You know, policy and procedures, that kind of thing.  And it also -- it included a lot of learning how to match.  Physical fitness

RA 183

classes, time in the pool.  There were
requirements that you had to meet, you know.

Q.  Okay.  And now after that initial 22
weeks of classes, any other classes that you
can recall, any specific areas that involve
detective work, for example?

A.  No.

Q.  Okay.  All right.  So in terms of
employment, did you have any employment
before joining the state police in the
private sector or public sector?

A.  When I was growing up my father owned a
refrigeration company after he -- that he
started after he came home from World War
II.  And from the time I was old enough to
carry a toolbox, I worked for my father.

Q.  Okay.

A.  And during the time that I was in
college, I had three summers with the
Barnstable Police.  And I worked every day
for them, from probably May until the
beginning of September.

Q.  Was that as a -- strike that.  Was that
a patrolman position?

A.   I was -- did a number of things for them.  First year, I was a traffic cop, and I directed traffic.

The following year I was in a cruiser, and worked evening.  I think it was mostly evening shifts that I worked.  You know, answering all kinds of calls.

And the last year that I worked for them, I was -- I had a partner, who actually was my college roommate.  I got him hired. And we had Main Street in Hyannis from 9:00 at night to 5:00 in the morning.  And it was basically keeping the order on Main Street, sort of thing.

Q.   Okay.  Now, once you started at Mass State Police, is it fair to say that you did not have any concurrent employment, that was your sole job?

A.   Yes.

Q.   Up until the time of your retirement?

A.   Yes.

Q.   Okay.  And if I understand correctly, after you retired you joined Amica Insurance Company?

RA 185

Robert Meier
September 06, 2024                                                    12

A.  I worked for Amica Mutual Insurance and their special investigation unit for 12 years.

Q.  After retirement?

A.  After I retired from the state police.

Q.  Right.  Did you work anywhere between after retirement for the state police and starting at Amica?

A.  I went directly to Amica.

Q.  Okay.

A.  And in fact the state police let me use vacation and even sick leave to make up a gap of a few months for when I actually retired.

And in January of 1999, that was when I officially retired.  So I was working for Amica and still a state trooper.

Q.  Okay.  And after leaving Amica and retiring from Amica, have you worked anywhere else, sir?

A.  No.

Q.  All right.  Now, you are here today pursuant to a deposition subpoena; is that correct?

RA 186

A. Yes.

Q. Okay. And that subpoena requested that you bring with you all documents in your possession that relate to the investigation of Constance Schiappa that occurred in roughly September of 1979. Is that your understanding?

A. Yes.

Q. And you have received a -- one subpoena from my office, and one from Reyes' office; is that correct?

A. Yes.

Q. And have you -- what steps did you do to comply with that request?

A. Well, I have saved all of my personal files. And I have kept them with me and I have them here in Plymouth with me.

And I first went and found the file after I was contacted by an investigator, Nardo, I think was his last name. And I found my files.

And I went through them. And I looked them over. But I was hesitant -- other than telling him what I remember of the

Robert Meier
September 06, 2024                                                    14

investigation.  I didn't give him any of the files that I had.

Q.  Okay.  Just looking at this particular folder, one of the 13 that you have brought. It has some documents here from a John Nardizzi.  Is that the name?

A.  Nardizzi, yes.

Q.  And do you recall, did Mr. Nardizzi take any recorded statement from you?

A.  I don't recall that he did.

Q.  Okay.  Do you recall if Mr. Nardizzi asked you to speak to any attorneys or anyone that he may have been retained by?

A.  I don't recall speaking with anyone from a law firm associated with him.  I know that it was Project Innocence, that was looking at the case.

Q.  And the records that -- it appears to have been 2019 time period, does that sound right to you?

A.  Yes.

Q.  So Mr. Nardizzi is one of the private investigators that you have spoken with; is that correct?

Robert Meier
September 06, 2024                                                                    15

A.   Yes.

Q.   And was there another private investigator that asked to speak to you who was retained by my office, that you recall?

A.   Yes.

Q.   Do you recall that gentleman's name?

A.   David Benoit.

Q.   Benoit?

A.   I think so.

Q.   Can you tell us your recollection of your interactions with Mr. Benoit?

A.   Yes.  He -- I think that I showed him the files that I had.  And I think he had me go over a timeline of events.

And in particular what we were talking about, is who controls the investigation.

Q.   Okay.  And aside from Mr. Benoit and Mr. Nardizzi, any other private investigators that you can recall discussing this incident with?

A.   No.

Q.   How about when the trial was going on, years ago, involving either Michael

RA 189

Cifizzari or Gary Cifizzari, during that time period, which would have been in the early 1980's, other than working with the district attorneys office, were there any private investigators that you know that you had to speak with during that time period?

A.  Not that I recall.

Q.  Okay.  Now, let's go back to your starting your career with the state police. You said that it was 1971 approximately?

A.  Yes.

Q.  And you went to the State Police Academy?

A.  Yes.  I think it started in May of 1971.  And we graduated from the academy in the middle -- in the middle of September of 1971.  And then we were assigned to a barracks.

Q.  Right.

A.  And then we had a coach.  And we worked -- when we went on patrol, we went on patrol with the coach, that basically showed us how they operated, and we learned from them.

Q.   Okay.   What barracks were you initially assigned to?

A.   The Grafton barracks.

Q.   How long were you assigned to the Grafton barracks roughly?

A.   I was assigned there from 1971 until 1978.   But ---let's see.   I had one other assignment that took me away from that barracks.   And I think that was in 1975. The state police informed what they call a 55 team, to enforce the 55 mile an hour speed limit, because of the gas shortage during that period of time.   And I worked there for a number of months.

Q.   Mostly Mass Pike, or other areas?

A.   Pardon me?

Q.   That was the mass Pike page or all types of roadways?

A.   We stayed basically within troop C, but on 495 mostly.   Sometimes on Route 2.   Just major roads within Central Mass.

Q.   Okay.   So let's jump ahead to roughly the 1978 time period, what happened with your career at that time?

A.   One of the sergeants, one of the sergeants that I worked for, James Timothy Canti, called me while I was at Grafton on the desk.  And he asked me where I would like to be assigned.

And I told him I would like to be assigned to the bureau of investigative services.  So he told me -- he was a Lieutenant Colonel at that time -- told me he would speak with the Colonel John R. O'Donovan and see what he could do.

And then two weeks later, I was transferred to the major crime unit in Boston working directly for the colonel.

Q.   Where was that office physically located?

A.   The old headquarters, 1010 Commonwealth Avenue.

Q.   In Boston?

A.   Yes.

Q.   Okay.  And is Colonel O'Donovan passed away at this point?

A.   Yes, he has.

Q.   So how long did you work for that major

crimes unit in Boston?

A.   I think I was there for three or four months.  And I -- where I really wanted to go, was the CPAC unit crime prevention and control out of at DA office in Worcester.

Q.   Right.

A.   And so I was able to speak with the Colonel and get transferred to the crime prevention and control unit out of the DA office.

Q.   Okay.  So just going back, in the three or four months that you worked with that major crime unit in Boston, do you have a recollection of any special project for work you did?

A.   Yes.  They had me -- there was a case in California.  I think the -- the name for it was the Hillside strangler case.  And they had me look at a Boston connection for that.

So I did, you know, quite a bit of work to do a background on the people, or the person involved in that.  That was ultimately typed up and sent to California.  But I did

that.

Q.   The perpetrator was from Boston, did it ever turn out, or no?

A.   It wasn't him.  It was a guy named Shamshank I believe.  But it turned out, turned out it was, you know, someone else not from Massachusetts.  That, initially, yeah.

Q.   Okay.

A.   That made the case.

Q.   Okay.

A.   On it.

Q.   All right.  So jump ahead now to where you left the major crimes unit after three or four months, and the Worcester CPAC unit; is that correct?

A.   Yes.

Q.   What was the ballpark total amount of time that you spent at CPAC Worcester?

A.   11 years.

Q.   And roughly the time frame, what are we talking?

A.   From probably, going to say October of 1971 until I was promoted.  And then I left

the unit, which would have been 1989.

Q. Okay. So what was your promotion, the CPAC?

A. A promotion to the rank of corporal. What they usually do, they put you back in uniform. And then I was sent to a school for noncommissioned officers in Vermont that has officers -- I think it was Connecticut. I think I was the only one from Massachusetts. But they were from all over the New England states. At they had been promoted, and they were going to the NCO school to learn how to be a supervisor.

Q. Okay. I will come back to that. But going back to CPAC, am I correct in saying that Lieutenant DeFuria was the head person that -- when you were there?

A. Yes. Initially there was another lieutenant, detective there. And not long enough for me really to become familiar with him. But, DeFuria became the main man.

Q. The pecking order of seniority, it was difficult, that would ---

A. By rank.

Robert Meier
September 06, 2024
22

Q.  Was the top rank?

A.  I was a lieutenant detective.  He had come to us -- back then the state police wasn't making its troopers that went up through the ranks detective, we were taking them from local police departments.  So not academy trained.

But they fit into the rank as a superior officer.  And DeFuria had come from the Somerville police, and he had a brother James that was also on the state police, had come from Somerville.  And also was a lieutenant detective in another jurisdiction.

Q.  Okay.  Has Ralph DeFuria passed away at this point?

A.  Yes, he has.

Q.  And below rank wise, below Ralph DeFuria, who was in charge at CPAC in Worcester?

A.  Next in charge would have been Sergeant Joseph Doheny.  Well, a lot of people pronounced it Doheny.  Well, it was mangled.  Doheny was the correct way to pronounce it.

Q.  Doheny, forgive if I may mispronounce

RA 196

Robert Meier
September 06, 2024                                                    23

it here.  Doheny, it was sergeant Doheny?

A.  Yes, it was.

Q.  Sergeant Doheny, he was -- did you --
was he your immediate supervisor at CPAC, or
somebody in between you and him?

A.  Two sergeants.  The other Dave
Mattioli.  And I took assignments from both
of them.

Q.  Okay.  And so Sargent Mattioli, has he
passed away?

A.  I don't think so.

Q.  Okay.  But Sergeant Doheny has passed
away?  Yes?  Is that correct?

A.  Yes.

Q.  In terms of the Gary Cifizzari matter,
was Sargent Doheny the lead or chief
investigator?

A.  Yes, he was.

Q.  Okay.  And was that through assignment
by Ralph DeFuria?

A.  Yes.

Q.  Okay.  And do you recall anyone else
from CPAC that had investigative
responsibilities for duties with regard to

RA 197

the investigation of Gary Cifizzari and Michael Cifizzari incidents?

A. Yes. Well, initially when the homicide happened, I wasn't initially involved until the month of October. I think it may have been the 3rd, where myself and DeFuria went down to Central -- her Central Street apartment.

And we had been told -- we had some idea that she had she secreted money and clothing, and in particular we were looking for a couple of women's handbags that seemed to be missing. So that was my first involvement, you know.

Q. So back up a little bit. You were not present at the scene, the crime scene on the day of the crime?

A. No. Initially it would have been Doheny and Tom White. I believe.

Q. Okay. And there was an autopsy a day or two later. I understand you that were not present at that?

A. I was not present at the autopsy.

Q. Okay. And now Tom White, was he a

state trooper at the CPAC unit?

A.   Yes, he was.

Q.   And has he passed away, or a likely --

A.   He has passed away.

Q.   Did you ever discuss with Tom White any of his observations of interviews with Michael Cifizzari that he may have been part of, seen part or some of?

A.   No, I did not.

Q.   Okay.

A.   Well, I will let you ask the question.

Q.   That's fine.  What interactions -- strike that.  What observations if any did you make of work done by Trooper White with regard to either Michael Cifizzari's prosecution or Gary Cifizzari's prosecution?

A.   Well, I know that he had keyed in on Giroux as a suspect.  And primarily based on his being accused of going into her apartment and taking money from her some months before.

Q.   Okay.  Any other troopers from CPAC that you have not mentioned that you think may have been involved with either Michael

Robert Meier
September 06, 2024                                                          26

Cifizzari's prosecution or Gary's?

A.    There were other troopers involved. But only, like, to accompany White, or to, you know, accompany me --

Q.    Yes.

A.    -- when I was ultimately assigned specifically to see if I could get Gary Cifizzari to agree to a dental impression.

Q.    Which troopers were those, if you recall?

A.    I recall Brad Holmes.  Jack Cunningham. Those are the ones that come to mind.

Q.    Okay.  And were those troopers -- strike that.  Were those gentleman that you just named, Holmes and Cunningham, with the state police or Milford Police?

A.    They were with the state police.

Q.    Okay.  And again, their role was helping you getting the dental impression agreement?

A.    Well, not so much that.  It would be to accompany me when I was taking a statement. I know that one -- the first statement that I took from Gary Cifizzari, I had a Milford

RA 200

officer with me.  And subsequently I think for the second statement, it was O'Donovan, it was Corporal Brad Mullen.  He was with me when I took the second statement from Gary Cifizzari after we had become aware that Cifizzari brothers had been implicated in the murder.

Q.  Okay.  Is Brad Mullen still living do you know?

A.  I think that -- well, I don't know for a fact.  But if he is, he is in Florida.  I know that's where he moved after he retired.

Q.  Okay.  And the first gentleman -- strike that.  The gentleman you named a few minutes ago, a Trooper Holmes, is he still with the state police or retired?

A.  He would be retired.  And I don't recall him having passed away.

Q.  Okay.

A.  I have no knowledge of that.

Q.  Do you know how long he stayed with the CPAC for, or the state police for?

A.  No, I don't.

Q.  Okay.  And Jack Cunningham, that was a

RA 201

second trooper that you mentioned a few minutes ago?

A.  Yes.

Q.  And is he, if you know, is he still living?

A.  Yes, he is.  And I have talked to him in recent time.

Q.  Tell me about his career path from CPAC?

A.  Well, he eventually became a lieutenant colonel of the state police.  And this was after I had left.  And he had gone with Amica, and he did retire from them.  And I reconnected with him when I was doing a membership to the Sons of the American Revolution.  The person that was helping me with the application asked me if I knew Jack Cunningham, and I said I did, that I worked with him.  And he was asking me because he saw that I had been a trooper.

Q.  Okay.

A.  And then strangely enough, Jack was the president of the organization at that time.  So when it came time to swear me in, he was

my sponsor, and he swore me in.

Q.   Okay.   Tell me about his career path, you said he went on to become a lieutenant colonel?

A.   Yes.

Q.   And how long did he have that role for, if you know?

A.   I don't know for a fact how long he stayed.   But -- and I don't believe that, you know, that he went to work for anyone else beyond that.

Q.   Okay.   And do you know where he lives now?

A.   In Framingham.

Q.   Okay.   And do you know what duties or actions or responsibilities he had with regard, if any, with regard to the Gary Cifizzari's prosecution?

A.   Really, other than I think that he was present with DeFuria, or Joe Doheny, when they talked -- I believe it was Michael.

Q.   Okay.   Did you, yourself, sir, ever speak with Michael Cifizzari?

A.   I have no memory of ever speaking to

Robert Meier
September 06, 2024                                                        30

Michael.  And I cannot even see him in my mind's eye.

Q.  Okay.  Now, going back to the crime event involving Mrs. Schiappa, you mentioned that it was probably early October of 1979, when you first got involved in the murder investigation; is that correct?

A.  I think if I had my notes, the date would have been -- I think it was October 3rd.

Q.  Okay.

A.  That we conducted a search, and it was Milford Police officers with us, Vinny Liberto.

Q.  Okay.  And, again, I think that you mentioned your goal was, your suspicion was that Mrs. Schiappa had sort of hidden away or squirreled away some of her money in the walls or places in her apartment, and that may still have been there after her death; is that correct?

A.  Yes.

Q.  And --

A.  It was, also, to look for the

RA 204

particular handbags we thought were missing to make sure they were, in fact, missing.

Q.  Okay.  And then after that, after that event, was there some focus by you and your colleagues at the Mass State Police on trying to investigate and locate any individuals that were responsible for the murder?

A.  Yes.  I was -- I got specific assignments.  It was not something at that time that I was working on all the time.

Q.  Okay.

A.  The next thing I did of any consequence that I was assigned, was to meet with Giroux and take a statement.  And I think that the reason that they had me do that, they wanted a fresh set of eyes on him, to see if I came up with anything different than what he had told Tom White.

Q.  Okay.  And at that point in time, sir, there had been no confession about the crime by Michael Cifizzari; is that correct?

A.  No.

Q.  That's correct, then?

A.   Yes.

Q.   Okay.  And the Cifizzaris were not on anybody's so-called radar; is that fair to say?

A.   No.

Q.   Is that fair to say?

A.   Yes.

Q.   So what's your best recollection, sir, then, of what was done with regard to Mr. Giroux by either you or your colleagues?

A.   Like I said, White did not readily share information.  I was just told, you know, go here, you know, take a statement from him.

And then I had the statement that I took typed up.  And I don't recall ever getting any feedback from White about, you know, what I had found out.

And I was never really sure, you know, how much White knew about, you know, the different -- from what I had learned from Giroux.

Q.   So the statement that you took of Mr. Giroux, was that taken at a Veteran's

Hospital.

A.   Yes, it was.

Q.   And were you informed about why Mr. Giroux was in the hospital?

A.   Not that I recall.

Q.   Okay.  Do you know was that statement in one of these folders that you brought with you here today, if you know?

A.   The statement?

Q.   Yes.

A.   Yes.  It is.

Q.   Okay.

A.   And it's a separate folder.  It should have -- the very bottom one.

Q.   That's Murphy's Law.

A.   Well, it's a little over a page.

Q.   Okay.  And it's got a date on it, sir, does it not?

A.   Yes.  October 5th.

Q.   Okay.

A.   1979.

Q.   There's a second document, is that the same identical document?  If you know.

A.   Yes, it is.

Q.  Okay.  Make things easier, I will ask you some questions from it.

A.  Okay.

Q.  So this statement that you took from Mr. Giroux is dated October 5th, 1979; is that correct?

A.  Yes.

Q.  And it appears, and correct me if I'm wrong, that there was no one from the Milford Police Department involved in the taking of this statement?

A.  No, there wasn't.

Q.  Okay.  And who was involved with the taking of this statement?

A.  The chief of the VA police, Bill Warren.  And a -- and a doctor, apparently Giroux's doctor, Mark Thall, were present when I spoke with him.

Q.  Looking at the third paragraph, it appears that in the statement Mr. Giroux was indicating to you on the night of the subject murder of Connie Schiappa, he had been at a bar, and he had been fairly heavily intoxicated that night; is that what

he is saying to you roughly?

A.   Yes.

Q.   And he is identifying a witness, a witness named Sandy Goucher, maybe an alibi witness placing him there?

A.   Yes.  She was there, yes.

Q.   Do you know if anyone from the state police spoke with Ms. Goucher?

A.   I'm not sure, but I think that anything I got from him, that White did not have, he followed up on.  And there may be, you know, a statement somewhere in the statement that were taken from her that she had seen him. Unless I'm confusing that with somebody else.

Q.   So if there were follow up with Goucher, you think that White, as opposed to you, would have done it?

A.   White would not have told me.

Q.   You, yourself, don't have a recollection of yourself doing any interaction with Goucher?

A.   No.

Q.   Okay.

A.   I would have only done that if I were assigned to do that.  And all they told me to do, was get a statement.

Q.   Okay.  Going to the last page, page 23.

A.   (The witness complies).

Q.   Giroux at the top of that page is telling you that he is -- also spoke to Trooper White that same day; is that correct?

A.   Yes.

Q.   And he also spoke with Brad Holmes, who was also a state trooper; is that correct?

A.   Yes.

Q.   Were you aware, if you can recall, that Trooper White had already spoken with Giroux --

A.   Not until he told me.

Q.   Okay.  Not until Giroux told you?

A.   Giroux told me.  Yeah.  But I knew that I was going there because White wanted me to talk with him.

I think that he felt that I might be able to get something different from him than he had.

Q.  Okay.  Did it ever come up either from your interactions with Trooper White or from other sources as to whether Mr. Giroux acted in any capacity of being an informant to state police?

A.  That was what -- when I was first approached by Nardizzi.

Q.  Yes.

A.  I was not remembering the -- the name was familiar to me, but I was not remembering who it was.  And I thought that maybe it was an informant that White may have.  He is from that area.

In fact, he was buried from a church in Milford, and I thought that it was someone that he might have known or might have gotten information from in the past.

But I have no -- it was never told directly.  And I have no knowledge that he was an informant for White.

Q.  Okay.  And I would ask you a similar question.  Have you ever heard from any source, either Trooper White or anyone from the state police, or any other law

Robert Meier
September 06, 2024                                          38

enforcement agency that Michael Giroux had

any role as being an informant for the

Milford Police Department?

A.   No, I have not.

Q.   Okay.  And same question, sir, with a

different spin to it.  About the FBI.

Have you heard from any source, law

enforcement source, of Mr. Giroux being an

informant for the Federal Bureau of

Investigation?

A.   No, I haven't.

Q.   Okay.  So I want to put that back in

the folder.

A.   Okay.

Q.   Okay.  Do you recall any factual

developments with the investigation of the

Schiappa murder that took place after that

period where you looked for money in the

house of the victim, and you interviewed Mr.

Giroux at the Veterans Administration

Hospital, from that point in time, to the

time of the Michael Cifizzari confession?

A.   I did not work on the case, anything

after those two events.

Robert Meier
September 06, 2024                                                        39

Q.  Okay.  So that event happens, where Michael Cifizzari, for whatever reason, confesses to the murder of Connie Schiappa, are you aware of that, sir?

A.  Yes.

Q.  At that time of that confession, 1981, that was the time period?

A.  Yes, it was.

Q.  And at that time, sir, you were still with CPAC, right?

A.  Yes.

Q.  And at that time you were given some job assignment with regards to the investigation of the Schiappa murder?

A.  Yes.

Q.  Okay.  And were your, at that time, were your -- would you say that your assignments were more related to Michael Cifizzari's case or Gary Cifizzari's case?

A.  I never worked on -- did anything regarding Michael.  It was Gary I was assigned to contact and see if he would voluntarily submit to having a dental impression made.  And that was from Sergeant

RA 213

Doheny.

Q.  So Sergeant Doheny tasked you with contacting Gary Cifizzari and to see if he will consent to a dental mold; is that roughly what the assignment was?

A.  Yes, it was.

Q.  Were you also told to contact Mr. Cifizzari, Michael Cifizzari's cousin named Robert Cananzey?  Let me have -- I can get you the spelling here.  C-A-N-A-N-Z-E-Y.  So there's the cousin Cananzey, that is also a potential suspect here for some period of time?

A.  Yes.  Apparently, yeah.  Michael had named them as being with him.  First -- I think that first he said just his cousin Cananzey.  And then subsequent on questioning, from what I read, he added that Gary was with him, too.

Q.  Okay.  So it's your understanding that Michael Cifizzari gave two confessions, one at the Milford Police, and one at the CPAC unit?

A.  Yes.

Robert Meier
September 06, 2024                                                                          41

Q.  And is it fair to say, based on what you have read and understand from this matter, that the confession where Gary Cifizzari was first implicated by Michael, is done at the Massachusetts CPAC unit?

A.  Yes.  I'm not sure if, you know, if he said that to Milford Police, too.  But I know definitely that he said that when Sergeant Doheny was talking to him taking a statement.

Q.  And, again, going back to that statement at CPAC unit by Michael Cifizzari, that was primarily to Sergeant Doheny?

A.  Yes.

Q.  Okay.  And were you present during that?

A.  No, I wasn't.

Q.  Okay.  All right.  So you are tasked with contacting Gary Cifizzari.  And do you have to go to Taunton to do that?

A.  I did that in a phone call, you know, got the agreement -- got him to agree during a phone call at his mother's residence. It's my memory.  But that is my memory.  But

RA 215

it's possible that there -- there were times when I was sent down there, and I think that was when Corporal Mullen was with me. And right after we learned that he had been implicated that I took a statement from Gary. And it was a denial, you know, that he was in Milford at that time. Or that he -- so it was very brief, and lasted probably 30 minutes or less.

Q. Did he, in that interaction with Gary Cifizzari, did Gary Cifizzari agree to the dental molds performed?

A. That was the object of getting him to submit the dental mold of his teeth made.

Q. And did he agree to do that?

A. He agreed to do that.

Q. And did you end up transporting Mr. Gary Cifizzari to a dentist's office to do that?

A. Yes.

Q. And when you did that, did you have another trooper with you, or a Milford police officer?

A. I was by myself.

Q.   You were by yourself?

A.   Yes.

Q.   No Milford involved in that?

A.   No.

Q.   And then after the dentist obtained the molds of Mr. Gary Cifizzari's teeth, what did you do with those molds?

A.   I believe they -- I didn't get them the day that they were done.  I had to go back to the dentist's office a day or so later when the mold would have been hardened.  And they would have been boxed and labeled.  And I believe that when I got them, I took them directly to Dr. Schwartz at Tufts on Stuart Street in Boston, and dropped them up off with him.

Q.   When you did that, was there involvement with the Milford town police?

A.   Just myself.

Q.   Okay.  Now, at some point were results provided to you concerning Dr. Schwartz's opinion about the dental molds of Gary Cifizzari?

A.   Yes.  First I got a telephone call that

Robert Meier
September 06, 2024                                                                 44

he had made a comparison, and the bite marks

matched.  And you want me to answer?

Q.  Yes.

A.  The question that you, you know, really

is important.

Q.  Go ahead.

A.  On the way to the dentist Gary offered,

"Would it make any difference if I had

dental work done to my myself," or a

statement similar to that.

    And then he proceeded to tell me

about a fight that he was in in 1980, and

that he had -- having a front tooth knocked

out.  And I didn't offer any opinion one way

or the other.  We continued to the dentist

and had the impression made.

    And then I let Sergeant Doheny and

the DA know that Gary had made this statement

about dental work done after the homicide.

And then I was instructed to call him and ask

where the incident happened, and, you know,

what -- what medical treatment he got.

    And then I was advised of a date in

Taunton, and that it was at the Morton

RA 218

Robert Meier
September 06, 2024                                                                              45

Hospital, and that he had a dentist in
Taunton that he was using at that time.

Q.  Okay.  Now, you have got a folder, one
of the forms you brought, has a search
warrant and affidavit by you concerning
securing dental records from Gary Cifizzari;
is that correct?

A.  Yes.

Q.  So do you have a recollection of having
doing the affidavit of what your activities
were in order to secure a warrant?

A.  Yes.

Q.  Okay.

A.  Yes.  And, you know, something that I
wrote out would have been run by the DA and
the DA would have had -- well, after --
well, actually, I would have testified in
front of a grand jury.

Q.  Right.

A.  And that's where they would probably
have gotten the information from me directly
that would have been typed on the search
warrant.  It would have been given to me to
serve.

RA 219

Q.  Okay.  And, now, in preparing that affidavit for the search warrant, did you rely upon any information provided to you by the Milford Police Department?

A.  I would have to look to see if anything.

Q.  Take your time.

(Witness reviews document.)

A.  This would probably be when I learned from reading Sargent Doheny's report at the time.  So after I had become -- after I was assigned to get that statement, I would have read Doheny's report of the investigation up to the events that occurred in 1981, where Michael approached the Milford police.

Q.  Right.

A.  Actually, my information would have come from Doheny's report.

Q.  Okay.

A.  And my own actions.

Q.  All right.  So, again, in terms of the Milford police, did the Milford police assist you or were they involved in this effort here to secure the search warrant for

Gary Cifizzari's dental records?

A.   No.

Q.   Okay.  All right.  So what happens next, sir, in terms of the chronology after the search warrant for Gary Cifizzari's dental records?  I assume you get the records and then provide them to the DA; is that what happened?

A.   They were provided.  Now, I'm not sure if they went to the DA first before they went to Dr. Schwartz.  But eventually they would have gone -- the DA would have seen them.  Because they make a list of what is recovered during the search.  So there would be a list of the items recovered.  And then the documents would have been, you know, brought to Dr. Schwartz.

Q.   Okay.

A.   To make his further comparison.

Q.   All right.  Just to clarify a little bit here.  In terms of when we are referring to records going to the DA, was that primarily District Attorney Lawrence Murphy that you were working with?

RA 221

A. Yes.

Q. We have been talking about your working and providing records to the district attorneys office from time to time, was Lawrence Murphy the primary district attorney that you were working with?

A. Yes.

Q. And any other district attorneys that you were regularly working with?

A. Not regularly. But when the idea was broached that there should be a waiver, if he was doing it freely and voluntarily, I primarily wrote that myself. But I had it -- I wanted to have that checked out with the DA's office to have any changes made that they thought were necessary. And for some reason, Larry Murphy was not available. And I spoke with ADA Dan Toomey.

Q. Okay.

A. And, you know, he went over it.

Q. He became a judge eventually?

A. Yes, he did.

Q. Okay. Other than at that time the district attorney Dan Toomey, anyone else

from the DA's office that you can recall interacting with on the Gary Cifizzari matter?

A.    No.

Q.    And, again, in terms of having the search warrant reviewed, did you have the search warrant reviewed before with regards to search warrants, where you mentioned that you had it reviewed before, it was submitted by some personnel at the Worcester DA, correct?

A.    Yes.

Q.    My next question is, did you have the search warrant reviewed by anyone at the Milford Police Department before it was submitted?

A.    No.

Q.    Okay.

A.    And in actuality, it would have been the DA's office that would have written the whole search warrant.

Q.    Okay.

A.    Based on my testimony in front of an impaneled grand jury.

Q.   Okay.  All right.  Moving along.

After the dental records are received and provided to the district attorney, and also provided with Dr. Schwartz, correct?

A.   Say that again.

Q.   Also provided to Dr. Schwartz, the dental records?

A.   Yes.  And after that they would have done an inventory of what was received, you know, on the basis of those search warrants. Then I would have -- I would have transported them to Dr. Schwartz.

Q.   Okay.  And then at some point thereafter, did the DA Larry Murphy, Lawrence Murphy, and you travel to Florida to meet with a dental expert?

A.   Yes.

Q.   And what was the reason for that Florida trip, sir?

A.   That was, I believe, that was Richard Souviron.  And looking for another expert to back up Dr. Schwartz's work.

Q.   Had you ever had any other files with Souviron before this file?

A.  With --

Q.  Do you recall working with Dr. Souviron on any matters before the Gary Cifizzari matter?

A.  Souviron in Florida?

Q.  Yes?

A.  No.

Q.  Can you tell us, a thumbnail sketch of your interaction with Dr. Souviron?

A.  He had been conferred with Dr. Schwartz, was my understanding.  And DA Murphy wanted to meet with him in particular, and see if, you know, he would agree to be a witness for us.  And, you know, what he would say based on his interactions with Dr. Schwartz.  That was what, you know, the purpose of the trip was.

Q.  Okay.  And who was present at the meeting with Dr. Souviron, Larry Murphy, yourself, and the doctor?

A.  Yes.

Q.  And anyone else that you can recall?

A.  No.

Q.  And the dental records, I assume were

Robert Meier
September 06, 2024                                                      52

reviewed, or molds reviewed?

A.  Yes.

Q.  And what opinion was received from Dr. Souviron?

A.  That the impression that he was looking at from Gary Cifizzari, were the teeth that made the marks on Mrs. Schiappa's body.

Q.  Okay.  And then at some point after that, I don't know in terms of weeks or months, an indictment of Gary Cifizzari was obtained; is that correct?

A.  Yes.  A period of time later that the indictment was obtained.

Q.  Okay.  And I don't want to put words in your mouth, was the indictment primarily based primarily on the opinions of Dr. Schwartz and Dr. Souviron?

A.  Yes.  And a third dentist had been hired by the defense.  And he agreed with our two experts, that those were Gary Cifizzari's bite marks on the body.

Q.  Okay.  Do you recall that doctor's name?

A.  I knew it was a Philadelphia dentist.

Reporters, Inc.
617-786-7783

RA 226

But I can't break it up.

Q.  If I say the word Kapitan?

A.  Yes.

Q.  Other than the dental records, and the opinions of the forensic dental experts, was there other information relied upon by the Mass State Police for the indictment, such as fingerprints of Gary Cifizzari, or a specific confession by Gary Cifizzari, or some -- eye witness testimony as to someone seeing Gary Cifizzari do something?

A.  Well, the main reasons for the indictment were the concurring dental experts.  And, in my opinion, the statement of his cousin Annette in Milford.  That the two brothers had showed up at her house on September 29th, the day that Schiappa's body was found in the morning, and that's right later in the afternoon.  And in particular the statement that she made that strikes me is, "If the police knew you two goons were here, they would think you did it."

So in my mind that was pretty definitive that she remembered that they were

there, in Milford, at her house, the day that their great aunt was found murdered.

Q.  Now, it appears that there were -- that Gary and Michael may have been entitled to some rather small amount of inheritance of Ms. Schiappa's estate plan?

A.  I didn't look into that.  But I read that in one of the statements.  I think that was from Gary or Michael's mother, had made that statement.  That they got a small stipend, you know, from her estate.

Q.  But that's not something that you worked upon or developed as a theory in the case, is that fair to say?

A.  No, it isn't.

Q.  Fair to say, then?

A.  Yes.

Q.  Okay.  Can you tell us the steps, now, where from the point where at some point -- strike that.

        At some point was a grand jury indictment issued?

A.  Yes.

Q.  And at that time did you effectuate an

Robert Meier
September 06, 2024                                                        55

arrest of Gary Cifizzari?

A.  Yes.

Q.  And was there a brief statement taken from Gary Cifizzari at the time of his arrest?

A.  Yes.  He was arrested in Taunton by myself and Lieutenant DeFuria.  And he was brought back to our office at 283 Main Street in Worcester, where Sergeant Doheny was present.

    And I was present during that taking of that statement.  And that statement was reduce to writing.  Again, you know, he denied that he had anything to do with the great aunt's murder.  And he denied that he was in Milford at the time of her homicide.

Q.  Okay.  Was there anyone from the Milford Police Department involved in the arrest of Gary Cifizzari?

A.  No.

Q.  And anyone from the Milford Police Department involved in that meeting with Gary Cifizzari at the CPAC headquarters after the arrest?

Robert Meier
September 06, 2024                                                    56

A.   No.

Q.   Okay.  Can you tell us -- strike that. Do you have that in one of the folders here today, the statement of Gary Cifizzari?

A.   I believe that it is.  That's the booking information from that time.  So the interview that I did with Gary in Taunton, in May 28th, 1983, that was the interview that Corporal Brad Mullen was with me. That's in here.

Q.   Yes.

A.   And the November 21st, 1983, statement of Gary Cifizzari, given to Sergeant Joseph Doheny and Robert Meier, is also in here.

Q.   Okay.

A.   That's it.

Q.   And that one reads -- all right.  That is when the questioning stops, when he wants to speak with his mother; is that correct?

A.   Yes.

Q.   Okay.  So just to be clear, again, showing you this document, this is dated November 21, 1983, correct?

A.   Yes.

RA 230

Robert Meier
September 06, 2024                                                    57

Q.  And this would be the day that Gary was
arrested; is that right?

A.  Yes.  If you notice the time, we
probably made the arrest around 5:00 or so.
And then by 7:00, he was back in Worcester.

Q.  For the record, the time indicated for
this statement is 7:20 p.m.; do I have that
right?

A.  Yes, sir.

Q.  And, again, you said no one from the
Milford police was there, correct, for this?

A.  No.

Q.  That is correct?

A.  No.

Q.  That is correct?

A.  Yes, that is correct.

Q.  That's true, this statement was taken,
Gary had already -- it had been informed
that he was -- at the time of the November
21, 1983 statement, that was taken at 7:20
p.m., Gary Cifizzari had already been
informed that he was under arrest for the
murder of Constance Schiappa?

A.  Yes.

RA 231

Q.   Who was is Robert Zullas?

A.   Yes, lieutenant DeFuria, in the chain of command, Zullas had a number of county district attorney investigators in the state police that answered to him.  And Zullas answered directly to Colonel O'Donovan.

Q.   Okay.

A.   So it was very common, you know, when you completed a case that the disposition of the case was written out in the form like that.  And that form of letter.  And then it went to Zullas for his files.

Q.   So Zullas was not physically present in CPAC Worcester, right?

A.   No. I think he was had headquarters, the 2 -- the 1010 Commonwealth Avenue at that time.

Q.   Okay.  And Zullas was sort of overseeing things going on in different CPAC offices within the state?

A.   Yes.

Q.   And primarily Worcester, West, or some other --

A.   I'm not sure how it was broken up.

Q.   Okay.

(Recess taken.)

MR. CAFFREY:   Back on the record.

Q.   Detective Meier, can you tell us whether you attended, whether you have a memory of attending any of the trials of either Michael Cifizzari or Gary Cifizzari, Michael Cifizzari -- or suppression hearings involving Michael Cifizzari?

A.   I did not attend the trial of Michael Cifizzari.   But I was very much involved in the trial of Gary Cifizzari.   And I was present throughout the whole trial.

Q.   Of Gary Cifizzari?

A.   Gary.

Q.   Okay.   And do you recall were you present in the courtroom or --

A.   We were present in the courtroom.

Q.   So did you observe the testimony by dental experts in the Gary Cifizzari trial?

A.   Yes.

Q.   Okay.   Was there testimony by forensic experts with allegations that Gary's teeth, as recorded in dental molds and records,

matched that of the bite marks of Constance Schiappa?

A.   Yes.   And it made a difference that, you know, we had served those search warrants and had an X-ray of Gary's teeth prior to the Schiappa homicide.

Because it showed the position of that right front tooth in his mouth before it was knocked out in 1980.

Q.   And was Lawrence Murphy the district attorney that was presenting that argument and case against Gary Cifizzari?

A.   Yes.

Q.   And what is your recollection of what the allegations were with regard to the -- if any damage done to Mr. Cifizzari's teeth before the murder and post murder event?

A.   Well, the bite mark, or the bite marks showed a right front tooth that was bilaterally retunded -- in other words, it was back in the mouth, it was not within what they call a dental arch.   And when Gary was brought to the dentist to have the impression of his teeth made, he had a tooth

Robert Meier
September 06, 2024                                                        61

in place that put them all in line.

But the X-ray that I think that was taken in 1977, showed that at that time, showed the root of that particular right front tooth, would have been a palatinus retunded tooth.

Q.  Okay.  And was, if you can recall, was the testimony at trial presented through the district attorney lawyer Lawrence Murphy, that the bite mark that Schiappa had, was a palatinus retunded tooth?

A.  I believe it was, yes.

Q.  At the end of the trial, were you present when the jury verdict came in?

A.  Yes.

Q.  What is your recollection of the jury verdict?

A.  I know that they found him guilty.

Q.  Okay.

A.  I know that they found him guilty.

Q.  Were there any post trial hearings or events that you attended after the murder verdict?

A.  No.

Robert Meier
September 06, 2024                                                          62

Q.  Any memory of any motions, legal proceedings concerning this matter from the time of the conviction to the time that the Innocence Project contacted you?

A.  No.

Q.  Okay.  And with regards to the Innocence Project, if I understood you correctly, you didn't take -- provide any recorded statements that you know of?

A.  I don't recall being recorded.  It's possible.  But I do not recall it.

Q.  Do you recall writing out any affidavits or statements for them?

A.  No. The only thing that I gave Matt Dietz, was a copy of the SJC binding that there were no trial errors and confirming the conviction.  And I, you know, if I were going to get files that were to be gone through, you know, a summons of some sort.

Q.  Okay.  So in terms of this murder investigation with regards to Gary Cifizzari, would you say that it was primarily conducted by the state police or the Milford police?

Robert Meier
September 06, 2024                                                                63

A.   The state police.

Q.   And why do you say that, sir?

A.   Well, it was Joe Doheny, Ralph DeFuria, you know, talking with Larry Murphy, you know, about how the case would proceed, the direction of the case.  What had to be done, and what records, what statements had to be taken and so forth.

Q.   Okay.  To your knowledge were there any search warrants, arrest warrants filed by anyone from the Milford Police Department with regards to this Gary Cifizzari matter?

A.   Not to my knowledge.  No.

Q.   Okay.  And just going, in terms of generally speaking, if a murder event happens in a Town the size of Milford, as it was in 1979, through 1981, time period, was Milford, to your knowledge or understanding, equipped with a homicide division?

A.   No.

Q.   And was if -- was there a policy or a statute in place that you are aware of that put the responsibility for murder investigation and towns the size of Milford

RA 237

with the state police rather than with the town?

A.   The district attorney, in fact all of the district attorneys throughout the Commonwealth, have a state police unit; and they only allow certain towns, like in Worcester County the only town that could investigate a homicide was the Worcester Police Department.

And that was, you know, pretty standard throughout the Commonwealth, that it would be up to the district attorney whether, you know, a town or a city police department would, you know -- I don't even think Brockton can investigate its own homicides. I think the state police unit and DA's office does that.

Q.   Okay.  All right.  So you met with, you testified earlier, that you met with an investigator Benoit at the request of my office; is that correct?

A.   Yes.

Q.   And with regard to that, with regard to that contact, was there an affidavit that

Robert Meier
September 06, 2024                                                    65

was prepared by you with your memory of the
investigation of the Gary Cifizzari matter?

A.  Yes.

Q.  Okay.  And can you take a look at that
affidavit, sir.

A.  (The witness complies).  Here it is.

Q.  Okay.  All right.  So you have brought
with you today, sir, is a document entitled,
"Affidavit of Robert C. Meier"; is that
correct?

A.  Yes.

Q.  And it's a three page document?

A.  Yes.

Q.  And you have signed the document back
in January 13th, of this year; is that
correct?

A.  Yes.

Q.  So I just want to ask you some
questions about what is contained within the
affidavit.  Maybe you have had a birthday,
you were 77 when you signed it?

A.  Still 77.

Q.  Okay.

A.  I will be 78 in December.

Robert Meier
September 06, 2024                                                                66

Q.   It says that you served as a state trooper from 1971 to 1999?

A.   Yes.

Q.   And retired at as a sergeant; is that correct?

A.   Yes.

Q.   And, again, it says that you started in 1978, with the major crimes unit in Boston that we discussed earlier, correct?

A.   Yes.

Q.   Paragraph 4 talks about what we just discussed, is Worcester District Attorney's office only allowed the city of -- looking at paragraph No. 4, sir.  That's what we recently were discussing, about the concept that the city of -- that the office of the district attorney only allows the City of Worcester to investigate murders that happened in Worcester County, the Worcester District Attorney does not allow small towns such as -- or towns the size of Milford, to investigate homicides?

A.   That's correct.

Q.   Okay.  Paragraph No. 5, it's a

RA 240

statement about your involvement in Gary the

Cifizzari murder.  Strike that.

Paragraph 5, is the paragraph

concerning your investigation of the Connie

Schiappa murder with the indication that you

believe a to the best of your knowledge,

October 3rd, of 1979, that you became

involved?

A.  Yes.

Q.  Paragraph 6, refers to your memory that

Sergeant Doheny was the lead investigator

for the Schiappa murder case, correct?

A.  Yes.

Q.  Okay.  And also a reference to Trooper

White in paragraph No. 6?

A.  Yes.

Q.  Okay.  And again, going on a tangent,

with regard to Trooper White, going back to

the Michael Giroux investigation of him as a

suspect.  Was it your understanding that

Trooper White was the state police official

tasked with primarily with investigation as

to Mr. Giroux's involvement with the

Schiappa murder?

A.   Yes.

Q.   Okay.  And you indicated that some times Trooper White would give you tasks with regard to Giroux?

A.   Not directly from him.  In this particular case, I assume that it was him that wanted me to do the -- take the statement.  But it was probably done -- or it was done through Sergeant Doheny, you know.  White didn't give me any instructions.

Q.   Okay.  Was White, if you know, supposed to follow-up with you as to the progress with the developments with the investigation of Giroux?

A.   No.

Q.   Okay.  Was it your understanding that White was supposed to be providing information regarding the Giroux investigation to someone else at the state police?

A.   It would be Sergeant Doheny that would be speaking with him directly.

Q.   Paragraph 7 refers to your recollection

that the top detective, or in terms of rank at Worcester CPAC, was Ralph DeFuria?

A.  Yes.

Q.  Did Ralph DeFuria ultimately report to Lieutenant Colonel John O'Donovan?

A.  Yes.  I neglected Zullas, not sure how many supervisors he actually got from Zullas.  But did he report to O'Donovan, went through Zullas.

Q.  Paragraph 8 refers to your belief that the strategy and planning for the Schiappa homicide investigation, was developed by Sargent Doheny through consultation with DeFuria?

A.  Yes.

Q.  Okay.

A.  And Doheny had done quite a few homicide investigations.  He was rather adept at it.

Q.  Paragraph 9, there's a statement here in paragraph 9 by you that the Schiappa homicide was initially reported to Milford Police, they would be the first ones to learn of it, correct?

A.   Yes.

Q.   But that the investigation of the Schiappa murder, that was coordinated and directly controlled by CPAC?

A.   Yes.

Q.   Paragraph 10, has a statement by you that Sargent Doheny staff CPAC investigators with -- in additional to troopers, state police technicians, like a chemist, James Canney, and Corporals John Baliuans and Paul Rich, the Holden Photography Bureau; is that correct?

A.   Yes.

Q.   Corporate John Baliunas was the fingerprint specialist, if you know?

A.   Yes.  Both Baliunas -- he was the fingerprint guy, and Rich was the photographer.

Q.   Are either of those gentleman still alive if you know?

A.   I don't know.

Q.   Okay.

A.   And it's pronounced Baliunas.

Q.   Okay.  What was your review if any by

the chemist James Canney?

A.   None.

Q.   What was review of the work, then, by John Baliunas?

A.   None.

Q.   What was your review of the work if any done by Paul Rich?

A.   None.

Q.   Okay.   Paragraph 11 has a statement by you that the Milford Police Department does not -- do not investigate murders but provide assistance as directed by CPAC investigators; is that correct?

A.   Yes.

Q.   And paragraph 12, you kind of elaborate on that a little, it was standard protocol to contact, to request local law enforcement to accompany CPAC investigators on the interviews; is that correct?

A.   Yes.

Q.   Paragraph 13, your have a -- it states that the Milford Police did not coordinate direct or control the CPAC operations?   Is that a true statement?

Robert Meier
September 06, 2024                                                                    72

A.   Yes, it is.

Q.   Paragraph 14, you sort of break out or specify individual tasks that were assigned by CPAC to have interviews done by state police accompanied by Milford Police on certain matters; is that correct?

A.   Yes.

Q.   And, again, on paragraph 15, I repeat here, that the Milford Police did not coordinate, direct or control the homicide investigation, no authority from CPAC or the Worcester Direct Attorney's office to do so; is that correct?

A.   Yes.

Q.   The paragraph 16, refers to autopsy of the victim of Constance Schiappa.  Was that autopsy, if you know, would that be set up by the Milford Police or the state police?

A.   Well, they contact the medical examiner, and the medical examiner -- or an assistant would inform the state police when they were going to do the autopsy.

Q.   Right.  And in paragraph 16, it concludes the autopsy is directed by the

medical examiners office and Sergeant Doheny; is that a true statement?

A.   Yes.

Q.   To your knowledge?

A.   Yes.  To the extent that Doheny would be advised when they wanted to do that, and I would either -- if there's a reason not having a to be, you know -- usually that was doing a particular case, would want to attend the venue, the autopsy.

Q.   Paragraph 17 talks about some of the things done at the autopsy.  One of which was having the cast made for the bite marks on the victims stomach or legs; is that correct?

A.   Yes.

Q.   And in that paragraph 17, your affidavit reads the Milford Police were not involved in any aspect of the autopsy or the cast of the bite marks; is that a true statement to your knowledge?

A.   Yes.

Q.   Paragraph 18, states that it was reported by Sargent Doheny that it was the

opinion of Dr. Schwartz that the cast had enough detail to allow a casting to be done of a suspect's mouth for comparison; is that your understanding?

A.   Yes.  It was my memory that one of the bite marks was a good subject for the cast. And the other one was rather shallow, and basically consisted of scarring -- or a broken blood vessel that made marks.

Q.   Okay.  Paragraph 19, it's referenced by you, to your understanding that some of the physical evidence was brought from the autopsy or crime scene to the state police chemical lab for evaluation by -- for analysis by Trooper Canney, paragraph 19?

A.   Yes.  And I only know from the report, you know, as I said.

Q.   You didn't interact with James Canney?

A.   No. No, I would -- I had very limited involvement.  At first it was just, you know, to do the apartment with DeFuria and search that with Liberto looking for the items.  And then later, you know, basically assigned to Gary.  So basically Liberto.

Q.  Paragraph 20, on October 3rd, 1979, you arrived at the murder scene with DeFuria, and then Doheny, and Milford detective Liberto looking for missing items from her apartment?

A.  Yes.  And then recovering the money that she may have secreted in the clothing in the apartment.

Q.  Okay.  Paragraph No. 21 of your affidavit makes a mention of what you discussed earlier about a meeting, viewing Michael Giroux in the Veteran's Hospital in West Roxbury?

A.  Yes.

Q.  And, again, with that meeting, that was something that Sargent Doheny requested you to do?

A.  Yes.

Q.  And with regard to that meeting the Massachusetts State Police was involved in that meeting?

A.  Correct.

MR. CAFFREY:  Off the record.

(Discussion off the record.)

Robert Meier
September 06, 2024                                                      76

MR. CAFFREY:  Back on the record.

Q.  Did you, again, I don't think this is reflected in the affidavit, but do you have a memory of a meeting with a David Giroux who was the brother of Michael Giroux who apparently -- strike that.

If you look at paragraph 23, it says that on the day of the murder, that your understanding that Giroux -- or it's your recollection from the statement provided to you by Giroux, that Giroux told you that he had been with his brother on the day of the murder event, and that he gotten home about 9:30 or 10:00, and then he received some clothing from his brother.  Do you see that in paragraph 23?

A.  I do.

Q.  And do you recall if you ever did any follow-up with the brother of Michael Giroux?

A.  I was never instructed to do anything other than take the statement.  And I imagine White had it, and that if there was follow-up, you know, he would have done

RA 250

that.

Q. Okay.

A. And I don't know even know if there was follow-up.

Q. Okay. And then, again, with regard to paragraph No. 25, a reference to Giroux telling you that Sandy Goucher might be able to testify or support his statement that he was present at Lonergan's Bar on the evening of the murder event?

A. My memory is correct, there could be a statement in the file that, you know, she was spoken to and confirmed that he was there.

Q. Okay. But, yourself, don't recall?

A. No, I don't.

Q. Okay. The people, Terhume or Kathy Duncan that lived in the same apartment building that the victim lived in, did you ever have a recollection of speaking with them, was that something you were tasked with?

A. I never spoke with them.

Q. You were never requested to do so.

Paragraph 28 of your affidavit, it indicates that you reviewed in the reports allegations that Mr. Giroux had taken some money from Mrs. Schiappa, the victim, at some point prior to the murder event; do you recall seeing that in the report?

A. Yes.

Q. And do you have any memory of how many weeks or months or years that that gap was?

A. I think it was a matter of weeks. If I'm not mistaken. I'm not sure. But that's my memory.

It wasn't that distant -- it wasn't a distant length of time. And one other thing I didn't know, was there is a witness in there that claims to have seen him coming out of her apartment.

Q. Okay. Okay. Paragraph 30, talks about your interview at the Veteran's Hospital, Giroux told you that he could not stand the sight of blood. Do you know if there was any follow-up on that by either you or anyone at the state police?

A. No, I don't.

Q.   Paragraph 31, talks about there Gary --
Mr. Michael Cifizzari back on February 26th,
1981, being transported from Milford Police
to CPAC unit for questioning?

A.   Yes.

Q.   Okay.  And at that time he had already
-- at that time Michael Cifizzari had
already confessed to Milford Police about
the murder of Constance Schiappa; is that
right?

A.   Yes.  In fact, 31, 32, and 33, are kind
of out of -- out of order.

Q.   Right.

A.   33 should be 31.  And so forth.

Q.   Right.  I see.  Okay.

     Paragraph 32, has a statement here
about the Milford confession made by Michael
Cifizzari.  And according to the statement
here, in paragraph No. 32, it reads, "Earlier
the same morning Michael Cifizzari had
confessed to the murder to the Milford Police
Department, Sergeant Anthony DiGirolamo at
the Milford Police station, while also
implicating Robert Cananzey but not Gary

Robert Meier
September 06, 2024                                                    80

Cifizzari."  Do you see that?

A.  That's my memory.

Q.  Okay.  So your memory was that Gary Cifizzari was not --

A.  Initially.

Q.  -- implicated by whatever Michael Cifizzari was talking to the Milford Police Department about?

A.  Yes.

Q.  And it was only when he, Michael Cifizzari, was questioned by CPAC did Michael Cifizzari implicate Gary Cifizzari?

A.  Yes.

Q.  Okay.  Do you know if the Milford Police Department participated with any type of active questioning of Michael Cifizzari at the CPAC office?

A.  No, not -- my understanding, from what I have read, they didn't.

Q.  Okay.  And so the CPAC investigation or investigation of Michael, Michael Cifizzari at CPAC, that would have been conducted by Sargent Doheny?

A.  Yes.

RA 254

Q.   And not by the Milford police?

A.   Right.

Q.   Okay.  Paragraph 34 makes reference, an indication of reliability to some extent as to what Michael Cifizzari was confessing to, as he would perhaps be the only person to know the details of the murder; do you see that reference?

A.   Yes.

Q.   What is being communicated in that paragraph 84?

A.   Well, it's, although he was rambling and somewhat in coherent, Sargent Doheny felt that he had knowledge of the murder that wasn't public knowledge or anything that had been printed in newspapers at the time.

Q.   Okay.  And it appears that on the morning of that --  strike that.

     It appears that in paragraph 35, there's a reference here to following Doheny's interrogation or questioning of Michael Cifizzari, the CPAC office, a decision was made to place Michael Cifizzari

RA 255

under arrest and bring him to the Milford Courthouse for murder charges?

A. Yes.

Q. That's your understanding?

A. Yes.

Q. Okay. And that didn't happen to Gary Cifizzari that day; is that correct?

A. No, it didn't.

Q. Okay. And that's what is referenced in paragraph 36, that's what is referenced, the events after Michael Cifizzari's arrest; is that correct?

A. Yes.

Q. And according to the paragraph No. 36, you were directed by Sargent Doheny to proceed to Taunton, Massachusetts?

A. Yes. Yes, that was the first interview that I did with Gary. And I had a Milford officer with me, you, know, during those two interviews.

Q. Did you do the questioning, or the Milford Police officer do the questioning?

A. I did the questioning.

Q. And it appears at that time that Gary

Cifizzari was living in Taunton, Massachusetts?

A. What?

Q. Was Gary Cifizzari living in Taunton, Massachusetts, at this time?

A. Yes.

Q. And his cousin was also present?

A. Yes.

Q. And that's Robert Cananzey?

A. Yes.

Q. Okay. There also, apparently in addition to a Milford Police officer present while you were doing the questioning of Gary Cifizzari, there was Fred Simmons of Taunton Police?

A. Yes.

Q. And did Fred Simmons do the questioning or some of it, or just you?

A. No, just me. Simmons would not have known anything about the case. And where we are using their department, as a courtesy, or, he was just standing by.

Q. Okay. And was this in the Taunton Police Department, is that where the

questioning was?

A.   Yes.

Q.   It appears, again, now looking at paragraph No. 37, at the time of that interview, this would be your first interview with Gary Cifizzari, he was saying that he first heard about the murder while at his Aunt Emma Pasqualone's house in Milford?

A.   Yes.

Q.   And that is something that you recall, or do you recall from the reports?

A.   Yes.  What the subsequent -- subsequently said, though, that it was, you know, weeks later, you know, not the same day that her body was found.  And that's what he pretty much insisted on.  And that -- that he would not have stayed over because he was living with his mother at the time.  And he -- it was a dispute or a difference of opinion as to when his mother kicked him out of the house.

         At first the information was not -- it wasn't given to me -- but from what I

understand, was that it was at the time of the homicide that they had been kicked out of the house. And then later she changed when she kicked them out.

Q. Okay. When you say "she," that is the mother of Gary?

A. The mother. Yes. Of the Cifizzaris. Eleanor, was it?

Q. Was it Emma?

A. Something like that. Yeah. I have talked to her on the phone. But I don't think I ever met her in person.

Q. Actually, sorry, Emma was the aunt. Sorry, actually.

A. Yes. Yeah.

Q. Paragraph 38 references what was discussed about the bite mark mold, obtaining court orders for that; do you see that?

A. Yes.

Q. Paragraph 38 has a reference here, Dr. Schwartz advised Murphy that the dental impression of Michael Cifizzari did not match the bite marks of the body of the

victim?

A.  Yes.

Q.  That's your understanding based on your review of the reports?

A.  Yes.

Q.  So after that came back, that the -- that there no match between Michael Cifizzari and the victim, there was a decision made to try and get dental molds of Gary Cifizzari and Robert Cananzey?

A.  Yes.

Q.  And that was set forth in paragraph 39 to your affidavit.

A.  Yes.

Q.  Paragraph 40 states that there apparently discussed between Captain Zullas and you regarding an issue, if, in fact, there was no match between Robert Cananzey's teeth or Gary Cifizzari teeth, that that would cast doubt on Michael Cifizzari's confession; do you see that?

A.  I would have -- I would object to that.

Q.  Okay.

A.  I see what is trying to be said here.

But that's --

Q.  What is being set forth in paragraph 40 of your affidavit?

A.  I never had a direct conversation. There would be a report that would go through him, and it wouldn't be for his approval or anything of that sort.  It would be to, just, to advise him of the progress of the investigation.

It's like, you know, the -- after Gary was found guilty, the letter that is written to close the case, is sent to Zullas.

Q.  Okay.  So Zullas is not actively instructing you what to do with the molds and how they turn out?

A.  No.

Q.  Okay.  Paragraph 41 talks about in March of 1983, that's when you contacted Gary Cifizzari and Robert Cananzey, asking if they would provide you with the molds, correct?

A.  Yes.

Q.  And they agreed?

A.  Yes.

Robert Meier
September 06, 2024                                                        88

Q.   Paragraph 42 indicates that on March 30th, of 1983, you brought Cananzey to Dr. -- a dentist named Juliano in Brockton?

A.   Yes.

Q.   And then about a month later, April of 19883, April 27th, paragraph 43, indicates that you brought Gary to the same dentist, Juliano for denial molds?

A.   Yes.

Q.   Paragraph 44 indicates that you brought Cananzey's mold to Dr. Schwartz in April of 1983.  And you also later in the month of April, you brought Gary Cifizzari's dental molds or impressions to Dr. Schwartz?

A.   Yes.

Q.   We talked earlier in the deposition about your search warrant activity to get the medical records, X-rays, photographs of Gary's teeth; do you recall that testimony, sir?

A.   Yes.

Q.   Add that's set forth in paragraph No. 45, is it not?

A.   Yes.

RA 262

Q.   And that paragraphs 45 indicates that the warrants were served on Gary Cifizzari on May 16th, 1983?

A.   Yes.

Q.   And paragraph 46 indicates that on May 17th, 1983, dental records obtained from the search warrants were given to Dr. Schwartz?

A.   Yes.

Q.   And then later in the month of May, of 1983, May 28th 1983, according to paragraph No. 47, your affidavit recites that you spoke to Gary Cifizzari in May of 28th, 1983, and told him that the teeth, his teeth records matched the bite marks of Mrs. Schiappa?

A.   Yes.

Q.   Was Mr. Cifizzari placed under arrest at that time?

A.   No.

Q.   Was this a phone call or in person?

A.   In person.  And I believe Brad Mullen was with me.  I was instructed to meet with him, and, you know, see if he would speak regarding this new information.

Q.   And what, do you have any recollection of what Mr. Gary Cifizzari's response was to being informed of the match?

A.   That he, you know, he didn't murder his aunt, and that he was not in Milford at the time of her murder.

Q.   Okay.  Was there a formal statement of this event, if you know?

A.   Yes.  There is a statement missing.  It's referred to in the report.  But I could not find it.  And I didn't have a copy of it.  And I believe it's that one.

Q.   Okay.  And the next event in your affidavit is October 1983, for an event that you testified earlier about today going to Florida to interview Dr. Souviron; is that correct?

A.   Yes.

Q.   And as you sit here today, do you have a memory of any other events taking place between the end of May and the October trip to Florida?

A.   Sorry.  Would you...

Q.   Sure.  The affidavit jumps from May of

1983, to October of 1983, between paragraph 47 and paragraph 48; do you see that?

A.  Yes.

Q.  Do you recall any event of significance if any between the end of May and October?

A.  No.

Q.  All right.  It appears, paragraph 48, that you were informed by Dr. Souviron at the time of your meeting that it was his opinion that there is a match, Mrs. Schiappa, and the teeth and the bite marks on the victim; is that correct?

A.  Yes.

Q.  Okay.  Paragraph 49, talks about November of 1983 time frame, that's when Mr. Cifizzari was indicted by the Worcester grand jury; is that correct?

A.  Yes.

Q.  And on that same day of the grand jury indictment, would that be the day that Mr. Gary Cifizzari was placed under arrest?

A.  It would have been probably, if I recall, close.  If not that day.

Q.  Within 48 hours?

A.   Yes.   Probably.

Q.   Paragraph 51, references a statement of Mr. Cifizzari at the time of the arrest that you -- we discussed earlier today, do you recall that?

A.   Yes.

Q.   Okay.   Paragraph 52, that goes back to one of the initial -- some of the initial paragraphs in the affidavit repeating here in paragraph 52, during the Schiappa homicide investigation, CPAC would request assistance if the investigation was needed from the Milford Police, but CPAC would at all times direct and control all aspects of the investigation?

A.   Yes.

Q.   Is that a true statement?

A.   Yes, it is.

Q.   Okay.   And in paragraph 53, at no time during the course of the murder investigation did the Milford Police coordinator direct the investigation, and was not authorized to do so?

A.   Yes.

Q.   Paragraph 54 relates to Michael Giroux, with respect to Michael Giroux not aware of any Milford Police efforts to investigate his role in the murder?

A.   True.  Yes.

Q.   And you are not aware of any instructions by Doheny or CPAC to Milford Police about looking further into Giroux?

A.   I am not.

Q.   Okay.  55, that paragraph states, "I'm not aware of, not aware of any facts to suggest that Michael Giroux was an informant of the Milford Police; is that a true statement, sir?

A.   Yes.

Q.   "And at no time during the course of the murder investigation or after did I come to learn that the Milford Police were aware or had been informed that Michael Giroux was a police informant for any law enforcement agency"?

A.   Correct.

Q.   Okay.  And paragraph 57, not aware of any facts to support the contention that any

law enforcement agency involved in the Schiappa homicide investigation failed to investigate Michael Giroux as a suspect because of his role as a police informant?

A.   True.   And I made -- that I -- when I was initially approached by Nardizzi, I was not, you know, correctly remembering who Giroux was.   And the name was familiar.   And I made the statement to him, that I thought that maybe he was an informant for White.

And then once I reviewed the reports that I had, you know, I knew who Giroux was. And, you know, I never understood that Giroux was an informant for White.

White was keeping him in because of that incident with Giroux going into Schiappa's apartment.

Q.   Right.   Okay.   We are getting there. Paragraph 58, Milford Police did not possess or maintain custody or control of any physical evidence during the murder investigation?

A.   That's true.

Q.   All such evidence was controlled by the

Robert Meier
September 06, 2024                                                                 95

CPAC unit, the Worcester DA's office, or the state police crime lab?

A.  Yes.

Q.  Okay.  And so the Milford Police was not an evidence containing container for the state police, or this?

A.  And we made an evidence locker, and I'm going to guess that the Dr. Schwartz, you know, kept the bite mark evidence in his possession.  And you know, with -- it wasn't in our possession as far as I know.

Q.  Okay.  So during that course of the this Schiappa murder investigation, there were no times where you had to go into the Milford Police Department and say, "Hey, I need this broomstick," or this item from the Milford Police?

A.  Yes.

Q.  Is that fair to say?

A.  True.

Q.  That's a true statement?

A.  Yes, it is.

Q.  And 59 paragraph reads, "The Milford Police did not participle in any aspect of

Robert Meier
September 06, 2024                                                          96

the decision to have Dr. Schwartz attend the autopsy, examine the bite marks on the victim, and make a cast of the bite mark from the victim's stomach"?

A.   Yes.

Q.   Is that true?

A.   Yes.   True.

Q.   Paragraph 60, the Milford Police did not participate in any efforts or decisions to obtain dental impressions from any murder suspect, including Michael Cifizzari, Gary Cifizzari, and Robert Cananzey, to compare with Dr. Schwartz's bite mark impression of the victim?

A.   True.

Q.   And paragraph 61, the Milford Police did not participate in any efforts or decisions to retain any other forensic dental experts, including Richard Souviron, DDS, to compare the impression created by Dr. Schwartz?

A.   True.

Q.   And paragraph 62, not aware of any communication between the Milford Police and

RA 270

Worcester County District Attorney's office,

including ADA Lawrence Murphy, to discuss

any facts or issues related to bite mark

cast and comparisons with the dental

impressions from Michael Cifizzari, Gary

Cifizzari and Robert Cananazey?

A.   True.

Q.   Paragraph 63, the Worcester District

Attorney's office together with the State

Police CPAC unit coordinated, directed, and

controlled the investigation of Connie

Schiappa's homicide?

A.   Try.

Q.   And paragraph 64, the Worcester

District Attorney's office coordinated and

directed and controlled the separate

criminal prosecutions of Michael Cifizzari

and Gary Cifizzari, arising from the murder

of Connie Schiappa?

A.   Yes.

Q.   Two to go.  65, the Worcester District

Attorney's office worked directly with the

State Police CPAC unit to carry out the

investigation?

A.   Yes.

Q.   And 66, all of the decisions related to the Schiappa homicide investigation and the resulting criminal prosecutions of Michael Cifizzari and Gary Cifizzari, were made by the Worcester County District Attorney's office and Mass State Police through its CPAC unit?

A.   True.

Q.   Okay.  End of the affidavit.  Your signature under the pains and penalties of perjury, January 13th, of 2024.  January 13th?

A.   What you should also know, that the day that I read this deposition and initial and signed it, the one that I initialed and signed, is not this one.  This is a copy. We did not make a copy of it at my house. So it's the same deposition, but...

Q.   When you say deposition, you mean the affidavit?

A.   Pardon me.  The affidavit.

Q.   The affidavit.  Okay.  So the same affidavit?

RA 272

Robert Meier
September 06, 2024                                                    99

A.   Yes, it is.  And -- you know, after he left, I found that I did not have a copy of what, you know, I had signed.  But I had a copy of the affidavit.

Q.   Okay.

A.   So I initialed this and signed it so it would be.

Q.   So everything in this exhibit here, part of the collective Exhibit A for today's deposition, everything in this affidavit that you signed here, is dated January 13th, of 2024, that is true and accurate to the best of your knowledge?

A.   Yes.  And I did that because, you know, I wanted a copy of what I actually, you know, would sign.

I didn't have something with my name on it that I signed, so.

Q.   Okay.  All right.  I think we are all set with regards to the affidavit.

Is there anything, looking back, that indicates to you that the Milford Police Department destroyed any evidence, interfered with your investigation, somehow mislead your

RA 273

investigation in any way?

A.   No, they didn't.

Q.   Okay.  Do you have any plans to move from your current address to a new address in the next year?

A.   No plans of mine.  But you never know.

Q.   Okay.  Okay.  All right.

        MR. CAFFREY:  That's all the questions I have for you at the time.  I'm sure Attorney Reyes may have some questions for you.  And I may have some more after he finishes.  But for now, I think I'm done. Thank you for your time.

        CROSS EXAMINATION BY

            MR. LOEVY-REYES

Q.   Mr. Meier, you are aware, are you not, that Michael Giroux's DNA was found from a semen stain on Connie Schiappa's nightgown; are you not?

A.   Yes.

Q.   And that's an indication, would you agree, that Michael Giroux was involved in the murder of Connie Schiappa?

A.   No, not really.

Q.   Let me finish before you answer.

What is your explanation as to how Michael Giroux's DNA from his semen was found on Connie Schiappa's nightgown?

A.   Well, if it's true that he went into her apartment and stole from her before, he could have left the deposit then.

I mean, I have had -- I'm aware of house breaks where, you know, people have defecated in someone else's house after have they have stolen from them, and it's not that uncommon.  So is it possible that -- you cannot say, I don't know that there's any test to show when it was deposited.

Q.   Was there ever any indication that outside of the murder of Connie Schiappa, that her nightgown was ever involved in any crime, including when Michael Giroux was in her apartment?

A.   I have no information on that.

Q.   You do not have any evidence at all that Michael Giroux somehow masturbated on the nightgown before she was murdered?

A.   No.

Q.  So it's conjecture that you are talking about?

A.  Yes.

Q.  So you think that Michael Giroux is innocent of Connie Schiappa's murder?

A.  I don't know.  He could have been there.

Q.  You do know that in the early 90's he was involved in another murder, are you not?

A.  I was not aware of that.

Q.  Oh, you are not aware of that.  If Michael Giroux murdered Connie Schiappa, how do you feel about that?

MR. CAFFREY:  Objection.  He can answer.

A.  Well, we looked at him, but we were never able to show that he knew the Cifizarris, or that he -- or we could never place him at the scene.  That was not my direct task, but that's my understanding of, you know, why, you know, he wasn't charged.

Q.  My question is, how do you feel about it, though?

MR. CAFFREY:  Objection.  You can

answer.

A.   I don't really have any deep feeling, other than he would have escaped, you know, being held accountable.

Q.   He would also have been involved in a later murder that he might not have been involved in if he had been incarcerated; is that correct?

A.   I'm not aware of any of that.

Q.   All right.  You had a conversation with defense counsel during the break that we just had.  What did you tell him about the Connie Schiappa murder investigation?

A.   Well, I told him that there was something that I became aware of that really, in my opinion, didn't have any bearing on what happened.

        But when I -- after Gary had given his dental impression, and he asked me to take him to a residence in Brockton, he took me over to Lou Kraft Avenue and dropped -- and we dropped him off there.

        And I was aware from when I was a young man working for my father, and working

for one of his refrigeration men, that a

Victor DiGirolamo lived on Lou Kraft Avenue.

Q.   Did you say anything else to them about

this case?

A.   No.

Q.   Now you just testified, did you not,

that there was never any known connection

that was found by police between Gary

Cifizaari and Michael Giroux; is that

correct?

A.   To my knowledge, there was no

connection between them.

Q.   Okay.

A.   Although, that was never -- I was never

tasked to do.

Q.   Right.  But you have never seen a

police report that said that Michael Giroux

and Gary Cifizzari had any connection with

each other?

A.   True.

Q.   And the same would be true of Michael

Cifizzari and Michael Giroux; is that

correct?

A.   Yes.

Q.   Okay.  Now, before the break you testified that, in your opinion, no officer from the Milford Police Department withheld any evidence regarding this investigation, but you have no personal knowledge of what all the police officers were doing about this case, do you?

A.   No.

Q.   What did you review, if anything, to prepare for today's deposition?

A.   Everything that is in this pile of papers.

Q.   Everything that has been marked as Exhibit A, correct?

A.   Yes.

Q.   And did you meet with anybody to prepare for today's deposition?

A.   No.

Q.   Did you meet with defense counsel before the deposition started this morning?

A.   Yes, we did talk.

Q.   What did he say to you, and what did you say to him.

A.   It was just general about, you know,

what would be going on today, what the procedures were.  And nothing directly about the case.

Q.  And did you tell him anything at all about the substance of the Connie Schiappa murder investigation?

A.  No.

Q.  Do you have any personal knowledge of the interview that you conducted with Michael Giroux.  Let me rephrase.  As we sit here today, do you have a present memory of the interview that you conducted with Michael Giroux?

A.  Barely.

Q.  Okay.  And when you say "barely," describe what you remember.

A.  I remember going there and I remember talking to him.  And I remember, you know, other people were present.  And that's about it.

Q.  Do you remember the substance of what he said to you?

A.  From the statement that I took from him, yeah, I do.

Q.  Okay.

A.  In the sense that, you know, he denied stealing from her.  He put himself close to where she was the night before -- well, yeah, the night before her body was discovered.  You know, she was probably murdered on the 28th, and discovered on the 29th.  On the 28th, he was at a bar up the street from where her home is.

Q.  And as we sit here today, do you have a present memory of him telling you that, or is that based on your report?

A.  From my report.

Q.  Okay.  And that's why you write police reports, correct?

A.  That's why I write notes to myself.

Q.  Right.  And also, in particular, you were trained as a police officer that when you -- when you obtain information, you write that in a detailed report so that you can remember it later?

A.  Yes.

Q.  And one of the reasons why is, perhaps 45 years later, you are sitting in a

RA 281

deposition, and after an event happened, and that gives you information about what you did?

A.   Yes.

Q.   And is it fair to say that when you were trained to be a police officer, it was impressed upon you the importance of writing good police reports so that the who, what, when, where, and why of your investigation, is documented?

A.   Yes.

Q.   And did you receive that training in the police academy?

A.   No.

Q.   Okay.  When did you receive that training?

A.   From experience.  And through my own -- the way I look at things.  The way I remember things.  You know, I try and put things in chronological order so that they make sense.

     It's like when I worked for the insurance company, and one of the superiors over me said, "We like the way you write your

reports, don't change them."

They would never say that to me at the state police, they would not even know the difference.

Q.   Did you ever receive any training regarding how to interrogate a suspect?

A.   Not specifically, no.

Q.   Okay.  And when you say not specifically, what do you mean?

A.   I mean that no one ever told me how to, you know, conduct a statement.

But what I came to understand is, that there is the carrot and the stick.  And some police officers use the stick all the time, and it doesn't work.

I use the carrot.  I'm polite to people.  I try to -- I don't belittle them.  And I try to generally you know have a conversation with them.

And I don't go after them and hammer them to try and say something.  You know, words that I'm putting in their mouth.

Q.   Fair enough.  You just testified a little bit ago that Michael Giroux put

himself near the scene of the murder on the night of -- the night before her body was discovered. And I am going to show you what was previously marked as Exhibit No. 15. I will show you, and I ask if you have ever seen that before?

A.  No, I haven't.

Q.  All right. I represent to you that this was a map that was drawn up about the underlying post conviction case that traces the route that Michael Giroux told police officers that he went the night of the murder of Connie Schiappa.

And looking at that map, does that seem like an accurate statement that this is what he told you that his route was?

A.  You know, I didn't know when he was telling me where he was exactly where these places were. And I knew that, you know, when White saw the report he would, because he lives in Milford.

And he would know that. But I knew that Lonergan's Bar was very close to where she was.

Q.  Okay.  And do you also know he told you that he had gone through the parking lot; is that right?

A.  Yes.  And I didn't know exactly where Stone's, you know, parking lot was.

Q.  Sure.  And you testified earlier that when you were transferred to CPAC in Worcester, that that was the position that you wanted.  Why did you want to have that position?

A.  Because I knew that I would be doing more police work there.  I would be doing investigations for the DA, and homicide investigations.  And major crime was more or less filling in for members -- other CPAC's, when they could not be present to do something, or to, you know, be an extra chess piece in a gaming raid, or a drug raid, or something of that sort.

And I wanted -- I did the police work as a uniform trooper.  I did.  I had a number of fairly decent arrests just sitting and watching and profiling, so to speak, you know.  Picking out good vehicles to stop.

I knew that you can drive around all night and not see anything.  But if you sit and watch, you can usually pick something out that is worth stopping.

And you can usually, you can come up with a good reason, a valid reason for stopping it.

Q.  Okay.  And Worcester in particular?

A.  Plus I lived in Grafton.

Q.  Got it.  Okay.  And how fax were you from Milford before October of 1979?

A.  Not that much.  It was in our patrol area.  But then again, we don't patrol the town.  We would, you know, drive through it.

And in fact, our -- the court and a section of 495, that would be in Milford, you know.  The Milford court covered that section.  So, you know, I was familiar with the court personnel.  And just in that court.

Q.  Got it.  And can you define your role in Connie Schiappa's murder investigation?

A.  Well, initially I was used to search her apartment.  And then after the case broke, when Michael made those statements to

RA 286

Milford Police, I became more involved.

When I was given the specific task of trying to get Michael and Cananzey to submit voluntarily, you know, for dental records.

Q.  Okay.  And Gary Cifizzari, did he voluntarily submit his dental records, correct?

A.  Yes, he did.

Q.  And in fact he volunteered who he had seen as a dentist?

A.  Yes.

Q.  You just testified about Michael Cifizzari making a statement to the Milford Police Department.  Before the officers of the Milford Police Department interrogated Michael Cifizzari, do you know if anybody from CPAC had directed them to do so?

A.  No.

Q.  Do you know if the officers took it upon themselves to interrogate Michael Cifizzari?

A.  I would suspect they did.

Q.  Why do suspect they did?

A.  Because I think that their relationship

RA 287

between DiGirolamo and the Cifizzaris -- and I'm only guessing at this, and I'm guessing at it because as I explained to you before, my father had evicted DiGirolamo, one of his refrigeration men.  And I had been with him over on Kraft Avenue, to his home there.

And that's where I ended up taking Gary after the dental impression was made. And I assumed there was a relationship between Victor DiGirolamo and Tony DiGirolamo.  But I don't know what that was.

Q.  Do you know if the police officer DiGirolamo or Chianese told anybody in the Massachusetts State Police said they had a relationship with Michael Cifizzari?

A.  I don't know that.

Q.  You did become aware at some point though, before the interrogation, that Michael Cifizzari had been found on the porch of a woman's house in Milford eating food out of a dog bowl, correct?

A.  Yes.  I heard that.

Q.  Did you also hear that he was -- had suffered from mental illness at the time,

including schizophrenia?

A.   I didn't know about the schizophrenia in particular.  But I knew that he had mental issues.  And he was a drug user.

Q.   Okay.  And did you also know that Michael Cifizzari in 1981, when he was interrogated, had an IQ somewhere in the 70's?

A.   No, I didn't.

Q.   Did you know that Gary Cifizzari, when you dealt with him in 1983, had been diagnosed with an IQ in the 70's?

A.   I didn't have -- I didn't know it specifically, but I'm not surprised.

Q.   When you say you are not surprised, what do you mean?

A.   Because of my interactions with him. You know, he is not an extremely bright person.

Q.   Sure.  And I don't know if it's a PC word, but would you, in your interactions with Gary Cifizzari, say that Gary Cifizzari appeared slow to you?

A.   Yes.

Q.   When you were doing this investigation before Gary Cifizzari was convicted, did anybody ever tell you about a police interview with David Giroux?

A.   No.

Q.   Did you ever hear that an officer Vinny Liberto was told by David Giroux on the night of the murder, Michael Giroux showed up with at his house with blood on his clothing?

A.   Never that heard.

MR. CAFFREY:  Objection.

Q.   Did you ever hear any officer that it was told by David Giroux that the night of the murder Michael Giroux showed up at his house with blood on his clothing?

A.   Never heard that.  In fact I never knew the name David.

Q.   Got it.  And nobody asked you to talk to David; is that correct?

A.   No.

Q.   Okay.  By the way, did you know Vinny Liberto, I think you called him Vinny before?

A.   I think this case was the first time that I met him.  And I became friendly with him.  We had a ride together to a Pennsylvania Lewisberg Penitentiary to return someone to Massachusetts, so I -- I did spend -- spent quite a bit of time with him.  Talked with him quite a bit and was really friendly with him.  I liked Vinny.

Q.   And what you just described as going to Pennsylvania, was that before or after this involvement with this?

A.   It would have been after.

Q.   So the first time that you met him, though, was this investigation?

A.   I believe so.

Q.   Did you ever talk to Mr. Liberto about his involvement in this investigation?

A.   No.

Q.   Did you ever talk -- did you know Detective Small from the Milford Police Department?

A.   I met him through this investigation.

Q.   Did you ever talk to him about his involvement in this investigation?

A.    No.

Q.    Did you ever talk to Officer DiGirolamo about his involvement in the Connie Schiappa investigation?

A.    No, I didn't.

Q.    John Chianese, was he involved in the Connie Schiappa investigation?

A.    Well, other than the fact that he was with me during the first interview of Gary. And even then, I don't recall ever discussing -- I just assumed that he was someone that was handy that would go with me that they assigned.  I didn't pick him out.

Q.    Is it fair to say that there were a number of Massachusetts State Police officers who were involved in some way in the Connie Schiappa murder investigation?

A.    Yes.

Q.    And also is it fair to say that there were a number of Milford police officers that were involved in some way in the Connie Schiappa murder investigation?

A.    Yes.

        MR. CAFFREY:   Objection.

Robert Meier
September 06, 2024                                                                119

A.   I know that Sergeant Conley was one of the responding officers.  I investigated his murder.

Q.   He was with Milford?

A.   Yes.

Q.   I see.  He got murdered later?

A.   Yes.

Q.   When did he get murdered?

A.   It would have been I believe 1982.  He was working a detail in uniform at a bank on 140, and there was group of -- or two guys that had become friendly with one of the tellers in the bank.  And then she was able to tell them about a large amount of money that would be hand carried back after an armed car made a delivery to the bank across the street.

     And Conley was coming back, turned out to be a bag full of pennies, when they swopped in and drew.  And he drew.  And they shot him.  Killed him.

Q.   Wow.  You would agree, would you not, that Massachusetts State Police officers are not allowed to violate the Constitution?

RA 293

A.   Yes.

Q.   You would also agree that Milford police officers were not allowed to violate the Constitution?

A.   Yes.

Q.   And there's nothing about any statute about who is responsible for a murder investigation that would authorize any officer to violate the Constitution, is there?

A.   Not that I know of.

Q.   You testified earlier that you talked to Gary and Michael Cifizzari's mother on the telephone?

A.   Yes.

Q.   Did you draft a report about that?

A.   No.

Q.   Why not?

A.   Well, I made a note that, you know, I called her and when.  I think that's in my report.

Q.   Okay.  What did she tell you during that conversation?

A.   Well, she talked about Michael and, you

Robert Meier
September 06, 2024                                                                   121

know, that the fact that he had been

charged.  And from my point of view at the

time, the information he had provided, that

Sergeant Doheny thought only if someone had

been involved would know.

        And I thought that, you know, that

would go up to a jury.  And I didn't think

that there was any, you know, definitive

proof that, you know, could convict him.  And

I thought that, you know, if Michael, as he

claimed, wasn't there, and, you know, didn't

do it and so forth, consented to having a

dental impression made.  And if it was not

his dental impression that were those bite

marks, then a lot of what Michael said would

be made up on his part.

Q.  Do you recall anything that Michael and

Gary Cifizzari's mother told you during the

telephone conversation?

A.  No, I don't.

Q.  You were never present for any

statement that Michael Cifizzari gave, were

you?

A.  No, I wasn't.

Q.  And as far as you know, John Doheny didn't talk to Michael Cifizzari until after he was interrogated by officers from the police department; is that correct?

MR. CAFFREY:  Joe --

A.  -- it's Doheny.

Q.  Yes.

A.  But my -- my understanding is that Milford got some cursory statements from Michael, and immediately called Tom White. Who came to the Milford police, Trooper White.  And this was enough to bring Michael up to where, you know, our Worcester office, 2833 Main Street, for Sergeant Doheny to continue the questioning.

Q.  Who told you that the statement Milford police got from Michael Cifizzari were cursory?

A.  It was my impression from what I read in the report -- reports of him.  Putting himself in the apartment, a place he had been before.  And his -- it just seemed like there wasn't a lot of detail about, you know, what had transpired.

Q.  Did you ever see the handwritten statement written by Milford police officers when they and Chianese were alone with Michael Cifizzari in the interrogation?

A.  No. Never part of the file, as far as I know.

Q.  And, in fact, isn't it true that those statements didn't see the light of day until the trial of Michael Cifizzari?

A.  That, I don't know.  In fact, I was never aware that there were statements.

Q.  That's right.  And you were not present at Michael Cifizzari's trial?

A.  No.

Q.  You didn't have any personal knowledge about who the Milford Police Department officers used as confidential informants in 1979, did you?

A.  No, I didn't.

Q.  You had testified earlier that Doheny was the lead investigator.  What do you base that on?

A.  Well, Joe is an experienced investigator.  I don't recall ever having a

meeting that involved directing, specifically directing the investigation. And he left pretty much how things would be done up to the sergeant. And I know that, you know, we met with the DA. I met with the DA a number -- or Larry Murphy a number of times to discuss, you know, what, you know, he was looking for from me.

Q. Okay. And would it be fair to say that Doheny also gave you directions about what he was asking you to do?

A. Yes.

Q. You said that you first became involved in the investigation by going to search at the crime scene, there was some allegations about missing handbags. Do you know where that information came from?

A. From neighbors who knew her. I think it's in the statements.

Q. Okay.

A. That it was a particular bag that they remember her having. That we, you know, we were not finding. And might very well have been the one that was found, you know, a

time later.

Q.  Right.  The one that was found in the yard?

A.  Yes.

Q.  Got it.  And who was it that told you about the missing handbags?

A.  Well, the day of the search, it would have been, you know, Lieutenant DeFuria. That's what we are looking for.

Q.  You testified White was keyed in on Mike Giroux as a suspect?

A.  Yes.

Q.  What was White's responsibility in the Connie Schiappa murder investigation?

A.  Well, he was -- he was a senior trooper in the office.  He had been in the office a lot longer than I had.

He lived in Milford.  He had relationships that I didn't have with some of the Milford officers, or at least knew them, to talk to them.  Where I didn't so much. And I had been in the office just about a year when this happened.

Q.  Sure.  Did you ever hear -- his first

name is Tom, correct?

A. Yes.

Q. Did you ever hear any things that Tom White ever engaged in, any misconduct during the investigation?

A. Not specifically. No.

Q. And if Tom White was keyed in on Michael Giroux as a suspect, if he had received information that Michael Giroux showed up with blood on his clothes, do you think he would have taken the next step that the clothes are recovered and tested?

A. I have no doubt in a heartbeat he would have done that. Even if, and I don't know this, if he had some relationship with Giroux, he would never let him get away with that.

Q. In fact, he was the one that directed you to go to Giroux?

A. Yes.

Q. Quick question. You indicated that the morning that you talked to Giroux, Tom White also talked to him. Did you ever see a police report about that?

A.   No, I didn't.

Q.   And if you had received information that David Giroux said that the brother had showed up with blood on his clothes the night of the murder, you would have been sure that the Massachusetts State Police would have tested that clothing?

A.   Absolutely.

Q.   When you met with Michael Giroux in the VA Hospital, did you ask him why he was in there?

A.   I don't believe that I did.  But I understood it, it had to be a -- some sort of a mental issue that, you know, related to his military service.

Q.   Okay.  He didn't seem to be physically injured at all to you, did he?

A.   No.

Q.   When you took Michael Giroux's statement, that would have been important for you to note if there was a report that Michael Giroux had been seen with blood on his clothing the night of the murder?

A.   That would have been helpful.

Q.   That would have been key evidence, correct?

A.   Yes.  Is there such a report?

Q.   I'm sorry, I have to ask the questions.

Do you know if anybody from the Massachusetts Police Department talked to Sandy Goucher, the woman who Giroux said he saw at the bar?

A.   I believe I did see that in the file. Because it was confirmed that she saw him, or they were -- exchanged greetings as they passed each other.  He claimed he was too drunk to carry on a conversation with anyone.

Q.   Do you know if anybody, any law enforcement agency, did a survey of the neighborhood around the murder to see if anybody had seen Michael Giroux in the vicinity that night?

A.   There did -- I know I was not part of it.  But I can tell from the reports and statements, they interviewed neighbors, and in particular there had been someone who had seen three people outside of her apartment

that night.  And they were never identified.

And I think it was Gary Trahume, the neighbor coming back looking in Schiappa's window seeing someone with an afro-shaped haircut that he could not identify, and didn't -- made a statement he did not belong there.  And I'm aware that Tom White, you know, thought he might be identifying Giroux. But I don't know that Giroux had that type of haircut.

I don't remember that from when I talked to him.

Q.  Sure.  And a little more specifically, though, do you know if anybody had gone, like, just down the street of where the murder happened, knocked on doors and said, hey, did you see anybody that night?

A.  I think they did.

Q.  Okay.

A.  But I don't know.

Q.  Have you ever seen a report that shows that?

A.  There are a bunch of, like, all those interviews where, you know, a lot of them

Robert Meier
September 06, 2024                                                          130

were people, you know, in the neighborhood
where officer so and on, or trooper so and
so, went with officer so and on, yes, a lot
of them, have you seen the neighbors.  As I
understand it.

Q.   Those are the ones that are reported?

A.   Yes.

Q.   By the way, have you ever been trained
in forensic dentistry?

A.   No.

Q.   Have you followed any kind of science
of forensic dentistry?

A.   Not really.

Q.   Are you aware that under current
understanding of forensic dentistry, bite
marks cannot be used to inculpate, only used
to exclude?

A.   I didn't know that.

        Something, you know, you have not
asked, maybe you should know, is that when
Dr. Schwartz, you know, had made his
comparison, he showed me using that acetate
sheet, you know, how he made his comparison.

        In other words, by, you know, taking

RA 304

a marker and drawing lines after, you know, after the acetate sheet was laid over the pictures, the bite mark, and then laying the dental impression on top of it to show how they matched, you know.  So I did see that.

Q.  Did you know that one of the two forensic dentists you have discussed, has withdrawn his opinion about there being a match?

A.  Souviron from Florida.

Q.  Yes.

A.  I was surprised.  Yes, I heard that.

Q.  And I might have asked you, and sorry, I apologize, did you ever have a conversation with Vinny Liberto about the Schiappa murder investigation?

A.  Not that I can think.  I didn't, you know, really know him that well at that point in time.

Q.  It was only after you did that trip down to Pennsylvania?

A.  Yes.  And maybe before, like I -- I'm not sure, you know, what -- the relationship in time when that was.  With the Walter --

Sergeant Walter Conley homicide, I met, you know, a lot more of the Worcester police during that.

Q.   Sure.  Do you know before officers DiGirolamo and Chianese interrogated Michael Cifizzari, if anybody from the Massachusetts State Police Department directed them to do so?

A.   No, I don't.

Q.   Have you ever seen a report to that effect?

A.   No, I haven't.

Q.   In your affidavit, and in paragraph 14, you list out a number of interviews that were conducted by officers and who conducted them.  Would it be fair to say that your sole knowledge about that, is based upon the reports themselves?

A.   Yes.

Q.   Okay.

A.   And if you ask -- asked me who interviewed who, I cannot -- could not tell you.  But that's in the reports.

Q.   Okay.

A.   That's from the reports.

Q.   If somebody had recovered Michael Giroux's clothing to analyze it, there would be a police report of that, would there not?

A.   Yes, there would be.

Q.   And the Massachusetts State Police Department would make sure that there was?

A.   Yes.

Q.   And the Massachusetts State Police have their own forensic unit?

A.   It had -- not really.  What it had at the time, was we had a crime lab, and a state police chemist.  And you were lucky if you can get them out to a scene.

     And after I came into the office, I noticed that there wasn't really any good way of collecting evidence.  And I made up little evidence kits for everybody, you know, which consisted basically of grocery bags and, you know, plastic bags, if they were in existence in time, you know, tags and so forth.  To identify who took it, where it came from and so forth.

Q.   Sure.  When did you make up those kits?

RA 307

A.   Probably about the time that I started you know being assigned to homicide cases.

Q.   Which was?

A.   Probably right after that.  Right after this case.

Q.   Okay.  But there was Massachusetts State Police, had a way to do blood analysis; is that correct?

A.   They don't tell you much.  They could tell you a blood type.

Q.   Right.

A.   And that was about it.

Q.   Okay.

A.   And I had some vomit on one occasion, that I wanted to see what they could do with it.  And they would not even take it.

Q.   When you talked to Michael Giroux, you did know that his sister and brother-in-law lived in the same building as Connie Schiappa?

A.   No, I didn't.

Q.   Okay.  And did anybody ever tell you that?

A.   No. I wasn't under the impression that

he was friends with the Trehumes and Duncans and that was his connection to the building.

Q. Kathy Duncan was the sister of Michael Giroux's wife, were you aware of that?

A. No, I wasn't.

Q. Do you have any knowledge at all as to whether Michael Giroux was an informant for any law enforcement agency?

A. I do not.

Q. Outside of Michael Giroux, who else did you talk to as part of your involvement in Connie Schiappa's murder investigation?

A. Other than Gary's sister -- sorry, no one that I can -- although -- no one.

Q. No one?

A. Well, reconsidering that. I would have talked to Cananzey and Gary Cifizzari's mother. But I don't think I ever had a conversation with Michael.

Q. And during the entire time that you had talked to Gary Cifizzari, including after telling him that his bite marks purportedly matched those on the victim, he never fled from the area, did he?

Robert Meier
September 06, 2024                                                          136

A.   No, he didn't.

Q.   And in fact you told him in May of 1983, and he was not arrested until November of 1983, correct?

A.   Yes.

Q.   And during those months, he did not try to leave the area?

A.   No.

Q.   By the way, why the delay in arresting Gary Cifizzari after the May 31st, 1983, bite mark evidence?

A.   I don't know.

Q.   Okay.  You were not part of that decision?

A.   No.

Q.   Okay.  We would have to ask the DA?

A.   Yes.

Q.   Is Larry Murphy still alive?

A.   Yes.

Q.   Sorry if I asked you this already, sometimes I get ahead of myself and move quickly.  Do you know if anybody within CPAC authorized those two Milford police officers to interrogate Michael Cifizzari?

A.   No, they didn't.  In my opinion, it was

RA 310

just spontaneous.  He showed up, and they asked.  And as soon as he said something that they thought was noteworthy, they got Tom White involved and Sergeant Doheny.

Q.  You would agree, would you not, that no officers from the Massachusetts State Police would have authorized any other officer to not document a report that Michael Giroux had blood on him on the night of the murder?

A.  That's inconceivable.  I have only had one investigation in my career where a police department or a -- a police officer tried to cover up a homicide.  And I certainly would not go along with it.

Q.  And you would trust, based on your work with them, your fellow Mass State Police officers not to do that, too, correct?

A.  Yes.

Q.  You never worked for the Milford Police Department did you?

A.  No, I didn't.

Q.  And you have no knowledge at all regarding their policy or procedures, do you?

MR. CAFFREY:  Objection.

A.  No, I don't.  If I may add something.

Q.  Yeah.

A.  I don't know if I added this when Joe was talking to me.  I think I did.  That during the time that I was in college, summers, I worked for the Barnstable Police on the Cape.

Q.  Okay.

A.  Did I say that?

Q.  Did White or Holmes ever tell you what Michael Giroux told them the morning that you had interviewed Giroux?

A.  No, they didn't.  And I didn't know until I talked to Giroux, and he made that statement that they had.

Q.  I see.

A.  I just knew that White was interested in him.  And White is not known for sharing information.

Q.  And when you say that you knew that White was interested in him, what do you base that on?

A.  His insistence that Giroux, you know,

Robert Meier
September 06, 2024                                                                  139

he felt was a strong suspect.

Q.  Okay.

A.  And I think it boiled down to the allegation of theft of money from her apartment, you know, some weeks earlier.

Q.  Sure.  And do you know what Tom White's role was in the investigation?

A.  Well, Tom lived in the Milford area. He was senior in the office.  He had worked these types of investigation before.

And, you know, he was being utilized, you know, more than I was at the beginning. This is the -- really the first time that I am involved that I can remember in a homicide investigation.

Q.  Would it be fair to say that Tom White had a greater role in the Connie Schiappa murder investigation than you did?

A.  Yes.  He would have known more about it than I would have.

Q.  Okay.

A.  And my role was minimal.  Until I was given that assignment.  And then in order to write my report, I had to read Doheny's

RA 313

report and statements to bring myself up to speed to get the content of what was going on.

Q. You are aware that Michael Cifizzari's dental impression did not match any of the wounds on the victim; is that correct?

A. Yes.

Q. You are also aware that the statement that he gave to the Milford police officers, that he did bite the victim?

A. Yes.

Q. Was there ever any discussion that you heard that the physical evidence did not match his statement?

A. No discussions. But I reached that conclusion. And that was one of the reasons that I approached Gary's mother, because there were those inconsistencies. And they may have convicted him based on what they had, but, you know, they didn't have that definitive identification of the bite mark. At least what I thought was definitive.

Q. Sure.

        (Recess taken.)

Q.  Did anybody ever tell you how Gary
Cifizzari's name was first raised in the
Connie Schiappa investigation?

A.  I assumed that it was the statement
that Michael made.

Q.  All right.  But you don't have personal
knowledge do you?

A.  I don't.

Q.  I'm just going to show you a picture of
a previous marked exhibit as Cifizzari
deposition Exhibit No. 38.  I represent to
you this is Michael Cifizzari.  And I ask
you to look at that, and tell me if you
recall having any dealings with him?

A.  I didn't.  I see a resemblance, you
know, with Gary.  But I never talked to him.

Q.  Okay.  Just going to go through a few
additional exhibits I have some questions
about.

    I'm showing you what was marked
Cifizzari deposition Exhibit No. 10
previously.  My only question is, there's no
name on the investigator on this, and I ask
if you know who took this statement from Mary

Ellen Halkett.

A.   There's a notation down here, not really familiar with.  It looks like Worcester DA.

Q.   That's from this litigation, nothing you need to worry about.  It's kind of how we number things to keep track of them for this case.

A.   I have no idea.

Q.   Okay.

A.   I have never seen it before.  And I don't know who took it.  And I don't think it's in the file documents of the statements that I had.

Q.   Sure.

A.   And a lot of those, you know, I got, you know, from Joe's office.  And I didn't have them previously.  I had my report, and stuff I did.

Q.   Right.  Those are the things that you have personal knowledge about?

A.   Right.  And I had Doheny's report.  Because that was part of what I did.

Q.   Right.  And same question for Cifizzari

RA 316

deposition Exhibit 40, which relates to Ronald and Dianne -- first of all, do you recognize the handwriting or the printing on that?

A.  I don't know.  You know, what I do know, sometimes police officers will throw someone a sheet of paper, write your statement, and then that may have been what happened.

Q.  Sure.  You just don't have knowledge of it either way?

A.  No, I don't.

Q.  Got it.  All right.  And same question regarding handwriting for Cifizzari deposition Exhibit No. 16.  Which I represent to you was a statement by Michael Giroux on September 28th, 1979.  Do you know whose handwriting that is?

A.  I don't recognize it.  And I have never seen it before.

Q.  Got it.  Do you know who took this statement?

A.  If it was Tom White, he would have at least had -- I mean, he had two secretaries

in the office who could type up a statement.

Q. And you have seen other statement by Tom White in this case, in which there's a typed statement and then his name appears, correct?

A. Yes.

Q. Was that his practice at the time?

A. Well, yes if it was -- - it was information that he took that he was trying to pass on to the lead investigator, he would have, he would have written out the statement and had it typed up, you know. And it would have become part of the file.

Q. And I noticed that when Tom White had statements he took, also in addition to it being typed, the name is on it, the date on it, and the location is on it?

A. Yes.

Q. And were those the things that were the standard practice of the Massachusetts State Police at the time?

A. I would not say all of -- I mean, I have seen troopers, you know, just uniform troopers, just throw a pad of paper and tell

RA 318

someone to write out what happened.  You know, "Write out what happened."  So -- but in our office, you know, if we took statements, they wanted that in writing. And then they wanted to know who took it and when.  You know.  That's how we treated it.

Q.  Sure.  And it looks like they were typed up as well in your office?

A.  Yes.

Q.  I'm going to show you what was been marked as Cifizzari deposition Exhibit No. 31, which I represent to you is from November of 1983.  And it's an evaluation of Gary Cifizzari.

And the second paragraph states he has an IQ of 75.  I think that you testified earlier that doesn't surprise you, does it?

A.  No.

Q.  Okay.  And when you first -- let me rephrase it.

When Gary Cifizzari was first questioned by anybody in this case, it was almost a year and a half after the murder, correct?

A.  Yes.  Yeah.  1981.  Yeah.

Q.  Okay.

MR. LOEVY-REYES:  Those are all the questions I have.

REDIRECT EXAMINATION BY MR. CAFFREY

Q.  Just a few questions for you, sir.

In terms of -- and trying not to repeat myself from what I already asked you this morning, just a few questions to make it clear as to a few matters.

Joseph Doheny, lead investigator, now deceased, correct?

A.  Yes.

Q.  Thomas White, one of the investigators at CPAC on this subject murder investigation, also deceased?

A.  Yes.  I was actually at his funeral.

Q.  Okay.  You were asked about just a recorded statement, or statements of a Mary Ellen Halkett.  I know this is tough to read, but apparently at the time she had had a spouse, Donald Halkett.  There was no indication on the statement that you were shown of Mary Ellen Halkett as to who took

the statement, right?
A. Right.
Q. And looking at this statement, which I believe bears the same date of September 30th, 1979, of Donald Halkett, was that -- does that indicate to you who took the statements?
A. I can see "sergeant" down here.
Q. At the top. Do you see --
A. I cannot make out --
Q. Do you see, "TPR Thomas White."
A. Is that --
Q. Is he referenced in the second line from the top?
A. He wouldn't be a sergeant, no. He wasn't a -- I see Tom White. Yes. Yeah. And in the presence of sergeant -- probably a Milford -- I can see a "Milford" -- but I cannot see who the sergeant is.
Q. Right. But before the Milford reference there's a reference of a --
A. Tom White.
Q. Tom White is taking the statement, if you read that, correct?

A.   Yes.

MR. CAFFREY:   Let's mark these as the next two exhibits, please.

(Exhibits B and Exhibit C

marked for identification.)

Q.   Now, there were some questions asked to you about if the state police received information that -- when Gary Giroux arrived at his house -- strike that.

You were asked some questions about when Michael Giroux returned on the evening of the murder to his brother's house or apartment, and had blood on his clothing; do remember being asked about that a few moments ago?

A.   Yes, I do.

Q.   If that were the case, that the state police received information that there was blood on Michael Giroux's clothing, based on your experience with CPAC, would it be the state police that would be doing the blood testing, or the Milford?

A.   It would be the state police.  And if they knew there was blood on his clothing,

and they had credible information, you know, from a credible person that they could put that in an affidavit, they would get the search warrant and take all his clothing, looking for that bloody clothing.

Q.   So based on your knowledge and experience working with CPAC and the state police, they would not delegate that blood testing to the Milford Police?

A.   No. Milford would have no way of doing that.  The state police lab could.

And back at that time, it would be a blood type.  That was about all they could tell you from blood.

Q.   Okay.

MR. CAFFREY:  All set.  All right. That's all the questions that I have for you. Again, thank you.

MR. LOEVY-REYES:  I have nothing at this point.

(Whereupon the deposition

was concluded at 4:20 p.m.)

RA 323

SIGNATURE PAGE


I, ROBERT C. MEIER, do hereby certify that I have read the above and foregoing deposition, and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.



---------------------------------
ROBERT C. MEIER

Robert Meier
September 06, 2024                                                            151

                              ERRATA SHEET


        Page    Line        Correction

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

        ---     ---         ----------------------------------------

COMMONWEALTH OF MASSACHUSETTS


I, Lisa Lee Gross, Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 6th day of September, the person hereinbefore named, who was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth of their knowledge concerning the matters in the controversy in this cause; and that they were thereupon examined upon their oath, and their examination reduced to typewriting under my direction, and that the deposition is a true record of the testimony given by the deponent.

I further certify I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action whereby this deposition was taken; and further, I am not a relative or employee by the parties hereto, nor financially interested in this action.


In Witness Whereof, I have hereunto set my hand and affixed my seal this 20th day of September, 2024.




*Lisa L. Gross*
_____
Notary Public
My commission expires:
April 13, 2028

# EXHIBIT 3.

RCM

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GARY CIFIZZARI,

        Plaintiff,

        v.

TOWN OF MILFORD, FORMER
MILFORD POLICE OFFICERS VINCENT
LIBERTO, JOHN CHIANESE, FORMER
MILFORD POLICE SGT'S ANTHONY
DIGIROLAMO AND DONALD SMALL,
AS WELL AS-YET UNKNOWN POLICE
OFFICERS AND ADDITIONAL AS-YET
UNKNOWN POLICE SUPERVISORS,
HERIN REFERRED TO AS JOHN AND
JANE DOES 1-20,

        Defendants.

C.A. NO. 4:22-cv-40139-MRG

## AFFIDAVIT OF ROBERT C. MEIER

I, Robert C. Meier, on oath hereby depose and state as follows on personal knowledge and under the pains and penalties of perjury:

1.     I am 77 years old, and a resident of Plymouth, Massachusetts.

2.     I served as a Trooper with the Massachusetts State Police ("MSP") from 1971 to 1999, at which time I retired as a Sergeant.

3.     Starting in March 1978, I was assigned as an investigator to the major crime unit of the MA State Police Bureau of Investigative Services. I was subsequently assigned as an investigator to the Crime Prevention and Control ("CPAC") unit of the MA State Police which was located at 283 Main Street in Worcester, MA.

4.     In coordination with the Worcester County District Attorney's Office, CPAC investigates homicides and other serious crimes in Worcester County. The Worcester County District Attorney only allowed one municipal police department in the county to investigate

1

RA 328

*RCm*

homicide cases, and that department was the City of Worcester, whose police department was large enough to have a homicide unit. The Worcester District Attorney's Office directed the Worcester Police Department's homicide investigations as it did with the Massachusetts State Police CPAC unit.

5.      Beginning on October 3, 1979, I helped investigate the September 29, 1979, murder of Concetta Schiappa in Milford, MA, as a member of the CPAC unit. My review of State Police records related to the investigation of the Schiappa homicide and my recollection of activities conducted to solve the Schiappa homicide serve as the basis for the following statements concerning the matters stated by me in this affidavit.

6.      I was assigned to the Schiappa homicide investigation team by Sgt. Joseph Doheny, who was the lead CPAC investigator throughout the course of the investigation. Trooper Thomas White was also very active in the investigation, as were several other investigators in our office.

7.      Sgt. Doheny's supervisor in the Worcester CPAC unit was Detective Lieutenant Ralph DeFuria. Additionally, the CPAC investigation team reported to Lieutenant Colonel John O'Donovan from the Office of Investigations & Intelligence Operations.

8.      Strategy and planning for the Schiappa homicide investigation was developed and communicated by Sgt. Doheny, through consultation with Det. Lt. DeFuria, who communicated regularly with each other in the Worcester CPAC office.

9.      The homicide was initially reported to the Milford Police, where the crime occurred at 72 Central Street, but the investigation was coordinated, directed and controlled by CPAC immediately upon notice of the murder to Sgt. Doheny and his arrival at the murder scene on September 29, 1979.

2

RA 329

RCM

10.    Sgt. Doheny staffed the case with CPAC investigators and MSP technicians, including State Police Chemist James Canney, Corporals John Baliunas and Paul Rich of the MSP Holden Photography Bureau, who arrived at the murder scene, took photographs, and made a search in the apartment for fingerprints.

11.    The Milford Police Department ("MPD") do not investigate murders, but provide assistance as directed by CPAC investigators.

12.    It was standard protocol during CPAC investigations to request local law enforcement to accompany CPAC investigators on interviews, particularly when witnesses resided in that locality. This occurred during the Schiappa homicide investigation. It was generally believed by CPAC investigators that local law enforcement was likely to have more familiarity with local residents and would be of assistance as witnesses to what transpired and was said during witness and suspect interviews.

13.    The Milford Police, however, did not coordinate, direct or control the Schiappa homicide investigation. Instead, Milford Police detectives were assigned discrete tasks by CPAC investigators, such as accompanying CPAC investigators during interviews.

14.    Interviews of neighbors and witnesses were conducted at the direction of Sgt. Doheny on the day the homicide was discovered and reported, and during the following weeks by CPAC investigators, often accompanied by Milford Police Department ("MPD") officers, including for example as documented in State Police investigative reports: (1) Trooper White and MPD Detective Sergeant Donald Small interviewed Gary Terhume, a resident of the first floor left apartment; (2) Trooper White and MPD Det. Sgt. Small interviewed Charles Lindsey; (3) Trooper White and MPD Det. Sgt. Small interviewed Diane Nydam; (4) Sgt. Doheny interviewed Kathy Ann Duncan; (5) Sgt. Doheny and MPD Detective Vincent Liberto interviewed Nicholas

3

**RA 330**

RCM

Trongone; (6) Trooper White and MPD Det. Sgt. Small interviewed Mary Dumayne; (7) Sgt. Doheny and MPD Detective Liberto interviewed Dominic and Georgiann Compagnone; (8) Trooper White and MPD Det. Sgt. Small interviewed Kathy Duncan a second time; (9) Sgt. Doheny and MPD Det. Liberto reinterviewed Gary Terhume; (10) MPD Det. Sgt. Small interviewed Lorraine Alteri; (11) Trooper Richard Gore and MPD Det. Liberto re-interviewed Donald and Mary Ellen Halkett; (12) Det. Lt. DeFuria and MPD Det. Sgt. Small reinterviewed Charles N. Lindsey; (13) Sgt. Doheny and MPD Det. Sgt. Small accompanied Gary Terhume to Boston where he was administered a polygraph examination by MSP Detective Lieutenant Peter DeStefano; and (14) MSP Det. Lt. DeFuria and MPD Det. Sgt. Small accompanied Terhume to Bridgewater, where J. Francis Cloutier, a Hypnologist, attempted to hypnotize Terhume.

15.    The Milford Police did not coordinate, direct or control the Schiappa homicide investigation, and had no authority from CPAC or the Worcester District Attorney's Office to do so.

16.    An autopsy of the victim was conducted on September 29, 1979, at Watson Funeral Home in Milford, performed by Dr. Ambrose Keeley, the State Pathologist, in the presence of Dr. Nicholas Capece. Also present at the autopsy was Sgt. Doheny, Trooper White, Cpl. Baliunas of the MSP Photo Lab, MPD Chief McGrath, MPD Det. Sgt. Small, and MPD Det. Liberto. The autopsy was coordinated and directed by the Medical Examiner's Office and Sgt. Doheny.

17.    Prior to conducting the autopsy, Dr. Keeley contacted Dr. Stanley Schwartz, a Forensic Dentist of the Tufts School of Dentistry. Dr. Schwartz examined the bite marks on the body of the victim, and then made a cast of the bite marks located on the victim's stomach. The Milford Police were not involved in any aspect of the autopsy or the cast of the victim's bite marks, other than to have been present with Sgt. Doheny at Watson Funeral Home.

4

RA 331

RCM

18.    Sgt. Doheny reported that it was Dr. Schwartz' opinion that this cast had sufficient detail so that if he were allowed to make a cast of a suspect's mouth, he could positively identify it as having made the tooth impressions on the victim's body. Dr. Schwartz did not believe that the bite marks on the victim's left leg were of sufficient quality to warrant casting.

19.    Sgt. Doheny reported that both pieces of a mop, a broken piece of the wood, clothing of the victim, and fingernail scrapings taken by Dr. Ambrose Keeley were taken and secured by him and brought to the State Police Chemical Lab and turned over to the State Chemist, James Canney.

20.    On October 3, 1979, I arrived at the murder scene with Det. Lt. DeFuria, Sgt. Doheny, and MPD Det. Liberto to determine if there were items missing from the victim's apartment.

21.    On October 5, 1979, I conducted an interview with suspect Michael Giroux at the Veterans Administration Hospital in West Roxbury, MA. I was accompanied by Bill Warren, the Chief of Veterans Administration Police, and Dr. Mark Thall, Senior Resident at the VA Hospital.

22.    Giroux stated that he was discharged from the U.S. Army on September 14, 1979, arrived in Milford on September 16, 1979, and was living with his brother. He was an Army clerk and also drove a tank. Giroux finished high school in the Army. He was stationed at Fort Riley in Kansas. Giroux received an honorable discharge for hardship because his wife was having problems. He was in the military service for 20 ½ months.

23.    Giroux informed me that on the day of the murder, he worked for his brother in Framingham installing carpeting. He arrived home with his brother at 9:30 or 10:00 p.m. Giroux's brother gave him a brown shirt, a plaid pair of pants and brown socks to wear. He said that he wore his own brown shoes.

5

**RA 332**

RCM

24. Giroux said his brother dropped him off at Lonergan's bar where he was watching the Shaver's boxing match fight on TV. Giroux didn't know what time it was, but at the end of the fight, he started to leave Lonergan's. He stated that he was very drunk, so drunk that he said he had trouble talking.

25. As Giroux was leaving Lonergan's, he met Sandy Fisher, saying "Hi Sandy," but could not recall any further conversation. He said that Sandy's married name is Goucher and that she was a friend of his wife's from school.

26. Giroux informed me that he went right home and went to sleep. I asked Giroux about his route home from Lonergan's, and he said he went through Stone's parking lot because he did not want to walk on Main Street and be seen.

27. I asked Giroux if he went near the victim's house. Giroux said no, and also stated that he didn't go to see Gary [Terhume] and Kathy [Duncan] on Central Street, because he thought they would not be home and he was too drunk to talk anyway.

28. I asked Giroux if he knew Mrs. Schiappa. He said no, but said he knew where she lived. Giroux said that last September [1978] he had been visiting Kathy Duncan and Gary [Terhume] and that the lady upstairs had accused him of taking money from Mrs. Schiappa. Giroux told me that he never talked with Mrs. Schiappa at that time. Giroux said he did not take Mrs. Schiappa's money and was not in her house. Giroux said that Mrs. Schiappa had never accused him of taking her money, but that it was the lady upstairs who said he was the only one hanging around there so he must have done it.

29. I asked Giroux when the last time he was at Kathy Duncan and Gary Terhume's apartment, and he said it was the Friday before last (the Friday before Mrs. Schiappa was murdered). Giroux said he arrived at their house between 8:30 p.m. and 9:15 p.m., had a drink,

6

RA 333

RCm

stayed for a short while and left to get a haircut at the Clip & Cut across the street from Friendly's on Main Street. Giroux said he has not been to the house since then.

30.    Giroux also stated that he already had spoken to Trooper White and Trooper Holmes the morning of this interview. Giroux informed me how he couldn't stand the sight of blood, and spoke of how his brother had cut his finger a few days earlier and how much the site of blood bothered him.

31.    On February 26, 1981, Michael Cifizzari was transported to the State Police CPAC office in Worcester by the Milford Police, where under questioning by Sgt. Doheny he confessed to the murder of Concetta Schiappa, while also implicating his cousin, Robert Cananzey, and his brother, Gary Cifizzari, in the murder.

32.    Earlier that same morning, Michael Cifizzari had confessed to the murder to MPD Sgt. Anthony DiGirolamo at the Milford Police station while also implicating Robert Cananzey, but not Gary Cifizzari.

33.    Also on February 26, 1981, at approximately 2:30 a.m., MPD Sgt. DiGirolamo requested that CPAC investigator, Trooper Thomas White, come to the Milford police station to be briefed on and participate in the confession Michael Cifizzari was then making. Trooper White arrived, listened to the statement for a few minutes, but when he attempted to ask questions himself to clarify certain points, Michael Cifizzari became angry, stated he did not know Troper White and did not wish to talk with him, and that he wished to talk with Sgt. DiGirolamo. Arrangements were made to bring Michael Cifizzari to the Worcester CPAC office later in the morning for questioning.

**RA 334**

RCM

34.     According to Sgt. Doheny's report, despite noting that Michael Cifizzari was somewhat confused and did do some rambling, his account of the murder and how it happened had detail in it which in his opinion "would be known only to the person who had committed the murder."

35.     Michael Cifizzari was then placed under arrest by Sgt. Doheny and charged with the murder of Concetta Schiappa.  He was fingerprinted and had his mug shot taken by Cpl. Baliunas of the MSP Photo Lab and then taken to Milford District Court where he was presented before Judge Compagnone.

36.     After Michael Cifizzari confessed to the murder at the CPAC office in Worcester, Sgt. Doheny directed me to Taunton, where Gary Cifizzari and Robert Cananzey resided, to interview both suspects.  I was accompanied to the interviews by MPD Officer John Chianese and Sgt. Fred Simmons of the Taunton Police.

37.     Gary Cifizzari informed me during the interview that he had heard about the murder of his Aunt Connie while at his Aunt Emma Pasqualone's house in Milford.

38.     In October 1982, Assistant District Attorney, Lawrence Murphy, obtained a court order for dental impressions of Michael Cifizzari's teeth.  These dental impressions were taken and compared to the bite mark mold on Mrs. Schiappa's body made by Dr. Stanley Schwartz, DDS, of Tufts Dental School.  Dr. Schwartz advised ADA Murphy that the dental impressions of Michael Cifizzari's teeth did not match the bite marks on the body of the victim.

8

**RA 335**

RCM

39.    In a discussion of the case between me and ADA Murphy, a decision was made to ask both Robert Cananzey and Gary Cifizzari to submit to having a dental impression made of their teeth, because both had been implicated in the Schiappa murder by Michael Cifizzari in his February 26, 1981, confession to Sgt. Doheny at the CPAC office in Worcester, during which he admitted to biting the victim.

40.    I reported to CPAC Detective Captain Robert Zullas that if both suspects Robert Cananzey and Gary Cifizzari had dental impressions taken that did not match the bite marks on the body of the victim, it then could be assumed that Michael Cifizzari had manufactured his confession in order to seek help for himself.

41.    In March 1983, I contacted both Gary Cifizzari and Robert Cananzey and asked if they would voluntarily agree to have dental impressions made for the purpose of comparison to bite marks made on the body of Mrs. Schiappa. Both agreed.

42.    On March 30, 1983, I transported Robert Cananzey to a pre-arranged appointment with Dr. Peter Juliano, DDS, 185 Belmont St., Brockton, MA.

43.    On April 27, 1983, Gary Cifizzari had an impression of his teeth made in Dr. Juliano's office. Both Gary Cifizzari and Robert Cananzey, in my presence and Dr. Juliano's presence, signed waivers attesting that they willingly and freely submitted to having dental impressions made of their teeth for the purpose of having the impression compared to the bite marks on the body of Mrs. Schiappa.

44.    I transported both dental impressions to Dr. Schwartz for comparison; Cananzey's on April 1, 1983, and Gary Cifizarri's on April 29, 1983.

9

RA 336

R cm

45.    On May 13, 1983, I obtained two search warrants in Worcester Superior Court; the first for medical records, X-Rays, and photographs of the jaw, head and teeth of Gary Cifizzari in possession of the keeper of the records at the Morton Hospital in Taunton; and the second for X-rays, dental charts and records for Gary Cifizzari in the possession of Dr. Roland Sedgwick of Taunton, MA. Both warrants were served on May 16, 1983.

46.    The following day, May 17, 1983, those records were given to Dr. Schwartz to aid him further in making a positive identification.

47.    On May 28, 1983, MSP Corporal Bradley Mullen and I spoke to Gary Cifizzari in Taunton. During the interview, I advised Gary Cifizzari that the dental impression of his teeth matched the bite marks on Mrs. Schiappa's body.

48.    In October 1983, ADA Laurence Murphy and I traveled to Florida to interview Dr. Richard Souviron, DDS, a nationally recognized expert on bite marks in forensic dentistry. Dr. Schwartz had collaborated with Dr. Souviron on the Cifizzari case. Dr. Souviron informed us that the dental comparisons showed that Gary Cifizzzari's maxillary and mandibular teeth had inflicted the bite marks on Ms. Schiappa.

49.    In November 1983, on the basis of the concurring opinions of Dr. Schwartz and Dr. Souviron, Gary Cifizzari was indicted by the Worcester County Grand Jury for the 1979 murder of Concetta Schiappa.

50.    On November 21, 1983, Det. Lt. DeFuria and me, together with Taunton Police detectives, served an indictment warrant on Gary Cifizzari and placed him under arrest for the murder. He was advised of his Miranda rights by Det. Lt. DeFuria and then transported to the CPAC unit office in Worcester.

10

**RA 337**

RCM

51.     At the CPAC office, Gary Cifizzari was questioned by Sgt. Doheny in my presence during which he denied having anything to do with the murder, stated that he was not in Milford during September 1979, and then changed his story to state that he learned of the murder either the night after or two nights after the death while at his Aunt Emma Pasqualone's house in Milford.

52.     To the extent CPAC investigators desired assistance from the Milford Police during the Schiappa homicide investigation, CPAC would request such assistance, but CPAC would at all times coordinate, direct and control all aspects of the investigation.

53.     At no time during the course of the murder investigation did the Milford Police coordinate, control or direct the investigation, and was not authorized to do so.

54.     With respect to the suspect Michael Giroux, I am not aware of any efforts made by the Milford Police to investigate his role in the murder, or that they were directed by Sgt. Doheny or CPAC to do so.

55.     I am not aware of any facts to suggest that Michael Giroux was an informant for the Milford Police

56.     At no time during the course of the murder investigation, or after, did I come to learn that the Milford Police were aware or had been informed that Michael Giroux was a police informant for any law enforcement agency.

57.     I am not aware of any facts to support the contention that any law enforcement agency involved in the Schiappa homicide investigation failed to investigate Michael Giroux as a suspect because of his role as a police informant.

58.     The Milford Police did not possess or maintain custody or control of any physical evidence during the murder investigation.  All such evidence was possessed and controlled by the CPAC unit, the Worcester County District Attorney's Office, or the State Police Crime Lab.

11

**RA 338**

RCM

59.    The Milford Police did not participate in any aspect of the decision to have Dr. Schwartz attend the autopsy, examine the bite marks on the victim, and make a cast of the bite mark from the victim's stomach.

60.    The Milford Police did not participate in any efforts or decisions to obtain dental impressions from any murder suspect, including Michael Cifizarri, Gary Cifizzari and Robert Cananzey, to compare with Dr. Schwartz's bite mark cast from the victim.

61.    The Milford Police did not participate in any efforts or decisions to retain other forensic dental experts, including Richard Souviron, DDS, to compare dental impressions to the victim's bite mark cast created by Dr. Schwartz.

62.    I am not aware of any communications between the Milford Police and the Worcester County District Attorney's Office, including with ADA Lawrence Murphy, to discuss any facts or issues related to the use of the bite mark cast and comparisons with the dental impressions from Michael Cifizzari, Robert Cananzey and Gary Cifizzari.

63.    The Worcester District Attorney's Office together with the State Police CPAC unit, coordinated, directed and controlled the investigation of Concetta Schiappa's homicide.

64.    The Worcester District Attorney's Office coordinated, directed and controlled the separate criminal prosecutions of Michael Cifizzari and Gary Cifizzari arising from the murder of Concetta Schiappa.

65.    The Worcester District Attorney's Office worked directly with the State Police CPAC unit to carry out the investigation.

12

RCM

66.    All decisions related to the Schiappa homicide investigation and the resulting criminal prosecutions of Michael Cifizzari and Gary Cifizzari were made by the Worcester County District Attorney's Office and the Massachusetts State Police, through its CPAC unit.


SIGNED UNDER THE PAINS AND PENALTIES OF PURJURY THIS / 3 Th DAY OF JANUARY, 2024.

Robert C Meier

Robert C. Meier


Witness:

Page 13 of 13
RCM

David Benoit

2 Abbott St. Box 54
Address

Woburn, MA. 01801

13

RA 340

# EXHIBIT 4.

· PAGES 211-423

COMMONWEALTH OF MASSACHUSETTS    84-362
TRIAL COURT OF THE COMMONWEALTH

WORCESTER, SS:                          SUPERIOR COURT DEPARTMENT
                                        CRIMINAL CASE NO. 95167

COMMONWEALTH            )
                        )
     v.                 )        TRANSCRIPT OF THE EVIDENCE
                        )
MICHAEL P. CIFIZZARI)

                                BEFORE:  Mulkern, J. W/J

                                Superior Court - Room 16
                                Worcester, Massachusetts

                                September  22, 23, 26, 1983

(Appearances as heretofore mentioned)

FILED

FEB  1 1984
ATTEST:
        Philip & Pli ...
             CLERK

                                Ronald P. Francescone
                                Official Court Reporter

Cifizzari 002412

211A

I N D E X

| Witnesses: | Examination by: | |
|---|---|---|
| | MURPHY | MONOPOLI |
| Anthony DiGirolamo | 211<br>276 | 240<br>277 |
| John Chianese | 278 | 308 |
| Thomas White | 329<br>340 | 338<br>342 |
| Joseph Doheny | 342 | |
| Nicholas Capace, M.D. | 387 | 395 |
| Joseph Doheny | 424 | 396<br>422 |

***********

| E X H I B I T S | PAGE |
|---|---|
| NO. 2 — Bold Letter Miranda Warning | 221 |
| NO. 3 — Fourth Statement of Michael Cifizzari | 231 |
| NO. 4A-D  Photographs | 236 |

***********

| Motion for Mistrial | 290<br>422<br>901 |
|---|---|

***********

Cifizzari 002413

RA 343

211 ß

(ANTHONY DiGIROLAMO, having been duly sworn, testified upon his oath as follows:)

DIRECT EXAMINATION

Q. (By Mr. Murphy)  Sir, would you give your name, please?

A. Anthony DiGirolamo.

Q. How do you spell your last name, sir?

A. D-I-G-I-R-O-L-A-M-O.

Q. What is your occupation, sir?

A. Police sergeant.

Q. In what town?

A. Milford Police Department.

Q. How long have you been a Milford police officer?

A. 30 years.

Q. And sir, calling your attention to February 26, 1981, did you know Michael Cifizzari on that date?

A. Yes I did.

Q. When did you first know Michael Cifizarri?

A. I knew Mike when he was approximately 12, 13 years old. He was a football player on the Junior Football League, the junior football team which I coached.

Q. You coached the team?

A. Yes.  I coached Michael.

Q. How long did you coach him for?

A. Couple of years.

Q. What position did he play?

Cifizzari 002414

RA 344

212

A.  He played halfback.

Q.  Was he a good football player?

A.  Yes he was.

Q.  How often would you see him during those years?

A.  I would see him in the fall during the football season. Then I would see him off and on downtown.

Q.  What years were they approximately?

A.  12, 13. When he was approximately 12, 13 years old.

Q.  Did you see him as he was growing up from those years?

A.  Yes.

Q.  Did you remain in contact with him?

A.  Most of the time. When he was at that age bracket.

Q.  At some point in his growing up, did you lose contact with him?

A.  Yes I did.

Q.  When was that?

A.  It was a few years after he had left the football league.

Q.  And did you at a later time start to see him again?

A.  Yes. I saw him off and on walking the streets.

Q.  Would you talk to him when you saw him walking on the streets?

A.  I would say hello to him. We'd talk about his days playing football, how was he doing.

Q.  What years would you see him on the streets?

A.  17, 18, maybe later.

Q.  And how many years ago would that have been?

Cifizzari 002415

RA 345

213

A. Oh, ten, fifteen years ago.

Q. And in February 26, 1981, had you seen him before that date?

A. Yes I did.

Q. How often would you see him before that date?

A. I'd see him probably half a dozen times when he came in the police station.

Q. Over the last how many months before that date?

A. Six months.

Q. The last six months before February 26, 1981 you saw him, maybe a half dozen times?

A. Yes, sir.

Q. Where did you see him?

A. In the police station.

Q. And what was your role at the police station at that time?

A. I was desk officer, midnight to eight shift.

Q. And were you in charge of that shift?

A. Yes I was.

Q. When you saw Michael at the station those five or six times, what happened?

A. Well, Mike would come in, he would be cold and hungry, and his personal hygiene was bad. Be looking for a place to sleep. Several times I gave him a place to sleep. I gave him a night's lodging because he was hungry and so forth. I'd buy him a cup of coffee and ask him how he was doing and we'd talk about the days he played football.

Cifizzari 002416

RA 346

214

Q. And you say that was five or six times that you did that?

A. Yes. Approximately five or six times.

Q. Were there ever any times when you wouldn't let him stay at the police station?

A. After a few times he came in, I told him, I said, "Look, Mike, you've got to do something. You've got to go on Welfare. You've got to find a job and make yourself some money so you can go on your own." Then finally I would give him a place to stay. We would talk about him going on his own.

Q. But you would give him a place to stay after that?

A. Yes I would.

Q. And Sergeant, calling your attention to February 26, 1981, what time did you report to work that day?

A. Ten minutes to twelve. That would be ten minutes before midnight.

Q. At some point that night, did you see Michael Cifizzari?

A. Yes I did.

Q. About what time did you see him?

A. Approximately one o'clock, 1 A.M.

Q. Where did you see him?

A. In the police station.

Q. Whereabouts in the police station?

A. Well, we have a lobby in the police station that is like one big room, and the desk counter separates the lobby

Cifizzari 002417

RA 347

215

from my desk, and he sat down in the lobby in one of the seats.

Q.  Did you make any observations of him at that time?

A.  Yes.  He was cold and hungry, and clothes were dirty, and I asked him how he was doing and he said, "Fine." Normal conversation with him at that time.

Q.  How much conversation did you have with him?

A.  When he was sitting down, there wasn't too much at that time.

Q.  What next happened?

A.  Well, Officer Chianese was with me at the station and I said to Jack, I says, "Why don't we have a little talk with Mike."  Each time he came in the station previously, it seemed as though he had something on his mind that he wanted to talk about. At that time I felt that it wasn't my place to ask him, I just wanted to wait for him to tell me when he was ready.  So, we decided to have a little talk with him, and we asked Mike if he liked to talk, he says, "Sure."

Q.  Did you go somewhere?

A.  Yes.  We went down the room down the corridor, which is the clerk's office, it is a room for the clerk who does her typing and bookwork, and that is where we sat down with him, myself, Officer Chianese and myself.

Q.  What did you do once you went into that room?

Cifizzari 002418

RA 348

216

A.   We sat down and I told Mike, I said, "We would like to have a talk with you," and he says, "Sure."

MR. MONOPOLI:  Respectfully, your Honor, the acoustics---

THE COURT:  Hold it just a minute. Would you close this window, please.

(Court officers complying)

THE COURT:  All right.

Q.   Sergeant, would you describe a little more about the room that you went into, type of room that it was?

A.   It is a room with windows, it had a door, and it had a desks, had some books, typewriter, it was a room approximately ten by fifteen.

Q.   What's normally done in this room?

A.   The clerk does her deskwork like the payroll and typing and so forth.

Q.   All right.  And what did you do once Michael was taken to that room?

A.   Well, I told Mike, I says, "Mike, we want to talk to you about something and I want to advise you of your rights first," and Mike says, "Well, you don't have to.  I know what they are because I have been arrested before."  I says, "Well, regardless, Mike, I do have to advise you of your rights and I want to do that."  So, I took a card, Miranda card, from the draw that where we keep them,

Cifizzari 002419

RA 349

217

and I read him the Miranda warnings, and I asked him if he understood and he says, "Yes." So, I instructed Officer Chianese to write out the rights form because the writing on the card was very---was a fine type of writing, and I felt maybe that Mike wouldn't be able to read that. Because I didn't know if he had an eye problem or what.

MR. MONOPOLI: Objection, your Honor. I move that be stricken.

THE COURT: All right. That may go out.

A. So, Officer Chianese wrote out the Miranda warnings in big, bold letters and we gave them to Mike to read.

Q. Did he read it?

A. Yes he did.

Q. What next happened?

A. He understood it. I says, "Would you sign it?" and he signed the Miranda warnings.

Q. How did he first sign it?

A. He signed it Paul McCartney. And when I saw that I kind of smiled and I says, "Mike, Paul McCartney!" and he says, "That's the fellow that used to play in the band, he was my idol." "Well, Mike, we need your right name. Would you sign your right name?" He says, "Sure," and he signed his right name.

Q. And what observations did you make of him at that point?

A. Well, he was normal. Like I say---

Cifizzari 002420

RA 350

213

MR. MONOPOLI:  Objection.

THE COURT:  No.  The question is--- all right, that is stricken.  The question calls for what observations did you make, not conclusions, please.

WITNESS DiGIROLAMO:  Would that be his appearance?

THE COURT:  Yes.

A.  Well, he appeared alert, his eyes were clear, his speech was good, and as far as, like I say, his personal hygiene was bad.

Q.  Could you understand him?

A.  Yes.

Q.  Could you tell whether or not he was under the influence of anything?

A.  Yes, I could tell.

Q.  Was he under the influence of anything?

A.  No, he wasn't.

Q.  When you talked to him on prior occasions, out of those six times that he was at the station, were there times when he was under the influence of anything?

A.  Yes he was.

MR. MONOPOLI:  Objection, Judge.

THE COURT:  He may have it.

Q.  Pardon me?

A.  Yes.  There were times when he was.

Cifizzari 002421

RA 351

219

Q. How many out of those prior five or six times?

A. Oh, probably three, four times probably.

Q. But on this particular night, it was your opinion he was not under the influence of anything?

A. I would say he wasn't.

Q. Did you smell his breath?

A. Yes I did.

Q. Was there any alcohol on his breath?

A. No alcohol.

Q. Could you understand his speech?

A. Yes.

Q. And after giving him those rights, you say he signed the rights card; is that right?

A. Yes he did. Well, he signed the bold letters.

Q. Bold letters?

A. Yes.

Q. Do you have a copy of that with you?

A. Yes I have.

Q. Does your copy have Miranda warnings at the top?

A. Yes, sir.

Q. Is that a copy of an original that you actually had Officer Chianese write out that night?

A. Yes. The same thing.

Q. May I see that, please?

A. (Complying).

220

Q. Have you had this copy in your papers since the time of this statement to you?

A. Yes. This was a copy I had. I had made two or three copies.

Q. And is this signed by you as well?

A. Yes, sir.

Q. When did you sign it?

A. Right after he read the statement.

Q. And did you sign it right after he signed it?

A. Yes I did.

Q. Did Officer Chinese sign it in your presence as well?

A. Yes.

MR. MURPHY: We'd ask to introduce this, your Honor.

MR. MONOPOLI: I have no objection, your Honor.

THE COURT: Next exhibit in order.

MR. MONOPOLI: Respectfully, your Honor, may we approach the side bar, please?

THE COURT: Yes.

(Conference at side bar)

MR. MONOPOLI: I would just like the record to reflect, your Honor, that the originals of these documents are, in fact---were introduced into evidence at the Motion to Suppress and are apparently unavailable now. I

Cifizzari 002423

RA 353

221

have discussed this with Mr. Murphy, and I am consenting to letting copies go into evidence.

THE COURT:  All right.

(Bench conference ended)

(Exhibit No. 2 - See Index)

Q.  (By Mr. Murphy)  Sergeant, I hand you this exhibit which is marked Exhibit 2, the rights that you gave Mr. Cifizzari that night.  I would ask you to read what rights you gave him?

A.  This is the, "Miranda Warning:  Before we ask you any questions, you must understand your rights.  You have the right to remain silent.  Anything you say can be used against you in court.  You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.  If you cannot afford a lawyer, one will be appointed for you before questioning if you wish.  If you decide to answer questions now without a lawyer present, you will still have the right to stop questioning at any time until you talk to a lawyer.  Do you understand what I have read to you?  Having these rights in mind, do you wish to talk to me now?"

Q.  Did Michael answer that last question?

A.  I beg your pardon, sir?

Q.  Did Michael say whether or not he was willing to talk to you then?

Cifizzari 002424

RA 354

222

A. He said he was willing to talk to you.

Q. And then did you talk to him?

A. Yes I did.

Q. And for how long a period of time did you talk to him for?

A. During the whole time?

Q. Yes.

A. Oh, I'd say about two hours.

Q. And what did you first say to him after giving him his rights, sir?

A. I asked him if he knew anything about the woman that was murdered on Central Street and Mike says, "Oh yeah, I know about that because that was my great aunt Connie." He referred to her as Connie. I says, "Well, Mike, can you tell us anything about it?" Were you there that night?" He says, "Yeah. I was there." I said, "About what time were you there?" He says, "Between eleven and 11:30." So, I says, "Well, tell us a little more about it." So, he said that he and his friend, or his cousin, Bob Cananzey, went down approximately at that time and she let them in. They were going after some money that she had. They knew she had some money. She gad given them money before. So, they both went in and he said that Bob gave her a backhander. Well, as soon as he said that I directly asked him, I said, "Did you people or you fellows kill that woman on Central Street?" He said,

Cifizzari 002425

RA 355

223

"Yes, we did."

At that time I instructed Officer Chianese to get a pad and start writing the statements that Mike was going to give us.

Q. Did he get a pad, Officer Chianese?

A. Yes he did.

Q. Did he write down what Mr. Cifizzari said?

A. Yes he did.

Q. How long did that last for?

A. I would say approximately three quarters of an hour.

Q. How many times did he go over the incident?

A. Well, I instructed Officer Chianese to---I asked him once, I asked him twice, asked him three times, I wanted to make sure he is telling us the truth. So, Officer Chianese did that. He wrote a statement and wrote another and another, and then he condensed it into one.

Q. And whose words were those that Officer Chianese was writing down?

A. Mike Cifizzari.

MR. MONOPOLI: Objection.

THE COURT: He may have that. Is it the leading quality that you object to?

MR. MONOPOLI: I am not sure what the officer was writing down, Judge.

THE COURT: That wasn't the question

Cifizzari 002426

RA 356

224

though.  The question was whose words was the officer writing down.

MR. MONOPOLI:  All right.

Q.  Were you people asking Mr. Cifizzari questions or was he just telling you in---

A.  No.

Q.  ---narrative form?

A.  He just came out with it.  He just kept talking.

Q.  And did you stop at some point?

A.  I did.  I says, "Mike," I says, "let me tell you something.  You know what you are saying?  You know how serious a charge this is?  You are telling us you killed a woman.  Now, you want to go on?" and he says, "Yeah, I will."  But I did tell him how serious the thing was.

Q.  Did you leave the room at some point?

A.  Yes I did.  Nick told me about his cousin, Bob Cananzey, and I says, "Who is Bob Cananzey? " and he says, "Well, he lives in Taunton."  I says, "Has he ever been arrested by the police?"  "Yes," he says.  I said, "For what?"  "Assault and battery with a dangerous weapon and drug offenses."  So, I asked him how long did he know him, and he said quite a while.  They were cousins.  They always hung around together.  He says, "He is trying to be a fighter.  He is lifting weights."

So, I says to Jack, you know, "Keep talking

Cifizzari 002427

RA 357

225

to him, I am going to go out and check with the Taunton police to see if Mike is telling us the truth." So, I called the Taunton Police.

MR. MONOPOLI: Objection.

THE COURT: Now, at that point we will stop.

Q. And after that conversation, did you go back into the room?

A. Yes I did.

Q. What happened once you went back in the room?

A. I told John, in the presence of Mike, that what he was telling us was the truth.

MR. MONOPOLI: Objection.

THE COURT: Now, that will go out and the jury will disregard it.

Q. Once you went back in the room, what next happened?

A. I called my superior officer, the Chief of Police, and I told him about what was transpiring. And I asked him if he wanted me to continue with it and he says, "Yes, go right ahead."

I called Trooper White, who at the time was with the Crime Prevention Unit, and we were working on the case, and he came down to the police station, and I filled him in on what was happening. And I brought him into the room with Mike and Officer Chianese and I told Mike, "This is Trooper White from the Crime Prevention

Cifizzari 002428

RA 358

226

Unit. He'd like to talk to you. Why don't you tell him what you have been telling us." Now, Mike began---

Q. Let me interrupt you at this point, Sergeant. Up to that point, had you gone through all four statements?

A. Yes. I believe so.

Q. And then was the trooper there at the station?

A. He came down approximately two o'clock.

Q. And what happened once he came to the station?

A. Well, I took him in the room with Mike and Officer Chianese.

Q. All right.

A. And Mike became paranoid. He just didn't want to talk to Trooper White.

MR. MONOPOLI: Objection.

THE COURT: The jury will disregard the diagnosis of the Sergeant.

Q. What happened once Trooper White came into the room? Did Mr. Cifizzari say anything further?

A. I don't believe he did.

Q. Did you have some conversation before you began talking about this incident?

A. To Mike?

Q. With all four of you people present?

A. I know Trooper White and I left the room and went into the hallway because Mike didn't want to talk to anybody but us.

Cifizzari 002429

RA 359

227

MR. MONOPOLI:  I move that be stricken, your Honor.

THE COURT:  Is this something Mike said, "I don't want to talk to anybody but you"?

WITNESS DiGIROLAMO:  No, he didn't say that, your Honor.

THE COURT:  All right.  Then the jury will disregard it.

Q.  At some point you left the room and talked to Trooper White; is that right?

A.  Yes I did.

Q.  How long a period of time were you talking to Trooper White?

A.  Just a few minutes.

Q.  Was that before Trooper White went into the room?

A.  It was after.

Q.  After?

A.  Yes.  After.

Q.  All right.  What did Mr. Cifizzari do after Trooper White went into the room?

A.  He became quiet.

Q.  How long was Trooper White in the room for?

A.  About five minutes.

Q.  Did Mr. Cifizzari say anything further or not?

A.  Not in front of Trooper White.

Q.  All right.  At some point did Trooper White leave?

RA 360

228

A.  Yes he did.

Q.  Where did he go?

A.  He went in the hallway.

Q.  Then you went out and talked to Trooper White?

A.  Afterwards, yes.

Q.  After Trooper White left the room, did you have further conversation with Mr. Cifazzari?

A.  Yes.  We went back in and Jacky was still there with him, and we just kept talking to him.

Q.  Did he continue to talk?

A.  Yes he did.

Q.  All right.  How long afterwards did he continue to talk for?

A.  Approximately half an hour or so.

Q.  Did Officer Chianese continue to write?

A.  Yes.  He wrote down---like I say, he wrote the three statements, and then he condensed it into one complete statement.

Q.  Do you have that last complete statement with you?

A.  Yes I have.

Q.  Is that the original of that statement?

A.  Yes.  This is the completed original.

Q.  That is the original?

A.  Yes.

Q.  I would ask you to read that statement, please.

A.  Date on it is February 26, 1981, time is approximately

Cifizzari 002431

RA 361

229

1:30 A.M.   "Statement taken from Michael Paul Cifizzari in the presence of Sergeant DiGirolamo and Patrolman John Chianese".

"My cousin, Bob, and I had been drinking and smoking pot and I think we had some Angel Dust, you know what that is?  Cousin, Robert Joseph Cananzey. Later that night it was dark and I don't know what time it was for sure, maybe around 11:00 - 11:30 P.M., we went down to my aunt's apartment on Central Street, Connie Concetta Schiappa, because me and my cousin, Bob, came to Milford to get money, and Aunt Connie had given us money before.  I knocked on the front door,and she, Aunt Connie, let Bob and I into the apartment.  The T.V. was on and the volume was pretty loud."

"She asked what we wanted, I said, 'We want some money.'  She said, 'I  don't know about giving you guys any money.  I haven't bearly got enough for the rent.'  Bobbie came across with a backhander and it knocked her down, she was yelling, 'Help!.Help!,' the cats were running around the room, they were scared and going crazy.  Aunt Connie was reaching for the T.V. and fooling with the knobs.  She turned the T.V. volume down. I don't know why."

"We were high and Bob was going for her breasts and was trying to rip her clothes.  We were

Cifizzari 002432

RA 362

230

wasted.  She had money in there and Bob got it.  Bob had a long stick and he whacked her with it.  We pushed her onto the couch where she slept.  She was trying to run away.  I think she was trying to get to the kitchen.  The light was on in there, and the back light was on, too.  I think we turned them out, but I'm not sure.  Anyway, she was trying to hold us back, but we overpowdered her.  She fell to the ground like with her head against the wall near where she sleeps.  It was like a couch or something.  She was still scratching and trying to push us away.  She even bite me.  Bob still had a big stick or maybe a broom, she had a lot of those in the apartment.  Bob and me wondered why she had them there.  Anyway, we went overboard.  She still didn't want us to have the money.  I just couldn't understand why."

"She kept saying, 'Help! Help!'  But she got us so excited that we got off and just went high.  She was saying something about an egg or something stupid like that.  Bob and I kept saying, 'What's she talking about?'

"Anyways, I couldn't understand her mumbling.  This was still in the T.V. room near that couch.  I think Bobbie was biting her on the neck or something.  I think that I accidentally bite her on the neck and the inside of her upper leg.  I don't know which

Cifizzari 002433

RA 363

231

leg. I have this long fang tooth. Anyway, I think my cousin put that stick he had inside her, or maybe it was me, I don't know we were really off."

"Then I had an idea she was dead. My cousin and I think alike, you know. I got some milk out of the fridge for the cat and I took a dark pocketbook and left from the back door, I think, and went across down Jefferson and went under the bridge at the Charles River at Archer Rubber near the Highway Department. I had some money. I think I got about $75.00 out of the deal. I think I threw the pocketbook away somewhere between the back of the house and Jefferson Street."

"Anyway, I smoked some more and got really wasted. I think Bob ran out the front door of Aunt Connie's. I really can't explain what we did after that, we were all drugged out."

"The next day I saw my cousin, he was scared and pretty shaken up. But I really don't know what we talked about, we were still drugged out."

MR. MURPHY: We'd ask to introduce that, your Honor.

MR. MONOPOLI: No objection, your Honor.

THE COURT: All right. Exhibit 3.

(Exhibit No. 3 - See Index)

Q. Sergeant, were you able to understand Mr. Cifizzari

Cifizzari 002434

RA 364

241

Q. Do you have anywhere in your report, "I love my brother, Gary. I'd do anything for him," is that in your report?

A. No, I haven't.

Q. It is not in your report; is that right?

A. No, sir.

Q. And you have never done any report at all indicating that that was said, correct?

A. No, sir.

Q. Now, you have known this young man for some time, correct?

A. Yes, sir.

Q. And you had had a conversation with the detectives handling this case; is that right?

A. No.

Q. Some time prior to February 26th?

A. No, I didn't.

Q. When were you aware of the fact that Donald Small, who is now the Chief, and Lieutenant Liberto, brought him to the Milford-Whitinsville Mental Health Center, some time in November?

A. No, sir.

Q. Never had any conversation with them about that?

A. No, sir.

Q. This type of a case is usually handled by detectives; isn't that correct?

A. Yes, sir.

Cifizzari 002444

RA 365

248

THE COURT: All right. Exhibit 5.

(Exhibit No. 5 - See Index)

Q. Now, on this particular night, February 26th, what time was it that Mr. Cifizzari came into the police station?

A. Approximately one o'clock, 1 A.M.

Q. And you were there and Officer Chianese was there also?

A. Yes.

Q. And when you first saw Mr. Cifizzari, exactly where was he in the police station?

A. Came in and sat on one of the benches in the lobby, be the far part of the office.

Q. And sir, at that point you were aware, were you not, that he had been in and out of mental institutions for the last 10, 13 years; isn't that right?

A. No, sir.

Q. You didn't know that?

A. I didn't know that, sir.

Q. You didn't know he was ever committed to a mental institution?

A. No, sir. I never knew that.

Q. Now, when he came in, what was the first thing he did?

A. Well, he came in and he sat down, and I said, "Hi, Mike, how are you doing?" and he said, "Good."

Q. This is when you told Chianese, "He is here. We will see if we can talk to him in regard to this particular

Cifizzari 002451

RA 366

250

A.    Oh, we talked about, you know, football and so forth, probably 10, 15 minutes.

Q.    Where was he when you were talking to him?

A.    In the front lobby.

Q.    And you are telling us he responded to your questions?

A.    Yes he did.

Q.    You are telling us he did not---his speech did not waunder at all?

A.    No, sir.  He was alert.

Q.    You are certain of that?

A.    Yes, sir.

Q.    You are aware, sir, are you not, that the very next day he was sent by a psychiatrist who sent him to Bridgewater, are you aware of that?

A.    Yes, sir.

Q.    And you are also aware, sir, that he remained there for some 15 months, not even competent to stand trial, are you aware of that?

A.    I am aware of that, sir.

Q.    Now, how much time passed before you started talking about this incident?

A.    Well, we started talking to him approximately 1:30, which is about 15 minutes after we had a conversation about football and how he played and so forth.

Q.    Who was involved in this conversation?

Cifizzari 002453

RA 367

251

A. Officer Chianese, myself and Mike.

Q. And this was taking place where again, sir?

A. In the clerk's office down the hall, sir.

Q. And just with the three of you?

A. Yes, sir.

Q. Did you give him anything to drink or eat?

A. Not---he did have a cup of coffee.

Q. Who gave him the coffee?

A. I think Officer Chianese gave him a cup of coffee.

Q. It was your intention, was it not, at that point to talk to him about this incident, this Schiappa killing?

A. Yes. We sat down in the clerk's office, that is when we started to talk to him about the incident, that is when we advised him of his rights.

Q. When did you advise him of his rights?

A. Right after we sat down in the clerk's office. I asked him if he wanted to talk about the incident that happened down in Central Street, if he knew anything about it.

Q. That was the first thing you did with regard to the incident, correct?

A. Yes.

Q. And you read him his rights when?

A. Right after that.

Q. This was from the card?

A. Yes.

Cifizzari 002454

RA 368

252

Q. Did you read them?

A. Yes I did.

Q. Who read them, you?

A. I did.

Q. After each of the rights, did you ask him if he understood each and every one?

A. Yes.

Q. And he responded to every one?

A. Yes he did.

Q. There is no question in your mind about that?

A. No question.

Q. So, you were satisfied, sir, were you not, at that point, that you had given him all of the so-called Miranda rights?

A. No, I wasn't satisfied. Not after I read the card. That is why I rewrote it out in big, bold letters. I wanted to make sure he could read it because the lettering on the card is really fine lettering.

Q. Didn't you read that to him?

A. Yes I did. And I showed it to him.

Q. After you read each line, you asked him if he understood that particular line?

A. Yes.

Q. "You have a right to remain silent, Michael, do you understand that?" is that what you said?

A. Yes I did.

Cifizzari 002455

RA 369

253

Q. After each and every question?

A. That is right.

Q. And Chianese was right in the room?

A. Yes he was.

Q. Well, you nevertheless wrote it out also; is that correct?

A. Yes.

Q. Who wrote it out?

A. Officer Chianese.

Q. Did you read him that also?

A. Yes I did.

Q. And is that the form you asked him to sign?

A. Yes, sir.

Q. When you told him to sign it, he signed it Paul M. Cartney; is that correct?

A. That is right.

Q. And you did a couple of reports on this; is that correct?

A. I made out a couple of observation reports, plus the incident in general when we had Mike here.

Q. But you did three observation reports, as you call them; is that correct?

A. I did one observation report.

Q. That was to put down everything that was said or every observation you made that night that was important, correct?

A. Not everything that was said. Just the observations I made of Mike, how he was acting and so forth.

Cifizzari 002456

RA 370

254

Q. Now, he signed it Paul M. Cartney, correct?

A. Yes, sir.

Q. And you looked at it?

A. Yes, sir.

Q. And you said to him, "Sign your name, too;" is that correct?

A. I didn't say that.

Q. What did you say?

A. I said, "Mike--" I smiled, I said, "Mike, this is not your right name, Paul McCartney?" and he says, "Yeah," he says, "It is my idol." He says, "He played in the band." I says, "Mike, would you sign your real name?" He said, "Sure," and he signed his real name underneath.

Q. And you made no comment about that at all in any of your reports; isn't that correct?

A. I felt that it wasn't necessary.

Q. My question was, sir, did you make any comment at all in any of your reports?

A. As far as McCartney?

Q. Yes.

A. I think I did. I am not sure.

Q. Would you look.

A. (Complying). No, I haven't in any report. I haven't got it.

Q. I am sorry.

A. I haven't got it in my report, sir.

Cifizzari 002457

RA 371

255

Q.  It was not in your reports?

A.  No, sir.  I haven't got it in any report.

Q.  Now, in February of 1981 you had in your possession that so-called rights sheet in which he signed it Paul M. Cartney, correct?

A.  On that night---the night he came into the station?

Q.  Yes.

A.  Yes, I did.

Q.  You had it, right?

A.  Yeah.

Q.  And what did you do with that?  Did you turn it over to someone?

A.  That was taken up to CPAC, Crime Prevention office in Worcester, Main Street.

Q.  And this was now in February of 1981, correct?

A.  Yes.  February 26th.

Q.  And you turned that over to them so they would have everything and everything could be turned over to the district attorney's office and over to defense counsel, correct?

A.  We just turned it over.  We don't know where it was going to go from there.  We turned it over to Lieutenant DeFuria and the office of the Crime Prevention Unit.

Q.  Are you certain you turned that particular page over?

A.  Yes I did.

Cifizzari 002458

RA 372

256

Q. Who did you give it to?

A. I am pretty sure I gave it to Lieutenant DeFuria.

Q. Who did you give it to?

A. Lieutenant DeFuria.

Q. And thatwould have been February of '81, correct?

A. Yes, sir.

Q. Also there were three other statements taken, correct?

A. Yes.

Q. And you had those copies, correct?

A. Yes, sir.

Q. And did you turn those over to someone?

A. Yeah. I believe we turned everything---

Q. Not what you believe, sir, either you did or you didn't?

A. I think we did.

MR. MURPHY: Objection to that, your Honor.

MR. MONOPOLI: May I be heard on that, your Honor, at the side bar?

THE COURT: Sure.

(Conference at side bar)

MR. MONOPOLI: All I am trying to get into, your Honor, is, first of all, the statement I feel was very important, Paul M. Cartney, and also the three other statements. I have had this case since being appointed by Justice Travers in February of 1981, and in January of 1983,

Cifizzari 002459

RA 373

257

the so-called rights page was turned over to me for the first time, and everybody is claiming that everybody else had it.

With respect to the prior three statements, which are very critical, we had the Motion to Suppress scheduled this June, and we started on Monday, and those weren't turned over to me until the Friday preceding. I think I should have some latitude to inquire who he gave these to.

THE COURT:  I think he has said that he gave it to Lieutenant DeFuria.

MR. MONOPOLI:  I was inquiring as to the other three reports also, Judge.  Maybe I covered it.

THE COURT:  No.  I have no problem with that, do you?

MR. MURPHY:  No.  My only objection was the fact that---

THE COURT:  The form of the question?

MR. MURPHY:  Yes.  You did or you didn't.

THE COURT:  All right.  You can explore that.

(Bench conference ended)

Q.  (By Mr. Monopoli)  With respect to the three statements, sir, you turned those over to CPAC, right?

A.  Yes, sir.

Cifizzari 002460

RA 374

258

Q. And you turned those over to whom?

A. Lieutenant DeFuria.

Q. There is no question in your mind about that, right?

A. I'm pretty sure, sir. That is who we gave them to.

Q. This was in February of '81?

A. That morning. Yes, sir.

Q. Now, when the so-called statements were taken, Officer Chianese was writing them down, correct?

A. Yes, sir.

Q. And he was writing them verbatim to what Mr. Cifizzari was saying, correct?

A. Yes, sir.

Q. In the first one, "My cousin, Robert Cananzey, age 25, 450 Broadway Street, Taunton, Massachusetts, five/six, 160 pounds, big shoulders, black hair, light mustache," that is his words?

A. I read that as it is on the statement. This was written here, and that is what I read.

Q. What I am asking you, sir---

A. Yes, sir. Okay.

Q. Chianese---

A. I follow you.

Q. He was taking down word for word?

A. Yes, sir.

Q. Those are the exact words that Mr. Cifizzari said, correct?

Cifizzari 002461

RA 375

272

A.   Lieutenant DeFuria.

Q.   Did you speak to him?

A.   Yes.

Q.   Was it at that time that you gave him the four statements and the rights sheet in which he said Paul McCartney?

A.   Yes.

Q.   You gave that all to him?

A.   Yes, sir.

Q.   Okay.  Do you remember Sergeant Joseph Doheny trying to speak to him?

A.   Yes, sir.

Q.   Do you remember Michael Cifizzari saying to Sergeant Joseph Doheny, "I bite her breast and neck.  I bite her nipple almost off.  I bite her neck and left a mark there. I bite her leg and her stomach," do you remember him saying that?

A.   No,  I wasn't there all the time when Sergeant Doheny was talking to him.  I was in and out there talking to DeFuria and some of the troopers.  I wasn't in there all the time.

Q.   Had he been given anything to eat up to that point?

A.   I don't believe so.  Well, wait a minute.  He had breakfast at the Hungry Eye on the way up.

Q.   On the way up to CPAC?

A.   Yeah.  Before we went to CPAC.

Cifizzari 002475

RA 376

275

A. Yes.

Q. Trooper Thomas White, when did he speak to Mr. Cifizzari?

A. It was approximately 2 A.M. that morning. I called my Chief, told him what was transpiring, and he told me to continue with the investigation.

Q. Well, that is not what I asked you. I asked you when did Trooper White speak to Mr. Cifizzari?

A. That is what I am getting to. Right after I called Trooper White.

Q. When was it, sir, that night?

A. That morning. 2 A.M. in the morning.

Q. 2 A.M.?

A. 2 A.M.

Q. You have been a police officer in Milford for how long?

A. 30 years, sir.

Q. And you are a resident of Milford also; isn't that correct?

A. Yes, sir.

Q. And with respect to the facts concerning this killing, how it was done, the fact that the elderly lady was, in fact, killed in this brutal way, that was well known on the street; isn't that correct?

A. It was not. No, sir.

Q. You are certain of that?

A. There was a few things that were let out. The only thing I knew about was bite marks and a stick that was used.

Cifizzari 002478

RA 377

276

That was all that I knew about it.

Q. That was well known on the street; isn't that correct?

A. It was in the newspaper. But if you want to believe the newspaper.

Q. I am sorry?

A. There are some things in the newspaper. But if you want to believe the newspaper. The only thing I knew about was the bite and the stick that was used. That is all that we knew about.

Q. You knew some money was taken?

A. No, I didn't.

Q. You didn't know that?

A. No, I didn't.

MR. MONOPOLI: I have nothing further.

REDIRECT EXAMINATION

Q. (By Mr. Murphy) Sergeant, Mr. Monopoli asked you whether or not Mr. Cifizzari was free to go that night. Was there any effort on his part to leave the station?

A. No effort at all.

MR. MONOPOLI: Objection.

THE COURT: He may have it.

Q. Is it fair to say, Sergeant, in your position as in charge of the nightshift, one of your normal duties is not to investigate murders; is that rights?

A. That is right.

Cifizzari 002479

RA 378

277

Q. It is also fair to say that the office that investigates murders occurring in Milford is the Crime Prevention and Control Unit in Worcester; isn't that right?

A. Yes, sir.

Q. And that is where you took Mr. Cifizzari that next morning?

A. Yes, sir.

MR. MURPHY: Thank you, sir.

RECROSS-EXAMINATION

Q. (By Mr. Monopoli) Isn't it a fact, sir, that you had a detective bureau in Milford also?

A. Yes, sir.

Q. And isn't it a fact, sir, that on a serious crime, the detective bureau works on it in conjunction with the CPAC office; isn't that right?

A. Right.

Q. At this particular time it was Detective Liberto and now Chief Small; is that right?

A. Yes, sir.

Q. And those were the two individuals from your department that were investigating this; is that correct?

A. Yes, sir.

Q. And when he came into the police station that night, did you call either of those two individuals?

A. I called my superior officer, the Chief of Police.

Q. You did not call either of the two detectives?

Cifizzari 002480

RA 379

306

A.   Yes.

Q.   What did you do for the remainder of the night?

A.   I continued to patrol.  I went on patrol.

Q.   And at some point in the morning, did you come back to the station?

A.   Yes, sir.

Q.   When was that?

A.   It was about 7 A.M., I think.

Q.   What did you do once you came back at 7 A.M.?

A.   I logged out.  The Sergeant and I transported Michael up to Worcester to CPAC.

Q.   What is CPAC, is that the state police office in Worcester?

A.   Yes.

Q.   Did you stop on the way up?

A.   Yes, sir, we did.  In Grafton.

Q.   Where did you stop?

A.   In Grafton at the Hungry Lion, I think, breakfast place.

Q.   Did you have breakfast?

A.   I had a coffee.

Q.   Did Mr. Cifizzari have breakfast?

A.   Yes.

Q.   Do you remember what he had for breakfast or not?

A.   It was a large breakfast.  I don't recall what.

Q.   Who bought the breakfast?

A.   The Sergeant.

Cifizzari 002509

RA 380

307

Q. Who ordered the breakfast?

A. Michael.

Q. Did you make any observations of Mr. Cifizzari in the car coming up to Worcester?

A. Yes, sir.

Q. What observations did you make?

A. He was fine. He talked. He was relaxed.

Q. Did you go to the office at CPAC office?

A. Yes, sir.

Q. What did you do once you went to that office?

A. We sat and talked with Michael and some of the troopers up there for a while.

Q. Were you in the room with Sergeant Doheny or not?

A. No, sir.

Q. How long did you stay at that CPAC office for?

A. Say approximately half an hour.

Q. Did you leave that office?

A. Yes, sir.

Q. And approximately what time did you leave?

A. I can't recall the exact time.

Q. Did you go somewhere?

A. Yes, sir.

Q. Where did you go?

A. I went to Taunton.

Q. Did you speak to someone there?

Cifizzari 002510

RA 381

308

A.  Yes, sir.  I went with a trooper to Taunton and spoke to Bob Cananzey.

Q.  Did you talk to any one else or not?

A.  I don't recall.

Q.  Sir, the statements that you have testified to, the four statements, do you have a memory whether or not you brought these four statements to Worcester?

A.  The Sergeant did.

Q.  The Sergeant did?

A.  Yes, sir.

Q.  What did you do with the four statements once you were finished writing them down?  Did you do anything with them?

A.  That night I just gave them to the Sergeant.

Q.  Is that the last time you saw those original statements?

A.  The originals, yes.

Q.  When did you make copies of them?

A.  I believe the Sergeant made them up in Worcester.

Q.  Up in Worcester?

A.  Yes.  That morning, I think.

            MR. MURPHY:  Thank you, sir.

            CROSS-EXAMINATION

Q.  (By Mr. Monopoli)  Prior to Michael Cifizzari coming into the police station that night, you had had some talk with Sergeant DiGirolamo about talking to Mr. Cifizzari regarding this killing; is that correct?

Cifizzari 002511

RA 382

322

that night with cousin, Robert, age 25, and then did visit with the victim at approximately 6 P.M."

Q. The time is 6 P.M.?

A. That is what this one says, yes, sir.

Q. Now, you had known Michael Cifizzari for some period of time; is that correct?

A. Yes, sir.

Q. And how many times to your knowledge while you were there had he come to the police station and asked to stay in the police station?

A. A lot. Many times.

Q. And you would see him around town, he was actually living on the street; is that correct?

A. I believe he was living in Taunton.

Q. Nevertheless, on many occasions he would come to Milford and ask someone to stay at the police station; is that correct?

A. Yes, sir.

Q. And when you would see him, he would generally be dressed in shabby clothes, be dirty?

A. Yes, sir.

Q. Now, after he gave the second statement, what happened, just tell us again?

A. Yes, sir.

Q. Isn't it a fact, sir, when you spoke to him, you'd ask

Cifizzari 002525

RA 383

323

him some questions?

A. No, sir.

Q. You never asked him any questions at all?

A. Just when he would get ahead of me, I would ask him to stop and repeat something so I could catch up while I was writing.

Q. That was it?

A. That was it.

Q. And you had him sign the rights page?

A. Yes, sir.

Q. Did you show him what you had written down?

A. The rights page?

Q. No. What you had written down, one, two, three, four statements?

A. Yes. He read them.

Q. He read them?

A. Yes, sir.

Q. There is no question in your mind whether he could read those or not?

A. No problem. He said he would read them.

Q. But you had a concern whether he could read the printed rights card?

A. The wallet card, yes.

Q. The statements, his signature is not on the statements; is that correct?

Cifizzari 002526

RA 384

337

A. Yes I was.

Q. Did you go to the scene on that day?

A. Yes, sir.

Q. And did you take part in an investigation?

A. Yes I did.

Q. And as part of your investigation, did you talk to a number of people?

A. Yes, sir.

Q. And were you familiar with the details of the investigation?

A. Yes I was.

Q. Were you familiar with whether or not those details were common knowledge in Milford?

A. To my knowledge, they were not common knowledge.

Q. Was there an effort to prevent those details from becoming common knowledge?

A. Yes there was.

Q. And after talking to Michael Cifizzari on the 26th, 27th of February, 1981, did you have further dealings with this case or not?

A. I believe I did. But not that much.

Q. At some point did you leave that office?

A. Yes I did.

Q. Were you transferred to another office?

A. To another barracks.

Q. To another barracks?

Cifizzari 002540

RA 385

340

Q. Were you actively pursuing these other suspects, sir, at that point?

A. Yes, sir.

Q. And sir, even after February 26, 1981, besides Gary Cifizzari, were you actively pursuing any other suspects?

A. I was.

Q. You were, sir?

A. Yes.

Q. Would you tell us who, sir?

A. Robert Cananzey, Michael Giroux, in my opinion, Gary Terhune was not ruled out at that point.

MR. MONOPOLI: Thank you, sir.

REDIRECT EXAMINATION

Q. (By Mr. Murphy) At some point in time, Sergeant, do you know whether or not there were tooth impressions taken from Cananzey?

A. I believe there were.

Q. Or was that after you left the office?

A. I think it was afterwards. But I believe they were.

Q. Do you know whether or not there were tooth impressions taken of Terhune?

A. I think they were.

Q. Is that after you left the office as well?

A. Yes, sir.

Q. And did you, in fact---Mr. Monopoli asked you whether or

Cifizzari 007793

**R.A. 1093**

RA 386

341

not Mr. Giroux was a suspect.  Did you, in fact, locate Michael Giroux?

A.  Yes I did.

Q.  Did you talk to him?

A.  Yes I did.

Q.  How long a period of time did you talk to him, sir, for?

A.  Hours.

Q.  Hours?

A.  Yes, sir.

Q.  Do you know what type of an automobile Michael Giroux drives?

A.  Now I do not.

Q.  At the time you talked to him, did you know what type of automobile he drove?

A.  I believe he had a black Thunderbird at that point.

Q.  Do you know the year of it in relation to how many years old it was?

A.  It wasn't new.  But it was in good shape.

Q.  Do you know whether or not Michael Giroux had dealings with Michael Cifizzari?

A.  In my opinion, he did not.

Q.  Did they hang out in the same circle of friends or not?

A.  No, sir.

MR. MURPHY:  Thank you, Sergeant.

MR. MONOPOLI:  Couple of questions, sir.

Cifizzari 007794

**R.A. 1094**

RA 387

342

RECROSS-EXAMINATION

Q.  (By Mr. Monopoli)  When did you speak to Michael Giroux?

A.  I spoke to him on several occasions.  The last occasion was with three to six months of the initial murder.

Q.  Within a day or two after this killing, sir, did anything unusual happen to Michael Giroux?

A.  Yes, sir.

Q.  You tell us what that is?

A.  He was admitted to the VA hospital in Jamaica Plains or Roxbury, I believe.

Q.  You know for what purpose, for what reason?

A.  Of my own knowledge?

Q.  Yes, sir.

A.  I believe it was a drug overdose.

MR. MONOPOLI:  I have nothing further, your Honor.

MR. MURPHY:  Nothing further, your Honor.

THE COURT:  All right.  Thank you, Sergeant.

MR. MURPHY:  Sergeant Doheny.

(JOSEPH M. DOHENY, having been duly sworn, testified upon his oath as follows:)

DIRECT EXAMINATION

Q.  (By Mr. Murphy)  Sir, would you give your name, please?

A.  My name is Joseph M. Doheny, D-O-H-E-N-Y.

Q.  What is your occupation?

Cifizzari 007795

**R.A. 1095**

RA 388

417

A. (No response).

Q. I am talking about after September 29th of 1979?

A. There were several people who were reinterviewed because there was some suspicion as to what we had learned.

Q. On questioning from the district attorney you stated that up until February 26th of 1981, Mr. Cifizzari was not even a suspect; isn't that correct?

A. He was not in my mind a suspect, no, sir.

Q. And up to that point it is fair to say Michael Giroux was, in fact, a suspect?

A. He was one of them, yes, sir.

Q. Isn't it fair to say, sir, that at least after September 29th of 1979 and from there, that Mr. Gary Terhune was, in fact, a suspect?

A. Yes. He would have to be considered a suspect, yes.

Q. With respect to Mr. Robert Cananzey, he has never been a suspect in this case; isn't that correct?

A. No. That is not true, sir.

Q. When was he a suspect in this case?

A. After Mr. Cifizzari's statement.

Q. And since then he is not a suspect; isn't that correct?

A. I wouldn't say he is definitely not a suspect, no, sir.

Q. Well, no one is actively seeking a case against him; isn't that right?

A. That is correct, sir.

Cifizzari 002620

RA 389

PAGES 424-654

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT OF THE COMMONWEALTH    84-362

WORCESTER, SS:                    SUPERIOR COURT DEPARTMENT
                                  CRIMINAL CASE NO. 95167

COMMONWEALTH          )
                      )
     v.               )          TRANSCRIPT OF THE EVIDENCE
                      )
MICHAEL P. CIFIZZARI)


                          BEFORE:  Mulkern, J. W/J

                          Superior Court - Room 16
                          Worcester, Massachusetts

                          September 26, 27, 1983


(Appearances as heretofore mentioned)


FILED

     FEB  1 1984
ATTEST:
   Philip J. Perlman
              CLERK


                          Ronald P. Francescone
                          Official Court Reporter

Cifizzari 002628

RA 390

424 A

I N D E X

| Witnesses: | Examination by: | | |
|---|---|---|---|
| | MURPHY | MONOPOLI | COURT |
| Elizabeth DeSantis | 424 432 434 | 430 433 | |
| Kennard Kobrin | 435 455 (Voir Dire) 471 | 463 (Voir Dire) 474 | |
| Venyamin Pinsky, M.D. | 475 | 480 | |
| John Baliunas | 482 490 | 484 | |
| Gary Cifizzari | | | 492 (Voir Dire) |
| Edward Sussman, M.D. | 497 | 502 | |
| Stanley Schwartz, M.D. | 504 547 | 530 | |
| Michael Foster | 552 | | |
| Edward Sullivan | 557 | 560 | |
| Robert Joseph Cananzey | 569 | 573 | 567 (Voir Dire) |
| Annette Pasqualone | 577 601 | 586 | |
| Theresa Ferrini | 604 | 614 618 | |
| John Daley | 629 | 620 | |
| James Robison, M.D. | 643 | 630 653 | |

***************

| Motion for Directed Verdict | | | 619 |

PENGAD CO., BAYONNE, N.J. 07002 · FORM 2EL 2547

Cifizzari 002629

RA 391

510

A. Yes. Well, international, I suppose.

Q. Now, sir, calling your attention to what you did in this case, this particular case, calling your attention to September 29, 1979 at about 4:30 in the afternoon, where were you at that time?

A. Home.

Q. Did you receive a call?

A. Yes I did.

Q. After---who did you receive a call from?

A. The Massachusetts State Police.

Q. And after receiving that call, did you go somewhere?

A. Yes.

Q. Where did you go?

A. I went to, I believe it is at the Watson Funeral Home in Milford, Massachusetts.

Q. What did you see take place at that funeral home?

A. The autopsy of Mrs. Schiappa.

Q. What did you do at that funeral home?

A. I examined two areas that were asked of me to examine for there being or not being human bite marks.

Q. Did you conclude whether or not they were human bite marks?

A. Yes.

Q. What was your conclusion?

A. They were. And I then photographed them and took impressions.

Cifizzari 002716

RA 392

PAGES 211-423

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT OF THE COMMONWEALTH   84-362

WORCESTER, SS:                    SUPERIOR COURT DEPARTMENT
                                  CRIMINAL CASE NO. 95167

COMMONWEALTH        )
                    )
    v.              )             TRANSCRIPT OF THE EVIDENCE
                    )
MICHAEL P. CIFIZZARI )

BEFORE:  Mulkern, J. W/J

Superior Court - Room 16
Worcester, Massachusetts

September  22, 23, 26, 1983

(Appearances as heretofore mentioned)

FILED

FEB  1 1984

ATTEST:

Philip & Pla___

CLERK

Ronald P. Francescone
Official Court Reporter

Cifizzari 007662

R.A. 0962

RA 393

211A

I N D E X

| Witnesses: | Examination by: | |
| --- | --- | --- |
| | MURPHY | MONOPOLI |
| Anthony DiGirolamo | 211 | 240 |
| | 276 | 277 |
| John Chianese | 278 | 308 |
| Thomas White | 329 | 338 |
| | 340 | 342 |
| Joseph Doheny | 342 | |
| Nicholas Capace, M.D. | 387 | 395 |
| Joseph Doheny | 424 | 396 |
| | | 422 |

\*\*\*\*\*\*\*\*\*\*\*

E X H I B I T S                    PAGE

NO. 2  -  Bold Letter Miranda Warning            221

NO. 3  -  Fourth Statement of Michael Cifizzari      231

NO. 4A-D  Photographs                         236
\*\*\*\*\*\*\*\*\*\*\*

Motion for Mistrial                          290
                                             422
                                             901

\*\*\*\*\*\*\*\*\*\*\*

Cifizzari 007663

R.A. 0963

RA 394

378

and a half that you interviewed many people in connection with this case?

A. Yes, sir. That is fair to say.

Q. It is also fair to say that there were no arrests made during that time; is that correct?

A. No, sir, there were not.

Q. Did you have a number of people in your office working on this case?

A. Yes, sir.

Q. Calling your attention to February 27, 1981 in the morning hours of that date, were you present at your office on that morning?

A. Yes I was.

Q. And approximately what time did you get to the office that morning?

A. Before 8 o'clock, sir. I would say about 7:30.

Q. Had you had a conversation with any one at that time or not?

A. Sir, are you referring to the 27th or the 26th?

Q. Excuse me. I will withdraw that and insert the day of the 26th, the morning of the 26th, you are correct.

A. Yes, sir.

Q. The 26th in the morning, did you go to work that day?

A. Yes I did.

Q. Did you have any connection with the Cifizzari matter, with the Schiappa homicide on that morning?

Cifizzari 007831

**R.A. 1131**

RA 395

384

furious at that time. He said that I nor any one else was going to make any cast of his teeth or any impressions of his teeth, and furthermore, that he did not want to talk to me any more.

Q. Did you ask him who was present at the scene?

A. Yes I did.

Q. What did you say to him?

A. He had been telling me all along that it was his cousin who was there. I asked him if, in fact, it was his counsin there or was it his brother, Gary Cifizzari, who was there. His response was, "Yes, Gary was there."

Q. All right. Did you---

A. I said to him, "So, it was Gary and not your cousin?" He said, "No. They were both there."

Q. All right. And then what next happened after that?

A. I asked him no further questions. I had a conversation with Sergeant Dean, with my supervisor, Detective/ Lieutenant DeFuria. At the conclusion of that conversation, I formally placed Michael Cifizzari under arrest, caused him to be fingerprinted and photographed; I made a booking sheet in which I asked him questions concerning his date of birth, place of birth, height, weight, parents name, which he responded to and answered; and subsequently that afternoon I had him brought to the Milford Court for a formal arraignment.

Cifizzari 007837

**R.A. 1137**

RA 396

400

A. I did not know that, sir.

Q. And you were actually the chief investigator, so to speak, on this; isn't that correct?

A. It was my case, yes, sir.

Q. It is very customary, sir, that the local police turn over their information to you; is that correct?

A. Yes.

Q. You did, in fact, speak to Sergeant DiGirolamo regarding this case?

A. Yes, sir.

Q. You talked to him on several occasions; isn't that correct?

A. Yes, sir.

Q. And when you spoke to him---was it the 27th for the first time in regards to this case?

A. 27th, yes, sir. I had spoken to him before that about this case, sir.

Q. I am talking in regard to Michael Cifizzari?

A. With regard to Michael Cifizzari the 27th.

Q. And you were never made aware that he had signed his name Paul M. Cartney, correct?

A. No, I was not, sir.

Q. Did you know that this so-called handwritten rights sheet even existed, sir?

A. I did not know what existed, sir. I was just told that he had been advised of his rights and had waived them

Cifizzari 007853

**R.A. 1153**

RA 397

402

Q. And certainly, sir, in 1981 all the reports had been gathered to turn over as discovery to defense counsel; isn't that correct?

A. I had submitted all my reports, sir, and all reports that I was aware of that had been given to me by Milford officers were turned over to the district attorney, supposedly to be turned over to you.

Q. And you had asked Milford for everything regarding this case that they had; isn't that correct?

A. I have no definite memory of doing that, sir. But it is customary for me to do that, yes.

Q. And sir, when did you first become aware that there were three prior statements taken supposedly from Mr. Cifizzari?

A. At a hearing on this case in this courthouse, sir.

Q. At a preliminary hearing, sir, would it be fair to say that was in June of 1983?

A. Yes, sir.

Q. That is the first time you had even heard of these three other statements; isn't that right?

A. Yes.

Q. Again this is your case and you are the chief investigating officer; isn't that correct?

A. Yes, sir.

Q. Now, Sergeant White who testified, he was working on this case with you; is that correct?

Cifizzari 007855

**R.A. 1155**

RA 398

TRIAL Vol IV    PAGES 655-778

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT OF THE COMMONWEALTH

WORCESTER, SS:                           SUPERIOR COURT DEPARTMENT
                                         CRIMINAL CASE NO. 95167

COMMONWEALTH           )
                       )
        v.             )           TRANSCRIPT OF THE EVIDENCE
                       )
MICHAEL P. CIFIZZARI   )


BEFORE:  Mulkern, J. W/J

Superior Court - Room 16
Worcester, Massachusetts

September 27, 28, 1983


(Appearances as heretofore mentioned)


FILED

FEB  1 1984
ATTEST
[signature]
        CLERK


Ronald P. Francescone
Official Court Reporter

Cifizzari 008112

R.A. 1412

RA 399

I N D E X

| Witnesses: | Examination by: | |
| --- | --- | --- |
| | MURPHY | MONOPOLI |
| Neil Borenstein, M.D. | 682 698 | 655 693 700 |
| Donald Small | 710 | 702 |
| Albert Pike, M.D. | 722 731 | 711 726 |
| Frederick W. Kelso | 746 | 731 |
| Vincent Liberto | 763 770 | 749 770 |
| Evelyn Davron Bon Tempo | 776 | 771 776 |
| Peter Trotta | 779 | 777 |
| Michael Cifizzari | 809 | 779 898 |

************

Cifizzari 008113

**R.A. 1413**

RA 400

702

(Reconvened at 3:15 P.M.)

MR. MONOPOLI: May I call my next witness, your Honor?

THE COURT: Please.

MR. MONOPOLI: Chief Small.

(DONALD SMALL, having been duly sworn, testified upon his oath as follows:)

DIRECT EXAMINATION

Q. (By Mr. Monopoli) Sir, would you identify yourself for us, please?

A. My name is Donald Small.

Q. You are presently?

A. The Chief of Police in the Town of Milford.

Q. How long have you been Chief?

A. Since July 1st.

Q. How long have you bee an officer in this town?

A. 33 years.

Q. And calling your attention to the fall of 1980, were you working in this department?

A. Yes, sir.

Q. In what capacity?

A. I was a Detective/Sergeant in charge of detectives.

Q. When were you first made a Detective/Sergeant?

A. About seven years ago.

Q. And you remained in that capacity up until you were

Cifizzari 008161

**R.A. 1461**

RA 401

703

appointed Chief; is that correct?

A. Yes, sir.

Q. And calling your attention, sir, towards the end of November, 1980, November 21, 1980, can you tell us whether or not you had occasion to see Michael Cifizzari?

A. Yes I did.

Q. You tell us, sir, where you saw him?

A. Well, we picked him up at the Milford District Court, my partner, Detective Liberto, and I, and took him over to the Whitinsville Division of the Milford/Whitinsville Regional Hospital.

Q. Can we just back up a second, sir. The Schiappa murder, that happend in September of 1979, correct?

A. Yes, sir.

Q. And were you investigating that case?

A. Yes I was.

Q. And how long were you working on that case up until when?

A. Oh, up until he went into Sergeant DiGirolamo and told him the story that he told him.

Q. Who else was working on that case?

A. Detective Liberto and the state police.

Q. After September of 1979, did you have suspects in that case?

A. Yes, sir.

Q. How many suspects did you have?

A. We had one.

Cifizzari 008162

**R.A. 1462**

RA 402

704

Q.  Who was that, sir?

A.  That was---I am sorry now.  Right now I can't think of his name.  But it wasn't him.

Q.  Was it Michael Giroux?

A.  Yes, that is who it was, Michael Giroux.

Q.  You continued to work on the case?

A.  Yes, sir.

Q.  Until 1981 anyways; isn't that correct?

A.  That is correct.

Q.  And was Michael Cifizzari ever a suspect in your mind?

A.  No, sir, he wasn't.

Q.  And Sergeant DiGirolamo, did he work with you?

A.  No, sir.

Q.  He was a patrolman on the desk?

A.  No, he was a Sergeant.

Q.  And did he ever have anything to do with this case up until February of 1981, the time it happened until February of '81?

A.  No, sir.

Q.  The case was specifically assigned to you and your men, correct?

A.  That is correct.

Q.  And you worked on that in conjunction with the CPAC office, State Police; is that correct?

A.  Yes, sir.

Cifizzari 008163

**R.A. 1463**

RA 403

706

Q. Unmarked?

A. Yes.

Q. Now, Chief, where was Mr. Cifizzari seated?

A. He was seated in the back seat.

Q. And on the way to the Milford/Whitinsville Regional Hospital, how long a ride is that?

A. About ten minutes.

Q. During that period of time, did you talk to him?

A. Yes, sir.

Q. And can you tell us, sir, what the conversation consisted of?

A. Well, one of the questions I asked him is if he had hit his aunt and why he had hit his aunt, his Aunt Connie, and he said, well, she had made him angry at her. And then a little later I asked him if he had killed his aunt, and he said, "My aunt isn't dead. I was just talking to her a couple of weeks ago." And then I asked him if he hit his aunt with a stick, and he said, "I didn't hit my aunt." "Well," I said "why did you just tell me you had hit your aunt?" "Well," he says "I thought that is what you wanted me to say." So, after that, I had no other conversation with him.

Q. Did he speak to you coherently on that day, sir?

A. Yes. He answered the questions coherently.

Q. And you then dropped him off where?

A. At the Whitinsville Division of the hospital.

Cifizzari 008165

**R.A. 1465**

RA 404

710

to speak, the members of the community?

A. Yes, sir. It was common. A lot of the details were common knowledge around town.

Q. What details, sir, were in fact common knowledge.

A. Well, where Mrs. Schiappa's pocketbook was found, that she had been bitten, and that she had a stick inserted in her vagina.

Q. Anything else, sir?

A. No, that is about it.

Q. How about where she was found in the apartment?

A. Well, that was in the newspapers.

Q. That was in the newspapers?

A. Right. Where she was found, yeah.

Q. Do you remember anything else being in the newspapers?

A. No.

Q. Do you remember any talk as to how she was dressed?

A. No, I don't remember any talk on how she was dressed.

MR. MONOPOLI: I have nothing further.

CROSS-EXAMINATION

Q. (By Mr. Murphy) Chief Small, do you know whether or not he was released from the hospital that day---Mr. Cifizzari?

A. No, sir. I don't know whether he was released or not.

Q. And do you know the reason he was taken to the Milford/Whitinsville Hospital?

A. The court ordered him committed over there.

Cifizzari 008169

**R.A. 1469**

RA 405

756

facing the bureau, be the right front corner, the cloth was kind of ruffled. That was the only thing that appeared to be disturbed in the room at that time.

Q. Did you continue, sir, to work on this investigation?

A. Yes, sir.

Q. For how long a period of time?

A. Approximately up until the time that the defendant had been apprehended.

Q. And up until that time, sir, were you one of the prime investigators on the case?

A. Sergeant Small and myself, along with the members of CPAC, correct.

Q. And up at least until that time, sir, did you have a prime suspect in this case?

A. Yes, sir.

Q. Who was that?

A. Michael Giroux.

Q. Did you ever talk to Michael Giroux?

A. I tried to.

Q. When was that?

A. Short time after the murder.

Q. Were you able to talk to him?

A. I was not, no.

Q. Now, where was it that you tried to talk to Michael Giroux?

Cifizzari 008215

R.A. 1515

RA 406

757

A.  I believe it was the Jamaica Plain Veterans Hospital.

Q.  Did you know Michael Cifizzari?

A.  Yes I did.

Q.  When did you first become acquainted with him?

A.  The late sixties, '68, '69, '70, somewhere in that time period.

Q.  And calling your attention to the fall of 1980, can you tell us whether or not you had any occasion to see Michael Cifizzari?

A.  Yes I did.

Q.  And could you tell us where you saw him?

A.  I saw him once or twice at the Milford police station, and then I saw him at the Milford District Court.

Q.  Did you have occasion to transport him some place at one point, sir?

A.  Yes, sir.

Q.  When was that?

A.  I believe it was November of 1980.

Q.  Where was it that you first saw him, in court?

A.  At the Milford courthouse, yes.

Q.  Who were you with, sir?

A.  I was with Detective/Sergeant Small.

Q.  Do you remember the exact date in November?

A.  I don't know, sir.

Q.  You brought him from the Milford Hospital to where, sir?

Cifizzari 008216

**R.A. 1516**

RA 407

733

A.  It was from the courthouse.

Q.  Strike that.  From the courthouse where?

A.  Over to the Milford/Whitinsville Regional Hospital in Whitinsville.

Q.  How did he appear on that day?

A.  His personal hygiene was very deteriorated.  He was dirty, grubby.  The best way I can describe it, like a skid row bum.

Q.  And before that date in November of '80, had you seen him any other times?

A.  Yes, sir.

Q.  When were those times?

A.  Either once or twice when I reported from duty at 8 o'clock in the morning at the Milford police station.

Q.  And you know what month that would have been?

A.  It was shortly before bringing him to the hospital, I think.

Q.  How did he appear, sir, on those occasions?

A.  His personal hygiene was dirty, grubby, just as I explained.  I mean, it was like he didn't take a bath for months, shave for weeks, his clothes were just plain filthy.

Q.  And before the time you saw him in November of '80, how many different occasions had you seen him, if you know?

A.  Probably once or twice at the Milford police station. those times he had slept at the milford station

Cifizzari 008217

**R.A. 1517**

RA 408

759

A.  Yes, sir.

Q.  After the time in November of '89, did you see him at all?

A.  No.

Q.  You didn't see him at all?

A.  Oh no.

Q.  Now, what time of day was it, sir, if you remember, when you saw him?

A.  Please?

Q.  When you saw him at the Milford Court when you picked him up, approximately what time of day was it?

A.  I believe it was late in the afternoon, maybe 2:30, 3 o'clock.

Q.  And how long did it take you to drive from the courthouse to the hospital?

A.  20 minutes or so.

Q.  And this was the psychiatric unit you were taking him to; is that correct?

A.  Yes, sir.

Q.  Did you have any conversation with him in the car on the way from the courthouse to the hospital?

A.  Yes, sir.

Q.  Who was talking?

A.  Myself and Sergeant Small, plus the defendant.

Q.  And could you tell us, sir, who spoke first in the car?

A.  I can't            el  or Sergeant Small did.

Cifizzari 008218

**R.A. 1518**

RA 409

760

Q. Tell us what was said?

A. Basically, I am almost sure I had asked him at one time---

MR. MURPHY: Well, objection, your Honor.

THE COURT: Your best memory of what was said, please.

A. I asked him how his Aunt Connie was.

Q. What did he respond?

A. He said, "She's all right."

Q. Then what was said, sir?

A. I asked him when he saw his Aunt Connie last.

Q. And what did he say?

A. He said, "About two or three weeks ago."

Q. Now, this is November, '80, correct?

A. Correct.

Q. What was his response?

A. He said, "Oh, about two or three weeks ago," he has seen her.

Q. Just continue, sir, tell us who spoke and what was said?

A. I said, "How come you had a fight with your aunt?" He said, "She got me mad." And then I asked him, "Why did you hit her?" He said, "Because she got me mad." And I asked him here, you know, what hand did he hit his Aunt Connie with, and I am almost positive he said his right hand. You know, "I hit her with my right hand."

And then I asked him, I said, "Why did you hit me and told ah what? he hit me

Cifizzari 008219

**R.A. 1519**

RA 410

761

Aunt Connie with the stick."

Q.  Please keep your voice up.

A.  He said, "I never hit my Aunt Connie with a stick."  Then he said, you know, "She gives me money now and then if I need it."  Now, I am not sure whether, you know, I asked him, and I think Sergeant Small asked him, "How come you killed your aunt?" and he said, "No, she's alive.  I just talked to her not too long ago."

Then we stopped the car and we said--- I don't know if I said it or Sergeant Small said it, but it something about Connie being dead.  And Cifizzari stated, "No, Connie is alive.  I just talked to her.  I was down the house not too long ago talking with her."  And I said, "Mike, why are you telling us you hit your Aunt Connie if you loved her so much?" and he said, "Well, that is what you wanted me to say."  I said, "Mike, do you know what you are saying to us?"  He said, "No."  I said, "Well, how come you told us or why are you telling us that you hit your Aunt Connie?"  He said, "That is what you want me to say.  That's what you want to hear, isn't it?"

I looked at Sergeant Small and we kind of shook our head, and I said, well, you know, he is freaked out.  He is like in left field.

Q.  When you spoke to him, was he coherent, sir?

Cifizzari 008220

**R.A. 1520**

RA 411

766

Q. Isn't it a fact, sir, that during the course of this entire investigation that you yourself didn't write down any police reports?

A. I wasn't assigned to it, sir.

Q. Well, did you write down any police reports, sir?

A. No, I did not, sir.

Q. And sir, in any event, after hearing from Mr. Cifizzari on the 20th of November, you called Trooper Robert Meier and told him of this conversation; isn't that a fact?

A. Yes, sir.

Q. And that's good police practice; isn't that right, sir?

A. Yes, sir.

Q. And the reason you did that was what?

A. I felt there could be something to it.

Q. And one of the things that Mr. Cifizzari told you during the course of your conversation, was that his Aunt Connie gave him money now and then when he needed it?

A. Yes, sir.

Q. Sir, do you know why Mr. Cifizzari was before the court on that date, November 20, 1980?

MR. HETOPOLI: Objection.

THE COURT: He may answer yes or no.

A. No, I do not.

Q. And you made no research with any other officers in your department as to why he was before the court on that date?

Cifizzari 008225

**R.A. 1525**

RA 412

# EXHIBIT 5.

**Lawrence Murphy**
**March 06, 2024**

UNITED STATES DISTRICT COURT

for the

District of Massachusetts

Civil Action No.: 22-cv-40139-MRG


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

GARY CIFIZZARI,                    \*

      Plaintiff            \*

v.                                 \*

TOWN OF MILFORD, et al.,           \*

      Defendants           \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*




DEPOSITION OF:

LAWRENCE J. MURPHY

The Varallo Group

43 Grafton Street, Suite 2

Millbury, Massachusetts  01527

March 6, 2024 at 9:12 a.m.



Christine M. Lo Schiavo

Professional Court Reporter

APPEARANCES:

Representing the Witness:

OFFICE OF THE ATTORNEY GENERAL

One Ashburton Place

Boston, Massachusetts   02108

BY:   EVA M. BADWAY, ESQ.

(617) 727-2200 x2824

Email: eva.badway@mass.gov


Representing the Plaintiff:

LOEVY & LOEVY

398 Columbus Avenue, Suite 294

Boston, Massachusetts

BY:   MARK LOEVY-REYES, ESQ.

(312) 243-5900

Email: mark@loevy.com


Representing Defendant Town of Milford:

MORRISON MAHONEY

250 Summer Street

Boston, Massachusetts   02210

BY:   JOSEPH H. CAFFREY, ESQ.

BY:   WILLIAM B. SCARPELLI, ESQ.

Email: jcaffrey@morrisonmahoney.com

Lawrence Murphy
March 06, 2024                                                                                    3

                               I N D E X


WITNESS:                                    LAWRENCE J. MURPHY


EXAMINATION BY:                                            PAGE:

Mr. Loevy-Reyes                                              7

Mr. Caffrey                                                 88


FURTHER EXAMINATION BY:                                    PAGE:

Mr. Loevy-Reyes                                            125


EXHIBITS:                                                  PAGE:

Exhibit 60, Defendant's Motion to

        Suppress Statements . . . . . . . . . 117


(Exhibit retained by Mr. Caffrey)

RA 416

THE COURT REPORTER:  Go ahead.

MR. CAFFREY:  Okay.  This is a deposition being conducted by Attorney Loevy-Reyes, but I wanted to address the issue of stipulations as to what we can agree to today.  I would propose that counsel -- between Attorney Loevy-Reyes and myself agree to use the same stipulations as were agreed to for the deposition of Ms.  Mary Ellen Auger, A-U-G-E-R.  And that we'll leave it up to counsel about having the witness read and sign the transcript.

MR. LOEVY-REYES:  Yeah.  That's acceptable for Plaintiff.  And just -- just so the attorney --

MS. BADWAY:  I just --

MR. LOEVY-REYES:  -- for the witness knows --

MS. BADWAY:  Could you tell --

MR. LOEVY-REYES:  Yeah.  The stipulations were that we would reserve all objections, except for the form of the question, until trial.  That was the main one that I could remember.

Lawrence Murphy
March 06, 2024                                                          5

MR. CAFFREY:  Yeah.  And the motions to strike are reserved --

MR. LOEVY-REYES:  Yeah.

MR. CAFFREY:  -- until trial.

And the witness had 30 days to read and sign the transcript.  And if it is not returned with an errata sheet within 30 days, it will be deemed to have been read and signed.

MR. LOEVY-REYES:  Yeah.  And -- and regarding -- regarding the signature and dates and notary, I would defer to whatever the witness or the witness's lawyer would prefer.

MS. BADWAY:  Larry, is 30 days enough for you, or would you like more time for 30 -- than 30 days?

THE WITNESS:  You're going to give me a transcript to read afterwards?

MS. BADWAY:  Correct.

THE WITNESS:  That's enough time.

MS. BADWAY:  Okay.  30 days.

MR. CAFFREY:  Sure.

MR. LOEVY-REYES:  Okay.  And do you

want to waive notary, so it's just signed?

MS. BADWAY:  Do you want to waive it, or would you rather have a notary sign it when you sign it?

MR. MURPHY:  No, that's fine.  I can waive that.

MS. BADWAY:  We'll waive.

MR. LOEVY-REYES:  Yeah.  That seems easier anyway.

MS. BADWAY:  I like to give the client --

MR. LOEVY-REYES:  Yeah -- no, of course.  Those are acceptable to Plaintiff.

MS. BADWAY:  And acceptable to witness.

MR. CAFFREY:  Acceptable -- acceptable to the Defendant.

THE COURT REPORTER:  Okay.  Are we ready for me to swear in Mr. Murphy?

MR. LOEVY-REYES:  Definitely ready.

THE COURT REPORTER:  Okay.

MR. LOEVY-REYES:  As long as Mr. Murphy is ready.

THE COURT REPORTER:  Are you ready,

Lawrence Murphy
March 06, 2024                                                                    7

Mr. Murphy?

THE WITNESS:  I'm ready.

LAWRENCE J. MURPHY, Deponent, having first been satisfactorily identified and duly sworn, deposes and states as follows:

EXAMINATION BY MR. LOEVY-REYES:

Q.     Good morning.  Can you please state your name, and spell it?

A.     My name is Lawrence, L-A-W-R-E-N-C-E, middle initial J, last name Murphy, M-U-R-P-H-Y.

Q.     Mr. Murphy, have you ever been deposed before?

A.     I've never been deposed, no.

Q.     Okay.  You are a licensed lawyer; is that right?

A.     Retired.

Q.     Retired.  Do you still have a license?

A.     No.

Q.    Okay.  When did you give that up?

A.    2012.

Q.    When you were a lawyer, where did you work?

A.    You want me to start from the beginning?

Q.    Sure.

A.    I worked in a firm in Worcester for two years, 1976 to 1978.  Do you want the name of the firm?

Q.    Sure.

A.    Yagjian, George, Kelleher, Lian, and Zarrow.

Q.    Okay.  What kind of work did you do there?

A.    General practice, but I -- I was brought in by a person who did insurance work.

And then I worked with Lawrence O'Connor, who was a defense attorney, and a former police detective for the Worcester Police Department, and a former Assistant DA.  He did criminal cases; he did big criminal cases.  I sat through a number of murder trials with him.  I left the firm after two years.

Lawrence Murphy
March 06, 2024                                                                                    9

Q.    Okay.  Why did you leave the firm after two years?

A.    I wasn't really -- I was going to the DA's Office, at that stage, as an -- as a part-time Assistant DA.

And I also went into a lawyer's reference service with another lawyer, and sat with him for the next two years.  His name was Ralph Sigel, S-I-G-E-L.

And after that -- if it's okay to keep going?

Q.    Please do.

A.    Okay.  I went to the District Attorney's Office full time.  And that was in 1978, January of 1978, and I worked there until 2012.

Q.    I see.  When you left the DA's Office in 2012, what was your position?

A.    I was a trial attorney.  And I did other cases, but I also did murder cases.  I did murder cases for 31 years.

Q.    Fair to say that you started doing murder cases at the DA's Office in '81, if my math is correct?

A.    Yes, but I started there in '78 part time.  After a year and a half, I went full time, and I stayed in what they would call the six-member jury session.  So I spent three years in the six-member jury session.  That session was just starting up in Worcester County at that time. And myself and another attorney did those cases, primarily jury trials, and a high percentage of them driving unders.

Q.    When was the first time that you were the lead trial attorney for a murder case for the District Attorney's Office?

A.    In 1981, I was transferred to the Superior Court.  And it wasn't long after that I received my first murder case.  I had what I would call two major trials before the Cifizzari case -- two major murder trials before the Cifizzari case, which began -- if you want me to keep going?

Q.    Please.

A.    Began, approximately, 1983, when Michael Cifizzari was brought to CPAC and gave a statement that day.  And I was assigned the case right around that time.  I had not had any contact

Lawrence Murphy
March 06, 2024                                                          11

with this case for the prior two years, or three years.

Q.      Fair to say that your first involvement was after Michael Cifizzari spoke to police?

A.      I think I was actually aware that he was going to speak to police that day.  So that was -- that was pretty much when it was assigned.  And I had other cases, but that's when I was assigned that case.

Q.      Okay.  Did you ever sit in on any session that involved a police interrogation of Michael Cifizzari?

A.      No.

Q.      Okay.  What about during your entire career in the DA's Office, would you ever sit in on interrogations of suspects?

A.      No.

Q.      Do you know if anybody within the District Attorney's Office ever had the responsibility to sit in when suspects were interrogated?

A.      I don't think they ever did, not to my knowledge.

Q.　　Going back to your work in the District Attorney's Office from --

A.　　I certainly never did.

Q.　　No, sure, sure.

Going back from -- to your work in the -- in the District Attorney's Office, from the time that you first started until you retired in 2012, approximately how many murder trials did you participate in as the lead trial attorney?

A.　　Approximately 300.　I can explain that a little bit.

Q.　　Please.

A.　　The first 15 years, I kept track of how many cases through a card system, where I had a box where I put -- would put the cases in there and keep track of it.　And at that time, I had 150 murder cases.　I -- I gave up on that and didn't do it for the next 18 years, but I -- I think a -- a fair number would be 300.

Q.　　Okay.　Where'd you go to law school?

A.　　Went to Suffolk at night.

Q.　　When did you get your law degree?

A.　　1975.

Q.　　Where did you get your undergraduate

Lawrence Murphy
March 06, 2024                                                                13

degree?

    A.    Holy Cross.

    Q.    When did you get that?

    A.    1970.

    Q.    What was your undergraduate major?

    A.    Sociology.

    Q.    Before coming to today's deposition, did you review anything to prepare for it?

    A.    I reviewed a few things.  I reviewed the Supreme Court decision on the met -- on the Gary Cifizzari case.

    I reviewed two Milford Daily News articles, short articles, about the case.

    I reviewed a Prisoner's Rights -- a Prisoner's Innocence Project statement that was put out over the internet.  I reviewed that, approximately -- if you want me to continue, I'll continue.

    Q.    Please.

    A.    Approximately, I -- I would say, four pages, that statement.

    Q.    Okay.

    A.    That's all.

    Q.    For the news articles that you

Lawrence Murphy
March 06, 2024                                                        14

reviewed, what did -- what did those relate to?

A.    The case being dropped; the presence of DNA; some history of the DNA -- Gary Cifizzari's DNA requests.

Q.    To prepare for today's deposition, did you speak with anyone?

A.    I talked with the DA's Office and told them I -- I had received a summons.  And then I had -- I had a couple of very short conversations with them.  One -- you want me to continue?

Q.    Please.

A.    One where -- where I talked to a person in the office, and said, where was the DNA found?  And they said to me, on the shoulder of the nightgown.

Q.    Okay.  And did you have any other conversations with anybody else regarding the deposition?

A.    Only the fact that I was notified -- notified of the deposition, and, you know, what do I do at this point.

Q.    Sure.  Did the person from the DA's Office tell you that the source of the DNA found

on the nightgown was from semen?

A.    I think so.

Q.    Okay.

A.    I'm not positive of that.  I haven't seen any reports, no DNA reports.

Q.    Okay.

A.    So I don't know any of that.  But they did tell me it was found on the shoulder of the nightgown.

Q.    Got it.

A.    I believe it was the left shoulder, but...

Q.    Have you ever been the subject of any ethical complaints regarding your practice of law?

A.    No.

Q.    Ever been arrested?

A.    No.

Q.    Were you ever disciplined at all by the District Attorney's Office?

A.    No.  I was a First Assistant DA for 20 years.

Q.    Sure.  I found my legal pads.

MR. LOEVY-REYES:  I'm sorry.  I only

Lawrence Murphy
March 06, 2024                                                           16

have one extra copy of this, but I'm not going to be on this exhibit that long.

Q.     (By Mr. Love   I'm showing you what's -- what's previously been marked as Cifizzari Deposition Exhibit No. 1.  I'm just going to ask you to look at the first page of that.

MR. CAFFREY:  I just want to steal it for a second.

MR. LOEVY-REYES:  Yeah, sure.

MR. CAFFREY:  Just one second, please.

Q.     (By Mr. Loevy-Reyes)  And I'll represent to you that it has the DNA information, and then some query information about Michael Giroux.

THE COURT REPORTER:  Did you say Michael Giroux?

MR. LOEVY-REYES:  Yeah.  G-I -- G-I-R-O-U-X.

THE WITNESS:  You're asking me to look at the front page?

Q.     (By Mr. Loevy-Reyes)  Yeah, just take a look at the front page.  And I'm going to

represent to you that this is a document that was generated as part of the litigation of this case. And it describes that there is a DNA profile linked to Michael J. Giroux, from the white, with floral design, nightgown. And it lists out area one.

Is that consistent with the conversation that you had with the District Attorney's Office about the DNA evidence that was found in this case?

A.     Yes. But I don't know what this -- this section was. You said nightgown, section one; is that what you said?

Q.     That's -- that's what this says. It says area one on the nightgown.

A.     Okay. Okay. All I can say is that that -- that's what it says.

Q.     Okay. By the time that this report was done in -- in May of 2019, you were no longer employed by the --

A.     Right.

Q.     --- District Attorney's Office, correct?

A.     Right.

Q.    All right.  And you would have had no role at all regarding the motion for new trial that was conducted regarding Gary Cifizzari; is that right?

A.    No, that's correct.

Q.    Okay.  At some point, when you were a practicing District Attorney, DA -- DNA evidence became available for use in -- in criminal cases, correct?

A.    Yes.

Q.    Did the Worcester County District Attorney's Office have any policy or procedure, whereby cases that had physical evidence, that had been tried previously, in which guilt was contested, did the DA conduct any sort of DNA testing, on its own accord, to ensure that the -- the DNA evidence from crime scenes matched the person who had been previously convicted?

A.    Can I explain that a little bit?

Q.    Sure, please.

A.    Okay.  The basic answer is the state lab and the police department handled DNA in a case from the start.  The trial prosecutor would have to handle it during the case.  After it went

Lawrence Murphy
March 06, 2024                                                                    19

to a conviction, the Appeals Division would handle

anything that was post-trial.  So can I --

Q.      So do you --

A.      You want me to explain a little

further?

Q.      Yeah, please.

A.      The fact that Gary Cifizzari asked

for DNA testing in 2006 -- I believe it's 2006: it

may have been 2004, but it's in that neck -- neck

of the woods.  I think it's 2006.  I was made

aware of that because I was at the office, but I

had no -- no con -- contact, no part to play in

that at all.  But they did tell me that, you know,

Gary Cifizzari is asking for DNA.

Q.      Right.  Do you know if -- if anybody

within the DNA -- or I'm sorry, the DA's Office

ever took a position that DNA evidence should not

be tested in Gary Cifizzari's case?

A.      No.

Q.      Okay.

A.      No.

Q.      So going back to your answer about

retesting physical evidence to see if the DNA was

consistent with -- with convictions that have

Lawrence Murphy
March 06, 2024
20

occurred, it sounds like what you're saying is, that would be up to the law enforcement agencies that held the evidence, and any Appeals Division within the District Attorney's Office; is that right?

A.    Well, not -- not quite.  The request for DNA is probably instigated by the lawyer for the defendant.  So -- and that lawyer would notify our office.  And our office would, the Appeals Division, handle it because it would be post-conviction.

Q.    Sure.  So it would be something that would have to be done through the -- the post-conviction process?

A.    Yeah.

Q.    Okay.

A.    Yeah.

Q.    As far as --

A.    And the court process as well.

Q.    Yea, sure, sure.

A.    Yeah.

Q.    And as far as you know, was there ever any effort undertaken by either any law enforcement agency in Worcester County or the

RA 433

Lawrence Murphy
March 06, 2024                                                                21

District Attorney's Office, independent of there being a filed motion for a new trial or any motion to overturn a conviction, to retest evidence to ensure that the DNA from that evidence was consistent with any verdicts that had been found against defendants?

A.    I don't know of any -- any individual cases where that was the situation.

Q.    Okay.  How clearly do you remember the prosecutions of Michael and Gary Cifizzari?

A.    I remember bits and parts.  I remember, I would think, some of the major points of the case.  Can I -- can I explain?

Q.    Please.

A.    This was a very, very shocking case. This was horrendous from the start.  Everybody was moved on this case.  It was very, very emotional. And the driving issue was who did the bite marks. The -- from the time of the autopsy, the -- the doctors were horrified.

And they brought in Dr. Schwartz, from Tufts University, to do the autopsy, and he photographed the bite marks.  And from that point on, that was a huge part of this case.  And

Lawrence Murphy
March 06, 2024                                                        22

it -- it went for the next two or three years, regarding that bite mark.  And their opinion, in the beginning, was that that bite mark was outstanding.  I think it's particularly the one on the leg.

And Dr. Schwartz photographed it. The doctor who did the autopsy called him in, into the autopsy.

The police that I talked to were horrified at what happened.  And, you know, it went from there.  And there was a long history of -- of trying to find out who did the bite mark.

Q.    Which police did you talk to who you had described as being horrified by the crime?

A.    I think the state police were.  I did not talk to Milford at that time.  So I -- I imagine Milford was present at the autopsy, but I did not speak with Milford.

Q.    Okay.  You would agree, would you not, that as we sit here today in 2024, the forensic evidence regarding bite marks, in which a forensic science person can say that a bite mark matches a unique individual, has been discredited?

A.    Well --

Lawrence Murphy
March 06, 2024                                                                    23

MR. CAFFREY:  Objection.

You can answer.

Q.      (By Mr. Loevy-Reyes)  You can answer.

A.      Okay.  I think -- I'm not up to speed on the -- the position of bite mark evidence at this time.  I read a little bit that said that the -- in one of those articles -- that said that the bite mark evidence has been discredited to a certain extent, and that -- and that the language has been changed as to what these experts can say.

I don't think -- at least, you know, from a distance, I don't think it's been banned from court, bite mark evidence.  I think it's still accepted.  But I think that there's been some changes made, and that the experts would be aware of that.

Q.      Well, and in fact, one of the experts that you used in trial, Dr. Souviron -- S-O --

A.      Souviron.

Q.      -- Souviron.

A.      Right.

Q.      S-O-U-V-I-R-O -- V-I-R-O-N --

Lawrence Murphy
March 06, 2024                                                                    24

A.      Right.

Q.      -- filed a declaration in this case, in which he indicated that the testimony that he gave, that Gary Cifizzari's bite marks matched the bite mark photographs from the victim, were no longer valid, and he would not offer that opinion anymore because the science has been discredited. Have you ever been made aware of that?

MR. CAFFREY:  Objection.

You can answer.

THE WITNESS:  I read some things about that, but my conclusion wasn't that it's banned from court.  My conclusion was that -- I -- I did see that Souviron changed his opinion.  And for -- you know, I had no part in Souviron changing his opinion.  And I -- I don't really have any -- anything to add on why he changed his opinion.

Q.      (By Mr. Loevy-Reyes)  Are you aware that the Department of Justice has come out with its recommendations regarding bite mark evidence, that using it to match an individual suspect with a particular set of bite marks is no longer valid

science?

MR. CAFFREY:  Objection.

You can answer.

THE WITNESS:  I -- I don't really know that.

Q.    (By Mr. Loevy-Reyes)  Okay. And -- and you've been retired since 2012, correct?

A.    Right.

Q.    And you've had no reason to look at the validity of bite mark evidence since then, have you?

A.    No.  I -- I could have at this point, but I didn't.

Q.    Sure.

A.    Right.

Q.    And -- and since 2012, you haven't done any legal research regarding the admissibility of bite mark evidence, have you?

A.    No.

Q.    Okay.  When you were prosecuting Michael and Gary Cifizzari for the Schiappa murder, did you ever become aware of an individual by the name of Michael Giroux?

A.    No.

Q.    Now, his name --

A.    Can I explain a little bit?

Q.    Sure, please.

A.    The only thing I can say is, I've seen the statement of the Prisoner Project, who talks about Michael Giroux's probable sister-in-law being Kathy Duncan.  I think her name is Duncan.  She was also known as Terhune.  So she gave them some sort of a statement.  So -- but the first time I ever heard of the name Michael Giroux was reading that.  I don't know Michael Giroux.  I don't know that name.

As far as I know, Michael Giroux has no connection to this case --

Q.    Got it.

A.    -- before the DNA.

Q.    Right.

A.    Right.

Q.    And -- and when you say when the first time you learned it was reading that, that was when reading the newspapers, correct?  And -- well, let me rephrase that.

It was when reading the newspapers

Lawrence Murphy
March 06, 2024                                                      27

and the Innocence Project information about this case?

A.    Yeah, the Innocence Project had more details than the paper.  The paper was pretty general.

Q.    Okay.  Yeah.  Did anybody from the Milford Police Department -- pardon me -- ever tell you, during the prosecution, that Michael Giroux was ever a suspect?

A.    No.

Q.    Did anybody from the Milford Police Department ever tell you, during the prosecution, that Michael Giroux was a confidential informant for the Milford Police Department?

A.    No.

MR. CAFFREY:  I object to that question.

You can -- obviously, he can answer.  I'm slow.  I apologize.

THE WITNESS:  If you want me to slow down on my answer --

MR. CAFFREY:  No, no.

THE WITNESS:  -- I will.

Q.    (By Mr. Loevy-Reyes)  I'm going to

Lawrence Murphy
March 06, 2024
28

show you what's previously been marked as Cifizzari Deposition Exhibit No. 7, and ask you to look at that and tell me just if you recognize what the document is.

A.    The only thing I can say is -- is it refers to Michael Giroux.

Q.    Sure, sure.  I'm going to ask you to go to what is marked on the bottom as Cifizzari No. 111.  And where it says, "Court Appearance 4 of 11," it has a date of 2/19/1976.  During the prosecution of Michael or Gary Cifizzari, did anybody from the Milford Police Department tell you that Michael Giroux was a suspect, and he had had a prior misdemeanor assault and battery case from 1976?

A.    No.

Q.    Same question for where it says --

A.    Can -- can I explain that a little bit?

Q.    Please, yeah.

A.    The -- I don't know anything about Michael Giroux at the time of this case.

Q.    Right.

A.    So whether he had a -- a case in

Lawrence Murphy
March 06, 2024                                                        29

Milford or -- or any other place, I -- I don't know.

Q.    Okay.  And I'm just going to ask you, then, one more question about this, but it's going to be a little bit of a long one.  I'm going to read off some of the charges here, and I'm just going to confirm that you never heard about them.

So starting from Cifizzari 111 to Cifizzari 114, it sounds to me like what you're saying is nobody ever told you, during the time of -- of the prosecutions of Gary and Michael Cifizzari, back in the 1980s, that a Michael Giroux was a suspect, and that he had a prior record that included charges of misdemeanor assault and battery; felony larceny; misdemeanor -- looks like a motor vehicle registration; misdemeanor possession of controlled substance with a conviction; misdemeanor felony possession of a dangerous weapon; misdemeanor operating after; misdemeanor possession of Class A controlled substance, heroin; felony breaking and entering; felony -- another felony breaking and entering -- the first one was '73, and the second one was '72; felony attempted larceny in '72; a

misdemeanor operating under the influence in '72; a misdeme -- another misdemeanor operating -- looks like to end lives and safety; and a misdemeanor possession of controlled substance in 7 -- in '71.

During the prosecution in the '80s, you were never made aware of Michael Giroux or any of those charges, were you?

A.     No.

MR. CAFFREY:  Objection.  Objection.

You can answer.

THE WITNESS:  I'm sorry.  I'll go slower.

MR. CAFFREY:  It's okay.

THE WITNESS:  No.  But I -- I -- since -- since this thing has hit, I saw that someone said that Michael Giroux did time in prison.  I think it was -- may have been his brother or it may have been Kathy Duncan.  So with that in mind, you know, I -- I now know that he had a record.

Q.     (By Mr. Loevy-Reyes)  Sure.

A.     You know, and I know that he probably did time in prison.

Lawrence Murphy
March 06, 2024                                                          31

Q.      Sure.

A.      But I did not know anything about Michael Giroux in -- around 1983 or '4, or anything like that.

Q.      Okay.  I'm going to show you what's been marked previously as Cifizzari Deposition Exhibit 16, and ask you if you've ever seen that before.

A.      (Witness perusing documents)

This appears to be a document regarding Michael Giroux.  I have no -- no knowledge of this at all.

Q.      Okay.

A.      I have never seen it.

Q.      Okay.  And you can just put -- what we'll do is, you can just make a list -- or make a stack of the exhibits over there, if -- if you want to.  You can push them away.  Otherwise, it's going to -- more paper is going to confuse me.  I get easily confused.

A.      Okay.  All right.

Q.      Perfect.  All right.

I'm going to show you what's previously been marked as Cifizzari Deposition

RA 444

Lawrence Murphy
March 06, 2024
32

Exhibit No. 15.  I'll represent to you that this is a map that was generated as part of Gary Cifizzari's motion for a new trial, which lists out Michael Giroux's claims to police about his path that he made the night of the Schiappa murder.

Have you ever been made aware of Michael Giroux admitting to following this path that's indicated in Exhibit 15?

A.    No.  And -- and you're saying that he -- he admitted to the police about -- on --

Q.    Yeah.

A.    -- this path?

Q.    Yes.

A.    No, I've never seen this.

Q.    Okay.  All right.  I'm going to show you what's been marked as Deposition Exhibit No. 24, and ask if you've ever seen that before.

A.    No, I've never seen this before.

Q.    Okay.

MS. BADWAY:  Can we just identify what that is for the record, please?

MR. LOEVY-REYES:  Oh, sure.  It's a statement of Michael Giroux, dated October

5, 1979.

Q.    (By Mr. Loevy-Reyes)  All right. I'm going to show you --

A.    Could I read it a little bit?

Q.    Oh, please, feel free.  Yeah, absolutely, I would like you to.

A.    Okay.  Thank you.

(Witness perusing documents)

I've read it.

Q.    All right.

A.    I've never seen that before.

Q.    Okay.  I'm going to show you what's been marked as Cifizzari Deposition Exhibit 26. And you had --

A.    Can I -- can I just say one thing about this --

Q.    Yes.

A.    -- this statement of Giroux?

Q.    Sure.

A.    Although I've never seen it before, and I've only read it very quickly, I don't believe it says anything criminal in there.  I just want to make that -- I -- I -- because it ties into something else later on.  I -- I will

Lawrence Murphy
March 06, 2024                                                      34

tell you, unless you want me to explain right now.

Q.    Yeah, please explain right now.

A.    Okay.  The sister-in-law, Kathy Duncan -- Kathy Duncan, who gave the Prisoners' Rights people a statement, she was a witness.  She gave two -- she was a witness at two trials.  She was, basically, what I would call a background witness at two trials.

At one of the trials, and I'm not sure which one -- I think it was the Gary Cifizzari trial, but I'm not positive.  I can explain that in a little bit.  But anyway, I interviewed her in preparation for her testimony at the trial.  In very -- in my mind, an odd thing happened.  I was bringing her from the office into the courtroom.  She says to me, kind of like -- she says, I -- my -- my -- my brother-in-law talked to the police, but he had nothing to do with it.  I think she said he was drunk that night, but he had nothing to do with it.

Now, I was a little bit surprised at that.  It does happen when witnesses say things at different times, but not -- I never knew that she was, in any way, related -- that this

RA 447

Lawrence Murphy
March 06, 2024
35

brother-in-law was this Giroux.  I never had his name.  But she did tell me that.  And I remember it because it was odd.

Q.    Okay.  Sure.  Did you have any other discussions with Kathy Duncan before she testified?

A.    I would have talked to her a number of times.

Q.    Okay.  But --

A.    I would have talked to her a number of times.  And I would have -- and as I say, I think it was Gary's trial, but it could have been Michael's --

Q.    Sure.

A.    -- that she said that.

Q.    Sure.  And -- and that stands out just because it was a little unusual?

A.    Yeah.

Q.    Yeah.

A.    It was unusual.  You know, this is a witness who's, you know, already given statements, and she's making -- she's saying that to me.  I'm thinking, hmm.  Why -- why -- you know, why are you doing that?

Lawrence Murphy
March 06, 2024                                                                    36

Q.      Right.

A.      And she wasn't serious.  She was just, kind of, you know, he -- he -- my brother -- my brother-in-law talked to the police.  I said, oh -- I'm saying to myself, there's nothing criminal there.  And maybe the police talked to her in a -- in a canvas at the beginning of the -- talked to Giroux in a canvas at the beginning of the trial.

Q.      Sure, yeah.

A.      That's what I thought.  Now you have a statement here that says it's from Trooper Robert Meier.

Q.      Right.  Fair to say, that in the course of your career as a lawyer, you likely prepped thousands of witnesses?

A.      Yes.

Q.      Okay.  And outside of this one conversation that you recall with Kathy Duncan, I think you testified you likely talked to her other times to prepare her testimony, correct?

A.      Right, right.

Q.      Fair to say you don't recall those?

A.      I'm not -- I'm not following you on

Lawrence Murphy
March 06, 2024                                                    37

that.

Q.    You -- you don't recall the other times that you talked to Kathy Duncan about her testimony?

A.    Oh, oh.  I would have talked to her -- I would have read her statement --

Q.    Yeah.

A.    -- you know, as part of the normal witness preparation.  She wasn't a -- you know, there were three or four witnesses that were in her category, because we're trying to prove when did the murder happen.  We have to limit -- limit it as much as we can.  And they were witnesses, three or four witnesses -- I call them background witnesses -- that would give us that information. So yeah, I -- I would have talked to her two or three times before.

Q.    Sure.  And -- and I guess my point is, is you remember her talking to you as she's approaching testifying because that stands out as unusual.  You don't recall the time -- like, what you said to her and what she said to you during the prep sessions, because that would be less typical -- I mean, that would be more typical?

Lawrence Murphy
March 06, 2024                                                                                          38

A.      Right, right, right.  I would just review her statement --

Q.      Right.

A.      -- you know, with her.

Q.      Kind of standard witness prep?

A.      Right.  I -- I would just be reviewing her statement.  And she's going to testify.

Q.      Right.

A.      She's testifying in a trial so, you know...

Q.      Going back to Exhibit 26, you had testified that you had heard that Michael Giroux, at some point, did time.  I'll represent to you that this is a 1992 judgment of conviction for second-degree murder and conspiracy regarding Michael Giroux.  Is that consistent with your understanding about when Michael Giroux did prison time?

A.      Murder?

Q.      Yes.

A.      Murder?

Q.      Second-degree murder.

A.      Wow, I didn't know that, no.

Q.    Okay.

A.    No.

Q.    And I think you testified earlier that during the prosecution, nobody spoke to you about Michael Giroux, correct?

A.    Correct.

Q.    Okay.  So you would -- you would have no information at all about whether Mr. Giroux was a police informant, would you?

A.    No, none.  I think they said FBI informant too.

Q.    Okay.

A.    And if -- you know, if he was an informant, that would be -- that would also stick out.

Q.    Why would that stick out?

A.    If he was an informant?

Q.    Yes.

A.    Oh, well, that's -- that's huge. I mean, that's a discovery situation with a lawyer, and you're telling the lawyer about it, and, you know, there's -- there's danger and there's all kinds of issues surrounding an informant.  That's -- that's very important

Lawrence Murphy
March 06, 2024                                                                          40

information.

Q.      Sure.  When you say it's "a discovery situation," do you mean you would have to disclose that?

A.      I would disclose it.

Q.      And --

A.      Yeah.

Q.      And why would you disclose it?

A.      Well, because I want the -- the other side to know.  You know, and -- and I want to talk to them and see if we can handle it smoothly so it doesn't come out in open court.

Q.      Sure.  And when you say you want the other side to know, why would you want the other side to know?

A.      Well, because it's discoverable.

Q.      I know it's getting really basic, but why is it discoverable?

A.      Well, it goes to his credibility, the witness's credibility.

Q.      Did anybody ever tell you, when you were prosecuting the case, that Kathy Duncan reported that Michael Giroux had previously been accused of stealing money from Concetta Schiappa's

RA 453

Lawrence Murphy
March 06, 2024                                                             41

apartment?

A.    No.  No.  I heard that later.  I don't know how -- how that comes in, but it comes in somewhere.  I think one of the Prisoners' Rights articles.

Q.    Got it.  Yeah.

I'm going to show you what's been marked previously as Cifizzari --

A.    The -- the other thing, I --

Q.    Yeah.

A.    -- if -- if I could say it, regarding that exhibit number -- you've got a 20 at the top.  It's Giroux's statement.

Q.    Yes.

A.    That's October 5, 1979?

Q.    Yes.

A.    I don't -- I'm not involved in the case at that point.

Q.    Oh, no, clearly.  Yeah.

A.    Yeah.

Q.    You -- you got involved only after February of '81, correct?

A.    Yes.

Q.    Yeah.

Lawrence Murphy
March 06, 2024                                                              42

A.      Yeah.

Q.      I'm going to show you what's been marked as Cifizzari Deposition Exhibit No. 5, and I apologize that it's black and white of a -- was an evidence photograph.  But did you ever see the -- the nightgown piece of evidence regarding the murder investigation?

A.      Yes.

Q.      Does that appear to be it?

A.      Well, it's not a great picture, but I -- I assume it is right.

Q.      Okay.

A.      I remember that nightgown.  I remember introducing it into evidence.

Q.      Right.  I'm going to show you what's been marked as Cifizzari Deposit -- Deposition Exhibit 32.

MR. LOEVY-REYES:  Sorry, Joe.  I didn't mean to hit you with that.

MR. CAFFREY:  No problem.

MS. BADWAY:  What's that number?

MR. LOEVY-REYES:  Number 32.

Q.      (By Mr. Loevy-Reyes)  And I'm going to ask you to take a look.  It's really hard to

RA 455

read, but I'm going to read on page Cifizzari 352.

MR. CAFFREY:  Excuse me.  I just want to put it on the record just so that we don't get confused down the road.  This is a two-sided exhibit.  So when we're --

MR. LOEVY-REYES:  Yes.

MR. CAFFREY:  Okay.  Go ahead.

Q.      (By Mr. Loevy-Reyes)  The first paragraph on the bottom, I'm going to read the last two sentences.  It reads, "This officer lifted a partial off a glass doorknob in the living room.  The door led to the" -- it looks like front hall.  And I can't read the rest, but then it goes, "to the exit."

Do you recall ever being told about a partial fingerprint that was lifted from the Schiappa apartment?

A.      No.

Q.      And then this also has, on the -- the last three pages, Michael Giroux's fingerprints.  Did anybody ever tell you that they had compared Michael Giroux's fingerprints regarding a partial fingerprint that was found at the murder scene?

RA 456

Lawrence Murphy
March 06, 2024                                                                 44

        A.      No.

                (Witness perusing documents)

                Can I slow down on this one a little bit, this exhibit?

        Q.      Yeah.

        A.      I'm trying to see the date of it. It -- it -- it's such a poor copy.  It's hard to -- to see a date.  Hard to see what they're saying.

        Q.      Of course.  And let me see if I can help you with it --

        A.      Okay.

        Q.      -- if I can find my copy.  It looks like the only dates I see are on page Cifizzari 352.  At the top, it has a date of case and then a date of crime, which they both are listed as 9/29/79.

                MS. BADWAY:  That's correct.  That's what we have too.

        Q.      (By Mr. Loevy-Reyes)  But as far as the date near the signature, I'm not seeing anything.  It looks like the only thing is the top date.

        A.      (Witness perusing documents)

RA 457

Lawrence Murphy
March 06, 2024                                                                45

MS. BADWAY:  Do you want to take a break?

THE WITNESS:  No, no.  I'm just -- I'm just trying to figure out whether this was done at the time of the crime, or was it done afterwards?

Q.    (By Mr. Loevy-Reyes)  Well, I'll represent to you that this -- this comes to us as part of the original investigation file, but obviously I have no personal knowledge as to when it was done.

A.    Okay.  Okay.

Q.    I'm going to show you what's been marked previously as Cifizzari Deposition Exhibit 33, and just ask you to look through that and tell me if you recall ever seeing this before.  And I'll just represent to you that the last two pages are from the motion for a new trial, but I'm -- I'm asking for the prior five pages.

A.    (Witness perusing documents)
This appears to be a list of the evidence that was taken from the scene.

Q.    Okay.  Do you recall seeing that as part of the prosecution?

Lawrence Murphy
March 06, 2024                                                              46

A.      No, I don't remember it.

Q.      Okay.

A.      However, we would have a reports file ourselves.  And I don't remember this as part of a -- as part of it, but it may be there.

Q.      Sure.

A.      It may be, because it appears to be a lab report.

Q.      Sure.  And -- and --

A.      It's got my -- it's got my name on it.

Q.      Exactly.

A.      So what --

Q.      I was just --

A.      -- do I know.

Q.      -- going to just direct you there.

A.      Yeah, so...

Q.      On -- on the fifth page, your name appears.  And -- and do you know whose handwriting that is?

A.      It's not mine.

Q.      Okay.

A.      But it's probably -- well, I'm only guessing, someone from the DA's Office that

Lawrence Murphy
March 06, 2024                                                    47

forwards the report to me --

Q.    Right.

A.    -- once it comes to them, once it comes to the office.

Q.    And that would indicate that you were the person who was doing the prosecution?

A.    Yeah, it would make sense, because this report would be -- I know that name, James Canney, from the lab.

Q.    Right.

A.    So I know that.  Yeah, it make -- makes sense.  As I say, the lab is in charge of the physical evidence from the scene and so forth.  They take it.  They analyze it.  They see -- it appears to be a report from the lab.

Q.    Right.  And -- and the one that we were just looking at indicates that various items tested positive for the presence of blood, including the -- the nightgown.  Was that consistent with your memory, that there was blood on -- on several pieces of evidence?

A.    Yeah.

Q.    It was -- it was a pretty horrific murder, correct?

Lawrence Murphy
March 06, 2024                                                                48

A.      Oh, oh, I mean, no sense getting into the gory details with everybody --

Q.      Yeah, yeah.

A.      -- but, yes, it was -- it was brutal.

Q.      Fair to say that of the 300 murders that you prosecuted, probably one of the most brutal, if not the most brutal?

A.      Yes.

Q.      And back in -- in -- in 1979 or the early '80s, how big a town was Milford; do you recall?

A.      Yeah.  It was -- it was fairly -- it -- it was a decent-sized town.  A lot -- a lot going on there.  Had its own district court. Had -- nice town.  I actually looked at a house there around this time.

Q.      Did -- did anybody from the Milford Police Department ever describe to you how the initial interrogation of Michael Cifizzari was conducted?

A.      Well, we had the motion to suppress. So yes, I mean, I knew the -- I knew the -- I didn't know the officers beforehand, but I -- I

RA 461

Lawrence Murphy
March 06, 2024                                                                          49

did have the officers testify at the motion to suppress. But --

Q.    And --

A.    But this -- this probably might help too. I dealt almost in no way with Milford Police. I dealt with the CPAC Police, and Milford Police was -- was on their own. And they -- they probably did the canvas. They probably came up with these four witnesses, you know, that were background witnesses. But I didn't have any real conversation with them until the Michael Cifizzari statement, and then I would have conversation with them. The report was handled by CPAC, State Police.

Q.    Right.

A.    Yeah.

Q.    Were you ever made aware that the two Milford Police officers who took Michael Cifizzari's initial statements were patrol officers, one patrol sergeant, and not detectives in the Milford Police Department?

A.    I -- I found out their rank, you know, but I don't -- I don't know the -- the ranks of the -- I -- I knew the -- the sergeant who was

Lawrence Murphy
March 06, 2024
50

in charge of the detective bureau.  But I didn't know the other officers  --

Q.    Okay.

A.    -- or their rank.  I probably knew at the motion to suppress.

Q.    Sure.  Who was the sergeant in charge of the detective bureau for the Milford Police Department?

A.    His name was Anthony DiGirolomo, D-I-G-I-R-O-L-O-M-O.  He's dead, I believe.

Q.    And it was your understanding that Mr. DiGirolomo was a supervising sergeant for the detectives in the Milford Police Department?

A.    Yes.

Q.    Okay.  Who told you that?

A.    I don't know.  I think it was just, you know, I -- I got to meet him.  I meet him -- he was -- he was a -- I met him.  He was an older man.  I was in my early 30s.  He was probably 65 at the time.  He stayed for a few more years.  I knew him that way.  And I'm -- I'm fairly certain he died.

Q.    Sure.

A.    I have a memory of hearing that he

RA 463

Lawrence Murphy
March 06, 2024                                                          51

died.

    Q.    Sure.  And did you know a Milford police officer by the name of Liberto, L-I-B-E-R-T-O?

    A.    I knew Vincent Liberto, but I don't think I knew him from this case.  I knew him from other cases.  And...

    Q.    What about Milford Police Officer Chianese, C-H-I-A-N-E-S-E?

    A.    I think I met -- I met him in this case.  I don't think I knew him in advance.

    Q.    Okay.  Did you -- were you ever made aware that there were detectives in the Milford Police Department who were assigned to investigate the Schiappa murder, and that it was not those detectives who actually questioned Michael Cifizzari?

            MR. CAFFREY:  Objection.

            You can answer.

            THE WITNESS:  I -- I don't know that -- I didn't know that.

    Q.    (By Mr. Loevy-Reyes)  Okay.

    A.    No.  I know that it wasn't the -- the detectives that questioned him that

Lawrence Murphy
March 06, 2024                                                    52

first time --

Q.    Sure.

A.    -- on the way to the hospital.

Q.    For -- and when you say, "on the way to the hospital," you're talking about Vincent Liberto, correct?

A.    I don't know -- I don't know if he was one of them.

Q.    Okay.

A.    But those two officers, I think that was the first time they talked to him.

Q.    Did anybody ever explain to you why it was that the -- the officers questioned Michael Cifizzari on the way to the -- to the mental hospital?

A.    No.  No, I wouldn't know that.

Q.    Okay.  For Mr. -- and -- and for some reason I have a mental block about pronouncing his name, Mr. Di --

A.    DiGirolomo.

Q.    DiGirolomo.

A.    Yeah.

Q.    I'll try to take your cue on that.

Did he ever tell you how the course

Lawrence Murphy
March 06, 2024                                                                53

of the interrogation of Michael Cifizzari, on February 26, 1981, was handled?

A.     Well, we did the motion to suppress in court, so --

Q.     Yeah.

A.     -- I would have seen how it was handled --

Q.     Well, you weren't --

A.     -- at that stage.

Q.     Yeah.  You weren't present for that, were you?

A.     For the -- the -- this statement?

Q.     For the -- for the interrogation, yes.

A.     No, no, no.

Q.     Okay.  Okay.  Are you familiar with the -- the Reid Method of interrogation?

A.     Tell me what it is and I'll --

Q.     Basically, it's -- it's -- it's making accusations that you did this, and -- and kind of forcing you to admit or deny it.  Are you aware of -- of -- of that type of interrogation?

A.     I -- I -- I would say no.

Q.     Okay.

Lawrence Murphy
March 06, 2024

54

A.     I think -- I -- I don't know.  That sounds like a variation of the good cop -- cop, bad cop thing, so I -- I -- I don't know.

Q.     Okay.

A.     I mean, DiGirolomo was a nice man. He -- he isn't, in my mind, a guy that would yell at people.  He was a -- he was a people's person. He was -- you've -- you've seen from other pieces of information that he was a football coach in Milford.

Q.     Mm-hmm.

A.     And -- and he may have coached Michael Cifizzari for something, for football, and so Michael knew him.  And he allowed Michael to sleep at the police department at different times. That's the type of guy he was.

Q.     Did Mr. DiGirolomo ever tell you that he was aware, in February of 1981, that Michael Cifizzari suffered from serious mental health issues?

A.     Well, I -- I think, I don't know about serious, but I think he was probably aware that -- the thing that stuck out to me was, he was eating out of dog dishes.  So he was on the

RA 467

street.

Q.    Right.

A.    Now, about his mental, I -- I -- I have no real good grasp of how Michael Cifizzari's mental state was.

Q.    Sure, sure.  And -- and I guess my question is a little more pointed than that. Is -- and that is did Mr. DiGirolomo ever tell you that he knew what Michael Cifizzari's mental state was?

A.    No.

Q.    Did -- did Officer Chianese ever tell you that he knew what Michael Cifizzari's mental state was?

A.    No.  But there is the thing that says that one of those two officers made comments about his state, as they talked to him in that first interview on the way to the hospital.

Q.    Sure.  And -- and -- and which of those two officers made comments about his state?

A.    I'm -- I'm not sure, but I think -- I don't know.  I don't know.

Q.    Okay.

A.    That -- that would have to be in

RA 468

Lawrence Murphy
March 06, 2024                                                                    56

reports.

Q.    Sure, sure.

A.    Yeah.  And it -- it is, somewhere.

Q.    Yeah.

A.    Yeah.

Q.    And what -- what was the comment, if you remember, about his state?

A.    I don't know.  But basically, to a layman, he was -- the way I would say it, is all over the place.

Q.    Okay.  Did -- did Mr. Chianese ever tell you that he had grown up with Michael Cifizzari and, therefore, knew Mr. Cifizzari's mental state?

A.    No.

Q.    Okay.

A.    I never had conversations with him like that --

Q.    Yeah.

A.    -- at -- at that length.

Q.    Sure.

A.    You know...

Q.    Did Mr. DiGirolomo ever tell you that when they were -- when he and Mr. Chianese

were interrogating Michael Cifizzari, they told him, Mr. Cifizzari, information about the crime and accused him of -- of  doing those things?

MR. CAFFREY:  Objection.

You can answer.

THE WITNESS:  No, I -- I -- I didn't get the -- the steps of the -- of the questioning.

Q.    (By Mr. Loevy-Reyes)  Okay.

A.    I had the motion to suppress, so the motion to suppress was in front of a Superior Court judge, so it was fairly -- and I remember it.  I remember it, parts of it anyway.

Q.    Sure.

A.    And, you know, it was not a -- a quick handling of the situation.

Q.    Right.  All right.  I'm going to show you what's previously been marked as Cifizzari Deposition Exhibit 37.  And ask you to look at that and tell me if you recognize what either of those documents are.

A.    Yeah, that's a Miranda warning.

Q.    Okay.

A.    And I'm looking for a date, but I

Lawrence Murphy
March 06, 2024                                                                58

don't see it.  Oh, here it is down here, yup.

2/26/81, okay.  1:36 a.m., yup.

Q.      And what about the last two pages,
do you recognize those?

A.      No.

Q.      Okay.  All right.  So going to the
Miranda warning on the first page, did it cause
you any concerns at all that the interrogation of
Michael Cifizzari began approximately 1:30 a.m. in
the morning?

A.      No.

Q.      Okay.  What about the fact that his
signature, initially, was signed as Paul M.
Cartney?

A.      Yeah, we were aware of that.

Q.      Yeah.

A.      That was part of the motion.

Q.      Yeah.

A.      Yeah, that was part of the motion.
Does it cause me concern?

Q.      Yes.

A.      Well, it was -- it was a very
strange fact, for sure, and the judge heard it
all, you know, heard that in depth.

Lawrence Murphy
March 06, 2024                                                                        59

Q.    Right.

A.    And he found against it, you know, he found that he was waiving his rights.

Q.    Right.  Okay.

A.    So...

Q.    Okay.  And on the Miranda warning, did anybody explain to you why it was that they wrote it out in longhand like this?

A.    No.  I -- I don't really remember this warning.

Q.    Okay.

A.    I -- I don't remember that.

Q.    Fair enough.

A.    Yeah.

Q.    Fair enough.

And on the bottom of it, there are two witness signatures.  There's John Chianese and -- and Sergeant DiGirolomo.

A.    Yup.

Q.    And that's consistent with your understanding, that those were the two officers who interrogated Michael Cifizzari, correct?

A.    Yes.

Q.    And then I think you testified that

RA 472

Lawrence Murphy
March 06, 2024

60

you didn't recognize the -- the handwritten statement after that; is that right?

A.    That's right.

Q.    Okay.  I'm going to ask you just a couple questions about -- from this statement. Starting at the second line from the top, the sentence at the end begins, "The TV was running loud."  Did either Mr. Chianese or DiGirolomo tell you that they're the ones who told Mr. Cifizzari that the TV was on loud?

A.    I -- you went to the back of that Miranda warning?

Q.    Yeah, it's on -- it's actually the second page, which is the statement.

A.    Okay.

Q.    Yeah.

A.    All right.  And what's the question?

Q.    The question is, did either Mr. Chianese or DiGirolomo tell you that they're the ones who gave information about the volume of the television to Michael Cifizzari?

A.    No, I -- I -- I don't -- I don't --

Q.    Okay.

A.    -- I don't recognize that.

Q.    Okay.  And -- and rather than actually just look -- looking at the statement, I'll just ask you some general questions.  Did either Mr. Chianese or Mr. DiGirolomo tell you that they gave information to Michael Cifizzari as part of the interrogation about where the body was found?

A.    The thing I -- I -- the thing I would say about this is I don't recognize this statement.

Q.    Okay.

A.    I do not recognize that statement.

Q.    Okay.  All right.  Fair enough.  Yeah, you can just put it in the pile.

A.    Okay.

Q.    Thank you.

All right.  Showing you what's been marked as Cifizzari Deposition Exhibit 34.

A.    Can -- can I explain this a little bit more?

Q.    Yeah, feel free.

A.    The state police report may or may not have this in here, or have these details in there.  I -- I don't -- you know, that's -- that's

another -- that's another issue.  But this thing -- this statement, handwritten statement, and this Miranda, handwritten Miranda, I don't recognize them.

Q.    Okay.  Okay.

A.    It could be part of the DA's -- you know, it could be part of the DA's file.  I don't know.

Q.    Sure.  Okay.

A.    But I don't recognize it.

Q.    Got it.

Same question for Deposition Exhibit No. 34, and simp -- that's simply, do you recognize that?

A.    (Witness perusing documents)

I -- I don't recognize this, no.

Q.    Okay.

A.    And once again, this -- some of these facts may be in the distant -- the state police report, but I do not recognize this.

Q.    Fair enough.

Same question for Deposition Exhibit No. 35.  If you can look at that and tell me if you recognize that.  And I'll represent to you

Lawrence Murphy
March 06, 2024                                                          63

that there are two statements in this one.

A.       (Witness perusing documents)

Are you asking me about all the pages?

Q.       Yes, exactly, if you -- if you recall seeing any of the pages that are in Exhibit 35.

A.       I don't recognize these, no. However, some of the -- I'm not reading it in detail, but some of the facts may be contained in the state police report.

Q.       Sure, sure.  I'm going to show you what's been marked as Cifizzari Deposition Exhibit No. 27, and ask if you've ever -- if you recall ever seeing that before?

A.       (Witness perusing documents)

I would say that, probably, yes, to this.  This appears to be material related to the motion to suppress, which I do recognize.

Q.       Okay.  And -- and this would be a police report that you typically would receive as part of the prosecution; is that right?

A.       It's -- yes.

Q.       Okay.

RA 476

A.      Yes.

Q.      Okay.  All right.  And I'm going to show you what's been marked --

A.      And that's from Milford Police Department --

Q.      Yes, exactly.

A.      -- for the record.  Yes.

Q.      Yes.  I'm going to show you what's been marked as Cifizzari Deposition Exhibit 38, and ask if you recognize what these photographs are?

A.      No.  I recognize them as Michael Cifizzari, but I don't remember ever having seen these before.

Q.      Okay.  I'm going to show you what's been marked as Cifizzari Deposition Exhibit No. 53, and just generally ask if you know what kind of form this is?

A.      (Witness perusing documents)
        Seems to be an intake form from the Boston Municipal Court.

Q.      Okay.  On -- on the back of the second page of Cifizzari Deposition Exhibit 53, there's a signature by a John F. Daley, in the

case --

A.     Is this totally a separate question?

Q.     Yes, exactly.

A.     New -- new topic?

Q.     Well, it's the same -- same -- same document there.

A.     Oh, okay.

Q.     So there's a John F. Daley who signed off on it on February 26, 1981, which is the date of the interrogation.  The question for you is, did you recall a probation officer by the name of John F. Daley?

A.     No.

Q.     Okay.  Did you have much contact with probation officers?

A.     When I was in District Court, yes, but not when I was in Superior Court, because we have a different department.

Q.     Okay.  And -- and in --

MR. CAFFREY:  I'm sorry.  Can I interrupt?

MR. LOEVY-REYES:  Yeah.

THE WITNESS:  Yeah.

MR. CAFFREY:  Can we just take a

five-minute break?

MR. LOEVY-REYES:  Oh, yeah, of course, always.  I meant to tell you, too, Mr. Murphy, if you ever want to take a break.  I'm just always happy I'm not the first one to ask, so thank you, Joe.  I appreciate it.

MR. CAFFREY:  Okay.  It's a competition.

MR. LOEVY-REYES:  It is.  Well, it's, you know, trying to be tough.

(A recess was taken)

THE COURT REPORTER:  Go ahead.

Q.     (By Mr. Loevy-Reyes)  I'm going to take us back to Exhibit 53.  I'm just going to read something off of this.  And it states on the first -- and then it goes back over to the second side, "Defendant has been a patient in State Hospital recently.  I attempted to speak to him, but I was unable to get any intelligent responses."

Were you aware that morning or the

Lawrence Murphy
March 06, 2024                                                          67

day after his interrogation, John Daley, the

probation officer, reported that information?

        A.      No.   But is that in response to

the -- the fact that the two officers took him to

the hospital the night before?

        Q.      It's just -- it -- it's a -- it's

a -- it's a court document.   It says it's a

pre-trial intake report.   I'm not sure what the

basis of it is.

        A.      Yeah.

        Q.      But the question is really just

about whether -- whether you knew that

information, that Mr. Daley, the probation

officer, wasn't able -- unable to get any

intelligent response.

        A.      No.

        Q.      Okay.

        A.      I -- I don't -- I know -- I don't

know anything about that interview.

        Q.      Okay.   I'm going to show you what's

been marked as Cifizzari Deposition Exhibit 51.

First of all, I'll ask you if you recognize what

this is?

        A.      Looks like an examination by a

RA 480

Lawrence Murphy
March 06, 2024                                                                      68

doctor.

Q.    Okay.  What is a 15 AGL Chapter 123 examination?

A.    I think it's -- it -- it's -- I think it's a competency thing.

Q.    Okay.

A.    Maybe competency and responsibility.

Q.    Uh-huh.

A.    Maybe initial -- the initial screening exam by the doctor at the court.

Q.    Sure.  Were you made aware that the day after the interrogation, February 27, 1981, that Dr. James S. Robeson reported, "I feel this man's current mental state raises questions of his competency to stand trial or understand the charges made against him"?

A.    What's the question on that?

Q.    Were you aware of that information?

A.    I would say probably, because now we're into the court process.

Q.    Yes.

A.    I would know that he had competency exams and -- and it's a screening exam, competency and responsibility.

Lawrence Murphy
March 06, 2024                                                      69

Q.    All right.  I'm going to show you what's been marked as Cifizzari Deposition Exhibit No. 52.

A.    Sorry.

Q.    Oh, that's okay.  I'll ask you to look at that and tell me if you recall ever seeing that before?

A.    (Witness perusing documents)

It looks like a -- a report from a -- a doctor to the court about Cifizzari, but I -- I can't really get the details of it or the date of it.  Looks like it's -- I can't tell.

Q.    Yeah, I think there's a date at the top of the first page of --

A.    Oh, yeah.  13 --

Q.    -- Mark -- March 13th --

A.    -- March, '91.

Q.    '81.

A.    '81.  I'm sorry.

Q.    Yes.  That's okay.

A.    Yeah.

Q.    Did you do know a Dr. Albert Pike?

A.    I remember the name, so he was a court clinician that would do exams at court.

That's the way I remember it.

Q.    Okay.  I'm going to ask you to go toward the back of Exhibit 52, on page Cifizzari 3272.  At the bottom of the page, there's a summary and conclusions, number one, it reads, "At the present time, Mr. Cifizzari is psychotic." Were you made aware of that in March of 1981, that Dr. Pike was -- was identifying that Michael Cifizzari was psychotic?

A.    I have to amend my prior answer, which is, Dr. Pike is from Bridgewater.  So he's one of the doctors that -- that did a responsibility exam at Bridgewater.  I would have seen this.

Q.    Sure, sure.

A.    Yeah.

Q.    So you would have been -- you would have made -- been aware, at some point --

A.    Yes.

Q.    -- that Dr. Pike was saying that Michael Cifizzari was psychotic?

A.    Right.

Q.    Okay.

A.    Yes.

Q.    And then, also, you -- you would have been made aware that --

A.    I don't really remember that part of it --

Q.    Yeah.

A.    -- but I would say, yes, I would -- I would be told that.

Q.    Sure.

A.    Yeah.

Q.    And you would also have been made aware of the second conclusion, on page Cifizzari 3273, that applying the above criteria, Mr. Cifizzari would be considered unfit to stand trial?

A.    I -- I -- I would know that that process happened, and, you know, that's part of the doctor's report.

Q.    Yeah.

A.    I would know that.  I would have read that report.

Q.    And in fact, you would have, based upon that report -- I'm going to show you what's been marked as Cifizzari Deposition Exhibit 44. Fair to say that this is your petition for the

RA 484

commitment of Michael Cifizzari, based upon that report, meaning the report by Dr. Pike?

A.    Yes, I would say that's a result of a court hearing.

Q.    Right.

A.    Right.

Q.    Well, in -- in Exhibit 44, it looks like it's -- it's your petition, correct?  You signed off on the -- on --

A.    Yes.

Q.    -- the second page?

A.    Right, right.

Q.    And then on the bottom of the first --

A.    But there is a court hearing.

Q.    Yeah, oh, of course.

A.    Yeah.

Q.    Of course.

A.    Yeah.

Q.    And at the bottom of the first page, you're saying that according to the report of Albert D. Pike, MD, of March 13, 1981?

A.    Right, yeah.

Q.    Yeah.

Lawrence Murphy
March 06, 2024                                                                    73

A.      They -- they would be connected.

Q.      Okay.  Okay.

A.      Right.

Q.      And it looks like -- you said there would have been a court hearing.  I'm going to show you what's been marked as Cifizzari Deposition Exhibit 41.  It looks like there was a court hearing, and the court did order that Michael Cifizzari would be committed to Bridgewater; is that right?

A.      Yes.

Q.      Okay.  I'm going to show you --

A.      That's the judge's signature at the bottom.

Q.      Yes.

A.      Judge Meagher, M-E-A-G-H-E-R.

Q.      I'm going to show you what's been marked as Cifizzari Deposition Exhibit 47.  Ask if you recall ever seeing this before.

A.      (Witness perusing documents)

I would say it's a Bridgewater doctor's report.

Q.      Sure.  And if you go to the last page of Cifizzari Deposition Exhibit 47, there's a

signature line of a Frederick W. Kelso, assistant medical director. Did you know Mr. Kelso?

A.    Not really, no.

Q.    All right.

A.    I -- I -- I'm just trying to search my mind quick to see if we would ever have a hearing. Most of these things are standard forms, and many of them use no hearing. Yeah.

Q.    You were made aware, at least from '81 to '83, that Michael Cifizzari was continually -- continuously found to be unfit to stand trial; is that right?

A.    Yeah. I think he -- he spends time at Bridgewater.

Q.    Right.

A.    Right.

Q.    Right. Okay. And then going back to the last page of Cifizzari Deposition Exhibit 47, the first conclusion is that the patient remains mentally ill, and it describes him as an individual with a long history of schizophrenic diagnosis, who also presents with a history of extensive drug abuse.

You would have been made aware of

Lawrence Murphy
March 06, 2024                                                                                75

that during the '81 to '83 proceedings when he was unfit to stand trial?

A.    Yeah, I would have read it.  But I -- I don't remember the drug abuse part of it, but it -- it -- it kind of fits.

Q.    Okay.  All right.

A.    At some point he was deemed to be sent back to court.  He -- he was found to be competent and responsible.

Q.    Yes.

A.    Well, competent, anyway.

Q.    And -- and that would have been -- that would have been before he was put on trial, obviously, correct?

A.    Right, right.  I don't think he -- I don't think he presented a not guilty by reason of mental illness defense.  I think it was just a straight-on-the-facts case.

Q.    Right.  He -- he claimed -- he claimed that he was innocent.

A.    Right, right.

Q.    I'm going to show you what's been marked as Deposition Exhibit No. 50.  This is a letter to Michael Monopoli, M-O-N-O-P-O-L-I, who

Lawrence Murphy
March 06, 2024

76

was Michael Cifizzari's lawyer, from Dr.

Borenstein, B-O-R-E-N-S-T-E-I-N.  Do you recall

receiving this letter?

     A.    No, and I don't know that I would

have, because I -- I don't really understand what

this is.

     Q.    Okay.

     A.    But -- but as far as a defense

doctor with that -- with a defendant, I probably

never got to see that.

     Q.    I see.  Okay.

     A.    Yeah.  Because of Fifth Amendment.

     Q.    Sure.  All right.  I'm going to show

you what's been marked as Cifizzari Deposition

Exhibit No. 42, and ask you to look at that and

tell me if you recognize what that is.

     A.    (Witness perusing documents)

          I think this is probably the same

situation.  It's a defense report regarding the

defendant, which I would not be privy to.

     Q.    Okay.  And why do you think it would

be a defense report?

     A.    I'm just looking at it quickly.  I

could be wrong, but I see psychology trainee, test

Lawrence Murphy
March 06, 2024                                                              77

results.

Q.    Okay.

A.    Yeah, I -- I -- I wouldn't get test results on --

Q.    Okay.

A.    -- because of the Fifth Amendment.

Q.    Underneath test results, actually, that first line, identifies Michael Cifizzari's IQ as being 75.  Were you ever made aware that Mr. Cifizzari's IQ was 75?

A.    I don't remember it.  It could have been -- it could have been in another document.  I wouldn't have gotten it through this one.

Q.    Sure, sure.  All right.  I'm going to show you what's been marked as Cifizzari Deposition Exhibit No. 31, and ask if you've ever seen that before?

A.    "Qualified Physician's Report, Examination of the Defendant, Lamb Warnings."

(Witness perusing documents)

I can't -- I -- looks like a mental illness type report, which I've probably never received --

Q.    Okay.

Lawrence Murphy
March 06, 2024                                                                    78

A.       -- because of -- once again, because of the Fifth Amendment.

Q.       What is --

A.       I think it's probably the defense attorney having him examined to see whether or not they should be presenting a mental illness defense.  And at some point in time, the defendant and the attorney would have decided not to present it.  So I never see it.

Q.       What is an examination under Section 15A GL Chapter 123?

A.       I think it's a competency and responsibility exam, but primarily competency.

Q.       Okay.  Going to the second paragraph on page 1 of Deposition Exhibit 31, which is --

A.       Is that the last one I still have?

Q.       Yup, exactly.

A.       Okay.

Q.       Which has a Bates number of Cifizzari 1243.  The second paragraph reads, in the first sentence, "According to clinician attending him when evaluated for Mass Rehab Services, 9/1982, he has IQ of 75, (borderline mental deficiency), and a MMPr profile consonant

RA 491

Lawrence Murphy
March 06, 2024                                                                    79

with a schizoid personality disorder, with passive aggressive features."

Were you made aware of that regarding Gary Cifizzari during the prosecutions in 1983?

A.    Now we're shifting -- shifting to Gary, right?

Q.    Yes, exactly, Gary.

A.    Would I have been aware of these reports for Gary?  I would say no.  We're in the same situation.  This is a psychiatric-type report.  I -- I recognize the signature of John O'Connor, the clerk, so -- but also, L. Hipshman, MD.  It's H-I-P-S-H-M-A-N, MD.  I can't read the name above it.  Cecilia Hay (phonetic), something or other, Caceres, maybe.  Lamb Warning situation.

I think this is a warning with a defendant on mental illness that I -- I wouldn't get.

Q.    Do you know -- so Exhibit 42 appears, to me anyway, to be something that was filed with the -- with the court.  Are you aware whether this was ever filed?

A.    That same one you just give me?

RA 492

Lawrence Murphy
March 06, 2024                                                                          80

Q.    Yes, exactly.

A.    That one?  Yeah, I would think it would be part of the court papers --

Q.    Okay.  Okay.

A.    -- part of the court papers, but not -- not -- I don't think it's part of the DA's papers.  I think it's part of the court's papers.  They're looking at the -- at the -- at the defendant's competency and responsibility.

There -- there's a number of rules that pertain to whether or not we get reports of doctors.  And usually, very -- very strict, and I'm not sure where it is right now, but it's very, very strict.  We don't really get a report even until they've already testified in court, which is kind of an odd rule, but that's what it is; that's what it was anyway.

Q.    I'm showing you what's been marked as Cifizzari Deposition Exhibit No. 48, which I'll represent to you is a motion for a view, which is signed by you.

A.    Right.

Q.    And what -- what sort of view were you asking the court to allow?

Lawrence Murphy
March 06, 2024

81

A.    Well, let's see.  Usually, I would go to the scene of the murder with the -- with the jury and get a bus, take the jury, court officers, and they'd see -- they'd go to the scene.

Now, I don't remember it in this case, but obviously we did.

Q.    What would --

A.    Yeah.  And it's -- and that's standard procedure.  Some cases, rarely, wouldn't go to the view --

Q.    Okay.

A.    -- but it makes sense for the jury, because they can follow the testimony.

Q.    Okay.  And -- and you don't know in this case whether it was granted or not?

A.    I don't, but it looks like it was.

Q.    Okay.

A.    I think it was.  I think we did it, but I don't remember it.

Q.    Okay.

A.    I remember the house.  And I remember downtown Milford, how close it is to downtown Milford, very close to the main street. And I remember the house, too.  So I -- I know I

went there.  I don't know if that is from the view or -- I -- I know that I went there prior to it, too.

Q.    Fair enough.

Did you ever see any handwritten notes from either Officer Chianese or DiGirolomo regarding their interrogation of Michael Cifizzari?

A.    Probably not, but if you have them, can I look at them?

Q.    I don't have them; that's what I'm trying to ask --

A.    Oh.

Q.    -- if you ever saw them.

A.    No.

Q.    Okay.

A.    No.  I -- I -- I don't have any memory of seeing handwritten notes from them, no.

Q.    Okay.  Outside of reading about Michael Giroux in this case, had you ever heard his name, regarding any matter, during your time at the DA's Office?

A.    No.  The only thing I ever remember is what I said earlier.  She -- Kathy Duncan, who

later became Kathy Duncan from Kathy Terhune, saying, "my brother-in-law." And I didn't know it was her brother-in-law, but, you know, Prisoners' Project said that's her brother-in-law.

Q.    Right.

A.    Right.

Q.    At some point, Gary Terhune, T-E-R-H-U-N-E, indicated that he had seen somebody inside the Schiappa apartment as he was coming or going. And he described the person as five-nine to five-eleven, with an afro-type haircut. Did you ever speak with Mr. Terhune about the person that he saw?

A.    Yes, and he testified.

Q.    Yeah. What did he --

A.    I think he testified in both cases.

Q.    Yeah. What did he tell you, outside of the testimony that he gave, about the person he saw?

A.    He said -- he changed that testimony. He said, I couldn't tell if it was a male or a female. And -- and originally, I think he said male, but he did change it, and...

Q.    Did he tell you why he changed it?

Lawrence Murphy
March 06, 2024                                                                84

A.    No, no.  He was just unsure.  He was unsure because I wanted -- obviously, I wanted to -- to get his best testimony as to what he sees inside this house.  And he originally said man, but he couldn't say that -- he did not say that at trial.

Q.    Okay.

A.    Yeah.

Q.    And you don't know --

A.    At least at -- at least one of the trials, the second trial.  I'm not sure if on the first trial he did.

Q.    Right.

A.    I -- you know, but I assume that, you know, he -- he backed away from that statement.

Q.    Right.  And -- and you don't know why he backed away, do you?

A.    No, no.  I -- I assume that it was because he was legitimately unsure, you know, but that's what happened.

Q.    And why would you assume that was the case?

A.    Well, because when he testified,

RA 497

he wasn't sure.  You know, he was -- I was surprised -- a little bit surprised, but, you know, that's -- you know, sometimes witnesses change.

I've never seen a picture of Michael Giroux to see what he looks like, you know.

Q.    Did you ever receive any reports from a Milford Police Officer by the name of Brian Harris?

A.    I -- I would need to know what his -- what his role was in the case.  I think I know Brian Harris.  I know that name.  I had very few cases in Milford, but I -- I have no memory of Brian Harris.

Q.    Okay.

A.    No.

Q.    What about specifically, did you receive any reports from Brian Harris about an interview with a neighbor by the name of Mary Halkett, H-A-L-K-E-T-T?

MR. CAFFREY:  Objection.

You can answer.

THE WITNESS:  I don't recognize that name.

Lawrence Murphy
March 06, 2024
86

Q.    (By Mr. Loevy-Reyes)  Okay.

MR. LOEVEY-REYES:  Those are all the questions I have.  See, I told you I'm working on timeliness.

MS. BADWAY:  Thank you.  Now we have to go to the other side.

MR. CAFFREY:  I know, right.

MR. LOEVY-REYES:  I just don't want you to blame me.

MS. BADWAY:  I promise I won't.

THE WITNESS:  Want me to give you back all these papers?

MR. LOEVY-REYES:  Yeah, sure, I'll take them.

THE WITNESS:  Okay.

MR. LOEVY-REYES:  Then I've got to reorganize them.

THE WITNESS:  You don't want to give them to me, right?  Do you get them?  No?

THE COURT REPORTER:  I mean, I -- I -- I got some spellings while we were going, but maybe I'll just --

MR. LOEVY-REYES:  Yeah.

THE COURT REPORTER:  -- look at them

Lawrence Murphy
March 06, 2024                                                    87

before I leave --

          MR. LOEVY-REYES:  Sure.

          THE COURT REPORTER:  -- if that's

okay.  And then I'll give them back.

          MR. LOEVY-REYES:  And also -- and

you can also email me for any spellings,

too.

          THE COURT REPORTER:  Okay.

          MR. LOEVY-REYES:  I'm happy to -- to

share.

          THE COURT REPORTER:  You were very

good about spelling most things.

          MR. LOEVY-REYES:  I try to remember.

          THE COURT REPORTER:  Yeah.  Thank

you.  I appreciate it.

          MR. LOEVY-REYES:  Yeah.

          MR. CAFFREY:  Okay.  Before we

start, do you need to take a break?  Are

you good to start?

          THE WITNESS:  Go ahead.

          MR. CAFFREY:  Okay.

          THE WITNESS:  Thank you.

RA 500

EXAMINATION BY MR. CAFFREY:

Q.    All right.  Okay.  Attorney Murphy, I'm Attorney Joseph Caffrey.  I represent the Defendant, Town of Milford, in this action --

A.    Yes.

Q.    -- and -- and a police officer named John Chianese.

A.    Yeah.

Q.    I've got a series of questions for you, similar to the ones that you were asked earlier --

A.    Yeah.

Q.    -- by Attorney Loevy-Reyes.  And I'd ask that if at any time you don't hear my question, let me know and I'll speak up and repeat it for you.  Okay?

A.    Sure.

Q.    And if at any time you don't understand my question or one of the words in my question, let me know and I'll be happy to rephrase it or tell it to you another way.  Okay?

A.    Thank you.

Q.    So if you don't hear it or

Lawrence Murphy
March 06, 2024                                                          89

understand it, don't answer it; ask me to try again.  Okay?

A.   Okay.

Q.   All right.  Let me ask you first a question about the court reporters for this case.  Do you remember a court reporter named Ron Frencescone?

A.   Yes.

Q.   Okay.  Do you have any information as to where his whereabouts is; is he still living, if you know?

A.   Well, that's a good question.  He's probably at least 10 years older than I am, maybe more, so he's probably 85.  He retired a long time ago.

Q.   Yeah.

A.   He was a very, very well-known reporter.

Q.   Yes.

A.   And he lived in Framingham.  And I haven't seen him.  I don't know, you know, whether he's still alive or not.

Q.   Okay.

A.   But he was an excellent reporter.

RA 502

Q.    Okay.  And I think, if I understood you correctly, your first involvement in this case was not in -- not in the 1979 timeframe, when the murder took place, but rather around 1981, when Mr. Michael Cifizzari appeared at the Milford Police Station and gave a statement to the Milford Police Department; is that correct?

A.    Yes.

Q.    Okay.  You were shown a bunch of documents today.

A.    It was actually the next day, but it's -- it's that same time period.

Q.    Okay.

A.    Right.

Q.    So at no time were you present at the Milford Police Department while Mr. Michael Cifizzari was giving any statements --

A.    No.

Q.    -- is that correct?

A.    Correct.

Q.    Okay.  Now, you were shown several documents this morning about this interrogation or questioning of Michael Cifizzari at the Milford Police Station, correct?

Lawrence Murphy
March 06, 2024
91

A.     Yes.

Q.     Okay.  And it's your understanding that the day after that, Mr. Michael Cifizzari was questioned all over again by the CPAC unit, correct?

A.     Yes.

Q.     And the CPAC unit, if I understand correctly, is a unit of the Massachusetts State Police that works under the operation and control of the Worcester County District Attorney.

A.     Well --

Q.     Or in affiliation.

A.     -- they work with them.

Q.     Okay.

A.     They work with the DA's Office in Worcester.  They're -- of course, it's the state police.

Q.     Okay.

A.     So we don't really control them.

Q.     Okay.

A.     But they -- they have a number of detectives there.

Q.     Yeah.

A.     And they handle the -- the murders

RA 504

for the county of Worcester.

Q.    Okay.

A.    And --

Q.    So --

A.    Except for the Town of Worcester. They ha -- they ha -- they handle every other town.

Q.    Okay.

A.    Yeah.

Q.    So Worcester, in the view of the District Attorney's Office, is able to investigate murders that happen within the city of Worcester --

A.    Yes.

Q.    -- is that correct?

A.    Yes.

Q.    Okay.  Milford, in the eyes of the Worcester District Attorney, is not equipped to investigate murder offenses?

        MR. LOEVY-REYES:  Object -- objection.

        You can go ahead and answer.

        THE WITNESS:  Well --

Q.    (By Mr. Caffrey)  As a matter of

Lawrence Murphy
March 06, 2024                                                          93

policy?

MR. LOEVY-REYES:  Objection.

You can go ahead and answer.

THE WITNESS:  I -- I think it -- it's fair to say that Milford doesn't have many murders.

Q.     (By Mr. Caffrey)  Yeah.

A.     And therefore, they wouldn't be as experienced as the state police handling murders. Murders are a special level of criminal prosecution.  And I -- I would say the Milford Police Department is good, but they don't handle many murders.

Q.     Okay.  And is it practice or procedure that when a murder takes place in Milford, that the state police are notified to investigate that murder?

MR. LOEVY-REYES:  Objection.

You can go ahead and answer.

THE WITNESS:  They are assigned, yes.

Q.     (By Mr. Caffrey)  Okay.

A.     And they're made aware of the -- the fact.  They're assigned.  They -- they respond to

RA 506

Lawrence Murphy
March 06, 2024                                                                 94

the scene with a number of detectives, and they

help out --

Q.      Okay.

A.      -- in conjunction with Milford.

Q.      All right.  And going back, you were

shown some documents this morning that showed, for

example, police attempts to get fingerprints from

crime scene services.  Do you recall that?

A.      Yes.

Q.      And those reports, were

those -- strike that.

You talked about a lab that

had -- that would hold the evidence for a murder.

Do you remember that this morning?

A.      Yes.  And they would also respond to

the scene.

Q.      Yeah.

A.      The lab would respond to the scene

and would coordinate with the police as to what

they should take.

Q.      Okay.  Now, is that lab, is that a

Milford lab or a Mass State Police lab?

A.      Mass State Police.

Q.      Okay.  Now, going back to the

RA 507

questioning of Michael Cifizzari, that you were shown documents about this morning, I think you just indicated he was questioned initially at Milford Police Department by some Milford Police Officers, and then he was interviewed a second time, a day later, at the CPAC Office in Worcester --

A.　Yes.

Q.　By the Worcester State Police, correct?

A.　Yes.

MR. LOEVY-REYES:　Objection.

You can go ahead and answer.

Q.　(By Mr. Caffrey)　Okay.　With regard to the first interview of -- or questioning of Mike Cifizzari, are you aware -- or did you see any reference to Michael Cifizzari implicating Gary Cifizzari at that Milford Police interview?

A.　Yes.　Now, there's two Milford Police office -- two Milford --

Q.　Yes.

A.　-- statements from Michael.

Q.　Yup.

A.　There's one at the hospital, or on

Lawrence Murphy
March 06, 2024                                                    96

the way to the hospital.

Q.    Yup.

A.    And then there's one at the -- at the police station in the middle of the morning. One of those, he said Gary was there.

Q.    Okay.  Well, at one of those, he talked about Robert Cananzey --

A.    Yeah, he said --

Q.    -- his cousin.

A.    -- Robert Cananzey was there, too.

Q.    Okay.

A.    Yeah.

Q.    All right.  But the -- the -- the statement --

A.    He said -- I -- I believe his statement was, Robert was there, and Gary was there too.

Q.    Okay.  Are you saying with regard to both the State Police CPAC interview and the Milford Police interview, or just one?

A.    I could be confused, but I --

Q.    Okay.

A.    -- I -- I don't think so.  He said to Milford, one of those two stations --

Lawrence Murphy
March 06, 2024

97

statements in Milford, Gary was there.  Robert Cananzey was -- he said to the state police in Worcester, to Joseph Doheny --

Q.    Yeah.

A.    -- Gary was there.  And I think he also said it to one of those police officers in Milford, Gary was there.  I don't know if it was DiGirolomo or the guys that took him to the hospital.

Q.    All right.  Well, you were shown Exhibit 35 this morning.  Can you take a look at that?

A.    (Witness perusing documents)

Now, this is the one that -- one of the ones that I said I've never seen.  Now --

Q.    Okay.

A.    -- I've seen -- I've -- I've seen the state police report that talks about Michael's statements.  I've also had motions to suppress --

Q.    Yeah.

A.    -- on Michael's statements.  And Michael's statements regarding Gary, Michael said Gary was there, I think twice, in those statements.  Maybe there was only one, but I think

RA 510

it was twice.

Q.    Okay.  And do you see any reference to Gary in that statement, which is Exhibit 35?

A.    (Witness perusing documents)

I think what I've seen is a shortened version of this, with less detail.

Q.    Okay.

A.    And I believe that was testified in court, that Gary was present, according to Michael.  My memory is twice, but it may only have been once.  I'm -- I'm sure that it was with Joseph Doheny, the sergeant --

Q.    Right.  Okay.  So --

A.    -- with the state police.  I'm not positive there.

Q.    Okay.

A.    I think it was -- I think one of the officers, he did say that, either to DiGirolomo and to the -- and the other officers that took him to the hospital.  I think one of them, he -- he -- he said it, but I'm not positive.

Q.    Okay.  So I don't want to put words in your mouth, but you're -- you're saying, if I'm hearing you correctly, you're -- you're sure that

Lawrence Murphy
March 06, 2024                                                    99

when Michael Cifizzari was interviewed at the CPAC office by the state police, he made a statement that said that Gary Cifizzari was present --

A.    Right.

Q.    -- at the murder scene, correct?

A.    Right.  You want me to explain that a little bit?

Q.    No, no.

A.    Okay.

Q.    No.  Let me ask the next question.

A.    All right.

Q.    With regards to what was said at the Milford Police Department, are you telling us you're not sure that Michael Cifizzari implicated Gary Cifizzari in that setting?

A.    Right.

Q.    Okay.  That's fine.

A.    Right.

Q.    All right.

A.    I -- I would say that those things are in reports.

Q.    Okay.

A.    To clear -- clear that up, clear up my memory.

Q.    Okay.  You were asked about Michael Giroux this morning.  Do you recall some questions about him?

A.    Right.

Q.    Okay.  And I -- I think you were asked about whether anyone from Milford -- do you have a memory, as you sit here today, many years later, whether anyone from Milford ever mentioned Michael Giroux to you, correct?

A.    Yeah.  No one -- no one ever mentioned Michael Giroux to me.

Q.    Okay.  You also mentioned that there was -- were you -- I assume you were present at the suppression hearing, correct?

A.    Yes.

Q.    And Mr. Giroux -- strike that.

Mr. Michael Cifizzari would have been represented by Michael Monopoli, correct?

A.    Yes.

Q.    And you -- Michael Monopoli, unfortunately, is deceased, correct, at this time?

A.    Yes.

Q.    And he was an attorney who, maybe not exclusively, but did a lot of criminal defense

Lawrence Murphy
March 06, 2024                                                                101

work; is that correct?

    A.    Right.  He was also an assistant DA earlier.

    Q.    Okay.  I'm going to show you some pages from the -- the suppression hearing, which, again, was long ago.

    A.    Yup.  I do remember parts of it, though.

    Q.    Okay.

    MR. CAFFREY:  Do you want to see these before I...

    MR. LOEVY-REYES:  Sure.

    MS. BADWAY:  Yes, sure.

    MR. CAFFREY:  So I'm going to apologize; I don't have copies for everybody, but I only have a copy right here, if we can -- if the court reporting company can help me.

    MR. LOEVY-REYES:  Or you could just give me the Bates numbers, then.

    MR. CAFFREY:  Yeah, I'm going to put it on the record.

    MR. LOEVY-REYES:  Yeah.

    Q.    (By Mr. Caffrey)  The Bates numbers

for these are Worcester DA004820, 4821, 4822, 4823. I'll represent to you that there's a -- a police official on the witness stand being questioned at the suppression hearing.

A.    That's a transcript of that?

Q.    Yes.

A.    Okay.

Q.    And I'm going to ask if you can read to yourself, let's just start on page 339, from line 17, all the way to the end of that, please.

A.    Can you tell me who was on the stand?

Q.    I -- I believe it's Sergeant DiGirolomo, but --

A.    Oh, no. I'm sorry. Excuse me, I've got to -- well, let's see. "Principal investigators in the case."

      (Witness perusing documents)

      It would be helpful if you could tell me who's doing this.

Q.    Okay. Let me go back. I believe it's Thomas White.

A.    Okay.

Q.    State police.

A.    Yeah.

      (Witness perusing documents)

Q.    What's the first page you have in front of you, sir, the Bates number at the bottom?

A.    I'm looking -- well, the first one is 339.  I'm on to 340 now, if that's okay.

      (Witness perusing documents)

      Okay.

Q.    Okay.  You've had a chance to look at that, sir?

A.    Yes.

Q.    Okay.  Does this refresh your memory as to whether Michael Giroux was referred to in the suppression hearing?

      MR. LOEVY-REYES:  Objection.

      You can go ahead and answer.

      THE WITNESS:  I see that he was.

Q.    (By Mr. Caffrey)  Okay.  So in your mind, no one hid who Michael Giroux was from you during the course of this investigation?

A.    Well --

      MR. LOEVY-REYES:  Objection.

      You can go ahead and answer.

      THE WITNESS:  I would say that's the

first time I've -- I've heard of Michael Giroux. I mean, I -- I did not -- I do not remember him in that -- in that hearing.

Thomas White, I know him as a detective. I have never seen a report from Thomas White. I don't think that Thomas White -- I don't think the District Attorney's Office has a report from Thomas White regarding that. And that's -- that's all I can say.

Q.    (By Mr. Caffrey)  Okay.  And --

A.    And the other thing I should say is, it does not say what Michael Giroux told him. We don't have a statement from him. And did he ever give a statement?

Q.    Well, you know who Robert Meier is?

A.    Yes.

Q.    And who is Robert Meier?

A.    Robert Meier is -- is another trooper, a detective, and he was, basically, the main detective who did the work on the bite mark impression.

Q.    Okay.

A.      And he was the one that obtained the -- the impressions of Gary, and he's the one that found the dentist of Gary Cifizzari. He -- he did a lot of work in this case.

Q.      Okay.  And do you also know a gentleman, who I believe is now deceased, named Joseph Doheny?

A.      Yes.

Q.      Okay.  And who was Joseph Doheny?

A.      He was the lead detective on the case.  And he -- he was a lead detective for years on many cases.  He was probably the lead detective in the office, although he wasn't the head of the office.  He was a very well-known detective.

Q.      Okay.  So if you were to, sort of, rank in priority who was the number one detective on this case, who would you say that could have been?

A.      I would say Sergeant Doheny wrote the report --

Q.      Yeah.

A.      -- so he -- it's -- it's real -- he's the -- he's the lead detective.

Q.      Okay.  And then, in terms of that

ranking, where does Robert Meier fit in?

A.    He did a lot of work.

Q.    Okay.

A.    He did a lot of work.  He -- I don't know what he did initially, but when I was dealing with -- with this case, he was the primary detective.

Q.    Okay.  So you had a lot of interaction with Robert Meier and Joseph Doheny while you were trying to -- while you were prosecuting the case?

A.    Not -- not with Joseph Doheny, but with -- with Meier, yes, particularly, regarding the bite mark situation.

Q.    Okay.  And again, was -- who was Meier's employer, if you know?

A.    State police.

Q.    Okay.  Did you have a lot of interaction with detectives from the Milford's town -- Town of Milford after the Michael Cifizzari probable cause hearing was -- suppression motion was finished?

A.    Did I have dealings with them afterward?

Lawrence Murphy
March 06, 2024                                                                107

Q.    Yes.

A.    Very little.

Q.    Okay.  Looking back at this case, is there anything that you think Milford Police failed to disclose to you or led you astray?

MR. LOEVY-REYES:  Objection.

You can go ahead and answer.

THE WITNESS:  I would say Milford was good to deal with on this case; that's -- that's what I'd say, yeah.

Q.    (By Mr. Caffrey)  Okay.  I -- I want to go back now to what was marked as Exhibit 24.  This is the statement of Michael Giroux.  And I'll say here that it -- it -- according to the statement, it says, "Given to Trooper Robert C. Meier."  Do you recall looking at that this morning?

A.    Yeah, I saw it this morning, yes.

Q.    Okay.

A.    Dated October 5, '79.

Q.    Okay.  Now, the Robert Meier -- is that the Robert Meier we were just --

A.    Yes.

Q.    -- discussing that was --

A.    Right.

Q.    -- one of the investigators for the --

A.    Yeah.

Q.    -- state police?

A.    Yes.

Q.    Okay.  And that's the statement of who?

A.    Michael Giroux.

Q.    Okay.  And what's the date of that statement?

A.    October 5, '79.

Q.    So that agrees with -- you would agree with me that's shortly after the subject murder?

A.    Yes.

Q.    Okay.  So --

A.    And well before I was involved in the case.

Q.    Okay.  But according to that, as you read that document, is it fair to say that Michael Giroux was somehow on the investigative radar of the state police at that time?

A.    Yes.

RA 521

Lawrence Murphy
March 06, 2024                                                     109

Q.    Okay.  Now, during the course --

A.    Can -- can I -- can I just --

Q.    Sure.  Yeah.

A.    -- take a second?

Q.    Sure.

A.    I'm going to read from the one, two, three, fourth paragraph.  "I asked if he went near Mrs. Schiappa's house."  The spelling of Schiappa is wrong, but, "I asked him if he went near Mrs. Schiappa's house.  He said, no."

Q.    Okay.

A.    And now I'm looking at a little bit more here.  "He was too drunk to talk anyway.  I asked him if he knew Mrs. Schiappa.  He said, no.  He said" -- I -- "he knew where she lived.  He said that last September he had been visiting Kathy Duncan and Gary, and that the lady upstairs had accused him of taking money from Mrs. Schiappa.  He said he never talked with Mrs. Schiappa at that time.  He said he did not take her money and wasn't in her house.  He said that Mrs. Schiappa had never accused him of taking her money.  There was a lady upstairs.  She said he was the only one hanging around, so he must have

done it."

So his statement then continues with other -- other stuff that does not appear to be criminal.

Q. Now, is that something you would expect to be in the file of Robert Meier for this claim?

MR. LOEVY-REYES: Objection.

You can go ahead and answer.

THE WITNESS: Yes.

Q. (By Mr. Caffrey) Okay.

A. Now, the file is -- is the state police file.

Q. Yes.

A. I would expect it to be in the state police file.

Q. Okay. Now, as prosecutor for this claim against -- for -- strike that.

As prosecutor for the criminal actions that were prosecuted against Michael Cifizzari and Gary Cifizzari, did you have the power to issue search warrants?

A. No.

MR. LOEVY-REYES: Objection.

RA 523

You can go ahead and answer.

HE WITNESS:  No.

Q.    (By Mr. Caffrey)  Okay.  Did you have the power to apply for search warrants?

A.    The police would apply for search warrants.  I -- I didn't.

Q.    Okay.

A.    Yeah.

Q.    Did you ever -- and if -- and in this claim -- or strike that.

In the key -- criminal proceedings against Michael Cifizzari and Gary Cifizzari, do you recall if search warrants were requested for, say, dental records of Gary Cifizzari?

A.    I remember that Trooper Meier did the investigation regarding the records.  And I remember there was a time when we had Michael's impressions, teeth -- tooth impressions.

Q.    Yup.

A.    And they -- and there was an attempt by the experts to compare those impressions with the bite mark on Mrs. Schiappa, and it was their opinion that it was not done by Michael Cifizzari.

So at that point in time, we went to

Lawrence Murphy
March 06, 2024                                                                112

Cananzey and Gary, and said -- Trooper Meier did --

Q.      Yup.

A.      -- and got -- got it done.  I think he had search warrants, but I'm not sure on that part of it, but he got the impressions of Gary.

Q.      Yup.

A.      And then Gary -- Gary's impression was compared, and it was not, in any way, accurate or a match or consistent with the bite mark, and --

Q.      Did you say Gary or Michael?

A.      Gary -- both.  Gary's secondary. Gary was not -- was not, in any way, consistent with that bite mark.

Q.      Okay.

A.      And Trooper Meier continued his investigation and found that in 1980 Gary lost his right front tooth.  The big question in this case was who has the retreated right front tooth?  Gary didn't have it.  So he go -- he gets his dental records -- Bob Meier gets his dental records. Talks to the dentist and finds out that he replaced his tooth in 1980.  It got knocked out.

RA 525

And beforehand, it was a retreated right front tooth --

Q.    Okay.

A.    -- that he -- that Gary Cifizzari had.  And we -- we got the impressions showing that, gave it to the experts, and the experts said, yes, it's -- it's very, very consistent.

Q.    Okay.  Now, assuming those records were obtained by search warrants, would those be search warrants from -- pulled from state police or the Milford Police?

A.    Now, Gary was not under arrest at the time.  So it could have been that Gary consented to having his -- his impressions.

Q.    Okay.

A.    I'm not sure of that.  And Cananzey, I'm fairly certain, it was voluntary.  He consented to having his -- his impressions taken.

Q.    Is it your memory that the Milford Police were involved in getting these dental records or was it the state police?

A.    State police.

Q.    Okay.

A.    It was -- it was Robert Meier.

Q.    Okay.  And I think you mentioned, very early on in this deposition, that you reviewed the Supreme Judicial Court decision on this matter --

A.    Yes.

Q.    -- of Gary's conviction, correct?

A.    Yes.

Q.    And in reading that, was it your conclusion that the principal basis for the conviction was dental forensic bite mark evidence?

A.    It was very important; it was very important evidence.  The -- and the decision did mention, which was interesting to me, that we could have used Michael's statement against Gary, and we didn't.  We elected not to do that.  Joseph Nolan, writing the opinion, said that.  He said you could have done that, or it could have been done by the Commonwealth.

Q.    Okay.  There was also some discussion today about the suppression hearing and Michael Cifizzari's conviction.  Is it your understanding that that conviction is still on the books, so to speak?

A.    He's dead.

Lawrence Murphy
March 06, 2024

**115**

Q.    Yeah.

A.    But -- I -- I -- there -- there are some rules when someone's dead.  I -- I -- I forget exactly what it is.  The -- the conviction was not reversed at any time, so that --

Q.    Okay.

A.    That fact of someone who's dead and whether or not the record still holds, that's a -- that's a technical thing that I'm not really up on.

Q.    Okay.  So you were shown a lot of documents this morning, correct, concerning mental evaluations of Michael Cifizzari; remember that, those documents you were shown?

A.    Yeah, yeah.

Q.    And I think you indicated that the -- the whole issue about the competency of Michael Cifizzari was a subject of a suppression hearing?

A.    Well, not competency as much as, respond -- well, the motion to suppress the statement, it was the subject of a motion to suppress, and his mental condition would have been part of that process, and as -- as controlled by

Lawrence Murphy
March 06, 2024                                                                116

his defense attorney.

Q.    Okay.  I'm going to read you a -- a snippet here from that suppression hearing decision from the motion judge.  It reads, para -- Bullet No. 3, "The court rules the defendant's mental condition did not render the defendant incapable of understanding the meaning and effect of his confession or cause him to be indifferent to self-protection."

Do -- is that consistent with your memory of what the court found?

A.    Yes.

Q.    Okay.

MR. CAFFREY:  I'm going to mark this as the next exhibit, please.

THE COURT REPORTER:  Do we have a number that we're using, or are you going to start with one?

MR. CAFFREY:  We're going to -- no, we're going to go sequentially to what -- whatever the next exhibit number would be.

THE COURT REPORTER:  I don't know what that --

RA 529

Lawrence Murphy
March 06, 2024                                                                117

THE WITNESS:  51, maybe.

MR. LOEVY-REYES:  Let -- let -- do you mind if I give you a number?

THE COURT REPORTER:  Yeah -- yeah, that's what I was hoping.

MR. LOEVY-REYES:  Yeah, because I left off numbering yesterday.

MR. CAFFREY:  Okay.

MR. LOEVY-REYES:  So my numbering -- I think if we went to 60, that should be safe.

THE COURT REPORTER:  60?

MR. CAFFREY:  60?

MR. LOEVY-REYES:  Yeah.  I left off at 58 or 59 yesterday when I was marking exhibits.

(Exhibit 60, Defendant's Motion to Suppress Statements, marked)

Q.     (By Mr. Caffrey)  Just for the record, I just want to have -- show you Exhibit 60 for this deposition, which is the court ruling on suppression hearing.

A.       Yes.

Q.       It looks like a copy went to the DA, so is it fair to say you would have received a copy of this?

A.       Yes.

Q.       Okay.

A.       Yes.

Q.       Okay.  And having looked at that, is it your -- refresh your memory at all as to whether this particular -- well, strike that.

You -- you brought the case to a jury against Michael Cifizzari, and they found him to be guilty of second-degree murder; is that correct?

A.       Yes.

Q.       There was a DA named Harry Quick, who has passed away, correct?

A.       Right.

Q.       Did Harry handle the --

A.       Appeal?

Q.       -- appeal of this case?

A.       I assume so.

Q.       Okay.

A.       You know, I don't -- I didn't know

that, but --

Q.     Okay.

A.     -- if you tell me he did, I'm going to believe you.

Q.     All right.  Is it your understanding that the conviction was affirmed by the appeals court, of Michael?

A.     I don't know if it was appeals or supreme, but it was -- whatever it was, it was affirmed.

Q.     Okay.

A.     Yeah.  It's not first degree, so it doesn't have to go to --

Q.     Right.

A.     -- the Supreme Court.  So it --

Q.     Okay.

A.     -- probably was appeals.

Q.     All right.  The -- okay.  So there's nothing -- as you sit here today, many years later, there's nothing in your mind telling you or indicating to you that that conviction of Michael Cifizzari was flipped or turned over?

A.     No.

Q.     Okay.  You -- you indicated

that -- again, I'm trying not to repeat things, but you didn't really get involved in the Gary Cifizzari case or the Michael Cifizzari case until early 1981, when Gary Cifizzari made some statements to the Milford Police Department; is that fair to say?

A.    Michael.

Q.    When Michael said that, yes.

A.    Yeah, Michael.  Yes.

Q.    Pardon me.

A.    Yes, agreed.

Q.    Okay.  Was there a district attorney from the Worcester County District Attorney's Office assigned to this case from the time of the murder event to the time that you got involved?

A.    Not that I know of.

Q.    Okay.  And do you know why that would be?

A.    Not really.  It was a -- someone may have talked to the police at different times, but the police pretty much do their own work. They -- they're not going to come to the DA unless there's a reason.

Q.    Okay.

Lawrence Murphy
March 06, 2024                                                      121

A.      That's pretty much across the board.

Q.      Is it your understanding that during that time period, State Police Crime Scene Services and State Police Trooper Doheny and State Police Trooper Meier were involved in investigating the claim -- claim?

A.      I think it's fair to say that in the beginning they're -- they were involved in it. How much they're involved in it after, let's say, the first three months --

Q.      Yeah.

A.      -- when nothing's happening, you know, they're waiting for something. They're certainly on edge. And I imagine Milford Police was on edge, too. Everybody's on edge on this thing, trying to get it solved. And, you know, it's...

Q.      Okay.

A.      If they had a -- the thing that they would want to bring to the wit -- to the DA's Office, they could do it, and they know it. So --

Q.      Okay. With regard to Michael Cifizzari, were you ever notified that he was going to have a, sort of, parole hearing?

A.      No.  I -- I -- I don't think I ever knew that.

Q.      Okay.  Same type of question regarding Gary Cifizzari.  I believe he probably was not eligible for parole based on his sentence; is that your understanding?

A.      Yes.  First degree, but that would depend, in part, on the defense attorneys, what they're going to do.

Q.      Okay.

A.      But if they don't do anything, he's going to stay there; that's basically the bottom line.

Q.      Okay.  And with regard --

A.      Once again, that -- that is all appeals.

Q.      Yeah.

A.      The Appeals Division handles that, you know...

Q.      Okay.

A.      Yeah.

Q.      So on that subject, were you involved -- did you work at all on the Gary Cifizzari appeal?

A.      No.

Q.      Okay.  Who handled that from your office?

A.      (No audible response)

Q.      Claudia Sullivan?

A.      Yes, Claudia Sullivan.  Yes.

Q.      Okay.

A.      Thank you.

Q.      Anyone else come to mind other than Claudia?

A.      No.  She -- she was there for a while, and then she left at one point.  So I don't know who handled the DNA request.

Q.      Yeah.  Now, there's a DA -- there was, I don't know if she's still there, a woman named Michelle King.  Do you know who she is?

A.      Yes.

Q.      And do you know what her involvement with this Gary Cifizzari conviction has been?

A.      I think she handled it toward the end of the -- the DNA situation, in -- in which it was eventually reversed or null-prossed.

Q.      Yeah.  Okay.  Have you any memory of discussing this claim with Michelle King?

A.    No.

Q.    Did you ever have to appear -- whether at Mr. Gary Cifizzari was entitled to a parole hearing or not, did you ever have to attend or appear at any type of hearings involving possible early release --

A.    No.

Q.    -- of Gary Cifizzari?

A.    No.  There's another couple of units in the office that handle that, and that's a different --

(Court Reporter sneezes)

THE COURT REPORTER:  That's a different what?

THE WITNESS:  Different kettle of fish.

Q.    (By Mr. Caffrey)  Okay.  Were you consulted by anyone at the DA's Office at the time that Gary Cifizzari was about to be released from --

A.    No.

Q.    -- custody?

A.    No.

Q.    Okay.

MR. CAFFREY:  Bill, you got anything?

MR. SCARPELLI:  No.

MR. CAFFREY:  All right.  That's all the questions I have for you, sir.  Thank you.

THE WITNESS:  Yeah.

MR. LOEVY-REYES:  I just have a few follow-up questions.

FURTHER EXAMINATION BY MR. LOEVY-REYES:

Q.    One was a question I forgot to ask you earlier.  You had mentioned earlier about an individual eating dog food in Milford.  You were referring to Michael Cifizzari, correct?

A.    Yes.

Q.    And -- and there were reports that he had been found doing that in the fall of 1980; is that right?

A.    I don't know the -- the timing of

it, but there was -- it was a -- the dog food thing came up at one point.

At another point, it came up he was eating out of McDonald's trash bins.

Q.   Okay.  And -- and both of those reports would have been before the interrogation in February of 1981?

A.   Yes.  I don't know about that -- I'm not sure about that other one, the -- the McDonald's thing, I knew McDonald's.  I didn't know about the other thing you're talking about. Did you say dog dish?

Q.   Yeah.

A.   Yeah.  I -- I don't remember knowing that, but I probably did.  I -- I probably did know that.

Q.   Thomas White, he worked for Massachusetts State Police; is that right?

A.   Yes.

Q.   Fair enough that for --

A.   Long retired.

Q.   Fair enough that for the motion to suppress hearing, evidence that Michael Giroux's DNA from his semen was found on the nightgown was

not part of the motion to suppress hearing?

A.      You mean -- you mean in -- in Michael's -- the suppression hearing?  No.

Q.      Yeah.

A.      We -- we knew nothing about DNA then, nothing.

Q.      Exactly.  DNA evidence wasn't even a thing at that time, was it?

A.      Well, I think we had it.  I think we had it at some point in time, and I forget the -- the time.  And --

Q.      Yeah.

A.      Yeah.

Q.      But it came around sometime after the Cifizzari prosecution?

A.      Right.  Oh, absolutely.

Q.      Okay.

A.      Right.

Q.      And same thing would be true for Michael Cifizzari's trial, evidence that Michael Giroux had deposited semen, as proven by DNA evidence on the nightgown of Connie Schiappa, that was not part of Michael Cifizzari's trial either, was it?

A.     No.

Q.     And the same thing would be true of the appeals about that trial.  There was no appellate record in which Michael Giroux's semen being found on the victim's nightgown, that was not part of the appeal process either, was it?

A.     Right.

Q.     Okay.

A.     Right.

MR. LOEVY-REYES:  Those are all the questions I had.

THE WITNESS:  Right, right.

MS. BADWAY:  Thank you.

MR. CAFFREY:  I don't have any further questions.  Thank you.

THE COURT REPORTER:  Who needs a copy of the transcript?

MR. LOEVY-REYES:  Electronic only, no index.

THE COURT REPORTER:  No, you don't want a word index?

MR. LOEVY-REYES:  No, no.  I never use an index.

MR. CAFFREY:  I'll take an

electronic copy with the index, if you're making it.

THE COURT REPORTER:  Okay.  Do you need a copy?

MS. BADWAY:  I do, because he has to sign it.

THE COURT REPORTER:  Okay.

MS. BADWAY:  So thank you.

THE COURT REPORTER:  Okay.  Is PDF okay for you?

MS. BADWAY:  Yes, it is.

THE COURT REPORTER:  Okay.

(Deposition concluded at 11:31 a.m.)

RA 542

Lawrence Murphy
March 06, 2024                                                                    130

I, CHRISTINE M. LO SCHIAVO, Notary Public, do hereby certify that LAWRENCE J. MURPHY appeared before me and identified himself on the 6th day of March, 2024, at the office of The Varallo Group, 34 Grafton Street, Suite 2, Millbury, Massachusetts, and was duly sworn by me to testify to the truth and nothing but the truth as to his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath and said examination reduced to writing by me; and that the statement is a true record of the testimony given by the witness, to the best of my knowledge and ability.

I further certify that I am not a relative or employee of counsel/attorney for any of the parties, nor a relative or employee of such parties, nor am I financially interested in the outcome of the action.

WITNESS MY HAND this 14th day March, 2024.

*Christine M. Lo Schiavo*

Christine M. Lo Schiavo        My Commission Expires:
Notary Public                  April 13, 2029

RA 543

UNITED STATES DISTRICT COURT

for the

District of Massachusetts

Civil Action No.: 22-cv-40139-MRG


* * * * * * * * * * * * * * *

GARY CIFIZZARI,                         *

          Plaintiff                     *

v.                                      *

TOWN OF MILFORD, et al.,                *

          Defendants                    *

* * * * * * * * * * * * * * *


     I, LAWRENCE J. MURPHY, do hereby certify, under the pains and penalties of perjury, that the foregoing testimony is true and accurate, to the best of my knowledge and belief.

     WITNESS MY HAND, this___day of_____2024.


                         _____

                              LAWRENCE J. MURPHY

Lawrence Murphy
March 06, 2024                                                                           132

```
                        CORRECTION SHEET

DEPONENT:        Lawrence J. Murphy

CASE:            Gary Cifizzari vs.

                 Town of Milford, et al.

DATE TAKEN:      March 6, 2024

*************************************************

PAGE   / LINE /   CHANGE OR CORRECTION AND REASON

*************************************************

        /        /

        /        /

        /        /

        /        /

        /        /

        /        /

        /        /

        /        /

        /        /

        /        /

        /        /

        /        /

        /        /

        /        /

        /        /

        /        /
```

THE VARALLO GROUP LLC
(508)753-9282  www.TheVaralloGroup.com

RA 545

# EXHIBIT 6.



*The Commonwealth of Massachusetts*

*Department of Public Safety*
1010 Commonwealth Avenue, Boston 02215
March 16, 1981

LAB. NO.  65899 - MILFORD

Examination of Materials in connection
with the Fatal Beating and Rape of
Concetta Schiappa at 72 Central Street,
Milford on September 29, 1979.

On September 29, 1979, at the request of Sergeant Joseph Doheny
of the State Police Bureau of Investigative Services, Worcester
County CPAC, I proceeded to the above location where I removed
the following items from the indicated areas:

A.  Living Room
1.  Pair of black slippers
2.  Pillow and pillow case
3.  Pink and white towel
4.  White rag
5.  Red scatter rug (round)
6.  Two red scatter rugs (square)
7.  One large brown rug
8.  Miscellaneous papers

B.  Bathroom
9.  White underwear
10.  Pink towel
11.  Pair nylon stockings
12.  Two combs
13.  Brown sponge
14.  Rag
15.  Wash cloth

On October 2, 1979 Sergeant Doheny delivered the following items
to this laboratory in connection with the above subject:

16.  One dust mop with broken handle
17.  Mop handle from victim
18.  Victim's clothing:
            A)  white with floral design nightgown
            B)  bathrobe
19.  Slivers of wood from victim (removed during autopsy)
20.  Slivers of wood from victim (removed after autopsy)
21.  Fingernail scrapings (2 envelopes):
            A)  Fingernail scrapings right hand
            B)  Fingernail scrapings left hand
On October 3, 1979, Detective Vincent Roberto of the Milford Police
Department and Trooper Robert Meier of the State Police Bureau of
Investigative Services, Worcester County CPAC, delivered the following
items to this laboratory in connection with the above subject:

22.  Coveralls of Vincent Joseph Badala, Jr.
23.  Pair of sneakers of Vincent Joseph Badala, Jr.

RA 547

Lab. No. 65899                       -2-                    March 16, 1981

On October 7, 1979, Doctor Ambrose Keeley, State Police Pathologist, delivered the following items to this laboratory in connection with the above subject:

24.   Two cotton swabs from bite smear

On October 18, 1979, Doctor Keeley delivered the following additional items to this laboratory:

25.   Ruler used to mark photographs of bites

EXAMINATION

Item 1-Pair of black slippers:  Visual examination revealed the presence of brown dirt stains and debris on the soles of these slippers.

Positive Benzidine reagent tests indicated the presence of blood in these stains.  Samples of these stains were submitted to Chemist John C. Abbott of this laboratory for blood grouping analysis.

Item 2-Pillow and pillow case:  Visual examination revealed the presence of red-brown stains on this pillow case and pillow.  Positive benzidine reagent tests indicated the presence of blood in these stains. Samples of these stains were submitted to Chemist Abbott for blood grouping analysis.

Item 3-Pink and white towel:  Visual examination revealed the presence of red-brown stains on this towel.  Positive benzidine reagent tests indicated the presence of blood in these stains.  Samples of these stains were submitted to Chemist Abbott for blood grouping analysis.

Item 4-White rag:  Visual examination revealed the presence of red-brown stains on this rag.  Positive benzidine reagent tests indicated the presence of blood in these stains.  Samples of these stains were submitted to Chemist Abbott for blood grouping analysis.  Several tears are present on this item.

Item 5-Red scatter rug (round):  Nothing of present evidential value was detected on this item.

Item 6-Two red scatter rugs (square):  Visual examination revealed the presence of red-brown stains on these rugs.  Positive benzidine reagent tests indicated the presence of blood in these stains.  Samples of these stains were submitted to Chemist Abbott for blood grouping analysis.

Item 7-One large brown rug:  Visual examination revealed the presence of red-brown stains on this item.  Positive benzidine reagent tests indicated the presence of blood in these stains.  Samples of these stains were submitted to Chemist Abbott for blood grouping analysis.

Item 8-Miscellaneous papers:  Visual examination revealed the presence of red-brown stains on this item.  Positive benzidine reagent tests indicated the presence of blood in these stains.  Samples of these stains were submitted to Chemist Abbott for blood grouping analysis.

Lab. No. 65899                           -3-                           March 16, 1981

Item 9 through 15:  Nothing of apparent evidential value was detected
on these items.

Item 16-One dust mop with broken handle:  Visual examination revealed
this item to consist of a dust mop with a wooden handle broken off
approximately 25" up from the mop end.  Red-brown stains are present
around the broken section of the mop handle.  Positive benzidine
reagent tests indicated the presence of blood in these stains.

Item 17-Mop handle from victim:  The piece of wooden handle removed
from the victim was found to fit mechanically into Item 16 and thus
was originally part of the dust mop handle.  Red-brown stains are
present on this mop handle.  Positive benzidine reagent tests
indicated the presence of blood in these stains.

Item 18A-White and floral design nightgown: Visual examination revealed
the presence of red-brown stains on this nightgown.  Positive benzidine
reagent tests indicated the presence of blood in these stains.  Samples
of these stains were submitted to Chemist Abbott for blood grouping
analysis.  This item appears to have been cut from the victim.

Item 18B-Bathrobe:  Visual examination revealed that the first, fourth,
fifth and sixth buttons to be missing from this bathrobe.  Red-brown
stains were also observed on this bathrobe.  Positive benzidine reagent
tests indicated the presence of blood in these stains.  Samples of
these stains were submitted to Chemist Abbott for blood grouping
analysis.  This item appears to have been cut from the victim.

Item 19-Sliver of wood from victim (removed during autopsy):  Visual
examination revealed this item to consist of two fragments of wood
with the largest piece measuring 2½" long and ½" wide at its widest
point.  This piece of wood was found to fit mechanically into Item 17
and thus was originally part of the dust mop handle.

Item 20-Sliver of wood from victim (removed after autopsy):  Visual
examination revealed this item to consist of four fragments of wood
with the largest piece measuring 5" long.  This piece of wood was
found to fit mechanically into Item 17 and thus was originally part
of the dust mop handle.

Item 21A-Fingernail scrapings right hand:  Visual examination revealed
small red-brown foreign material in these envelopes.  Positive benzidine
reagent tests indicated the presence of blood in these stains.  Samples
of these stains were submitted to Chemist Abbott for blood grouping analy
sis.

Item 21B-Fingernail scrapings left hand:  Visual examination revealed
small red-brown foreign material in these envelopes.  Positive benzidine
reagent tests indicated the presence of blood in these stains.  Samples
of these stains were submitted to Chemist Abbott for blood grouping
analysis.

Item 22 and 23:  Nothing of present evidential value was detected on
these items.

Lab. No. 65899                      -4-                    March 16, 1981

Item 24-Two cotton swabs from bite smear:  These items were submitted
to Chemist Abbott for blood grouping analysis.

Item 25-Ruler used to mark photographs of bites:  No analysis.

                                    *James P. Canney*
                                     James P. Canney
                                     Assistant Chemist
                                     Chemical Laboratory

JPC/ard
report to:   Sgt. Doheny
             Sgt. Small
                        COMMONWEALTH OF MASSACHUSETTS

Suffolk,ss.

    James P. Canney, whom I know to be a Chemist of the Massachusetts
Department of Public Safety appeared before me and affirmed the
attached to be a true copy of the test result made by him in Lab. No.
65899, Fatal Beating and Rape of Concetta Schiappa at 72 Central Street,
Milford on September 29, 1979.

    Sworn and subscribed to before me this *19th* day of *March, 1981.*


                                    *Kathleen Mary Higgins*
                                           NOTARY PUBLIC
My commission expires: *November 1, 1985* .

RA 550

# EXHIBIT 7.



*The Commonwealth of Massachusetts*

*Department of Public Safety*
CPAC
283 Main Street, Worcester, Mass.
May 7, 1981

To:        Lt. Col. John R. O'Donovan
           Office of Investigations & Intelligence Operations

From:      Joseph M. Doheny, Sergeant

Subject:   Investigation of the homicide of
           CONCETTA SCHIAPPA, WF, DOB
           of 72 Central St., Milford -
           Additional Information

1.        On February 26, 1981, at approximately 1:00 AM, MICHAEL
P. CIFIZZARI, WM, DOB        , of 9 Loucroft Ave., Brockton, walked
into the Milford PD.  Present at the Station at this time were Sgt.
Anthony DiGirolamo and Officer John Chianese.  Michael started a
conversation with Sgt. DiGirolamo in regard to being allowed to stay
at the Police Station for the night.  Cifizzari had been considered a
suspect in the Schiappa murder and had been previously spoken to by
Det. Vincent Liberto.  At the time Det. Liberto spoke to Cifizzari,
Cifizzari was obviously under the influence of drugs and it was im-
possible to have a detailed conversation or to form any opinions
about him.  Sgt. DiGirolamo decided that he would attempt to talk
with Michael Cifizzari about the Schiappa murder at this time.
Michael sat in the clerk's office of the Milford PD with the Sergeant
and Officer Chianese.  Sgt. DiGirolamo read Michael his Miranda
Rights from a Card and Officer Chianese wrote out the Miranda rights,
which Michael read, stated he understood them and signed it.  He was
asked if he knew about the murder of Mrs. Schiappa on Central Street
Michael stated he did, that, in fact, he was related to Mrs. Schiappa,
and he referred to her as Connie or Aunt Connie.  Michael then went
on and gave a statement in which he admits that he had gone to Mrs.
Schiappa's house on the night she was murdered, attempted to get
some money from her, was refused, became angry, and then killed her.
During this statement he indicates that his Cousin, Robert J.
Cananzey, was with him.  (Refer to attached statement).

2.        On the same date, at approximately 2:30 AM, as the result
of a call from Sgt. DiGirolamo, Cpl. Thomas R. White went to the
Milford PD and was briefed as to the statement that Michael was
giving.  Cpl. White listened to the statement for a few minutes,
but when he attempted to ask questions of Cifizzari to clarify certain
points, Cifizzari became angry at him, stated he did not know him
and did not wish to talk with him and that he wished to talk with

-1-


BUREAU OF INVESTIGATIVE SERVICE
MASS. STATE POLICE
Year/Dist/Crime/Case
79-115-0999-0247
Serial #    2

Captain                              Supervisor

RA 552

Murder of Concetta Schiappa          -2-          May 7, 1981

Sgt. DiGirolamo.  As a result of this, arrangements were made to bring Cifizzari to the Worcester CPAC Office later in the morning, and Cpl. White left the Police Station.

3.          On the same date, at approximately 8:00 AM, after Michael had slept in the Police Station and had had some breakfast, he was brought to the Worcester CPAC Office by Sgt. DiGirolamo, Officers Chianese and Nicholas Sullo.  The undersigned had a conversation with Sgt. DiGirolamo and read the statement which Michael had given.  I then introduced myself to Michael and reminded him again of his Miranda rights.  He stated he understood them and he was willing to talk with me.  He stated he was living in Brockton with his Aunt, Theresa Ferini, off Warren Ave., and that he had his own room at her home.  He stated he was unemployed.

4.          In going back to September of 1979, he stated he came to Milford at about noon time that day and went with his cousin to Draper Park.  He said they smoked some joints laced with PCP that his cousin Robert had.  He went on to state that at about midnight he went to his Aunt Connie's house on Central St. to get money to buy more drugs.  He stated he went to the front door and she opened the front door for him.  When asked how she was dressed, he said she had on something like a shirt or blouse that buttons down the front and a nightshirt or nightgown.  He could not remember the colors.  He said he asked her for money and she said, "See your friends", in other words - take a hike.  Cifizzari then jumped to what they had done to Mrs. Schiappa.  He stated that she had her legs wide open. She kept saying the same thing over and over. "She was ridiculing us. She kept it up.  We put a stop to it.  We both kept hitting her, whacking her and whacking her. Bob and I both shoved the stick up her cunt.  I bit her breasts and neck.  I bit her nipple almost off.  I bit her neck and left marks there.  I bit her leg and her stomach.  The stick snapped inside her twat.  It broke."  Cifizzari was then asked if he was sure it was his cousin that was with him and not his brother Gary and he said, "Yes, Gary was there."  When asked if, in fact, it was Gary and not his cousin, he stated, "No, they were both there."  Cifizzari was then asked if he would voluntarily allow a dentist to make a tooth impression.  At this point he became very upset, stated no he would not allow anyone to make a tooth impression, and he became very angry at the undersigned and refused to have any further conversation with the undersigned.

5.          Despite the fact that Cifizzari was somewhat confused and did do some rambling, his account of the murder and how it happened has detail in it which, in the opinion of this Investigator, would be known only to the person who had committed the murder.

Murder of Concetta Schiappa          -3-                    May 7, 1981

6.       Michael Cifizzari was then placed under arrest and charged
with the murder of Concetta Schiappa.  He was printed and mugged by
Cpl. Baliunas of SP Photo Lab and taken to the Milford District
Court where he was presented before Judge Compognone.  He was found
to be indigent and was ordered to the Worcester Superior Court for
appointment of counsel.  He was ordered held without bail and his
case continued to 2-27-81.

7.       On February 27, 1981 Cifizzari appeared in the Worcester
Superior Court before Judge Travis.  Atty. Michael Monopoli of
Worcester was appointed to represent him and he was returned to the
Milford District Court for arraignment and for a screening exam,
under the provisions of Chapter 123, Section 15A.  At the completion
of this exam, he was ordered sent to the Bridgewater State Hospital
for a further examination, under the provisions of Chapter 123,
Section 15B.

8.       On February 26, 1981 Tpr. Robert Meier and Officer Jack
Chianese went to the Taunton PD and, with the assistance of Fred
Summons of that department, located and interviewed Gary J. Cifizzari,
WM, DOB     , of 44 Summer St., Taunton.  He completely denied be-
ing involved in the murder of Concetta Schiappa.  (Refer to attached
statement).

9.       These same officers interviewed Robert J. Cananzey, WM,
DOB     , of 240 High St., Mill River Apts., Apt. #E7, Taunton.
Cananzey denied that he had ever been to the Schiappa apartment,
saying that the only time he was in Milford was to visit his Aunt
Emma Pasqualone with Michael Cifizzari.  (Refer to attached statement).

10.      The 13B Examination on Michael Cifizzari by the Bridgewater
State Hospital revealed him to be incompetent and as a result on
4-10-81 he appeared before the Worcester Superior Court to answer to
an indictment which had been presented by the Worcester County Grand
Jury.  In view of the fact that he was incompetent he was not
arraigned on this indictment, but instead was committed to the
Bridgewater State Hospital for a period of six months.

11.      Subsequent to Cifizzari's arrest, his mother had called
the Milford PD and stated that her son Michael had definitely not
killed Mrs. Schiappa and that his knowledge of the case came from
what she had told him.  As a result, on May 6, 1981, Tpr. John
Cunningham and the undersigned interviewed Eleanor M. Cifizzari, WF,
DOB     , of 450 Broadway, Taunton, the mother of Michael Cifizzari.
She related that Mrs. Schiappa was her late husband's aunt and that
she very seldom if ever saw her.  However, they were close enough
that her husband and as a result of his death her two sons had re-
ceived some money from her will.  She stated that in September 1979
she was living with both of her sons in Apt. 104, Building 4, at

RA 554

Murder of Concetta Schiappa        -4-                May 7, 1981

103 Hart St., Taunton.  She said that both her sons would go to
Milford every now and then to see their Aunt, Emma Pasqualone and
that Michael also visited with his uncle, Joseph Cifizzari.  She
went on to say that on the night Mrs. Schiappa was murdered, both
boys were at Emma's house in Milford and that that is how they found
out about the murder.  She repeated that the only thing Michael knew
about the murder was what she and Emma and Annette Pasqualone had
told him.  She stated that what she knew of the murder she had found
out from Emma and Annette.  She said she knew that Mrs. Schiappa had
been found molested, but she did not know in what room of the house.
She knew that a broom had been inserted in Mrs. Schiappa's vagina
and that the murderer had apparently had sex with her.  She knew noth-
ing about any money or pocketbook being missing nor did she know how
Mrs. Schiappa was dressed.  She was also under the mistaken assumption
that a TV and furniture had been taken from the house.  She stated
that she has visited her son at the Bridgewater State Hospital and
that he now denies the murder, saying that he put the pieces together
from what he had heard and admitted to the murder because he needed
help.  He had no where to go and no one was helping him.  She stated
that she had previously tried to get help for Michael through
Elizabeth Tavares, the Adult Probation Officer in the Taunton District
Court.  She said that Michael had had previous psychiatric observations
at the Taunton State Hospital and the Worcester State Hospital.  She
was asked by Tpr. Cunningham if Michael had ever made up stories like
this before and she said that when Michael lived with her sister,
Theresa Ferini, at 9 Loucroft Ave., Brockton, he would be watching
television, would point out a subject on the TV and say that he had
killed that subject.  Other than this, Mrs. Cifizzari said she always
found Michael to be truthful.

12.        On the same date Annette Pasqualone, WF, DOB ‾ ‾ ‾ ‾ ‾, of
42 Lawrence St., Milford, was interviewed at her home.  Her mother
Emma died in February of 1981.  Annette stated that prior to
September of 1979 she hadn't seen Michael for about three or four
months and before that she saw him every couple of months.  She said
he showed up at her home with his brother Gary on 9-29-79, between
6:00 & 8:00 PM.  This was the night after the Schiappa murder.  She
stated they were dressed in bummy clothes, dirty dungarees and
sneakers, but that she noticed no blood on either of the boys' cloth-
ing.  In fact she said her mother had washed their clothes and she
mentioned nothing about blood.  She told them that Aunt Connie had
been murdered and that if the police saw them around town they'd
think that they had done it.  She said Michael showed no expression
on hearing this news, no shock, no giggles, just no expression.  The
boys told her that their mother was arguing with them and they had
no place to stay.  They stayed over one night and the next day went

RA 555

Murder of Concetta Schiappa        -5-                    May 7, 1981

to Johnny Arcudi's in Mendon.  When asked as to their condition,
Annette stated they looked high, but they both always looked high.
She said the next time she saw them was about Christmas time of
1979.  She said they have showed up several times since then, but
never stayed overnight.  She said that her mother, herself, and her
Aunt Perry and her Uncle Joe had told the boys about the murder and
in about as much detail as had appeared in the newspaper.  She said
they didn't know any more than what was in the paper.  She said they
knew nothing about the TV set in the home being off or on and they
knew nothing about the pocketbook having been found. She said these
things were told to the boys as general conversation and not in
answer to any specific questions from either Michael or Gary.

Case Open

                            Joseph M. Doheny
                            Joseph M. Doheny
                            Sergeant

JMD/mws

# EXHIBIT 8.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GARY CIFIZZARI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 4:22-cv-40139-MRG |
| v. | ) | |
| | ) | |
| TOWN OF MILFORD, VINCENT | ) | |
| LIBERTO, JOHN CHIANESE, TODD | ) | JURY TRIAL DEMANDED |
| A. GATTONI as personal | ) | |
| representative of the Estate of | ) | |
| ANTHONY DIGIROLAMO, FRANCIS | ) | |
| X. SMALL as personal representative of | ) | |
| the Estate of DONALD SMALL, and | ) | |
| AS-YET UNKNOWN POLICE | ) | |
| OFFICERS AND POLICE | ) | |
| SUPERVISORS | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiff, Gary Cifizzari, by his attorneys, Mark Loevy-Reyes of Loevy &

Loevy, and William S. Smith, Esq. of The Law Office of William S. Smith, complain

of the above-named Defendants, as well as other as-yet unknown police officers and

police supervisors acting under color of state law, hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      How does a person do who was falsely and repeatedly labeled,

"murderer," for some 35 years of his life on earth obtain justice?  This Complaint

opens the door to the answer.  As a direct result of doctored and suppressed reports,

false forensic testimony, coerced and unreliable witness statements, improper

identification procedures, false forensic testimony, and a general pattern of blatant

RA 558

disregard for the law and the United States Constitution on the part of the Defendants, Plaintiff Gary Cifizzari ("Plaintiff") spent some 35 years in prison for a murder he did not commit, and with which he had all of nothing to do.

2.     Plaintiff was wrongfully convicted and sentenced to life in prison without the possibility of parole and this despite not a scintilla of physical or other evidence tying him to the murder. The sole basis for the Commonwealth's case for guilt was bitemark evidence that was decades later retracted.

3.     Plaintiff continued to assert his innocence for over three decades. Through persistence and a dogged determination to reveal the truth, Plaintiff eventually obtained proof of egregious misconduct by the Defendants.

4.     In 2019, Plaintiff moved for a new trial based on newly discovered evidence. The Commonwealth of Massachusetts (the "Commonwealth") joined in the motion to vacate his conviction. That motion was granted on December 10, 2019, and the Commonwealth *nolle prossed* all of the indictments against Plaintiff.

5.     Among other misdeeds set forth in this Complaint, the Milford Police Department ("Milford PD") violated Plaintiff's constitutional rights by, inter alia, improperly obtaining witness statements in an effort to fabricate Plaintiff's guilt. The Town of Milford and Milford PD also withheld and doctored key exculpatory evidence. These constitutional violations facilitated the presentation of the false evidence to a jury, which resulted in the erroneous conviction of Plaintiff.

6.    The egregious constitutional violations resulted in Plaintiff having been forced to spend decades without his family. Plaintiff was forced to miss weddings, funerals, births, graduations, birthdays, and other monumental life events.

7.    While he can never regain the approximately 35 years that were taken from him as a result of the misconduct described herein, Plaintiff is entitled, pursuant to 42 U.S.C. §§ 1983 and 1988 and state law, to monetary damages for the extraordinary injuries suffered as a result of Plaintiffs mortifying and shocking wrongful arrest, prosecution, conviction, and 35-year imprisonment.

## JURISDICTION AND VENUE

8.    This action is brought pursuant to, inter alia, 42 U.S.C. § 1983, to redress the deprivation, under color of law, of Plaintiffs rights as secured by the Constitution and laws of the United States.

9.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.

10.    Venue is proper under 28 U.S.C. § 1391{b), as the events giving rise to the claims asserted herein occurred in this district and numerous Defendants reside in this district.

## THE PARTIES

11.    At all times relevant to this Complaint until his incarceration, Plaintiff was a resident of Massachusetts. At the time of the arrest giving rise to this action, Plaintiff was living in that same location.

12.    Defendant Town of Milford is located in the County of Worcester and is

a municipal corporation of the Commonwealth of Massachusetts.

13.    Upon information and belief, at all times relevant to this Complaint, Defendants Vincent Liberto, John Chianese, Donald Small, and Sgt. Anthony Digirolamo were employed by the Milford Police Department and acting under color of law.

14.    Todd A. Gattoni is named as a defendant as the representative of the Estate of Anthony Digirolamo. Francis X. Small is named as a defendant as the personal representative of the Estate of Donald Small.

15.    Defendants John and Jane Does 1 through 10, whose identities are currently unknown, represent individuals acting under color of law who had personal involvement in the investigation of Plaintiff (the "Doe Defendants").

16.    Defendants John and Jane Does 11 through 20, whose identities are currently unknown, represent those employees who supervised certain Defendants and had personal involvement in the investigation of Plaintiff (the "Supervisory Doe Defendants").

17.    Each of the foregoing Defendants in the above Paragraphs are sued in their individual capacities, and all acted under color of law while engaging in the actions alleged in this Complaint.

### FACTS

18.    Milford resident, Concetta Schiappa, was last seen alive by her next-door neighbor at around 9 p.m. on Friday, September 28, 1979. She was discovered lying dead on her living room floor the following morning.

19.    There was bruising on the right lower part of her stomach and on the inside of her upper left leg, which experts for the prosecution via the Worcester County District Attorney's office later · claimed at trial to be human bitemarks.

20.    The Milford Police Department investigated the murder. Photo and fingerprint technicians took numerous photographs of the inside and the outside of the apartment and searched for latent fingerprints, including removing and testing window shades that had been pulled down by the perpetrator. Policed removed for analysis the rug underneath the victim's body, the pillow that was lying over her arm, a pair of the victim's slippers, and "numerous other items which were around the body," including fragments of the mop used to kill Ms. Schiappa. In addition, Ms. Schiappa's black pocketbook and set of keys were found in a yard two streets away from her apartment.

21.    Prior to and during the autopsy, Dr. Stanley Schwartz, a forensic dental examiner, examined, and photographed the bruising on the victim. He would later testify at the Plaintiff's trial. He also attempted to take an impression of the mark on the victim's abdomen using a rubber base material.

22.    The crime lab analysis itself, however, did not result in any evidence being introduced at the plaintiff's trial.

23.    The Milford Police knew very early on that the real perpetrator, Michael Giroux, had both the motive and opportunity to commit this crime, but utterly failed to adequately investigate him. Neither Mr. Cifizzari nor his brother Michael Cifizzari—Ms. Schiappa's great nephews was a suspect at this stage of the

police investigation. Although none of the people interviewed by the police had useful information regarding the identity of the perpetrator, the Milford Police initially focused on several suspects-including Michael Joseph Giroux, whose DNA was decades later found to match and/or be consistent with the semen on the victim's nightgown.

24.    The police had several reasons to suspect Mr. Giroux. About one year prior to the murder, the victim, Ms. Schiappa, had accused Mr. Giroux of entering her home without permission and stealing cash from the top of her dresser.

25.    Further, approximately just two weeks prior to the murder, Mr. Giroux had come uninvited to · Mr. Terhune's and Ms. Duncan's apartment shortly after being discharged from the United States Army. A scant one or two days after the murder, Mr. Giroux overdosed on drugs and was admitted to the VA hospital in Jamaica Plain.

26.    The Milford and State police were aware that Mr. Giroux had a prior criminal record.

27.    They also interviewed him at least twice. In his statements to the police, Mr. Giroux placed himself within just 200 yards of Ms. Schiappa's residence at approximately the time of the murder. Mr. Giroux stated that, on the evening of September 28, 1979, he went to a bar called Lonergan's, which was located at 5 Central Street, a two-minute walk to Ms. Schiappa's apartment at 72 Central Street. Mr. Giroux told the police that he became "very drunk, so drunk that he said he had trouble talking" and that, after leaving Lonergan's, he walked back to his

brother David's house at 10 Genoa Avenue in Milford. Mr. Giroux said that he cut "through Stone's parking lot because he did not want to walk on Main Street and be seen," and that he then went "down Jefferson St-up street behind Town Hall," The walking route from Lonergan's through Stone's parking lot (located at 32 Central Street) to Jefferson Street to 10 Genoa Avenue passes directly by Ms. Schiappa's residence and the 23 Spring Street location where Ms. Schiappa's pocketbook and keys were ultimately found after the murder.

28.    For example, in his initial statement on October 5, 1979, Mr. Giroux stated that he "went · right home and went to sleep." In the second statement on October 24, 1979, however, he said that he got home and "turned on TV...." Mr. Giroux also admitted that he had changed his clothes, telling the police that his brother David gave him clothes that day ("a brown shirt, a plaid pair of pants and brown socks"), raising the obvious question of whether Mr. Giroux needed to discard his clothes because they were stained with Ms. Schiappa' s blood. In addition, Mr. Giroux's brother, David Giroux, is certain that he never owned plaid pants. In the same discussion with police, Mr. Giroux volunteered the strange non-sequitur that "he couldn't stand the sight of blood," which his brother explained was not true.

29.    Despite the manifest inconsistencies in Mr. Giroux's statements and significant reasons to suspect him, the Milford Police Department or any other law enforcement entity took no further steps to investigate him or pursue him as a suspect. There is no evidence of which Plaintiff is aware that they interviewed anyone else regarding Mr. Giroux's whereabouts on the night of the murder,

including his brother, David, who would have been his alibi witness. There is also no evidence that the police searched David Giroux's home, where Michael Giroux was staying, to search for the clothes that Michael Giroux admitted he had discarded the night of the murder or to search for items taken from the victim.

30.    Unlike other suspects, Mr. Giroux was never asked to provide a cast of his teeth for comparison to the bitemarks. Indeed, with Michael Giroux's self-serving and false statement that he could not stand the sight of blood, the investigation of Michael Giroux seems to have been non-existent until 2019, when the Plaintiff's newer legal team (for the Motion for New Trial) itself undertook efforts to solve the crime.

31.    Michael Giroux at all times relevant acted as an informant for, at a minimum, the Federal Bureau of Investigation, the Massachusetts State Police, and the Worcester Police Department.

32.    The police interviewed the victim's neighbor, Gary Terhune, and his associates several times after finding inconsistencies in the accounts of his activities during the night of the murder. They never followed-up on these inconsistencies.

33.    The Plaintiff, Gary Cifizzari, did not become a suspect until the police encouraged and coerced his brother, Michael Cifizzari, who suffered from chronic schizophrenia and acute psychosis, to make false statements implicating the Plaintiff in the crime.

34.    Mr. Cifizzari's older brother, Michael, was diagnosed with schizophrenia in 1970 when he was seventeen years old. He also had a "borderline"

intellectual disability, having scored 75 on an IQ test. In his youth, Michael

Cifizzari, was committed to psychiatric institutions a myriad of times. The Milford

Police and other law enforcement entities involved were cognizant of his mental

condition. They were also aware that he was related to the victim, Ms. Schiappa.

35.    On or about November 21, 1980, Michael Cifizzari was reported to the

Milford Police for drinking from a dog bowl on a stranger's porch. Seemingly

unprovoked and without any factual predicate or basis, Milford police officer

Vincent Liberto and Sergeant Donald Small decided to use this occasion to question

and interrogate Michael about the murder while taking him to a psychiatric unit at

the Whitinsville Hospital in Milford.

36.    During this interrogation, Michael initially said that he saw his "Aunt

Connie" a couple of weeks earlier despite the fact that Ms. Schiappa had died more

than a year prior. The Milford officers then asked Michael "how come" he had a

fight with her and "why" he had hit her, to which Michael responded that "she got

me mad." When the Milford Police further asked if Michael "killed his aunt" or "hit

her with a stick," Michael clarified that he did not hit his aunt and that she was

alive and gave him money. When Officer Liberto asked why Michael initially said

that he hit his aunt, Michael responded: "That is what you want me to say. That's

what you want to hear, isn't it?" Officer Liberto characterized Michael as incoherent

during this conversation and testified during the Plaintiff's court case that he

thought Michael would agree to anything asked of him.

37.    On or about February 26, 1981, Michael Cifizzari walked into the Milford police station asking to be allowed to spend the night there. He was homeless, dirty, cold, and hungry. Officer Anthony DiGirolamo, the station desk officer and Michael's youth football coach, had allowed him to sleep at the station about five or six times in the previous six months. Officer DiGirolamo would later testify that "[e]ach time [Michael Cifizzari] came to the station previously, it seemed as though he had something on his mind that he wanted to talk about." On this occasion, Milford police officers DiGirolamo and his colleague, Officer John Chianese, decided to "have a little talk" with Michael about the murder of Ms. Schiappa. Michael was allegedly read his Miranda rights but initially signed a waiver of rights using the name "Paul M. Cartney[1]" before signing his real name. Over the next two hours, Officer Chianese wrote down four different statements, of varying degree of detail, that Michael purportedly gave, supposedly confessing to the murder of Ms. Schiappa.

38.    The interrogation was not recorded, and Michael Cifizzari did not sign or otherwise adopt the statements.

39.    According to the final (fourth) version of the statement drafted by Officer Chianese, after a night of drinking, smoking marijuana, and taking PCP, Michael Cifizzari and his cousin, Robert (Bob) Cananzey, went to Ms. Schiappa's house to ask for money because she had previously given them money. When she refused, the two "knocked her down" and attacked her with a stick. According to the

---

[1] Presumably, this was a bizarre reference to the singer and bassist for the Beatles, Paul McCartney.

statement, "Bobbie was biting her on the neck" and Michael "accidentally bit her on the neck and the inside of her upper leg." The statement says that Michael and Mr. Cananzey "were all drugged out" and does not account for their movements after leaving the victim's apartment.

40.    However, and of immense salience, none of the versions of Michael's purported confession provided to Milford officers DiGirolamo and Chianese even so much as mentioned his brother, the Plaintiff Gary Cifizzari.

41.    Later that morning, Michael Cifizzari was transported to the Worcester CPAC office, where he was further questioned by State Police Sergeant Joseph Doheny. Michael appeared "somewhat confused" and "wild-eyed," "looked like he had been up all night," and was at times "rambling." Sergeant Doheny reported that Michael stated that he "bit [the victim's] breast and neck. I bit her nipple almost off. I bit her neck and left marks there. I bit her leg and her stomach."

42.    Along with Milford Police Sgt. DiGirolamo, Milford Officers Chianese and Nicholas Sullo, Sergeant Doheny began questioning Michael about his statements and asked Michael whether he was sure he had been with his cousin, and not his brother, Gary, at the time of the crime.

43.    Hitherto, however, there was no factual basis or predicate whatsoever in the investigation for the police to have suspected the Plaintiff, Gary Cifizzari.

44.    Michael then responded that yes, "Gary was there," and said that "they [his cousin and his brother] were both there." Id. However, Michael never once indicated any purported act Gary Cifizzari was supposed to have taken during this

incident. In fact, Michael later testified that when he spoke to Sergeant Doheny, he was actually trying to clarify that the Plaintiff, Gary Cifizzari, had nothing to do with the murder and that, at the time of the crime, he was with his brother Gary elsewhere.

45.     Based on his observations of Michael as "wild-eyed" and "rambling," Sergeant Doheny was well aware that, at the time of his questioning, Michael had severe psychiatric problems, as were the Milford officers.

46.     Michael's multiple statements were not only inconsistent with each other but also inconsistent with several of the known facts about the crime. Nonetheless, Michael was charged with the murder of Ms. Schiappa the same day as his alleged "confessions."

47.     On February 26, 1981, the day Michael Cifizzari gave his statements, police separately interviewed Gary Cifizzari and Bob Cananzey.

48.     Gary Cifizzari also maintained his innocence then, and forever thereafter. When questioned about his brother's statements, Gary Cifizzari told police that he was nowhere near Milford on the night of the murder and that he only recalled going there in October 1979, after he and Michael were thrown out of their mother's house and sought to spend the night at their aunt Emma and cousin Antonetta Pasqualone's home in Milford.

49.     Police took no further steps to investigate Ms. Schiappa's murder until more than two years after Michael Cifizzari was charged. In October 1982, shortly

RA 569

after Michael was found to be competent to stand trial[2], the Commonwealth obtained a court order for his dental impressions and sent them to Dr. Stanley Schwartz for comparison to photographs of the bitemarks. In February 1983, Dr. Schwartz excluded Michael as the person who purportedly bit Ms. Schiappa. In his report, Dr. Schwartz noted that Dr. Richard Souviron had also reviewed the materials and agreed that Michael could be excluded as the source of the bitemarks.

50.     On or about April 27, 1983, Gary Cifizzari had tooth impressions taken by Dr. Juliano. Because Mr. Cifizzari had lost a front tooth in a beating in 1980, police also obtained a set of 1977 X-rays of Mr. Cifizzari's dentition and delivered them to Dr. Schwartz. Dr. Schwartz concluded "within reasonable medical certainty" that this final suspect's dentition matched the marks on the victim's body based on the position of the missing maxillary right central incisor. Mr. Cifizzari was interviewed again in May 1983, after the supposed "match" was determined. He again adamantly denied any involvement in the murder.

51.     The case for guilt against Mr. Cifizzari consisted entirely of this "bitemark comparison evidence" in the form of expert testimony, which is now recognized as scientifically unreliable. The Commonwealth heavily relied on this throughout the criminal trial.

52.     As a result of the expert testimony and despite the absence of any other credible evidence linking him to the crime, the Plaintiff, Gary Cifizzari, was convicted of first-degree murder on July 30, 1984. The following day, July 31, 1984,

---

[2] He had originally been found by the court to have been incompetent.

he was sentenced to life in prison without the possibility of parole.

53.     In the (final) Motion for New Trial proceedings, results of recent DNA tests conclusively excluded the Plaintiff, Gary Cifizzari, as a possible contributor of the DNA profile developed from the sperm and saliva deposited on the victim's nightgown at the time of her death.

54.     On or about May 3, 2019, the Massachusetts State Police Laboratory notified the police that the profile from a sperm fraction on Ms. Schiappa's nightgown matched the DNA profile of Michael Giroux, the original (and eminently obvious) suspect in the 1979 murder investigation, as outlined above.

55.     There was, and remains, no evidence that Mr. Giroux ever had any connection to Gary or Michael Cifizzari. Michael Cifizzari testified that he did not know Michael Giroux. At Michael Cifizzari's trial, Sergeant Thomas White also testified that Mr. Giroux did not have any dealings with Michael Cifizzari and did not "hang out in the same circle of friends." In addition, nothing in the autopsy report or investigation reports indicates that more than one person was suspected · of assaulting and killing Ms. Schiappa.

56.     Having escaped justice in this case, Mr. Giroux pursued a life of violent crime. For example, he was one of three conspirators in the murder of a Rhode Island landlord who was shot as he collected rents.

57.     In support of the Plaintiff's Motion for New Trial that would exonerate him, the Commonwealth's own forensic dentistry expert at trial, Richard Souviron, D.D.S., ABFO, in a sworn affidavit, stated, inter alia, "At trial, I identified Mr.

[Gary] Cifizzari as the person who bit the victim, and I did not in any way qualify that statement. I would not offer such testimony today. I therefore recant the testimony that Mr. Cifizzari's teeth were the teeth, to a reasonable degree of certainty, that inflicted both of the victim's bite wounds... There is no degree of certainty with which I could testify that Mr. Cifizzari was 'the biter' in this case," he averred, due to changes in the relevant scientific knowledge.

58.    As referenced herein, the bitemark evidence was, in sum and substance, the entire case the Commonwealth had offered at trial against the Plaintiff.

59.    Eventually, the Commonwealth via the Worcester County District Attorney's office, assented to the most recent and final Motion for New Trial filed by the Plaintiff in the criminal case in 2019. It thereafter entered a nolle prosequi, stating as follows:

> "[T]he aforementioned evidence leads the Commonwealth to determine that Michael Giroux perpetrated this brutal murder, and a Nolle Prosequi of Gary Cifizzari is in the interests of justice in this case."

59.    This admission came, however, some 35 years too late.

60.    At all times relevant, and from his arrest to the assent, the Plaintiff, Gary Cifizzari, was incarcerated in Massachusetts State Prisons, suffering daily, hourly, by the minute, and by each agonizing second, for every one of those 35 years.

## DAMAGES

61.    The actions of the Defendants set forth herein unlawfully deprived Plaintiff of his civil rights under the United States Constitution and the laws of the Commonwealth of Massachusetts.

62.    In serving some three-and-a-half decades behind bars, Plaintiff was wrongfully deprived of virtually his entire adult life up until the time of his release. Plaintiff must now attempt to make a life for himself outside of prison without the benefit of the decades of life experiences which ordinarily equip adults for that task.

63.    Although Plaintiff has been out of prison since 2019, he has not maintained gainful employment, largely due to the stigma associated with his vacated murder conviction, and also substantial medical conditions from which he suffers greatly (see below).

64.    Having been incarcerated for most of his adult life, Plaintiff does not have the benefit of education, training, or the professional experience necessary to equip him for the task of finding long-term employment.

65.    Moreover, Plaintiff suffers from a myriad of substantial, debilitating conditions such as cancer and diabetes. Additionally, the emotional pain and suffering caused by losing 35 years in the prime of life is extreme and incessantly agonizing. During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, weddings, graduations, and other life events with

loved ones, the opportunity to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.

66.    Plaintiff has suffered severe and extreme injury, including, but not limited to, extraordinary physical suffering and extreme emotional distress, all proximately caused by Defendants' misconduct.

## 42 U.S.C. § 1983 CLAIMS

## COUNT I

**42 U.S.C. § 1983 Claim by Plaintiff for Unduly Suggestive, Biased, and Otherwise Improper Identification Procedures in Violation of the Fourteenth Amendment Against those Defendants then employed by the Milford Police Department as well as John Does 1- 20**

67.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

68.    "A defendant has a due process right to identification procedures meeting a certain basic standard of fairness." Commonwealth v. Dougan, 377 Mass. 303 (Mass. 1979).

69.    "Criminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." Gregory v. City of Louisville, 444 F.2d 725, 746 (6th Cir. 2006) (quoting Stovall v. Denno, 388 U.S. 293, 302, 87 S. Ct. 1967 (1967)).

70.    Defendants Vincent Liberto, John Chianese, Milford Police Sgt's. Anthony Digirolamo and Donald Small, as well as John Does 1-20 under color of law facilitated identifications using unduly suggestive identification procedures, which

RA 574

led to the improper identification of Plaintiff as the individual who killed the victim.

These improper procedures included:

- Questioning and interrogating Michael Cifizzari- a man who the police knew full well, or reasonably should have known, suffered from severe mental illness- without any factual predicate whatsoever about his supposed involvement in the murder.

- During said questioning and interrogation, without any factual predicate whatsoever, asking Michael Cifizzari suggestively whether he was sure he had been with his cousin, and not his brother, the Plaintiff Gary Cifizzari, at the time of the crime.

- Especially due to Michael Cifizzari's extremely deteriorated mental state, the police's used this technique- one grossly unnecessarily suggestive and conducive to irreparable mistaken identification- to falsely accuse, then ultimately convict, the Plaintiff of a murder he had absolutely nothing to do with.

71.    The Individual Defendants committed these unduly suggestive, biased and otherwise improper acts intentionally and with deliberate indifference to Plaintiff's clearly established constitutional rights. No reasonable officer would have believed these procedures were lawful or would produce a reliable identification of the Plaintiff as the killer.

72.    As a direct and proximate result of these unduly suggestive procedures, Michael Cifizzari falsely identified Plaintiff as having been guilty of murder, in violation of Plaintiffs Fourteenth Amendment right to a fair trial and to be not deprived of liberty without due process of law. Due to these Defendants' misconduct, Plaintiff suffered 35 years of wrongful imprisonment, and endured all of the other physical, emotional and pecuniary damages set forth above.

## COUNT II- 42 U.S.C. § 1983

### 42 U.S.C. § 1983 Claim by Plaintiff for Improper Interrogation Procedures and Techniques in Violation of the Fourteenth Amendment Against those Defendants then employed by the Milford Police Department as well as John Does 1-20

73.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

74.    The actions by those Defendants then employed by the Milford Police Department as well as John Does 1-20 in interrogating and questioning the severely mentally ill Michael Cifizzari, then later implicating the Plaintiff in the murder in additional interrogations, as set forth above, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment. They were so brutal and offensive as to shock the conscience. *See* e.g., *Miller v. Fenton*, 474 U.S. 104, 109 (1985).

75.    The Individual Defendants committed these unduly suggestive, biased and otherwise improper acts intentionally and with deliberate indifference to Plaintiff's clearly established constitutional rights. No reasonable officer would have believed these procedures were lawful or would produce a reliable identification of the Plaintiff as the killer.

76.    As a direct and proximate result of these shocking and offensive interrogation procedures, Michael Cifizzari falsely identified Plaintiff as having been guilty of murder, in violation of Plaintiff's Fourteenth Amendment right to a fair trial and to be not deprived of liberty without due process of law.

77.    Due to these Defendants' misconduct, Plaintiff suffered 35 years of wrongful imprisonment, and endured all of the other physical, emotional and pecuniary damages set forth above.

### COUNT III- 42 U.S.C. § 1983

**42 U.S.C. § 1983 Claim by Plaintiff for Fabricating False Inculpatory Evidence in Violation of the Fourteenth Amendment Against those Defendants then Employed by the Milford Police Department as well as John Does 1-20**

78.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

79.    Vincent Liberto, John Chianese, Milford Police Sgt's. Anthony Digirolamo and Donald Small, as well as John Does 1-20 under color of state law fabricated inculpatory evidence via their use, without any factual predicate, of the interrogation and questioning of the Plaintiffs severely mentally ill brother.

80.    As a direct and proximate result of this fabrication of inculpatory evidence the Plaintiff's clearly established Fourteenth Amendment due process rights, including the right to a fair trial and his Fourth Amendment right to be free from unreasonable seizures were violated, and Gary Cifizzari was wrongly convicted and suffered the injuries and damages described above.

### COUNT IV- 42 U.S.C. § 1983

**42 U.S.C. § 1983 Claim by Plaintiff for Fabricating False Inculpatory Evidence in Violation of the Fourteenth Amendment Against Defendant Richard Souviron**

81.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

82.     Vincent Liberto, John Chianese, Milford Police Sgt's. Anthony Digirolamo and Donald Small, as well as John Does 1-20 under color of state law fabricated inculpatory evidence via their use, without any factual predicate, of the interrogation and questioning of the Plaintiff's severely mentally ill brother.

83.     As a direct and proximate result of this fabrication of inculpatory evidence the Plaintiff's clearly established Fourteenth Amendment due process rights, including the right to a fair trial and his Fourth Amendment right to be free from unreasonable seizures were violated, and Gary Cifizzari was wrongly convicted and suffered the injuries and damages described above.

### COUNT V- 42 U.S.C. § 1983

### 42 U.S.C. § 1983 Claim by Plaintiff for Failure to Investigate Against those Defendants then employed by the Milford Police Department as well as John Does 1-20

84.     Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

85.     Vincent Liberto, John Chianese, Milford Police Sgt's. Anthony Digirolamo and Donald Small, as well as John Does 1-20 under color of state law deliberately and/or recklessly failed to investigate adequately, as any minimally competent officer or forensic scientist would have, by, among other things, failing to adequately investigate the man who was ultimately established via DNA evidence as the murderer, Michael Giroux and his connection with said murder.

86.     As a direct and proximate result of this deliberately and/or recklessly conducted failure, the Plaintiff's clearly established Fourteenth Amendment due

RA 578

process rights, including the right to a fair trial and his Fourth Amendment right to be free from unreasonable seizures were violated, and Gary Cifizzari was wrongly convicted and suffered the injuries and damages described above.

## COUNT VI- 42 U.S.C. § 1983

**42 U.S.C. § 1983 Claim by Plaintiff for Malicious Prosecution Against those Defendants then employed by the Milford Police Department as well as John Does 1-20**

87.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

88.    Those Defendants then employed by the Milford Police Department as well as John Does 1- 20, state actors acting under color of law, commenced or caused to be commenced a criminal prosecution, instituted with malice and without probable cause against the Plaintiff. As set forth above, they together constructed a case against the Plaintiff, Gary Cifizzari, by suppressing, fabricating, and/or failing to investigate important evidence, and, ultimately, obtained a conviction against him.

89.    The criminal actions ultimately terminated in the Plaintiff's favor on December 10, 2019, when his convictions were vacated by the trial court on the grounds of his actual innocence, due to conclusive scientific evidence that the perpetrator's DNA did not match him but instead matched Mr. Giroux. The Commonwealth thereafter filed a nolle prosequi indicating that the reason for it was because DNA evidence showed Giroux had committed the murder.

90.    The conduct of Defendants then employed by the Milford Police Department as well as John Does 1-20 violated the Plaintiff's clearly established

rights under the Fourth Amendment and the procedural due process component of the Fourteenth Amendment.

91.     As a proximate result of the above-referenced conduct, the Plaintiff was arrested, was prosecuted, was forced to endure an unfair trial and wrongful conviction, and was wrongly imprisoned for some 35 years. He suffered and continues to suffer the highly substantial injuries and damages set forth above.

### COUNT VII- 42 U.S.C. § 1983

### Monell Claim Against The Town of Milford and The Milford Police Department

92.     Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

93.     At all times relevant, including during the investigation of the murder, the defendants The Town of Milford and The Milford Police Department had a policy, custom, or practice of failing to properly discipline, supervise and train Milford police officers including the individuals named in this case. The Town of Milford and The Milford Police Department failed to ensure that its police officers would conduct constitutionally adequate identification procedures; obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclose to prosecutors material information favorable to criminal defendants; follow the duties imposed by Brady v. Maryland; conduct adequate investigations, and never fabricate inculpatory evidence.

94.     These policies, customs and practices led Milford police officers to believe that misconduct would be tolerated and that allegations of abuse of

RA 580

constitutional rights would not be investigated. They made it foreseeable that officers would violate people's constitutional rights.

95.    The policies, customs and practices of the Town of Milford and the Milford Police Department described in this complaint were the moving force behind the plaintiff's arrest, prosecution, conviction and incarceration.

### Count VIII- 42 U.S.C. § 1983

**Claims Against Doe Defendants for Supervisory Liability as to those Defendants then employed by the Milford Police Department as well as John Does 1-20**

96.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

97.    The Doe Defendants who served as supervisors in the Milford Police Department, acting under color of law with deliberate indifference to the rights of criminal suspects, failed to train and supervise adequately the relevant Milford police officers. In doing so, the Milford supervising Doe Defendants tacitly acquiesced in, condoned, or encouraged their officers to engage in unconstitutional misconduct, including the erroneous identification of the Plaintiff as the killer, the suppression of exculpatory evidence, and other conduct set forth above.

98.    The failure of these defendants to supervise and train those officers amounted to deliberate indifference, or intentional misconduct, which proximately and directly caused the Plaintiff to suffer all of the injuries and damages set forth above.

Count IX - 42 U.S.C. § 1983

**Conspiracy Claims Against to those Defendants then Employed by the Milford Police Department as well as John Does 1-20**

99.   Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

100.   Those Defendants then employed by the Milford Police Department as well as John Does 1- 20 acted in concert to deprive the Plaintiff of his constitutional due process rights by, among other things, suppressing, fabricating, failing to disclose, and/or failing to properly investigate the murder.

101.   On information and belief, Defendants affirmatively agreed to act together in, among other things, the wrongful identification of the Plaintiff, in failing to investigate other exculpatory leads and in suppressing evidence helpful to the Plaintiff. By doing so, defendants agreed to deprive Plaintiff of his clearly established rights under the Fourth Amendment and the procedural due process component of the Fourteenth Amendment.

102.   On information and belief, in furtherance of the conspiracy, Defendants undertook overt acts as referenced above and herein.

103.   Defendants' conspiracy directly caused the constitutional deprivations suffered by the Plaintiff's false arrest, malicious prosecution, unfair trial, wrongful conviction and unlawful confinement, and all the other grievous permanent damages set forth above and herein.

RA 582

## COUNT X- State Civil Rights Statute

**Claims Against those Defendants then Employed by the Milford Police Department as well as John Does 1-20 For Violation Of Massachusetts Civil Rights Ac M.G.L. CH.12, § 111**

104.    Plaintiff hereby incorporates all of the foregoing as if set forth herein and further alleges as follows:

105.    All Defendants interfered with the Plaintiff's exercise and enjoyment of rights guaranteed to him by the United States Constitution, and the Constitution and Laws of the Commonwealth of Massachusetts by, among other things, conducting a sham investigation of the actual perpetrator, Giroux, coaching, coercing or otherwise fabricating evidence against the Plaintiff, or causing witnesses to give statements and/or testimony that would result in his misidentification, or offering statements and/or testimony they knew or should have known was false.

106.    Defendants' misconduct deprived plaintiff of his rights under federal and state law by threats, intimidation and coercion, thereby violating the Massachusetts Civil Rights Act.

107.    As a direct and proximate result of this conduct, plaintiff suffered the injuries as described above.

## CLAIMS FOR DAMAGES

108.    Defendants' actions deprived Gary Cifizzari of his civil rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the Commonwealth of Massachusetts.

RA 583

109.    The defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith and/or malicious acts, misdeeds and omissions caused Cifizzari to be falsely arrested, maliciously prosecuted, unfairly tried, wrongfully convicted, and to suffer 35 years of wrongful imprisonment.

110.    All the alleged acts, misdeeds and omissions committed by the defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of defendants meets all of the standards for imposition of punitive damages.

WHEREFORE, Plaintiff, Gary Cifizzari, prays as follows:

A.    That the Court enter judgment in favor of the Plaintiff, Gary Cifizzari, and against defendants on all Counts of the Complaint;

B.    That the Court award compensatory damages to Plaintiff and against the defendants, jointly and severally, in an amount to be determined at trial;

C.    That the Court award punitive damages to Plaintiff and against all individual defendants, jointly and severally, in an amount to be determined at trial, in order that such award will deter similar proscribed conduct by defendants in the future;

D.    That the Court award to Plaintiff and against defendants' pre-judgment and post judgment interest on all sums awarded him in this action and that it further award to Plaintiff recovery of all of his costs and expenses concerning this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and/or other authority; and

E.    That the Court grant Plaintiff any such other relief to which he may be entitled.

### JURY TRIAL DEMAND

*PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES AND CLAIMS SO TRIABLE.*

Dated: March 8, 2024

RESPECTFULLY SUBMITTED,
GARY CIFIZZARI

BY:   /s/ Mark Loevy-Reyes
      *One of Plaintiff's Attorneys*

Mark Loevy-Reyes, BBO No. 707974
LOEVY & LOEVY
398 Columbus Avenue, Suite 294
Boston, MA 02116
(312) 243-5900
mark@loevy.com

Jon Loevy*
Loevy & Loevy
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
Ph: (312) 243-5900
Fax: (312) 243-5902
jon@loevy.com
*Admitted *pro hac vice*

William S. Smith, Esq., BBO# 635432
THE LAW OFFICE OF WILLIAMS. SMITH
206 Worcester Road,
P.O. Box 585
Princeton, MA O1541
(774) 317-9287
holdenattorney@gmail.com

RA 585

## CERTIFICATE OF SERVICE

I, Mark Loevy-Reyes, an attorney, hereby certify that on March 8, 2024, I filed the foregoing notice using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*

# EXHIBIT 9.

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT OF
THE COMMONWEALTH
CRIMINAL NO. 95167


COMMONWEALTH

VS.

MICHAEL P. CIFIZZARI


MOTION TO SUPPRESS STATEMENTS OF
THE DEFENDANT


Before:    KEATING, J.


APPEARANCES:

LAWRENCE MURPHY, ESQ., Asst District Attorney,
for the Commonwealth.

MICHAEL M. MONOPOLI, ESQ., 67 Highland Street,
Worcester, Ma., for the Defendant.

JAMES F. BROWNING, CCR
Official Court Reporter
Superior Court
Worcester, Ma.

RA 588

2

I N D E X

3

(The court was called to order at 10 A.M., June 6, 1983. The defendant was present in court with counsel.)

THE CLERK. For the record, this is the case of the Commonwealth against Michael P. Cifizzari, Indictment Number 95167, which presents murder. The defendant is present and represented by Attorney Michael Monopoli, and counsel for the Commonwealth by Attorney Lawrence Murphy.

The matter before the Court is a motion to suppress.

THE COURT. Mr. Monopoli, I understand, looking at your affidavit signed by Mr. Cifizzari, that the thrust is that any statement that he made was made at a time when he was unable to make a voluntary waiver, is that right?

MR. MONOPOLI. That's correct, your Honor.

THE COURT. That is the thrust?

MR. MONOPOLI. That's correct.

THE COURT. All right. Now what about his competency at this time?

MR. MONOPOLI. Your Honor, I have a report from Doctor Neil Borenstein, which is dated -- if I may have a moment, sir.

(Mr. Monopoli perusing papers)

MR. MONOPOLI. Well, it's stated, anyways, January

RA 590

of 1983, and in that report, your Honor, there is an indication that Mr. Cifizzari is, in fact, competent to stand trial, and the report is dated January 24, 1983.

I did make a copy of this report available to the Court sometime in January or February; and, in addition to that, I believe there is a report from Mr. Kelso of Bridgewater as to his -- who has indicated that this man is, in fact, competent; and the report of Doctor Kelso, your Honor, is dated April 5, 1982.

THE COURT. All right. Let me have Doctor Borenstein's statement. I'm going to make that part of the record, Mr. Murphy, unless you have an objection.

MR. MURPHY. No objection.

THE COURT. Is Borenstein going to be here tomorrow?

MR. MONOPOLI, That's correct, sir.

THE COURT. O.K. Give it to the reporter, Mr. Browning. Exhibit 1.

(Above-mentioned report was then marked Exhibit 1.)

THE COURT. All right, Mr. Murphy --?

MR. MURPHY. Your Honor please, there is a statement where the Commonwealth is under the burden to go forward. There was a statement taken at the

RA 591

police station without the defendant's attorney being present.

THE COURT.  All right.

MR. MURPHY.  May we call the first witness, your Honor?

THE COURT.  Certainly.

MR. MURPHY.  Sergeant DiGirolomo.

\* \* \* \* \*

ANTHONY DiGIROLOMO, a witness for the Commonwealth, was duly sworn and testified as follows:

DIRECT EXAMINATION

Q    (By Mr. Murphy)  Would you give us your name, please.

A.    Anthony DiGirolomo.

Q    What is your occupation?

A.    Police sergeant.

Q    How long have you been a police officer?

A.    Thirty years.

Q    And where are you employed?

A.    Milford Police Department.

Q    And what shift do you work?

A.    Midnight to 8 shift.

Q    And, sir, calling your attention to February 26, 1981, what shift were you working that night?

A.    Midnight to 8 shift.

6

Q    What time did you arrive at work?

A.    Ten minutes to 12.

Q    And at some time did you see Mr. Cifizzari?

A.    Yes, sir, I did.

Q    When did you see Mr. Cifizzari?

A.    Approximately 1 A.M.

Q    Do you know Michael Cifizzari?

A.    Yes, I know him very well.

Q    How did you know him?

A.    I kneww him from previous years.  I was his coach in the Junior Football League, and he was approximately 12 or 13 years old.

Q    And --

    MR. MONOPOLI.  Most respectfully, if I may be heard.  I would make an oral motion that the witnesses be sequestered.

    THE COURT.  I assume that they are.

    Anybody here in the courtroom who will be a witness in this case?

    MR. MURPHY.  The only potential witness is Doctor Pike.

    THE COURT.  Well, might as well have Doctor Pike step out then.

    (Whereupon, Doctor Albert Pike withdrew from the courtroom.)

7

Q    And, sir, you say that you coached Michael Cifizzari when he was a young boy?

A.    Yes.

Q    In the 12-year-old bracket?

A.    Yes.  It was the Junior Football League for Boys.

Q    How long a period of time did you coach him for?

A.    Approximately a year and a half to two years.

Q    Did you get to know him during this time?

A.    Yes.

Q    What observations did you make of him at that time?

A.    Well, in my opinion he had possibly family problems, and he wanted something to take out his frustrations on, and he was looking for --

MR. MONOPOLI.  I move that that be stricken, your Honor.

THE COURT.  Well, led you to believe that, Sergeant?

THE WITNESS.  Well, he was aggressive.

THE COURT.  On this particular night how was he?

THE WITNESS.  On this particular night, your Honor?

THE COURT.  Yes.

THE WITNESS.  As far as what?

8

THE COURT. Well, how did he appear to you?

THE WITNESS. This particular night?

THE COURT. Yes.

THE WITNESS. Appeared O.K.

THE COURT. All right.  Go ahead.

Q    Sergeant, you say that you saw Mr. Cifizzari when he was about 12 years old?

A    Yes.

Q    And did you see him as he grew up?

A    Some of the times.  Some of the times.

Q    Did he at some time -- did you lose track of him for sometime?

A    Yeah.  After I got through coaching him, I kind of lost track of him for awhile.

Q    When did you see him again?

A    I saw him off and on, oh, probably about four or five years after that.

Q    And then did you lose track of him after those four or five years?

A    Yes, I did.

Q    And when did you again see him again?

A    Oh, I began to see him, I'd say, in the fall of -- before that -- of 1980.

Q    Where was it that you saw him?

RA 595

A.    I'd see him walking the streets; then he'd come in the station, and he wanted some place to sleep. So, I conversed with him for awhile and talked about football, and so forth; and then I'd give him a night's lodging.

Q    How many times would you say you gave him a night's lodging at the station?

A.    At least a half dozen times.

Q    Were there ever any times when you refused him a night's lodging?

A.    Yeah, there were times I talked to him.  I said, "Mike, I can't keep putting you up all the time. You've got to find some help.  You've got to find some money, or a job, or go on welfare, whatever."  And there was a time that I wouldn't put him up.

Q    What observations did you make of him in the fall of 1980?

A.    Oh, he was -- his personal hygiene was bad; he was, you know, depressed, and hungry.  I'd give him a cup of coffee now and then and get him something to eat, but his personal hygiene was bad.

Q    How about talking to him?  Were you able to talk to him?

A.    Yeah, we conversed, naturally, and talked about -- he was always bringing up football because he liked it

10

and he was a good football player.

Q    He was a good football player?

A.    Yes.  I thought he was.

Q    What position did he play?

A.    I believe he played halfback.

Q    And calling your attention to February 26, 1981:  When was the last time prior to that time that you had seen him?

A.    Oh, probably four or five weeks before that.

Q    What was his condition then four or five weeks before?

A.    The same.  His personal hygiene , and so forth, was bad.  He was hungry and cold; wanted a place to sleep.

Q    Were you able to talk to him at that time?

A.    Yes.

Q    And, sir, calling your attention again to the 26th of February:  When you first saw him, where was he seated?

A.    Seated in the lobby of the police station.  It's one big room.  He was on a seat there and I was behind the desk.

Q    How far away from him were you?

A.    15 to 20 feet.

Q    All right.

A.    Maybe more.

Q    Did you make any observations of him at that time?

RA 597

11

A.   Yes.  He came in and he sat down and relaxed -- just to keep warm, and I said, "Hi, Mike!  How are you doing?"  He said, "Good."

Q   At some point did you later talk to him?

A.   Yes, I did.

Q   When was this?

A.   Approximately a half-hour later -- one or one-thirty.

Q   What did you say to him?

A.   I --

THE COURT.  I'm sorry, around what time?

THE WITNESS.  About 1:30.

THE COURT.  A.M.?

THE WITNESS.  Yes, sir.

Q   What did you say to him?

A.   I said, "Mike, we'd like to have a talk with you," and he said, "Sure."  So Officer Chianese was with me at the time.  I said, "Jack, let's have a talk with him.  Let's talk nice to him.  He seems to be wanting to tell us something."  In the past he had been in here and he seemed to have something on his mind, but he just wasn't ready to say anything.

MR. MONOPOLI.  I object.

THE COURT.  I'll take that and note your exception.

Q   Did you go somewhere with him?

12

A.    Yes.

Q    Where did you go?

A.    Went to the clerk's office, which is a short distance down from the front office to the clerk's office.  We sat down in there.

Q    Who was in that room?

A.    Myself, Mike and Chianese -- Officer Chianese.

Q    What type of room is that?

A.    It's a clerk typist's room; it has a typewriter, few books; it's well lighted, you know.  Windows there and so forth.

Q    How big a room is it?

A.    Probably 10 by 15 .

Q    And what happened once the three of you went into the room?

A.    We sat down and I asked Mike if he wanted to talk, and he said sure.  So I told him, I said, "Mike, I'm going to advise you of your rights before we say anything.  It's just a matter of routine."  So he told me.  He said, "Well," he says, "I know what those are all about.  I've been arrested before."  I said, "Well, Michael, I'm going to advise you of your rights anyway."

So, I took the Miranda card, which we had in one of the drawers there.  We had several that

RA 599

13

we keep there.  And I read him his Miranda rights, and I asked him if he understood them.  He said, "Yeah, I heard those before.

So then we -- I noticed on the card it was a fine writing, so I says -- I said to Officer Chianese, "Write them out for him in bigger letters so he can read them and so he can understand.  I want to make sure he understands what we're talking about."

Q    Did he do that?

A.    Yes.

Q    Officer Chiances do that?

A.    Yes, he did.

Q    What happened after he wrote those out?

A.    Michael signed it.

Q    Who did he sign it?

A.    At first he signed it Paul McCartney; so, I said to him, "Mike," I said, and he kind of smiled, and I said, "Mike, what's that name?"  He said, "That's Paul McCartney, one of my idols when he was playing in the band."

I said, "Mike, we need your real name."  So he said, "O.K.," and he wrote his real name right underneath it.

Q    And did you make any observations of him at that point?

A.    Yeah, he was normal and --

RA 600

14

MR. MONOPOLI.  I object.

Q   Were you able to talke to. him?

MR. MONOPOLI.  I object.

THE COURT.  I'll take it.  He was normal as far as he was concerned.

Q   Were you able to talk to him?

A.   Yes.

Q   Was he able to talk to you?

A.   Yes.

Q   And did you notice anything out of the ordinary at that time about him?

A.   No, nothing out of the ordinary.

Q   And were you able to continue with your investigation?

A.   Yes, I did.

Q   What next happened?

A.   Well, after we got through with his rights, and so forth, and we asked him if he understood and he said yes, I asked him if he knew anything about the murder on Central Street in regards to Mrs. Schiappa, and Mike said, "Oh, yeah.  I know that woman.  That's Connie.  That's my greataunt.  I'm related to her."

So I says, "Mike, were you around at that time?"  He said, "Yeah, I was down there around 11-11:30."  I says, "Do you want to tell us anything about it?"  He said, "Yeah."  He brought up Robert Canesi and said

15

he was with him.  And he says, "We went there to get some money, and we knew she had some money, so we went there to get some money."

She let them in, and when they got inside. I guess Bob was trying to get the money and he gave her a backhand.  Mike said he gave her a backhand and knocked her down.  At that point, I felt that I should ask him directly if he had anything to do with murder. I said, "Mike, did you people -- did you and Bob kill that woman?"

He said, "Yeah, we did."

So then I said, "Look, want to tell us about it?"  I asked Officer Chianese to get a pad.  He started writing down what Mike was telling us.

Q    Did Officer Chianese continue to write down what he was saying?

A.    Yes, he did.

Q    How long -- how many times did you go over that statement?

A.    I told Officer Chianese, I said, "Take it once; take it twice; take it three times.  I want to make sure he knows what he's telling us.  And at one point I told Mike, I said, "Do you realize what you're telling us?  This is serious.  This is a serious charge.  You're telling us you killed a woman."  He

said, "Yeah, I know.  I want to tell you all about it.
I want to get it off my chest."

Q   How many times did he go over it?

A.   He went over it three or four times.

Q   Did Officer Chianese write out those three or four
different times that he went over it?

A.   Yes.  Then he wrote out the final statement.

Q   And did you do something after some period of time in
that room?

A.   Yes, I did.  Mike mentioned Robert Cananzey, and
I asked him who Robert Cananzey was. He said that he was
his cousin from Taunton.  I says, "Has he ever been
arrested, Mike?"

He said, "Yes, he's been arrested for assault
and battery with a dangerous weapon and drug offense."

I said, "Where does he live?"  He told me
in Taunton.  So I said to Jack:  I said, "Jack, I'm
going to call the Taunton Police.  I'm going to check
and see if Mike's story is true.  So I called Taunton.
I talked to a Lieutenant Wescott and I asked him if he
knew a Cananzey.  He said, "Yeah, we have a card on
him."

MR. MONOPOLI.    I object.

THE COURT.  All right, I'll exclude that.

Q   And how long did you talk to that man?

17

A.    The lieutenant?

Q    Yes.

A.    About five or ten minutes.

Q    And after that conversation, did you go back into the room?

A.    Yes.

Q    What did you do when you went in the room?

A.    I told Officer Chianese, I said, "I checked --

MR. MONOPOLI.    I object, respectfully.

THE COURT.    He can say what he told him.    The defendant was there, I assume.    Was he?

THE WITNESS.    Yes.

THE COURT.    Go ahead.

A.    "I checked his story and it is true."    And we continued talking to Michael.

Q    At some point did a Trooper White come into the room?

A.    Yes, he did.

Q    And when was this?

A.    Trooper White came in approximately two o'clock, and he was with me when I made the phone call to the lieutenant in Taunton.

Q    How did Trooper White come into the room?

A.    I notified him as soon as Michael gave us a statement.    I called my superior, the Chief of Police, and I called Trooper White.    And I asked my chief if I

RA 604

18

should continue with the investigation, and he said, "Go right ahead."

Q    Where does Trooper White live?

A.    He lives in Milford.

Q    So how long after you called him did he arrive at the police station?

A.    Five minutes.  He came right down.

Q    And he arrived at the police station in five minutes. After he arrived at the police station, what did you do?

A.    Well --

Q    Regarding him?

A.    I told him what the situation was, what we had and so forth.

Q    What did he do?

A.    I asked Michael if he'd like to talk to this fellow, and Tommy came into the room -- Trooper White came into the room.  And I told Michael that this is a State Trooper from the Crime Prevention Control Unit and that he'd like to talk to him.  "I want you to tell him what you told us."  And at this  point Michael got very paranoid.  He glared at him.  He just didn't want to talk to anybody else.  Trooper White tried to talk to him but Michael wouldn't.  So, Trooper White finally left the room, and then Michael started the conversation again with Officer Chianese.

Q    How long was Trooper White in the room?

A.    It wasn't too long. Five minutes at the most.

Q    Then where did he go after that?

A.    He went out in the hallway, just outside the door.

Q    Then you continued to talk to Mr. Cifizzari?

A.    Yes.

Q    How long did you talk to him for?

A.    Another half-hour; maybe less than that.

Q    During this time the final statement was written?

A.    Officer Chianese wrote the final statement.

Q    And after you took the final statement from Mr. Cifizzari, what next happened?

A.    When we were all through, I took him out into the guardroom, and I said, "Michael, would you like something to eat? Would you like a soda or something?" He just felt relaxed. He said, "Tony," he said, "I'm glad it's all over with. I wanted to get it off my chest a long time, that's why I kept coming into the station to see you because I wanted somebody to talk to."

Q    What happened after that?

A.    After that I said to him, "Mike," I says, "would you like -- would you be willing to go to Worcester to take some tests up there." I said, "If you want, you can stay here for the night. We'll put you up for

a night's lodging and take you to Worcester in the morning." He said,"Fine." So I put him in a cell and he went to sleep.

Q    Once you put him in the cell, did you stay in the cell as well?

A.    No, I stood by until he went to sleep.

Q    What was he mental condition at that point?

A.    Well, he was what you'd call a -- he was depressed but he was relaxed, just like somebody that just got everyting off his chest and was relaxed.

         MR. MONOPOLI.  I object.

         THE COURT.  How do you know he was depressed?

         THE WITNESS.  Well, his head was down and he was -- he looked remorseful in my mind.

Q    How long a period of time did you stay with him while he was going to sleep?

A.    It wasn't too  long -- ten to fifteen minutes at the most.  I kept checking him every so often.

Q    How long did he sleep for?

A.    Until about 6 to 7 o'clock.  That's when we woke him up and took him to Worcester.

Q    Who took him to Worcester?

A.    There was myself, Officer Chianese and Officer Sullo.  And on the way up, Michael was hungry.  He said he'd like to get some breakfast.  So we stopped at the

Hungry L in Grafton and we bought him his breakfast, and then we went to Worcester.

Q   Who ordered his breakfast?

A.   He ordered the breakfast.  We asked him what he wanted.  I forget just what he had.

Q   But he did order his breakfast?

A.   Yes, he did.

Q   Where did you go in Worcester?

A.   Crime Prevention Control Unit.

Q   Is that located on Main Street in Worcester?

A.   Main Street, Worcester.  Yes, sir.

Q   What time did you arrive there?

A.   Oh, must have been around 9 o'clock.

Q   What happened at that office?

A. At that office we were talking to Michael, and Sergeant Doheny was talking to him.  And then, again, Michael glared at him and just didn't want to talk to Sergeant Doheny.

Q   Did you fill Sergeant Doheny in as to the statement you had taken?

A.   Yes, we told him just what we had, and so forth, and talked to Lieutenant DeFuria, and he pulled a file on whatever he had on the case and they proceeded to talk to Michael.

Q   Had you been investigating this case yourself, Sergeant,

22

or not?

A.    No, I hadn't.

Q    So who in the Milford Police Department had been investigating this case?

A.    The Detective Bureau.   Sergeant Small and Liberto.

Q   Detective Liberto as well?

A.    Yes.

Q    And they had investigated with the CPAC officers?

A.    Right.

Q    So you had nothing to do with the investigation?

A.    No.   One time I asked them if they needed any help -- at the time of the murder -- and I told them that my shift and myself would be glad to co-operate with them and see what we could do.

Q    But during the course of the investigation -- about the next year and a half -- you, yourself, didn't investigate the case?

A.    No, I didn't.

Q    So were you familiar with the details of the investigation or not?

A.    Just a few.   I wasn't familiar with the whole case.

Q    How would you get those details that you were familiar with?

A.    With my fellow officers.   We heard different things.

RA 609

23

Q    So you, yourself, never had any police reports or
conducted any interviews and so forth?

A.    No, I didn't.

Q    And were you present with Sergeant Doheny for the
entire time that he was talking to Michael Cifizzari
or not?

A.    Not the full time Sergeant Doheny was in there.
I'd go out and talk to Lieutenant DeFuria and come back
in, but Officer Chianese and Sullo were there most of
the time with Michael.

Q    And how long was he at the CPAC office for?

A.    I'd say he was there for about an hour and a half.

Q    Then where was he taken after that?

A.    Taken to the Milford District Court for arraignment.

Q    Did you take him there?

A.    I took him with Trooper Sullivan.

Q    What was he like on the way from CPAC to Milford?

A.    Well, we had Michael handcuffed, and he was
complaining about them being too tight; so, Trooper
Sullivan and I, we pulled over and we unloosened them
for him so he'd be comfortable.  But he was talking
normally, you know, in my opinion.  Once in awhile he'd
get a little aggravated because of the handcuffs, and
so forth, and he didn't like the presence of Trooper
Sullivan.  And in my opinion, Michael -- anything that

RA 610

represents authority, he resents it.

MR. MONOPOLI. I ask that that be stricken, your Honor.

THE COURT. I'll take it for whatever value it is to me.

Q   And, Sergeant, did you make any observations of Mr. Cifizzari at the CPAC office?

A.   Yes, I did. He, like I say, he became -- when Sergeant Doheny came in the room and started to talk to him, he became very tense and glared at him; he just didn't want to talk to him.

Q   Then later --

THE COURT. Did he say so?

THE WITNESS. Yeah, he did. He mentioned in his statement, he said, "That sergeant," he said, "get him out of here. He's driving me nuts." He made that statement.

Q   And was that after Mr. Cifizzari had talked to Sergeant Doheny?

A.   During the conversation.

Q   At one point during the conversation Mr. Cifizzari stopped the interview, is that right?

A.   At CPAC? Yes.

Q   Were you present a t that time?

A.   Yeah. Yes, I was.

25

Q   Were you present at the Milford Courthouse when he was
at the Milford Courthouse?

A.   Yes, I was.

Q   Did you make any observations of him there?

A.   Very quiet, and he had his head down, and he didn't
say too much.

Q   Sergeant, do you have the Miranda card with you?

A.   Yes.   Here.

MR. MURPHY.   I would ask to introduce this.

MR. MONOPOLI. No objection.

THE COURT.   All right, Exhibit 2.

(Above-mentioned item was then marked Exhibit 2.)

Q   And that's the card that you used on that night?

A.   Yes.

Q   The 26th of February?

A.   Yes, sir.

Q   And it's been in your possession since?

A.   Yes, sir.

Q   Sergeant, as you observed him on the 26th of February,
didyou form an opinion as to whether or not he had
had anything to drink?

A.   Yes.   He was perfectly sober.   No smell of liquor.
Nothing.

RA 612

Q    Had you formed an opinion as to whether or not he had had any drugs?

A.    No, he was straight; his eyes were clear; speech was good.

Q    Had you seen him under drugs or the influence of drugs at other times that he was in the Milford Police Station?

A.    Yes, I have.

Q    In your opinion, Officer, on the 26th of February when he was in the Milford Police Station, did he seem to know what he was doing?

A.    Yes, sir.

Q    Did he respond approriately to questions?

A.    Yes, sir, he did.

Q    Was he alert?

A.    Yes, he was.

Q    Could you understand him as he was talking?

A.    Very clearly.

Q    And you had known him for a fairly long period of time?

A.    Yes, sir.

MR. MURPHY.  Thank you, Sergeant.

THE COURT.  Any questions, Mr. Monopoli?

MR. MONOPOLI.  If I may.

CROSS-EXAMINATION

Q    (by Mr. Monopoli)  Sergeant, at one point you were

asked if you noticed anything unusual about him on February 26 when you observed him at the police station, and your answer was no, is that correct?

A.   I think it was yes -- his personal hygiene.

Q   When you say, "personal hygiene," what was wrong with his personal hygiene?

A.   Body odor; he was unshaven; his clothes were raggerty -- not raggerty, but dirty.

Q   Ripped also?

A.   No, they weren't ripped, but like he slept in them for quite awhile.

Q   Would you characterize his physical appearance as that of someone you see lying in the gutter?

A.   Well, no.

THE COURT.   Depends on where the gutter is.  I don't think it's terribly helpful to me.

Q   In any event, his physical appearance was very shabby, is that correct?

A.   Yes, sir.

Q   Very dirty, is that right?

A.   Yes, sir.

Q   Now on how many occasions did he come to the police station asking for lodgings?

A.   Well, when I was there -- of course, I don't work steady.  I have two nights a week off.  I'd say

RA 614

28

at least six times -- at one point almost every night in the week, you know, I work four nights a week. And at other times, once a month or every two weeks. About six times anyways while I was there that he came in.

Q    And on each of those occasions his physical appearance was the same, is that correct?

A.    Yes, sir.

Q    You said you have known him for a number of years, is that right?

A.    Yes, sir.

Q    And --

THE COURT.    Do you know his family?

THE WITNESS.    Yes, sir, I do.

Q    When was the first time in 1980 that you would have had occasion to see him, do you know?

A.    Oh, I'd say it was August, September of 1980.

Q    And from August or September of 1980 through February 26 of 1981, is it fair to say that his general condition, his physical appearance deteriorated?

A.    Looked the same to me, sir. I wouldn't say it was deteriorated; I'd say it was always the same, you know.

Q    Whose investigation was this, sir, from the Milford Police Station -- Police Department?

29

A.    Well, the Detective Bureau; it was Sergeant Small and Detective Alberto, and they were working along with CPAC.

Q    And there are police reports on this matter in the station, correct?

A.    Yeah, they had the police reports.  We didn't have them ourselves.  They had them, their own personal file.

Q    As to how this alleged murder was committed, such as the broomstick in this lady's vagina, bite marks, some of the details, that was well known around Milford, is that correct?

A.    No, sir.

Q    It was not?

A.    There was some of the things -- the only thing I learned through other officers was something about a broomstick that was used, and bite marks; other than that, I didn't have too much.  I mean, I --

THE COURT.  That's not what he asked. He asked if it was well known?

THE WITNESS.  I wouldn't say allthe facts were well known.

THE COURT.  Having in mind that this murder happened in Milford -- it happened in September of '79?

30

THE WITNESS.  I think it was, yes.

THE COURT.  In that interval, between September 1979 and February, 1981, how often was the defendant in the police station?  Are you able to say, at least that you know of?

THE WITNESS.  I'd say that was from the fall of '80 that I know of, at least a half a dozen times.

Q    And, sir, prior to the time of his coming to the station on the 26th, you had in your own mind determined that he was a suspect in this case, is that correct?

A.    No, not right away.

Q    Well, didn't you plan, sir, that this was the occasion in which you were going to talk to him about the murder?  Didn't you plan that beforehand?

A.    We had suspected that he might know something about the murder, but at that time, no, I didn't feel he was a suspect.

I figured that he knew something, where he was related to the woman and he could possibly tell us something about it.

Q    In any event before you came to the station that night you had planned to talk to him about this murder, is that correct?

RA 617

31

THE COURT. Did he know he was coming in? Is that the thrust of it?

Q    Did you make up your mind, sir, before he came in on the 26th that the next time he came into the station that you were going to talk to him about this murder?

A.    Well, a couple of days before I was talking to Officer Chianese, and I says, "We should have a talk with Mike when he drops in again." We didn't know he was going to drop in that night, but when he did, I said, "Jack, let's have a talk with him."

Q    In your report, sir, you stated you felt this was an opportune time to talk to him about this matter, is that correct, sir?

A.    Yes, sir.

THE COURT. What made it an opportune time?

THE WITNESS. Well, he was sober; he was calm, and he was, in my opinion, normal. He was talking like any ordinary human being should, and I felt this was --

THE COURT. (Interposing) Were there other times that he wasn't like this?

THE WITNESS. No, your Honor. there were times he came in when he was, well, you could see he was on something. I don't know what type of drugs

RA 618

32

because I'm not an expert on the subject.

Q    Now you talked to him, sir, and you read him his rights, is that correct?

A.    Yes, sir, I did.

Q    No question in your mind that he understood those rights, is that correct?

A.    No question.

Q    And you read him from the card that was just introduced into evidence?

A.    Yes, sir.

Q    However, after reading them, you decided to write them out also?

A.    Yes, sir.

Q    No question in your mind that he understood those rights?

A.    No question.

Q    And as I say, after reading them you decided to write them out also?

A.    Yes, sir.

Q    That was to make sure he understood them, is that right?

A.    Not only that, but making the lettering bigger in case there may be something wrong with his eyes. I don't know, but the card had very fine print, I read them to him, and I wanted to make sure that he could

RA 619

33

read the writing, so we wrote them in big, bold letters.

Q    You asked him to sign it?

A.    Yes, sir.

Q    And he did sign it, correct?

A.    Yes, he did.

Q    And he signed it Paul M. McCartney?

A.    McCartney.

Q    Didn't he sign it Paul M. McCartney?

A.    From what I can recall --

Q    Do you have a copy with you, sir?

A.    Yes, I have.

Q    Take it out, please.

A.    I don't know if there's a period there after the M or what, but it looks like Paul M., and then it's McCartney.

Q    Take that out , sir.

A.    I have it right here.

Q    Remove it from the file.

A.    Want me to take out the whole thing -- the whole page?

Q    Yes.  That is, in fact, the form that he signed?

A.    Yes.

Q    Then you told him to sign his own name to it?

A.    Yes,

Q    And he did?

34

A.    Yes.

MR. MONOPOLI.  Respectfully I would offer this as an exhibit.

THE COURT.  Any objection?

MR. MURPHY.  No.

THE COURT.  Exhibit 3.

(Above-mentioned document was then marked Exhibit 3.)

Q    Now, sir, at some point you turned over your statement from Mr. Cifizzari to the district attorney's office, is that correct?

A.    Yes, sir, I did.

Q    When was this?

A.    That was when we brought Michael up in the morning, approximately around 9 o'clock when we arrived at CPAC, and I talked to Lieutenant DeFuria and I told him just what we had.

Q    You also gave him a report also that indicated that his rights were given?

A.    Yes.

Q    Is that correct?

A.    Yes, sir.

Q    That cover sheet, sir, which was just introduced as an exhibit, when did you give that to the district attorney's office?

35

A.   Which one, sir?

Q   The one we just talked about that was signed Paul McCartney.

A.   Gave them all at the same time.

Q   Who did you give it to?

A.   Lieutenant DeFuria.

Q   Do you know when the district attorney's office received this?

A.   I really don't know, sir.

Q   You're certain you gave it to Lieutenant DeFuria?

A.   Yes, I gave him the statement and the rights there -- the whole thing, right to Lieutenant DeFuria.

Q   In this statement you took from Michael Cifizzari, he makes mention of Robert Cananzey being there, is that correct?

A.   Robert Cananzey?  Right.

Q   Your department, or CPAC, determined that this individual was not there, is that correct?

A.   That I don't know, sir.

Q   He also makes mention that he, in fact, bit this woman, is that correct?

A.   I think in the statement Mike made, he -- I don't think he did.  Could I take a look at my report?

THE COURT.  Sure.

RA 622

Q    May I direct your attention at this point  to the typewritten page at the bottom of Page 1 and the top of Page 2.

MR. MONOPOLI.  He doesn't have a typed page, your Honor.  M ay I approach the witness?

THE COURT.  Sure.

A.    This one?

Q    This.  I direct your attention, sir, at this time to the typewritten statement of Michael Cifizzari, the bottom of Page 1 beginning at this paragraph.

A.    It would be different on this one, sir.

Q    If you would read that, sir, to yourself.  Right here.

A.    He said, "I think Bobbie was biting her on the neck, or something."

Q    Did he make any mention of himself biting her?

A.    He said he thought he did.

Q    Tell us what he said in regard to that?

A.    "I think that I accidentally bit her on the neck and the inside of her upper leg.  I don't know which leg.  I have this long-fanged tooth."

Q    In the report which you took, sir, did he make any mention at all of Gary Cifizzari, his brother?

A.    Not in the report.  He mentioned -- when he mentioned Bob Cananezy --

Q    (Interposing)  Is there anything in his statement that

37

you have provided us?

A.   No, sir.

Q   Some time later he was interviewed by Sergeant Doheny of the State Police, is that correct?

A.   Yes, sir, he was.

Q   Were you present for this conversation, sir?

A.   Not all of it, sir.

Q   Were you present when Sergeant Doheny asked him specifically if he bit his aunt?

A.   No, I don't think I was there then.  Like I say, I was in and out.  I was talking to DeFuria and talking to a few other troopers there.  I wasn't there for the total conversation.

Q   Were you there when he was asked if his brother Gary was there at the time of the killing?

A.   No, he just mentioned it down at the police station.

Q   When you asked him to sign his name to the exhibit that we have in evidence, you told him to sign his own name, is that correct?

A.   I told him to sign it.

Q   Is that when he signed Paul M. McCartney?

A.   Right.

Q   Had you had, prior to talking to him, or approximately at the time you did talk to him, had you had any

RA 624

38

conversations with other police officers as to his mental capacity, so to speak?

A.   Was this before we talked to him, sir?

Q   Yes.

A.   I did have conversation as far as his personal hygiene.

Q   Prior to talking to him, did you have any knowledge of a conversation he had approximately two months before this date with Detective Liberto and soon to be Chief Small of Milford?

A.   I never had any inkling of that.   There was some-thing in the newspapers.   Like I say, if you want to believe the newspapers --?

Q   Were you aware of the fact that approximately two months prior to yourself taking a statement, your department was called and this individual was at a house eating out of a dogfood bowl that happened to be on the front porch.

A.   Yes.   I recall that, yes.

Q   Did you have any conversation with the police officers involved as to this man's mental capacity?

A.   I didn't have no conversation with them.   They just referred to the dog-dish incident.

Q   Isn't it a fact, Officer, the night you talked to Mr. Cifizzari you asked him a question and his mind would

RA 625

39

sort of wander; he talked about all different things?

A.    No, not --

Q    Never happened?

A.    No, not when I talked to him.

Q    And Chianese was there also?

A.    Yes, sir.

THE COURT.    Chianese?    That's Chianese who was writing that report?

THE WITNESS.    Yes, it would be, sir.

Q    He was?

A.    Yes, sir.

MR. MONOPOLI.    I have no further questions of this witness.

REDIRECT EXAMINATION

Q    (By Mr. Murphy)    One area, Sergeant: Mr. Monopoli asked you whether or not Michael on the night of the statement to you at the Milford Police Station, did Mike say anything to you about Gary Cifizzari?

A.    Yes, he did.

Q    What did he say?

A.    We were talking about Cananezy, and he said, "I'm like Robert Cananezy.  I lift weights, and I'm strong like him."  And he says, "My brother Gary, I'd do anything for him," and, "I love my brother Gary."

RA 626

Q   He didn't say anything about Gary being at the scene, did he?

A.   Not at that time.

Q   On the day of the murder?

A.   No.

MR. MURPHY.   Thank you.

THE COURT.   Thank you, Sergeant.

(Whereupon, the witness withdrew from the courtroom.)

MR. MURPHY.   Patrolman Chianese.

JOHN CHIANESE, a witness, was duly sworn and testified as follows:

DIRECT EXAMINATION

Q   (By Mr. Murphy)   Sir, give us your name, please.

A.   John Chianese.

Q   And, sir, on February 26, 1981, where were you employed?

A.   I was employed with the Milford Police Department, sir.

Q   Are you still employed by the police department?

A.   I am not.

Q   Where are you employed?

A.   I'm currently employed in the City of Orlando, Florida.

Q   Were you brought up for this motion?

41

A.    Yes, sir.

Q    Sir, calling your attention to February 26, 1981 at about 12 o'clock at night:   Where were you at that time?

A.    I was on duty at the Milford Police Station.

Q    What were your hours of duty that night?

A.    From midnight to 8 A.M.

Q    What time did you arrive there that night?

A.    Approximately 11:30.

Q    At some point did you see Michael Cifizzari?

A.    Yes, sir.

Q    Where did you see Michael Cifizzari?

A.    I believe Michael came into the police station around 1 o'clock.

Q    Do you know Michael Cifizzari?

A.    Yes, sir.

Q    How do you know him?

A.    Well, we kind of like grew up together living in the same town.

Q    Did you go to school together?

A.    Yes, earlier grades.

Q    Were you actually in his same grade or not?

A.    No, he was about two years behind me.

Q    And after up until what year of school?

A.    I think I was maybe a junior in high school, or sophomore in high school, and I think he was probably

RA 628

42

Q    in the 8th grade or 9th.

Q    Then did you lose contact with him?

A.    Yes.

Q    When did you see him again after that point in time?

A.    Sporatically.  Sometimes once a month; maybe once every 6 months when he was around town.

Q    Is that during the time you were a police officer?

A...  No, this was before.

Q    Before?

A.    Yes.

Q    During what years would you see him when he was around town?

A.    This was probably when I was in high school and had just gotten out of high school.  He had a band, a rock group, I guess.  He was around town now and then.

Q    Was he living in Milford?

A.    I don't know at that time.

Q    When did you become a police officer?

A.    1971.

Q    During 1971 to 1981 did you see him during that period of time?

A.    Yes, on occasions I had.  I had seen him.

Q    How often would you see him during this period of time?

43

A.   When he was around town I would see him two to three times a week, maybe; and then sometimes I wouldn't see him for two or three months.

Q    Calling your attention to February 26, 1981, when was the last time prior to that date that you had seen Michael Cifizzari?

A.   I would say I had seen him probably a couple of months prior to that.

Q    And on the 26th of February, 1981, where did you first see him?

A.   At the police station.

Q    Did you make any observations of him when you first saw him?

A.   Well, he was wet and cold and he wanted to come in.

Q    Where was he?

A.   He came into the lobby of the police station.

Q    And where was he in that lobby?

A.   He was sitting on the bench at the opposite end of the lobby.  It's a long-seat bench, and he was sitting there.

Q    What type of night was it?

A.   It was cold and raining.  It was raining heavily, sir.

Q    Did he have a coat on?

A.   I don't recall.

44

Q    After you saw him there, what next did you see?

A.    Well, he approached the desk and talked to the sergeant, and he wanted coffee, so I went out and got coffee.

Q    He got coffee for who?

A.    The sergeant, myself and Cifizzari.

Q    How long did that take?

A.    Five or ten minutes.

Q    After you came back, what did you do?

A.    We sat around and talked with the Sergeant, and we were just gabbing back and forth for awhile.

Q    How long were you just talking in this manner?

A.    Ten or 15 minutes.

Q    Then what happened?

A.    Well, he wanted to talk to the sergeant, and the sergeant wanted to talk to him, and the sergeant asked Mr. Cifizzari if it was all right if I sat in on the conversation.

Q    Did you have any trouble understanding him during this 10 or 15 minute span that you were talking just about everyday matters?

A.    No.

Q    Did you make any observations regarding whether or not he was under the influence of any drugs or alcohol?

A.    No, he wasn't.

45

Q    And where did you go to talk to Mr. Cifizzari?

A.    We went into the clerk's office -- like a payroll office.

Q    What was done when you went into that office?

A.    We sat down and talked in reference to Mrs. Schiappa.

Q    Who was doing the talking?

A.    I believe the conversation started with Mr. Cifizzari wanting to talk to the sergeant and --

THE COURT.    What did he say?

A.    Well, he wanted -- the sergeant wanted to question him in reference to this Schiappa case, and Mr. Cifizzari said he wanted to talk to him.

Q    Then you went in the room?

A.    Yes.

Q    What was said when you went into the room?

A.    The sergeant asked him -- the sergeant gave Mr. Cifizzari his Miranda rights.

Q    Were you present at that time?

A.    Yes, sir.

Q    Were the rights read?

A.    Yes, sir, they were read from the sergeant's card.

Q    After reading them from the card, did Mr. Cifizzari say anything?

A.    He said that he understood the rights.

RA 632

Q    Then did the sergeant ask you to do something?

A.    Yes.  The sergeant asked me to take the card and rewrite it on a large piece of paper so it was more legible to read and so that he could read it himself.

Q    Did you do that?

A.    Yes, I did.

Q    Once you finished writing those rights out on a large piece of paper what did you do with them?

A.    The sergeant asked Mr. Cifizzari if he understood them and if he would sign it.

Q    Did he read them?

A.    Yes.

Q    How long a period of time did it take him to read them?

A.    Couple of minutes.

Q    How did he sign that card?

A.    Well, first he scribbled a signature that wasn't too legible to me.  It wasn't his signature.  And the sergeant picked it up and looked at it and said, "That's not you.  It's not your signature."  He said, "That's a signature I use for checks."  The sergeant said, "Use your own.'

Q    Then did he sign his own name?

A.    Yes,

Q    Did you make any observation at that point of Mr.

RA 633

47

Cifizzari?

A.    He was calm and relaxed; normal.

Q    And what next happened after the signing of the rights card?

A.    The sergeant asked him if he would talk to him about Mrs. Schiappa.

Q    One further question about the rights card, Officer: The rights that you wrote out, Mr. Cifizzari first signature, that is, Paul M. McCartney, that's in red ink, isn't it?

A.    I believe it was.

Q    How many pens were there present?

A.    A lot.

Q    A lot of pens?

A.    Yes, on top of the desk.

Q    Did he, Mr. Cifizzari, after signing/the red pen, did he then sign Michael Cifizzari with a black pen?

with

A.    (No response)

        THE COURT.    Want to look at it?   If's Exhibit 3.

Q    I show you this:   Do you recognize that piece of paper?

A.    Yes.

Q    What do you recognize this as?

A.    That's the Miranda warning I wrote up.

RA 634

48

Q    Are those Mr. Cifizzari's signatures?

A.    Yes.    The one in the red pen and the one in the black pen.

Q    Did you actually see him sign both of those?

A.    Yes, sir.

Q    And calling your attention again to the statement that Mr. Cifizzari was giving in that room after this rights card was signed, what next happened?

A.    He began to tell us a story of the night he went down to visit Mrs. Schiappa.

Q    Did Sergeant DiGirolomo ask him a question first, if you remember?

A.    He first asked him:    Did he go down to visit Mrs. Schiappa.    He said he had, and he said that was about 11:30 at night, I think he said.

Q    All right.

A.    And then he began to tell us the story about how he went in to ask for some money.    He needed some money for food, and stuff like that, and he said that Mrs. Schiappa wouldn't give him anything.

THE COURT.    Without going into detail on the whole statement, on that statement were you writing it down?

THE WITNESS.    I did not start it at that time.

49

THE COURT.  All right.  You were both just sitting there listening?

THE WITNESS.  Yes.

THE COURT.  At any time was he interrupted for questions that you remember?

THE WITNESS.  Yes.  He told the sergeant that he punched her, and the sergeant said, "Do you know what you're saying?  Do you realize what you're saying?"  He said, "Yes."  Then the sergeant asked him if he had done it, and he said he did.  At that time the sergeant told me to write the statement.

Q   During that first  question-and-answer period of time, you weren't writing?

A.   No.

Q   Sergeant DiGirolomo was asking Mr. Cifizzari?

A.   Yes.

Q   During that period of time you were not writing?

A.   No.

Q   How long a period of time did this take?

A.   It was only a couple of minutes.

Q   Then you began to write?

A.   Yes.

Q   And what were you writing down?

A.   Basically, I was trying to write just what he was saying -- just what he said when he started to

RA 636

50

tell us about it in detail.

Q   How many times did you go over what he was telling you?

A.   Probably four or five times.

Q   Did you write down four or five different statements?

A.   Yes.

Q   And have you kept those notes that you made?

A.   Yes.

Q   And did you finally compose a fifth statement that was his final statement?

A.   Yes.

Q   And did that statement, did you take this to CPAC and have that typed the next day?

A.   Yes, that fifth statement.

Q   And do you have that last statement present with you?

A.   Yes, I do.

Q   I would ask you to read that, please.

A.   "My cousin Bob and I had been drinking and smoking pot, and I think we had some angel dust. Do you know what that is?" He asked me. I said, "Yes." And he went on: "Later that night -- it was dark, and I don't know what time it was for sure, maybe around 11 or 11:30. We went down to my aunt's apartment house on Central Street, and because me and my cousin Bob came to Milford to get some money, and Aunt Connie had

51

given us money before. I knocked on the front door and she let Bob and I into the apartment. The TV was on and the volume was pretty loud.

"She asked what we wanted. I said we wanted some money. She said, 'I don't know about giving you guys any money. I haven't barely got enough for the rent.' Bobby came across with a backhander and knocked her down. She was yelling 'Help! Help!' And the cats were running around the room; they were scared and going crazy.

"Aunt Connie was reaching for the TV and fooling with the knobs. She turned the TV volume down, and I don't know why. We were high, and Bob was going for her breasts and was trying to rip her clothes. We were wasted. She had money in there and Bob got it. Bob had a long stick and he was whacking her with it. We pushed her onto the couch where she slept. She was trying to run away, I think so. She was trying to run away. I think she was trying to get to the kitchen. The light was on in there, and the back light was on, too. I think we turned them out, but I'm not sure. Anyway, she was trying to hold us back but we overpowered her. She fell to the ground like with her head against the wall near where she sleeps. It was like a couch or something. She was still

RA 638

52

scratching and trying to push us away. She even bit me. Bob still had a big stick, or maybe a broom. She had a lot of those in the apartment. Bob and me wondered why she had them there. Anyway, we went overboard. She still didn't want us to have the money. I just couldn't understand why.

"She kept saying, 'Help! Help!' But she got us so excited that we got off and just went high. She was saying something about an egg or something, something stupid like that.

"Bob and I kept saying, 'What's that she's talking about anyway?' I couldn't understand her mumbling. This was still in the TV room near the couch. I think Bobbie was biting her on the neck or something. I think that I accidentally bit her on the neck and inside of her upper leg. I don't know which leg. I had this long-fanged tooth.

"Anyway, I think my cousin put the stick he had inside her, or maybe it was me. I don't know. We were really off.

"Then I had an idea she was dead. My cousin and I think alike, you know. I got some milk out of the fridge for the cats and I took a dark pocketbook and left from the backdoor, I think, and we went across down Jefferson Street and went under the bridge

RA 639

53

at the Charles River arch of rubber near the highway department. I had some money. I think I got about $75 out of the deal. I think I threw the pocketbook away somewhere between the back of the house and Jefferson Street. Anyway, I smoked some more and got really wasted. I think Bob ran out the front door of Aunt Connie's. I really can't explain what we did after that. We were all drugged out.

"The next day I saw my cousin. He was scared and pretty shaken up, but I really don't know what we talked about. We were still drugged out."

That's the end of the statement.

Q    Sir, was that the typewritten statement or is that the handwritten statement?

A.    No, this is a copy of my handwritten statement.

Q    Is that a copy of your handwritten statement?

A.    Yes.

Q    Is the original of that handwritten statement in Sergeant DiGirolomo's file?

A.    I believe so.

MR. MURPHY.  I would ask to introduce that.

MR. MONOPOLI.  I object.

THE COURT.  What's your objection?

MR. MONOPOLI.  All right, no objection.

THE COURT.  All right, Exhibit 4.

RA 640

54

Q    Officer, do you also have present with you the four statements that you took preliminarily to this last statement?

A.    Yes, I do.

THE COURT.   How is it that you got into a second, third and a fourth statement?

THE WITNESS.   Well, he had told us the story briefly once, and the sergeant said that I should ask him the story again to make sure everything he's telling us is the same.

THE COURT.   All right.

Q    Do you have the first story that he told you?

A.    Yes, I do.   I think this was the first one here. Want me to read it?

Q    Yes.

THE COURT.   How do you know it's the first one?   Is there a mark on it?

THE WITNESS.   No.

THE COURT.   How do you know it was the first one?   Can you tell by looking at the others?   How do you know?

THE WITNESS.   I think this is the first one I wrote.   I'm not sure.   I can't tell for sure, your Honor.

Q    Is there a different amount of detail in each one of

RA 641

them?  Were details added as you went along by Mr. Cifizzari?

A.  Yes.

Q  All right.

A.  There's only three; there wasn't four.

Q  I'm sorry.  Three.  O.K.  Do you have the first one present with you?

A.  Yes.

Q  I would ask you to read that.

A.  The first story he told us was:  "We were both drinking, my cousin Robert Cananzey, and smoking pot, and we had a $25 bag of treated pot.  We came to Milford because my cousin Robert needed money and he said he had to go to Milford to get it," and he said he went to see his aunt because she had money.  "We went in, and the cat was drinking milk.  The first thing Bob did was ask for money.  She said, 'I don't know.'  He said, 'Hey, are you kidding?'  and he gave her a backhand and knocked her down.  He pulled about $70 from a small pocketbook down her bra."

That was the end of the first story he told us.

Q  Then you asked him to go over it a second time?

A.  Yes.

Q  Did he go over it a second time?

56

A.   He did.

Q    What was done this second time?  What did he say the second time?

A.   It's jumbled here some.  "I was in town that night with cousin Robert Cananzey and we visited my aunt."  He's got "approximately 6 P.M."

"We were both drinking and smoking.  We wanted to go to Milford for money.  If we don't go, we won't have any money.  We went into to visit my aunt.  The cat was drinking milk.  The first thing Bob asked for was money. She said, 'I don't know,'

"Hey, are you kidding?  And he hit her and knocked her out and took her money.  It was down her bra.

"Then we put some milk in the bowl for the cat. She had a gold or black or dark leather pocketbook from under the bed, and we left."

I can't read my own writing.  "When someone like that panics, they get mad and out of hand.  Bob really gave it to her.  He shoved the broom up her cunt.  He really did a job.  She tried to push me away, so I grabbed her hand and Bob grabbed her feet and knocked her down.  We started in the living room and ended up in the bathroom."  And it says here, "We took approximately $700 and we split it."

Q    That's the second statement?

RA 643

A.    Yes.

Q    And there's a third statement, too?

A.    Yes.

Q    Do you have that with you?

A.    Yes.

Q    I would ask you to read that.

A.    O.K.  "It was dark when we went to the apartment. We knocked on the front door and she let us in.  The TV was running loud.  She asked us what we wanted, and I said money; and she said that she didn't know about giving us money.  She tried to turn down the TV.  I don't know why, but the cats were running around and were scared.  We were high, and he was going for her breasts and was trying to rip her clothes.  He whacked her with the stick.  The kitchen light was on. She was trying to run away.  She was trying to hold us away but we overpowered her.  She fell to the ground near where she sleeps.  It was like a oouch, or some-thing.  She scratching and pushing away.  Bob had a large stick or a handle, or something.  She had some sticks or handles in the apartment.

"We went overboard.  She didn't want us to know where she had the money.  She kept saying, 'Help! Help!' but she got us so excited that we got off and went high.  She was saying something about an egg, but

RA 644

58

I couldn't understand her voice.  This was in the TV room.  I think Bobby was biting her on the neck.  I think I accidentally bit her on the neck; and my cousin put the stick in her.  But then we took off.  I bit her on the leg, I think.  Then I had an idea she was dead. We left --" I'm sorry.  "We took a dark pocketbook. Bob ran out the front door and I ran out the back.  I ran down by the Charles and I hid under the bridge near Arch and Rubber and I smoked some pot.  I got about $75 out of it.  I was pretty wasted.  I really can't explain what we did.  We were all drugged out.  The next day I saw my cousin and he was scared shakey, but I don't know really what we talked about."

MR. MURPHY.  I would ask to introduce those statement, your Honor.

MR. MONOPOLI.  No objection.

THE COURT.  All right.  The first statement is 5; the second statement is 6; and the third statement is 7.

(Above-mentioned documents were then received in evidence and marked Exhibits 5,6 and 7 respectively.)

THE COURT.  How long did all these questions take place?

THE WITNESS.  I believe about an hour and a half to two hours, your Honor.

RA 645

59

THE COURT.  Any time did the defendant ask for anything to drink or eat?

THE WITNESS.  Not during this time, your Honor, no.

THE COURT.  O.K.

Q  Officer, approximately what time did the interview end that night?

A.  I think it was approximately 3 o'clock.

Q  What did Mr. Cifizzari do after this, if you know?

A.  Well, after that, he went into the guardroom, and he wanted a soda.  So I bought him a coke out of the machine.

Q  Did he drink that?

A.  Yes.

Q  Then what did he do?

A.  He was tired.  He wanted to rest.  He said he was relaxed and felt better.

Q  Then did he go to sleep in the police station?

A.  Yes.

Q  During the course of the time that you talked to him, were you able to understand him?

A.  Oh, yes.

Q  Did you find he was able to understand you?

A.  Yes.

Q  Did you make any observations of him other than the fact

60

that he was normal?

A.   Very coherent.  I knew he wasn't drinking.  I smelled his breath.

Q   And regarding drugs:  Any evidence of drugs at all?

A.   No, he was very clear.

Q   And then in the morning did you go to Worcester with him?

A.   Yes, sir.

Q   In an automobile?

A.   Yes.

Q   Did you also eat breakfast with him at the Hungry L in Grafton?

A.   Yes.

Q   Then did you go to CPAC with him?

A.   Yes, I did.

Q   What did you do once he was taken to CPAC?

A.   We sat with him.  One of the state police wanted to question him.  We sat with him while he was being questioned.

Q   Were you present when Sergeant Doheny was talking to him or not?

A.   Yes.

Q   For the whole time or just for some of the time?

A.   Not the whole time.

Q   Did you make any observations of him at the CPAC office?

A.   He didn't want to talk to Officer Doheny at first.

Q   And do you remember what was said or not?

A.   I don't recall.  I don't recall what agitated him, but he didn't want to talk to him.

Q   Was that regarding a tooth impression?

A.   I don't recall.

Q   Were you present when a tooth impression was talked about?

A.   Nope.

Q   And did you go from CPAC -- where did you go?

A.   I went to Taunton.

Q   Who did you speak with there?

A.   We went to the police department there to talk to Mr. Cifizzari's cousin, Mr. Cananzey.

Q   Did you talk to Gary Cifizzari while you were down there as well?

A.   Yes, we did.

Q   You and another trooper?

A.   Yes.

Q   Was that Trooper Meier?

A.   Yes.

        MR. MURPHY.  Thank you.

        THE COURT.  Mr. Monopoli?



MR. MONOPOLI.  Yes, your Honor.

CROSS-EXAMINATION

Q    (By Mr. Monopoli)  Prior to the February 26th date of 1981, you had some conversation with Police Officer DiGirolomo in regard to Michael Cifizzari, is that correct?

A.    Yes.

Q    And you had some conversation relative to take a statement from him, is that correct, the next time you saw him?

A.    To question him, yes.

Q    To question him?

A.    Yes.

Q    Just to question him about what he knew, is that correct?

A.    Yes.

Q    When he came into the station that night, before you started to talk to him about the Schiappa murder, you read him his rights, is that right?

A.    Yes.

Q    So is it fair to say, sir, he was a suspect, at least in your mind?

A.    Yes.

Q    And that's why you were talking to him that night about that, is that correct?

63

A.   Yes.

Q   And you had a discussion, had you not, with Police Officer DiGirolomo prior to this evening about Michael Cifizzari being a suspect, correct?

A.   Prior to --?

Q   Before the actual night you talked to him?

A.   We did, yes; we did talk about it.

Q   And isn't it the usual procedure in the Milford Police Department in a case such as this, a murder, that it is done by the people in the Detective Bureau or CPAC is called in, isn't that correct?

A.   I believe so, yes.

Q   This particular night --

        THE COURT.  You're not going to be of any help to us if you adopt everything he says.  Do you know?  If you do, say what it is.  Don't say, "I believe so."

A.   Yes, it is.

Q   Is that correct?

A.   Yes.

Q   And in this particular case you did not follow the usual procedures in the Milford Police Department, you and DiGirolomo talked to him, is that correct?

A.   Yes.

Q   About this murder?

64

A.   Yes.

Q    And you had some information as to the facts of this particular murder, is that correct?

A.   No.

Q    None at all?

A.   I had nothing.

Q    You had heard nothing around town or anywhere else from any of the fellow police officers about a broomstick being used?

A.   I heard about that, yes.

Q    And you had no knowledge about any bite marks?

A.   No.

Q    And you talked to -- strike that.  When you first saw this man on February 26th, it was a cold night, is that correct?

A.   Yes.

Q    Had been raining out?

A.   Yes.

Q    This is February 26th?

A.   Right.

Q    He came into the police station.  He was wet, is that correct?

A.   Yes.

Q    He appeared to be cold?

A.   Yes.

65

Q    He asked you for something to eat.  He appeared hungry?

A.    No.

Q    He had been to the police station on many different occasions though prior to that date, is that correct?

A.    Yes.

Q    And he would come in and ask to sleep there, is that correct?

A.    Well, I don't work the desk.  He has come in and done that.

Q    Did you see him come in and be allowed to sleep there?

A.    Sometimes.

Q    And when he would be there they would give him something to eat also?

A.    Not always.  No.  Sometimes.  Depends if he asked.

Q    His personal hygiene, sir:  How was it?

A.    When?

Q    When he came into the police station?

A.    That night?  O.K.

Q    Nothing wrong with him at all?

A.    Just cold .

Q    He was clean, right? No problem?

A.    He appeared to be.

Q    He appeared to you to be clean?

A.    Yes.

Q    His clothes appeared to be clean?

66

A.    They were wet.

Q    And what time did you start taking the first statement? What time did you start writing?

A.    Might have been around a little bit after 1.

Q    Well, how much after?

A.    (No response)

THE COURT.  Would it show on the statement, if you know?

THE WITNESS.  I might have the time on there. Exhibit 4 says 1:30 A.M.

THE COURT.  Looking at Exhibit 4, does that help you remember?

THE WITNESS.  Yes.

THE COURT.  What time did you start?

THE WITNESS.   One-thirty A.M.

THE COURT.  Next question.

Q    And you took one statement from him then, is that correct?

A.    Yes, sir.

Q    And no where in any of these statements does it talk about a specific time when this crime was done, is that correct?  Not the time of day, the date?  Is that right?

A.    Date?  No, I don't think there's a date on there.

Q    This murder happened in September of 1979, correct?

RA 653

A.    I believe so.

Q    But nowhere in the notes you took on the conversations of Michael Cifizzari does the date of this alleged offens is involved appears, is that correct?

A.    No, not a date.

Q    Now you read to us the first, second and third statements -- with his Honor's permission, I'll take a look at those, sir.

        MR. MONOPOLI,   Respectfully, may I question him from here?

        THE COURT.   Yes.

Q    Now, Officer, which is the first statement you took?

A.    I believe it's this one here.

Q    Which one?

A.    This short one here.

Q    Exhibit 5?

A.    Five, yes.

Q    And no date as to when this offense occurred appears in there, is that correct?

A.    Correct.

Q    Also, there is no reference to the victim of this particular offense, isn't that correct?

A.    No reference to the victim; no.  That's correct, sir.

Q    That's correct?

68

A.    Yes.

Q    Somebody at the bottom of the page there in handwriting wrote in "Connie Concetta Schiappa," is that correct?

A.    Yes.

Q    That was not said by Michael Cifizzari?

A.    Not in that statement he didn't say it; no.

Q    So the first  statement you have is him referring to Robert Cananzey giving somebody a backhand, is that correct?

A.    Yes.

Q    And that's the full statement he gave you the first time you talked to him?

A.    Yes, it is.

Q    And you decided to take another statement and supply more of the details, is that correct?

A.    No, I didn't supply any details.

Q    Well, who was asking him the questions?

A.    We didn't ask him any questions; we just asked him to tell us the story.

Q    So the next time around you just said to him, "Tell us the story again"?

A.    Yes.

Q    And all the items were in fact placed in there, is that correct?

A.    Just what he told me.

RA 655

69

Q    Are you telling us, Officer, that there were no questions and answers?  "Did this happen?  Did that happen?"  Nothing like that at all?

A.    I wanted the story.  I just was told to write the story.

Q    My question to you is:  Sir, did you at any time, or did Officer DiGirolomo in your presence ask Michael Cifizzari questions such as, "How did it happen?  What happened next?"

A.    Not during those statements, no.

Q    So you just said -- let me see if I have this correctly -- You said, "Tell us," and you wrote down the first statement?

A.    Yes.

Q    Not satisfied with that one, you told him, "Go ahead and tell us the story again," is that correct?

A.    Yes.

Q    And he just ran through it again?

A.    Yes, he did.

Q    Is this verbatim as to what he said?

A.    As close as I could, as fast as I could write, yes.

Q    He didn't ramble into anything else?

A.    No.

Q    And the second statement, how much money does he say he

70

took and split?

A.    $700.

Q    $700?

A.    Yes.

Q    On the first statement how much does it say?

A.    $70.00.

Q    Then there's a third statement, right?

A.    Yes.

Q    And the third statement is even more detailed now, is that correct?

A.    Yes.

Q    And how much does he say he took in that statement?

A.    $75.

Q    So, one time it's --

THE COURT.  Don't repeat.

MR. MONOPOLI.  All right.

Q    Now are you telling us, Officer, for each one of the statements that was given you said, "Tell us the story," and no questions were asked during the course of his talking?

A.    I didn't ask him any questions.

Q    Nothing at all?

A.    No, sir, I didn't.

MR. MONOPOLI.  May I have a brief moment, your Honor?

RA 657

71

THE COURT.  Sure.

(Mr. Monopoli perusing papers)

Q    Now, Officer, at some time you turned over reports.
To whom?

A.    Are you talking about that night or the morning
after?

Q    You took some reports.  Who did you turn them over to
and when?

A.    We turned the statements over the next morning
to CPAC, the State Police.

Q    Did you turn in the first statement?

A.    Gave them everything.  Showed them everything, I
think.

Q    My question --

A.    I don't recall.  I can't say for sure.

Q    What did you give them?

A.    Brought up everything that we had.

Q    Were you aware of the fact that the first time the
district attorney saw these -- 1, 2 and 3 statements --
was last Friday?

A.    Yes, that's right; he told me.  You're talking about
these that I have?

Q    Yes.

A.    Yes.

Q    So did you ever turn those over then?

RA 658

A.    Yes, everything was brought up.

Q    To whom?

A.    The state police -- when we went up there that morning.

Q    CPAC?

A.    Yes.

Q    And --

THE COURT.    Where did you get these statements today?

THE WITNESS.    These I had in my own file.

THE COURT.    Copies?

THE WITNESS.    No, sir.

THE COURT.    They made copies in Worcester?

THE WITNESS.    Yes.

THE COURT.    And they returned these to you?

THE WITNESS.    Yes, sir.

Q    You're certain those were given to CPAC?

A.    I brought everything I had.

Q    Prior to talking to him, and immediately upon talking to him, his rights were read to him, is that correct, Officer?

A.    Yes.

Q    That was from a card?

A.    Yes.

Q    And who read the rights?

A.   The sergeant did.

Q   You were right there.  You read them verbatim from a card?

A.   The sergeant read them, yes; he did.

Q   This is Sergeant DiGirolomo?

A.   Yes.

Q   And you were right there?

A.   Yes.

Q   And he understood all his rights?  No question about it, right?

A.   He said he did.

Q   Well, did he appear to understand?

A.   Yes, he did.

Q   And --

          THE COURT.  What kind of "appear" is that?
How did he appear to understand?

          THE WITNESS.  Normal.  Like us.

          THE COURT.  Other than what he says, I assume.

          THE WITNESS.  Correct.

          THE COURT.  Next question.

Q   You nevertheless wrote out all of the items contained on the card, correct?

A.   Yes.

Q   You wrote them out in longhand and you handed them to him, is that right?

74

A.    Yes.

Q    That's because you had a question in your mind as to whether he understood or not, is that correct?

A.    No, I wanted him to read them.

Q    You just read his rights from a card, correct?

A.    The sergeant read him his rights, yes.

Q    And then they were written down, and the reason you did that, the reason you read them is because you had a question in your mind as to whether he understood what was going on, right?

A.    No necessarily, no.

Q    You had no question in your mind at all as to whether he understood them?

A.    I knew he understood them as far as I was concerned.

Q    How long had you been a police officer up to that time?

A.    Nine years.

Q    In the nine years that you've been a police officer was it your customary practice to read from a Miranda card and then write out in longhand everything that's on the Miranda card and hand it to the person?

A.    Not always.

Q    You've done that before?

A.    Sometimes.

RA 661

75

Q     How often?

A.    If someone says they can't read the card.  They're small, wallet-sized cards.

THE COURT.  Was this at your suggestion or the sergeant's?

THE WITNESS.  The sergeant's suggestion.

Q     Now he was told to sign the form, correct?

A.    Yes, sir.

Q     And he signed it Paul M. McCartney, correct?

A.    Yes.

Q     Then he was told to put his own name, Michael Cifizzari, correct?

A.    Yes.

Q     And he did so?

A.    Yes.

Q     Now that form -- who did you turn that over to?

A.    The sergeant took it, I believe.

Q     He turned it over to CPAC?

A.    I think it was; yes.

Q     This would have been in February of '81?

A.    Yes.

Q     Are you aware that this wasn't turned over to defense counsel until March of '83?

THE COURT.  He's been in Florida.  What does he know about it.  He's up here today to testify.  What

RA 662

76

is the importance to me if he knew it?

MR. MONOPOLI.  My thrust is, your Honor, if I may?

THE COURT.  Go ahead.

MR. MONOPOLI.  There are some documents which obviously appear to be damaging to the Commonwealth's position.  I was not given them, your Honor, until last Friday; and the other one, which I think is the critical document, "Paul M. Cartney," I was not given until March of this year.

THE COURT.  Let's go onto another matter.

Q   When he would talk, he would sometimes ramble into other subjects, is that correct?

A.   That night?

Q   Yes.

A.   No.

Q   He wouldn't?

A.   He just told me the story; that was it.

Q   When he talked about an aunt, did he say who the aunt was?

A.   Yes, Aunt Connie.

MR. MONOPOLI.  I have nothing further.  Thank you.

THE COURT.  Mr. Murphy--?

RA 663

77

## REDIRECT EXAMINATION

Q    (By Mr. Murphy)  The only question I have, Officer, is the statements that you referred to as being your first three statements, where were they located during the time you were in Florida?

A.    They were in my file in my office at my home.

Q    Where is your home?

A.    In Milford.  I have a home in Milford.

Q    Do your parents live there?

A.    Yes, they do.

Q    Was it locked in the office?

A.    The office is loced and the file is locked.

        MR. MURPHY.  Thank you.  Nothing further.

        THE COURT.  Thank you.

        (Whereupon, the witness withdred from the witness stand and the court room.)

        MR. MURPHY.   Trooper White.

        THOMAS WHITE, a witness, was duly sworn and testified as follows:

## DIRECT EXAMINATION

Q    (By Mr. Murphy)  Would you identify yourself for the Court, please.

A.    Trooper Thomas White, State Police Officer.

Q    And, Trooper White, calling your attention to February 27, 1981, where were you assigned at that time?

RA 664

78

A.    At that time I was assigned to the Crime Prevention and Control Unit in Worcester, which is a State Police investigative unit assigned to the district attorney's office.

Q    And are you presently assigned to that same unit or not?

A.    I'm not.

Q    And, sir, on February 26, 1981, at about 1 o'clock in the morning, where were you at that time?

A.    I was home in bed.

Q    Did you receive a call at some time that night?

A.    Yes, sir, I did.

Q    Approximately what time was that?

A.    Approximately 1 o'clock in the morning.

Q    After receiving that call, did you go somewhere?

A.    Yes.

Q    Where did you go?

A.    I went to the Milford Police Station.

Q    What did you do at the Milford Police Station?

A.    I had conversation with Sergeant DiGirolomo of the Milford Police Department.

Q    How long did this conversation take place, or last?

A.    Oh, 20 to 25 minutes.

Q    After that, did you do something?

A.    Yes, I did.

RA 665

Q   What did you do?

A.   I went into an office off the main office, which I believe is the Sergeant's office, and in this room present was Sergeant DiGirolomo, Officer Chianese and Michael Cifizzari.

Q   And what happened once you went into that room?

A.   I was introduced to Michael Cifizzari by Sergeant DiGirolomo.  Sergeant DiGirolomo at that point asked Michael Cifizzari to run the story by me what he had told him earlier.

Q   Did he do that?

A.   No, he hesitated.

Q   Did you talk for awhile before he asked you to -- before he asked Michael to tell you the story?

A.   Yes, sir.

Q   And did you make some observation of Michael Cifizzari during this time?

A.   Yes, sir, I did.

Q   What observation did you make of him?

A.   Well, I observed that he appeared to be sober; his clothing was unkempt, a little dirty.  At that time I believe he had a full beard and a full head of hair, or at least a full mustache that went down.  He did not appear to be under the influence of any drugs or narcotics.  He was very excited during my initial meeting

80

with him.   Paranoid.   He didn't really want to talk to me.

Q   Were you dressed in uniform or not?

A.   No, I was not.

Q   How long were you in the room for?

A.   15 or 20 minutes, approximately.

Q   And you say he wouldn't tell the story when you were in the room?

A.   We --

THE COURT.   Just tell us what he said and what you said.   That may help.

Sergeant DiGirolomo told him to run it by you, to tell you the story he told the sergeant?

THE WITNESS.   Right.

A.   Well, as we got into it, it was more the sergeant would ask Michael to tell me about being in his aunt's house, and Michael just put his head down.

THE COURT.   Did you get any answers from Michael?

THE WITNESS.   No, not at that time.

Q   Did you make a decision then?

A.   Yes, sir, I did.

Q   What decision did you make?

A.   To leave the room.

Q   Did you leave the room?

RA 667

81

A.   Yes, I did.

Q    Where did you go?  Where did you go after you left the room?

A.   I stood out in the hall.

Q    Could you hear what was going on in the room?

A.   I could hear part of the conversation.

Q    Do you remember what you heard?

A.   One area of the conversation involved Michael talking about his cousin.  His cousin was a real bad guy, or a tough guy.

The only other area of the conversation was where Sergeant DiGirolomo asked him -- went back and asked him about bite marks, if he knew where his aunt had the bite marks; and at that point, Michael stood up and said, "Yeah, I'll show you."  And there was an attempt to take his pants down, and at that point Sergeant DiGirolomo said, "No, that's not necessary, Mike."

Q    How long were you outside the room for?

A.   Oh, approximately 15 minutes.

Q    What did you do after that?

A.   After that, I had more conversation with the Sergeant and Officer Chianese and set up an interview at the State Police Office in the morning.

Q    Did you stay in the police station after that?

82

A.    No, I left.

Q    You left?

A.    Yes.

Q    And then did you go to CPAC the next morning or not?

A.    Yes, I did.

Q    Did you have anything to do with Mr. Cifizzari at CPAC that next day?

A.    No, I remained out of the interview.

        MR. MURPHY.    Thank you.

        THE COURT.    Mr. Monopoli--?

        MR. MONOPOLI.    Briefly, your Honor.

                    CROSS-EXAMINATION

Q    (by Mr. Monopoli)    Trooper, did you have any conversation at all with the defendant?

A.    Just preliminarily when I first went into the room.

Q    Did you form any opinion as to his mental capacity as to competency?

A.    Yes, sir.

Q    Did he appear to be rational?

A.    He appeared to know what he was saying, but he was totally rational.    He was excited.    My initial impression was that I didn't think he was all that smart.    I didn't think he was that bright a kid.

Q    What about, sir, whether or not he understood what he was doing, whether he was rational?

83

THE COURT.  Rational, I assume, involves mental processes.  Only by reporting to me what the fellow said to him can I determine it, which is the object of this -- whether he was rational or not.

MR. MONOPOLI.  Fine.

Q    Where was he the first time you saw him?

A.    Seated in the sergeant's office.

Q    And this was where?

A.    At the Milford Police Station.

Q    And you went in and you talked to him?

A.    Yes, sir.

Q    What did you say to him?

A.    After I was introduced to him, I asked him about how he had played Pop Warner Football.

Q    Did he respond?

A.    Yes.

Q    What did he say?

A.    He told me that he had played Pop Warner Football in Milford for Sergeant DiGirolomo, and that he told me what a good football player he was.

Q    Did he say anything else?

A.    Yes, he did.  He talked about how he had been living in Brockton, no particular place.  I think he had an aunt down there that he stayed with once in awhile.  He talked about how he had wanted to stay out

RA 670

84

of Milford. He didn't really like being around there. Just general conversation along those lines.

Q    Did he say anything else?

A.    No.  Then once the question got into another area, he didn't want to talk to me.

Q    What is the next thing you said, sir?

A.    I asked him if he wanted to tell me the story that he had told Sergeant DiGirolomo.

Q    What was his response?

A.    His response was:  He put his head down and he didn't answer.

Q    What did you do then?

A.    I asked him again in a similar manner.  I told him that I was just interested in hearing the story; that nothing was going to happen to him that night, and he just completely stopped talking to me at that point.

Q    What, if anything, did you observe about him at that time, sir?

A.    That he put his head down.  He seemed to be afraid of me.

Q    Did he say anything else after that to you?

A.    No, sir.

Q    Did you say something else to him, sir?

A.    Yes, sir, I did.

-85-

Q    What did you say?

A.    I said, "If you feel more comfortable, Michael, I'll leave the room."

Q    Did he respond?

A.    He looked at Sergeant DiGirolomo, and I don't think he indicated by way of voice, but I think he shook his head.

Q    What happened then?

A.    I left the room.

Q    Then you went where, sir?

A.    I stood out in the hall.

Q    When you stood out in the hall, you said you could hear what was said in the room, part of the conversation?

THE COURT.    Were you in plain clothes?

THE WITNESS.    Yes, sir, I was.

Q    Who was in the room at that time?

A.    I believe Officer Chianese and the sergeant were in the room at that point.

Q    And who was talking?

A.    Sergeant DiGirolomo.

Q    And do you know what he was saying?

A.    Two area:  He asked him about his cousin, and at that point I remember Mike getting excited about his cousin, how he was a tough guy.

Q    Do you remember what the sergeant said?  If you don't,

RA 672

86

it's O.K.

A.    No, I don't know.

Q    And what else was said?

A.    The other areas -- I recall the Sergeant asking him where the bite marks were.

Q    Did you hear whether he responded or not?

A.    I could.  He got up of of his chair and started to undo his belt, and at that point the sergeant stopped him and said, "That's not necessary, Mike."

Q    He was undoing his belt?

A.    His belt or his pants; I don't know which.

Q    And this was a question-answer type of -- in other words, it wasn't just said to him, "Tell us what happened," it was specific questions asked of him?

A.    Those two questions I remember as being questions.

Q    Were there other questions asked, sir?

A.    There were, but I can't recall what they were. They were muffled as far as I was concerned.

Q    The questions were being asked by either Sergeant DiGirolomo or Officer Chianese, is that correct?

A.    I believe so.

Q    Did you have any further contact with Michael Cifizzari?

A.    No; I saw him at the office in the morning, and I had no further conversation or contact.

Q    And when you saw him in the office in the morning, sir,

RA 673

87

where was he, sir?

A.   He was seated in the dining -- well, it's a coffee room at 283 Main Street, which is the State Police office.

Q   And what did you observe about him at that time, if anything?

A.   Nothing other than he was in the same clothing and he was seated in a chair.

Q   Was he talking?

A.   No, I just observed him; I didn't hear any conversation.

Q   Was that the end of your involvement with this matter, sir?

A.   The whole matter?

Q   Did you subsequently at any point see Michael Cifizzari?

A.   No, I did not.

Q   Were you actively involved in this investigation?

A.   Was I?

Q   At some point.  You?

A.   Yes, I was.

Q   When was this?

A.   The date of the murder on through.

Q   Until when, sir?  Any specific date?  You had transferred from CPAC.

A.   I left there in August '82.

RA 674

88

Q    Your involvement would have ceased at that time?

A.    That's correct.

MR. MONOPOLI.  Nothing further.

THE COURT.  Thank you very much, Trooper.

(Whereupon, the witness withdrew from the witness stand and the courtroom.)

MR. MURPHY.   Sergeant Doheny.

JOSEPH M. DOHENY, a witness, was duly sworn and testified as follows:

DIRECT EXAMINATION

Q    (By Mr. Murphy)  Would you state your name, please.

A.    Joseph M. Doheny.    D-o-h-e-n-y.

Q    And what is your occupation?

A.    I'm a state police officer presently assigned to the Crime Prevention and Control Unit for Worcester County.

Q    How long have you been a state police officer?

A.    Twenty-three years, sir.

Q    And, sir, calling your attention to September 29, 1979, were you on duty that day?

A.    I was not, sir, but I was called to duty that day.

Q    Where did you go?

A.    I went to 72 Central Street in the Town of Milford.

Q    What time did you go there?

A.    I received a call at my home at approximately 9:15 or

RA 675

89

9:20 A.M.    I got dressed immediately and proceeded to that location.

Q    When you got to that location, what did you see, Sergeant?

A.    72 Central Street was an up-and-down, two-story and divided left and right home.  In one of the partments at 72, I entered by the rear door, walked through the hall into the living room, and in the living room I saw the body of an elderly, white female who I was told had been pronounced dead; that the body was laying face up in the living room floor.

Q    Did you later find an age for that person?

A.    Yes, sir.

Q    And name?  What was the person's name and age?

A.    The person's name was Concetta Schiappa; her date of birth was _____, making her 75 years old at the time...74 years old at the time.

Q    And, Sergeant, did you make observations of the body?

A.    Yes, I did.

Q    What observations did you make of this body?

A.    The body was clad in a light --

THE COURT.    Pardon me.  What's the purpose of this, to corroborate the condition the body was in?

MR. MURPHY.  Yes, your Honor, along with the bite marks found on the body.  The doctors are coming in

RA 676

90

this afternoon, including the forensic dentist regarding the tooth impressions on the body.

THE COURT. Well, I don't see where that's too helpful to me. The issue here is that he gave a statement. It isn't as to the accuracy of the statement; it's did he voluntarily waive his privilege.

MR. MURPHY. Fine.

Q  Sergeant Doheny, calling your attention then to the 26th of February, 1981: Were you working at that time?

A.  Yes, I was.

Q  And at about 8 o'clock in the morning did you have occasion to see Mr. Cifizzari?

A.  Yes, sir, I did.

Q  Where did you see him?

A.  At the State Police Detectives' Office, 283 Main Street, Worcester.

Q  And is it fair to say that you were one of the main people conducting the entire investigation?

A.  Yes, sir.

Q  And up to this point was Mr. Cifizzari a suspect?

A.  His name had come up, but I would not classify him as a suspect, sir.

Q  Once you saw him at the CPAC office on the 26th of February, 1981, what did you do with him?

A.  First, I had him seated -- well, what we refer to as

91

the coffee room in the CPAC office.  It's a large room containing a table and several chairs around it. He was asked    if he wanted a cup of coffee.  Made comfortable, and a Milford Police Officer was sitting with him.

I then had a conversation with Sergeant DiGirolomo of the Milford Police Department.

Q    And did you look at statements at that time or not?

A.    Yes, sir, I did.

Q    And after looking at those statements, what did you do?

A.    I went into the room where Mr. Cifizzari was seated, and there were either one or two other Milford Police officers in the room at that time.  I introduced myself to him and started to advise him of his Miranda rights, reminding him that he had been already advised of them, but I started to go over them again.  Mr. Cifizzari stared at me and didn't answer any of my questions for a short period of time.

Q    Did you finish reading him his rights?

A.    I went through them, sir, but he said that he had talked about the thing, and he told Sergeant DiGirolomo about it, and that Sergeant DiGirolomo was the person he wanted to talk to.

Q    Did you say something further to him?

A.    I went out and got Sergeant DiGirolomo, and it

RA 678

92

was either the sergeant or one of the other Milford officers that came back in the room with me and told Michael who I was; that I was someone that they had known for sometime. And at this time he seemed a little more at ease. I then went over his Miranda rights with him. He stated he understood them; he was ware of them, and I then started going over the statement that I had a copy of, which was given to me by Sergeant DiGirolomo.

Q    And, Sergeant, after you read him his rights, after Michael said he understood them, did you make observation of Michael Cifizzari at this point?

A    Yes, sir.

Q    What observations did you make?

THE COURT. Doesn't he have to do a little more than just to understand them? Is that the extent of the government's case here, that he understood them?

Q    Did he say anything further than that he understood them? Was he willing to talk to you?

A    Yes, he said he would talk to me at that point.

Q    Then did he talk to you?

A    Yes, he did.

Q    And --

THE COURT. I believe you were asking about

RA 679

93

his appearance.  How did he appear to you?

THE WITNESS.  His appearance was -- well, I was told he had been up all night. It was obvious that he probably had been.  He was disheveled looking; he was abit wide-eyed, almost wild-eyed.  I was wondering if he understood what I said to him, but he responded to each question I asked him; each statement I made regarding his Miranda rights, he said he would talk with me, and as we started into pieces of the statement that he had given previously to Sergeant DiGirolomo, he realized what I was saying. He expanded upon parts of it; agreed with parts of it, and changed parts of it.

Q    How long a period of time did you talk to him for?

A.    Probably 35 or 40 minutes, sir.

Q    And during the course of this time did you take a verbal statement from him?

A.    Yes, sir, it was strictly verbal.  I didn't even make any notes of it at that time.

Q    Did you later reduce that statement to writing as part of your report?

A.    I later made some notes on it, sir, and subsequently dictated it from those notes.  I dictated to a stenographer what that conversation was between Michael and myself at that time.

RA 680

94

Q    I would ask you to read what Michael said, what that conversation was, Sergeant.

A.    In going back to September of 1979, he stated he was living in Brockton with his Aunt Teresea Ferin off Walnut Avenue; that he had his own room in her home; he was unemployed.  In going back to September of 1979 he stated:  "He came to Milford at about noon-time that day and went with his cousin to Draper Park."  He said they smoked some joints laced with PCP  that his cousin Robert had.  He went on to state that about midnight he went to his Aunt Connie's house on Central Street to get money to buy more drugs.

He stated he went to the front door and she opened the front door for him.  When asked how she was dressed, he said, "She had something like a shirt or blouse that buttons down the front and a nightshirt or night gown."  He could not remeber the colors.  He said he asked her for money, and she said, "See your friends.  In other words, take a hike."

He then jumped to what they had one to Mrs. Schiappa.  He stated that she had her leg wide open.  She kept saying the same thing over and over.  She was ridiculing us.  She kept it up.  We put a stop to it.  We both kept hitting her, whacking her and whacking her.  Bob and I both shoved the stick up her cunt.  I

RA 681

95

bit her breasts and neck.  I bit her nipple almost off. I bit her neck and left marks there.  I bit her legs and her stomach.  The stick snapped inside her twat. It broke.  I then asked him if he was sure it was his cousin that was with him and not his brother Gary. In response to that, he said, "Yes, Gary was there."

I asked him if, in fact, it was Gary and not his cousin.  He stated no, they were both there.

I then asked him if he would voluntarily allow a dentist to make a tooth impression of his teeth.  At this point he became very uspet stating he would not allow me or anyone else to make an impression of his teeth, and, furthermore, that he did not want to talk with me any further.

Q    Was that the end of the interview?

A.    The conversation ceased at that time, sir.

Q    And what was next done, Sergeant?

A.    After a conversation with Sergeant DiGirolomo, my supervisor, Lieutenant DiFuria, Michael Cifizzari was placed under arrest; a fingerprint and photography man was brought to the station; he was fingerprinted, photographed and booked.  I made out a booking sheet in which I asked him questions as to his date of birth, place of birth, mother's and father's name, height, weight, color of hair, color of eyes, and he responded

RA 682

96

to these questions.

Q    Did you make any further observations of him at the CPAC office or was that basically your observations?

A    After the part about the tooth impression, he became very,very, very upset it seemed, especially with me. And he just refused to have any further conversation with me for the rest of the day.

There were no further observations besides what I testified to, sir.

Q    Sergeant, you stated that you had photographs taken of Mr. Cifizzari at the CPAC office?

A    Yes, sir, I did.

Q    Do you have those photographs with you?

A    There are some of them outside the room, sir; I can get them. I have more at my office that I did not bring with me this morning.

Q    All right.

MR. MURPHY.  Perhaps, your Honor, we can introduce those at 2 o'clock.

THE COURT.  All right.

Q    And, Sergeant, after placing Mr. Cifizzari under arrest at the CPAC office, did you go with him to some other place?

A    I did not go with him. I had him transported to the Milford District Court that afternoon. I later went

RA 683

97

to court myself and saw him there, and there was a proceeding in the Milford Court that afternoon.

Q    And during the course of that proceeding, did you ob-serve Mr. Cifizzari?

A.    Yes, sir, I did.

Q    Did you observe anything unusual during the course of that proceeding?

A.    No, sir.

Q    What happened to Mr. Cifizzari after that proceeding, Sergeant?

A.    After that proceeding, he was brought to the Worcester House of Correction; the following morning to this court here, and then returned to the Milford District the following day.

Q    And from there he was transferred to Bridgewater?

A.    Yes, sir, he was.

Q    Did you go to Milford that next day as well?

A.    I believe I did; yes, sir.

Q    Did you make any observations of him out of the usual at Milford that day?

A.    Nothing out of the usual, sir, except that he was very quiet.

Q    And, Sergeant, at some later point in time did you be-come involved in an affidavit for a tooth impression, a court order for a tooth impression on the person of

RA 684

Mr. Cifizzari?

A.   Yes, I did, sir.

Q   And did your office also become involved in a voluntary tooth impression from Robert Cananzey?

A.   Yes, sir.

Q   And also a voluntary tooth impression from Mr. Cifizzari's brother, Gary Cifizzari?

A.   Yes, sir.

Q   All those, to your knowledge, were transported to Doctor Schwartz of the Tufts Dental School?

A.   Yes, sir.

Q   Is it fair to say, Sergeant, that according to your knowledge Mr. Cifizzari's tooth impression has excluded him from being the person that bit Concetta Schiappa?

A.   It excluded im from having made the two bite marks which were casted by Doctor Schwartz at the autopsy.

Q   In other words, Doctor Schwartz's report that you have been furnished a copy would exclude Michael Cifizzari as doing the bites that Doctor Schwartz was able to cast at the autopsy?

A.   Yes, sir.

          MR. MURPHY.  Thank you, sir.

          THE COURT.  Mr. Monopoli--?

          MR. MONOPOLI.  Yes, your Honor.

## CROSS-EXAMINATION

Q    (By Mr. Monopoli)  Sergeant, were you here in court when counsel was appointed to Mr. Cifizzari in Room 204 by the Honorable Justice Travers?

A.    I believe I was.

Q    Do you remember anything unusual about that proceeding?

A.    Unusual?

THE COURT.  Why don't you give him a hint.

Q    Do you remember, sir, Mr. Cifizzari standing up saying, "I didn't kill anyone.  I'm supposed to be going home this morning," words to that effect?

A.    I don't remember that, no, sir.

Q    Well --

A.    Possibly I wasn't there for that, sir.  I don't remember that happening.

Q    Now you said at one point, sir, that as you were talking to him he was wide-eyed, almost wild-eyed, and you had some question as to whether he understood you, is that correct?

A.    Yes, I had some question as to whether he would from his looks, sir, but when I started talking to him, I was convinced that he understood me and knew what I was saying and was properly answering me.

Q    What in his looks, sir, caused you to have that concern?

A.    He looked to me like someone who was on drugs or

100

was not right. That's what his looks were.

Q    Explain in more detail, if you can, Sergeant?

A.    His eyes, sir, they were, as I say, quite wide. When I first went into the room, he just stared directly at me.

Q    First time you saw him was where, sir?

A.    I saw him --

THE COURT.    (Interposing)  Two o'clock.

(Recess)

RA 687

AFTERNOON SESSION

(The court was called to order at 2 P.M.  The defendant was present in court with counsel.)

THE COURT.  Mr. Monopoli.

CROSS-EXAMINATION, continued

Q   For the record, you're Sergeant Doheny?

A.   Joseph M. Doheny, State Police Sergeant assigned to the Crime Prevention Control Unit.

Q   You're the same person that was previously sworn and testified before the break, correct?

A.   Yes, sir.

Q   Now you talked to Michael Cifizzari on what day, sir? Strike that.  February 26 or 27th?

A.   26th, sir.

Q   And you first spoke to him in what office?

A.   At the State Police Detectives' Office, 283 Main Street, Worcester.

Q   And you did, in fact, take a statement from, is that correct?

A.   A verbal statement, yes, sir.

Q   While you were taking that statement you had, which was made available to you by the Milford Police Department, a previous statement of his, correct?

A.   Yes, sir.

Q   And do you have a copy of that statement, sir?

102

A.  I have a typewritten copy of if that I had typed in our office.

THE COURT.  What statement are you talking about?  The one that he had in front of him?

THE WITNESS.  The statement taken by the Milford officers.

THE COURT.  Just a moment.  Which one?

MR. MONOPOLI.  I'm talking about the statement that was typed, the final statement.

THE COURT.  His statement that he made from his notes?  That this witness made from his notes?

MR. MONOPOLI.  Yes, sir.

THE COURT.  Go ahead.  I'm sorry.

Q      MR. MONOPOLI.  That's not correct, your Honor.  I'm talking about the statement taken by the Milford Police Department and given to him.

THE COURT.  That he had given to him?

MR. MONOPOLI.  Yes, sir.

Q    And how many statement did they give you, sir?

A.    They gave me one statement, sir.

Q    One statement?

A.    Yes, sir.

Q    And you had it typed up, is that correct, Sergeant?

A.    Yes, sir.

Q    Do you have a copy of that statment with you?

RA 689

103

A.    Yes, sir.

Q    All right.

MR. MONOPOLI.   May I approach the witness, your Honor?

THE COURT.   Sure.

Q    I show you, Sergeant, Commonwealth's Exhibit -- strike that -- Exhibit Number 7.  I ask you if you recognize that document?

A.    I don't recognize it in that form, sir.

Q    How about Commonwealth Exhibit Number 4:  I'll ask you if you recognize that?

A.    Yes, sir, I do.

Q    Is that the copy that was made available to you?

A.    Yes, sir, it is.

Q    And this is the one you had subsequently typed?

A.    Yes, sir.

Q    Did they give you -- the Milford Police -- did they give you any other statements?

A.    Not at that time, no, sir.

Q    At some time later did they give you any other statements of the defendant?

A.    Give to me?  No, sir.

Q    To you or anyone in the CPAC office?

A.    No, sir.

Q    I -show you Commonwealth Exhibit 7 -- just "Exhibit 7" --

RA 690

104

I'd ask you if you have ever seen that one before?

A.    No, sir, I have not.

Q    I show you Exhibit 5 and ask you if you've ever seen that one before?

A.    I have seen copies of both of these, sir, but not the originals.

Q    At the time you spoke to Michael Cifizzari, had you seen any copies of those?

A.    No, sir, I did not.

Q    I show you Commonwealth -- strike that -- Exhibit Number 6 and ask you if you can identify that?

A.    Again, it's a statement that I recently seen a copy of, but I had never seen before that, sir.

Q    All right.  When you say you saw copies of these statements I showed you, when did you see copies of these, sir?

A.    Last week.

Q    Last week?

A.    Yes, sir.

Q    So these were never given to you by the Milford Police Department?

A.    No, sir, they were not.

Q    Also, sir, I show you a piece of paper with the Miranda Warning written on it and at the bottom the signature Paul M. Cartney and then Michael Cifizzari -- Exhibit

105

3.  At the time you spoke to Mr. Cifizzari you took a statement from him; did⁷ you have this in your possession then?

A.    No, sir, I did not.

Q   Did anyone from the Milford Police Department show you this?

A.    No, sir.

Q   And did they give you copies of materials?

A.    They gave me a copy of a statement.

Q   This one?

A.    Exhibit Number 4.

Q   Exhibit Number 4?  That's all they gave you?

A.   Yes, sir.

Q   And at some time later, Sergeant, did you have occasion to see this exhibit, Number 3, which is the Miranda Warning with Paul M. Cartney and Michael Cifizzari signed at the bottom?

A.   Yes.

Q   When did you first see that?

A.   I would/say about two months ago, sir.

Q   Two months ago was the first time you had ever seen this?

A.   Yes, sir.

Q   And --

THE COURT.  What's the relevancy as to when

RA 692

he saw it? What does that have to do with whether he voluntarily made the statement at the Milford Police Station?

MR. MONOPOLI. Well, your Honor, to some extent the credibility of the officers who previously saw him are in question, and the officers both say they turned everything over back on the 26th.

THE COURT. All right.

MR. MONOPOLI. May I proceed, sir?

THE COURT. Yes. They are inconsistent statements. The question is whether they are major or minor.

MR. MONOPOLI. Yes, your Honor.

Q    Now, Sergeant, when you started to talk to Mr. Cifizzari in the room, is it fair to say you asked him a question and he rambled?

A.    No, sir, that's not fair to say.

Q    Did he do any rambling, so-called rambling?

A.    I would not describe it as rambling; no, sir.

Q    Did you do a report on this?

A.    Yes, sir, I did.

Q    In your report, did you make the statement that: "Despite the fact that Cifizzari was somewhat confused and did do some rambling."?

A.    I believe I did make that statement.

107

Q    What did you mean, sir, by the term "rambling"?

A.    Well, what I meant at that time was that he talked fast. I was unable even to make any notes of what he said because when he started talking about something, he talked rapidly.

THE COURT.  Fast or slow, was it pertinent?

THE WITNESS.  Yes, it was pertinent, sir.

Q    Well, what specific itemsdid he talk about in a rambling manner?

A.    Well, I was using the term rambling in my report, but that probably isn't an accurate term. When I asked him a question concerning a part of the statement that he had made and that I had in my possession, he would go on and answer that question and just keep expanding on it and keep going on from there; and that is what I meant by rambling.

Q    Can you give us any specifics?

A.    When he spoke of the stick that was used, that was pushed up inside Mrs. Schiappa, I asked him one question about who inserted the stick, and he went on to say that they pushed it all the way up into her cunt, that it broke off inside her.

Q    You used the term also that he was confused, is that correct?

A.    I said that he appeared to be somewhat confused.

Q    When you say, "appeared somewhat confused," you mean, do you not, that he didn't understand what was going on right then and there?

A.    No, sir, I do not mean that.

Q    When you used the term, what did you mean, sir?

A.    I used the term -- when I used the term, I meant that looking at the man he appeared disoriented; his eyes were once/open and staring at me and then they were -- they would be drooping; his appearance was confused, but his responses to questions did not appear to be confused.

Q    Didn't you put that in your report, sir, "despite the fact that Cifizzari was somewhat confused and did some rambling," when you were talking about the confusion, weren't you talking about what he was saying to you, sir?

A.    No, sir, I was not.

Q    You were not referring to that?

A.    No, sir.

MR. MONOPOLI.    May I have a moment, sir?

THE COURT.    Yes.

Q    After you took the statement from him, Sergeant, what happened next?

A.    At the culmination of the statement, I asked him about voluntarily submitting to a tooth impression,

109

and at that time he got extremely upset; he told me I would not take any tooth impressions and no one will take any tooth impressions from him.

Q    And did you talk to him at all after that, sir?

A.    I did, in that I had him fingerprinted and photographed, and I took a booking sheet from him.

Q    Did you ask him questions for the booking sheet?

A.    Yes, sir, I did.

Q    And were his responsed direct at that point?

A.    Yes, sir, they were.

        MR. MONOPOLI.  I have nothing further.  Thank you.

                    REDIRECT EXAMINATION

Q    (By Mr. Murphy)  Sergeant, were you able to locate the pictures of the defendant at the CPAC office?

A.    Yes, sir.

Q    Do you have those with you?

A.    Yes, sir, I do.

Q    May we see those, please?

A.    )  (The witness complied with the request.)

Q    And, Sergeant, would you explain what these pictures are, please?

A.    These are actual booking photos that were taken of Mr. Cifizzari; they Polaroid black and white photos that were taken with our camera at the CPAC office.  There are

110

four front views -- three front views and four side views of Mr. Cifizzari taken on the morning of February 26, 1981.

Q   Sergeant, are these pictures fair and accurate representations of the way Mr. Cifizzari looked that morning?

A.   Yes, sir, they are.

MR. MURPHY.  I would ask to introduce those, your Honor.

MR. MONOPOLI.  May I just see them?

THE COURT.  Yes.

MR. MONOPOLI.  No objection.

THE COURT.  What are they offered for?

MR. MURPHY.  To show the defendant's appearance on the morning of the statement at the CPAC office, your Honor.

THE COURT.  All right.

(Above-mentioned photographs were then marked Exhibits 8 thru 14 inclusive.)

MR. MURPHY.  Nothing further.

(Whereupon, the witness was excused from the witness stand and withdrew from the court room.)

MR. MURPHY.  We have Doctor Schwartz here.

THE COURT.  What is he going to say?

MR. MURPHY.  He's from the Tufts Dental School.  He has been summonsed by the defendant.  I

RA 697

111

believe we have a stipulation that if Doctor Schwartz were to testify, he would testify that he took a bite impression from the body of Mrs. Schiappa and he took two photographs of that body, and that he subsequently has a full-mouth impression from the defendant Michael Cifizzari; that he's compared that impression and that that impression excludes Michael Cifizzari.

He would also testify, your Honor, that he has recently been given a tooth impression from Gary Cifizzari and that he has compared that tooth impression with the pictures that he took on the night of the autopsy, and it is his opinion that it is definitely Gary Cifizzari who bit the victim.

MR. MONOPOLI. Your Honor, I actually had him here for the trial. But basically the other part of the stipulation --

THE COURT. (Interposing) I don't see how it helps me at all in determining voluntariness of this statement. So, I'm not really terribly interested in that. It's whether or not he voluntarily waived his privilege and his rights. So, I'll take this stipulation, if you want it on the record. I don't know what it's going to do.

MR. MURPHY. Fine.

RA 698

112

MR. MONOPOLI. Also, the other part of the stipulation: There was a tooth impression taken of Robert Cananzey and he was also excluded.

THE COURT. Anyone else get himself excluded? All right.

MR. MURPHY. There were others.

THE COURT. O.K. That will be in the record. Next witness.

MR. MURPHY. Doctor Robison.

JAMES S. ROBISON, a witness, was duly sworn and testified as follows:

#### DIRECT EXAMINATION

Q    (By Mr. Murphy) Sir, would you give us your name, please.

A.    James S. Robison. R-b-b-i-s-o-n.

Q    And, sir, what is your occupation?

A.    I am a practicing adult and child psychiatrist in Milford.

Q    Sir, what is your academic background?

A.    You want the medical schools and --

Q    Please.

A.    -- up through

Q    Please.

A.    Medical College of Virginia -- Richmond, Virginia; graduated in 1961; interned at the Naval Hospital in

RA 699

113

Newport, Rhode Island, the following year.

Three years of active duty in the Navy as general medical officer and ship's medical officer; two years of psychiatric residency training at the University of Cincinatti, and then two years of child psychiatric reside training at George Baker and the Children's Hospital Medic Center in Boston; and this included time spent at the Boston Juvenile Court and in the area of court clinics within the Boston area; and one year as court psychiatrist at the Framingham District Court.

MR. MURPHY. Your Honor, may the witness be qualified as an expert?

THE COURT. Yes. Any problem with him, Mr. Monopoli?

MR. MONOPOLI. No, your Honor.

THE COURT. Go ahead.

Q    Sir, calling your attention to February 27th --

THE COURT. Is there any report from Doctor Robison?

THE CLERK. I don't see any.

MR. MURPHY. I don't believe there is.

THE COURT. I see you have it in your brief.

MR. MURPHY. I do have a copy of the report that I'd be willing to give you, your Honor.

THE COURT. All right. Fine. Unless you want

RA 700

114

to examine him with it. You can give it to me after-wards.

MR. MURPHY. I think that I'm familiar with it.

THE COURT. All right.

(Report handed to the Court by Mr. Murphy.)

Q    Sir, calling your attention to February 27, 1981, were you working on that day?

A.    Yes, I was.

Q    And were you called somewhere?

A.    On that day?

Q    Yes.

A.    Yes, sir, I was.

Q    Where were you called, sir?

A.    I was called to the Milford District Court.

Q    What was your purpose in going to the Milford District Court on that day?

A.    I was asked to see a Michael Cifizzari and to do an examination at that time.

Q    About what time was that, Doctor?

A.    As I recall it would have been about 10 o'clock in the morning.

Q    And did you make any note of the time or not? Just from your memory?

A.    That is my memory.

Q    Where did you see Mr. Cifizzari?

A.    I saw him in the courthouse.

Q    Do you remember where in the courthouse?

A.    I believe in the Probation Office.

Q    Did you conduct an interview with Mr. Cifizzari at that point?

A.    I conducted an interview with him at that time.

Q    What was the purpose of your interview?

A.    It was to establish criminal responsibility and to determine whether he needed further study, psychiatric study at that time.

Q    Did you at that time examine him on his ability to make a statement the day before?

A.    No, I did not.

Q    What conversation did you have with him on the day of the 27th?

A.    I talked with him in a general way and then in a specific way regarding why he was before the court that day and attempted to determine his mental state at the time I saw him.

Q    Did you write a report?

A.    Yes, I did.

Q    Do you have that report with you?

A.    Yes, I do. I have my handwritten report. I don't have the typed report, but it should be the same.

Q    What conversation did you have with Mr. Cifizzari at the courthouse?

A.    Would you like the contents of the interview?

THE COURT.    Sure, if that's another way of saying it.  What conversation did you have?  What did you say?  What did he say, if you can remember.

A.    Well, I had my handwritten notes which I pre-served, which were rough working notes taken at the time; and as I recall, I asked him why he was before the court in Milford.  And he seemed unalbe to give me any specific answer to that.  He seemed to have a rambling answer; there was halting hesitant speech.  At times he seemed  to stutter, and after listening to that for several moments, I asked him specifically, again, what he was trying to tell me about why he was before the court.

I asked him then in a very direct specific way, to which he said, "They think I murdered my aunt, and I said I didn't."

I then asked him what he meant by that.  He then again became fragmented in his thinking; he was vague.  He said he had gone to the Milford Police Station and then began to stutter and seemed to have a tick.  I have noted that it may have been a grimace of his face or a moment of his shoulders.  I didn't

RA 703

record the exact nature of it.

He then said there was a sergeant, I believe it's DiGirolomo, who asked him a question, and he said, "I said I didn't do it," was his reply.

At that point, I then got rather specific with him in a formal standard mental status questions. I asked him the date, to which he replied it was the 27th of February, 1981. He stated he didn't have any permanent address.

I then asked him standard questions in the mental status examination. These are proverbs that we frequently ask in order to determine a person's ability to use their powers of reason. Want me to to ghrough those?

Q  Please.

A.  I can just go through this interview, if you like. I asked him, "What would it mean to you if I said, 'People who live in glass houses shouldn't throw stones?'" His reply that I have recorded is:  "Don't commit adultry, like the Ten Commandments."

I then asked him what it would mean to him if I said, "A rolling stone gathers no moss?"  His reply was:  "Say I threw a stone.  It wouldn't count. I can throw.  Is that it?"

I then asked him:  "Suppose I say to you, 'A

stitch in time saves nine?'"  His reply:  "Don't throw people down if they can help you."

I then asked him how he was sleeping.  He said he found it hard to sleep.

I asked him about his appetite.  He didn't give me any specific reply that I recorded.

I asked him about weight loss.  He told me no.

He denied hallucinations of any kind, oratorially or visually.  He said he had not been working for three years.

I then asked him about his aunt.  He said that she was a distant aunt and that she had passed away three years ago. And I then asked him how he felt about her passing away, to which he replied:  "It doesn't borther me because when I die people won't come to anything."

And the only other thing recorded here:  I asked him about drugs.  He said he had used marijuana for many years but that he had no marijuana or drugs in the last month.

Q    No marijuana or drugs in the last month?

A.    Yes, before the time I saw him.

Q    And, Doctor, you have said that he was vague in some of the things that he said?

119

A.    Yes.

Q    But were the things that he said, were they relevant as to what was going on at that time?

A.    I felt that the quality of many of his answers were vague but nevertheless had a strange relevance to the crime he was charged with.

Q    And, Doctor, is it fair to say at that point in time he was under a considerable amount of stress?

A.    The general picture I have found was a person under a great deal of stress.

Q    Doctor, will stress contribute to someone's mental state?

A.    I feel it will.

Q    Was he generally aware of what was going on around him, Doctor?

A.    He seemed to be.

Q    Was he schizophrenic at that time or not?

A.    I think that is a debatable question.  I can't say that I would diagnose him as actually schizophrenic at the time I saw him.  There's such a large stress factor, and much of his mental status interview had to do, I thought, with issues related to that stress and being in a court; that it was difficult to make any absolutely accurate assessment of whether or not he was schizophrenic.  I felt that -- or, I think that that

RA 706

question has to be raised as to whether or not this man was and is schizophrenic.

Q    And, Doctor, at the time that you give you any way of telling what his mental state was, like, the day before as he was talking to the Milford Police officers or not?

A.    I think that, again, is a difficult question for me to answer.  I think it is reasonable to assume that his mental state the day before would show some of the same symptoms that I saw on that day.  I think that is a reasonable assumption.

Q    The stress that he was under at the time you saw him though, did that contribute to his mental state?

A.    I feel it did.  I felt the stress he was under was a very strong factor.

Q    But he realized at that time that he was charged with murder?

A.    I felt that he did, yes, because he gave me a very direct clear statement about that.

            MR. MURPHY.   Thank you, Doctor.

                    CROSS-EXAMINATION

Q    (By Mr. Monopoli)  Doctor, when you first saw him, where was he?

A.    He was in the Milford courthouse.

Q    In a cell?

121

A.    I don't recall.

Q    Well --

A.    Specifically, my memory is that I saw him in the Probation Office.

Q    What was the first --

A.    On the first floor of the courthouse.

Q    What was the first thing you said to him, do you re-member?

A.    I asked him why he was before the court in Milford.

Q    You say at that point he did some rambling?

THE COURT.  Didn't you introduce yourself, Doctor?  Didn't you say, "I'm Doctor Robison?"

THE WITNESS.  Yes.

THE COURT.  I assume you did.

Q    At some point you asked him why he was there, is that right?

A.    Yes.

Q    You said he did some rambling.  Specifically, what was that?

A.    I --

THE COURT.  Did this witness say "rambling"? I didn't hear that.

MR. MONOPOLI.  I think he did.

A.    I didn't use the word rambling, but I think that would apply.  I can try to duplicate the nature of

122

his reply to my initial question as closely as I can from my notes taken at the time.

Q    If you could, sir.

A.    All right.  He, in a very halting, hesitant manner, said he was brought by the police force.  "They said I had admitted my aunt's --" and then there was a pause.  And then he said, "which I didn't do, like," and then another pause.  "I didn't," pause.  "What -- what they pinning charges from, I didn't do."  Another pause.  And that is as closely as I can describe the actual phraseology and the nature of his initial reply to me.

Q    Yes.

A.    And it's at that point that I asked him again specifically what he was trying to tell me and why he was before the court.

Q    Doctor, you also stated in your report that he was vague and scattered in his thinking.  Specifically, sir, what are you referring to?

A.    I'm referring to the content of that initial reply.  That's what I'm calling vague and scattered.

Q    You also stated that his judgment was poor.  What are you referring to there, sir?

A.    In that I'm referring to the answers to the proverbs that he gave me.  That's where I'm getting that statement

RA 709

123

from.

THE COURT.  You say that that showed poor mental integration.  Is that the same as poor judgment? Poor judgment, I suppose, is a result of poor mental integration.

THE WITNESS.  That's what I would say.

Q    Would you explain to us, sir, if you would, what you mean by poor mental integration?

A.   I would the inability to take what would be a fairly common, clear answer -- to come out with what sounds like a sensible, relevant answer.  I don't think he did this on the proverb integration.  That's what I'm basing that statement on.

Q    At that time, sir, your examination revealed to you that there were some questions of his competency to stand trial, correct?

A.   Yes.

Q    When you're talking about competency to stand trial, sir, what does that mean to you?

A.   That would mean that I would say that he lacked a substantial appreciation of the charge and that he seemed to have a very limited ability to participate in any defense.

THE COURT.  Well, Doctor, he was astute enough to deny murder.

RA 710

124

THE WITNESS.  Yes.

THE COURT.  You don't consider that a sign that he didn't understand the seriousness of his position, do you?

THE WITNESS.  No, I don't, your Honor.

THE COURT.  You say he was alert and co-operative?

THE WITNESS.  Yes, he was.

THE COURT.  And because of those answers to those 6 or 7 questions in which he comes up with inapproriate responses to the proverbs, this poor judgment, you felt that a wiser observation, or course, was to have him further observed?

THE WITNESS.  Yes, I did.

MR. MONOPOLI.  I would just like to offer this copy.

THE COURT.  All right.  Good enough.  Exhibit 15.

(Above-mentioned report was then marked Exhibit 15.)

MR. MONOPOLI.  I have nothing further.

MR. MURPHY.  One area, Judge.

THE COURT.  All right.

REDIRECT EXAMINATION

Q    (By Mr. Murphy)  Doctor, as part of your practice do you

RA 711

125

work at the Milford-Whitinsville Regional Hospital?

A.    Yes.

Q    And do you remember whether or not you saw Mr. Cifizzari at that hospital on November 21, 1980, some three months approximately before this?

A.    Yes, sir.    I don't remember seeing the man.    I remember a phone call which I think relates to the incident, and I have not been able to review that hospital record.

MR. MURPHY.    May I approach the witness?

THE COURT.    Yes.

A.    This is my handwriting, so I did see him.

Q    You saw him November 21, 1980?

A.    Yes.

Q    At the hospital?

A.    Yes, sir.

Q    And is it fair to say that you -- what was your finding on that date?

A.    "Not psychotic at this time.    Aware of surroundings. No indication for hospitalization at this time."

MR. MURPHY.    Your honor, that report is part of the medical records in the Clerk's Office.    I would ask the Court to introduce this.

THE COURT.    What do you say, Mr. Monopoli?

MR. MONOPOLI.    No objection.

RA 712

126

THE COURT. Having in mind, Mr. Murphy, at some time, assuming that I find against the Government on this, what use would the Appeals Court make of that, three months prior to this the doctor doesn't find him psychotic, and he doesn't find him psychotic now. Now he has a youngman charged with murder and he thinks he ought to be further observed. For what value that is, I'll take it, but --

(Above-mentioned document was then marked Exhibit 16.)

MR. MURPHY. Nothing further of the Doctor.

THE COURT. Thank you, Doctor.

(Whereupon, the witness was excused and withdrew from the witness stand and the courtroom.)

MR. MURPHY. Doctor Pike.

ALBERT D. PIKE, a witness, was duly sworn and testified as follows:

DIRECT EXAMINATION

Q (By Mr. Murphy) Sir, would you give us your name, please.

A. Albert Douglas Pike. P-i-k-e.

Q What is your occupation?

A. I am a forensic psychiatrist.

Q Where are you employed?

RA 713