No. 25-1667

# United States Court of Appeals
## For the First Circuit

GARY CIFIZZARI
*Plaintiff - Appellant*

v.

TOWN OF MILFORD; VINCENT LIBERTO, former Milford Police Officer;
JOHN CHIANESE, former Milford Police Officer; TODD A. GATTONI, as
personal representative of the Estate of Anthony Digirolamo; FRANCIS X.
SMALL, as personal representative of the Estate of Donald Small,
Defendants - Appellees,

JOHN AND JANE DOES 1-20,
Defendants.

Appeal from the United States District Court
for the District of Massachusetts
Case No. 4:22-cv-40139-MRG

## CORRECTED BRIEF FOR
## PLAINTIFF-APPELLANT GARY CIFIZZARI

Jon Loevy
Mark Loevy-Reyes, BBO# 707974
Steve Art
LOEVY + LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
P: (312) 243-5900
F: (312) 243-5902
jon@loevy.com

November 6, 2025

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION............................................................1

QUESTION PRESENTED .................................................................1

STATEMENT OF THE CASE .............................................................1

SUMMARY OF ARGUMENT ...........................................................23

ARGUMENT ...............................................................................25

    I.    The District Court Erred In Granting Summary Judgment On
    Plaintiff's Claim For Fabrication Of Evidence ...................................25

        A.    Legal Standard .........................................................25

        B.    A Jury Could Find that Michael's Statement Was Fabricated
            And False .................................................................26

        C.    A Jury Could Find That Defendants Fabricated Michael's
            Statement Knowing It Was False..............................................26

        D.    CPAC's Involvement Does Not Negate That Defendants'
            Liability For Fabricating Michael's Statement..........................28

        E.    A Jury Could Reasonably Find It Likely That, Without
            Michael's Confession, Plaintiff Would Not Have Been
            Deprived Of His Liberty ...........................................34

            1.    Legal Standard .................................................35

            2.    Michael's Fabricated Statement Contributed To The
                Deprivation Of Gary's Liberty By Making Gary The
                Suspect .................................................36

            3.    Michael's Fabricated Statement Also Harmed Gary's
                Defense At His Criminal Trial........................................36

            4.    The Bitemark Evidence Does Not Defeat Liability .......39

F.     Gary Is Not Collaterally Estopped From Arguing Michael's Statement Was Coerced ............................................................40

G.    The District Court's Conclusion That Plaintiff Lacked Standing Was Plainly Wrong ...................................................41

II.    Summary Judgment Should Not Have Been Granted On Plaintiff's *Brady* Claim ............................................................44

    A.    Legal Standard ..........................................................44

    B.    Plaintiff Sufficiently Established A Question Of Fact On His Claims That Material Evidence Was Withheld .......................45

        1.    The Circumstances Surrounding Michael's Interrogation ....................................................45

        2.    The Missing Terhune Statement.....................................48

        3.    Giroux's Brother's Bombshell .......................................50

        4.    Giroux Was A Milford Police Informant .......................53

III.   Summary Judgment Should Not Have Been Granted On Plaintiff's Conspiracy Claim...................................................54

IV.   Summary Judgment Should Not Have Been Granted On Plaintiff's Failure To Investigate Claim.............................................55

    A.    Milford Assumed A Duty ..........................................56

    B.    The District Court Also Erred In Finding That Probable Cause Defeated This Claim .............................................57

Conclusion ...............................................................................58

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Alba v. Raytheon Co*., 809 N.E.2d 516 (Mass. 2004)................................................40

*Alvarez v. City of Worcester*, 605 F. Supp. 3d 304 (D. Mass. 2022).............. *passim*

*Amor v. John Reid,* No. 20 C 1444, 2024 WL 4299004
    (N.D. Ill. Sept. 26, 2024) ................................................................................29

*Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994).....................................................56

*Atkins v. County of Riverside*, 151 F. App'x 501 (9th Cir. 2005) ...........................47

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017)......................................35

*Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842 (4th Cir. 1964) .......................44

*Bellermann v. Fitchburg Gas & Elec. Light Co*., 18 N.E.3d 1050 (Mass. 2014) ...41

*Bilokumsky v. Tod,* 263 U.S. 149 (1923) .................................................................39

*Boyette v. Lefevre,* 246 F.3d 76 (2d Cir. 2001)........................................................45

*Brady v. Maryland*, 373 U.S. 83 (1963) .............................................................44, 45

*Brown v. City of Chicago,* 19 CV 4082, 2025 WL 2785426
    (N.D. Ill. Sept. 30, 2025) .......................................................................29, 30

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)............................................................55

*Caldwell v. Cambra,* -- F. Supp. 3d --, 2025 WL 2617906
    (D. Mass. Sept. 10, 2025) ......................................................................30, 47

*California v. Texas*, 593 U.S. 659 (2021)................................................................41

*Clark v. Taylor*, 710 F.2d 4 (1st Cir. 1983) .......................................................55, 56

*Clarke v. Burke*, 440 F.2d 853 (7th Cir. 1971) .......................................................44

*Conservation Law Found., Inc. v. Acad. Express, LLC,* 129 F.4th 78
(1st Cir. 2025) ........................................................42

*Cosenza v. City of Worcester,* 355 F. Supp. 3d 81 (D. Mass. 2019) ......................40

*County of Sacramento v. Lewis,* 523 U.S. 833 (1998).............................................27

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ....................................................43

*Dickerson v. United States*, 530 U.S. 428 (2000) ....................................................25

*Drumgold v. Callahan*, 707 F.3d 28 (1st Cir. 2013).................................................45

*Estate of Bennett v. Wainwright*, 548 F.3d 155 (1st Cir. 2008)...............................54

*Evans v. Katalinic,* 445 F.3d 953 (7th Cir. 2006) ..................................................40

*FDA v. Alliance for Hippocratic Med.,* 602 U.S. 367 (2024)...................................42

*Fulton v. Bartik*, Nos. 20 C 3118 & 20 C 3119, 2024 WL 1242637
(N.D. Ill. Mar. 22, 2024)......................................................30

*Gibson v. City of Chicago*, No. 19 C 4152, 2020 WL 4349855
(N.D. Ill. July 29, 2020).........................................................31

*Giglio v. United States*, 405 U.S. 150 (1972) ..........................................................44

*Gual Morales v. Hernandez Vega*, 579 F.2d 677 (1st Cir. 1978)...........................55

*Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011) .............................................45

*Hurt v. Wise,* 880 F.3d 831 (7th Cir. 2018) ............................................................38

*In re Eventflo Co., Mktg., Sales Pracs & Prods. Liab. Litig.*, 54 F.4th 28
(1st Cir. 2022)..............................................................41, 42

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) ...................................47

*Kyles v. Whitley,* 514 U.S. 419 (1995)....................................................................45

*LiButti v. United States,* 178 F.3d 114 (2d Cir. 1999) .............................................39

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) .........................................25, 33, 35

*Manganella v. Evanston Ins. Co.*, 700 F.3d 585 (1st Cir. 2012) ............................40

*Perrot v. Kelly*, No. 18-CV-10147-DPW, 2023 WL 2939277
    (D. Mass. Feb. 15, 2023) ...................................................................27

*Price v. Montgomery County*, 72 F.4th 711 (6th Cir. 2023)...................................25

*Reese v. Herbert*, 527 F.3d 1253 (11th Cir. 2008) ...................................................52

*Rieves v. Town of Smyrna*, 67 F.4th 856 (6th Cir. 2023)..........................................43

*Santiago v. Fenton*, 891 F.2d 373 (1st Cir. 1989) ...................................................54

*Santiago v. Keyes*, 890 F. Supp. 2d 149 (D. Mass. 2012) ......................................56

*Saunders v. Chicago*, No. 12-CV-09158, 2014 WL 3535723
    (N.D. Ill. July 11, 2014)....................................................................26

*Smith v. Florida*, 410 F.2d 1349 (5th Cir. 1969) ....................................................44

*Spano v. New York*, 360 U.S. 315 (1959) ...............................................................27

*Taylor v. Chicago*, No. 14-cv-737, 2019 WL 4597383
    (N.D. Ill. Sept. 23, 2019) ..................................................................25

*Trammell v. McKune,* 485 F.3d 546 (10th Cir. 2007) .............................................51

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ................................................41

*United States v. Agurs*, 427 U.S. 97 (1976)............................................................45

*United States v. Andrews*, 532 F.3d 900 (D.C. Cir. 2008).......................................49

*United States v. Hufstetler*, 782 F.3d 19 (1st Cir. 2015) ...................................25, 27

*United States v. Innamorati*, 996 F.2d 456 (1st Cir. 1993) .....................................51

*United States v. Tucker*, 61 F.4th 194 (1st Cir. 2023) ...............................................50

*United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990) ...............................................54

*Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021)...................................................42

*Ward v. County of Wayne*, No. 21-cv-12742, 2024 WL 4148636
    (E.D. Mich. Sept. 11, 2024)...............................................................................34

*Washington v. Boudreau,* No. 16-CV-01893, 2022 WL 4599708
    (N.D. Ill. Sept. 30, 2022) ..........................................................................35, 39

*Waters v. Town of Ayer*, No. CV 04-10521-GAO, 2009 WL 10728977
    (D. Mass. Feb. 27, 2009) ...............................................................................25

*Webb. v. Injured Workers Pharmacy, LLC*, 72 F.4th 365 (1st Cir. 2023).........41, 43

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)..................................35, 38

*Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36 (1st Cir. 2005) ....42, 43

## Other Authorities

RESTATEMENT (SECOND) OF TORTS §§ 314, 323, 324, 324A (1965) ..........57

## Articles

*Michael Paul Cifizzari*, FIND A GRAVE. (April 30, 2019),
    https://www.findagrave.com/ memorial/198750609/michael-paul-cifizzari ..........20

## STATEMENT OF JURISDICTION

Jurisdiction was proper in the district court under 28 U.S.C. §1331 and §1343, and this Court has jurisdiction pursuant to 28 U.S.C. §1291. After the district court granted summary judgment on all claims on July 9, 2025, ECF 141, Plaintiff timely filed his notice of appeal on July 14, 2025. Record Appendix ("RA") 15.

## QUESTION PRESENTED

Where Plaintiff's wrongful conviction was vacated based on DNA testing after 35 years of wrongful incarceration, whether the district court erred in granting summary judgment on Plaintiff's Section 1983 claims alleging, *inter alia,* that the Defendants fabricated incriminating evidence and withheld exculpatory information.

## STATEMENT OF THE CASE

Following discovery and briefing, the district court granted summary judgment of all of Plaintiff's claims. The factual record supporting Plaintiff's position on appeal is summarized as follows.

## Michael Giroux Murders Connie Schiappa

In 1979, Connie Schiappa was a 75-year-old woman living in Milford, Massachusetts. RA1287, ¶1; RA155. Schiappa lived alone and never locked her door. RA155; RA1289, ¶18.

Sometime during the early hours of September 29, 1979, Schiappa was raped and murdered in her apartment by Michael Giroux. RA1287, ¶¶1-2; RA1290, ¶22. Giroux left his semen on Schiappa's nightgown, RA1288, ¶8, and there is no dispute that Giroux committed this crime, *see* RA2949 (District Court describing Giroux as "the true killer of Mrs. Schiappa," "as established by DNA evidence in 2019").

Giroux was a user of heavy narcotics, such as heroin and cocaine. RA1291, ¶30; *see also* RA2007 (calling Giroux "the biggest drug addict in Milford"). He had a long criminal history involving drugs, theft, assault and battery, breaking into other people's homes, violence, and uncontrollable rage. RA1288-90, ¶¶10-11, 20-21; *see also* RA2042-43 (Giroux robbed his own family, multiple times).

Giroux's murder of Schiappa was a heinous and brutal crime. *See* RA1287, ¶¶2-3. Among other senseless acts of violence, Giroux bit Schiappa and shoved a broomstick inside her body. *Id.* ¶3.

The night of the murder, Giroux showed up at his brother's home with blood on his clothes. RA1288, ¶12. A day or two later, Giroux overdosed and had to be hospitalized, though he later recovered. RA1289, ¶15.

## Plaintiff's Innocence

In 1979, Plaintiff Gary Cifizzari (then age 22) was living at home with his mother near Taunton. RA1414-15; RA1305, ¶142. Schiappa had been his great-aunt, but Gary had no relationship with her and had never been to her apartment in his life, much less on the night of the murder. RA1305, ¶¶138-39.[1]

On the night Giroux killed Schiappa, Gary was at home with his mother and brother, Michael Cifizzari. *Id.* ¶142. Neither brother knew Schiappa's killer (Giroux) or had anything to do with him or the murder. *Id.* ¶¶140-41. Both Cifizzaris are completely innocent. *Id.*

Notwithstanding his innocence, Gary was wrongfully convicted of Schiappa's murder. He spent almost 35 years in prison for a crime in which he was not involved. RA2943-44 (district court acknowledging that "an innocent man spen[t] nearly 35 years in prison for a murder he did not commit").

Gary always maintained his innocence. In 2006, he moved for DNA testing. RA1317, ¶219. In 2017, the New England Innocence Project got involved and worked with the Worcester County District Attorney's office ("WCDA") to locate and test the physical evidence from the Schiappa murder investigation. *Id.* ¶220.

---

[1] This statement of facts involves two pairs of brothers and a couple who share last names. These six people, confusingly, include two Michaels and two Garys. Plaintiff refers herein to the Cifizzari brothers by their first names, the real killer (Michael Giroux) as "Giroux," the latter's brother as "David Giroux," and Gary Terhune's wife, Kathy, by her former name, Duncan.

The DNA testing was eventually conducted, and the results from the semen on Schiappa's nightgown excluded Gary as the source and identified Giroux. RA1288, ¶9; RA1317, ¶222. WCDA thereafter assented to Gary's motion for new trial, which was granted, and then, in December of 2019, it dismissed the prosecution against Gary. RA1317, ¶223. The Commonwealth's *nolle prosequi* filing acknowledged that Giroux was the real murderer. *Id.*; RA2957 (citing RA1263, ¶241).

Although his conviction was ultimately overturned, Gary suffered profoundly during his 35 years of wrongful incarceration. And as described more fully below, Gary's wrongful conviction was no accident; it was the direct result of Defendants' violation of his constitutional rights in multiple ways.

### Milford's Investigation

By statute, the entity primarily responsible for the investigation of Schiappa's murder was the WCDA, but the investigation was multi-jurisdictional. RA2945. The Crime Prevention and Control ("CPAC") Unit of the Massachusetts State Police worked with WCDA and took the lead. *Id.*

The Milford Police Department ("MPD") was involved as well. *See, e.g.*, RA1822-23 (White and Small Report), 1825 (DeFuria and Liberto Report), 2207 (Chianese Report), 2732 (Chianese and DiGirolamo Report), 2773 (Small and White Report). As part of Milford's role in the investigation, a number of MPD

officers, including Defendants Donald Small, Vincent Liberto, Anthony DiGirolamo, and John Chianese, interviewed multiple witnesses about Schiappa's murder. RA2946-48; RA1290-91, ¶¶23-24, 26 (citing various Milford police reports summarizing witness interviews); RA1226, ¶57; RA1230, ¶68; RA1232-35, ¶¶76-86.

In Milford, the case was assigned to Milford Detectives Small and Liberto, who investigated in conjunction with CPAC. RA1630; RA1290, ¶23. Within a week of the murder, Milford Detectives Liberto and Small were interviewing witnesses as part of the investigation of the Schiappa murder. RA1291, ¶26.

At the time the case was assigned to Milford's detectives, Giroux was Milford's original and only suspect. RA1630-31.

### Giroux Was The Original Suspect

Giroux's sister-in-law, Kathy Anne Duncan, was one of Schiappa's neighbors. RA1289, ¶16. On October 5, 1979, Duncan reported to investigators that Giroux not only robbed people, but that about a year before the murder, he had previously gone into Schiappa's apartment and stolen money from her bedroom. RA1289-90, ¶¶16, 20; *see also* RA2949 (Duncan reported that Schiappa had accused Giroux of taking her money). Duncan added that around the time of the murder, Giroux had recently come back to Milford after returning from the Army. RA2949-50. Another neighbor, Mary Ellen Auger, reported to police that Giroux had talked about money with Schiappa just before her murder. RA1289, ¶17.

Another of Schiappa's neighbors, Gary Terhune, saw a man around Schiappa's apartment near the time of the murder, and initially described him to police as a white man, 25 to 35 years old, between 5'9" and 5'11", with an "Afro-type" haircut. RA1307, ¶¶160-61. In September of 1979, Giroux was all of those things: he was 35 years old, 5'9" tall, and had a bushy-type haircut. RA1308, ¶¶162-63. (Gary Cifizzari, who was 5'6" and 22 years old, was none of those things. *Id.* ¶164.).

CPAC investigators interviewed Giroux at least twice in the weeks after the murder. RA2950. These investigators documented Giroux's admissions on October 5 and 24, 1979, that he walked along a route the night of the murder that took him near where Schiappa was murdered and where some of her keys and purse were found. RA1289, ¶¶13-14.

## Withheld (Exculpatory) Information

Milford Detective Liberto interviewed Giroux's brother, David Giroux, who told Liberto and one other officer that on the night of the Schiappa murder, Giroux had come to his house with blood on his clothes. RA1288, ¶12; RA1291, ¶26. This evidence about Giroux showing up bloody the night of the Schiappa murder was not included in any known police report or otherwise disclosed to prosecutors or Gary Cifizzari's defense when he was later prosecuted. RA1291, ¶28. In fact, there is no documentary evidence whatsoever of the David Giroux interview. RA2950.

It was learned much later that Milford had reasons to protect Giroux: It turned out that at the time Schiappa was murdered, Giroux was working as an informant for the Milford Police Department. RA1291, ¶¶31-33. In fact, Giroux continued working as a police informant for other agencies for decades. RA1291-92, ¶¶32-33. In 2013, for example, Giroux provided information to police and testified at a grand jury about a different murder. RA1292, ¶33.

### Pressure To Solve The Case

The Schiappa murder generated substantial media coverage. RA1288, ¶6. Because of the publicity and heinous nature of the murder, investigators were on edge to get it solved. RA1293, ¶41.

The investigation, however, eventually went cold.

### Michael Cifizzari

Plaintiff Gary Cifizzari's older brother, Michael, was 28 years old at the time of the murder. RA2680. The murder victim had been Michael's great aunt too. RA1305, ¶137. And also like his brother, Michael had nothing to do with her murder. *Id.* ¶141.

Michael had serious cognitive limitations and adaptive functioning deficits. RA1303, ¶125. His IQ score was only 75 – the bottom 5% for people his age – and he dropped out of high school after his freshman year. *Id.* ¶124; RA1301, ¶112. He presented as someone who had intellectual challenges. RA1295, ¶61.

Michael also suffered from mental illness, including chronic schizophrenia. RA1304, ¶135. He constantly rambled, with his thoughts and conversation jumping around. RA1295, ¶55. He had been hospitalized for mental health issues in 1970, in 1973-75, and in 1979. RA1301, ¶113.

By the late 1970s, Michael was living on the streets of Milford. RA1668-69. He was supposed to be taking mental health medications (thorazine and porlixin) but was not. RA1302, ¶114; RA1669-70.

**Michael's Involuntary Commitment**

About a year after the murder, in November 1980, a judge decided to involuntarily commit Michael to the psychiatric unit at a state mental hospital. *See* RA1302, ¶118. Milford detectives Small and Liberto performed the transport. *Id.* ¶116. At the time, Liberto saw that Michael's hygiene was very deteriorated, and he was "dirty" and "grubby" like a "skid row bum." *Id.* ¶120.

During the ride to the mental hospital, Small and Liberto brought up his Aunt Connie's murder. *Id.* ¶¶116-21. They asked Michael a leading question ("Why did you hit [Schiappa]?") to which Michael answered that he did so because he was angry. RA1656. When they then asked why he killed her, Michael insisted she was still alive, and that he had just spoken to her (which would have been impossible, as she had been dead for a year). RA1657. They then asked Michael if he hit his aunt with a stick, and Michael denied hitting her at all. *Id.* Small asked Michael why, then, did Michael just tell him that he hit his aunt, to which,

according to Detective Small, Michael responded: "I thought that is what you wanted me to say." RA1633; *see also* RA1657.

Liberto and Small believed Michael. When he later testified about the ride, Detective Liberto was asked: "So you are telling us, sir, are you not, that anything you said, [Michael] would agree with?" Detective Liberto answered: "In my opinion that day, yes." RA1658.

Accordingly, after Liberto and Small's conversation with Michael on the way to the mental hospital, they just "kind of shook [their] head[s]" and left it alone, observing, "he is freaked out. He is like in left field." RA1656-57. They dropped him at the hospital and did no further investigation of his potential involvement. RA122, ¶92.

According to Small and Liberto, the Milford detectives responsible for the Schiappa investigation, Michael was never even a suspect in his aunt's murder. RA1631. In fact, Michael was never identified as a suspect by either the CPAC or the Milford detectives who were investigating the Schiappa Murder. RA1294, ¶47.

### February 26, 1981

On the night of February 26, 1981 – about a year and a half after the murder – Michael was homeless and cold. *See* RA1689. With nowhere else to go, he went to the Milford police station around 1:00 a.m. looking for a safe place to warm up, something he had been permitted to do in the past. RA1295, ¶¶57-58; RA2952.

When Michael walked into the Milford police station, he was disheveled, dirty, smelly, hungry, cold, and wet. RA1295, ¶60. He was also in an emotional state, having just learned that a relative had died, and he appeared especially tired and distracted. RA1295-96, ¶¶59, 62.

Michael's mental health problems were flaring on the night he showed up at the police station. He appeared to be frightened and paranoid and did not want to talk. RA1296, ¶63.

**Defendants DiGirolamo And Chianese Decide To Interrogate Michael**

Defendants DiGirolamo and Chianese interacted with Michael at the station that night. They knew him. Chianese had grown up with Michael, who was a couple of grades behind Chianese in school before Michael dropped out, and he knew him around town after high school too. RA1294, ¶50. DiGirolamo, too, knew Michael, having been his youth football coach when Michael was 12, and seen him around town thereafter. *Id.* ¶51.

DiGirolamo knew that about two months before his interrogation of Michael, Michael had been found eating dog food on someone's porch. RA1302, ¶115. Based on the testimony and evidence, Plaintiff's expert (Dr. Lucy A. Guarnera) opined that Michael's presentation would have made his mental health and cognitive limitations obvious to the officers with whom he dealt. *Id.* ¶112.

For reasons not documented, Defendants DiGirolamo and Chianese decided to take this opportunity to interrogate Michael about the Schiappa murder that had occurred some 17 months prior. RA1296, ¶64. After allowing Michael to come in from the cold that night, they took Michael Cifizzari to the payroll-clerk's office at about 1:00 a.m. for interrogation. RA1295-96, ¶¶58, 64.

### Defendants DiGirolamo And Chianese Were Patrol Officers, Not Trained Detectives

To be clear, DiGirolamo and Chianese were not detectives. The latter was a patrol officer "assigned to cruiser duty," and the other his patrol sergeant. RA1649, 1546. As patrol officers, neither was assigned to investigate the Schiappa murder, which was the responsibility of MPD's detective bureau. RA1293, ¶¶42-43; RA1546-47. Defendants DiGirolamo and Chianese did not contact the Milford detectives who were actually investigating the Schiappa murder before interrogating Michael. RA1294, ¶48.

It was "not normal" at the MPD (or consistent with national standards for patrol officers) that officers not assigned to an investigation would conduct interrogations about a serious crime. RA1293, ¶44. Defendant Chianese was never trained in felony investigations or how to conduct interrogations; indeed, the Schiappa case was the only time he was ever involved in any murder investigation. RA1294, ¶45.

## Michael Was In No Condition
## To Be Interrogated That Night

DiGirolamo read Michael his *Miranda* rights. Because there was apparently some question about whether Michael could comprehend his rights, DiGirolamo also wrote them out by hand for him to sign. RA1296, ¶66. Michael signed the *Miranda* waiver under the name "Paul M Cartney" (*i.e.*, the Beatles' frontman). *Id.* ¶67. (DiGirolamo told Michael to write his own name instead, and he did. RA2952.)

Michael did not really understand what was happening during the interrogation. RA1298, ¶¶81-82. He appeared confused and was rambling, veering off into other topics when questioned. *Id.*

Michael tried to tell DiGirolamo and Chianese that he did not kill Schiappa, but they kept interrupting him. *Id.* ¶79. At some point, Michael confessed to killing Schiappa. *Id.* ¶¶84-85. At other times, Michael insisted he was innocent and began disagreeing with what DiGirolamo and Chianese claimed he said. *Id.* ¶¶86-87.

CPAC participated. During the interrogation of Michael, DiGirolamo and Chianese contacted CPAC Trooper Thomas White and requested that he join the questioning. RA2953. White arrived, but when he attempted to ask Michael questions, Michael refused to speak to him because "he did not know Trooper White," so White left and stood in the hallway while DiGirolamo finished the questioning for another half-hour or so. *Id.*; RA1240, ¶113.; RA552-53.

This session of the interrogation lasted until around 3:00 a.m. RA1296-97, ¶¶65, 71.

## Michael's Vulnerabilities

Plaintiff proffered an expert report from Dr. Guarnera who explained that Michael's incriminating statement bears the hallmarks of a fabricated confession. In particular, the first step in a false confession is for police to "misclassify" a person as guilty, as DiGirolamo and Chianese did before this interrogation began. RA1303, ¶123. They proceeded to take advantage of Michael's diminished capabilities to talk him into "confessing" to things they proposed to him. *Id.*

According to Dr. Guarnera, important factors for false confessions were Michael's low intellectual functioning, coupled with his schizophrenia and active psychosis when he was being interrogated. RA1303-04, ¶¶129-30, 134-36. These circumstances increase the risk of false statements to achieve short-term goals without understanding the consequences. RA1300, ¶¶103-04; RA1303-04, ¶¶128-30. Low intelligence and comprehension also reduce critical thinking and increase confusion; fatigue, impulsivity, gullibility, naivete, and acquiescence, were all exacerbated by Michael's isolation and fatigue from being interrogated all night. *Id.* People who are psychotic have trouble with self-regulation and are quicker to suffer "interrogation-related regulatory decline." RA1304, ¶136.

Like many innocent people, Michael would have likely believed (wrongly) that his innocence would protect him from his acquiescence to the officers' demands. RA1303, ¶128. That Michael had a prior, trusting relationship with DiGirolamo and Chianese (the former of which was his youth sports coach) would cause someone with Michael's mental illness to want to see them as friends, and to agree with them and please them for their friendship, which is a common reaction to hide deficits and seek approval for low-functioning people. RA1304, ¶131. Given the degree of Michael's impairment, acquiescence also might have even been as simple as wanting to be able to stay warm in the police station. *Id.* ¶132

Plaintiff's police practices expert, Dr. Andrew J. Scott (who has a Doctorate in Criminal Justice and over 30 years experience in law enforcement) opined about how interrogating a suspect with the obvious mental health issues in this case was contrary to established national policing standards. RA1295, ¶54; RA2688, ¶1.14; RA2684, 2700.

**Defendants Fabricated
Michael's Incriminating Statement**

During the interrogation, Defendant Chianese took four to five different statements from Michael (one of which was in the third person, and the others in the first person, as if the words came from Michael). RA1299, ¶94. Chianese claimed not to know the order of any of the purported statements though one supposedly included everything Michael said. *Id.* ¶95.

Michael did not tell a narrative story to DiGirolamo and Chianese about the murder. RA1297, ¶72. Rather, they directed specific, leading questions that included facts about the murder for Michael to respond to. *Id.* ¶73. In other words, Michael was asked to agree or disagree with what the police told him. *Id.* ¶75.

To take an example, DiGirolamo suggested that there was a couch in Schiappa's living room and Michael said yes (even though he had never been in the victim's apartment in his life). *Id.* ¶76; RA1452. When DiGirolamo suggested to Michael that his cousin, Robert Cananzey, hit the victim with a backhand, Michael simply said yes. RA1297, ¶77. This type of leading question format is a coercive police tactic that someone with Michael's particular vulnerabilities was especially vulnerable to. *Id.* ¶74.

Because Giroux committed the murder and Michael had nothing to do with it, Michael did not himself know any of the details of the crime. RA1451-57. In the process of interrogating Michael, DiGirolamo fed Michael the details that the officers knew about the murder, such as: (1) a broomstick had been shoved inside the victim's body; (2) there were bite marks on the body; and (3) how much money was taken from Schiappa's apartment. RA1296-97, ¶¶68-69. After the Defendants educated Michael about the facts of the crime, each of these incriminating details later ended up in Michael's statements. *See* RA1298-1300, ¶88.

Michael got some facts objectively wrong too – which also happened to be things DiGirolamo and Chianese did not know. For example, Michael's statement claimed that the victim yelled, but no such thing was heard by the upstairs neighbors, who were home and would have been able to hear a yell had it really happened. RA1298-99, ¶¶88, 92. He also gave differing accounts of how much money was stolen. RA1300, ¶97.

Additionally, after Michael (in response to leading questions) implicated his cousin, Cananzey, as participating in the murder, investigators began investigating Canazey's possible involvement. RA2732. This included DiGirolamo (for Milford) and White (for CPAC). *Id.*

At some point that same day, Chianese and another CPAC Trooper (Robert Meier) took a signed statement from Cananzey, who denied being involved. RA821. He had been living in another city with his wife (an alibi witness), and had not been to Milford in years. RA1297, ¶78; RA1306, ¶147; RA821.

The police apparently deemed his denials credible. Cananzey was never prosecuted. RA1297, ¶78. By the time of trial, he was not even a suspect. RA1569.

## Michael's "Statements"

Despite Michael's purported willingness to confess, Defendants DiGirolamo and Chianese did not ask Michael to sign any statement adopting what they claim he said, and did not show Michael what they wrote down. RA1299, ¶¶89-90. This was contrary to the standard practice at MPD, which (not surprisingly) called for a person to sign any purported confession. *Id.* ¶93.

Also contrary to national policing standards, neither DiGirolamo nor Chianese drafted any police report to document the interrogation and circumstances thereof. RA1300, ¶99. Chianese also did not file Michael's purported statements with officers from MPD or CPAC who were conducting the investigation; rather, he took them home and held them to himself (along with the Paul McCartney *Miranda* waiver) until the criminal trial, described below. *Id.* ¶96. He never produced his actual notes from the interrogation to anyone. *Id.* ¶98.

## The Second Interrogation Session

As stated, Milford's DiGirolamo and Chianese, along with CPAC's White, conducted the first interrogation session. After that two-hour interrogation session at the Milford Police Station ended around 3:00 a.m., DiGirolamo and Chianese brought Michael to the CPAC Office in Worcester for the next session of the interrogation. RA1296, ¶55. Before it began, DiGirolamo and CPAC Investigator Joseph Doheny had a conversation, and went over what DiGirolamo claimed Michael had said so far. RA553.

Thereafter, the interrogation of Micheal continued at the CPAC office sometime around 7:15 a.m. RA2954. CPAC investigator Doheny's closing report noted that Michael, who had been up all night, was "somewhat confused," "wide eyed, almost-wild eyed," and "did some rambling." RA1564-66 (Q: "There obviously appeared to be something out of the ordinary when you spoke to him as far as his appearance goes, is that correct?" A: "Oh yes.").

When Doheny tried to advise Michael of his rights to begin further questioning without success ("[Michael] just sat and stared at me"), he brought DiGirolamo into the room to introduce him to Michael. RA1565. There is no indication in the record suggesting that DiGirolamo ever left the room until Doheny's interrogation was over.

During this second session of the interrogation, Michael was able to state "graphic and specific details" about the crime. RA2954. However, the details "differed slightly" from the first session. *Id.*

Among the different details was who committed the crime. Likely given the problems with proving a case against Cananzey discovered by DiGirolamo, Doheny asked Michael if he really was sure it was Cananzey who was with him for the crime, and not his brother (Gary Cifizzari). RA1558. Michael supposedly replied: "Yes, Gary was there." *Id.* According to Doheny, he then said to Michael: "So, it was Gary and not your cousin [Cananzey]?" to which Michael (unhelpfully) replied: "No. They were both there." *Id.*

18

## Michael's Prosecution

The process of being interrogated all night concerning a murder about which he knew nothing badly exacerbated Michael's mental illness, essentially turning him catatonic. Immediately after the interrogation, the CPAC officer who drove him to court described Michael as rocking and mumbling. RA1301, ¶¶105-06. He took off his soiled shirt in the holding cell and paced back and forth. *Id.* ¶106.

A probation officer who tried to interview Michael during the next few days found him sitting on the floor, curled up into a ball in the corner, with no shirt on, and looking down. *Id.* ¶107. When questioned about where he was born, Michael answered, "earth" or "world." *Id.* ¶108. When asked where he lived or other questions, Michael gurgled or made grunting sounds. *Id.*

A few weeks later, on March 12, 1981, Michael was evaluated by a psychiatrist, who described Michael as "borderline retarded" and "psychotic," either from drug abuse or paranoid schizophrenia. RA1637-39. Michael was disjointed and incoherent, delusional, and did not seem to understand what he was doing there. RA1637-39, 1642, 1646. According to the psychiatrist, "[t]here was no coherence to the words he was putting together." RA1638 (including statements like: "The judge could not sentence me; 12th Commandment is a punishment; and I don't say anything, I don't know if the guys in the blue shirts are listening."). Michael also still thought he was Paul McCartney. *Id.*

The psychiatrist deemed Michael incompetent to stand trial. RA1646-47.

He remained hospitalized and medicated, but failed mental health exams, and was

repeatedly found unfit. Michael's trial had to be delayed for almost three years, by

which time meds had seemingly stabilized him. RA1301, ¶109; RA1671, 2954.

In September of 1983, Michael was tried and convicted of second-degree

murder. RA2954. Tragically, Michael died in prison in 2000 at the age of 47,

19 years before the DNA testing excluded him and implicated Giroux. *See Michael

Paul Cifizzari*, FIND A GRAVE. (April 30, 2019), https://www.findagrave.com/

memorial/198750609/michael-paul-cifizzari.

### Gary's Wrongful Prosecution And Conviction

Shortly after Michael's arrest, Gary was first interrogated on February 26,

1981, and he denied having anything to do with the murder. RA213-16. Gary

continued voluntarily speaking with investigators from 1981 to 1983, always

maintaining his innocence. RA1306, ¶¶149-50. During that whole time period,

Gary remained right where he had been living, with his mother, even though

investigators falsely told him they had evidence of his guilt. RA1307, ¶159.

Several CPAC troopers proceeded to find a bitemark "expert," who opined

that the bitemarks left on Schiappa's body could only have been caused by Gary's

teeth. RA2955. In November of 1983, more than four years after the murder, Gary

was arrested and charged. *Id.*; RA1308, ¶166.

In 1984, Gary was tried for Schiappa's murder. RA2956. In addition to introducing aspects of Michael's confession against Gary at trial, RA1308-09, ¶¶167-70, the Commonwealth relied on multiple bitemark experts, who opined that the bitemarks left on Schiappa's body matched a dental impression of Gary's teeth that Gary had voluntarily provided, RA2956; RA1307, ¶154. There was no evidence at all introduced against Gary other than (a) references to Michael's incriminating statements and their contents; and (b) the bitemark testimony.[2]

Because it had been withheld from Gary's criminal defense team, nothing about Giroux being bloody the night of the murder or having previously entered Schiappa's apartment to rob her, was introduced at Gary's trial in his defense. RA1309, ¶172.

At the conclusion of the trial, Gary was convicted of first-degree murder. RA2956. His subsequent appeals were denied. *Id.*

Meanwhile, Giroux continued to commit crimes. He was later convicted of second-degree murder in connection with another homicide. RA1293, ¶39.

---

[2] The scientific community has since reached a consensus that "bitemark evidence" is complete junk science. RA2957-58. In 2009, an influential report concluded that "no basis existed to support the proposition that a forensic odontologist, looking at a bitemark on human skin, could individualize that mark to a potential biter," much less rule out all of the other teeth in the population. *Id.* It is now "generally accepted scientific consensus that individualization testimony is inherently unreliable." RA2958.

**Gary's Exoneration**

As stated, many years later, the New England Innocence Project and the WCDA worked together to test the crime scene DNA, which excluded both Cifizzaris and identified Giroux as the source of the semen on Schiappa's nightgown. RA2957. In 2019, Gary filed a motion for a new trial, whereupon the Commonwealth entered a *nolle prosequi* in December 2019. *Id.*

Gary then filed this lawsuit on November 29, 2022, seeking justice for the 35 years he spent in prison for a crime he did not commit. RA3.

## SUMMARY OF ARGUMENT

The district court erred in granting summary judgment on several of Plaintiff's claims. First, the court found that Plaintiff had no standing to assert claims surrounding Defendants' fabrication of Michael's incriminating statement. This conclusion badly misunderstands the law around standing, which requires only that Plaintiff's injuries be fairly traceable to Defendants' conduct. They quite plainly were. Even though Michael and Gary are different people, Michael's fabricated confession was part of Gary's trial, and contributed to his own deprivation of liberty. This is not a question of standing at all.

The court also erred in finding that the Milford Defendants could not be liable for this coercive interrogation because they did not ask the final question implicating Plaintiff. That conclusion improperly twists the facts: It ignores the reality that this was actually a single interrogation, with periodic breaks, on a single morning; it was jointly conducted by law enforcement officers from two agencies, both of which were present for all sessions, and who conferred and strategized in between. If anything, the last questioner had the least culpability. A jury could reasonably conclude it was the Defendants' actions that set up and facilitated the constitutional violation.

Also erroneous was the district court's rejection of Plaintiff's *Brady* claim. Plaintiff proffered evidence that the Defendants suppressed critical evidence,

which should have sufficed. The district court nonetheless granted summary judgment on the (extremely dubious) ground that it simply did not find credible certain deposition testimony supporting Plaintiff's claim. While the key witness (David Giroux) did tell the story both ways at different times, that is not uncommon at summary judgment. Consistent with the Federal Rules, the proper course of action under those circumstances is for a court to permit impeachment with the prior inconsistent statement – not to decide for itself which story is true.

For the reasons discussed below, Plaintiff also stated viable claims for conspiracy and failure to investigate. Summary judgment should be reversed for those claims too.

## I. The District Court Erred In Granting Summary Judgment On Plaintiff's Claim For Fabrication Of Evidence

### A. Legal Standard

The Supreme Court and this Court have long held that police officers violate due process when they fabricate evidence – including by knowingly obtaining false confessions – for use against a criminal defendant. *United States v. Hufstetler*, 782 F.3d 19, 21-22 (1st Cir. 2015) (citing *Dickerson v. United States*, 530 U.S. 428, 434 (2000)); *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004).

In order to prevail on a fabrication-of-evidence due process claim, a plaintiff must prove (1) the defendant knowingly fabricated false evidence, and (2) there is a "reasonable likelihood" that, without such evidence, the plaintiff would not have been convicted. *Alvarez v. City of Worcester*, 605 F. Supp. 3d 304, 311 (D. Mass. 2022); *Limone*, 372 F.3d at 44-45; *Price v. Montgomery County*, 72 F.4th 711, 723-24 (6th Cir. 2023). The fact that the fabricated evidence – including false confessions – was elicited from a third party, rather than a plaintiff, does not defeat an otherwise valid fabrication claim. *E.g.*, *Waters v. Town of Ayer*, No. CV 04-10521-GAO, 2009 WL 10728977, at *15 (D. Mass. Feb. 27, 2009) ("Assisting vulnerable witnesses in fabricating a story is a clear due process violation.") (citing *Limone*, 372 F.3d at 44-45); *Taylor v. Chicago*, No. 14-cv-737, 2019 WL 4597383, at *15-16, (N.D. Ill. Sept. 23, 2019) (denying summary judgment on fabrication

claims for purported confessions of third parties); *Saunders v. Chicago*, No. 12-CV-09158, 2014 WL 3535723, at *4 (N.D. Ill. July 11, 2014) (use of co-plaintiff's fabricated confession in plaintiff's prosecution can support fabrication claim).

**B.   A Jury Could Find That Michael's Statement Was Fabricated And False**

The district court's opinion begins by acknowledging, as it must, that the incriminating statement procured from Michael was false. RA2964 (district court observing: "[I]t is clear that Michael's statements at his confession were false"). Indeed, that much is beyond debate. Based on the Defendants' own understanding of the crime scene, they suggested a detailed confession scenario to Michael, which he then readily adopted, but which in fact bore no relationship whatsoever to reality. It was completely false. As DNA evidence later confirmed, Giroux was the true perpetrator. The Cifizzari brothers had nothing to do with the crime. The entire story to which Michael "confessed" was completely untrue.

**C.   A Jury Could Find That Defendants Fabricated Michael's Statement Knowing It Was False**

As set forth above, because Michael was not actually involved in the murder, he could not have come up with the details if they had not been suggested to him. Moreover, Michael's vulnerability to suggestion and external influence was undeniable: a young man with a very low IQ, he was at the time experiencing schizophrenia and psychosis. He was homeless, cold and wet, seeking shelter at the

police station. Not even a legitimate suspect in this unsolved murder, he was isolated and kept awake while being interrogated all night long.

At a minimum, a jury question is presented as to whether Defendants fabricated statements from Michael under these circumstances. Courts have concluded that witness statements were fabricated where, for instance, officers used "suggestive" interview techniques. *Spano v. New York*, 360 U.S. 315, 322 (1959); *Perrot v. Kelly*, No. 18-CV-10147-DPW, 2023 WL 2939277, at *4, *11 (D. Mass. Feb. 15, 2023). There is no world in which a reasonable jury could not conclude that Michael's interrogators fabricated his statement under these conditions, particularly given Dr. Guarnera's expert report about false confessions.

It similarly must be left to the jury to determine whether Defendants DiGirolamo and Chianese knew that Michael's statement implicating Plaintiff was false. Plaintiff need not show that "it was . . . the ultimate purpose of the government actors to harm the plaintiff." *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998). It is enough that Defendants acted with "with full appreciation" of the wrongfulness of what they were doing. *Id.*

The Court must keep in mind that no sane defendant would ever outright admit to knowing that a fabricated confession was false. If that sort of admission were required, no fabrication-of-evidence plaintiff could ever win. Instead, the inquiry is necessarily circumstantial. *Cf. Hufstetler*, 782 F.3d at 22.

This element is easily satisfied here. If ever there were a case where a jury could reasonably infer that officers subjectively knew the suspect was being manipulated into a false confession, it is this one. Michael was incoherent and having a psychotic episode. There was no objective reason even to suspect his involvement in the first place. After the Milford detectives actually assigned to the case spoke with Michael just three months prior, they did no further investigation and did not consider him a suspect. When DiGirolamo and Chianese questioned Michael, he could not tell the murder story without being led through it. He was completely defenseless, and willing to agree to just about anything. He implicated someone (Cananzey) who the police did not believe was actually involved. If Defendants are going to deny they knew that Michael's statement was false, they have to persuade a jury.

### D. CPAC's Involvement Does Not Negate Defendants' Liability For Fabricating Michael's Statement.

The district court granted summary judgment on Plaintiff's fabrication claim primarily because Defendants were not the ones who asked the final question that prompted Michael to add Gary to his story. Contrary to the district court's assumption, however, this fact simply does not support summary judgment.

Fundamentally, Michael was subjected to a single interrogation. It started at 1:00 a.m. and continued through at least 8:00 a.m., and as is typical for protracted interrogations, there were breaks. After two hours of questioning, there was a break

around 3:00 a.m. before questioning resumed at roughly 7:00 a.m. Admissions were obtained along the way, and more information was developed, as, by all accounts, Michael's story kept evolving and changing as the morning progressed.

Nor was there anything unusual about the fact that multiple interrogators took turns. Indeed, for lengthy interrogations like this one, it would be rare for the same person to have asked all the questions. Officers routinely play tag team, take turns, rest up, do "good cop/bad cop," even go home for sleep while someone else takes a turn. *E.g.*, *Brown v. City of Chicago*, 19 CV 4082, 2025 WL 2785426, at *8-10 (N.D. Ill. Sept. 30, 2025).

When that happens, and when it results in a false confession, plaintiffs invariably, and legitimately, bring lawsuits against all of the participants who contributed to that false confession, not solely the very last questioner. That was the exact fact pattern, for example, in each of the last three wrongful-conviction cases tried by undersigned counsel.

First, in *Amor v. John Reid*, No. 20 C 1444, 2024 WL 4299004 (N.D. Ill. Sept. 26, 2024), Bill Amor falsely confessed after an overnight interrogation at the Naperville Police Station. At one point, the police took Amor from the station to the off-site offices of a polygrapher to administer a lie-detector test. Amor later sued not only both Naperville police officers, but also the man who interrogated him at the polygraph offices. *Id.* at *7. The polygraphers tried to escape liability by

arguing they did not actually elicit the confession, which came later, after Amor returned to the Naperville police station, when they were not present. *Id.* at *12. Despite that the polygraphers had not actually elicited the confession, the court denied their summary judgment motion, finding that they "took steps that purportedly caused [the plaintiff]'s coerced confession." *Id.*

Similarly, in *Brown v. City of Chicago*, 2025 WL 2785426, at *2, *8-10, the plaintiff successfully sued officers who interrogated him for 30 hours, even though it was the Assistant State's Attorney (ASA) who entered the room at the very end of the interrogation and finally got the false incriminating admission. *Id.* The court affirmed the plaintiff's fabrication claim against the detectives, despite their argument that the ASA was responsible for eliciting the confession. *Id.*

A similar outcome obtained in *Fulton v. Bartik*, Nos. 20 C 3118 & 20 C 3119, 2024 WL 1242637 (N.D. Ill. Mar. 22, 2024)*.* Two officers kept going in and out of the interrogation room, but it was the ASA who came in at the very end and finally obtained the false and incriminating statements. *Id.* at *1-4. The officers were nonetheless liable at trial for their roles in the resulting wrongful conviction, which included feeding witnesses information. *Id.* at *23.

These are only examples from the last three cases counsel has recently tried. There are many other comparable examples. *E.g.*, *Caldwell v. Cambra*, -- F. Supp. 3d --, 2025 WL 2617906, at *7 (D. Mass. Sept. 10, 2025).

In sum, where, as here, both DiGirolamo and Chianese were active and instrumental participants in an interrogation that led to fabricated statements, they cannot hide behind the fact that they only procured some of the fabrications, not all of them. Their actions were at least arguably *sine qua non* of the end result. They taught Michael the facts he needed, totally broke down his resistance, procured his buy-in, and kept him awake in the early hours of the morning before delivering him in a confessing-frame-of-mind to the next man up. Under those circumstances, Defendants cannot hide behind the fact that someone else finished the job, especially where Michael refused to speak to the new interrogator unless these Defendants were present. *Gibson v. City of Chicago*, No. 19 C 4152, 2020 WL 4349855, at *3-4, *6 (N.D. Ill. July 29, 2020) (claim could proceed against earlier interrogators who did not ultimately elicit plaintiff's coerced confession).

It is also immaterial that the interrogation was multi-jurisdictional, or that the second portion of the interrogation happened at a different physical location than the first. These are arbitrary factors when considering *Defendants*' role in the interrogation. Both Milford and CPAC investigators were present during questioning for both sessions. If Doheny had actually been a Milford detective, or if the two interrogation sessions had both occurred in the same room instead of in different buildings, the district court's criticisms would have no application, which illustrates the flaw in the court's analysis: Whether or not Defendants violated

Plaintiff's constitutional rights ought not depend on which agency someone further along the causal chain worked for, or which room things happened in.

Even more significant, *Defendant DiGirolamo was present in the room during Doheny's turn*, even if he was not himself doing the questioning. According to Doheny, when he could not get Michael to respond to him, he had to bring DiGirolamo (Michael's former youth coach, and thus a trusted figure) into the room to get Michael talking. RA1564-65. DiGirolamo's presence during Doheny's turn means he literally participated in the entire interrogation, serving a critical role in rendering Michael more susceptible, even if others took turns asking questions. That is hardly a recipe to escape liability.

Viewed another way, Doheny's culpability does not preclude liability for the Milford officers. Indeed, if anything, were Doheny a defendant, he would likely be seeking summary judgment on the ground that he did nothing more than ask a few questions to a young man who had already implicated himself in murder. Doheny would surely point out that his interrogation was shorter, and that he, unlike Defendants, was not the one who: (a) made the (unsupported) decision that Michael was a suspect who should be interrogated; (b) questioned Michael since 1:00 a.m. that morning, depriving Michael of sleep; (c) knew Michael, and thus subjectively understood his vulnerabilities; and (d) fed Michael the details that enabled him to falsely confess. All Doheny did, he would argue, was ask a suspect

(who had already confessed to murder before Doheny ever even met him) whether his brother Gary was there too. Of all of them, he is arguably the least responsible for the fabricated statement.

All that illustrates the folly of Defendants' attempt to shift blame away from themselves onto others. This confession was every bit a joint production. Defendants are presumably not suggesting that no one can be liable for a false confession procured by multiple interrogators, where each contributed their individual part to the injustice, but only one asked the final question. Under those circumstances, juries should decide where the culpability lies. Defendants are obviously free to try to point the finger away from themselves and at Doheny at trial, but causation is a quintessential jury question. *Limone*, 579 F.3d at 99.

As a final note, the district court's opinion relies quite heavily on the fact that the Schiappa murder investigation was overseen and directed by the WCDA and CPAC. RA2964. This is accurate, but another red herring. While it is undisputed that CPAC took the lead, it is equally true that Milford detectives were assigned to the case and interviewed witnesses too, sometimes with CPAC investigators, and sometimes on their own.

More to the point, who was officially "in charge" is not actually relevant to the fabrication claim. The Defendants are being sued here for their own actions as law enforcement officers, undertaken under color of law. The fact that they were

not the lead or the ultimate decision-makers makes no difference. Non-lead

detectives get sued all the time, even if not officially in charge, where they are part

of the harm. *E.g.*, *Ward v. County of Wayne*, No. 21-cv-12742, 2024 WL 4148636,

at *17 (E.D. Mich. Sept. 11, 2024).

If anything, lack of authority cuts *against* DiGirolamo and Chianese. Not

only was their Department (Milford) not leading this investigation, but DiGirolamo

and Chianese were not even leading Milford's (non-lead) participation in it. In fact,

DiGirolamo and Chianese were not even assigned to the case at all, because they

were not even detectives. Yet without consulting anyone, they took it upon

themselves to conduct the interrogation that broke open the case, more than a year

after the case went cold, and then fabricated the big break. The fact that they were

not in charge of the investigation at a police department that was not in charge is

just a fact in the case. It is certainly no defense to liability.

### E.     A Jury Could Reasonably Find It Likely That, Without Michael's Confession, Plaintiff Would Not Have Been Deprived Of His Liberty

Finally, Plaintiff must point to evidence from which a jury could conclude

that Plaintiff would have had a reasonable likelihood of acquittal if not for

Michael's confession. *Alvarez*, 605 F. Supp. 3d at 311. The district court held that

Plaintiff could not, resting on an assumption that Michael's fabricated statements

supposedly "were not introduced" at Plaintiff's trial. RA2956. On that basis, plus

the fact that the Commonwealth introduced bitemark evidence too, the district court concluded that the Defendants' actions in fabricating Michael's statements did not violate Plaintiff's rights.

That conclusion was wrong on both the facts and the law. Michael's incriminating statement did get introduced at Gary's trial and, regardless, formal introduction is not actually required even had the statement not been introduced.

### 1. Legal Standard

Fabricated evidence need not be formally introduced to establish a due process violation. It is enough to show that the fabricated evidence contributed to any deprivation of liberty "in some manner." *E.g.*, *Whitlock v. Brueggemann*, 682 F.3d 567, 585 (7th Cir. 2012); *Alvarez*, 605 F. Supp. 3d at 311 (denying summary judgment on an evidence fabrication claim that led to the prosecution and conviction); *Limone*, 372 F.3d at 44-45; *see also Avery v. City of Milwaukee*, 847 F.3d 433, 438-43 (7th Cir. 2017). Moreover, whether fabricated statements were used to deprive someone of liberty during the criminal proceedings is ordinarily a dispute of fact. *E.g.*, *Washington v. Boudreau,* No. 16-CV-01893, 2022 WL 4599708, at *21 (N.D. Ill. Sept. 30, 2022) (where arguments about the use of fabricated evidence involve disputes of fact about the effect of evidence on a criminal case, a trial is necessary).

### 2. Michael's Fabricated Statement Contributed To The Deprivation Of Gary's Liberty By Making Gary The Suspect

For starters, Gary never would have been tried at all had Michael's statement not been fabricated. But for that fabricated statement, Gary would not have been a suspect. *See* RA1630-31. No law enforcement officer would have ever spoken to him, much less asked him to provide a dental mold. *See* RA2955. A jury could very well conclude that charges would not have been brought – and, in fact, an investigation never initiated – absent the fabricated statement. *Alvarez*, 605 F. Supp. 3d at 311. It necessarily follows that a jury could conclude that Plaintiff would not have been convicted absent the fabricated statement.

### 3. Michael's Fabricated Statement Also Harmed Gary's Defense At His Criminal Trial

Independently, the essential premise of the lower court's holding was mistaken. Michael's fabricated statement was introduced at Gary's trial.

For starters, the prosecution called a witness (Annette Pasqualone) who referenced Michael's "confession" on the stand, in front of the jury. RA1759.[3]

Reinforcing the point, the prosecution also called a Trooper to explain that after his encounter with Michael on February 27, 1981, he was prompted to send another Trooper to go find Gary. RA1808

---

[3] The reference was not stricken, likely to avoid drawing further attention to it, but as the party that called the witness, the Commonwealth bore responsibility for ensuring witnesses respected the rulings.

In case any juror still did not get it, the prosecutor subjected Gary to a brutal cross-examination tracking Michael's fabricated confession. RA1451-57. This line of questioning lasted six transcript pages, and painted a very clear picture. After getting Gary to admit he was with Michael the night of the murder, the prosecutor asked Gary if he: smoked pot "laced with angel dust" that night, went to his aunt's house, had some conversation with her about an egg, hit her, found a brown change purse in her nightgown, saw her fall near the wall where she sleeps, put a pillow over her mouth so she wouldn't make any noise, fought off her scratching while she tried to push him away, sexually assaulted her, bit her, took a broomstick and shoved it in her vagina, whereupon he felt a "high," then fed her cats with milk from her refrigerator. *Id.* Gary was then asked if after all that, he went down to the bridge by the Archer Rubber building and got high again. *Id.*

Confronted on the stand with this onslaught of questions from Michael's fabricated statement, Gary denied them to the best he was able, but not perfectly. He did not, for example, initially deny that he was "going for [Schiappa's] breasts," claiming instead "I didn't kill my aunt." RA1453. Other times, Gary testified that he "didn't understand the question." RA1455-56. He volunteered information in response to others that may have hurt his credibility. RA1455 (claiming in response to a question about whether he shoved a broom in Schiappa's vagina that he did not even know where she lives).

The totality of this exchange presents a jury question about whether Michael's fabricated statement was used at Gary's trial to deprive Gary of his liberty in at least "some way." *Whitlock*, 682 F.3d at 585; *Alvarez*, 605 F. Supp. 3d at 311. Without the statement, the prosecutor would have had no good faith basis to have executed this damning cross-examination, the details of which left no ambiguity that the prosecutor was referring back to something – particularly where the jury heard about Michael's "confession," which Michael, in turn, never denied.[4]

In fact, the jury was instructed extensively about a "joint venture" theory relating to evidence at Plaintiff's trial. The prosecution persuaded the judge to instruct the jury about how he could be found guilty if the crime was committed with his brother, Michael, even if he was not primarily responsible. RA1309, ¶169. There was absolutely no basis for that instruction other than the fabricated statement. *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018) (fabricated evidence violates due process where it affects the outcome of the criminal case or "furthered the prosecution" in any way).

Finally, the fabrication also hurt Gary's defense by making Michael unavailable as an alibi witness. As stated, the Commonwealth elicited that Gary

---

[4] Gary was in a no-win situation. He could have avoided the stand altogether to prevent this cross-examination, but not if he wanted to proclaim his innocence.

was with his brother that night, but because of the fabricated statement, Gary did not (and could not) call his alibi witness to corroborate their innocence, nor explain why not. *Bilokumsky v. Tod*, 263 U.S. 149, 153-54 (1923) ("Silence is often evidence of the most persuasive character."). The unexplained absence of Michael was no doubt devastating to Gary's defense. *LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) ("[S]ilence when one would be expected to speak is a powerful persuader . . . ."). That is an independent due process violation because the fabricated statements thereby contributed to the unfair trial. *Washington*, 2022 WL 4599708, at *21 (due process violation where fabricated witness statement destroyed alibi).

### 4. The Bitemark Evidence Does Not Defeat Liability

The district court reasoned that the fabrication of Michael's statement was irrelevant because of its conclusion that Gary was "primarily convicted" based on the bitemark evidence. RA2968. The fact-finder, however, would not be required to agree with the district court's subjective opinion on that question, especially given all of the damage at the criminal trial summarized above associated with Michael's fabricated statement. The reference to Michael's confession, coupled with his failure to testify, the brutal cross of Gary based on Michael's statement, and the joint venture jury instruction, all may well have been the primary cause of Gary's conviction. Particularly given how profoundly silly it was to opine that a

picture of a bitemark on human skin could only have come from one set of teeth in the entire known universe of mouths. But even assuming *arguendo* that the bitemark was the "primary" evidence, there would still be a disputed question as to whether Michael's fabricated statement sufficiently *contributed to* the liberty deprivation.

### F.  Gary Is Not Collaterally Estopped From Arguing Michael's Statement Was Coerced

The district court's opinion implies that Gary might somehow be collaterally estopped from challenging the voluntariness of Michael's fabricated statement because Michael lost the motion to suppress in his own case, a decision affirmed on appeal. *See* RA2883-84. The court's suggestion is plainly wrong. Issue preclusion has no applicability here.

In Massachusetts, and elsewhere, the doctrine does not apply unless the party against whom it is asserted had a "full and fair" opportunity to litigate the issue. *Alba v. Raytheon Co.*, 809 N.E.2d 516, 521 (Mass. 2004); *Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012). That condition is absent here, because Michael died before learning that the DNA excluded him. Thus, unlike his brother, Michael had no opportunity to vacate his conviction. It is well settled that when a conviction is vacated, collateral estoppel no longer applies to intermediate rulings, such as motions to suppress. *Cosenza v. City of Worcester*, 355 F. Supp. 3d 81, 94 (D. Mass. 2019); *Evans v. Katalinic*, 445 F.3d 953, 954-56 (7th Cir. 2006).

Here, but for the fortuity that Michael did not live long enough to expose the truth, his conviction would have been overturned with Gary's based on the DNA. See RA2949, 1288, 1317.

At its roots, collateral estoppel is an equitable doctrine, one which will not be applied where unfairness would result. *Bellermann v. Fitchburg Gas & Elec. Light Co*., 18 N.E.3d 1050, 1065-67 (Mass. 2014). Because Gary cannot be fairly estopped by rulings in Michael's case, the doctrine does not apply here.

### G.     The District Court's Conclusion That Plaintiff Lacked Standing Was Plainly Wrong

The foundation of the district court's decision to grant summary judgment was that Plaintiff purportedly lacked standing. RA2960-65. That is wrong.

To sue in federal court, a plaintiff must establish standing under Article III of the Constitution. *California v. Texas*, 593 U.S. 659, 668 (2021). Doing so requires showing: (1) "an injury in fact," (2) "caused by the defendant," and (3) "redressable by a court order." *Webb. v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 372 (1st Cir. 2023). This "inquiry is distinct from the determination of whether the plaintiff['s] claims have merit." *In re Eventflo Co., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 54 F.4th 28, 34-35 (1st Cir. 2022). Rather, the question is simply whether the plaintiff has a "personal stake" in the suit. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted).

Here, the answer is unquestionably "yes." There is no dispute that Plaintiff

suffered a redressable injury in fact. He alleges an "injury to [his] constitutional rights," which is a cognizable injury under Article III. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024). And he seeks to recover damages, which are appropriate to redress constitutional injuries. *See, e.g.*, *Uzuegbunam v. Preczewski*, 592 U.S. 279, 286-87 (2021).

Neither Defendants nor the district court contended otherwise. *See* RA2931-32, 2964-65, 2966-67. Rather, this dispute centers on traceability. For Article III standing, a plaintiff must "show a sufficiently direct causal connection between the challenged action and the identified harm." *In re Eventflo*, 54 F.4th at 34 (citation omitted). That said, traceability requires less than "a tort-like showing of proximate causation." *Conservation Law Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 90 (1st Cir. 2025). So even indirect injuries can support standing. *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 45 (1st Cir. 2005) (collecting cases). To that end, an intervening actor breaks the chain of traceability only if her "independent action" caused the plaintiff's injury. *Id.* at n.2 (citation omitted).

Here, Plaintiff points to specific facts showing that his injury (being wrongfully convicted in part because of fabricated evidence) was fairly traceable to Defendants' conduct. As described above, viewing the facts in the light most favorable to Plaintiff, this is a question of fact. Doheny's actions were not *independent* of Defendants'. Rather, they were the "predictable" consequence of

Defendants' actions. *See Rieves v. Town of Smyrna*, 67 F.4th 856, 862 (6th Cir. 2023) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)).

By holding otherwise, the district court ignored this court's key decisions on traceability. It reasoned that because Doheny took the final step of eliciting Michael's false testimony about Plaintiff, Plaintiff's injuries are not fairly traceable to the series of actions Defendants took before that. *See* RA2967. That ruling flatly contradicts *Wine & Spirits Retailers*, in which this court held that the traceability requirement "does not mean that the defendant's action must be the final link in the chain of events leading up to the alleged harm." 418 F.3d at 45.[5]

At bottom, the proper question is not, as the district court incorrectly asked, who was the final link in the traceability chain. It is whether Defendants' actions predictably caused Doheny to violate Plaintiff's rights. They did. Defendants interrogated Michael in circumstances they knew would likely lead to false statements. After a two-hour early-morning interrogation, they finally elicited a false confession in which Michael implicated himself. Although they took turns with the questioning, they stood in the room as Doheny (who they had lied to about

---

[5] The district court's reasoning is likewise incompatible with this court's decision in *Webb*, 72 F.4th 365. After third-party hackers stole patients' data from their pharmacy, this Court found the patients' injuries fairly traceable to the pharmacy's false promises of data security. *Id.* at 377. That is, the plaintiffs had standing to sue the pharmacy for creating the conditions that made the theft possible, even though the pharmacy did not commit the theft. The same reasoning follows here.

how Michael got to the point he got to) elicited the same facts Defendants had fed Michael, this time implicating Plaintiff in response to a leading question – a question, it can be reasonably inferred, that was asked in consultation with Defendants after the officers all discovered together that the Cananzey angle blew up on them. Plaintiff has standing, and the district court erred in holding otherwise.

## II. Summary Judgment Should Not Have Been Granted On Plaintiff's *Brady* Claim

### A. Legal Standard

Dating back at least 60 years, the Supreme Court has been clear that "the suppression of material evidence favorable to an accused violates due process." *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."); *Giglio v. United States*, 405 U.S. 150, 153-55 (1972).

It has also long been the case, including well before the Schiappa investigation, that this obligation extends to the police. *E.g.*, *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964); *Clarke v. Burke*, 440 F.2d 853, 855 (7th Cir. 1971) ("[K]nowledge of the police is knowledge of the prosecutor." (citations omitted)); *Smith v. Florida*, 410 F.2d 1349, 1351 (5th Cir. 1969) ("[I]t makes no difference if the withholding is by the prosecutor or by officials other than the prosecutor.").

Evidence of the existence of alternative suspects is material under *Brady*.

*See e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 446 (1995) (evidence of alternative

suspects allows the defense to attack "the reliability of the investigation" if it

shows that investigators were less than energetic in exploring other potential

suspects). Such evidence is "classic *Brady* material," and must be disclosed.

*Boyette v. Lefevre*, 246 F.3d 76, 91-93 (2d Cir. 2001).

Given this constitutional requirement, Section 1983 recognizes a claim for

damages when material evidence is withheld by police officers. *See Drumgold v.

Callahan*, 707 F.3d 28, 48 (1st Cir. 2013); *Haley v. City of Boston*, 657 F.3d 39,

47-48 (1st Cir. 2011).

## B. Plaintiff Sufficiently Established A Question Of Fact On His Claims That Material Evidence Was Withheld

Suppressed evidence is "considered collectively, not item by item." *Kyles*,

514 U.S. at 436. Moreover, what might be considered insignificant evidence in a

strong case might suffice to disturb an already-questionable verdict. *United States

v. Agurs*, 427 U.S. 97, 112-13 (1976).

The record here contains plenty of items of *Brady* material withheld by

Defendants, the totality of which certainly could have changed the trial outcome.

### 1. The Circumstances Surrounding Michael's Interrogation

The two sides tell very different stories about how Michael's fabricated

statement came to be. As the district court summarized Defendants' position:

> Defendants assert that Sgt. DiGirolamo asked Michael Cifizzari if he
> knew anything about the murder, to which he responded that he did,
> and then gave a narrative account during which he stated that he had
> gone to Mrs. Schiappa's house on the night she was murdered,
> attempted to get some money from her, was refused, became angry,
> and then killed her.

RA2953. This understanding is drawn from CPAC Sgt. Doheny's report, which claims that DiGirolamo told him that Michael understood and signed a *Miranda* waiver (leaving out the Paul McCartney part) and that Michael proceeded to tell his story in an orderly, organized, and narrative form. RA553-54. Doheny's report further states that Michael repeated this narrative, without assistance, during the second interrogation session too. *Id.* A reviewing court later credited the officers' version of the interrogation, summarizing that Michael had "apparent clarity on the night in question." RA2954.

If the Defendants are accurately recounting how this really went down, they arguably did nothing wrong. But if Plaintiff's evidence set forth above is credited, that is not at all what happened. Not by a long shot.

At trial, moreover, a fact-finder could certainly conclude Plaintiff's version is more likely true. It is undisputed that the statement Defendants took from Michael is false. In a psychotic state, Michael took responsibility for a crime he did not commit, and incorporated details fed to him through leading questions that *only the real killer* (and the interrogators) would know. In fact, Doheny's report specifically pointed out that very fact. RA553 (noting that Michael possessed facts

only the killer would know). Either Doheny was misrepresenting what actually happened, or the Defendants misled Doheny about how Michael came to acquire the facts. Either way, no one disclosed the truth to Gary.

There is no recording or video of what really happened. When he went on trial, neither Gary nor the prosecution were privy to how exactly the Defendants coerced Michael into adopting a totally false murder scenario in which he raped and bit his aunt – something which never actually happened. However that process of questioning Michael really occurred, a jury could conclude that a full and accurate disclosure necessarily would have helped Gary's defense.

This type of *Brady* claim is the close cousin to the fabrication claim. Not only did Defendants fabricate the statement, but they withheld the details of how they did so. *See, e.g.*, *Caldwell*, 2025 WL 2617906, at *8 (declining to dismiss plaintiff's suppression claim, which was based on allegation that police did not disclose a false confession); *Jackson v. City of Cleveland*, 925 F.3d 793, 814-15 (6th Cir. 2019) (officer's knowledge that witness provided false statement was exculpatory evidence); *Atkins v. County of Riverside*, 151 F. App'x 501, 505 n.4 (9th Cir. 2005) ("[F]abricated inculpatory evidence … can have both exculpatory and impeachment value. The state has the obligation not to suppress such information.").

## 2. The Missing Terhune Statement

As also set forth above, prior to Michael's "confession," the only suspect in this homicide was Giroux. Two of Schiappa's neighbors (including Giroux's sister-in-law) told investigators that Schiappa believed Giroux had stolen from her a year earlier, and that Giroux, who had recently returned to town from the Army, had a recent negative interaction with Schiappa involving money. RA1289.

Recall that Gary Terhune reportedly saw a man around Schiappa's apartment near the time of the murder, and initially described him to police as a white male, 25 to 35 years old, between 5'9" and 5'11", with an "Afro-type" haircut, all of which matched Giroux, but none of which matched (the younger and smaller) Gary. RA1308, ¶¶161-63.

By Gary's trial, Terhune denied being able to see anyone, claiming instead that a sheer curtain prevented him from seeing anything but shadows. *Id.* ¶165. The prosecutor was unclear why Terhune changed his tune. *Id.*

When Terhune reversed course, the documents that should have protected Gary were unavailable. Terhune spoke with Milford detectives, including Defendant Small, on the day after the murder, but no Milford police report about that conversation or his description exists. *Id.* ¶¶160-61. Instead, the only evidence referencing Terhune's statement is the final CPAC investigation report, which comprised triple hearsay and only a vague summary that could not be used to

impeach Terhune with his own words. *Id.* ¶160.[6]

Of the neighbors' contemporaneous witness statements, only Terhune's is missing. *Id.* The other witness statements taken by the Milford Defendants, including Terhune's then-girlfriend (Kathy Duncan) and friend (Billy Dean Lindsay, who was with Terhune), both exist to this day. RA1289-90, ¶¶16-22. Considering that Terhune likely saw Giroux (he described him accurately), his contemporaneous statement was valuable not only as alternative suspect evidence, but for whatever else it contained that has never been discovered. *United States v. Andrews*, 532 F.3d 900, 906 (D.C. Cir. 2008) (notes from witness interview constitute *Brady* material when they could have exculpated criminal defendant or impeached witness).

The foregoing helps show that the Milford Defendants routinely disobeyed their obligation to disclose exculpatory evidence. (Plaintiff's *Monell* claim will establish this was the pattern and practice. *See* RA2896-910). Police reports, witness statements, and information known to Milford that could have helped Gary's defense were suppressed. Given the case's weakness, this alone could have

---

[6] The jury could infer that Defendants' failure to produce police reports were part of a pattern, not just random oversight. For example, Defendant Liberto spoke with Annette Pasqualone two days after the murder, but generated no police report about what she said. When Pasqualone was called by the prosecution at Gary's trial, he could not cross her on anything she previously said. RA1293, ¶40.

affected the outcome. *United States v. Tucker*, 61 F.4th 194, 207-08 (1st Cir. 2023) ("[T]he strength of impeachment evidence and the effect of suppression are evaluated in the context of the entire record to determine materiality.").

### 3. Giroux's Brother's Bombshell

In addition to everything else, there was testimony from which jurors could infer that Defendant Liberto withheld an extremely significant lead. Specifically, Giroux's brother, David, testified at his deposition that Giroux returned home on the night of the murder with blood on his clothes, and that David provided that information to a police officer he believes was Liberto. RA1291, ¶26-27.

If that testimony is credited, Plaintiff's *Brady* claim cannot be dismissed. Prior to Michael's confession, Giroux was the only suspect, and there were reasons for suspicion. *Id.* Additional proof that his own brother observed him with unexplained bloody clothes that night undoubtedly could have tipped the scales.

David's information was not put into any known police report or otherwise disclosed to prosecutors or the criminal justice system. *Id.* ¶¶28-29. In fact, the Milford police report for David Giroux's interview (assuming for Rule 56 purposes that it once existed[7]) has disappeared altogether. *Id.* It was never produced, which

---

[7] Per Plaintiff's expert, national police standards support an expectation that this sort of lead (especially coupled with the also-undisclosed information known to Defendants that a suspect had previously been accused of stealing from the victim) would in fact have been documented in a police report. RA1291, ¶¶28-29.

was a clear *Brady* violation. *Trammell v. McKune*, 485 F.3d 546, 552 (10th Cir. 2007) (suppression of evidence of alternative suspects violates *Brady*).

The district court's opinion did not, and could not, take issue with the proposition that a *Brady* violation would be established if David reported his brother's bloody clothes to one of the Defendants. The court rejected this *Brady* claim anyway for an unconventional reason: the court simply did not believe David Giroux, and did not find his 2024 deposition testimony credible. RA2950.

That sort of credibility judgment is a totally improper basis for summary judgment. While David was not absolutely sure, he testified that he believed that one of the two officers he told about the bloody clothes was Detective Liberto. RA998-99. Especially given that Liberto was actually one of the two officers assigned by Milford to this investigation, that level of recollection should have sufficed. *United States v. Innamorati*, 996 F.2d 456, 473 (1st Cir. 1993) (clarity of witness testimony is a credibility issue for a factfinder).

The district court nonetheless chose not to credit David's deposition testimony for several reasons. None hold up to scrutiny.

First, despite David's clear memory of the police interview, the court noted that there exists no documentary proof (no report or notes) confirming that any officer from either Milford or CPAC ever actually interviewed David. RA2950. This chain of reasoning draws inferences in exactly the wrong direction. If

inferences are credited in Plaintiff's favor, as opposed to the other way around, the lack of paperwork hardly proves that David is misremembering. It proves that the police suppressed the written record of the interview.

The second reason the court refused to credit David's deposition testimony was because he previously signed an affidavit in connection with Plaintiff's motion for a new trial claiming to be uncertain whether he spoke to the police back in 1979. *Id.* While that discrepancy might well give Defendants fertile grounds for cross-examination, it is nothing but a run-of-the-mill prior inconsistent statement. There are jury instructions for when a witness testifies to two different things under oath. What Rule 56 forbids, however, is the court deciding for itself which version to believe.

Upon reflection, it is hardly uncommon for witnesses to change stories in wrongful conviction cases. Recanting witnesses disavow testimony or affidavits they previously provided under oath for all kinds of reasons, including, *e.g.,* fear of accusing the police of wrongdoing at the time of the original statement. *See Reese v. Herbert*, 527 F.3d 1253, 1271 (11th Cir. 2008) (court erred by disregarding affidavits recanting prior sworn testimony at summary judgment). When a witness recants one story in favor of another, only a jury can decide which is credible.[8]

---

[8] An inapplicable exception exists under the "sham affidavit" rule, which prohibits witnesses from contradicting prior deposition testimony with new affidavits. This is not that. In fact, it is the exact opposite. Where a witness contradicts prior sworn

Lastly, the court rejected David's testimony as not credible because Gary's "own motion for a new trial" had argued back in 2019 that there was no known evidence that police interviewed David. RA2950. The court's logic is once again backwards. While it was entirely true that Gary did not know about David's interview as of 2019, and only learned it years later at David's civil deposition, that nondisclosure is precisely why this newly learned fact supports a *Brady* claim.

### 4. Giroux Was A Milford Police Informant

While it might have seemed a stretch to persuade a jury that Milford would have been interested in protecting Giroux, it turned out that Milford had a motive. The record contains evidence that Giroux was a long-time informant for police agencies, including Milford. Shortly before the murder, Giroux bragged to friends, including Terhune, that he was getting paid by the Milford police department for undercover work. RA2007-08, 2012. According to CPAC, Giroux continued being a police informant at least into the 1990s. RA2059-62.

At Gary's trial, no one mentioned any of that to Gary's defense team. There are no police reports or other disclosures on this subject.

In summary, a valid jury question has been presented as to whether the

---

statements at his deposition (as opposed to contradicting deposition testimony with a new affidavit), the proper outcome for summary judgment purposes is to view the evidence in the light most favorable to the nonmovant, and permit impeachment at trial. *Herbert*, 527 F.3d at 1270-71 & n.28.

Milford Defendants withheld various items of exculpatory evidence, the collective totality of which could have affected the outcome of Gary's criminal trial. Summary judgment on this claim was therefore inappropriate too.

### III. Summary Judgment Should Not Have Been Granted On Plaintiff's Conspiracy Claim

The district court granted summary judgment on Gary's conspiracy claims for failure to allege anything rising above "speculation and conjecture." RA2975. As pointed out in Plaintiff's response to Defendants' summary judgment motion, Defendants did not even move on this count, RA2889, so dismissal was improper. Any arguments that Defendants might have made are now forfeited. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

Defendants' clear forfeiture notwithstanding, the court erred in granting summary judgment on Plaintiff's conspiracy claim. Such claims lie where two or more defendants work together to violate constitutional rights and then take steps in furtherance of that common objective. *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008). Conspirators rarely sign contracts; proof is almost always circumstantial, and frequently presents factual questions for the jury. *Santiago v. Fenton*, 891 F.2d 373, 389 (1st Cir. 1989).

Here, there is evidence that: (a) officers from both agencies participated in both interrogation sessions, and conferred before questioning; (b) Doheny's misleading report falsely suggested that Michael was able to give a coherent and

orderly narrative; and (c) Milford and CPAC worked together to swap Gary for Cananzey as the co-perpetrator when they jointly investigated and discovered the latter would not work. Only a jury can determine whether the Defendants conspired to violate Plaintiff's constitutional rights. *Gual Morales v. Hernandez Vega*, 579 F.2d 677, 680-81 (1st Cir. 1978) (allowing conspiracy claim to proceed despite "somewhat sparse" allegations because "great circumspection is required" where "summary judgment is sought on an issue involving state of mind").

## IV. Summary Judgment Should Not Have Been Granted On Plaintiff's Failure To Investigate Claim

Liability under section 1983 may be imposed "for failure to act, when there is a duty to act, to prevent [a constitutional] deprivation." *Clark v. Taylor*, 710 F.2d 4, 9 (1st Cir. 1983). While liability for failure to act most often arises in the supervisory context, "[e]ven absent supervisory authority, . . . a party's position of responsibility may impose upon him a duty to intervene to prevent a constitutional violation." *Id.* For instance, a police officer has a duty to "stop other officers who summarily punish a third person in his presence or otherwise within his knowledge," as "to hold otherwise would be to insulate nonsupervisory officers from liability for reasonably foreseeable consequences of the neglect of their duty to enforce laws." *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972).

Plaintiff's failure-to-investigate claim is premised on Milford officers' failure to conduct further investigation into Giroux's role. To be clear, Plaintiff

concedes almost every point in the district court's discussion of this claim. This includes the conclusions that the WCDA and CPAC were the lead investigators who "directed and controlled" the investigation; that Milford detectives were assigned discrete tasks; and that there is no indication WCDA and CPAC even shared information. RA2971.

All of that notwithstanding, where the court went wrong was in jumping from (a) the fact that MPD did not control the investigation and had a limited role, to (b) the conclusion that MPD therefore had no duty to take any steps beyond what they were asked to do. RA2971-72. That leap lacks support in the law.

## A. Milford Assumed A Duty

Even if the district court is correct that Milford started with no duty to do anything, that changed when Milford undertook its own effort to investigate leads. Defendants may well have had no duty to speak to David Giroux or Gary Terhune, but once they did, they could not disregard or "un-hear" the powerful evidence they (but not WCDA or CPAC) learned about Giroux's guilt. *Clark*, 710 F.2d at 9; *Santiago v. Keyes*, 890 F. Supp. 2d 149, 158 (D. Mass. 2012) (officer failing to act on information that would have exonerated plaintiff may establish § 1983 liability); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that any

constitutional violation has been committed by a law enforcement official.").

The situation is analogous to the good Samaritan, who has no obligation to intervene, but once he does, assumes duties to comport with a standard of care. RESTATEMENT (SECOND) OF TORTS §§ 314, 323, 324, 324A (1965).

### B. The District Court Also Erred In Finding That Probable Cause Defeated This Claim

The district court also rejected the failure-to-investigate claim after finding that Michael's confession plus the bitemark evidence developed thereafter supplied probable cause, thereby eliminating any need for Defendants to push further. This conclusion, too, collapses because it disregards the chronology: Even if Michael's confession plus the bitemark supplied probable cause, Plaintiff's failure-to-investigate claim surrounds Liberto's lack of follow up on David's lead shortly after the murder, long before the basis for probable cause on which the court relied.

In sum, the MPD Defendants may have started with no duty to do anything. But having undertaken to investigate leads and talk to witnesses without CPAC present, they assumed a duty to properly carry out their law enforcement responsibilities, consistent with the applicable standard of care. Having been told by David Giroux that his brother (a suspect in the crime) came home that night covered in blood, Liberto could not just sit on that information, at least not without

creating liability to a man who spent 35 years in prison for Giroux's crime.[9]

## Conclusion

Summary judgment should be reversed in part, with the case remanded for trial against Defendants Liberto, Little, DiGirolamo, and Chianese on Plaintiff's Section 1983 claims for fabrication, withholding of exculpatory evidence, failure to investigate, conspiracy, and supervisory liability, plus the *Monell* claim.

RESPECTFULLY SUBMITTED,

**GARY CIFIZZARI**

 /s/ Jon Loevy
*Counsel for Gary Cifizzari*

Jon Loevy (1st Cir. No. 1142987)
Steve Art (1st Cir. No. 1201595)
Mark Loevy-Reyes (1st Cir. No. 1201593)
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, Illinois 60607
jon@loevy.com
P: (312) 243-5900
F: (312) 243-5902

---

[9] The district court granted judgment on the supervisory liability and *Monell* claims not on the merits, but on the grounds that Plaintiff had no surviving underlying claims. RA2973-74. Because the district court erred in granting judgment on the substantive claims, these claims should not be dismissed either.

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7)(B)(i)

I, Jon Loevy, hereby certify, pursuant to Federal Rule of Appellate Procedure 32(g)(1), that the foregoing Brief of Plaintiff-Appellant Gary Cifizzari complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,972 words, excluding those portions of the brief listed in Federal Rule of Appellate Procedure 32(f) that do not count toward the word limitation. I relied on the word-count feature in Microsoft Office 365.

/s/ Jon Loevy
*Counsel for Gary Cifizzari*

Jon Loevy (1st Cir. No. 1142987)
Steve Art (1st Cir. No. 1201595)
Mark Loevy-Reyes (1st Cir. No. 1201593)
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, Illinois 60607
jon@loevy.com
P: (312) 243-5900
F: (312) 243-5902

# CERTIFICATE OF SERVICE

I, Jon Loevy, hereby certify that I served the Corrected Brief of Plaintiff-Appellant Gary Ciffizari on November 6, 2025, using the Court's CM/ECF system, which affected service on all counsel of record for the Defendant-Appellee.

/s/ Jon Loevy
*Counsel for Gary Cifizzari*

Jon Loevy (1st Cir. No. 1142987)
Steve Art (1st Cir. No. 1201595)
Mark Loevy-Reyes (1st Cir. No. 1201593)
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, Illinois 60607
jon@loevy.com
P: (312) 243-5900
F: (312) 243-5902

No. 25-1667

# United States Court of Appeals
### For the First Circuit

GARY CIFIZZARI
*Plaintiff - Appellant*

v.

TOWN OF MILFORD; VINCENT LIBERTO, former Milford Police Officer;
JOHN CHIANESE, former Milford Police Officer; TODD A. GATTONI, as
personal representative of the Estate of Anthony Digirolamo; FRANCIS X.
SMALL, as personal representative of the Estate of Donald Small,
*Defendants - Appellees,*

JOHN AND JANE DOES 1-20,

*Defendants.*

Appeal from the United States District Court
for the District of Massachusetts
Case No. 4:22-cv-40139-MRG

## LOCAL RULE 28.0 ADDENDUM TO BRIEF OF PLAINTIFF-APPELANT GARY CIFIZZARI

Jon Loevy
Steve Art
Mark Loevy-Reyes, BBO# 707974
LOEVY + LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
P: (312) 243-5900
F: (312) 243-5902
jon@loevy.com

November 6, 2025

# TABLE OF CONTENTS TO ADDENDUM

Show Cause Order, Cifizzari v. Town of Milford, et al.,
No. 4:22-cv-40139-MRG (D. Mass) dated May 23, 2025,
[ECF 136].................................................................................Addendum 1

Order on Defendants' Motion for Summary Judgment,
Cifizzari v. Town of Milford, et al., No. 4:22-cv-40139-MRG
(D. Mass) dated July 9, 2025, [ECF141] ..................................Addendum 3

Final Judgment on Defendants' Motion for Summary Judgment,
Cifizzari v. Town of Milford, et al., No. 4:22-cv-40139-MRG
(D. Mass) dated July 9, 2025, [ECF142] ..............................Addendum 38

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

GARY CIFIZZARI,                          )
                                         )
     Plaintiff,                        )
                                         )
v.                                       )          Civil No. 4:22-cv-40139-MRG
                                         )
TOWN OF MILFORD, FORMER                  )
MILFORD POLICE OFFICERS                  )
VINCENT LIBERTO, JOHN                    )
CHIANESE, FORMER MILFORD                 )
POLICE SGT'S ANTHONY                     )
DIGIROLAMO AND DONALD                    )
SMALL, AS WELL AS-YET                    )
UNKNOWN POLICE OFFICERS AND              )
ADDITIONAL AS-YET UNKNOWN                )
POLICE SUPERVISORS, HEREIN               )
REFERRED TO AS JOHN AND JANE             )
DOES 1-20,                               )
                                         )
     Defendants.                       )

---

## SHOW CAUSE ORDER

In preparation for the upcoming Summary Judgment Motion Hearing, the Court directs the parties to
each file a brief supplemental memorandum that addresses the questions listed below by June 3, 2025.
The memorandum should include specific citations to case law and the record and may not exceed five
double-spaced pages.

**I.**    **Michael Cifizzari's Confession:**

  **A. Justiciability:** Does Gary Cifizzari have standing to contest the voluntariness of Michael
     Cifizzari's confession?

  **B. Issue Preclusion:**

*"[A] party to a civil action against a former criminal defendant may invoke the doctrine of collateral
estoppel to preclude the criminal defendant from relitigating an issue decided in the criminal
prosecution." Aetna Cas. & Sur. Co. v. Niziolek, N.E.2d 1356, 1360 (Mass. 1985). "Under
Massachusetts law, issue preclusion (or collateral estoppel) is appropriate where there is 'an identity of
issues, a finding adverse to the party against whom it is being asserted, and a judgment by a court or*

1

*tribunal of competent jurisdiction.'" Kyricopoulos v. Orleans, 967 F.2d 14, 16 (1st Cir. 1992) (per curiam) (quoting Miles v. Aetna Casualty & Surety Co., 589 N.E.2d 314, 317 (Mass. 1992)). "Massachusetts no longer requires mutuality of parties to invoke issue preclusion. Thus, where the party in whose favor collateral estoppel is to be applied was not a litigant in the original action, the central inquiry is whether the party against whom issue preclusion will be applied had a fair opportunity to litigate the issue fully or whether reasons exist to afford the party a chance to relitigate the issue." Kyricopoulos, 967 F.2d at 16 (citing Brunson v. Wall, 541 N.E.2d 338, 341 (Mass. 1989)).*

    i.    Was the issue of the voluntariness of Michael Cifizzari's interrogation at the Milford Police station fully litigated in *Gary Cifizzari's* criminal proceedings?

    ii.    What reasons exist that justify affording Gary Cifizzari a chance to relitigate whether Michael Cifizzari's confession was coerced?


## II.    <u>Failure to Investigate:</u>

*To show that the Milford Police Officers were obligated to conduct further inquiry under the present circumstances, Plaintiff must allege that the information known to the Milford Police gave those officers "an obvious reason to doubt" that Gary Cifizzari had committed the murder of Concetta Shiappa such that the officers' failure to conduct an additional inquiry "evinced a reckless disregard for the truth." Abubardar v. Gross, 542 F. Supp. 3d 69, 75 (D. Mass. 2021) (quoting United States v. Tanguay, 787 F.3d 44, 53-54 (1st Cir. 2015)).*

    i.    What non-hearsay evidence in the record can support a claim for failure to investigate?

    ii.    Is there evidence in the record that was contemporaneous to the investigation in 1979-1984 that could support a claim for failure to investigate?


## III.    <u>Causation</u>

*The parties should be prepared to discuss at the hearing whether Plaintiff can show that the Milford Police Officers, as opposed to the State Police, caused a violation of Gary Cifizzari's rights. No supplemental written response is required for this topic.*


SO ORDERED.

Dated: May 23, 2025

                      /s/ Margaret R. Guzman
                    Margaret R. Guzman
                    United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **GARY CIFIZZARI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 4:22-cv-40139-MRG** |
| | ) | |
| **TOWN OF MILFORD, FORMER** | ) | |
| **MILFORD POLICE OFFICERS** | ) | |
| **VINCENT LIBERTO, JOHN** | ) | |
| **CHIANESE, FORMER MILFORD** | ) | |
| **POLICE SGT.S ANTHONY** | ) | |
| **DIGIROLAMO AND DONALD** | ) | |
| **SMALL, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

### ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 117]

**GUZMAN, J.**

Plaintiff Gary Cifizzari brings this suit against the Town of Milford and several former Milford Police Department ("MPD") officers alleging violations of his civil rights stemming from his 1984 wrongful conviction for the murder of Concetta Schiappa. Before the Court is Defendants' Motion for Summary Judgment, ECF No. 117. For the reasons stated below, the motion is **GRANTED** as to all counts.

### I.    BACKGROUND[1]

The events giving rise to this case began on September 29, 1979, but as is often true in matters involving wrongful convictions, the tragedy did not end there. Instead, these events

---

[1] The facts are drawn from Plaintiff's Amended Complaint [ECF No. 65], Plaintiff's Response to Defendants' Joint Local Rule 56.1 Concise Statement of Undisputed Material Facts [ECF No. 122], Response of Milford Defendants to Plaintiff's Local Rule 56.1 Statement of Material Facts [ECF No. 131], and the documents cited therein.

culminated in an innocent man spending nearly thirty-five years in prison for a murder he did not commit. In seeking to address this profound injustice, the Court must now sift through a tangled web of facts dating back four decades.

Although the parties agree that certain basic events took place, they dispute many facts and the inferences that should be drawn from the evidence before the Court. Because Defendants have moved for summary judgment, the Court must review the evidence in the light most favorable to Plaintiff, who opposes summary judgment, and make all reasonable inferences in his favor. See Fed. R. Civ. P. 56(a); SEC v. Sharp, 692 F. Supp. 3d 9, 10 (D. Mass. 2023). However, the Court's analysis is limited to considering only those facts which are admissible and relevant to the legal issues at hand. Moreover, as this matter appears on summary judgment, the Court must distinguish which facts are truly material and consider whether – in the face of undisputed *material* facts – legal standards constrain Plaintiff's claims such that the Defendant is entitled to judgment as a matter of law. See Triumph Foods, LLC v. Campbell, 742 F. Supp. 3d 63, 69 (D. Mass. 2024) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

### A. The Murder

Between September 28 and 29, 1979,[2] Milford, Massachusetts resident, Concetta Schiappa, was murdered in her apartment. [ECF No. 122 ¶ 1]. Her body was discovered by her upstairs landlord on the morning of September 29, 1979, and the homicide was initially reported to the MPD. [ECF No. 117 at 7; ECF No. 122 ¶ 26]. The officers determined that the death had been a homicide. [ECF No. 122 ¶ 2]. A broomstick had been pushed inside the victim's body, and there were bitemarks on her body. [ECF No. 131 ¶¶ 2–3].

---

[2] The date of death is not established, as Mrs. Schiappa was last seen alive on September 28, 1979 and it is unknown if Mrs. Schiappa died before or after midnight on the 28th. [ECF No. 122 ¶ 1; Am. Compl. ¶ 18, ECF No. 65].

### B.  Control of the Murder Investigation

Although Mrs. Schiappa was murdered in Milford, pursuant to a state statute, the Worcester County District Attorney ("WCDA"), rather than the MPD, directed the investigation. [ECF No. 122 ¶ 5; Mass. Gen. Laws ch. 38, § 4[3]]. The Crime Prevention and Control ("CPAC") Unit is a unit of the State Police that works with the WCDA and handles murder investigations in the county, except in the City of Worcester. [ECF No. 122 ¶ 7]. While Plaintiff objects to the characterization of the WCDA and CPAC "coordina[ting], direct[ing], and control[ling]" the Schiappa murder investigation, he does not dispute that the WCDA was the agency that was overall responsible for conducting the investigation and that a CPAC Unit detective was the lead investigator. [Id. ¶¶ 4, 8, 10–11]. Additionally, the plain language of the statute stipulates that the WCDA "shall *direct and control* the investigation" of a death falling under its purview. Mass. Gen. Laws ch. 38, § 4 (emphasis added). Further, the decision to indict and prosecute Plaintiff rested squarely with the WCDA, with the investigation led at the time by Assistant District Attorney ("ADA") Lawrence Murphy. [ECF No. 122 ¶ 19]. Therefore, the Court concludes that the WCDA and CPAC directed and controlled the murder investigation and Plaintiff's subsequent prosecution.

The extent to which certain Defendant MPD officers participated in the murder investigation is somewhat disputed, although the dispute centers more on the characterization of their coordination with WCDA and CPAC rather than on a dispute that WCDA and CPAC were largely in charge. [See id. ¶¶ 59–66]. It was standard protocol during CPAC investigations to

---

[3] Mass. Gen. Laws ch. 38, § 4 provides that in the event of a death "due to violence or other unnatural means or to natural causes that require further investigation," "the district attorney or his law enforcement representative shall *direct and control* the investigation of the death and shall coordinate the investigation with the office of the chief medical examiner and the police department within whose jurisdiction the death occurred." (emphasis added).

request local law enforcement to accompany CPAC investigators on interviews, particularly when witnesses resided in that locality. [Id. ¶ 61].

The six individual defendants in this case worked for the MPD, and each had varying levels of involvement in the investigation of Mrs. Schiappa's homicide. A brief summary of the role of each defendant, as well as key non-defendant members of the investigation into Mrs. Schiappa's murder, follows:

- Vincent Liberto: Defendant Liberto was an MPD detective. [Id. ¶ 56]. He responded to the murder scene along with several other members of the Milford Police. [Id.] Det. Liberto also accompanied CPAC investigators on a few witness interviews. [Id. ¶¶ 74, 78, 82, 84]. In November 1980, Det. Liberto and Sgt. Small transported Plaintiff's brother and co-defendant, Michael Cifizzari, to a psychiatric hospital for involuntary commitment, and conversed with Michael during the ride about the victim, Mrs. Schiappa, who was the Cifizzari brothers' great-aunt. [Id. ¶¶ 95–98]. After Plaintiff's trial and conviction, Det. Liberto served as the Chief of the MPD. [ECF No. 131 ¶ 174].

- John Chianese: Defendant Chianese was a patrol officer with the MPD. [ECF No. 122 ¶ 58]. Officer Chianese grew up in Milford and knew Michael Cifizzari as being "about two grades behind [him] in school." [ECF No. 131 ¶ 49]. Officer Chianese was present at an interrogation[4] with Michael Cifizzari, at the Milford Police Station on February 26, 1981. [ECF No. 122 ¶ 58]. Officer Chianese wrote down Michael Cifizzari's statements during the interrogation. [Id. ¶¶ 58, 115]. Following that interrogation, together with Sgt.

---

[4] Defendants refer to Michael Cifizzari's interaction at the MPD Station as an "interview," whereas Plaintiff refers to it as an "interrogation." [See, e.g., ECF No. 122 ¶ 113]. Judge Francis Keating who ruled on Michael Cifizzari's Motion to Suppress determined that the conversation was a "custodial" "interrogation." [See Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983), ECF No. 118-2 at 192]. Accordingly, the Court will refer to the conversation as an interrogation.

DiGirolamo and Officer Sullo, Officer Chianese transported Michael Cifizzari from the Milford Police Station to the State Police CPAC office in Worcester. [Id. ¶ 58]. Officer Chianese was never officially assigned to investigate the Schiappa murder. [ECF No. 131 ¶ 42].

- Anthony DiGirolamo: Defendant DiGirolamo was an MPD sergeant. [ECF No. 122 ¶ 55]. Although Sgt. DiGirolamo was never officially assigned to investigate the Schiappa murder, [ECF No. 131 ¶ 42], he conducted the interrogation of Michael Cifizzari at the Milford Police Station on February 26, 1981, [ECF No. 122 ¶ 55]. Sgt. DiGirolamo knew Michael since he was about twelve years old and had been his football coach when Michael was a child. [ECF No. 131 ¶ 51]. Together with Officers Chianese and Nicholas Sullo, Sgt. DiGirolamo transported Michael Cifizzari from the Milford Police Station to the State Police CPAC Office in Worcester after Michael's interrogation. [ECF No. 122 ¶ 55]. Sgt. DiGirolamo is deceased. [Id.]

- Donald Small: Defendant Small was a MPD detective sergeant. [Id. ¶ 57]. Det. Sgt. Small attended witness interviews with State Police officers. [Id. ¶¶ 57, 76, 77, 79, 80, 81, 83, 85, 86]. Det. Sgt. Small accompanied Det. Liberto in transporting Michael Cifizzari to the psychiatric hospital in November 1980. [Id. ¶ 90].  Det. Sgt. Small is deceased. [Id. ¶ 57].

- Joseph Doheny: Doheny, not a named defendant, was a Sergeant of the State Police CPAC Unit in Worcester and the lead detective on this case. [Id. ¶¶ 11, 14, 18, 48; Murphy Dep., ECF No. 118-2 at 365:10–11; Michael Cifizzari Trial Tr. 244:2–4, ECF No. 118-2 at 244:2–4]. Sgt. Doheny conducted the State Police interrogation of Michael Cifizzari on February 29, 1981 at the CPAC Office in Worcester. [ECF No. 122 ¶¶ 134-44]. It was

during this interrogation that Michael Cifizzari implicated Plaintiff Gary Cifizzari in the murder of Mrs. Schiappa. [Id. ¶ 130]. Sgt. Doheny is deceased. [Id. ¶ 48].

- Robert Meier: Trooper Meier, not a named defendant, was a State Police CPAC investigator on the case, and was the main detective handling the bitemark evidence and impressions. [Id. ¶ 12; Murphy Dep. at 364:20–23].

- Thomas White: Trooper White, not a named defendant, was a State Police CPAC investigator on the case. [ECF No. 122 ¶ 50]. Trooper White arrived at the Milford Police Station on the morning of February 26, 1981, to be briefed on and participate in Michael Cifizzari's interrogation. [Michael Cifizzari Trial Tr. at 225:20–226:2, ECF No. 124-2]. Trooper White also conducted some witness interviews. [ECF No. 122 ¶¶ 76–81].

### C. Initial Collection of Evidence

The homicide was initially reported to the MPD, who contacted the CPAC Unit to take over the investigation. [Id. ¶¶ 26, 28–30]. The State Police and the State Crime Lab collected physical evidence, and the State Crime Lab was responsible for analyzing it. [Id. ¶¶ 34-37]. It is undisputed that the MPD did not possess or control physical evidence in the murder investigation. [Id. ¶ 67]. An autopsy on the victim was performed on September 29, 1979 by Dr. Ambrose Keeley. [Id. ¶ 40]. Prior to conducting the autopsy, Dr. Keeley contacted Dr. Arthur Schwartz, a Forensic Dentist of the Tufts School of Dentistry, and the State Police asked Dr. Schwartz to attend the autopsy. [Id. ¶¶ 42–43]. Dr. Schwartz examined the bitemarks on the body of the victim, and then made a cast of the bitemarks located on the victim's stomach. [Id. ¶ 44]. Trooper Meier was the main detective handling the bitemark evidence and impressions. [Id. ¶ 12]. To Trooper Meier's knowledge, MPD officers had no role in the decision to have Dr. Schwartz attend the autopsy,

examine the bitemarks on the victim, or make a cast of the bitemark from the victim's stomach. [Id. ¶ 47].

In the weeks following the discovery of Mrs. Schiappa's murder, CPAC investigators accompanied by local MPD officers conducted interviews with neighbors and witnesses. [Id. ¶ 68]. Not all the facts relating to witness interviews are relevant to summary judgment, and many of the factual assertions are supported only by hearsay in the form of police reports and witness statements within them. The police reports are documents that, if introduced for the truth of the matter asserted, fit the definition of hearsay. See Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted."). However, the police reports fall within the business record exception to hearsay, Fed. R. Evid. 803(6), and would be admissible at trial. The same cannot be said for witness statements recorded in police reports. "Although the police officer who writes the report is acting in the regular course of business, the witness talking to the officer is not," and the witness's statements are not covered by the business record exception. United States v. Matta-Quiñones, Nos. 23-1132, 23-1134, 2025 U.S. App. LEXIS 14107, at *54 (1st Cir. June 9, 2025) (citing United States v. Vigneau, 187 F.3d 70, 75–76 (1st Cir. 1999)).

Relevant, but not material to summary judgment, is that Michael Giroux, the true killer of Mrs. Schiappa (as established by DNA evidence in 2019), was the investigation's murder suspect before Michael Cifizzari made his statement to Sgt. DiGirolamo in Milford in February 1981. [ECF No. 122 ¶¶ 93–94]. Michael Giroux was the brother-in-law of Mrs. Schiappa's neighbor, Kathy Duncan. [Id. ¶ 81]. Duncan reported that Giroux had visited the year before the murder and Mrs. Schiappa had accused him of seeing him leave her apartment before she discovered missing money. [Id.] Duncan stated that Giroux was living in Milford after recently returning from the U.S.

Army. [Id.] CPAC investigators interviewed Michael Giroux at least twice in the weeks after the murder. [Meier Aff. ¶¶ 21–30 (Def. Ex. 3, ECF No. 118-2 at 174–87)].

Throughout the current litigation, Plaintiff argues investigators failed to pursue various leads that would have led them to charging Michael Giroux with Mrs. Schiappa's murder. Plaintiff alleges that David Giroux, Michael Giroux's brother, stated to Det. Liberto and another officer that, on the night of Mrs. Schiappa's murder, Michael came to his house with blood on his clothes. [ECF No. 131 ¶ 26]. This assertion arises from David Giroux's 2024 deposition. [David Giroux 2024 Dep. (Def. Ex. 29, ECF No. 118-3 at 264–308)]. In his deposition, David Giroux states that two officers spoke with him a few days after the murder in 1979 to ask him some questions about his brother Michael. [Id. at 7:23–9:3]. While David Giroux initially speculated that the officer he spoke with might have been Det. Liberto, he also stated he knew Liberto as an officer generally because, "Just, you know, you know who the cops are in Milford[.]" [Id. at 22:1–10]. David Giroux could not remember if the officers worked for the MPD or the State Police, or a combination of the two. [Id. at 24:3–11]. There is no documentary evidence that any State Police investigator, individually or accompanied by an MPD officer, ever interviewed David Giroux any time after the murder. [ECF No. 131 ¶ 26]. Likewise, there is no documentary evidence that MPD officers ever interviewed or attended an interview with David Giroux. [Id.] Further, in an affidavit made for Plaintiff's 2019 motion for new trial, David Giroux asserted that he was "not certain if the police talked to [him] about the murder in 1979." [David Giroux Aff. (Def. Ex. 30, ECF No. 118-3 at 310–13)]. In his own motion for new trial, Plaintiff stated, "[t]here is no evidence that the police interviewed anyone else regarding Mr. Giroux's whereabouts on the night of the murder, including his brother David." [Gary Cifizzari Mot. for New Trial at 14 (Def. Ex. 10, ECF No. 118-3 at 2–95)].

Plaintiff also notes that Gary Terhune, Mrs. Schiappa's neighbor, had described to police seeing a white man, twenty-five to thirty-five years old, between 5'9" and 5'11" with an "Afro-type" haircut in Mrs. Schiappa's apartment around the time of the murder, a description which more closely matched the appearance of Michael Giroux than Gary Cifizzari. [ECF No. 131 ¶¶ 160–63]. Plaintiff asserts that the MPD Defendants hid this information. However, the final State Police report of the murder investigation that summarizes witness interviews includes a reference to Terhune's statement. [1979 State Police Report ¶ 10 (Def. Ex. 1, dated October 11, 1979, ECF No. 118-2 at 1–21); ECF No. 122 ¶ 69; ECF No. 131 ¶ 160]. While there may not be a separate document recording Terhune's statement, as appears for some other witness statements, the State Police record indicates that the CPAC investigators were aware of Terhune's observations and his statement was included in the investigative record. Plaintiff also does not indicate which "police" allegedly spoke with Terhune; however, the State Police report indicates it was Det. Sgt. Small and Trooper White who interviewed Terhune. [1979 State Police Report ¶ 10].

Plaintiff also alleges that Michael Giroux was a police informant and that the Defendant MPD officers framed the Cifizzari brothers to protect Giroux. [ECF No. 127 at 19–20]. There is no documentary or admissible testimonial evidence supporting Plaintiff's assertion that Giroux was an informant for the MPD at any time. There is evidence that Giroux served as an informant for the FBI, the Massachusetts State Police, and the Worcester Police; however, the earliest evidence establishes his cooperation with law enforcement beginning in 1991. [ECF No. 122 ¶ 325; ECF No. 131 ¶ 31].

It is undisputed that the State Police "looked at" Giroux as a suspect but could not show he knew the Cifizzaris or place him at the scene. [ECF No. 122 ¶ 318]. Michael Giroux was never charged with the murder of Mrs. Schiappa. [Id.] Once Michael Cifizzari made his statements to

Sgt. DiGirolamo and Sgt. Doheny in February 1981, the Cifizzari brothers became the primary murder suspects. [Id. ¶¶ 93–94].

### D.  Michael Cifizzari's Milford Police Department Interrogation

On February 26, 1981, at approximately 1:00am, Michael Cifizzari walked into the Milford Police Station, asking to spend the night there. [ECF No. 122 ¶ 99–100; 1979 State Police Report ¶ 1]. Present at the station were Sgt. DiGirolamo and Officer Chianese. [ECF No. 122 ¶ 103]. Sgt. DiGirolamo, Michael Cifizzari's former youth football coach, had previously allowed Michael Cifizzari to sleep at the station on multiple occasions. [Id. ¶ 101]. Michael Cifizzari had previously been diagnosed with schizophrenia and had stayed at a state treatment facility on several occasions. [Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983) ¶ 12 (Def. Ex. 26, ECF No. 118-3 at 185–94)]. Michael Cifizzari struggled to maintain employment and spent significant periods of time without housing. [Gary Cifizzari Mot. for New Trial at 9]. The ruling on Michael Cifizzari's motion to suppress indicates that often, Michael appeared to be on drugs when he came into the station, "[h]owever, on this night, Sgt. DiGirolamo observed the defendant to be sober, eyes clear and speech clear. [Michael] did not appear to be on drugs." [Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983) ¶ 2].

Around 1:00am or 1:30am, Sgt. DiGirolamo attempted to talk with Michael Cifizzari about Mrs. Schiappa's murder. [ECF No. 122 ¶ 107]. Mrs. Schiappa was Michael and Gary Cifizzari's great-aunt. [Id. ¶ 109]. Sgt. DiGirolamo read Michael Cifizzari his Miranda rights and Officer Chianese wrote out the Miranda rights on a card. [Id. ¶ 107–108; 1979 State Police Report ¶ 1]. On the Miranda form, Michael Cifizzari first signed his name as "Paul M. Cartney," after which Sgt. DiGirolamo instructed Michael to sign his own name, which he did. [ECF No. 131 ¶ 67].

The parties offer differing accounts of how the questioning unfolded. Defendants assert that Sgt. DiGirolamo asked Michael Cifizzari if he knew anything about the murder, to which he responded that he did, and then gave a narrative account during which he stated that he had gone to Mrs. Schiappa's house on the night she was murdered, attempted to get some money from her, was refused, became angry, and then killed her. [ECF No. 122 ¶ 109–10]. Michael Cifizzari also stated that his cousin Robert Cananzey was with him during the murder. [Id. ¶ 111]. Plaintiff contends that the interaction with Sgt. DiGirolamo was coerced interrogation where Sgt. DiGirolamo and Officer Chianese asked Michael Cifizzari leading questions and challenged him about facts related to the Schiappa murder and had him either agree or disagree. [ECF No. 131 ¶¶ 72–75].

Officer Chianese wrote down what Michael Cifizzari said during the interrogation. [Id. ¶ 80]. During the questioning, Sgt. DiGirolamo and Officer Chianese contacted Trooper White and requested that he come to the MPD station to participate and be briefed on Michael's statements. [ECF No. 122 ¶ 112]. Trooper White arrived and listened to the interrogation of Michael Cifizzari, but when he attempted to ask questions, Michael Cifizzari refused to answer him. [Id. ¶ 113]. Trooper White left the room and stood in the hallway, and Sgt. DiGirolamo questioned Michael for another half hour or less. [Id. ¶ 114].

Later, during his criminal prosecution, Michael Cifizzari moved to suppress his statements from this interrogation. After a two-day evidentiary hearing, Judge Francis Keating of the Massachusetts Superior Court denied the motion to suppress, holding Michael's statements were made voluntarily. [Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983)].  Judge Keating noted that Sgt. DiGirolamo's "fatherly" relationship to Michael "facilitated the confession"; that Michael "was not tricked or cajoled into making a statement"; that although Michael had struggled

with mental illness, he had "apparent clarity on the night in question"; and that Michael was capable of understanding the meaning and effect of his confession. [Id. Rulings of Law ¶¶ 1–4]. Judge Keating's ruling was later affirmed by the Massachusetts Appeals Court. Com. v. Cifizzari, 474 N.E.2d 1174 (Mass. App. Ct. 1985).

### D. Michael Cifizzari's CPAC Interrogation

Around 7:15am the same morning as the interrogation at the MPD station, Sgt. DiGirolamo and Officers Chinese and Sullo transported Michael Cifizzari to the CPAC office in Worcester. [ECF No. 122 ¶¶ 119, 134]. Sgt. Doheny introduced himself, read Michael Cifizzari his Miranda rights, and questioned him about the murder. [Id. ¶¶ 134-37]. Michael Cifizzari again confessed to the murder, although the details differed slightly from his account at the Milford station. [Id. ¶¶ 137–43]. The State Police Report indicates that Michael stated graphic and specific details about what he and his cousin Robert Cananzey had done to Mrs. Schiappa. [Id. ¶ 142; May 7, 1981 State Police Report ¶ 4 (Def. Ex. 7, ECF No. 118-2 at 398–403)]. Sgt. Doheny then asked Michael Cifizzari if he was sure that it was his cousin Cananzey that was with him, and not his brother, Gary Cifizzari. [ECF No. 122 ¶ 143]. Michael Cifizzari replied, "Yes, Gary was there." [Id.]

On February 26, 1981, Michael Cifizzari was held without bail. [Id. ¶ 156]. On February 27, 1981, Michael Cifizzari was examined by a court psychiatrist during arraignment at Milford District Court and was declared incompetent to stand trial. [Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983) ¶ 10]. Michael Cifizzari was then hospitalized until around October 1982, after which he was deemed competent to stand trial. [1984 Trooper Meier Report ¶¶ 1–2, (Def. Ex. 16, ECF No. 118-3 at 129–33)]. After his motion to suppress was denied in June 1983, in September of that same year, Michael Cifizzari was tried and convicted of second-degree murder.

[ECF No. 122 ¶ 157]. Michael Cifizzari appealed the conviction, and the conviction was affirmed by the Massachusetts Appeals Court. Cifizzari, 474 N.E.2d 1174.

### E.  Investigation of Gary Cifizzari

After Michael Cifizzari implicated his brother, Plaintiff Gary Cifizzari, Gary was located and Trooper Meier interviewed him. [ECF No. 122 ¶¶ 160–61]. Plaintiff denied being involved in the murder of Mrs. Schiappa. [Id. ¶ 160]. Trooper Meier also conducted the investigation into the bitemarks on the victim's body. [Id. ¶ 165]. MPD did not direct and was not involved in the decision or arrangements to make a cast of the victim's bitemarks. [Id. ¶ 182]. Plaintiff was not under arrest at the time of Trooper Meier's bitemark investigation, but consented to having his dental impression made to compare with the bitemark cast made of the victim. [Id. ¶ 166]. MPD was not involved in getting Gary Cifizzari's dental mold made. [Id. ¶ 213]. Trooper Meier and ADA Murphy travelled to Florida to recruit Dr. Richard Souviron to be an expert in the murder case on the dental evidence. [Id. ¶¶ 168–69]. Dr. Souviron's opinion was that Gary Cifizzari's teeth made the marks on Mrs. Schiappa's body. [Id. ¶ 170]. Dr. Arthur Schwartz, the expert who examined the bitemarks on Mrs. Schiappa's body during the autopsy, also formed the opinion that Gary Cifizzari's teeth matched the bitemarks on the victim's body. [Id. ¶ 168]. The dental evidence and concurring expert opinions were presented to the grand jury, which indicted Gary Cifizzari in November 1983 for the 1979 murder of Concetta Schiappa. [Id. ¶ 206]. Gary Cifizzari was arrested in November of 1983 for the murder of Mrs. Schiappa. [ECF No. 122 ¶ 174]. At the State Police CPAC office, Gary Cifizzari was questioned by Sgt. Doheny in Trooper Meier's presence, during which Cifizzari denied having anything to do with the murder. [Gary Cifizzari Statement (Def. Ex. 20, ECF No. 118-3 at 141); Meier Aff. ¶ 51].

### F.  Conviction of Gary Cifizzari and Post-Trial Proceedings

At Gary Cifizzari's trial in 1984, the Commonwealth relied on the testimony of three forensic dental experts, and each expert matched Gary Cifizzari's dental impression to the bitemarks left on the victim's body. [ECF No. 122 ¶ 222; see Com. v. Cifizzari, 492 N.E.2d 357, 361 (Mass. 1986) (hereinafter, "Gary Cifizzari 1986 SJC Appeal")]. The third dental expert witness, Dr. Anthony Captline, was hired by Gary Cifizzari's defense, but when presented with the expert opinions of Doctors Schwartz and Souviron, agreed that the forensic dental evidence proved that Gary Cifizzari's bitemarks matched those on Mrs. Schiappa's body. [ECF No. 122 ¶ 173]. Michael Cifizzari's initial confession at the Milford police station and his subsequent interrogation at the State CPAC office were not introduced at Gary Cifizzari's trial, although a witness at Gary Cifizzari's trial did reference Michael's confession once in her testimony.[5] [Id. ¶ 233; Gary Cifizzari Trial Tr. 7:5–9, ECF No. 124-4]. At the conclusion of trial, Gary Cifizzari was found guilty of first-degree murder. [ECF No. 122 ¶ 234].

Gary Cifizzari appealed his conviction, and the Massachusetts Supreme Judicial Court affirmed the judgment against him. [Id. ¶ 236; Gary Cifizzari 1986 SJC Appeal at 369]. On appeal, Plaintiff raised a number of arguments, including but not limited to, the admissibility of bitemark identification evidence; the statement of witness Annette Pasqualone referencing Michael Cifizzari's confession; introduction of the theory of joint venture; instruction of felony murder; and the prosecutor's remarks on closing argument regarding a reference to the Cifizzari brothers' smoking marijuana under a bridge after the murder. [ECF No. 122 ¶ 237; Gary Cifizzari 1986 SJC Appeal at 358]. Plaintiff did not base his appeal on any conduct by the MPD relative to Michael Cifizzari's questioning on February 26, 1981, or on evidence of Michael Cifizzari's confessions that were not introduced at trial. Nor did he argue ineffective assistance of counsel relative to the

---

[5] Plaintiff did challenge this witness' statement regarding Michael's confession in his appeal. Gary Cifizzari 1986 SJC Appeal at 364.

failure to introduce a third-party culprit defense relative to Michael Giroux or other State Police suspects. [ECF No. 122 ¶ 237].[6]

In 2006, Gary Cifizzari sought to have the physical evidence from the Schiappa murder investigation tested for DNA evidence. [ECF No. 133 ¶ 219]. In 2017, the New England Innocence Project represented Plaintiff in a renewed request to have the DNA evidence from the murder tested. [Id. ¶ 220]. Ultimately, the WCDA worked with the Innocence Project to test the physical evidence, and this DNA testing excluded Gary Cifizzari and identified Michael Giroux as the source of the semen on Mrs. Schiappa's nightgown. [Id. ¶¶ 221–22]. Plaintiff filed a Motion for a New Trial in state court in May 2019. [ECF No. 122 ¶ 239]. In December 2019, the Commonwealth entered a *Nolle Prosequi* on the count of first-degree murder. [Id. ¶ 241]. In May 2021, Gary Cifizzari and the Commonwealth of Massachusetts agreed to a settlement relative to claims brought or which could have been brought against the Commonwealth pursuant to the Massachusetts Erroneous Conviction statute. [Id. ¶ 242].

The state of forensic science has drastically changed since Gary Cifizzari's conviction, beginning around 2009, when a landmark report by the National Academy of Sciences cast serious doubt on multiple forms of forensic evidence which had previously been accepted by courts. [Gary Cifizzari Mot. for New Trial at 33; see National Research Council, *Strengthening Forensic Science in the United States: A Path Forward* (2009) ("NAS Report"), https://nap.nationalacademies.org/catalog/12589/strengthening-forensic-science-in-the-united-states-a-path-forward; McCrory v. Alabama, 144 S. Ct. 2483, 2484-85 (2024) (Sotomayor, J., dissenting) (discussing the import of the 2009 NAS Report, noting, "Since the NAS Report, the

---

[6] The Court acknowledges that Plaintiff may not have raised these claims in his 1986 appeal as some of the bases for the claims did not become known until bitemark science was rejected and DNA evidence revealed Plaintiff's innocence.

scientific community has shored up some methods of forensic evidence and left others behind."). The NAS report found "no basis existed to support the proposition that a forensic odontologist, looking at a bitemark on human skin, could individualize that mark to a potential biter." [Gary Cifizzari Mot. for New Trial at 34 (citation omitted)]. Subsequent scientific evaluations of bitemark evidence have drawn similar conclusions about its unreliability, and it is now "generally accepted scientific consensus that individualization testimony is inherently unreliable." [Id. at 29, 32].

## II.   **LEGAL STANDARDS**

### A.  **Summary Judgment**

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 244. "Materiality depends on the substantive law, and only factual disputes that might affect the outcome of the suit can preclude summary judgment." Triumph Foods, 742 F. Supp. 3d at 69 (citing Anderson, 477 U.S. at 248). In reviewing the evidence at the summary judgment stage, the Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Sharp, 692 F. Supp. 3d at 10  (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). "However, '[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" Fernando v. Fed. Ins. Co., No. 18-10504-MBB, 2022 U.S. Dist. LEXIS 44315, at *3 (D. Mass. Mar. 14, 2022) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). If a properly supported motion for summary judgment is submitted, the opposing party must "set forth specific facts showing that

there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250. The adverse party cannot "rest upon the mere allegations or denials of his pleading," but must instead "present affirmative evidence." <u>Id.</u> at 256–57. Inadmissible hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted. <u>Kenney v. Floyd</u>, 700 F.3d 604, 609 (1st Cir. 2012). Further, opposition to a motion for summary judgment must set forth such facts as would be admissible in evidence. <u>Quinones v. Buick</u>, 436 F.3d 284, 291 (1st Cir. 2006); Fed. R. Civ. P. 56(c)(4).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact." <u>Scott</u>, 550 U.S. at 380 (quoting <u>Anderson</u>, 477 U.S. at 247–48).

### B.  Article III Standing

Article III standing "is an 'indispensable part' of any case that must be present at every stage of the case." <u>In re Lantus Direct Purchaser Antitrust Litig.</u>, 512 F. Supp. 3d 106, 119 (D. Mass. 2020) (quoting <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 561 (1992)). This requirement "assures respect for the constitutional requirement that federal court jurisdiction be limited to actual "'Cases' and 'Controversies.'" <u>In re Lantus</u> at 119 (quoting <u>Hochendoner v. Genzyme Corp.</u>, 823 F.3d 724, 731 (1st Cir. 2016) (citing U.S. Const. art. III, § 2, cl. 1)). The "irreducible constitutional minimum of standing contains three elements." <u>Lujan</u>, 504 U.S. at 560. First, the plaintiff must have suffered an "injury in fact," that is both "(a) concrete and particularized[,]" and "(b) actual or imminent, not 'conjectural' or hypothetical[.]'" <u>Id.</u> Second, the injury must be "fairly traceable" to "the challenged action of the defendant." <u>Id.</u> Third, it must be "likely" that the injury will be "redressed by a favorable decision." <u>Id.</u> at 560–61 (citation omitted). "[T]he plaintiff bears the burden of establishing sufficient factual matter to plausibly demonstrate his standing to bring

the action . . . Neither conclusory assertions nor unfounded speculation can supply the necessary heft." Hochendoner, 823 F.3d at 731.

The fairly traceable element of Article III standing requires that the injury be "'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] independent action of some third party not before the court.'" Lujan, 504 U.S. at 560 (alterations in original) (quoting Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 41–42 (1976)). "When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." Lujan, 504 U.S. at 561–62. Further, when "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.'" Lujan, 504 U.S. at 562 (citing Warth v. Seldin, 422 U.S. 490, 505 (1975)).

### III.    DISCUSSION

Summary judgment hinges on whether there is a genuine dispute as to *material* facts, as well as on whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The evidence and events proposed by the Plaintiff are supported largely by hearsay evidence and do not have other record support that was contemporaneous to the time of the murder and investigation. While these accounts of alternative theories and potential uninvestigated leads are provocative and concerning, they are ultimately not material because, as discussed further below, Plaintiff's claims fail as a matter of law based on his inability to demonstrate causation.

There are a few undisputed material facts at play here. First, a state statute required the murder investigation to be overseen and directed by the WCDA and the CPAC unit of the State Police rather than the local MPD. Mass. Gen. Laws ch. 38, § 4. While Plaintiff may dispute the level of involvement of individual MPD officers, it is undisputed that WCDA was the agency that was overall responsible for conducting the Schiappa murder investigation and that a CPAC unit detective was the lead investigator. [ECF No. 122 ¶¶ 4, 8, 10–11].  Second, the key event which triggered Plaintiff's prosecution occurred during a CPAC, as opposed to MPD, interrogation.  It is undisputed that Gary Cifizzari was not implicated in the investigation of the murder of Mrs. Schiappa until his brother Michael falsely stated in his second confession at the CPAC office in Worcester that Gary was with him when he committed the murder. [Id. ¶¶ 93–94]. It is undisputed that the second confession was conducted by Sgt. Doheny of CPAC at the CPAC office in Worcester, and that no MPD officers asked Michael any questions. [Id. ¶¶ 150–51]. Third, Plaintiff Gary Cifizzari was primarily convicted based on bitemark evidence. It is undisputed that in his 2019 Motion for New Trial, Plaintiff asserted, "[t]he Commonwealth's case against Mr. [Gary] Cifizzari was predicated entirely on 'expert' bitemark comparison testimony;" and that "[t]he case against [Gary] Cifizzari began and ended with bitemark comparison evidence in the form of expert testimony." [Id. ¶ 221; Gary Cifizzari Mot. for New Trial at 14]. It is undisputed that the State Police controlled the use of the bitemark evidence, and Plaintiff does not counter that "[t]he Town of Milford and members of its Police Department did not direct, control or participate in any aspect of securing, assessing, evaluating or utilizing as evidence the dental evidence, from the initiation of the murder investigation through the conviction of Gary Cifizzari." [ECF No. 122 ¶ 207].  It is undisputed that Plaintiff was indicted following confirmation of Dr. Souviron's expert dental opinion that Plaintiff's teeth made the marks on Mrs. Schiappa's body. [Id. ¶ 218]. It is undisputed

that the WCDA controlled the prosecution and presented the dental experts who testified at Plaintiff's trial that Plaintiff's dental impression matched the bitemarks on Mrs. Schiappa's body. [Id. ¶ 222; Gary Cifizzari 1986 SJC Appeal at 360]. It is undisputed that Plaintiff entered into a $1 million settlement with the Commonwealth of Massachusetts, which includes the WCDA and the State Police, where Plaintiff released the Commonwealth from any of all claims which were brought, or which could have been brought pursuant to the Massachusetts Erroneous Conviction statute. [Settlement Agreement, ECF No. 118-3 at 181]. MPD and its officers were not parties to the settlement. [Id.]

As will be discussed below, these undisputed material facts entitle the Defendants to judgment as matter of law on Plaintiff's Section 1983 claims because the facts controvert Plaintiff's attempt to establish causation. The success of Plaintiff's claim under the Massachusetts Civil Rights Act depends on whether Plaintiff can establish Defendants' interference or attempted interference with civil rights "by threats, intimidation or coercion" in Michael Cifizzari's confession, which, as will be explained in Section III.C of this opinion, the Court finds Plaintiff lacks standing to challenge. See Mass. Gen. Laws Ann. ch. 12, § 11H.

### A.  **Michael Cifizzari's Confessions**

Plaintiff challenges prior court rulings that Michael Cifizzari's confessions were uncoerced and voluntary. As stated above, Michael Cifizzari's attorney did bring a motion to suppress his confession at the Milford Police Department on February 26, 1981. This motion was denied after a two-day evidentiary hearing, and was denied again on appeal. [Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983) at 194; Cifizzari, 474 N.E.2d at 1177].  As this is a wrongful conviction case with the benefit of hindsight, it is clear that Michael's statements at his confession were false. However, this Court cannot replace the rulings of the judges hearing the evidence and argument

on the motion to suppress at the time these events unfolded. While Michael's statements do not reflect the truth, that does not require a finding that his confession was coerced or involuntary.

Defendants assert that Plaintiff Gary Cifizzari is issue precluded from relitigating in this action whether Michael's confession at the Milford Police Department was coerced. "[A] party to a civil action against a former criminal defendant may invoke the doctrine of collateral estoppel to preclude the criminal defendant from relitigating an issue decided in the criminal prosecution." Aetna Cas. & Sur. Co. v. Niziolek, 481 N.E.2d 1356, 1360 (Mass. 1985). In other words, in some cases, a defendant in a Section 1983 action may invoke issue preclusion to preclude the plaintiff who was criminally prosecuted from relitigating an issue that was decided in their criminal prosecution.  "Under Massachusetts law, issue preclusion (or collateral estoppel) is appropriate where there is 'an identity of issues, a finding adverse to the party against whom it is being asserted, and a judgment by a court or tribunal of competent jurisdiction.'" Kyricopoulos v. Orleans, 967 F.2d 14, 16 (1st Cir. 1992) (per curiam) (quoting Miles v. Aetna Cas. & Sur. Co., 589 N.E.2d 314, 317 (Mass. 1992)). Here, Plaintiff Gary Cifizzari is seeking to challenge his brother Michael's confession, which was a main issue in Michael's rather than Gary's prosecution. "Massachusetts no longer requires mutuality of parties to invoke issue preclusion. Thus, where the party in whose favor collateral estoppel is to be applied was not a litigant in the original action, the central inquiry is whether the party against whom issue preclusion will be applied had a fair opportunity to litigate the issue fully or whether reasons exist to afford the party a chance to relitigate the issue." Kyricopoulos, 967 F.2d at 16 (citing Brunson v. Wall, 541 N.E.2d 338, 341 (Mass. 1989)).

There are certainly some reasons that go against precluding Plaintiff from contesting Michael's confession; however, the Court need not reach the issue because Plaintiff has failed to demonstrate a causal link between the actions of the MPD Defendants and his own wrongful

conviction. While Gary Cifizzari may not be issue precluded from contesting the voluntariness of his brother Michael's confession to either the MPD or the State Police, he lacks standing to raise such a challenge. First, while a defendant has a Fifth Amendment right to seek suppression of his own confessions, "the privilege against self-incrimination is personal to a defendant," and "a co-defendant cannot object to the admission of a confessing defendant's inculpatory statement on the ground that the confessing defendant's Fifth Amendment rights were violated." United States v. Robinson-Munoz, 961 F.2d 300, 303 (1st Cir. 1992) (citing Moran v. Burbine, 475 U.S. 412, 433 (1986)). In some circumstances, a defendant may have a valid objection to the inclusion of a co-defendant's statement at his trial based on the Confrontation Clause and the Bruton rule. See id. at 303 n.2; Bruton v. United States, 391 U.S. 123, 128–37 (1968). However, that is not the circumstance of the motion before the Court.

Even more general principles of standing indicate that Plaintiff cannot meet the causation requirement of the injury-in-fact prong of a standing analysis – that the injury be "'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] independent action of some third party not before the court.'" Lujan, 504 U.S. at 560 (quoting Simon, 426 U.S. at 41–42). It is undisputed that Plaintiff was not implicated in the murder until Michael Cifizzari was interrogated by Sgt. Doheny *of the State Police CPAC unit at the CPAC office in Worcester*, and that MPD officers did not question Michael Cifizzari at that interrogation  – only Sgt. Doheny asked questions. [ECF No. 122 ¶¶ 150–51, 159]. Therefore, the infirmity that Plaintiff complains of in Michael Cifizzari's confession cannot be attributed to the MPD Defendants, but rather to the independent actions of the State Police, who are third parties not before the Court. See Lujan, 504 U.S. at 560 (quoting Simon, 426 U.S. at 41–42). Accordingly, the Court will not disturb the findings of the state courts that presided over Michael Cifizzari's motion to suppress and appeal

of his conviction. [See Ruling on Michael Cifizzari Mot. to Suppress (June 22, 1983); Cifizzari, 474 N.E.2d at 1177 (finding no error in trial court's denial of motion to suppress statements; "Commonwealth had sustained its burden of proving that the defendant's confession was voluntary and was based on a knowing and intelligent waiver of Miranda rights.").

### B.  42 U.S.C. § 1983

Plaintiff brings nine claims under 42 U.S.C.§ 1983 ("Section 1983"), including unduly suggestive, biased, and otherwise improper identification procedures (Count 1), improper interrogation procedures and techniques (Count 2), fabricating false inculpatory evidence (Counts 3 and 4), failure to investigate (Count 5), malicious prosecution (Count 6), a Monell claim (Count 7), supervisory liability (Count 8), and conspiracy (Count 9). Section 1983 "creates a private right of action against any person who, under color of state law, 'subjects, or causes to be subjected, any . . person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]'" Yaghoobi v. Tufts Med. Ctr., Inc., 762 F. Supp. 3d 85, 92 (D. Mass. 2025) (alterations in original) (citing 42 U.S.C § 1983). "A claim under Section 1983 has two elements: 1) that the conduct complained of has been committed under color of state law, and 2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." Yaghoobi, 762 F. Supp. 3d at 92 (citation omitted). "To satisfy the second element, plaintiffs must show that the defendants' conduct was the cause in fact of the alleged deprivation." Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997). Section 1983 "imposes a causation requirement similar to that of ordinary tort law." Maldonado Santiago v. Velazquez Garcia, 821 F.2d 822, 831 (1st Cir. 1987); see Rodriguez-Cirilo, 115 F. 3d  at 52 ("In applying basic tort principles to the facts raised by a particular section 1983 claim, the causation requirement may be fleshed out with reference to state law tort principles.").

### 1. **John Doe Defendants**

Plaintiff brings Counts I-II, V-VI, & VIII-X against John Doe Defendants 1-20. Plaintiff has made no effort to name "John Does 1 – 20" or serve them with the Complaint or Amended Complaint. "Because these fictitiously named parties remained unidentified at the close of discovery," and because summary judgment is ripe for resolution, the claims against John Does 1–20 are hereby **DISMISSED**. Silva v. Town of Uxbridge, 771 F. Supp. 3d 56 n.1 (D. Mass. 2025); Figueroa v. Rivera, 147 F.3d 77, 82–83 (1st Cir. 1998) (affirming dismissal of claims against John Doe defendants because plaintiff made no attempt to serve them with the complaint and summary judgment was ripe for resolution).

### 2. **Counts I, II, & III**

Counts I, II, and III all pertain to Michael Cifizzari's confession at the Worcester CPAC office. Count I asserts a claim of unduly suggestive, biased, and otherwise improper identification procedures against the MPD Defendants. Count II asserts a claim of improper interrogation procedures and techniques against the MPD Defendants. Count III asserts a claim of fabrication of false inculpatory evidence against the MPD Defendants. As stated above, Plaintiff Gary Cifizzari cannot establish standing for these claims against the MPD Defendants because his alleged injuries are not fairly traceable to them given that Sgt. Doheny of the State Police, rather than any MPD officer, conducted the interrogation where Michael Cifizzari implicated Plaintiff. [ECF No. 122 ¶¶ 150–51, 159]; see Lujan, 504 U.S. at 560 (quoting Simon, 426 U.S. at 41–42).

For Count I, Plaintiff alleges the improper identification procedures utilized included "[q]uestioning and interrogating Michael Cifizzari" in "deteriorated mental state" and "asking Michael suggestively whether he was sure he had been with his cousin, and not his brother . . . at the time of the crime." [Am. Compl. ¶ 70]. Count II accuses the MPD Defendants of "interrogating

and questioning the severely mentally ill Michael Cifizzari, then later implicating the Plaintiff in the murder in additional interrogations." [Id. ¶ 74]. In Count III, Plaintiff alleges the MPD Defendants "fabricated inculpatory evidence" in Michael's confession, essentially asserting that the Defendants fabricated Michael's confession. [Id.] In addition to lacking standing, Plaintiff's claims in Counts I, II, and III substantively fail because Plaintiff cannot establish the element of causation. To establish causation for a claim under Section 1983, a plaintiff "must show that the defendants' conduct was the cause in fact of the alleged deprivation." Rodriguez-Cirilo, 115 F.3d at 52. The MPD Defendants did not ask any questions at Michael's CPAC office interrogation. [ECF No. 122 ¶ 151]. It was Sgt. Doheny who asked Michael Cifizzari if he was sure it was his cousin that was with him during the murder and not his brother Gary, to which Michael replied, "Yes, Gary was there." [Id. ¶ 143; ECF No. 131 ¶ 102; May 7, 1981 State Police Report ¶ 4]. To the extent Plaintiff's allegations in Count III refer to Michael's first interrogation at the MPD station,[7] Plaintiff was not implicated at all during that interrogation and his injuries are not traceable to Michael's statements made therein.

Plaintiff cites four out-of-circuit cases to argue that causation is met for his Section 1983 claims because the MPD Defendants "set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of [his] constitutional rights." [ECF No. 127 at 53 (quoting Conner v. Reinhard, 847 F.2d 384, 397 (7th Cir. 1988))]. Plaintiff's argument has two flaws. First, Plaintiff's wrongful conviction was not a foreseeable result of the MPD Defendants' interrogation of Michael Cifizzari at the MPD station in February 1981. The MPD Defendants did not raise Plaintiff's name in their conversation with Michael

---

[7] The Amended Complaint is unclear as to which interrogation Plaintiff is challenging: Michael's first interrogation at the MPD station or Michael's interrogation at CPAC. [See Am. Compl. ¶¶ 78–80].

Cifizzari, nor does the record suggest that Sgt. DiGirolamo and Officer Chianese took any action to implicate Plaintiff in Michael's statements. There is no evidence in the record that the MPD Defendants told Sgt. Doheny to ask Michael whether Plaintiff was involved in the murder, rather it appears that Sgt. Doheny acted independent of his own accord. While a "defendant will not be relieved of liability by an intervening cause that was reasonably foreseeable, even if the intervening force may have directly caused the harm," a defendant is "shield[ed]" from liability if "an unforeseen and abnormal intervention . . . breaks the chain of causality." Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir. 1989) (internal quotation marks and citations omitted). Second, Plaintiff was primarily convicted based on bitemark evidence, and it is undisputed that "[t]he Town of Milford and members of its Police Department did not direct, control or participate in any aspect of securing, assessing, evaluating or utilizing as evidence the dental evidence, from the initiation of the murder investigation through the conviction of Gary Cifizzari." [ECF No. 122 ¶ 207]. Moreover, CPAC investigators had already decided that bitemark evidence might be used in a future criminal prosecution for Mrs. Schiappa's murder a full seventeen months prior to Michael's interrogation in Milford, when the State Police contacted Dr. Schwartz to attend the victim's autopsy on September 29, 1979 and make dental impressions of the bitemarks on her body. [Id. ¶¶ 40–44]. Therefore, while the MPD Defendants' interrogation of Michael Cifizzari does form part of the chain of events that implicated Plaintiff in Mrs. Schiappa's murder, it is not the proximate cause of Plaintiff's wrongful conviction.

The Court pauses to note that Plaintiff – at best – erroneously confuses and – at worst – intentionally conflates the actions of the MPD Defendants and the State Police investigators in a manner that improperly portrays the MPD Defendants as having a more active role in the murder investigation and Plaintiff's prosecution than is supported by the record. [See e.g., ECF No. 131

¶¶ 82, 86 (Plaintiff incorrectly citing testimony relating to the State Police interrogation of Michael and attributing it to Sgt. DiGirolamo's interview of Michael at the MPD station); compare Am. Compl. ¶¶ 42 ("Along with Milford Police Sgt. DiGirolamo, Milford Officers Chianese and Nicholas Sullo, Sergeant Doheny began questioning Michael about his statements and asked Michael whether he was sure he had been with his cousin, and not his brother Gary, at the time of the crime") with ECF No. 122 ¶ 151 (Not disputed that "The Milford Police did not question Michael Cifizzari at the CPAC office, only Sgt. Doheny.")]. Despite this sleight of hand, the picture remains clear as to the material undisputed facts at issue. The MPD Defendants did not cause Plaintiff's injuries for Counts I through III. Accordingly, summary judgment is **GRANTED** on Counts I-III.

### 3. **Count IV**

Count IV asserts a fabrication of false inculpatory evidence claim against Richard Souviron, the dental expert who gave the opinion that Plaintiff's teeth made the marks on Mrs. Schiappa's body. [ECF No. 122 ¶ 218]. Plaintiff failed to name Dr. Souviron as a defendant in the Amended Complaint caption, Dr. Souviron was never served with notice of this action, and no attorney has filed an appearance on behalf of Dr. Souviron. Additionally, the allegations for Count IV in the Amended Complaint are verbatim copy and pasted from Count III and refer only to the actions of the MPD Defendants. Because Plaintiff failed to serve Dr. Souviron in accordance with the Federal Rules of Civil Procedure, and because Plaintiff has failed to allege any facts that would form a basis for his claim against Dr. Souviron, summary judgment is **GRANTED** as to Count IV.

### 4. **Count V**

Count V asserts a claim of failure to investigate against the MPD Defendants. "[T]he First Circuit has recognized that a duty to investigate may arise in certain circumstances even when an

officer has obtained facts that would otherwise be sufficient to establish probable cause." Abubardar v. Gross, 542 F. Supp. 3d 69, 75 (D. Mass. 2021) (citing Chapman v. Finnegan, 950 F. Supp. 2d 285, 296 (D. Mass. 2013)). Here, the Court finds that Michael Cifizzari's confession at the CPAC office implicating Plaintiff, and the expert opinions that affirmatively (albeit erroneously) linked Plaintiff's bite impression to the bitemarks on the victim's body would have been enough to establish probable cause for his arrest. Still, Plaintiff argues that the Defendants ignored other leads and evidence that would have led them to identifying Michael Giroux as the real killer, thus ruling out Plaintiff as a suspect.

To show that the MPD Defendants had a duty to conduct further inquiry under the circumstances, Plaintiff must allege that the information known to the Milford Police gave those officers "an obvious reason to doubt" that Plaintiff had committed the murder of Mrs. Schiappa, such that the officers' failure to conduct an additional inquiry "evinced a reckless disregard for the truth." Abubardar, 542 F. Supp. 3d at 75 (quoting United States v. Tanguay, 787 F.3d 44, 53-54 (1st Cir. 2015)). To meet the standard for "reckless disregard for the truth," '"negligence or innocent mistake [is] insufficient."' Tanguay, 787 F.3d at 52 (alterations in original) (quoting United States v. Davis, 617 F.2d 677, 694 (D.C. Cir. 1979)). Generally, "[t]he failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth." Tanguay, 787 F.3d at 51-52 (citations omitted). Liability for failure to investigate only applies when Plaintiff can establish an "affirmative link" between the "alleged investigatory deficiency and [the police officer's] violation of [the plaintiff's] constitutional rights[.]" Aldrich v. Town of Milton, 881 F. Supp. 2d 158, 173 (D. Mass. 2012) (quoting Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 95 n.11 (1st Cir. 1994)).

Count V fails because Plaintiff cannot establish the first step of the failure to investigate analysis, which requires that the defendant was under a duty to investigate further. See Tanguay, 787 F.3d at 54 ("[T]he court must first determine whether the information known to [the law enforcement officer] gave [them] an obvious reason to doubt [the truthfulness of another witness's statements] and, thus, triggered a duty of further inquiry."). Plaintiff objects to the characterization that the MPD officers did not direct and control the Schiappa murder investigation, and alleges that individual actions by Defendants DiGirolamo, Chianese, Liberto, and Small show they retained some direction over the investigation. [See ECF No. 122 ¶¶ 59–68]. The Court has already concluded that that the WCDA and CPAC directed and controlled the murder investigation and Plaintiff's subsequent prosecution. See Section I.B. "Control of the Murder Investigation," supra. Further, in an affidavit, Trooper Meier of CPAC testified that the MPD "did not coordinate, direct or control the Schiappa homicide investigation" and that "[i]nstead, Milford Police detectives were assigned discrete tasks by CPAC investigators, such as accompanying CPAC investigators during interviews." [Meier Aff. ¶ 13]. Trooper Meier's assertion is not hearsay, but rather a fact statement based on his personal knowledge of how the investigation was conducted, given that he was assigned to investigate the Schiappa murder as part of the CPAC unit in 1979. [Id. ¶ 5]. Meier's characterization of the control over the investigation is also supported by state law. See Mass. Gen. Laws ch. 38, § 4. There is no evidence in the record that the State Police or WCDA even shared information about their investigation of the Plaintiff with the MPD officers. Given that MPD did not control the investigation and the MPD Defendants had a limited role in accompanying CPAC investigators on local interviews, the Court does not find that the MPD Defendants were under a duty to investigate further than what they were asked to do by CPAC. Additionally, the record reflects that MPD officers did report some of the purported uninvestigated leads to the CPAC

investigators, such as the statement of Gary Terhune. [See 1979 State Police Report ¶ 10; ECF No. 122 ¶ 69; ECF No. 131 ¶ 160]. As Plaintiff cannot show that the MPD Defendants had a duty to investigate further, the Defendants are entitled to summary judgment as a matter of law on Count V.

### 5. <u>Count VI</u>

Count VI asserts a claim of malicious prosecution against the MPD Defendants. To prevail on a Section 1983 malicious prosecution claim, "a plaintiff must meet the common law elements" of the claim "and additionally demonstrate 'a deprivation of a federally-protected right.'" <u>Watson v. Mita</u>, 396 F. Supp. 3d 220, 224 (D. Mass. 2019) (quoting <u>Nieves v. McSweeney</u>, 241 F.3d 46, 53 (1st Cir. 2001)). Under Massachusetts common-law, the elements of a malicious prosecution require, "(1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice.'" <u>Watson</u>, 396 F. Supp. 3d at 225 (internal quotation marks and citations omitted). Further, a plaintiff "must establish that a named defendant commenced or continued the criminal proceedings against the Plaintiff . . . and must show that the defendant acted with 'improper purpose.'" <u>Id.</u> (citations omitted). A plaintiff suing pursuant to Section 1983 "must do more than merely satisfy the elements of the common law tort of malicious prosecution[,]" they "'must show a deprivation of liberty, pursuant to legal process, that is consistent with the concept of a Fourth Amendment seizure.'" <u>Id.</u> at 224 (quoting <u>Harrington v. City of Nashua</u>, 610 F.3d 24, 30 (1st Cir. 2010)).

Plaintiff's malicious prosecution claim against the MPD Defendants must fail because the WCDA and the Massachusetts State Police instituted or commenced the criminal proceedings against Plaintiff, not the MPD Defendants. As discussed already at length, the WCDA and CPAC

directed and controlled the murder investigation and Plaintiff's subsequent prosecution. See Section I.B. "Control of the Murder Investigation," supra.  As no evidence has been presented to demonstrate that MPD officers, rather than the WCDA and CPAC investigators, were responsible for the Plaintiff's prosecution, Plaintiff cannot meet the first element of the claim and summary judgment on Count VI is **GRANTED**.

### 6.  Count VIII

Count VIII asserts a supervisory liability claim against the MPD Defendants. Supervisory liability under Section 1983 has two elements. First, "the plaintiff must show that one of the supervisor's subordinates abridged the plaintiff's constitutional rights." Guadalupe-Báez v. Pesquera, 819 F.3d 509, 514 (1st Cir. 2016) (citing Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)). Second, "the plaintiff must show that the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference." Pesquera, 819 F.3d at 515 (alterations in original) (citations omitted). The First Circuit is clear that "a supervisor may not be held liable under section 1983 on the tort theory of respondeat superior[.]" Id. Further, a supervisor's section 1983 liability cannot "rest solely on his position of authority[.]" Id.

Plaintiff's claim fails on the first element: as detailed above, the Court finds that no subordinate MPD officer violated Plaintiff's constitutional rights. Because Plaintiff cannot show that behavior of a subordinate resulted in a constitutional violation, there can be no supervisory liability. See Pineda, 533 F.3d at 54. Summary judgment is **GRANTED** as to Count VIII.

### 7.  Count VII

Count VII asserts a <u>Monell</u> liability claim against the Town of Milford and the MPD Defendants for failing to properly discipline, supervise, and train MPD officers. While municipalities, including their police departments, can be sued under Section 1983, they cannot be held liable on a respondeat superior theory for the actions of their employees. <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 691 (1978). Instead, a plaintiff must show that the municipality had a policy or custom that was the moving force behind the constitutional violation. <u>Id.</u> <u>Monell</u> liability is contingent on an underlying constitutional violation, and "if there is no underlying constitutional violation, there can be no municipal liability." <u>Johnson v. City of Biddeford</u>, 665 F. Supp. 3d 82, 122 (D. Me. 2023); <u>see</u> <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) (per curiam) ("[N]either [Monell] nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm."); <u>Evans v. Avery</u>, 100 F.3d 1033, 1040 (1st Cir. 1996) ("[W]e follow Heller's clear rule and hold that the City cannot be held liable absent a constitutional violation by its officers.").

As the Court has found the MPD Defendants have not committed an underlying constitutional violation, the City cannot be held liable under <u>Monell</u>, and summary judgment is **<u>GRANTED</u>** as to Count VII.

### 8.  <u>Count IX</u>

Count IX asserts a conspiracy claim against the MPD Defendants. There are several causes of action for conspiracy under state and federal law. Plaintiff has pleaded this claim as a civil rights conspiracy under Section 1983. "A civil rights conspiracy as commonly defined is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a

wrong against or injury upon another, and an overt act that results in damages.'" Est. of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008) (citation omitted). While agreement may be demonstrated with circumstantial evidence, Plaintiff has failed to allege any facts regarding an agreement between the defendants that rises above "speculation and conjecture." See Martinez v. City of Worcester, 502 F. Supp. 3d 606, 619 (D. Mass. 2020) (citation omitted). Indeed, even considering Plaintiff's primary theory regarding Defendants' alleged fabrication of Michael Cifizzari's confession, Plaintiff himself asserts that it is "[n]ot disputed" that "Defendants DiGirolamo and Chianese did not discuss their plans to interrogate Michael Cifizzari before they did so on February 26, 1981." [ECF No. 122 ¶ 106].

As Plaintiff has presented no evidence of an agreement among Defendants from which a reasonable jury could have inferred a conspiracy among them to inflict harm upon Plaintiff, summary judgment is **GRANTED** as to Count IX.

### C.  Count X: Massachusetts Civil Rights Act

Count X asserts a violation of the Massachusetts Civil Rights Act ("MCRA") against the MPD Defendants. To bring a claim under the MCRA, a plaintiff "must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion." Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 309 (D. Mass. 2017) (citation omitted). "[T]he MCRA is narrower than § 1983 in that it limits its remedy to conduct that interferes with a secured right 'by threats, intimidation or coercion[,]' . . . even a direct deprivation of a plaintiff's rights 'would not be actionable under the act unless it were accomplished by means of one of these three constraining elements.'" Id. at 309–10. "Other than the additional requirement that an interference or attempted

interreference was by threats, intimidation, or coercion, 'the [MCRA] is generally interpreted coextensively with' Section 1983." Renzullo v. Town of Wakefield, No. 20-cv-11961-DJC, 2023 U.S. Dist. LEXIS 32755, at *31 (D. Mass. Feb. 28, 2023) (alterations in original) (quoting Diaz v. Devlin, 229 F. Supp. 3d 101, 112 (D. Mass. 2017)).

Plaintiff fails to allege that the MPD Defendants violated his rights by subjecting him to "threats, intimidation, or coercion," and he likewise fails to establish an MCRA violation based on the MPD Defendants' use of "threats, intimidation, or coercion" against a third party. Plaintiff alleges that the MPD Defendants violated the MCRA by "conducting a sham investigation of the actual perpetrator, Giroux, coaching, coercing or otherwise fabricating evidence against the Plaintiff, or causing witnesses to give statements and/or testimony that would result in his misidentification," or by offering false statements and testimony. [Am. Compl. ¶ 105]. None of these actions constitute "threats, intimidation, or coercion" against Plaintiff directly. In some instances, a defendant's coercion of a third party, such as witness, to induce them to fabricate a false identification can suffice to demonstrate the requirement of coercion. See Echavarria v. Roach, No. 16-cv-11118-ADB, 2017 U.S. Dist. LEXIS 144589, at *42 (D. Mass. Sep. 7, 2017). However, this theory still requires causation that the defendant's actions harmed the Plaintiff. See Redgrave v. Bos. Symphony Orchestra, Inc., 502 N.E.2d 1375, 1378–80 (Mass. 1987) (discussing the circumstances in which a defendant's actions against a third party suffice for liability under the MCRA). Here, the third party is Michael Cifizzari, and Plaintiff alleges the MPD Defendants coerced Michael into falsely identifying Plaintiff. As stated repeatedly, Plaintiff was not identified Michael's interrogation at the MPD station. Plaintiff was only implicated in the murder during Michael's CPAC interrogation, which Sgt. Doheny conducted and where no MPD officer asked any questions. [ECF No. 122 ¶¶ 150–51]. Additionally, the Court has found that Plaintiff lacks

standing to contest the prior state court rulings that Michael's confession to the MPD was not the product of coercion. As Plaintiff has not demonstrated "threats, intimidation or coercion" by the MPD Defendants, and because he cannot show causation for his claim, summary judgment is **GRANTED** as to Count X.

### D.  Qualified Immunity

As the Court is granting summary judgment on all counts, it declines to reach the merits of whether any MPD Defendant would be shielded by qualified immunity.

### IV.    CONCLUSION

The Court acknowledges the substantial harm that Gary Cifizzari endured as a result of his wrongful conviction; however, it cannot grant relief that the law does not support. To do so would only compound the injustice surrounding this case. For the reasons stated above, Defendants' Motion for Summary Judgment, ECF No. 117, is **GRANTED** on all counts and the case is **DISMISSED.**


**SO ORDERED.**

Dated: July 9, 2025

   /s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| **GARY CIFIZZARI,** ) | |
| ) | |
| **Plaintiff,** ) | **CIVIL ACTION** |
| ) | **NO. 4:22-cv-40139-MRG** |
| **v.** ) | |
| ) | |
| **TOWN OF MILFORD, FORMER** ) | |
| **MILFORD POLICE OFFICERS** ) | |
| **VINCENT LIBERTO, JOHN** ) | |
| **CHIANESE, FORMER MILFORD** ) | |
| **POLICE SGT.S ANTHONY** ) | |
| **DIGIROLAMO AND DONALD** ) | |
| **SMALL, et al.** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**JUDGMENT**

**Guzman D.J.**

In accordance with the Court's Memorandum and Order dated July 9, 2025, granting

Defendant's Motion for Summary Judgment in the above-entitled action, it is hereby

**ORDERED:**

Judgment for the ___Defendants.___

By the Court,

July 9, 2025                                    /s/ Sandra Burgos
Date                                              Deputy Clerk

Addendum - 38